UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

**DAVID L. LANDAY**

Civil Action No. 04 11955WGY

**Plaintiff**

Vs.

**GMAC COMMERCIAL CREDIT LLC**
**GMAC COMMERCIAL FINANCE LLC**

**Defendants**

---

## FIRST AMENDED COMPLAINT

Plaintiff David L. Landay ("Landay"), by his attorneys, Lynch, Brewer, Hoffman & Fink, LLP alleges as his Complaint the following:

### Parties

1. Plaintiff Landay is an individual who currently is a resident of the State of Florida and who was at all relevant times a resident of the Commonwealth of Massachusetts and CEO, president, director and major shareholder of Seneca Sports, Inc. ("Seneca") and Brookfield International, Inc ("Brookfield", together with Seneca, the "Borrowers"). At all relevant times Seneca, a Delaware corporation, and Brookfield, a Massachusetts corporation, maintained their principal place of business at 75 Fortune Boulevard, Milford, MA 01757.

2. On information and belief, Defendant GMAC Commercial Credit LLC ("GMAC") is a New York limited liability company with its principal place of business at 1290 Avenue of the Americas, New York, New York 10104.

3. On information and belief, on or about January 30, 2003, GMAC Commercial Finance LLC merged into GMAC Commercial Finance LLC, a Delaware corporation with a principal place of business at 1290 Avenue of the Americas, New York, New York 10104.

4. On information and belief, GMAC Commercial Finance LLC is a successor in interest of GMAC and is responsible for all liabilities incurred by GMAC prior to the merger.

## Jurisdiction and Venue

5. This Court has jurisdiction pursuant to 28 U.S.C. Section 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000 exclusive of interests and costs.

6. Venue is proper pursuant to 28 U.S.C. Section 1391 (a) (2) in that a substantial part of the relevant events occurred within the District of Massachusetts. Venue is also proper pursuant to 18 U.S.C. Section 1391 (a) (1) in that, at all relevant times GMAC did business in and, upon information and belief, continues to do business as GMAC Commercial Finance LLC in the District of Massachusetts and thereby is a resident of same.

## Facts

7. As of January 1, 2000, Seneca was a distributor of adult and children's sporting goods products. It held patents, trademarks and/or licenses for many of the products manufactured for it. Its customers included large national retail chains and other stores.

8. In early 2000, Landay learned of an opportunity for Seneca to acquire Brookfield, a company that sold juvenile sports equipment and sports toys, including products featuring licensed characters such as "Barbie.".

9. Seneca required financing to make the Brookfield acquisition. Landay sought financing on Seneca's behalf from GMAC. Much of his dealing was with Paul Fitzgerald ("Fitzgerald") of GMAC's Boston office, then located at 151 Merrimac Street, Boston, MA 02114.

10. Landay was informed by Fitzgerald that GMAC would require a personal guaranty and/or collateral from Landay to secure a loan to Seneca and/or Brookfield. In or about the period July-September 2000, Fitzgerald represented to Landay that GMAC would look first to the assets of Seneca and Brookfield to satisfy any debt before it would seek to satisfy debt from Landay or any assets that Landay might provide personally as collateral.

11. The financing ultimately obtained from GMAC was in the form of a commercial factoring agreement that provided the funds needed for the acquisition and for the operating expenses of the two corporations.

12. On or about September 19, 2000, Seneca and Brookfield entered into a factoring agreement with GMAC (the "Factoring Agreement") which provided for a line of credit of up to $10,000,000 secured by the accounts receivable, inventory and all other assets of Seneca and Brookfield (the "Collateral") including machinery and equipment, bank accounts, patents, trademarks and copyrights, license agreements, furniture and fixtures and other tangible and intangible assets.

3

13. On or about September 19, 2000, Landay executed a personal guaranty (the "Landay Guaranty") of the obligations of Seneca and Brookfield under the Factoring Agreement with a $3,500,000 limit on his liability.

14. In addition, Landay provided personally a standby letter of credit (the "Standby Letter of Credit") in the amount of $4,100,000 drawn in favor of GMAC as collateral for the obligations of Seneca and Brookfield.

15. Landay, a secured creditor of Seneca, also subordinated to GMAC certain indebtedness of Seneca to Landay in the amount of $3,450,000 (the "Subordinated Debt").

16. Pursuant to the terms of the Factoring Agreement, (a) GMAC was to make advances to Seneca and Brookfield equal to 90% of their accounts receivable and specified percentages against inventory and other assets and (b) GMAC received directly from Seneca and Brookfield customers all payments made on accounts receivable. Since all Seneca and Brookfield receivables were directly paid to GMAC, unless GMAC made the agreed advances, the Borrowers would have no operating cash.

17. To permit the Borrowers to operate during the May through October period of the year when sales in their industry were customarily low, the Factoring Agreement also provided that during the months of May through October of 2001, GMAC would make an uncollateralized seasonal overadvance of up to $500,000 in excess of the advances based on the receivables formula (the "Seasonal Overadvance").

18. In early 2001, GMAC reaffirmed its obligation to provide the Seasonal Overadvance and stated its intention to make those funds available. In or around

February 2001 Fitzgerald asked Landay to provide personally to GMAC another $250,000 Standby Letter of Credit. He represented to Landay that, if Landay personally provided an additional $250,000 Standby Letter of Credit, GMAC would make $250,000 available to Seneca and Brookfield prior to May and then, in May, it would provide to Seneca and Brookfield the full $500,000 Seasonal Overadvance as scheduled.

19. In reliance on these representations, Landay provided to GMAC another $250,000 Standby Letter of Credit with an expiration date of May 2001.

20. Contrary to its representations and its obligation under the Factoring Agreement, GMAC did not make the May Seasonal Overadvance in the amounts agreed.

21. Furthermore, GMAC failed to fund other advances it had advised Landay, Seneca and Brookfield it would make. Checks that Seneca and Brookfield had issued in reliance on GMAC's representations were not funded by GMAC, thereby impairing the Borrowers' credit and reputation with vendors and suppliers.

22. As a result of GMAC's actions, Seneca and Brookfield lost sales. Without funds from GMAC they were unable to purchase product to fill orders and, thus, to generate the volume of sales necessary to comply with the terms of the Factoring Agreement. By refusing to fund, GMAC brought the Borrowers' business to a virtual standstill.

23. In or about May and June 2001, having failed to make the Seasonal Overadvance, GMAC by Jane Frangos ("Frangos") of its New York office and Fitzgerald of its Boston office represented to Landay that GMAC would make the Seasonal

5

Overadvance if Landay extended the expiration date on the $250,000 Standby Letter of Credit which he had provided in response to GMAC's February representations.

24. In fact, upon information and belief, GMAC had no intention of making the Seasonal Overadvance and had already determined that it would position itself to extricate itself from the loan by causing Landay to provide as much money as possible as quickly as possible.

25. Landay extended the $250,000 Standby Letter of Credit. However, GMAC continued to withhold the Seasonal Overadvance and continued to fail to lend sufficient sums to Seneca and Brookfield to buy product to make required sales.

26. When pressed by Landay to release money to the Borrowers, Frangos claimed that she was waiting for her legal department to perfect some overlooked paper work. In desperation, Landay asked Fitzgerald how to get Frangos to release the promised money. In response, Fitzgerald suggested to Landay that the borrowers hire a financial consultant, RAS Management Advisors, Inc. ("RAS").

27. Based on Fitzgerald's recommendation, on or about July 3, 2001, Landay consulted with Dick Sebastiao of RAS and provided him with proprietary details of the business. Unknown to Landay was the fact that GMAC had already engaged RAS as GMAC's consultant and RAS had already undertaken to provide to GMAC a liquidation analysis of the Borrowers' business.

28. After Landay's initial consultation with RAS, Seneca and Brookfield decided to hire a different consultant. Fitzgerald insisted that, even if Seneca and Brookfield proceeded with the consultant of its choice, they must pay RAS as an additional consultant. Consequently, throughout the next several months, RAS had free

access to the premises, business, books and records of Seneca and Brookfield under the guise of independent consultant.

29. In or about June-July 2001 GMAC by Frangos and Ftizgerald represented to Landay that GMAC would give him time to revive or liquidate Seneca and Brookfield in an orderly manner.

30. In or about July 2001, GMAC by Frangos and Fitzgerald, among others, represented to Landay that, if he would again extend the expiration date of his $250,000 Standby Letter of Credit, increase his guaranty by $1,000,000 and deposit $1,000,000 cash collateral in GMAC's favor, GMAC would provide additional funding to Seneca and Brookfield that would allow an orderly winding down. Until then, GMAC refused to make further advances.

31. In July and early August 2001 Frangos represented to Landay that, if he personally paid certain expenses of Seneca and Brookfield, he would be paid back from funds to be disbursed by GMAC when funding resumed. In reliance on this representation, Landay paid out approximately another $52,000 on behalf of the Borrowers.

32. In reliance on GMAC's representations (para. 28 above), Seneca and Brookfield entered a Forbearance Agreement with GMAC dated August 9, 2001 modifying the Factoring Agreement, and Landay signed an Amendment of Guaranty dated August 9, 2001 whereby Landay agreed to increase the amount of the limit on his guaranty from $3,500,000 to $4,500,000.

33. Landay also provided additional collateral in the form of a $1,000,000.00 cash deposit in a Bankers Trust account in GMAC's name (the "Cash Deposit") and

agreed to extend the date on the $250,000 Standby Letter of Credit that was due to expire.

34. Landay increased his personal exposure in order to cause GMAC to advance operating expenses to Seneca and Brookfield to allow them to survive long enough to pay the GMAC loan without Landay's personal assets being called upon. The consideration for Landay's Cash Deposit, the $250,000 Standby Letter of Credit extension, and the increase of the guaranty limit was GMAC's execution of the Forbearance Agreement and its assurances that it would advance money to Seneca and Brookfield in accordance with the schedule in the Forbearance Agreement and finance inventory purchases orders in an amount greater than the $1,000,000 Cash Deposit.

35. The purpose of the Forbearance Agreement was to permit Seneca and Brookfield to continue to operate their business into the Christmas holiday season when their sales and profitability were at their peak. It contemplated that GMAC would provide the financing necessary for Seneca and Brookfield to conduct their business, fill orders and pay down their debt to GMAC. According to the financial plan incorporated into the Forbearance Agreement, the Borrowers could remain in business through January 30, 2002, allowing them to sell off inventory at reasonable prices, collect the accounts receivable and create a surplus of funds in excess of any debt to GMAC.

36. The financial plan annexed to and incorporated in the Forbearance Agreement, set forth schedules for loan draws, loan payments, and "net availability," i.e., a formula for accounts receivable which was dependent upon sales made. The failure of Seneca and Brookfield to meet these schedules, including their "net

availability" projections on a weekly basis would constitute a default under the Forbearance Agreement.

37. These schedules anticipated a late-July execution of the Forbearance Agreement with Seneca and Brookfield able to draw down on their line of credit almost immediately. The first draw of $376,000 was to be in the week ending August 10.

38. GMAC delayed in executing the Forbearance Agreement into August. Nevertheless, it refused to change the schedules in the financial plan to reflect the delay. GMAC executed the Forbearance Agreement on August 10, 2001, the day after the date it bears.

39. GMAC did not provide to Seneca and Brookfield the funds that were scheduled to be disbursed in the week ending August 10. No funds were advanced by GMAC until late in the week ending August 17, 2001.

40. The financial plan contained in the Forbearance Agreement contemplated that Seneca and Brookfield would draw down on their line of credit according to the schedule attached. Funds disbursed by GMAC would enable Seneca and Brookfield to purchase goods to make the sales that were called for by the "net availability" requirements.

41. Despite its delay in executing and providing funds in accordance with the schedule, GMAC refused to make corresponding changes in the scheduled obligations of Seneca and Brookfield. Without funds, Seneca and Brookfield could not buy goods to make the sales to meet their weekly "net availability" projections. As a result of GMAC's actions and refusals to act, Seneca and Brookfield were placed in default under the Forbearance Agreement almost from the time it was executed by GMAC.

42. Although GMAC had promised Landay he would recoup expenses he incurred on behalf of the Borrowers (paragraph 29, supra) GMAC refused to release funds with which Landay could be repaid.

43. Although the schedule called for GMAC to begin lending in the week ending August 10 and to lend up to $1,682,954, GMAC neither loaned on schedule nor did it lend the amount promised. GMAC refused to release funds in excess of Landay's $1,000,000 Cash Deposit.

44. As a result of GMAC's actions and refusals to act, Seneca and Brookfield were unable to fill orders that had been made and lost those orders. They were put in a position where they could buy no goods and, therefore, could make no sales.

45. On September 25, 2001, GMAC declared the loans in default and demanded payment.

46. Because of GMAC's refusal to release funds, prior to September 25 Landay had been seeking another lender for Seneca and Brookfield who would pay of the GMAC loan.

47. In October 2001 Landay received a proposal from Platinum Credit Corp. to provide financing to Seneca and Brookfield. The proposal provided for GMAC to be paid 90% of the outstanding debt within 60 days, the remaining 10% over a two year period with interest, payment of that 10% to GMAC to be guaranteed and secured by Landay. Landay offered to pay the 10% immediately if the two year payout was not satisfactory to GMAC. Either proposal would have made GMAC whole while allowing Landay to recover the $5,350,000 collateral he had provided to GMAC.

48. Although GMAC stated it would consider these proposals, on or about October 15, 2001, the day it was allegedly considering these proposals, it collected the $4.1 million Standby Letter of Credit that Landay had provided in September 2000.

49. Thereafter, GMAC collected the $1 million Cash Deposit that Landay had provided in conjunction with the Forbearance Agreement, plus any interest thereon and the $250,000 Standby Letter of Credit that Landay had extended in conjunction with the Forbearance Agreement.

50. On October 22, 2001, GMAC, by its agent RAS, excluded Landay from the premises of Seneca/Brookfield and took possession of all of the assets and business records of Seneca and Brookfield.

51. Thereafter, GMAC and its agent RAS proceeded to dispose of the assets of Seneca and Brookfield in an irresponsible fashion, not designed in any way to maximize collection but, rather in derogation of Landay's rights as a guarantor, a creditor and a shareholder of Seneca and Brookfield.

52. GMAC refused any information or help from Landay. It refused to provide Landay with any information. It confiscated the books and records of the businesses and either continues to hold them or has destroyed and/or abandoned them.

53. GMAC's disposition of the assets of Seneca and Brookfield amounted to waste. GMAC sold the Borrowers goods at distress prices and/or abandoned them in warehouses. GMAC abandoned the intellectual property belonging to Seneca and Brookfield. It failed to pay patent and license fees necessary to maintain their value, permitted the rights from such patents and licenses to lapse and ignored inquiries by potential buyers of such intellectual property. Upon information and belief, GMAC failed

11

to collect accounts receivable and/or allowed Seneca/Brookfield customers to steeply discount and/or refuse to pay based on unsubstantiated excuses that Landay or any of his employees could have dispelled. Upon information and belief, whatever GMAC did not convert quickly into cash appears to have been lost or destroyed, and what was converted into cash was undervalued.

54. On or about October 24, 2001, GMAC informed Landay in writing that he would be provided with an accounting following GMAC's liquidation of the assets of Seneca and Brookfield. Landay has requested such an accounting from GMAC several times. GMAC refuses to provide an accounting.

55. Instead, in or about June-July 2002, without providing Landay with an accounting, by way of a "Summons With Notice" filed in a New York court, GMAC demanded that Landay, as guarantor, pay an alleged deficiency in excess of $1 million.

56. According to Landay's calculations, the day he was excluded from the premises, the assets of Seneca and Brookfield were more than sufficient to satisfy the net balance allegedly due GMAC and, in fact, there were sufficient assets to entitle Landay to a refund of some of the $5,350,000 collateral GMAC collected from him.

57. Landay engaged attorneys in New York who, in the interest of avoiding the costs of litigation, asked GMAC to provide Landay with an accounting that supported it's claim that money was owed under the guaranty. GMAC refused to provide an accounting, stating, in effect, that Landay should settle in ignorance and that if an accounting was a requisite, he could obtain it in the litigation.

58. GMAC has since proceeded with its litigation in New York, seeking in excess of $1,000,000 from Landay above and beyond the $5,350,000 it took from him in

2001. GMAC remains intransigent and still has not provided an accounting. The litigation has cost Landay in excess of $200,000 to date.

59. Although GMAC has yet to produce an accounting, it has produced some documents in the New York action that reveal that the interest, fees and charges made to the loan by GMAC were at usurious levels. Documents produced by GMAC show that interest, fees and charges in November 2001 appear to total 7% of the loan balance, or 84% annualized, and the December 2001 interest, fees and charges appear to total 18% of the loan balance, or 216% annually.

Count I
(Misrepresentation)

60. Landay repeats and restates the allegations set out in Paragraphs 1 through 59 of the Complaint as if fully set forth herein.

61. GMAC engaged in a series of misrepresentations designed to cause Landay to over-collateralize the debt of Seneca and Brookfield by placing his personal assets at the disposition of GMAC, assets that GMAC would find easier to confiscate than engaging in a proper collection and liquidation of the assets of Seneca and Brookfield.

62. The representations made by GMAC - in the period July-September 2000 as described in Paragraph 8, in or around February 2001 as described in Paragraph 16, in or about May and June 2001 as described in Paragraph 21, in or about June-July 2001 as described in Paragraph 27, in or about July 2001 as described in Paragraph 28, and in or about July and early August, 2001 as described in Paragraph 29 - were false when made.

63. By these false representations GMAC was looking to minimize its own exposure. Contrary to Fitzpatrick's representations in July-September 2000, GMAC had no intention of looking first to the assets of Seneca and Brookfield; it intended to make a quick collection from the liquid assets provided by Landay. Each time GMAC represented to Landay that it would make the Seasonal Overadvance, it had a preconceived intent not to do so. When GMAC represented that it would forbear and provide additional financing if Landay increased his guaranty and collateral, it had a preconceived intent not to do so. When GMAC told Landay it would repay expenses advanced by him, it had a preconceived intent not to do so. All such misrepresentations were made to induce Landay to maximize his personal exposure to GMAC and to make his personal assets available for immediate collection by GMAC.

64. In reliance on GMAC's representations, Landay provided to GMAC in September 2000 his Guaranty for $3,500,000 and a $4,100,000 Standby Letter of Credit and subordinated to GMAC a $3,450,000 debt owed to him by Seneca; provided to GMAC an additional $250,000 Standby Letter of Credit in February 2001 (to expire in May 2001 when the Seasonal Overadvance was to issue); extended the expiration date of that $250,000 Letter of Credit at least three times; and in July 2001, executed an Amended Guaranty whereby he increased his guaranty by $1,000,000, and deposited in GMAC's favor cash collateral in the amount of $1,000,000 and paid certain expenses of Seneca and Brookfield.

65. Landay was thereby injured in an amount in excess of $8,800,000.

## Count II

(Usury: M.G.L. c.. 271, Section 49)

66. Landay repeats and restates the allegations set out in Paragraphs 1 through 59 of the Complaint as if set out fully herein.

67. GMAC's transactions with Seneca, Brookfield and Landay were in violation of the Massachusetts usury statute (M.G.L. 271, Section 49) which provides that where interest and expenses charged for a loan exceed twenty percent it is usurious. Interest and expenses include "interest against or paid or to by the borrower," commissions, services, extension of loan, forbearance to enforce payment and all other sums charged.

68. On September 19, 2000, GMAC funded its loan to Seneca and Brookfield.

69. On September 22, 2000 GMAC filed a criminal usury notification pursuant to Chapter 271, Section 490 of the Massachusetts General Laws with the Office of the Attorney General concerning its loan to Seneca. No mention is made in that filing of the loan to Brookfield or of the Landay guaranty.

70. GMAC's filing was late and, therefore of no effect. Moreover it did not purport to relate to Brookfield or Landay.

71. Accordingly, the Court should void the loan and/or provide Landay with other relief consistent with equitable principles, allowing him to recover the damages he suffered on account of the usury, including but not limited to the $5,350,000 he has already paid to GMAC.

## Count III

(Breach of Contract, Factoring Agreement)

72. Landay repeats and restates the allegations set out in Paragraphs 1 through 59 of the Complaint as if set out fully herein.

73. Landay provided to GMAC a $4.1 million Standby Letter of Credit, a $250,000 Standby Letter of Credit, a $3,500,000 guaranty and subordinated to GMAC a $3,450,000 debt owed to him in consideration of GMAC lending funds to Seneca and Brookfield in accordance with the terms of the Factoring Agreement, including the Seasonal Overadvance.

74. GMAC failed to lend funds to Seneca and Brookfield in accordance with the terms of the Factoring Agreement, including the Seasonal Overadvance.

75. As a consequence, the business of Seneca and Brookfield were destroyed and GMAC collected $5,350,000 from Landay and is seeking to collect from him over $1,000,000 more.

76. As a result of the foregoing Landay was damaged in the amount of at least $10,000,000 consisting of, inter alia, the loss of his investment in Seneca and Brookfield, the loss of the debt owed to him by Seneca, and the sums collected from him by GMAC.

## Count IV

(Breach of Contract, Forbearance Agreement)

77. Landay repeats and restates the allegations set out in Paragraphs 1 through 59 of the Complaint as if set out fully herein.

78. Landay provided to GMAC an Amended Guaranty whereby he increased his guaranty by $1 million, he renewed a $250,000 Standby Letter of Credit and he made a $1 million Cash Deposit in favor of GMAC in consideration of GMAC lending funds to Seneca and Brookfield in accordance with terms of the Forbearance Agreement.

79. GMAC failed to lend funds to Seneca and Brookfield in accordance with terms of the Forbearance Agreement.

80. As a consequence, the business of Seneca and Brookfield were destroyed and GMAC collected $5,350,000 from Landay.

81. As a result of the foregoing Landay was damaged in the amount of at least $10,000,000 consisting of, inter alia, the loss of his investment in Seneca and Brookfield, the loss of the debt owed to him by Seneca, and the sums collected from him by GMAC.

## Count V

(Breach of Covenant of Fair Dealing)

82. Landay repeats and restates the allegations set out in Paragraphs 1 through 59 of the Complaint as if set out fully herein.

83. By the actions alleged above, GMAC breached the covenant of good faith and fair dealing implicit in the Factoring Agreement and the related agreements with Landay and in the Forbearance Agreement and the related agreements with Landay.

84. As a result of the foregoing Landay was damaged in the amount of at least $10,000,000 consisting of, inter alia, the loss of his investment in Seneca and

Brookfield, the loss of the debt owed to him by Seneca, and the sums collected from him by GMAC.

## Count VI

(Violation of Landay's Rights as Junior Creditor)

85. Landay repeats and restates the allegations set out in Paragraphs 1 through 84 of the Complaint as if set out fully herein.

86. GMAC failed to exercise the ordinary care of a prudent creditor seeking to maximize the value of assets in order to pay, to the greatest extent possible, the indebtedness owed to it.

87. Landay has received no payments of the indebtedness of Seneca to him which was subordinated to GMAC under the Subordination Agreement.

88. The acts of waste set out above were performed without the consent or licenses of Landay, Seneca or Brookfield.

89. GMAC breached its duty to Landay as a creditor of Seneca under the Subordination Agreement and violated the implied covenants of fair dealing and good faith of the Subordination Agreement.

90. As a result of the foregoing Landay, as guarantor and creditor, has been damaged in an amount to be determined at trial, but no less than $3,450,000.

## Count VII

(M.G.L. c.93A)

91. Landay repeats and restates the allegations set out in Paragraphs 1 through 90 of the Complaint as if set out fully herein.

92. GMAC, Seneca, Brookfield and Landay were at all relevant times engaged in trade or commerce within the Commonwealth within the meaning of M.G.L. c.93A.

93. The acts and practices described above occurred primarily and substantially in the Commonwealth of Massachusetts.

94. The acts and practices described above constitute unfair and deceptive acts or practices, which GMAC knowingly or willfully committed in violation of M.G.L.c.93A.

95. As a result of the unfair and deceptive acts or practices committed by GMAC, Landay has incurred damage at least in the amount of $10,000,000, and he continues to incur substantial monetary damages.

**WHEREFORE**, Plaintiff David L. Landay demands that a judgment enter in his favor and against defendants GMAC Commercial Credit LLC and GMAC Commercial Finance LLC as follows:

(a) On Count I, for damages in excess of $8,800,000 as determined at trial, together with interest and costs of this action;

(b) On Count II, voiding the loan and/or provide Landay with other relief consistent with equitable principles, allowing him to recover the damages he suffered on account of the usury, including but not limited to $5,350,000, together with interest and costs of this action and reasonable attorneys' fees;

(c) On Count III, for damages in the amount of at least $10,000,000, together with interest and costs of this action;

(d) On Count IV, for damages in the amount of at least $10,000,000, together with interest and costs of this action;

(e) On Count V, for damages in the amount of at least $10,000,000, together with interest and costs of this action;

(f) On Count VI, for damages as determined at trial, but no less than $3,450,000, together with interest and costs of this action;

(g) On Count VII, for damages in at least the amount of $10,000,000, doubled or trebled, together with interest and costs of this action and reasonable attorneys' fees; and

(h) For such other relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS OF ITS COMPLAINT SO TRIABLE.**

DAVID L. LANDAY,

By his attorneys,

_____
Alan R. Hoffman, BBO #236860
LYNCH, BREWER, HOFFMAN & FINK, LLP
101 Federal Street, 22nd Floor
Boston, MA  02110-1800
(617) 951-0800

Dated: _____

180892_1