SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------x

GMAC COMMERCIAL CREDIT LLC,

                Plaintiff,

    -against-

DAVID L. LANDAY,

               Defendant.

------------------------------------------------------------------x

**VERIFIED COMPLAINT**

Index No. 602338/02
Date purchased: 6/26/02

- NEW YORK
COUNTY CLERK'S OFFICE

OCT 29 2002

NOT COMPARED
WITH COPY FILED

        Plaintiff GMAC Commercial Credit LLC ("GMACCC"), by and through its attorney,

Cohen Tauber Spievack & Wagner LLP, alleges as its Complaint against defendant David L.

Landay ("Landay") the following:

## THE PARTIES

    1.      GMACCC is a New York limited liability company with its principal place of

business at 1290 Avenue of the Americas, New York, New York 10104.

    2.      On information and belief, Landay is a resident of the State of Massachusetts and

was at all relevant times the president of Seneca Sports, Inc. ("Seneca") and Brookfield

International, Inc. ("Brookfield," together with Seneca, the "Borrowers"). On information and

belief, at all relevant times the Borrowers were corporations organized under the laws of the

State of Massachusetts and maintained an office at 75 Fortune Boulevard, Milford,

Massachusetts 01757.

## JURISDICTION AND VENUE

    3.      This Court has jurisdiction over this action pursuant to CPLR 301. Venue is

proper pursuant to CPLR 501 and CPLR 503.

4.     In addition, as explained in further detail below, Landay has contractually submitted himself to the personal jurisdiction of the courts located in the State of New York.

### BACKGROUND FACTS

5.     On or about September 19, 2000, GMACC and the Borrowers entered into a commercial factoring agreement (the "Factoring Agreement").  A copy of the Factoring Agreement is attached as Exhibit A.

6.     Pursuant to the Factoring Agreement, GMACCC agreed to purchase from the Borrowers all of its receivables existing as of and created after September 19, 2000, and the Borrowers granted to GMACCC a continuing security interest in all of the Borrowers' present and future receivables and all "Collateral" as security for the Borrowers' "Obligations," as such terms are defined in the Factoring Agreement.

7.     On or about September 19, 2000, Landay executed an unconditional guaranty (the "Landay Guaranty"), personally guarantying any indebtedness that the Borrowers owed to GMACCC.  A copy of the Landay Guaranty is attached as Exhibit B.

8.     Under the Landay Guaranty, Landay expressly waived "[d]emand of payment, presentment, protest and notice of dishonor or non-payment."

9.     The Landay Guaranty also provided that "any statement of account which is binding on [the Borrowers] under the Agreement shall be binding on [Landay] for all purposes under this guaranty."

10.     The Landay Guaranty further provided that "[i]f this guaranty and/or any Obligation is placed with an attorney for collection, the undersigned further agrees to pay an attorney's fee of fifteen percent of any principal and interest due and demanded, which is hereby agreed to be just and reasonable and which shall be recoverable with the amount due under this guaranty."

11.    The Landay Guaranty's choice of law and forum selection clause provided that the Landay Guaranty was "to be governed by and construed in accordance with the laws of the State of New York" and that "all actions and proceedings arising out of or in connection with [the] guaranty . . . may be brought in the federal or state courts of the State of New York . . . or at [GMACCC's] option, in any other courts as [GMACCC] may select."

12.    Throughout the course of the parties' dealings under the Factoring Agreement, GMACCC issued and mailed monthly statements of account to the Borrowers in accordance with the terms of Section 6 of the Factoring Agreement, which provided that the statements of account "will be fully binding on [the Borrowers] and will constitute an account stated, unless, within thirty (30) days after such statement is mailed to [the Borrowers] or within thirty (30) days after the mailing of any adjustment thereof [GMACCC] may make, [the Borrowers give GMACCC] specific written notice of exceptions."

13.    On or about August 9, 2001, GMACCC and the Borrowers executed a Forbearance Agreement, whereby the Borrowers acknowledged, *inter alia*, the occurrence of certain "Events of Default" and outstanding obligations of "not less than $6,719,177.62" under the Factoring Agreement. Pursuant to the Forbearance Agreement, GMACCC agreed "for a limited period of time [to] forbear from exercising its rights and remedies under the [Factoring] Agreement," but did not waive the existing defaults or its rights and remedies under the Factoring Agreement. A copy of the Forbearance Agreement is attached as Exhibit C.

14.    In consideration of the forbearance, the parties agreed that Landay would execute (i) an Amendment and Ratification of Guaranty and (ii) a letter "regarding Cash Deposit." The Forbearance Agreement also modified the definition of "Borrowing Base" under the Factoring Agreement and provided that GMACCC would establish a specified amount of reserves.

15.     By letter agreement dated August 9, 2001 to GMACCC (the "Ratification Letter"), Landay ratified, in accordance with the terms of the Forbearance Agreement, the terms of the Landay Guaranty, as amended.  The ratification amended the maximum amount of Landay's liability from $3,500,000 provided under the Landay Guaranty, to "$4,500,000 plus interest thereon at the Default Rate provided for in the [Factoring] Agreement."  A copy of the executed Ratification Letter is attached as Exhibit D.

16.     As of September 24, 2001, the aggregate principal amount of the Borrowers' Obligations to GMACCC was $7,372,000, plus accrued and accruing interest, commissions, costs, fees and expenses (including attorneys' fees).  As of that date, both the Borrowers and Landay were in default of their Obligations, and the entire amount of the Obligations became due.

17.     By two letters dated September 25, 2001 (the "Default Letters"), GMACCC notified Borrowers and Landay of the defaults under the Factoring Agreement and Forbearance Agreement, and that all of the Obligations were then due and payable.  GMACCC accordingly made demand of Landay for immediate payment in full of all of Landay's Obligations to GMACCC under the Landay Guaranty.  Copies of the Default Letters are attached collectively as Exhibit E.

18.     Despite due demand, Landay has failed to make payment of any indebtedness owed to GMACCC.

19.     Neither the Borrowers nor Landay has provided any notice of objection to any statement of account or to the Default Letters.

20.     As a result of the liquidation of certain of the Borrowers' assets, as of October 3, 2002, the amount of the Borrowers' outstanding indebtedness has decreased to $1,205,402.13 with interest occurring at a rate of 8%, for a per diem amount of $267.69.

## FIRST CAUSE OF ACTION AGAINST LANDAY
### (Breach of Contract)

21.    GMACCC repeats the allegations set forth in paragraphs 1 through 20 hereof as if fully set forth herein.

22.    The Borrowers defaulted on their obligations under the Factoring Agreement and Forbearance Agreement and, despite due demand, have failed and refused to make payment on their outstanding indebtedness owed to GMACCC.

23.    As of October 3, 2002, the balance outstanding on the Obligations is $1,205,402.13, with interest running at 8%, or $267.69 per diem.

24.    Pursuant to the terms of the Landay Guaranty, Landay is unconditionally obligated to pay GMACCC the total indebtedness owed to it by the Borrowers.

25.    Despite GMACCC's demand for payment, Landay has refused to pay GMACCC the amounts due and owing to GMACCC under the terms of the Guaranty.

26.    By reason of the foregoing, as of October 3, 2002, GMACCC has been damaged in the amount of $1,205,402.13, with interest continuing to accrue thereon from October 4, 2002 at a rate of $267.69 per diem.  In addition, in accordance with the terms of the Forbearance Agreement and the Landay Guaranty, GMACCC is entitled to recover from Landay its attorneys' fees in this action, in an amount equal to fifteen percent of the amount of principal and interest due and owing to GMACCC.

## SECOND CAUSE OF ACTION AGAINST LANDAY
### (Account Stated)

27.    GMACCC repeats the allegations set forth in paragraphs 1 through 26 hereof as if fully set forth herein.

28.    GMACCC sent to the Borrowers statements of account on a monthly basis.

29.    The Borrowers accepted each statement of account received from GMACCC without objection, and therefore became bound thereby.

30.    The last statement of account sent by GMACCC to the Borrowers showed an account balance of $1,009,056.70 as of November 30, 2001.

31.    The Borrowers failed to pay the amount of $1,009,056.70 reflected in the last statement of account.

32.    Pursuant to the Landay Guaranty, Landay personally "guarantee(d) to [GMACCC] . . . the prompt payment at maturity, or whenever they may become due in accordance with any of their terms, of all now existing and hereafter arising liabilities, indebtedness and obligations of [the Borrowers] to [GMACCC]."

33.    Landay has failed to pay the amount of $1,009,056.70 reflected in the last statement of account.

34.    By reason of the foregoing, GMACCC is entitled to recover from Landay the sum of $1,009,056.70, plus interest at the contractual rate from December 1, 2001.

35.    By reason of the foregoing, GMACCC has been damaged in the amount of $1,009,056.70, plus interest thereon.  In addition, in, accordance with the terms of the Landay Guaranty, GMACCC is entitled to recover from Landay its attorneys' fees in this action in an amount equal to fifteen percent of the amount of principal and interest due and owing to GMACCC.

WHEREFORE, plaintiff GMAC Commercial Credit LLC demands judgment against defendant David L. Landay as follows:

A.    On the First Cause of Action, directing David L. Landay (1) to pay GMAC Commercial Credit LLC $1,205,402.13, plus interest thereon at a rate of $267.69 per diem from

October 4, 2002, and (2) to pay GMAC Commercial Credit LLC's costs and disbursements incurred in connection with this action, including reasonable attorneys' fees;

      B.      On the Second Cause of Action, directing David L. Landay (1) to pay GMAC Commercial Credit LLC $1,009,056.70, plus interest thereon from December 1, 2001, and (2) to pay GMAC Commercial Credit LLC's costs and disbursements incurred in connection with this action, including reasonable attorneys' fees; and

      C.      Such other and further relief as this Court deems just and proper.

Dated:   New York, New York
          October 25, 2002

                    COHEN TAUBER SPIEVACK & WAGNER, LLP

                    By: _____
                      Stephen Wagner
                      *Attorneys for Plaintiff*
                      *GMAC Commercial Credit LLC*
                      757 Third Avenue
                      New York, New York 10017
                      (212) 586-5800

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------X

GMAC COMMERCIAL CREDIT LLC,                    Index No. 602338/02
                                               Date Purchased: 6/26/02
                              Plaintiff,

        - against -
                                               **SUMMONS**
DAVID L. LANDAY,                               **WITH NOTICE**

                              Defendant.
-----------------------------------------------------------X

To the above named Defendant

        **YOU ARE HEREBY SUMMONED** to answer the complaint in this

action and to serve a copy of your answer, or, if the complaint is not served with

this summons, to serve a notice of appearance, on the plaintiff's attorney within

20 days after the service of this summons, exclusive of the day of service (or

within 30 days after the service is complete if this summons is not personally

delivered to you within the State of New York), and in case of your failure to

appear or answer, judgment will be taken against you by default for the relief

demanded herein.

        Plaintiff designates New York County as the place of trial.  The

basis of the venue is plaintiff's residence.  Plaintiff is a New York limited liability

company that maintains its principal office at and therefore resides at 1290

Avenue of the Americas, New York, New York 10104.

        The object of this action is to recover monies owed pursuant to a

promissory note and the guaranty thereof.

        The relief sought is money damages owed as of June 17, 2002, by the

defendant to the plaintiff, in the amount of One Million Two Hundred thirty-five

Thousand fifty-five Dollars and thirty-two Cents ($1,235,055.32), together with interest thereon at the rate of 8% per annum, late charges, reasonable attorneys' fees, and the costs and disbursements of this action.

Upon your failure to appear, judgment will be taken against you by default for the sum of ONE MILLION TWO HUNDRED THIRTY-FIVE THOUSAND FIFTY-FIVE DOLLARS AND THIRTY-TWO CENTS ($1,235,055.32), together with interest accruing at the rate of $273.42 per diem from June 18, 2002, late charges, reasonable attorneys' fees, and the costs and disbursements of this action.

Dated:    New York, New York
         June 17, 2002

LORRAINE S. FIELDS
Assistant General Counsel
Attorney for Plaintiff
**GMAC COMMERCIAL CREDIT LLC**
1290 Avenue of the Americas
New York, New York 10104
(212) 884-7281

TO:    **DAVID L. LANDAY**
       85 East India Row
       Apt. #20F
       Boston, Massachusetts 02110

**GMAC COMMERCIAL CREDIT LLC**
**FACTORING AGREEMENT**

Seneca Sports, Inc.
75 Fortune Boulevard
Milford, MA 01757

Brookfield International, Inc.
75 Fortune Boulevard
Milford, MA 01757

We are pleased that you have chosen us to act as your sole factor, effective as of _Sept. 19_, 2000 ("Effective Date"), and have agreed to do so upon the following terms:

### 1.     COVERED SALES; SECURITY INTEREST

( a )     You (any reference herein to "you" and "your" shall be deemed to refer herein to both Seneca Sports, Inc. and Brookfield International, Inc. ((a Massachusetts corporation)) individually and collectively and/or jointly and severally, as applicable), hereby assign and sell to us, as absolute owner, and we hereby purchase from you, all Receivables, now existing or created on or after the Effective Date, which arise from your sale of merchandise or rendition of services. Our purchase of and acquisition of title to each Receivable will be effective as of the date of its creation and will be entered on our books when you furnish us with a copy of the respective invoice.

( b )     You hereby grant to us a continuing security interest in all of your present and future Receivables and in all Collateral, as security for all Obligations.

### 2.     CUSTOMER CREDIT APPROVAL

You shall submit to us the principal terms of each of your customers' orders for our written credit approval. We may, in our discretion, approve in writing all or a portion of your customers' orders, either by establishing a credit line limited to a specific amount for a specific customer, or by approving all or a portion of a proposed purchase order submitted by you. No credit approval shall be effective (i) unless in writing; (ii) unless the goods are shipped or the services rendered within the time specified in our written credit approval or within forty-five (45) days after the approval is given, if no time is specified and (iii) unless the assignment of the invoice evidencing the applicable Receivable is received by us within five (5) business days from the date of such invoice. After the customer has accepted delivery of the goods or performance of the services, we shall then have the Credit Risk (but not the risk of non-payment for any other reason), to the extent of the dollar amount specified in the credit approval, on all Receivables evidenced by invoices which arise from orders approved by us in writing except for those Receivables evidenced by invoices less than One Hundred Fifty Dollars ($150.00) and invoices evidencing charges for samples supplied to your customers. We shall have neither the Credit Risk nor the risk of non-payment for any other reason on Receivables arising from orders not approved by us in writing. We may withdraw our credit approval or withdraw or adjust a credit line at any time before you deliver the goods or render the services.

### 3.     PURCHASE PRICE OF RECEIVABLES

The purchase price of Receivables is the net face amount thereof less our commission. The term "net face amount" means the gross face amount of the invoice, less returns, discounts (which shall be determined by us where optional terms are given), anticipation reductions or any other unilateral deductions taken by customers, and credits, and allowances to customers of any nature. The purchase price will be credited to your account and remitted to you on the "Settlement Date" (hereinafter described). The Settlement Date for each Receivable on which we have the Credit Risk and which is not due from a department or chain store shall be three (3) business days after the day on which the Receivable is actually collected by us or becomes one hundred twenty (120) days past due, whichever is earlier. The Settlement Date for all other Receivables shall be three (3) business days after the day on which the Receivable is actually collected by us. We may deduct, from the amount payable to you on any Settlement Date, reserves for all Obligations then chargeable to your account and Obligations which, in our sole judgment, may be chargeable, to your account (including but not limited to the sum of all ineligible receivables, disputed items, deductions, allowances, credits, consignment sales, outstanding letters of credit, steamship guaranties, airway insurance, and any other offsets asserted or granted, ineligible inventory including but not limited to packaging materials, samples, work-in-process, and such additional reserves, whether or not related to receivables or inventory deemed appropriate in our sole discretion), thereafter ("Reserves").

### 4.     ADVANCES; INTEREST; COMMISSIONS; LATE PAYMENT CHARGES

( a )     If you request, we may in our discretion make payments to you of the purchase price of Receivables in advance of the Settlement Date ("Advances") and cause documentary Letters of Credit ("Letters of Credit") to be issued for your account, subject to our right to withhold Reserves. All amounts which we pay or make available to you or for your account in excess of the purchase price of Receivables are loans and shall be chargeable to your account when paid or made available to you. Notwithstanding anything to the contrary

herein or elsewhere, all Loans or Advances hereunder are to be made on a totally discretionary basis on our part. In no event, however, shall (i) the aggregate amount of all outstanding Obligations (including but not limited to Advances, loans, the Seasonal Overadvance and all other amounts then charged or chargeable to your account including but not limited to amounts of outstanding Letters of Credit and any amounts due and owing by you to us in connections with Letters of Credit) exceed (i) the lesser of the Maximum Loan Amount or the Borrowing Base, plus (ii) the aggregate amount of outstanding Letters of Credit and amounts due and owing by you to us in connection with Letters of Credit exceed $500,000.00. If the outstanding Obligations at any time exceed the lesser of the Maximum Loan Amount or the Borrowing Base, in addition to our other rights, you shall pay us the excess forthwith. Any payments which we shall make with respect to drawings under any Letters of Credit shall be deemed to be Advances made to you pursuant to this Agreement. You agree to use the Advances and loans, if any, and the proceeds thereof, only for working capital purposes in the ordinary course of business. Without limiting the discretionary nature of the Advances, upon the occurrence of an Event of Default, we may at our sole discretion make no further Advances to you.

   ( b )    For our services, we shall charge to your account

      ( i )    monthly, as of the last day of each month, interest on the average daily balance of all Advances and all other loans and amounts charged and chargeable to your account hereunder (said Advances, loans and amounts being herein collectively called "Interest Bearing Obligations") which are outstanding during such month at the Borrowing Rate; provided, however, that if the Interest Bearing Obligations plus the face amount of outstanding Letters of Credit outstanding on each of five (5) or more days in any month exceed the Borrowing Base on such days, then the average daily balance of the Interest Bearing Obligations in that month shall bear interest at the Overadvance Rate; provided further, that said interest rate shall not be less than six percent (6%) per annum and shall in no event be higher than the highest rate permitted by New York law. Interest shall be calculated on the basis of the actual number of days elapsed over a year of three hundred sixty (360) days. Upon and after the occurrence of an Event of Default, and during the continuation thereof, the Interest Bearing Obligations shall bear interest at the Default Rate.

      ( ii )    monthly, as of the 15th day of each month, a commission at the rate of sixty-five hundredths of one percent (.65%) of the gross face amount of each invoice evidencing a Receivable purchased hereunder during such month on terms not exceed sixty (60) days (including dating), plus an additional one-quarter of one percent (1/4%) for each additional thirty (30) days or portion thereof of selling terms; provided, however, that if you change the terms of any invoice (whether or not we consent to such change, it being understood that nothing in this provision diminishes our rights or your obligations under any other provision hereof including but not limited to Paragraph 8), then the commission on the gross face amount of that invoice shall be the commission hereinabove set forth plus one-quarter of one percent (1/4%) for each thirty (30) days or portion thereof of such change. Our commission on any invoice evidencing a Receivable purchased hereunder shall not be less than Five Dollars ($5.00). However, the aggregate amount of Receivables with respect to which you are obligated to pay commissions and which you sell and assign to us ("Volume") shall not be less than $20,000,000.00 ("Minimum") in each Calendar Year (the twelve month period starting January 1st of each year, commencing prior to date on which this Agreement may be terminated under the terms of the second sentence of Section 11A(i) hereof), or the part of the last Calendar Year, commencing prior to date of which this Agreement is terminated under the terms of Section 11A(i) hereof if it is terminated before the end of a Calendar Year ("Partial Last Year"); provided, however, that the Volume for the part of the first Calendar Year during which this agreement is in effect if the Effective Date is after January 1 of such Calendar Year ("Partial First Year"), shall not be less than the amount equal to the Minimum multiplied by a fraction, the numerator of which is the number of months (a month shall mean any calendar month or portion thereof) between the Effective Date and December 31 of such Calendar Year and the denominator of which is 12 ("Reduced Minimum"). If the Volume in any Calendar Year or Partial Last Year (if any) is less than the Minimum, or in the Partial First Year (if any) is less than the Reduced Minimum, we shall charge to your account the difference ("Minimum Volume Charge") between the commission on the Minimum or Reduced Minimum, as the case may be, and the commission on the Volume for the Calendar Year or Partial Last Year, or the Partial First Year, respectively. We shall compute the Minimum Volume Charge, if any, on a calendar quarterly basis and charge your account therefor for each calendar quarter in the month following the end of such calendar quarter, or in the month following the effective date of termination of this agreement in the case of a Partial Last Year. However, if an Event of Default occurs, and if we so elect, and whether or not we then or thereafter exercise any of our rights of termination hereunder (including but not limited to our rights under Paragraph 11(a)(ii)), or your termination of the Agreement, pursuant to Section 11A(i) or otherwise, we may on or at any time after the occurrence of such Event of Default compute and charge your account for the Minimum Volume Charge for the period starting on such occurrence and ending on the last day of the Calendar Year during which the next date as of which you may terminate this agreement under Paragraph 11(a)(i) occurs, and for the purpose only of computing such Minimum Volume Charge, we may assume that your Volume for the period will be zero, subject, of course, to subsequent adjustment if such Volume in fact is more than zero.

Notwithstanding anything to the contrary herein, if you terminate this agreement prior to the term ending on the then effective Termination Date as stated in Section 11(a)(i), we may charge your account as of such termination or you shall pay us prior to such termination an amount (the "Early Termination Fee") equal to the sum of (x) an amount equal to 3% of the Maximum Loan Amount if this facility is terminated prior to the first anniversary date of the Effective Date, 2% of the Maximum Loan Amount if terminated after the first anniversary date of the Effective Date, but prior to the second anniversary date of the Effective Date or 1% of the Maximum Loan Amount if this Agreement is terminated after the second anniversary date of the Effective Date but prior to the third anniversary date of the Effective Date or prior to any other anniversary of the Effective Date after the third anniversary date of the Effective Date (while this Agreement is in effect) plus (y) the factoring commissions due us under the terms of the preceding paragraph on the Minimum calculated for the remainder of the term prior to the then effective Termination Date as described in Section 11(a)(i) as if you had not terminated this agreement prior to such then effective Termination Date.

      ( iii )    all bank charges for wire transfers when due.

S260/D4

-2-

together with interest thereon from the Settlement Date of such Receivable to the date of chargeback; such action on our part shall not be deemed a reassignment of such Receivable and will not impair our rights thereto or security interest therein, which will continue to be effective until all Obligations are fully satisfied.

(f)    YOU WARRANT THAT YOU WILL NOT GRANT A SECURITY INTEREST IN ANY OF YOUR RECEIVABLES OR IN ANY OF YOUR INVENTORY TO ANYONE EXCEPT US WITHOUT OUR PRIOR WRITTEN CONSENT.

(g)    YOU WARRANT AND REPRESENT THAT YOU ARE IN COMPLIANCE WITH ALL APPLICABLE LAWS, REGULATIONS AND RULES, INCLUDING BUT NOT LIMITED TO THOSE RELATED TO ENVIRONMENTAL LAWS AND SANCTION/EMBARGO PROGRAMS. YOU COVENANT AND AGREE THAT YOU SHALL REMAIN IN COMPLIANCE THEREWITH.

(h)    You represent that you and your subsidiaries have reviewed the effect that the Year 2000 Issue would have on your respective businesses. The costs to you and your subsidiaries of any reprogramming required to avoid the Year 2000 Issue to permit the proper functioning of your and your subsidiaries' computer software, hardware and firmware systems and equipment containing embedded microchips and the proper processing of data, and the testing of such reprogramming, and of the reasonably foreseeable consequences of the Year 2000 Issue to you and your subsidiaries (including reprogramming errors and the failure of systems or equipment supplied by others or with which your and your subsidiaries' computer systems interface) are not reasonably expected to result in an Event of Default or to have a material adverse effect on your business, assets, operations, prospects or condition (financial or otherwise) or those of your subsidiaries. You warrant that you shall take, and shall cause each of your subsidiaries to take, all necessary action to complete such reprogramming and the testing of such systems and equipment, as so reprogrammed, in all materials respects no later than September 1,2000. At our request, you shall provide, and shall cause each of your subsidiaries to provide, to us reasonable assurance of your and their compliance with the preceding sentence.

(i)    You represent that you have evaluated and assessed the potential impact of the Year 2000 Issue upon your and your subsidiaries' customers, key suppliers and vendors and their efforts to eliminate the risks arising out of the Year 2000 Issue, and that you have determined that those risks have been eliminated and, therefore, that your business, assets, operations, prospects and condition (financial and otherwise) and those of your subsidiaries shall not be adversely affected by any such impact or risks.

## 8.    INVOICING; PAYMENTS; RETURNS; NOTIFICATION

(a)    Each of your invoices and all copies thereof shall bear a notice (in form satisfactory to us) that it is owned by and payable directly and only to us at locations designated by us, and you shall furnish us with duplicate originals of your invoices accompanied by a confirmatory assignment thereof. Your failure to furnish such specific assignments shall not diminish our rights. You shall procure and hold in trust for us and furnish to us at our request satisfactory evidence of each shipment and delivery or rendition of services. Each invoice shall bear the terms stated on the customer's order, as submitted to us, whether or not the order has been approved by us, and no change from the original terms of the order shall be made without our prior written consent. Any such change not so approved by us shall automatically terminate our Credit Risk, if any, on the Receivable arising from your performance of the order. You will hold in trust for us and deliver to us any payments received from your customers in the form received, and hereby irrevocably authorize us to endorse your name on all checks and other forms of payment. Each payment made by a customer shall first be applied to Receivables, if any, on which we have the Credit Risk, and the balance, if any, of such payment shall be applied to other Receivables due from such customer. You understand that we shall not be liable for any selling expenses, orders, purchases, contracts or taxes of any kind resulting from any of your transactions, and you agree to indemnify us and hold us harmless with respect thereto, which indemnity shall survive termination of this agreement.

(b)    We shall have the right to communicate with and instruct the account debtors on your general intangibles to make payments in respect thereof directly to us.

## 9.    NEGATIVE COVENANTS

You covenant and agree that, until the later of the termination of this agreement or the satisfaction in full of all of the Obligations, you will not:

(i)    permit any of your property (including but not limited to Receivables, Inventory, machinery, Equipment, furniture, fixtures, plant and real estate) to be encumbered by any security interest, lien, mortgage, or other encumbrance of any nature whatsoever except liens in our favor, (other than Permitted Liens as listed on Schedule 9(i) attached hereto), unless you have obtained our prior written consent;

(ii)    incur any indebtedness of any nature whatsoever, including but not limited to guaranties and contingent obligations, except (a) unsecured debt to your trade suppliers in the ordinary course of your business, (b) debt subordinated to the Obligations in amounts and on terms acceptable to us in our sole discretion ("Subordinated Debt"), and (c) the promissory note in the amount of $1,500,000.00 payable to Brookfield International, Inc. issued in connection with the purchase of certain assets of Brookfield International, Inc.;

(iii)    prepay any amounts to become due on Subordinated Debt. Furthermore, you will not make any principal or interest payments on Subordinated Debt unless and until due and permitted by the terms of the applicable subordination agreement;

S260/D4

( iv )    permit your minimum Tangible Net Worth on a consolidated basis to be less than the amount stated opposite each fiscal quarter in the table below calculated as of the end of each such fiscal quarter;

| Fiscal Quarter Ending | Amount |
|---|---|
| 9/30/00 | ($3,606,000.00) |
| 12/31/00 | ($3,393,000.00) |
| 3/31/01 | ($3,617,000.00) |
| 6/30/01 | ($3,338,000.00) |
| 9/31/01 | ($2,811,000.00) |
| 12/31/01 | ($2,599,000.00) |
| 3/31/02 | ($2,819,000.00) |
| 6/30/02 | ($2,539,000.00) |
| 9/30/02 | ($2,013,000.00) |
| 12/31/02 | ($1,800,000.00) |
| 3/31/03 | ($2,020,000.00) |
| 6/30/03 | ($1,741,000.00) |
| 9/30/03 | ($1,214,000.00) |

( v )    permit your Fixed Charge Coverage Ratio, on a consolidated basis, to be less than then ratio set forth opposite each fiscal quarter as stated in the table below, calculated at the end of each quarter through the end of the fiscal quarter ending on December 31, 2001 and calculated at the end of each fiscal quarter on a rolling four quarter basis beginning with the first quarter in 2002;

| Fiscal Quarter Ending | Ratio |
|---|---|
| 12/31/00 | .35 to 1.0 |
| 3/31/01 | (.20) to 1.0 |
| 6/30/01 | 1.10 to 1.0 |
| 9/31/01 | 1.75 to 1.0 |
| 12/31/01 | .95 to 1.0 |
| 3/31/02 | .95 to 1.0 |
| 6/30/02 | 1.0 to 1.0 |
| 9/30/02 and at the end of each fiscal quarter thereafter calculated on a rolling four quarter basis | 1.10 to 1.0 |

( vi )    permit your pre-tax profits (defined in accordance with GAAP), on a consolidated basis, as calculated quarterly at quarter end to be other than positive (except for the first fiscal quarter of each of your fiscal years, in which case your pre-tax losses for such quarter shall not exceed ($230,000.00));

( vii )    deliberately left blank

( viii )    deliberately left blank

( ix )    deliberately left blank

( x )    make Capital Expenditures, on a consolidated basis, to exceed $150,000.00 during any fiscal year;

( xi )    purchase or acquire obligations or stock of, or any other interest in, any entity, except (A) obligations issued or guaranteed by the United States of America or any agency thereof, (B) commercial paper with maturities of not more than 180 days and a published rating of not less than A-1 or P-1 (or the equivalent rating), (C) certificates of time deposit and bankers' acceptances having maturities of not more than 180 days and repurchase agreements backed by United States government securities of a commercial bank if (x) such bank has a combined capital and surplus of at least $500,000,000.00, or (y) its debt obligations, or those of a holding company of which it is a subsidiary, are rated not less than A (or the equivalent rating) by a nationally recognized investment rating agency, (D) U.S. money market funds that invest solely in obligations issued or guaranteed by the United States of America or an agency thereof, and (E) Eurodollar time deposits with financial institutions with a published rating of not less than A-1 or P-1 (or the equivalent rating), except that you may purchase or acquire obligations or stock of, or any other interest in, any entity in the ordinary course of your business provided that you have obtained our prior written consent;

( xii )    make Advances, loans or extensions of credit to any person or entity;

( xiii )    declare, pay or make any dividend or distribution in any amounts on any shares of common stock or preferred stock or apply any of your funds, property or assets to the purchase, redemption or other retirement of any common or preferred stock, or of any options to purchase or acquire any such shares of your common or preferred stock;

( xiv )    substantially change the nature of the business in which you are presently engaged, nor except as specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than (A) in the ordinary course of business or (B) assets or property which are useful in, necessary for and are to be used in your business as presently conducted;

( xv )    directly or indirectly, purchase, acquire or lease any property from, or sell, transfer or lease any property to, or otherwise deal with, any affiliate, except (A) disclosed transactions in the ordinary course of business, on an arm's-length basis on terms no less favorable than terms which would have been

Obligations and no Event of Default has occurred, we shall pay such excess to you unless we determine, in our sole discretion, that one or more third parties are entitled to all or part of such excess by contract or operation of law or one or more third parties assert a claim to all or part of such excess.

(vi) submit to us for our approval prior to execution any agreements pursuant to which you will sell or distribute your Inventory.

(vii) you shall implement and have operating (if not already implemented and operating) within six months of the Effective Date a perpetual inventory control system acceptable to us in our sole and absolute discretion.

(viii) you shall on or before the Effective Date deliver to us in form and substance acceptable to us in our sole discretion the following documents duly executed by you or the appropriate parties thereto;

    (A) the Guarantee,
    (B) the Inventory Security Agreement,
    (C) the Equipment Security Agreement,
    (D) the Standby Letter of Credit,
    (E) the Subordination Agreement,
    (F) the Letter of Credit Financing Supplement,
    (G) your Certificate of Incorporation and By-laws,
    (H) all other documents required to be delivered hereunder or which we may request including but not limited to evidence of insurance and appropriate insurance policies (including but not limited to loss payee certificates).

(ix) you shall on the Effective Date, have on a consolidated basis, an excess availability, under all applicable formulas calculated pursuant to the Borrowing Base of at least $1,000,000.00 after applicable Reserves and payment and application of all proceeds of the initial Advances and payment of all fees and expenses as provided for hereunder

## 11. TERMINATION

(a) This agreement shall remain in full force and effect until terminated as follows:

(i) We may terminate this agreement at any time upon ninety (90) days prior written notice to you. If not so terminated, this agreement shall remain in full force and effect unless you give us written notice of termination (by certified mail, return receipt requested) no less than ninety (90) days prior to and effective as of the third anniversary of the Effective Date; or any subsequent anniversary date of the Effective Date after the third anniversary date of the Effective Date (such third anniversary of the Effective Date and each anniversary of the Effective Date after the third anniversary date shall hereinafter be referred to as a "Termination Date").

(ii) If you shall suspend business, sell all or a significant portion of your assets, become insolvent or unable to pay debts as they mature, or if you do not pay any of the Obligations when required in accordance with the terms hereof, make an assignment for the benefit of creditors, or apply for an extension from creditors; or if a meeting of your creditors is called; or if a Receiver or Trustee shall be appointed for you or your property; or if your property shall become subject to any lien or attachment; or if a petition under the Federal Bankruptcy Code shall be filed by or against you; or if you shall seek relief under any insolvency statute, federal, state or other; or if a custodian shall be appointed for all or substantially all of your property; or if you shall breach this agreement or any other agreement between us; or any representation or warranty made by you hereunder or any of the related documents executed of even date herewith shall be untrue or false, or if you shall fail to pay any Obligation when due; or if any guaranty of the Obligations shall be terminated; or if ownership or control of twenty percent (20%) or more of your aggregate outstanding stock, stock equivalents and any other equity changes after the Effective Date; or if any other significant change in the identity of those in control of you (whether or not qualifying under the preceding "20%" provision) or any significant change in your management occurs after the Effective Date; or there occurs a material adverse change in your financial conditions or your business prospects as determined by us and our sole discretion, then in any of such events, we may terminate this agreement at any time without notice.

(iii) notwithstanding Section 11(a)(i) you may also terminate this agreement at any time by giving us ninety (90) days prior notice to the requested termination date and by paying to us the Early Termination Fee and all other Obligations, as provided for in the second paragraph of Section 4(b)(ii).

(b) On the effective date of termination all Obligations shall become immediately due and payable in full without further notice or demand. Our rights with respect to Obligations owing to us, or chargeable to your account, arising out of transactions having their inception prior to the effective date of termination, will not be affected by termination. Without limiting the foregoing, all of our security interests and other rights in and to all Collateral shall continue to be operative until such Obligations have been fully and finally satisfied or you have given us an indemnity satisfactory to us.

**12.     DEFINITIONS**

As used herein

"Advances" shall have the meaning set forth in Paragraph 4(a) hereof.

"Alternate Base Rate" shall mean, for any day, a rate per annum equal to the higher of (i) the Prime Rate in effect on such day and (ii) the Federal Funds Rate in effect on such day plus one-half of one percent (1/2%).

"Bank" shall mean The Bank of New York, New York, New York.

"Borrowing Base" shall mean the lesser of (a) $10,000,000.00 or (b) the sum of (i) ninety percent (90%) of Eligible Receivables, (which percentage may be decreased or adjusted at any time, in our sole discretion, plus (ii) the lesser of (x) fifty percent (50%) of Eligible Inventory or (y) $2,500,000 plus (iii) 100% of the face amount of the Standby Letter of Credit plus (iv) $500,000.00 during the period of May through October only during your fiscal year 2001 ("Seasonal Overadvance"), minus (v)   the face amount of any outstanding Letters of Credit minus (iv) Reserves.

"Borrowing Rate" for each month shall mean an interest rate per annum which is one and one-quarter percent (1 1/4%) in excess of the average Alternate Base Rate in effect during such month.

"Capital Expenditures" shall mean, for any period, all payments made by or due (whether or not paid) from you during such period in respect of any asset which would be classified as property. Plant or equipment (including any payment in respect of any capital lease) or included in a comparable classification on your balance sheet prepared in accordance with GAAP.

"Change of Ownership" shall mean a change in the ownership of at least 51% of your capital common stock from the ownership by the Original Owners.

"Closing Fee" shall mean a non-refundable fee of $100,000.00 payable in two equal installments of $50,000.00 each the first of which shall have been paid at the time of your execution of the July 31, 2000 proposal letter and the other which shall be due and payable at the time of the closing of this Agreement.

"Collateral" shall mean all Receivables (including but not limited to all of your right, title and interest in and under the purchase agreement in respect of the assets of and/or capital stock of Brookfield International, Inc. a subsidiary of CHI Holdings, Inc.), all Inventory, all Equipment, Retained Goods, credit balances, and any other property in our possession or in the possession of any parent, affiliate or subsidiary of ours and any other security for the Obligations, whether coming into existence or into our or their possession before, on or after the Effective Date of termination and all proceeds thereof.

"Credit Risk" shall mean the risk of loss resulting solely and exclusively from the financial inability of your customer to pay at maturity a Receivable purchased hereunder.

"Default Rate" shall mean an interest rate per annum which is two percent (2%) in excess of the Borrowing Rate or the Overadvance Rate, as the case may be.

"Dispute" shall mean any cause for nonpayment of Receivables, including, without limitation, any alleged defense, counterclaim, offset, dispute or other claim whether arising from or relating to the sale of goods or rendition of services or arising from or relating to any other transaction or occurrence, including, without limitation, any Year 2000 issue of your customer(s), except for financial inability of your customer to pay a Receivable at maturity.

"EBITDA" shall mean earnings before interest, taxes, depreciation and amortization.

"Effective Date" shall mean the date set forth in the introductory paragraph hereto.

"Eligible Inventory" shall mean and include all finished goods inventory (and raw materials and work in progress acceptable to us in our sole discretion) in good condition and fully packaged for retail sale which is located in the United States of America on premises of the Borrower, or at warehouses under contract to the Borrower (for which you have delivered to us warehouseman's waivers acceptable to us), valued at the lower of cost or market value, determined on a first-in-first-out basis, which is not, in our opinion, obsolete, slow moving or unmerchantable and which we, in our sole discretion, shall not deem ineligible inventory, based on such considerations as we may from time to time deem appropriate including, without limitation, whether the inventory is subject to a perfected, first priority security interest in our favor, whether the inventory conforms to all standards imposed by any governmental agency, division or department thereof which has regulatory authority over such goods or the use or sale thereof, and whether the inventory is currently usable or salable in the normal course of your business.  We may from time to time after due diligence revise the standard of eligibility solely in our discretion exercised in good faith.

"Eligible Receivables" shall mean each Receivable on which we shall have the Credit Risk arising in the ordinary course of your business and which we, in our sole credit judgment, shall deem to be an Eligible Receivable, based on such considerations as we may from time to time deem appropriate.  In general, a Receivable shall not be deemed eligible unless such Receivable is subject to our perfected security interest

and no other lien, and is evidenced by an invoice or other documentary evidence that arises out of a credit approved order and is otherwise satisfactory to us.  In addition, no Receivable shall be an Eligible Receivable if:

    (a)    it arises out of a sale made by you to an affiliate or to an entity controlled by an affiliate;

    (b)    any covenant, representation or warranty contained in this agreement with respect to such Receivable has been breached;

    (c)    the account debtor is also your creditor or supplier, or the account debtor has disputed liability, or the account debtor has made any claim with respect to any other Receivable due from such account debtor to you, or the Receivable otherwise is or may become subject to any right of setoff by the account debtor;

    (d)    the account debtor has commenced a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or made an assignment for the benefit of creditors, or if a decree or order for relief has been entered by a court having jurisdiction in the premises in respect of the account debtor in an involuntary case under any state or federal bankruptcy laws, as now constituted or hereafter amended, or if any other petition or other application for relief under any state or federal bankruptcy law has been filed against the account debtor, or if the account debtor has failed, suspended business, ceased to be solvent, called a meeting of its creditors, or consented to or suffered a receiver, trustee, liquidator or custodian to be appointed for it or for all or a significant portion of its assets or affairs;

    (e)    the sale is to an account debtor outside the continental United States, unless the sale is on letter of credit, guaranty or acceptance terms, in each case acceptable to us in our sole discretion;

    (f)    the sale to the account debtor is on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment or any other repurchase or return basis or is evidenced by chattel paper;

    (g)    we believe, in our sole judgment, that collection of such Receivable is insecure or that such Receivable may not be paid by reason of the account debtor's financial inability to pay;

    (h)    the account debtor is the United States of America, any state or other governmental entity or any department, agency or instrumentality of any of them, unless you assign your right to payment of such Receivable to us pursuant to the Assignment of Claims Act of 1940, as amended (31 U.S.C. Section 203, et seq.), or have otherwise complied with other applicable statutes or ordinances;

    (i)    the goods giving rise to such Receivable have not been shipped and delivered to and accepted by the account debtor or the services giving rise to such Receivable have not been performed by you and accepted by the account debtor or the Receivable otherwise does not represent a final sale;

    (j)    the Receivables of the account debtor exceed a credit limit determined by us, in our sole discretion, to the extent such Receivable exceeds such limit;

    (k)    the Receivable is subject to any offset, deduction, defense, dispute, or counterclaim or if the Receivable is contingent in any respect or for any reason;

    (l)    you have made any agreement with any account debtor for any deduction therefrom, except for discounts or allowances made in the ordinary course of business for prompt payment, all of which discounts or allowances are reflected in the calculation of the face value of each respective invoice related thereto;

    (m)    shipment of the merchandise or the rendition of services has not been completed;

    (n)    any return, rejection or repossession of the merchandise has occurred;

    (o)    such Receivable is not payable to you; or

    (p)    such Receivable is not otherwise satisfactory to us as determined in good faith by us in the exercise of our discretion in a reasonable manner.

"Equipment" shall mean and include all present and hereafter acquired equipment, as defined in the Uniform Commercial Code, wherever located; and proceeds of the foregoing.

"Equipment Security Agreement" shall mean the Equipment Security Agreement of even date herewith granting GMAC COMMERCIAL CREDIT LLC a first priority lien in all of your Equipment.

"Event of Default" shall mean the occurrence of any of the events set forth in Paragraph 11(a)(ii) hereof.

"Federal Funds Rate" shall mean, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or if such day is not a business day, for the next preceding business day) by the Federal Reserve Bank of New York, or if such rate is not so published for any day which is a business day, the

average of quotations for such day on such transactions received by the Bank from three Federal funds brokers of recognized standing selected by the Bank.

"Fixed Charge Coverage Ratio" shall mean with respect to any computation period the ratio of EBITDA, less Capital Expenditures during any computation period to (B) the sum of (i) your total Interest Expense plus (ii) your total principal payments due under any other agreement, plus (iii) cash taxes during such computation period, plus (iv) capitalized lease payments during such computation period.  Such Fixed Charge Coverage Ratio shall be measured quarterly at the end of each fiscal quarter.

"GAAP" shall mean generally accepted accounting principles in the United States of America in effect from time to time.

"Guarantee" shall mean a Guarantee of even date herewith executed by David Landay in a maximum amount of $3,500,000.00.

"Interest Bearing Obligations" shall have the meaning set forth in Paragraph 4(b)(i) hereof.

"Interest Expense" shall mean, for any period, interest expense with respect to all your outstanding indebtedness for such period in accordance with GAAP.

"Inventory" shall mean all of your now owned and hereinafter acquired goods, merchandise and other personal property, wherever located, to be furnished under any contract of service or held for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description which are or might be used or consumed in your business or used in selling or furnishing such goods, merchandise or other personal property, all documents of title or other documents representing them and all products and proceeds of the foregoing.

"Inventory Security Agreement" shall mean the Inventory Security Agreement of even date herewith granting a first priority lien to GMAC COMMERCIAL CREDIT LLC in all of your Inventory.

"Letters of Credit" shall mean all Letters of Credit opened or facilitated by us for your account pursuant to the Letter of Credit Financing Supplement to the Factoring Agreement which shall have an expiration date not later than the next following Termination Date.

"Letters of Credit Fees" shall mean the fees payable by you as stated in the Letter of Credit Financing Supplement to the Factoring Agreement.

"Letters of Credit Financing Supplement to Factoring Agreement" shall mean the Letter of Credit Financing Supplement to Factoring Agreement executed as of even date with this Agreement.

"Matured Funds Rate" shall mean the rate of interest, announced by us from time to time, as the rate applicable to matured funds, such rate to be adjusted automatically on the effective date of any change in such rate as announced by us.

"Maximum Loan Amount" shall mean $10,000,000.

"Minimum" shall have the meaning set forth in Paragraph 4(b)(ii) hereof.

"Minimum Volume Charge" shall have the meaning set forth in Paragraph 4(b)(ii) hereof.

"Obligations" shall mean and include all loans, Advances, debts, liabilities, obligations, covenants, duties and amounts of any nature whatsoever, for which you are now or hereafter obligated to us (or to any corporation that directly or indirectly controls or is controlled by or is under common control with us, including without limitation any parent, subsidiary and affiliate of ours), of every kind and description (whether or not evidenced by any note or other instrument and whether or not for the payment of money or the performance or non-performance of any act), direct or indirect, absolute or contingent, due or to become due, contractual or tortious, liquidated or unliquidated, whether arising under this or any other present or future agreement or other documentation, or by operation of law or otherwise, now existing or hereafter arising (whether before or after the filing of any petition in bankruptcy by or against you or the commencement of any other insolvency proceeding, including but not limited to an assignment for the benefit of creditors), including, without limitation, any debt, liability or obligation now or hereafter owing from you to others, including without limitation any other present or future client(s) of ours, which we may have obtained or may obtain, by purchase, assignment, participation or otherwise, and further including without limitation, all interest, charges or any other payments you are required to make to us, together with all expenses and attorneys' fees and costs chargeable to your account or incurred by us in connection with your account, whether provided for herein or in any such other agreement or documentation.  Without limiting the foregoing, Obligations shall include the amounts of all Advances, loans, interest, commissions, customer late payment charges and bank related charges, costs, fees, expenses, taxes and all Receivables charged or chargeable to your account hereunder.

"Original Owners" shall mean the owners of the total outstanding stock issued by you as of the Effective Date.

"Overadvance Rate" for each month shall mean an interest rate per annum which is three and one-half percent (3.5%) in excess of the Alternate Base Rate in effect during such month.

"Partial First Year" shall have the meaning set forth in Paragraph 4(b)(ii) hereof.

"Partial Last Year" shall have the meaning set forth in Paragraph 4(b)(ii) hereof.

"Prime Rate" shall mean the prime commercial lending rate of the "Bank" as publicly announced to be in effect from time to time, such rate to be adjusted automatically, without notice, on the effective date of any change in such rate.

"Receivables" shall mean all amounts and all forms of obligations now or hereafter owing to you (including but not limited to accounts, instruments, contract rights, documents and chattel paper) and general intangibles (including but not limited to patents, copyrights, trademarks, trade names, licenses and tax refunds); all security therefor and guaranties thereof; all of your rights as an unpaid seller of goods and your rights to goods sold which may be represented thereby (including but not limited to your rights of replevin and stoppage in transit); all of your books of account, records, files, and documents relating thereto and the equipment containing said books, records, files and documents; all of your rights under insurance policies relating to the foregoing; the right to use the Trade Names in connection with our rights with respect to the goods; and all proceeds of the foregoing.

"Reduced Minimum" shall have the meaning set forth in Paragraph 4(b)(ii) hereof.

"Reports" shall have the meaning set forth in Paragraph 12(d) hereof.

"Reserves" shall have the meaning set forth in Paragraph 3 hereof.

"Retained Goods" shall mean returned or repossessed merchandise or other goods which by sale resulted in Receivables theretofore assigned to us.

"Sanction/Embargo Programs" shall mean economic and other sanctions and embargo program restrictions promulgated by the government of the United States of America or any officer or agency thereof including but not limited to the President and the Office of Foreign Assets Control of the Treasury Department, or either of them.

"Settlement Date" shall have the meaning set forth in Paragraph 3.

"Standby Letter of Credit" shall mean a Standby Letter of Credit issued by a bank acceptable to GMAC COMMERCIAL CREDIT LLC in its sole discretion, with a face amount of at least $4,100,000.00, in form and substance acceptable to GMAC COMMERCIAL CREDIT LLC in its sole discretion, to be delivered on a date of the closing of this Agreement.

"Subordination Agreement" shall mean the Subordination Agreement of even date herewith executed by David Landay by which he subordinates obligations owing to him by you in amounts of not less than $3,450,000.00.

"Tangible Net Worth" shall mean, at a particular date, all amounts which would be included under shareholders' equity plus subordinated debt minus intangible assets, all as reported on your balance sheet and determined in accordance with GAAP as at such date.

"Trade Names" shall mean all trade names or styles, trademarks, divisions or other names under which you conduct business.

"Unused Facility Fee" shall mean a fee per annum of one-quarter of one (1/4 of 1%) percent calculated on the difference between the Maximum Loan Amount and outstanding Advances as of the day of such calculation.

"Volume" shall have the meaning set forth in Paragraph 4(b)(ii) hereof.

"Year 2000 Issue" shall mean the inability of computer software, hardware and firmware systems and/or equipment containing embedded computer chips owned or operated by an individual, corporation, trust, unincorporated organization or other entity (each a "person") or used or relied upon in the conduct of a person's business (including systems and equipment supplied by others or with which such person's computer systems interface) to properly receive, transmit, process, manipulate, store, retrieve, re-transmit, without errors or delays, or in any other way to accurately recognize or otherwise utilize data and information in all respects in relation to the year 2000 or the inclusion of dates on or after January 1, 2000.

13.    PLACE OF PAYMENT; NEW YORK LAW AND COURT

( a )    All Obligations shall be paid at our office in New York, New York.

( b )    This agreement shall be governed by and construed according to the laws of the State of New York (without giving effect to its choice of law principles). All terms used herein, unless otherwise defined herein, shall have the meanings given in the New York Uniform Commercial Code.

( c )    You agree that all actions and proceedings arising out of or relating directly or indirectly to this agreement or any ancillary agreement or any other obligations shall be litigated in the United States District Court for the Southern District of New York or, at our option, in any other courts located in New York State or elsewhere as we may select, that such courts are convenient forums, and that you submit to the personal jurisdiction of such courts. You hereby consent to the service of process therein by registered or certified mail, return receipt requested, directed to you at your address set forth above, and you agree that service so made shall be deemed complete five (5) days after the date of mailing.

14.    REPORTS; RECORDS; ASSURANCES; WAIVERS; REMEDIES; ETC.

( a )    Upon request you shall periodically furnish us with statements showing your financial condition and the results of your operations. We may at all times have access to, and inspect, audit, and make extracts from, all of your records, files and books of account, and we may charge your account with the costs, fees or expenses incurred in connection therewith.

( b )    You shall perform all acts requested by us to perfect and maintain our security interest and other rights in the Collateral.

( c )    Failure by us to exercise any right, remedy or option under this agreement or delay by us in exercising the same will not operate as a waiver; no waiver by us will be effective unless we confirm it in writing and then only to the extent specifically stated.

( d )    We may charge to your account, when incurred by us, the amount of legal fees (including fees, expenses and costs payable or allocable to attorneys retained or employed by us) and other costs, fees and expenses incurred by us in negotiating or preparing this agreement and any legal documentation required by us or requested by you in connection with this agreement or any amendments or supplements thereof, or in enforcing our rights hereunder or in connection with the litigation of any controversy arising out of this agreement, or in protecting, preserving or perfecting our interest in, any Collateral, including without limitation all taxes assessed or payable with respect to any Collateral, and the costs of all public record filings, appraisals and searches relating to any Collateral. We may also charge to your account our then standard price for furnishing to you or your designees copies of any statements, records, files or other data (collectively "Reports") requested by you or them other than Reports of the kind furnished to you and our other clients on a regular, periodic basis in the ordinary course of our business. We may file Financing Statements under the Uniform Commercial Code without your signature or, if we so elect, sign and file them as your agent.

( e )    Our rights and remedies under this agreement will be cumulative and not exclusive of any other right or remedy we may have hereunder or under the Uniform Commercial Code or otherwise. Without limiting the foregoing, if we exercise our rights as a secured party we may, at any time or times, without demand, advertisement or notice, all of which you hereby waive, sell the Collateral, or any part of it, at public or private sale, for cash, upon credit, or otherwise, at our sole option and discretion, and we may bid or become purchaser at any such sale, free of any right of redemption which you hereby waive. After application of all Collateral to your Obligations (in such order and manner as we in our sole discretion shall determine), you shall remain liable to us for any deficiency.

( f )    We shall have no liability hereunder (i) for any losses or damages (including indirect, special or consequential damages) resulting from our refusal to assume, or delay in assuming, the Credit Risk, or any malfunction, failure or interruption of communication facilities, or labor difficulties, or other causes beyond our control; or (ii) for indirect, special or consequential damages arising from accounting errors with respect to your account with us. Our liability for any default by us hereunder shall be limited to a refund to you of any commission paid by you during the period starting on the occurrence of the default and ending when it is cured or waived, or when this agreement is terminated, whichever is earlier and any amount (but not including any consequential damages) which should have been, but was not, credited to your account pursuant to the terms hereof during such period due to any accounting error on our part.

( g )    This agreement cannot be changed or terminated orally and is for the benefit of and binding upon the parties and their respective successors and assigns except that you may not assign or transfer any of your rights or obligations under this Agreement without our prior written consent, and no such assignment or transfer of any such obligation shall relieve you thereof unless we have consented to such release in a writing specifically referring to the obligation from which you are to be released. This agreement, and any concurrent or subsequent written supplements thereto or amendments thereof signed by both of us, represent our entire understanding and supersede all inconsistent agreements and communications, written or oral, between your and our officers, employees, agents and other representatives.

( h )    This agreement shall not be effective unless signed by you below, and signed by us at the place for our acceptance.

( i )    TO THE EXTENT LEGALLY PERMISSIBLE, BOTH YOU AND WE WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY LITIGATION RELATING TO TRANSACTIONS UNDER THIS AGREEMENT, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

15.    APPLICATION OF PAYMENTS

We shall have the continuing and exclusive right to apply or reverse and reapply any and all proceeds of Collateral to any portion of the Obligations. To the extent that you make a payment or we receive any payment or proceeds of the Collateral for your benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause, then, to such extent, the Obligations or part thereof intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by us.

16.    INDEMNITY

You shall indemnify us from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against us in any litigation, proceeding or investigation instituted or conducted by any governmental agency or instrumentality or any other entity with respect to any aspect of, or any transaction contemplated by,

S260/D4

whether or not we are a party thereto, except to the
ligence or willful misconduct.

orts, Inc. and Brookfield International, Inc. shall be
d, each individually and collectively shall be deemed
ements granted or given under this Agreement.

Very truly yours,
**GMAC COMMERCIAL CREDIT LLC**

**SENECA SPORTS, INC.**

By: _____

Title: _____

**BROOKFIELD INTERNATIONAL, INC.**

By: _____

Title: _____

**GMAC COMMERCIAL CREDIT LLC**

By: _____

Title: _____

1290 Avenue of the Americas

- 13 -

# GUARANTY

**TO:    GMAC COMMERCIAL CREDIT LLC**

In consideration of your entering into or your refraining from terminating at this time a Factoring Agreement with Seneca Sports, Inc. and Brookfield International, Inc. (jointly and severally "Client"), bearing the effective date of _September 19_____, 2000 (said Factoring Agreement as heretofore or hereafter amended, supplemented and/or restated is hereinafter called the "Agreement") the undersigned hereby guarantees to GMAC COMMERCIAL CREDIT LLC (hereinafter called the "Company"), its successors and assigns, the prompt payment at maturity, or whenever they may become due in accordance with any of their terms, of all now existing and hereafter arising liabilities, indebtedness and obligations of the Client to the Company (including "Obligations," as defined in the Agreement, if such term is defined therein), whenever and however arising or acquired by the Company, whether direct or indirect, absolute or contingent (collectively, the "Obligations") and whether the same may now be or hereafter become due from the Client or the executors, administrators, successors or assigns of the Client, including the cost of protest and all legal expenses of or for collection, or for realization upon any collateral for the Obligations ("Collateral") or other guaranty.  If this guaranty and/or any Obligation is placed with an attorney for collection, the undersigned further agrees to pay an attorney's fee of fifteen percent of any principal and interest due and demanded, which is hereby agreed to be just and reasonable and which shall be recoverable with the amount due under this guaranty.

Demand of payment, presentment, protest and notice of dishonor or non-payment are hereby expressly waived, and if any of the Obligations are payable on demand, the Company may, in its sole and absolute discretion, determine the reasonableness of the period, if any, to elapse prior to the making of demand.

The undersigned hereby consents and agrees that, without notice to or further assent from the undersigned, the time of payment of all or any of the Obligations, or any other provisions of the Obligations, may be extended, changed or modified, the parties thereto discharged, any or all Collateral released without obtaining other Collateral in substitution therefor, and any composition or settlement consummated and accepted, and that the undersigned will remain bound upon this guaranty notwithstanding one or more such extensions, changes, modifications, discharges, releases, compositions or settlements.  The undersigned further consents and agrees that this guaranty shall not be impaired or otherwise affected by any failure to call for, take, hold, protect or perfect, continue the perfection of or enforce any security interest in or other lien upon, any Collateral or by any failure to exercise, delay in the exercise, exercise or waiver of, or forbearance or other indulgence with respect to, any right or remedy available to the Company.  Any statement of account which is binding on the Client under the Agreement shall be binding on the undersigned for all purposes under this guaranty.

The Company may also at any time in its discretion sell, assign, transfer and deliver the whole of the Collateral, or any part thereof, or any substitutes therefor, or any additions thereto, at public or private sale, at any time or place selected by the Company, at such prices as it may deem best and either for cash or for credit or future delivery, at the option of the Company without either demand, advertisement or notice of any kind to the undersigned, which are hereby expressly waived.

The undersigned assigns, pledges and grants a security interest to the Company in any money or property belonging to the undersigned at any time in the possession of the Company or in the possession of any parent, affiliate or subsidiary of the Company (hereinafter called a "Related Company"), including any deposit balances and all property held by the Company or a Related Company for any purpose including safekeeping, custody, transmission, collection, or pledge, and all proceeds of the foregoing, as security for the performance by the undersigned of the obligations under this guaranty, whether due or not, with full power and authority to apply any such money, property and proceeds to the extinguishment of any such obligations and to sell, enforce, collect or otherwise realize on said money, property or proceeds in accordance with applicable law.

The undersigned agrees that the Company is not to be obligated in any manner to inquire into the powers of the Client, or its successors, its or their directors, officers, or agents, acting or purporting to act on its or their behalf, and any liabilities purporting to be contracted for the Client, or its successors, by its or their directors, officers, or agents, in the professed exercise of such powers, shall be deemed to form a part of the liabilities guaranteed hereunder even though the incurrence of such liabilities be in excess of the powers of the Client, its successors, or its or their directors, officers, or agents aforesaid, or shall be in any way irregular, defective or informal.

The liability of the undersigned on this guaranty shall be direct, immediate, absolute, continuing, unconditional and unlimited and not conditional or contingent upon the pursuit by the Company of whatever remedies it may have against the Client or the Client's successors, executors, administrators or assigns, or the security or liens it may possess, and this guaranty shall be and shall be construed as being and intended to be, a continuing guaranty of the payment of any and all Obligations either made, endorsed or contracted by the Client, or any successor of the Client, prior to the receipt by the Company of written notice of the revocation of this guaranty by the undersigned, and of all extensions or renewals thereof in whole or in part; and notwithstanding the death of, or the revocation of this guaranty by, the undersigned guarantor, the liability of the guarantor so revoking and of the estate of the guarantor who dies shall continue as to Obligations incurred or contracted by the Client, or any successor of the Client, prior to such revocation or death and as to all extensions and renewals thereof, in whole or in part.

If any payment of the Obligations is made by or for the benefit of the Client and is repaid by the Company to the Client or any other party pursuant to any federal, state or other law, including those relating to bankruptcy, insolvency, preference or fraudulent transfer, then to the extent of such repayment, the liability of the undersigned with respect to such Obligation shall continue in full force and effect. The undersigned agrees that if the Company gives to the undersigned written notice of the institution of any action or proceeding, legal or otherwise between the Company and the Client, the undersigned shall be conclusively bound by the adjudication in any such legal or other proceeding, or by any judgment or award decree entered therein.

Until such time as the Obligations have been fully and indefeasibly paid, the undersigned waives any claim or other right which the undersigned may now have or hereafter acquire against the Client or any other person that is primarily or contingently liable on any obligation that arises from the existence or performance of the undersigned's obligations under this guaranty, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution, or indemnification.

Notwithstanding anything to the contrary contained herein, the undersigned's liability hereunder shall not exceed a total maximum aggregate amount of $3,500,000.00. Such amount shall be in addition to a certain Standby Letter of Credit open for the account of the undersigned and/or the Client for the benefit of the Company.

The undersigned also waives the right to assert in any action or proceeding upon this guaranty any defenses, offsets or counterclaims which the undersigned may now or hereafter have. This guaranty shall be governed by and construed and interpreted in accordance with the laws of the State of New York (without giving effect to New York law on conflicts of law). All actions and proceedings arising out of or in connection with this guaranty, the Agreement and/or any transactions relating hereto and thereto, including without limitation for recognition or enforcement of any judgment, may be brought in the federal or state courts of the State of New York or, at the Company's option, in any other courts as the Company may select and the undersigned agrees that such courts are convenient forums and the undersigned unconditionally and irrevocably submits, for the undersigned and its property, to the nonexclusive personal jurisdiction of such courts. The undersigned agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. The undersigned additionally hereby waives: (a) personal service of process and consents that service of process upon the undersigned may be made by certified or registered mail, return receipt requested, directly to the undersigned at the address of the undersigned appearing below and service so made shall be deemed completed two (2) days after the same shall have been so mailed; (b) any claim that the undersigned is not personally subject to the jurisdiction of the above named courts; and (c) notice of the acceptance of this guaranty. This guaranty cannot be altered or discharged orally.

THE UNDERSIGNED WAIVES THE RIGHT TO TRIAL BY JURY IN ALL ACTIONS BROUGHT BY OR AGAINST THE COMPANY.

IN WITNESS WHEREOF, the undersigned has duly executed these presents this _19_ day of ___September___, 2000.

_____
**Signature of Individual**

David Landay
**Typed Name of Individual**

_85 E. INDIA ROW #40F_

_BOSTON, MA    02110_
**Address**

STATE OF New York
                              } SS.
COUNTY OF New York

On this _19th_ day of _September_____, 2000, before me personally appeared David Landay to me known and known to me to be the individual described in and who executed the foregoing instrument and that such individual duly acknowledged to me that such individual executed same.

JOAN H. HIGHLAND
Notary Public, State of New York
No. 4984973
Qualified in Putnam County
Certificate filed in New York County
Commission Expires August 5, 200**1**

_____
Notary Public

Exhibit



C

## FORBEARANCE AGREEMENT

THIS FORBEARANCE AGREEMENT ("Forbearance Agreement") made as of this 9th day of August, 2001 among SENECA SPORTS, INC. ("Seneca"), having its chief executive office at 75 Fortune Boulevard, Milford , Massachusetts 01757, BROOKFIELD INTERNATIONAL, INC. ("Brookfield"; and together with Seneca, individually and collectively, the "Clients"), having its chief executive office at 75 Fortune Boulevard, Milford, Massachusetts 01757 and GMAC COMMERCIAL CREDIT LLC ("Factor"), having its chief executive office at 1290 Avenue of the Americas, New York, New York 10104.

### WITNESSETH:

WHEREAS, Clients and Factor have entered into a Factoring Agreement dated as of the 19th day of September, 2000 (as amended, the "Agreement") and various notes, instruments, guaranties, agreements and other documents executed and/or delivered in connection therewith (all of the foregoing, together with the Agreement, as the same now exist or may hereafter be amended, restated, replaced, renewed, extended, supplemented, substituted or otherwise modified, collectively, the "Factoring Documents"); and

WHEREAS, the Clients hereby acknowledge, confirm and agree that (a) Events of Default have occurred under the Agreement and the other Factoring Documents, which Events of Default continue to exist and which Factor has suffered to exist, to wit Events of Default occurring in connection with Clients' breach of Paragraph 4(a) of the Agreement (Repayment of Excess Obligations), Paragraph 7(a) of the Agreement (Representations and Warranties as to Receivables), Paragraph 7(c) of the Agreement (Financial Statements), Paragraph 9(ii) of the Agreement (Indebtedness), Paragraph 9(iv) of the Agreement (Tangible Net Worth), Paragraph 9(v) of the Agreement (Fixed Charge Coverage Ratio), Paragraph 9(vi) of the Agreement (Pre-Tax Profits), Paragraph 10(i)(c) of the Agreement (License Fees), Paragraph 10(ii) of the Agreement (Discharge of Obligations), Paragraph 10(iii) of the Agreement (Notification of Events of Default) and Paragraph 10(iv) of the Agreement (Certified Financial Statements), (collectively, the "Existing Defaults"); and (b) as a result of the Existing Defaults, the Factor is entitled, as of the date hereof, to terminate the Agreement and to exercise any and all of its rights and remedies under the Agreement, the other Factoring Documents, applicable law or otherwise to realize upon the Collateral and to collect the obligations owing to Factor under the Agreement and the other Factoring Documents; and

WHEREAS, in order for the Clients to continue to operate their business for the purpose of maximizing the value of their assets while they conduct an orderly liquidation of their business and assets, the Clients have requested that the Factor forbear for a limited period of time from exercising its rights and remedies under the Agreement and the other Factoring Documents; and

WHEREAS, the Factor has advised the Clients that the Factor will not waive the Existing Defaults and desires to preserve the rights and remedies arising under the Agreement

115602-3

and the other Factoring Documents as a result of the existence and continuance of the Existing Defaults; and

**WHEREAS**, subject to the terms and conditions set forth herein, Factor has agreed to accommodate the request of the Clients to forbear from exercising the rights and remedies of the Factor under the Agreement and other Factoring Documents for a limited period of time.

**NOW THEREFORE**, in consideration of the foregoing, and for good and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    **Acknowledgment of Outstanding Obligations.**  Each of the Clients hereby acknowledges, confirms and agrees that as of August 8, 2001, the Clients, jointly and severally, owe the Factor the aggregate principal amount of not less than $6,719,177.62, contingent obligations arising in connection with Letters of Credit in the aggregate face amount of $110,000, plus accrued and unpaid interest and plus all costs, fees, commissions, expenses and other sums and charges due and owing to the Factor under the Agreement and the other Factoring Documents, including, without limitation, all costs and expenses (including attorneys' fees and expenses) incurred by Factor (all of the foregoing is collectively referred to as the "Existing Debt").  Each of the Clients hereby acknowledges, confirms and agrees that as of the date hereof, the Existing Debt is due and owing by the Clients jointly and severally to the Factor without offset, defense or counterclaim of any kind, nature or description whatsoever.

2.    **Binding Effect of Agreement and Other Factoring Documents.**  Each of the Clients hereby acknowledges, confirms and agrees that: (a) the Agreement and each of the other Factoring Documents to which such Client is a party have been duly executed and delivered to the Factor, and each is in full force and effect as of the date hereof; (b) the covenants, agreements and obligations of each Client contained in or incurred under the respective Factoring Documents to which such Client is a party constitute the legal, valid and binding obligations of such Client, are enforceable against such Client, in accordance with the terms and conditions of the Agreement and the other Factoring Documents to which such Client is a party, and each such Client has no valid offset, defense or counterclaim to the enforcement of such obligations or such Factoring Documents to which it is a party; and (c) Factor is and shall be entitled to the rights, remedies and benefits provided for in the Agreement and the other Factoring Documents and pursuant to applicable law, subject to the terms and conditions of this Forbearance Agreement.

3.    **Acknowledgment of Liens and Security Interests.**  Each of the Clients hereby ratifies and confirms its respective grant to the Factor of the liens upon and security interests in its properties and assets heretofore mortgaged, pledged, granted or assigned to Factor under the Factoring Documents, and acknowledges and confirms that such liens and security interests secure and shall continue to secure the obligations of the Client to the Factor under the Agreement and the other Factoring Documents.

4.    **Release.**  In consideration of the agreement of the Factor to forbear from exercising its rights and remedies arising in connection with the Existing Defaults, each of the

115601.3                                          2

Clients forever releases and discharges the Factor, and its successors and assigns from any and all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, in law, admiralty or equity, which against the Factor, any Client, or any of its respective successors or assigns, ever had, now or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of this Forbearance Agreement arising under or in any way connected with the Agreement, the other Factoring Documents or this Forbearance Agreement.

   5.    **Preservation of Existing Defaults**. Each of the Clients hereby acknowledges, confirms and agrees that (a) the Existing Defaults are preserved and shall continue to exist after the execution and delivery of this Forbearance Agreement; and (b) subject to the conditions set forth in this Forbearance Agreement, the rights and remedies of the Factor arising by reason of the Existing Defaults are preserved in all respects without prejudice to the Factor, including, without limitation, Factor's right to charge interest at the Default Rate (as defined in the Agreement). Factor and Client confirm that Factor is presently charging interest on the Client's Obligations (as defined in the Agreement) at the Default Rate.

   6.    **Forbearance**.

        (a)    Each of the Factor and the Clients agrees that, during the Forbearance Period (as defined below), the Factor will forbear from exercising any of its rights and/or remedies arising by reason of the Existing Defaults to realize upon the Collateral, or any part thereof, and/or to commence any action against the Clients, individually or collectively, to collect the obligations owing by the Clients to the Factor. For the purposes of this Forbearance Agreement, the term "Forbearance Period" shall mean that period commencing on the date hereof and ending on the earlier to occur of (i) January 30, 2002 and (ii) the date of occurrence of an Additional Default (as defined below).

        (b)    Upon the termination of the Forbearance Period, the agreement of the Factor to forbear shall automatically and without further action or notice terminate and be of no further force or effect, it being expressly agreed that the effect of such termination of the Forbearance Period will be to permit the Factor, without notice, demand or advertisement (all of which are expressly waived by the Clients), to exercise its rights and remedies arising by reason of the Existing Defaults or applicable law with respect to the Collateral and the obligations owing by the Clients, all without further notice, passage of time or forbearance of any kind, or nature.

   7.    **Modification to the Factoring Documents**. In addition to the Clients' covenants and agreements set forth in the Agreement and in the other Factoring Documents, and notwithstanding anything to the contrary set forth in the Agreement or the other Factoring Documents, each of the Clients acknowledges, confirms and agrees that:
        (a)    The definition of "Borrowing Base" appearing in Section 12 of the Agreement is hereby amended and restated in its entirety as follows:

" "Borrowing Base" shall mean the lesser of (a) $10,000,000.00 or (b) the sum of (i) ninety percent (90%) of Eligible Receivables, (which percentage may be decreased or adjusted at any time, in our sole discretion), plus (ii) the lesser of (x) forty percent (40%) of Eligible Inventory or (y) $2,500,000 plus (iii) 100% of the face amount of the Standby Letter of Credit plus (iv) the amount of the Cash Deposit held by us in good and available funds pursuant to that certain letter re: Cash Deposit dated August 9, 2001 by and between us and David L. Landay; minus (v) the face amount of any outstanding Letters of Credit minus (vi) Reserves."

(b)     In addition to and not in limitation of Factor's rights to establish Reserves under the Agreement, in its sole and absolute discretion, Factor shall establish an additional Reserve in the amount equal to eight percent (8%) of the aggregate amount of all Receivables purchased by Factor from Clients with respect to which such Receivables Toys-R-Us is the account debtor.

(c)     Concurrently with the execution of this Forbearance Agreement, David L. Landay, shall execute and deliver to and in favor of Factor (i) an Amendment and Ratification of Guaranty, substantially in the form annexed hereto as Exhibit A , and (ii) a letter re: Cash Deposit, substantially in the form annexed hereto as Exhibit B, all in form and substance satisfactory to Factor.

(d)     On or before August 15, 2001, David L. Landay shall deliver to Factor an original amendment to that certain Letter of Credit number 1551257988 issued by Fleet National Bank on the application of David L. Landay for the account of the Clients and for the benefit of Factor, which amendment shall provide for the extension of the expiry date of such Letter of Credit from October 30, 2001 to March 31, 2002.

(e)  .   Clients acknowledge that Factor has retained RAS Management to conduct, on behalf of Factor, from time to time, field examinations, collateral analysis, orderly liquidation analysis and/or other business analysis of the Clients and the Collateral. Clients hereby acknowledge, confirm and agree that, (i) without limitation of Factor's rights to charge the Clients' account for other costs, fees, and expenses incurred by Factor, all costs, fees and expenses charged to Factor by RAS Management, as billed, shall be charged by Factor to the Client's account and (ii) Clients shall fully cooperate in all respects with the representatives of RAS Management by, including, without limitation, providing representatives of RAS Management with access to the Clients' books and records and all Collateral and making representatives of the Clients available to representatives of RAS Management to discuss the Clients' books and records and the Collateral.

8.     **Additional Defaults; Remedies.**

(a)     The occurrence of any one or more of the following shall constitute an "Additional Default" under this Forbearance Agreement:

(i)    the breach of any representations, warranties, covenants or agreements contained in this Forbearance Agreement;

(ii)    the failure by David L. Landay to timely comply with the terms and conditions of that certain letter re: Cash Deposit dated August 9, 2001 by and between David L. Landay and Factor;

(iii)    the occurrence of an Event of Default under the Agreement or the other Factoring Documents, other than any of the Existing Events of Default; or

(iv)    if, as of the Friday of each week during the Forbearance Period, the Clients fail to maintain "Net Availability", as determined by Factor in its sole and absolute discretion, equal to or greater than the "Net Availability" amounts for each such week set forth on the line identified as "Net Availability" on the Seneca Sports Projected Availability annexed hereto as Exhibit C; it being acknowledged that for the week ending January 25, 2002, "Net Availability" shall mean an amount equal to $1,298,673.

(b)    Upon the occurrence of any Additional Default hereunder, and notwithstanding anything to the contrary contained in this Forbearance Agreement, the Factor may thereupon, and at any time and from time to time thereafter, in full or in part, exercise any and all of its rights and remedies under this Forbearance Agreement, the Agreement or the other Factoring Documents, applicable law or otherwise, all of which rights and remedies shall be non-exclusive and cumulative and exercisable in whatever order or manner as the Factor, in its sole discretion, may deem appropriate.

9.    **General Provisions**.

(a)    Upon the request of the Factor, the Clients shall execute and deliver to Factor, or cause to be executed and delivered, all such additional documents, instruments and agreements as the Factor, may determine, in its sole discretion, is necessary or desirable to effectuate the purposes and intent of this Forbearance Agreement.

(b)    This Forbearance Agreement shall be binding upon each of the Clients and their respective successors and assigns.

(c)    The validity of this Forbearance Agreement, its construction, interpretation and enforcement, shall be determined under and according to the laws of the State of New York, without any reference to its principles of conflicts of law. Each of the Clients hereby consents to the exclusive jurisdiction of the Supreme Court of the State of New York for the County of New York and the United States District Court for the Southern District of New York in any action or proceeding under, arising out of or related to this Forbearance Agreement and the Factoring Documents, confirms that such courts are convenient forums, and that each such Client submits to the personal jurisdiction of such courts. Each Client hereby consents to the service of process by registered or certified mail, return receipt requested, directed to such Client at such Clients' address set forth above, and each Client agrees that service so made shall be deemed complete five (5) days after the date of mailing.

(d)    EACH OF THE CLIENTS HEREBY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING UNDER, ARISING OUT OF OR RELATED TO THIS FORBEARANCE AGREEMENT.

(e)    The unenforceability or invalidity of any one or more provisions hereof shall not render any other provisions herein contained unenforceable or invalid.

(f)    This Forbearance Agreement is the result of a full and complete negotiation at arm's length by all parties hereto.  No prior drafts or memoranda prepared by any parties shall be used to construe or interpret any provision hereof, nor shall any one party hereto be considered the "drafter" of this Forbearance Agreement for the purposes of construing the terms, conditions and obligations set forth herein.  This Forbearance Agreement sets forth the entire understanding of the parties with respect to the matters set forth herein and supersedes in their entirety any and all understandings and agreements, whether written or oral, of the parties with respect to the foregoing.  Except as expressly amended or otherwise modified hereby (including, without limitation, the preservation of the Existing Defaults), the Agreement and the other Factoring Documents remain in full force and effect in accordance with their existing terms and provisions as of the date hereof, except that, in the event of any conflict between any term or provision of this Forbearance Agreement and any term or provision of the Agreement or the other Factoring Documents, the term or provision of this Forbearance Agreement shall control. This Forbearance Agreement cannot be changed, modified, amended, waived or terminated in any respect, except by a writing executed by the party to be charged.

(g)    This Forbearance Agreement may be executed in one or more counterparts, each of which shall constitute but one and the same Forbearance Agreement.

IN WITNESS WHEREOF, the parties hereto have duly executed this Forbearance Agreement as of the date first written above.

GMAC COMMERCIAL CREDIT LLC

By: _____

Title: PRESIDENT & CEO

[SIGNATURES CONTINUED ON NEXT PAGE]

[SIGNATURES CONTINUED FROM PREVIOUS PAGE]

AGREED TO:

SENECA SPORTS, INC.

By: _____

Title: _____ Prts. _____


BROOKFIELD INTERNATIONAL, INC.

By: _____

Title: _____ Prts. _____

# Exhibit

# D

**EXHIBIT A**

August 9, 2001

**GMAC COMMERCIAL CREDIT LLC**
1290 Avenue of the Americas
New York, New York 10104

Re:  Ratification and Amendment of Guaranty

Gentlemen:

Reference is made to the Guaranty dated September 19, 2000 (as the same has heretofore or may be hereafter amended, restated, renewed, extended, supplemented, substituted or otherwise modified from time to time, collectively, the "Guaranty") executed by the undersigned (the "Guarantor") in favor of GMAC Commercial Credit LLC (the "Company") pursuant to which Guarantor guaranteed all of the obligations of Seneca Sports, Inc. ("Seneca") and Brookfield International, Inc. ("Brookfield"; and together with Seneca, collectively, the "Clients") to the Company, including all such obligations of the Clients to the Company arising under or in connection with that certain Factoring Agreement dated September 19, 2000 by and among the Clients and the Company and all of the notes, instruments, agreements and other documents executed and/or delivered in connection therewith (all of the foregoing, as the same have heretofore been amended, restated, renewed, extended, supplemented, substituted or otherwise modified, collectively, the "Factoring Agreements").

Reference is further made to the Forbearance Agreement dated the date hereof by and among the Company and the Clients (as may be hereafter amended, restated, renewed, extended, supplemented, substituted or otherwise modified, collectively, the "Forbearance Agreement"). Guarantor acknowledges that it has received a copy of the Forbearance Agreement.

As an inducement to the Company to enter into the Forbearance Agreement, Guarantor hereby (i) acknowledges and consents to the execution of the Forbearance Agreement by the Clients; and (ii) ratifies, reaffirms and confirms all terms and provisions of the Guaranty including, without limitation, the representations, warranties and covenants contained in the Guaranty, as amended herein, and (iii) acknowledges, confirms and agrees that Guarantor's Obligations (as defined in the Guaranty) are due and owing by the Guarantor to Factor without offset, defense or counterclaim of any kind, nature or description whatsoever.

Guarantor hereby acknowledges, confirms and agrees that the second to last paragraph of the Guaranty (which paragraph, for the avoidance of doubt, begins "Notwithstanding anything to the contrary contained herein ...") is hereby amended as follows:

"Notwithstanding anything to the contrary contained herein, the continuing liability of the undersigned hereunder shall not exceed the principal amount of $4,500,000, plus interest thereon at the Default Rate provided for in the Agreement (which interest shall be payable for the period commencing on the date of demand for

113661-2

payment by the Company and ending on the date of full and complete payment of such amount), plus any and all costs and expenses of collection hereunder, including, without limitation, attorneys' fees and legal expenses. Such continuing liability shall (i) be in addition to and shall not be reduced or satisfied from the proceeds of certain Standby Letters of Credit in the aggregate original face amount of $4,350,000 opened for the account of the Client at the request of the undersigned for the benefit of the Company, and shall not be affected by, nor shall anything herein contained be deemed a limitation of the amount of credit which may be extended to the Client, or the number of transactions with the Client or the nature or the amount of the "Obligations", as defined in the Agreement, incurred by the Client."

Except as specifically set forth herein, no other modifications or amendments to the Guaranty are intended or implied, and in all other respects the Guaranty shall continue in full force and effect in accordance with its respective terms as of the date hereof.

Nothing in this agreement shall be deemed to prejudice, waive, compromise, discharge or otherwise effect any and all claims, security interests, rights and remedies which the Company now has or may hereafter have against any person not a party hereto or any of such person's assets, under applicable law or otherwise, all of which are hereby expressly reserved.

This agreement constitutes a continuing obligation and shall be binding upon Guarantor and shall inure to the benefit of and be enforceable by the Company and its successors, transferees and/or assigns.

Guarantor hereby agrees that Guarantor shall, from time to time, execute and deliver any and all additional and/or supplemental instruments, and do such other acts and things, as may be necessary or desirable to affect the purposes of this agreement, and the consummation of the transactions contemplated hereby.

This agreement sets forth the entire agreement and understanding of the Guarantor and the Company with respect to the matters set forth herein, and supersedes any and all prior agreements and understandings of the parties hereto with respect to the foregoing, and this agreement cannot be changed, modified, amended or terminated except in writing executed by the party to be charged.

Very truly yours,

_____

**DAVID L. LANDAY**, individually

AGREED:

**GMAC COMMERCIAL CREDIT LLC**

By: _____

Title: _____

**EXHIBIT B**

**GMAC COMMERCIAL CREDIT LLC**
1290 Avenue of the Americas
New York, New York 10104

August 9, 2001

Mr. David L. Landay
85 East India Row
Apt. #20-F
Boston, Massachusetts 02110

Re: <u>Cash Deposit</u>

Dear Mr. Landay:

Reference is made to the Factoring Agreement dated September 19, 2000 (as amended, restated, renewed, extended, supplemented, substituted or otherwise modified, the "Factoring Agreement") by and among Seneca Sports, Inc. ("Seneca"), Brookfield International, Inc. ("Brookfield"; and together with Seneca, collectively, the "Clients") and GMAC Commercial Credit LLC ("Factor"). All capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to them in the Factoring Agreement.

Reference is further made to (i) that certain Guaranty dated September 19, 2000 (as amended, restated, renewed, extended, supplemented, substituted or otherwise modified, the "Guaranty") executed by David L. Landay ("Pledgor") in favor of Factor, pursuant to which Pledgor unconditionally guaranteed the Obligations of the Clients to Factor and (ii) that certain Forbearance Agreement dated the date hereof by and among Clients and Factor (as amended, restated, renewed, extended, supplemented, substituted or otherwise modified, the "Forbearance Agreement").

Pledgor hereby acknowledges, confirms and agrees that Pledgor shall make certain cash deposits in the aggregate amount of $1,000,000 (collectively, the "Cash Deposit") with Factor to be held by Factor as collateral security for the Obligations (as defined in the Guaranty). The Cash Deposit shall be made by Pledgor in the amount of (i) $400,000 on or before August 11, 2001, and (ii) $600,000 on or before August 15, 2001. Pledgor has agreed to make the Cash Deposit with Factor in consideration of Factor's agreement to forbear from exercising its rights and remedies under the Factoring Agreement, all as more fully set forth in the Forbearance Agreement.

Pledgor hereby grants to Factor a continuing first security interest in and right of setoff with respect to the Cash Deposit, securing payment and performance of all of the Obligations. In the event of a default by Clients in payment or performance of the Obligations, when due, or in the event of any other Event of Default under the Factoring Agreement or under the Forbearance Agreement,

115660-2

or under any other agreement among Factor and any Client or executed by any Client in Factor's favor or guaranteeing, evidencing or standing as collateral security for the Obligations, or in the event of the termination for any reason of any guarantee of the Obligations, then Factor may immediately apply the Cash Deposit to payment of the Obligations without notice or demand and in such order as Factor shall determine. Pledgor agrees that Factor need not attempt to exercise any of Factor's rights or remedies with respect to any other collateral for the Obligations or against any other obligor or guarantor of the Obligations (which rights and remedies may be exercised by Factor in such order and manner as Factor shall elect, and which shall be cumulative and not exclusive) before applying the Cash Deposit to payment of the Obligations. Factor may add or release any collateral for the Obligations or any party primarily or secondarily liable for the Obligations without affecting Factor's rights or recourse with respect to the Cash Deposit.

Any rights and remedies granted to Factor under the Factoring Agreement with respect to collateral security for the Obligations shall apply with equal force to the Cash Deposit.

While held by Factor, the Cash Deposit shall bear interest in Pledgor's favor at a per annum rate equal to the Alternate Base Rate minus three percent (3%).

If you are in agreement with all of the foregoing, please so indicate by signing and returning to us the enclosed copy of this letter.

Very truly yours,

GMAC COMMERCIAL CREDIT LLC

By: _____

Title: _____


AGREED:


_____
DAVID L. LANDAY, individually


115660-2

# EXHIBIT C

Bentcol Sports

Projected Availability for the Period July 21 through October 28, 2001
$ (Dollars)

09/06/2002 14:12 FAX 212 884 7372   GMACC LEGAL   ☐004

August 9, 2001

**GMAC COMMERCIAL CREDIT LLC**
1290 Avenue of the Americas
New York, New York 10104

Re:   Ratification and Amendment of Guaranty

Gentlemen:

Reference is made to the Guaranty dated September 19, 2000 (as the same has heretofore or may be hereafter amended, restated, renewed, extended, supplemented, substituted or otherwise modified from time to time, collectively, the "Guaranty") executed by the undersigned (the "Guarantor") in favor of GMAC Commercial Credit LLC (the "Company") pursuant to which Guarantor guaranteed all of the obligations of Seneca Sports, Inc. ("Seneca") and Brookfield International, Inc. ("Brookfield"; and together with Seneca, collectively, the "Clients") to the Company, including all such obligations of the Clients to the Company arising under or in connection with that certain Factoring Agreement dated September 19, 2000 by and among the Clients and the Company and all of the notes, instruments, agreements and other documents executed and/or delivered in connection therewith (all of the foregoing, as the same have heretofore been amended, restated, renewed, extended, supplemented, substituted or otherwise modified, collectively, the "Factoring Agreements").

Reference is further made to the Forbearance Agreement dated the date hereof by and among the Company and the Clients (as may be hereafter amended, restated, renewed, extended, supplemented, substituted or otherwise modified, collectively, the "Forbearance Agreement"). Guarantor acknowledges that it has received a copy of the Forbearance Agreement.

As an inducement to the Company to enter into the Forbearance Agreement, Guarantor hereby (i) acknowledges and consents to the execution of the Forbearance Agreement by the Clients; and (ii) ratifies, reaffirms and confirms all terms and provisions of the Guaranty including, without limitation, the representations, warranties and covenants contained in the Guaranty, as amended herein, and (iii) acknowledges, confirms and agrees that Guarantor's Obligations (as defined in the Guaranty) are due and owing by the Guarantor to Factor without offset, defense or counterclaim of any kind, nature or description whatsoever.

Guarantor hereby acknowledges, confirms and agrees that the second to last paragraph of the Guaranty (which paragraph, for the avoidance of doubt, begins "Notwithstanding anything to the contrary contained herein ...") is hereby amended as follows:

"Notwithstanding anything to the contrary contained herein, the continuing liability of the undersigned hereunder shall not exceed the principal amount of $4,500,000, plus interest thereon at the Default Rate provided for in the Agreement (which interest shall be payable for the period commencing on the date of demand for

113661-2

payment by the Company and ending on the date of full and complete payment of such amount), plus any and all costs and expenses of collection hereunder, including, without limitation, attorneys' fees and legal expenses. Such continuing liability shall (i) be in addition to and shall not be reduced or satisfied from the proceeds of certain Standby Letters of Credit in the aggregate original face amount of $4,350,000 opened for the account of the Client at the request of the undersigned for the benefit of the Company, and shall not be affected by, nor shall anything herein contained be deemed a limitation of the amount of credit which may be extended to the Client, or the number of transactions with the Client or the nature or the amount of the "Obligations", as defined in the Agreement, incurred by the Client."

Except as specifically set forth herein, no other modifications or amendments to the Guaranty are intended or implied, and in all other respects the Guaranty shall continue in full force and effect in accordance with its respective terms as of the date hereof.

Nothing in this agreement shall be deemed to prejudice, waive, compromise, discharge or otherwise effect any and all claims, security interests, rights and remedies which the Company now has or may hereafter have against any person not a party hereto or any of such person's assets, under applicable law or otherwise, all of which are hereby expressly reserved.

This agreement constitutes a continuing obligation and shall be binding upon Guarantor and shall inure to the benefit of and be enforceable by the Company and its successors, transferees and/or assigns.

Guarantor hereby agrees that Guarantor shall, from time to time, execute and deliver any and all additional and/or supplemental instruments, and do such other acts and things, as may be necessary or desirable to affect the purposes of this agreement, and the consummation of the transactions contemplated hereby.

This agreement sets forth the entire agreement and understanding of the Guarantor and the Company with respect to the matters set forth herein, and supersedes any and all prior agreements and understandings of the parties hereto with respect to the foregoing, and this agreement cannot be changed, modified, amended or terminated except in writing executed by the party to be charged.

Very truly yours,

**DAVID L. LANDAY**, individually

AGREED:

**GMAC COMMERCIAL CREDIT LLC**

By:

Title: PRESIDENT & CEO

115661-2

2

# Exhibit

# E

## GMAC COMMERCIAL CREDIT LLC
1290 Avenue of the Americas
New York, New York 10104

September 25, 2001

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Seneca Sports, Inc.
Brookfield International, Inc.
75 Fortune Boulevard
Milford, Massachusetts 01757
Attention: Mr. David L. Landay
President

Dear Mr. Landay:

Reference is made to the Forbearance Agreement dated August 9, 2001 ("Forbearance Agreement") among Seneca Sports, Inc. ("Seneca") and Brookfield International, Inc. ("Brookfield"; and together with Seneca, individually and collectively, the "Clients") and GMAC Commercial Credit LLC ("Factor"), the Factoring Agreement dated September 19, 2000 ("Factoring Agreement") among Clients and Factor and all of the notes, instruments, mortgages, guarantees and other agreements executed and/or delivered in connection therewith (all of the foregoing, together with the Forbearance Agreement and the Factoring Agreement, as the same now exist or may hereafter be amended, restated, renewed, extended, supplemented, substituted or otherwise modified, collectively, the "Agreements"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Forbearance Agreement.

Factor hereby advises Clients that breaches of provisions of the Forbearance Agreement exist and are continuing, including without limitation, breaches of Section 8.4(a)(iv) and, therefore, Additional Defaults have occurred and continue to exist under the Forbearance Agreement. In accordance with the terms of the Forbearance Agreement, the Forbearance Period is hereby terminated.

Accordingly, all Obligations to Factor are immediately due and payable, including, without limitation, all principal, accrued and accruing interest, commissions, costs, fees and expenses (including, without limitation, attorneys' fees and disbursements) due under the Factoring Agreement.

As of September 24, 2001, the aggregate principal amount of outstanding Obligations is not less than $7,372,000, plus interest accrued and accruing thereon and all commissions, costs, fees and expenses (including attorneys' fees and disbursements) and all other charges payable by Clients to

123933-1

Seneca Sports, Inc.
September 24, 2001
Page 2

Factor under the Factoring Agreement and the other Agreements, and Factor hereby makes demand for immediate payment of the Obligations.

Nothing herein shall operate as a waiver of any rights or remedies of Factor, all of which rights and remedies are hereby reserved.

Very truly yours,

GMAC COMMERCIAL CREDIT LLC

By: _____

Title: _____

123933-1                                                2

09/06/2002 14:12 FAX 212 884 7372    GMACCC LEGAL    ☒002

**GMAC COMMERCIAL CREDIT LLC**

1290 Avenue of the Americas
New York, New York 10104

September 25, 2001

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Mr. David L. Landay
85 East India Row
Apt. #20-F
Boston, Massachusetts 02110

Re:  Seneca Sports, Inc. and Brookfield International, Inc.

Dear Mr. Landay:

Reference is made to the Forbearance Agreement dated August 9, 2001 (the "Forbearance Agreement") among Seneca Sports, Inc. ("Seneca") and Brookfield International, Inc. ("Brookfield; and together with Seneca, collectively, the "Clients") and GMAC Commercial Credit LLC ("Factor"), the Factoring Agreement dated September 19, 2000 ("Factoring Agreement") among Clients and Factor and all of the notes, instruments, mortgages, guarantees and other agreements executed and/or delivered in connection therewith (all of the foregoing, together with the Forbearance Agreement and the Factoring Agreement, as the same now exist or may hereafter be amended, restated, renewed, extended, supplemented, substituted or otherwise modified, are collectively referred to herein as the "Agreements").  Reference is further made to your Guaranty dated September 19, 2000 (as heretofore amended, restated, renewed, ratified, extended, supplemented, substituted or otherwise modified, the "Guaranty") pursuant to which you have guaranteed to Factor the prompt payment when due of all of the "Obligations", as defined in the Guaranty, of Clients to Factor, and to that certain letter re: Cash Deposit dated August 9, 2001 (as heretofore amended, restated, renewed, ratified, extended, supplemented, substituted or otherwise modified, the "Cash Deposit Letter") executed by you and Factor.

You are hereby advised that Additional Defaults exist under the Forbearance Agreement and the Forbearance Period is hereby terminated.  Pursuant to the terms of your Guaranty, the Forbearance Agreement and the Factoring Agreement, all of the Clients' Obligations are now due and payable to Factor.  Accordingly, demand is hereby made on you for immediate payment in full by you of all of your Obligations to Factor under your Guaranty.

{2}963-1

09/06/2002  14:12 FAX 212 884 7372    GMACCC LEGAL    ☑003

Mr. David L. Landay
September 24, 2001
Page 2

As of September 24, 2001, the aggregate principal amount of your Obligations to Factor under your Guaranty is $4,500,000, plus interest accrued and accruing thereon at the Default Rate, and all costs and expenses (including attorneys' fees and disbursements) and all other charges payable by you under the Guaranty.

If Factor does not receive immediate payment in full of all of the Obligations from you, Factor will, at its option, exercise its rights and remedies under the Guaranty and its rights and remedies as a secured party under the Uniform Commercial Code and other applicable law.

In addition to, and not in limitation of the foregoing, please be advised that Factor is simultaneously herewith exercising its rights under the Cash Deposit Letter and submitting sight drafts to the issuing bank for the full face amounts of (i) Standby Letter of Credit No. 1S1228246 dated September 19, 2000 in the face amount of $4,100,000 issued by Fleet National Bank in Factor's favor upon your application and (ii) Standby Letter of Credit No. 1S1257988 dated February 27, 2001 in the face amount of $250,000 issued by Fleet National Bank in Factor's favor upon your application.

Nothing herein shall operate as a waiver of any of the rights or remedies of Factor, all of which rights and remedies are hereby reserved.

Very truly yours,

GMAC COMMERCIAL CREDIT LLC

By: _____

Title: _____

123983-1