# EXHIBIT 3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------X

GMAC COMMERCIAL FINANCE,　　　　　　　　　　Index. No.: 602238/02

　　　　　　　　　　Plaintiff,　　　　　　　　**PLAINTIFF'S RESPONSES TO
　　　　　　　　　　　　　　　　　　　　　　　DEFENDANT'S FIRST SET
-against -　　　　　　　　　　　　　　　　　　OF INTERROGATORIES**

DAVID L. LANDAY,

　　　　　　　　　　Defendant.
-----------------------------------------------------------------X

　　　　Plaintiff GMAC Commercial Finance ("GMACCF"), by its attorneys Cohen Tauber Spievack & Wagner LLP, responds to Defendant David L. Landay's First Set of Interrogatories (the "Interrogatories"), as follows:

## GENERAL OBJECTIONS

　　　　1. GMACCF objects to the Interrogatories to the extent that they seek information that is neither material nor necessary to the claims or defenses raised in this lawsuit.

　　　　2. These responses are based upon a diligent investigation by GMACCF and its attorneys, but reflect only the present state of this investigation and research into the factual and legal issues relating to this action. GMACCF's responses, therefore, are not intended to be, nor shall be deemed to be, a representation that no other facts or contentions other than those specified in these responses exist. GMACCF reserves the right to amend or supplement these responses at any time in light of further investigation, research or analysis, to the extent permitted or required by law.

3. All specific responses to the Interrogatories are provided without waiver, and with express reservation, of: (a) all objections as to competency, relevancy, materiality and admissibility of the responses and the subject matter thereof as evidence in any further proceedings in this action, including trial, or in any other action; (b) the right to object on any ground at any time to a demand or request for further responses to these or any other discovery requests; and (c) the right to move for a protective order to protect the confidentiality of any information disclosed or for any other purpose provided by law.

## RESPONSES

1. Identify all GMAC employees that have been involved in the sale, disposition, or liquidation of the Assets.

    Answer:   Subject to and without waiving any of the general objections listed above, John Crowley, John Fitzpatrick, and Jane Frangos.

2. With respect to each employee identified in response to Interrogatory No. 1, describe (a) his or her title, job description, and relevant experience, (b) all complaints made about him or her during the period of his or her employment with GMAC, including but not limited to complaints made by customers, and (c) all occasions in which the employee was investigated, disciplined, written up, reprimanded, demoted, or subject to any other punitive or disciplinary action by GMAC.

    Answer:   GMACCF objects to parts (a), (b) and (c) of this Interrogatory on the grounds that they are overly broad, seek information irrelevant to this action, and are not reasonably calculated to lead to the production of admissible evidence. Subject to and without waiving these and the general objections set forth above, John Crowley was an account executive in the Boston office, John Fitzpatrick was an account executive in the New York office, and Jane Frangos was an account executive in the New York office.

3. Identify all agents of GMAC and other persons not employed by GMAC that

have been involved in the sale, disposition, or liquidation of the Assets.

<u>Answer</u>:    John Rijo and Dick Sebastiao.

4.    With respect to each person identified in response to Interrogatory No. 3, describe (a) his or her title, job description, and relevant experience, (b) all complaints made about him or her during the period of his or her employment with GMAC, including but not limited to complaints made by customers, and (c) all occasions in which the employee was investigated, disciplined, written up, reprimanded, demoted, or subject to any other punitive or disciplinary action by GMAC.

<u>Answer</u>:    GMACCF objects to parts (a), (b) and (c) of this Interrogatory on the grounds that they are overly broad, seek information irrelevant to this action, and are not reasonably calculated to lead to the production of admissible evidence. Subject to and without waiving these and the general objections set forth above, both Dick Sebastiao and John Rijo are experienced liquidators; John Rijo is a consultant for RAS, while Dick Sebastiao is RAS's president.

5.    Describe all efforts GMAC has made to dispose of, sell, or liquidate the Assets.

<u>Answer</u>:    GMACCF objects to this Interrogatory to the extent that, in seeking "all" efforts GMACCF made to dispose of the Assets, without any specification, the Interrogatory is overly broad, vague and not subject to a reasonable response. Subject to and without waiving these and the general objections set forth above, RAS, as GMACCF's agent, had numerous contacts with vendors and liquidators in its efforts to liquidate the Assets.

6. If the efforts described in response to Interrogatory No. 5 include advertising, describe such advertisements and identify the Assets to which each pertained, and where such advertisements were in print form, annex a copy of each advertisement as well as proof of payment for the advertisements.

Answer: To the best of GMACCF's current knowledge, information and belief, the efforts described in GMACCF's response to Interrogatory No. 5 did not include formal advertising, such as newspaper or other print ads, billboards, or television or radio ads.

7. Identify and describe the Assets that GMAC has sold, liquidated, or otherwise disposed of to date.

Answer: GMACCF sold, liquidated or otherwise disposed of Assets including, but not limited to, sporting goods, such as inline skates, snowboards, slumber bags, scooter boards, skateboards and helmets.

8. Identify and describe the sale of each Asset that GMAC has sold, liquidated or otherwise disposed of, including but not limited to the manner of sale, sale price, cost value of the Assets sold, and identity of the buyer, including any affiliations, associations, or relationships that said buyer has or has had with GMAC.

Answer: Plaintiff objects to this Interrogatory on the grounds that it seeks multiple categories of information (*i.e.*, manner of sale, price, cost value of asset sold, identity of buyer, etc.) and, as such, is overly broad, vague, and unduly burdensome. Subject to and without waiving these and the general objections set forth above, GMACCF responds as follows:

GMACCF signed a secured party's bill of sale with "It's Showtime." The net collection for the products, slumber bags and scooter boards, was $5,907.50. The cost value of these products equaled $13,176. This information was previously produced in documents bates numbered RAS 1089-1091.

GMACCF signed a secured party's bill of sale with "Excel Marketing." The net collection for the product, inline skates, was $2,800. The actual cost value was $5,107. This information was previously produced in documents bates numbered RAS 1119-1124.

GMACCF signed a secured party's bill of sale with "Direct Source." The net collection for the products, skateboards and helmets, was $34,346. The cost value was $91,401. This information was previously produced in documents bates numbered RAS 1144-1147.

GMACCF signed a secured party's bill of sale with "Warehouse Outlet Liquidators, Inc" ("WOL"). The net collection for the product was $77,000. The sale was for the remaining inventory within the Milford warehouse. The actual cost value was $397,876. This information was previously produced in documents bates numbered RAS 1205-1207.

GMACCF signed a secured party's bill of sale with the "Leon Korol Company" for all of the merchandise kept in the Toledo warehouse. The net collection was $115,000, while the cost value was $310,000. This information was previously produced in documents bates numbered RAS 1252-1253.

GMACCF signed a secured party's bill of sale contract with "Name Brand (Closeout Wholesalers, Inc.)." The net collection for the product, inline skates, was $13,532. The actual cost value was $33,926. This information was previously produced in documents bates numbered RAS 941-943. GMACCF also signed a second secured party's bill of sale with the company. The net collection for the product, also inline skates, was $5,929. The actual cost value was $14,866. This information was previously produced in documents bates numbered RAS 913-918.

GMACCF signed a secured party's bill of sale with "Olympia Sports Center." The net collection for the product, snowboards, was $16,762. The actual cost value was $34,560. This information was previously produced in documents bates numbered RAS 979-981.

GMACCF signed a secured party's bill of sale with "JC Penny." The net collection for the product, inline skates, was $33,668. The cost value was $33,420. This information was previously produced in documents bates numbered RAS 1077-1079.

GMACCF also sold a forklift for $1,600 to WOL. This information was previously produced in a document bates numbered RAS 0875.

9. Describe all Assets for which GMAC has received offers to purchase, including the cost value of the Assets.

Answer: On October 29, 2001, "Ozer" offered to purchase the Assets in the Milford warehouse for $140,474 or 22.5 percent of cost. That offer was refused and the items were eventually sold to Name Brand, Olympia, JCP, It's Showtime, Excel, Direct Source and WOL for $189,943 as detailed in the answer to Interrogatory No. 8.

On Friday, November 9, 2001, "Ocean State Job Lot" offered to purchase the $397,876 worth of remaining Milford inventory for less than $60,000 or 15 percent of cost. That offer was refused and the remaining inventory was sold on November 16, 2001, to WOL for $77,000 at 19 percent of cost.

10. With respect to each Asset described in response to Interrogatory No. 9, describe the terms of the offer, the date of the offer, the amount of the offer, the identity of the party who made the offer, and any affiliation or association said party has or has had with GMAC and its owners, officers, agents, or employees.

Answer: Please see response to Interrogatory No. 9.

11. With respect to all Assets described in response to Interrogatory No. 9 that GMAC ultimately sold, state the amount of the sale price, the date of sale, and the identity of the buyer.

Answer: Please see response to Interrogatory No. 9.

12. Describe all Assets that GMAC has sold at auction.

Answer: To the best of GMACCF's current knowledge, information and belief, no Assets were sold at auction.

13. With respect to each Asset identified in response to Interrogatory No. 12, state the amount of the winning bid, identify the winning bidder, and describe any affiliation, association, or relationship the winning bidder had or has had with GMAC or its owners, officers, agents, or employees.

Answer: Please see response to interrogatory No. 12.

14. With respect to the auctions in which Assets described in response to

Interrogatory No. 12 were sold, describe the location of the auction, the date of the auction, the manner in which the auction was publicized or advertised, and any affiliation, association, or relationship the winning bidder had with GMAC or its owners, officers, agents, or employees.

    Answer:    Please see response to interrogatory No. 12.

15. Describe all Assets that GMAC has abandoned, and as to such abandoned assets, describe its efforts to obtain consideration for these Assets prior to abandoning them, including but not limited to the period of time during which these efforts were made.

    Answer:    GMACCF objects to this Interrogatory on the grounds that it does not have records, nor was it required to maintain records, of Assets that it was unable to sell or otherwise liquidate. Subject to and without waiving these and the general objections set forth above, GMACCF is aware that RAS was unable to liquidate a portion of the Assets. It also is aware that efforts were made to sell the Assets remaining in the warehouses to Cal Cartage and Kellaway – the owners of the respective warehouses. However, those negotiations never reached fruition, because the money that might have been realized would not have even been enough to get the Assets released from the warehouse.

16. Describe the Assets that GMAC currently maintains in warehouses, and describe its efforts to sell or liquidate these assets, including the time period during which such efforts were made.

    Answer:    GMACCF objects to this Interrogatory on the grounds that it is vague and ambiguous as the term "currently maintains" is undefined. Subject to and without waiving this and the general objections set forth above, GMACCF no longer has any involvement with the Assets and, except for the work described above performed by RAS, did not make other efforts to dispose of the Assets.

17. State the total amount that GMAC has paid to date in warehouse fees for storage of the Assets.

<u>Answer:</u> GMACCF objects to this Interrogatory on the grounds that it seeks information irrelevant to this action and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving these and the general objections set forth above, GMAC paid $45,000 to release the Assets from the Toledo warehouse.

18. Describe the sale of all Assets for which the sale proceeds have been used to pay for fees incurred in connection to storage of the Assets.

<u>Answer:</u> GMACCF objects to this Interrogatory on the grounds that it seeks information irrelevant to this action and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving these or the general objections set forth above, the Assets were sold in bulk to one buyer and proceeds from that sale enabled GMACCF to pay the warehouse fee in order to release the goods.

19. State the total amount in Accounts Receivable owing at the time of GMAC's seizure of the collateral of Seneca Sports, Inc. and Milford International, Inc.

<u>Answer:</u> The amount of the Accounts Receivable owed at the seizure date according to the relevant invoices was $869,885.82.

20. Describe all Accounts Receivable that have been collected to date, including but not limited to the entities from whom they were received, the nature and amounts of expenses incurred arising from their collection, and the total amount collected.

<u>Answer:</u> To the best of GMACCF's current knowledge and belief, since its seizure of the collateral, GMACCF has collected $588,000 of the Accounts Receivable. At the current time, GMACCF could not locate the documents that provide the detail regarding the entities from which these sums were received. GMACCF is continuing to search for such records and reserves the right to supplement this response if and when it obtains such information.

21. Describe the Accounts Receivable that have not been collected to date,

including but not limited to the amounts thereof, the entities from whom they are owed, the reasons they have not been collected, GMAC's efforts to collect them, and the nature and amounts of expenses incurred through such efforts.

<u>Answer:</u>   Despite a diligent search, GMACCF was unable to locate documents or other evidence of the precise amount of accounts receivable that were not collected after GMACCF seized the collateral. GMACCF is continuing to search for such records and reserves the right to supplement this response if and when it obtains such information.

22. With respect to the entities identified in response to Interrogatory No. 21, identify those who are bankrupt or are party to pending bankruptcy proceedings.

<u>Answer:</u>   Please see response to Interrogatory No. 21.

23. Describe all efforts GMAC has taken to maintain the value the Assets had at the time it seized them, including but not limited to payment of patent, trademark, copyright, and license fees, and the dates and amounts of such payments.

<u>Answer:</u>   GMACCF, through its agent RAS, took every reasonable effort to maintain the value of the collateral and to obtain their maximum available value. At the same time, GMACCF, through its agent RAS, evaluated the collateral to determine whether additional payments should be made based on a cost-benefit analysis. After considering the value, if any, of the intellectual property, as well as the risks of maintaining licenses and their concomitant costs, to the best of GMACCF's current knowledge, information and belief, GMACCF, through its agent RAS, made the decision not to pay additional sums to maintain patents, trademarks, copyrights or licenses.

24. Describe all offers received by GMAC for the purchase of patents, trademarks, copyrights, or licenses, including all applications for patents, trademarks, or copyrights, held by Seneca Sports, Inc. and/or Brookfield International, Inc. prior to the GMAC's seizure of their assets.

<u>Answer:</u>   To the best of GMACCF's current knowledge, information and belief, GMACCF received only a few discrete inquiries relating to the intellectual

property, never an offer. Indeed, when GMACCF responded to several inquiries, none of the inquirers ever followed up with a *bona fide* offer.

25.   Describe all sales of Assets to Leon Korol, including but not limited to the following with respect to each Asset: the Asset's cost value, its sale price, negotiations between GMAC and the buyer prior to sale, and the manner in which the buyer learned the Assets were available for sale.

   <u>Answer:</u>   Please see response to Interrogatory No. 8.

26.   Describe all sales of Assets to J.C. Penney Catalog, including but not limited to the following with respect to each Asset: the Asset's cost value, its sale price, negotiations between GMAC and the buyer prior to sale, and the manner in which the buyer learned the Assets were available for sale.

   <u>Answer:</u>   Please see response to Interrogatory No. 8.

27.   Describe all sales of Assets to Name Brand/Closeout Wholesalers, Inc., including but not limited to the following with respect to each Asset: the Asset's cost value, its sale price, negotiations between GMAC and the buyer prior to sale, and the manner in which the buyer learned the Assets were available for sale.

   <u>Answer:</u>   Please see response to Interrogatory No. 8.

28.   Describe all sales of Assets to Direct Source Enterprises, including but not limited to the following with respect to each Asset: the Asset's cost value, its sale price, negotiations between GMAC and the buyer prior to sale, and the manner in which the buyer learned the Assets were available for sale.

   <u>Answer:</u>   Please see response to Interrogatory No. 8.

29. Describe all sales of Assets to Olympia Sports Center, including but not limited to the following with respect to each Asset: the Asset's cost value, its sale price, negotiations between GMAC and the buyer prior to sale, and the manner in which the buyer learned the Assets were available for sale.

<u>Answer:</u>   Please see response to Interrogatory No. 8.

30. Describe all sales of Assets to It's Showtime, including but not limited to the following with respect to each Asset: the Asset's cost value, its sale price, negotiations between GMAC and the buyer prior to sale, and the manner in which the buyer learned the Assets were available for sale.

<u>Answer:</u>   Please see response to Interrogatory No. 8.

31. Describe all sales of Assets to Excel Marketing, including but not limited to the following with respect to each Asset: the Asset's cost value, its sale price, negotiations between GMAC and the buyer prior to sale, and the manner in which the buyer learned the Assets were available for sale.

<u>Answer:</u>   Please see response to Interrogatory No. 8.

32. Describe all sales of Assets to Ocean State Job Lot, including but not limited to the following with respect to each Asset: the Asset's cost value, its sale price, negotiations between GMAC and the buyer prior to sale, and the manner in which the buyer learned the Assets were available for sale.

<u>Answer:</u>   To the best of GMACCF's current knowledge, information and belief, no Assets were sold to Ocean State Job Lot.

33. Describe all sales of Assets to KB Toys, including but not limited to the following with respect to each Asset: the Asset's cost value, its sale price, negotiations between GMAC and the buyer prior to sale, and the manner in which the buyer learned the Assets were available for sale.

> Answer: To the best of GMACCF's current knowledge, information and belief, no Assets were sold to KB Toys.

34. Describe all sales of assets to Consolidated Stores, including but not limited to the following with respect to each Asset: the Asset's cost value; its sale price, negotiations between GMAC and the buyer prior to sale, and the manner in which the buyer learned the Assets were available for sale.

> Answer: To the best of GMACCF's current knowledge, information and belief, no Assets were sold to Consolidated Stores.

35. Describe all sales of Assets to Costco, including but not limited to the following with respect to each Asset: the Asset's cost value, its sale price, negotiations between GMAC and the buyer prior to sale, and the manner in which the buyer learned the Assets were available for sale.

> Answer: To the best of GMACCF's current knowledge, information and belief, no Assets were sold to Costco.

36. Describe all sales of Assets to K-Mart, including but not limited to the following with respect to each Asset: the cost value of the Assets, its sale price, negotiations between GMAC and the buyer prior to sale, and the manner in which the buyer learned the Assets were available for sale.

> Answer: To the best of GMACCF's current knowledge, information and belief, no assets were sold to K-Mart.

37. Describe all sales of Assets to Industry Closeouts, including but not limited to the following with respect to each Asset: the Asset's cost value, its sale price, negotiations between GMAC and the buyer prior to sale, and the manner in which the buyer learned the Assets were available for sale.

> Answer:   To the best of GMACCF's current knowledge, information and belief, no assets were sold to "Industry Closeouts."

38. Describe all sales of Assets to The Marsden Company, Inc., including but not limited to the following with respect to each Asset: the Asset's cost value, its sale price, negotiations between GMAC and the buyer prior to sale, and the manner in which the buyer learned the Assets were available for sale.

> Answer:   To the best of GMACCF's current knowledge, information and belief, no assets were sold to "The Marsden Company."

39. Describe all sales of Assets to Lion Sports, including but not limited to the following with respect to each Asset: the Asset's cost value, its sale price, negotiations between GMAC and the buyer prior to sale, and the manner in which the buyer learned the Assets were available for sale.

> Answer:   To the best of GMACCF's current knowledge, information and belief, no Assets were sold to "Lion Sports."

40. Describe all sales of Assets to Kellaway, including but not limited to the following with respect to each Asset: the cost value of the Asset, its sale price, negotiations between GMAC and the buyer prior to sale, and the manner in which the buyer learned the Assets were available for sale.

> Answer:   To the best of GMACCF's current knowledge, information and

belief, no assets were sold to "Kellaway," although GMACCF, through RAS, made efforts in that regard, as set forth in response to Interrogatory No. 15.

41. Describe all sales of Assets to Cal Cartage, including but not limited to the following with respect to each Asset: the cost value of the Asset, its sale price, negotiations between GMAC and the buyer prior to sale, and the manner in which the buyer learned the Assets were available for sale.

> Answer: To the best of GMACCF's current knowledge, information and belief, no assets were sold to "Cal Cartage," although GMACCF, through RAS, made efforts in that regard, as set forth in response to Interrogatory No. 15.

42. State the total value of the Assets at the time they were seized by GMAC.

> Answer: GMACCF objects to this Interrogatory on the grounds that in asking for the "total value" of the Assets as of the date of seizure, and in not defining "value," whether as liquidation value, cost value, fair market value or other description or definition of "value," the Interrogatory is vague and not susceptible of a reasonable response. Subject to and without waiving these and the general objections listed above the gross value of the Assets according to the Defendant's books and records, without including any expenses or other inhibitors was $1,281883.

43. State the total amount that sale, disposal, and/or liquidation of the Assets has yielded to date, and state the nature and total amounts of expenses incurred in connection to their sale, disposal and/or liquidation. (You must attach any document that forms a part of or the entire basis for your response to this Interrogatory, or refers, relates, pertains to or reflects a part of or the entire basis for your response, pursuant to the Instructions set forth above (supra at 2-3)).

> Answer: GMACCF has collected $304,943 in connection with its disposal of the Defendant's Assets. However, GMACCF has also incurred various expenses in connection with the liquidation. While some of those expenses are listed below, GMACCF reserves the right to supplement this response if and when it obtains different information through its search of its books and records.

John Rijo's and Richard Sebastiao's fee for conducting the liquidation was $44,880.

James Hart's fee for organization, packing and shipping during the liquidation was $4,812.

Richard Herman's fee for system backup in connection with the liquidation was $318.

Cynthia Foscarota's fee for customer service, preparing AR backup and Ozer requests was $583.

Neil Finklestein's fee for wire transfers, running reports and general administration was $1,244.

Industrial Warehousing charged $45,000 for release of the goods from the Toledo warehouse.

44. State the total value of the Assets that GMAC currently possesses (i.e., Assets that have not been liquidated or sold).

   Answer: Please see response to Interrogatory No. 16.

45. Describe any plan devised by GMAC pursuant to which liquidation of the Assets was to be carried out.

   Answer: GMACCF retained RAS to liquidate the Assets. RAS's initial plan was to sell the Assets in bulk.

46. With respect to any plan described in response to Interrogatory No. 45, describe any terms of such plan to which GMAC did not fully adhere and identify the time period in which the plan was executed.

   Answer: RAS was forced to sell the goods piecemeal, because the wholesalers they contacted were unwilling to make a worthwhile offer.

COHEN TAUBER SPIEVACK & WAGNER LLP

By: _____
      Stephen Wagner
      The Graybar Building
      420 Lexington Avenue, Suite 2400
      New York, New York 10170
      (212) 586-5800

Attorneys for GMACCF Commercial Finance LLC

## PLAINTIFF'S SWORN SIGNATURE

STATE OF MICHIGAN            )
                             ) ss.
COUNTY OF OAKLAND            )


      Comes now Kathy Pappalardo, being first duly sworn, and states that she is a vice president of the Plaintiff, GMAC Commercial Finance and is authorized to make the foregoing responses to Defendant's First Set of Interrogatories, and that the responses were made pursuant to a review of the relevant records at her direction, and that they are true to the best of her knowledge, information and belief.

_____

Subscribed and sworn to before me

this 11th day of April 2005.



_____

Notary Public