UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID L. LANDAY )<br>     Plaintiff, )<br> )<br>v. )<br> )<br>GMAC COMMERCIAL CREDIT LLC )<br>and GMAC COMMERCIAL FINANCE )<br>LLC, )<br>     Defendants. )<br> ) | Civil Action No. 04-cv-11955-WGY |

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Landay cannot prove that defendant GMAC CF violated the Massachusetts usury statute (Count II) because: (a) New York law governs this case, so the Massachusetts statute does not apply; (b) Landay lacks standing to assert a usury claim; (c) Landay waived the right to bring a usury claim; and (d) the loan at issue was not usurious. Likewise, Landay cannot establish the reasonable reliance necessary to prevail on his misrepresentation claim (Count I) or the damages necessary to show that GMAC CF violated his rights as a junior creditor (Count VI). Accordingly, as a matter of law, GMAC CF is entitled to judgment on Counts I, II and VI of the Amended Complaint. Finally, since Landay grounds his assertion that GMAC CF violated Mass. Gen. Laws ch. 93A (Count VII) on the alleged fraud, usury and violation of rights referenced in Counts I, II and VI, to the extent that those claims fail, GMAC CF must necessarily prevail on what remains of Count VII.

## I.     STATEMENT OF FACTS

### A.     The 2000 Loan Documents

Landay is the president and CEO of Seneca Sports, Inc. ("Seneca"), a sporting goods distributor, and Brookfield International, Inc. ("Brookfield"), a company that sold juvenile sports equipment and sports toys. *See* Statement of Undisputed Material Facts ¶ 1. On September 19, 2000, GMAC CF, then a New York limited liability company based in New York, entered into a commercial factoring agreement (the "Factoring Agreement") with Seneca and Brookfield (collectively, the "Borrowers"). *Id.* ¶¶ 3-5. Landay, after consulting with counsel, signed the Factoring Agreement as President of Seneca and Brookfield. *Id.* ¶ 6.

Among other things, the Factoring Agreement provided that GMAC CF would provide the Borrowers with a $10 million line of credit, secured by the Borrowers' accounts receivable and other assets. *Id.* ¶ 7. It also stated that: (a) any loans or advances to the Borrowers were "on a totally discretionary basis on [GMAC CF's] part," *id.* ¶ 8; (b) GMAC CF could charge the Borrowers' account for interest up to "the highest rate permitted by New York law," *id.*; (c) New York law, exclusive of choice of law principles, governed; *id.*; and (d) the Factoring Agreement constituted the "entire understanding" of the parties and superseded "all inconsistent agreements and communications, written or oral." *Id.* ¶ 9.

In conjunction with the Factoring Agreement, Landay, after consulting with counsel, executed an personal guaranty of up to $3.5 million of the Borrowers' obligations, (the "Guaranty"), which explicitly provided that Landay's obligations were not conditional or contingent upon the pursuit by GMAC CF of any other remedies or security interests. *Id.* ¶¶ 10-12. As with the Factoring Agreement, the parties agreed that New York law governed the Guaranty. *Id.* ¶ 13. At the same time, Landay provided GMAC CF with a Standby Letter of

Credit (the "First Standby Letter of Credit") and executed a contract subordinating to GMAC CF certain debts that Seneca owed to Landay (the "Subordination Agreement"). *Id.* ¶¶ 14-16.[1]

### B.   The 2001 Loan Documents

As of August 9, 2001, the Borrowers were in default of numerous provisions of the 2000 Loan Agreement. *Id.* ¶ 26. In order to induce GMAC CF not to immediately exercise its rights as a secured creditor, Landay, in his capacity as president of Seneca and Brookfield, executed a Forbearance Agreement (the "Forbearance Agreement") with GMAC CF. *Id.* ¶¶ 27-29. In the Forbearance Agreement, the Borrowers acknowledged that as of August 8, 2001, they owed GMAC CF the aggregate principal amount of $6,719,177.62, plus other obligations. *Id.* ¶ 31. The Borrowers also released GMAC CF from "any and all actions, causes of actions, suits, … claims demands whatsoever." *Id.* The Forbearance Agreement further stated that New York law governed its "construction, interpretation and enforcement," and that it constituted "…the entire understanding of the parties with respect to the matters set forth herein and supersedes in their entirety any and all understandings and agreements, whether written or oral, of the parties with respect to the foregoing." *Id.*

In conjunction with the Forbearance Agreement, Landay signed a Ratification and Amendment of Guaranty, which affirmed "all terms and provisions of the Guaranty," consented to the execution of the Forbearance Agreement, and increased Landay's personal exposure on the Guaranty to $4.5 million (the "Ratification")[2]. *Id.* ¶¶ 32-35. In the Ratification, Landay confirmed that his obligations under the Guaranty were due and owing to GMAC CF "without

---

[1]   Collectively, the Factoring Agreement, the Guaranty, the First Standby Letter of Credit and the other ancillary documents to the September 19, 2000 transaction are referred to as the "2000 Loan Agreement."

[2]   Landay also provided GMAC CF with $1,000,000.00 in new cash collateral (the "Cash Collateral"), *id.* ¶¶ 39-41, and extended the term of a $250,000 Standby Letter of Credit (the "Second Standby Letter of Credit") that he had first issued in favor of GMAC CF in February 2001. *Id.* ¶ 42.

offset, defense or counterclaim of any kind, nature or description whatsoever." *Id.* ¶ 36. Landay also acknowledged that the Ratification "sets forth the entire agreement and understanding" between him and GMAC CF regarding the subject of the agreement. *Id.*

### C. GMAC CF's Liquidation of the Borrowers' Assets

By letters dated September 25, 2001, GMAC CF notified the Borrowers and Landay of the Borrowers' default under the terms of the Forbearance Agreement and demanded payment. *Id.* ¶ 45. Between October 15 and 18, 2001 GMAC CF collected $5,350,000 from Landay's First Standby Letter of Credit, the Cash Collateral and the Second Standby Letter of Credit. *Id.* ¶¶ 46-47. On October 22, 2001, GMAC CF took peaceful possession of certain of the Borrowers' assets. *Id.* ¶ 51. Acting through its agent, RAS Management Advisors, Inc., and RAS employee John Rijo, GMAC CF proceeded to liquidate the Borrowers' inventory and fixed assets. *Id.* ¶ 52. GMAC CF recovered at least $843,620.67 in net proceeds from the sale of inventory and the collection of the Borrowers' accounts receivable. *Id.* ¶ 53, 56 & n.14. GMAC CF credited all of the funds recovered during the liquidation process against the Borrowers' account. *Id.* ¶ 55.

### D. The Borrowers' Outstanding Debt To GMAC CF

GMAC CF provided the Borrowers with monthly summaries of account activity, dated as of the last day of each month and labeled: "Client Ledger Account" (the "Client Statements"). *Id.* ¶¶ 59-60. The Borrowers routed the Client Statements to their controller, Neil Finklestein, who had full authority to act on the Borrowers' behalf with regard to them. *Id.* ¶ 61. Each Client Statement contained the following language:

> THIS STATEMENT OF ACCOUNT SHALL BE FULLY BINDING UPON YOU AND SHALL CONSTITUTE AN ACCOUNT STATED UNLESS WE RECEIVE YOUR WRITTEN OBJECTION THERETO WITHIN NINETY (90) DAYS.

*Id.* ¶ 63. Finklestein never submitted written objections to any of the Client Statements that he received. *Id.* ¶ 68.

According to the Client Statement for October 2001, the Borrowers' outstanding loan balance as of October 1, 2001, was $7,376,884.31. *Id.* ¶ 70. After applying a series of credits and charges, the Borrowers' loan balance stood at $1,436,970.25 as of the end of the month. *Id.* ¶ 75. This figure included an assessment of $27,063 in interest, which amounted to an annualized rate of 8.782% of the average balance for October 2001. *Id.* ¶ 76.

The Client Statement for November 2001 showed an average balance of $1,163,493.27 and an ending balance of $1,009,056.70. *Id.* ¶ 77. The final number included $8,095.98 in interest charges, which amounted to an annualized rate of 8.350% of the average balance. *Id.* Similarly, the Client Statement for December 2001 showed an average balance of $1,055,743.39 and an ending balance of $1,057,223.38. *Id.* ¶ 78. The final number included $7,353.81 in interest, which amounted to annualized rate of 8.089% of the average balance. *Id.*

At no time after January 1, 2002, did the Borrowers' loan balance dip below $1 million. *Id.* ¶ 80. By August 17, 2005, the Borrowers' loan balance had risen to $1,584,048.16. *Id.* ¶ 82.

## II.   PROCEDURAL HISTORY

### A.   <u>The New York Action</u>

This is the second lawsuit between GMAC CF and Landay to address the same operative facts and legal theories. On October 25, 2002, GMAC CF sued Landay on his Guaranty in New York, seeking to collect $1,205,402.13 plus interest, attorneys' fees and other collection costs (the "New York Action"). *Id.* ¶ 94 and Ex. 29.[3] Landay denied GMAC CF's allegations and asserted nine affirmative defenses and seven counterclaims, including fraud, failure to dispose of

---

[3] All exhibits cited in this brief can be found in the Appendix of Exhibits, which is attached to the Statement of Undisputed Facts.

the Borrowers' assets in a commercially reasonable manner, breach of a "fiduciary duty to Landay as a junior creditor of Seneca under the Subordination Agreement," and violation of Mass. Gen. Laws ch. 93A ("Chapter 93A"). *Id.* ¶ 95 and Ex. 30.

After some initial discovery, GMAC CF moved for summary judgment, and on May 25, 2004, the New York Court granted the bulk of GMAC CF's motion. *Id.* ¶ 96 and Ex. 31. The New York Court determined that the Guaranty was "absolute and unconditional" and that Landay was "bound by its terms," especially since he had ratified those terms in the Ratification. *Id.* at 10-11. The Court concluded that in his Guaranty, Landay expressly waived his right to assert counterclaims and defenses, with the exception of the statutory obligation to dispose of the Borrowers' assets in a commercially reasonable manner. *Id.* at 12-14. Accordingly, the Court held that GMAC CF was entitled to summary judgment on all issues relating to liability, including the liability aspect of its claim to recover the costs of collection and attorneys' fees. *Id.* at 17-18.

The Court referred the few remaining questions to a Special Referee, including the issues of "whether or not the collateral was disposed of in a commercially reasonable manner, and the net amount, if any, due to [GMAC CF] from [Landay]," as well as "the reasonable amount of collection expenses and attorneys' fees incurred by [GMAC CF]." *Id.* at 18. Hearings before Special Referee began on October 27, 2005, and concluded on November 4, 2005. The parties will submit post-hearing briefs in early February 2006, and no decision is expected from the Special Referee before March 2006.

### B. This Lawsuit

Landay initiated this action on September 9, 2004, approximately four months after the New York court issued its summary judgment ruling. He subsequently served GMAC CF with

an Amended Complaint on December 16, 2004. After filing its Answer, *see* Docket No. 7, GMAC CF moved for judgment on the pleadings on all of Landay's claims, pursuant to Fed. R. Civ. P. 12(c). *See* Docket No. 22. This Court heard oral argument on the motion on May 17 and granted GMAC CF's motion as to Counts III, IV and V, as well as that portion of Count VII that was based on Counts III, IV and V. The Court took the rest of the motion under advisement. On July 22, 2005, this Court issued a one-page Order stating, "GMAC CF's motion for judgment on the pleadings on the basis of res judicata is denied." *See* Docket No. 40.

### III.   ARGUMENT

#### A.   GMAC CF Is Entitled To Summary Judgment On Landay's Usury Claim.

In his Amended Complaint Landay alleged that the November 2001 Client Statement shows that interest, fees and charges in that month "appear to total 7% of the loan balance, or 84% annualized," and that the December 2001 Client Statement shows that interest, fees and charges in that month "appear to total 18% of the loan balance, or 216% annually." Ex. 1 ¶ 59. Landay's proffered expert, CPA Keith Lowey, expanded on those allegations. *See* Ex. 22. He opined that between October 22, 2001, and January 31, 2003, GMAC CF charged the Borrowers a total of $411,480.80 in "interest and expenses," as he interpreted those terms, which, according to Mr. Lowey translated to an annualized interest rate of 27.10%. *Id.* at 2.[4] However, Landay's analysis is fundamentally and fatally flawed for at least four reasons. First, New York law governs all of the operative legal documents, and under New York law, Landay, as the guarantor of a corporate debtor, cannot maintain a usury claim. Second, usury claims are personal to debtors, so Landay lacks standing to raise the issue. Third, Landay waived any right he might

---

[4]   On November 11, 2005, Landay presented GMAC CF with a Supplemental Report from Lowey, which revises this estimate to $425,628.38. Statement of Undisputed Facts ¶ 84 & n.17. In conjunction with its motion for summary judgment, GMAC CF moved to strike this "Supplemental Report." In addition, GMAC CF will soon file a separate "*Daubert*" motion to exclude Lowey's testimony altogether.

once have had to assert a usury claim. Finally, even under Massachusetts law, as a matter of law, the loan in question was not usurious.

1. **Under Controlling New York Law Landay Cannot Maintain a Usury Claim.**

In diversity cases such as this one, federal courts apply the substantive law of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 491 (1941); *Reicher v. Berkshire Life Ins. Co. of America*, 360 F.3d 1, 4 (1st Cir. 2004). Massachusetts law favors the enforcement of contractual choice-of-law provisions, as long as those provisions are fair and reasonable. *Stagecoach Trans., Inc. v. Shuttle, Inc.*, 50 Mass. App. 812, 817-818 (2001). *See also Lambert v. Kysar*, 983 F.2d 1110, 1118 (1st Cir. 1993) (citations omitted) (governing law must bear reasonable relationship to contractual transaction between the parties).

In this case, the Borrowers agreed both that the Factoring Agreement would "be governed by and construed according to the laws of the State of New York" and that GMAC CF could assess interest at the "highest rate permitted by New York law."[5] In light of the fact that GMAC CF was based in New York when Landay, on behalf of Seneca, obtained financing for the Brookfield acquisition, the parties' selection of New York law was certainly fair and reasonably related to the underlying transaction. Therefore, this Court should enforce the choice-of-law provisions and conclude that New York law governs claims arising out of the Factoring Agreement, especially as those claims relate to permissible interest rates.

Since Landay's usury claim is based entirely on an inapplicable Massachusetts statute, GMAC CF is entitled to summary judgment on Count II. Moreover, even if Landay pled his usury claim more generally, he still could not prevail because under New York law, neither

---

[5] To the extent Landay believes his usury claim arises out of the Guaranty instead of the Factoring Agreement, the same analysis applies because the Guaranty also states that it is to be "governed by and construed and interpreted in accordance with the laws of the State of New York (without giving effect to New York law on conflicts of law)." *Id.* ¶ 13 and Ex. 4.

corporate borrowers, like Seneca and Brookfield, nor individual guarantors of corporate borrowers, like Landay, may challenge an allegedly usurious loan. *Shifer v. Kelmendi*, 611 N.Y.S. 2d 575, 575 (Sup. Ct. App. Div. 1994) (*citing* N.Y. General Obligations Law § 5-521[1]).

Previously, Landay has argued that the choice-of-law provisions in the Loan Documents do not apply because his usury claim is tort-based, and New York choice-of-law rules provide that a contractual choice-of-law provision does not control tort claims.[6] Once again, however, multiple flaws infect Landay's logic. First, the Factoring Agreement and the Guaranty expressly state that New York's choice-of-law principles do not apply. Second, Landay's usury claim is obviously contract-based, not tort-based. In his prayer for relief, Landay asks this Court to void the loan that GMAC CF provided to the Borrowers under the Factoring Agreement. Thus, Landay's claim attacks the heart of the agreement itself. Indeed it is impossible to analyze or even articulate the claim without reference to the Factoring Agreement and the related Forbearance Agreement. Finally, even if Landay's usury claim were tort-based, it still would be governed by New York law, because New York, as the place where GMAC CF resided and applied the allegedly usurious "interest" charges, has the most significant relationship to this claim. *See* Restatement (Second) Conflict of Laws § 145 (1971); *cited in Dasha v. Adelman*, 45 Mass. App. 418, 423 (1998).

### 2. Landay Lacks Standing to Assert a Massachusetts Usury Claim.

Even if the Massachusetts usury statute did apply in this case, Landay could not invoke it. The right to challenge a loan as usurious is a personal right that belongs to the debtor. *First Nat'l Bank of Jacksboro v. Lasater*, 196 U.S. 115, 118 (1905); *Focus Investment Assoc. Inc. v. American Title Ins. Co.*, 992 F.2d at 1231, 1241 (1st Cir. 1993). It does not attach to "strangers to the usurious transaction." *Focus Investment Assoc., Inc.*, 992 F.2d at 1241. Indeed, this

---

[6] *See* Docket No. 26 at 17-18; Docket No. 32 at 11-13.

principle is reflected in the very text of the Massachusetts usury statute, which provides a right to petition a court for voidance of a usurious loan only to "the person to whom the loan was made." Mass. Gen. Laws ch. 271, § 49(c) ("Section 49(c)").

In this case, the "person[s]" to whom GMAC CF made the allegedly usurious loan were the Borrowers, not Landay. Thus, only the Borrowers possess standing under Section 49(c). *See Beach Assoc., Inc. v. Fauser*, 9 Mass. App. Ct. 386, 389 (1980) (stating that Section 49(c) provides equitable remedies "to the borrower" on a usurious loan). The fact that Landay was a guarantor on the loan is of no legal import. *See Harrington v. Norex America Inc.*, No. 01-93-0116-CV, 1995 WL 19219, *3-4 (Tex. App.-Hous. Jan. 19, 1995). As the *Harrington* Court explained: "[O]ne who is not by law a maker of a note is not an obligor thereon though as an absolute guarantor he is liable for payment under the guaranty contract." *Id.* at *4 (*citations omitted*).[7] Precisely the same principles bar Landay from asserting a usury claim under Section 49(c).

### 3. Landay Waived His Right To Challenge The Loan As Usurious.

Usury claims and defenses may be waived, s*ee, e.g., Tarvezian v. Debral Realty*, 1996 WL 1249891, *4 (Mass. Super. Sept. 27, 1996); *Giorgio v. DeFusco*, 862 F.2d 933, 935 (1st Cir. 1998); *Milliken & Co. v. Stewart*, 182 A.D. 2d 385, 387 (N.Y. App. Div. 1992), and the Forbearance Agreement provides that the Borrowers released and discharged GMAC CF from "all actions, causes of actions, suits, … claims and demands whatsoever" that they "ever had, now or hereafter can, shall or may, have … arising under or in any way connected with the [2000 Loan Agreement] or this Forbearance Agreement." *See* Ex. 10. There can be no genuine dispute

---

[7] To the extent that *LBMs Fin. LLC v. Edgewater Investment Ltd. P'ship*, 2004 WL 2075565 (Mass. Super. Aug. 5, 2004), suggests a contrary result, it should be disregarded as inconsistent with the Supreme Court's decision in *Lasater* and the First Circuit's opinion in *Focus Investment Associates*, as well as the plain text of the usury statute itself and the Massachusetts Appeals Court's decision in *Beach Associates*.

that such a release was comprehensive and included any alleged usury claim. Landay agreed to the waiver on behalf of the Borrowers, and personally acknowledged and consented to the waiver when he executed the Ratification. Thus, the Borrowers' waiver binds Landay as Guarantor to the same extent that it bound Seneca and Brookfield.

Even to the extent that Landay argues that his usury claim arises out of his Guaranty rather than the Factoring and Forbearance agreements (a position that would suggest Landay misunderstands the nature of his own claim), the legal analysis remains the same. In his Guaranty, Landay waived the right to assert "any defenses, offsets or counterclaims which [he] may now or hereafter have" against GMAC CF. Clearly this language encompasses a usury claim, and such waiver provisions have been deemed enforceable by courts in both Massachusetts and New York. *See, e.g., Cambridgeport Savings Bank v. Boersner*, 413 Mass. 432, 443 (1992); *Shawmut Bank, N.A. v. Wayman*, 34 Mass. App. Ct. 20, 23-24 (1993); *Milliken & Co. v. Stewart*, 182 A.D.2d at 387; *New Jersey Bank, N.A. v. Varono*, 120 A.D.2d 505, 506 (N.Y. App. Div. 1986); *Rush Factors v. Sheffler*, 58 A.D.2d 557, 558 (N.Y. App. Div. 1977). Thus, even if Massachusetts law applied and even if Landay possessed standing to attack the loan as usurious, GMAC CF still would be entitled to summary judgment on Count II because both the Borrowers and Landay waived any such claim.

### 4. GMAC CF's Loan To The Borrowers Was Not Usurious.

Perhaps the most fundamental flaw with Landay's usury claim is that he cannot introduce any admissible evidence to support the contention that the loan was usurious. To the contrary, the evidence in the record clearly demonstrates that GMAC CF has not even come close to violating Mass. Gen. Laws ch. 271, § 49. The relevant portion of the statute provides as follows:

> Whoever in exchange for ... a loan of money ... knowingly contracts for, charges, takes or receives ... *interest and expenses* the aggregate of which exceeds an

>   amount greater than twenty per centum per annum upon the sum loaned or the equivalent rate for a longer or shorter period, shall be guilty of criminal usury and shall be punished .... For the purposes of this section the amount to be paid upon any loan for *interest* or *expenses* shall include all sums paid or to be paid by or behalf of the borrower for interest, brokerage, recording fees, commissions, services, extension of loan, forbearance to enforce payment, and all other sums charged ... *if such payment or charge was known to the lender at the time of making the loan, or might have been ascertained by reasonable inquiry.*

M.G.L. ch. 271, § 49(a) (emphasis added).

It is undisputed that GMAC CF charged substantially less than 20% per year in actual interest on the loan. In fact, even during the limited time period analyzed by Landay's proferred expert, the annualized interest rate was less than 10%. Landay, however, alleges that the term "expenses" as used in the usury statute includes all of the other charges that GMAC CF assessed against the Borrowers' account after October 22, 2001, including even the costs of collection and legal fees incurred after default.[8]

Myopically focusing on the irrelevant time period of October 22, 2001 through January 2005,[9] Lowey analyzed the actual interest that GMAC CF assessed against the Borrowers' loan plus all other charges. Interestingly, Lowey did not read any case law or commentary on the usury statute. Statement of Undisputed Fact ¶89. Instead, after receiving instruction from

---

[8] In the interest of simplicity, GMAC CF limits its argument in this motion to the legal fees that Lowey included in his tabulation of usury-related charges. GMAC CF reserves its right, if necessary, to challenge Lowey's inclusion of other default-related charges at a later date.

[9] Lowey testified that while his report focused on the period between October 22, 2001, and January 2003, he also computed effective interest rates for two other time periods: (1) from the inception of the loan on September 19, 2000, through November 2003 when GMAC CF wrote it off its books; and (2) from the execution of the Forbearance Agreement through the write-off date. Statement of Undisputed Facts ¶ 90. Even under Mr. Lowey's analysis, the annualized interest rates for the first time period was less than 20 percent, and Lowey does not remember what the precise rate was for the second period. *Id.*

Landay's counsel, Alan Hoffman, about how the Massachusetts usury statute should be interpreted, Lowey simply included all charges in his usury calculation. *Id.* ¶ 89.[10]

Although at deposition he admitted his mistake, Lowey initially included a $56,908.22 payment that GMAC CF made to cover Disney's draw on a letter of credit issued at the request, and for the benefit of, the Borrowers. *Id.* ¶ 87. Subtracting that $56,908.22 error from Lowey's "Usury Interest Damages" estimate yields a balance of $50,866.98. *Id.* To reach that figure, however, Lowey included at least $71,204.47 in legal fees incurred by GMAC CF in connection with collecting the Borrowers' debt. *Id.* ¶ 88. In short, the Landay/Hoffman/Lowey usury theory ignores the requirement that to be considered as an "expense" under the statute a charge must have been "known to the lender at the time of making the loan," or capable of being "ascertained by reasonable inquiry." Mass. Gen. Laws ch. 271, § 49(a). Obviously, GMAC CF did not know at the time it entered into the Forbearance Agreement that the Borrowers would default. Nor is there any evidence in the record that could support the conclusion that such information was ascertainable by reasonable inquiry. Thus, this case differs from *Begelfer v. Najarian*, 381 Mass. 177, 180-182 (1980), and *In re Rolfe*, 25 B.R. 89, 94 (D. Mass. 1982), where the debtors' defaults triggered accelerated *interest* payments that the creditors, at the time of making the loans, knew would exceed 20%. Here, GMAC CF could not know in advance (a) the amount of the legal fees it might incur in connection with the loan, especially with regard to collection costs, or (b) what the ratio of those legal fees to the overall loan balance might be at any particular time in the future. Accordingly, post-default legal fees could not have been

---

[10] Based entirely on Attorney Hoffman exegesis, Lowey concluded that although he did not do so, he could have performed his analysis based on charges assessed on a single day. *Id.* ¶ 92. According to Lowey, any time a fee is imposed on a particular day, and the amount of the fee multiplied by 360 is greater than 20 percent of the loan balance on that day, there would be a violation of the usury statute. *Id.* Thus, in Lowey's view, if a debtor had a line of credit for $1 million on which it never drew and as a result, the creditor charged a $20 unused line fee, the "loan" would be usurious, even though the creditor never advanced any funds. *Id.*

"ascertained by reasonable inquiry" and, therefore, cannot be included within the scope of "interest and expenses" under the Massachusetts usury statute.

Moreover, the Landay/Hoffman/Lowey theory of usury liability is fundamentally inconsistent with basic public policy issues at the heart of debtor creditor relationships. For example, if this Court adopts Landay's view that legal fees can be included in the usury calculus, future debtors would be encouraged to intentionally default on their loans and sue their creditors in an effort to drive up their creditors' legal bills. By defaulting on their loan in such a manner, debtors could obtain complete relief from their obligations through the expedient of having the loan declared void as usurious – a result that clearly would be contrary to the public policy favoring the payment of justly incurred debts.

Since Lowey erred by including legal fees and the Disney letter of credit payment in his analysis, and because the erroneously included charges exceed Lowey's "Usury Interest Damage" estimate of $107,775.20, Landay cannot prove that the loan was usurious, even during his strategically selected time frame.

**B.     GMAC CF Is Entitled To Summary Judgment On Landay's Count I Fraud Claim.**

To prevail on his claim of misrepresentation (Count I), Landay must show (1) that GMAC CF made false statements of material fact (2) to induce action from Landay, and (3) that Landay reasonably relied on the false statements (4) to his detriment. *Hogan v. Riemer*, 35 Mass. App. Ct. 360, 365 (1993); *DiPietro v. Sipex Corp.*, No. 031774, 2005 WL 1812505 (Mass. Supra. Ct. June 20, 2005).[11] Irrespective of what he may or may not prove with respect to the other elements of this claim, as a matter of law, Landay cannot establish reasonable reliance with regard to any of the four allegedly false statements referenced in his Amended Complaint.

---

[11]    The elements are the same in New York, *J.A.O. Acquisition Corp. v. Stavitsky*, 18 A.D. 3d 389 (N.Y. App. Div. 2005), so no conflict-of-laws issue exists with respect to Count I. *Kaufman v. Richmond*, 442 Mass. 1010, 1012 (2004) ("Choice of law analysis is unnecessary when that choice will not affect the outcome of the case").

Furthermore, Landay waived his right to assert any fraud claim against GMAC CF relating to the loan agreements. For both reasons, GMAC CF is entitled to summary judgment on Count I.

### 1. Landay Cannot Establish Reasonable Reliance.

Where a written contract contains terms that contradict prior oral assurances or representations, the written terms will prevail over the oral assurances and representations. *Augat, Inc. v. Collier*, 1996 WL 110076, *9 (D. Mass. Feb. 8, 1996); *Turner v. Johnson & Johnson*, 809 F. 2d 90, 96 (1st Cir. 1996) and *Greenery Rehabilitation Group, Inc. v. Antaramian*, 628 N.E. 2d 1291, 1293 (Mass. App. Ct.). The underlying rationale is obvious. It is unreasonable, as a matter of law, for an experienced businessman, like Landay, to rely on oral representations that conflict with a written contract. *See, e.g., Kuwaiti Danish Computer Co. v. Digital Equipment Corp.*, 438 Mass. 459, 468 (2003) (businessman's reliance on other party's oral statements or conduct was unreasonable as a matter of law where it conflicted with documents); *McCartin v. Westlake*, 36 Mass. App. 221, 233 (1994) (ruling that defendants were entitled to directed verdict on plaintiffs' fraud claim that was based upon oral representation inconsistent with a subsequently executed written agreement).

The *McCartin* case is particularly illustrative of the legal deficiencies in Landay's fraud claim. In *McCartin*, the plaintiffs (the "franchisees") sued the defendants (the "franchisors") for allegedly defrauding them in connection with a franchise agreement. *McCartin*, 36 Mass. App. at 222-23. In support of their claim, the franchisees relied upon alleged oral representations which they claimed the franchisor made prior to the execution of the franchise agreement. *Id.* at 225-226. The jury returned a plaintiffs' verdict. *Id.* at 223. However, the Appeals Court ruled that the trial judge should have granted judgment as a matter of law in favor of the defendants. *Id.* at 233. The Court explained that the alleged misrepresentations, made during contract

negotiations, had to be viewed against the written contract documents, and that in that context, the alleged misrepresentations were not actionable. *Id.* at 230-31. It noted that the parties negotiated their agreement over a period of more than three months and that the franchisees had been represented by counsel. *Id.* at 231. Ultimately, the Court held that where a writing warns the buyers that what they sign, and no more, is binding, and the buyers acknowledge that to be so, a firm case is made, as a matter of law, to enforce what was signed and not what was said during negotiations. *Id.* at 232-33.

Application of *McCartin* to the facts of this case compels the dismissal of Count I. Like the plaintiffs in *McCartin*, Landay – a seasoned businessman represented by counsel – entered into written agreements with GMAC CF stating that they constituted the parties' "entire understanding," notwithstanding "inconsistent agreements and communications, written or oral, between your and our officers, employees, agents and other representatives." Moreover, in this case, like *McCartin*, the express terms of the applicable loan documents are entirely inconsistent with each of the alleged misrepresentations identified in the Amended Complaint.

For example, Landay's claim that GMAC CF promised to look to the Borrowers assets before collecting his personal collateral is contradicted by the statement in the Guaranty that it was "unconditional and unlimited and not conditional or contingent upon the pursuant by [GMAC CF] of whatever remedies it may have against [the Borrowers]. . . or the security or liens [GMAC CF] may possess." At his deposition Landay even admitted that this language meant that GMAC CF "can come after [him] if they want to, at their discretion." Given this clear and unequivocal written statement, Landay simply could not have reasonably relied on any contrary oral statements. Nor could he have reasonably relied on an oral promise that GMAC CF would make a Seasonal Overadvance to the Borrowers in May 2001, when the Factoring

Agreement stated that all payments to the Borrowers were discretionary. Landay even admitted at his deposition that GMAC CF "could refuse to lend [to the Borrowers] if they chose to." Similarly, Landay could not have reasonably relied on any promises regarding forbearance, a payment schedule, or reimbursement of a "bridge" loan, which were not expressly referenced in the Forbearance Agreement, since that document stated that it constituted "the entire understanding of the parties with respect to the matters set forth herein and supercedes in their entirety any and all understandings and agreements, whether written or oral, of the parties with respect to the foregoing."[12]

Since, Landay cannot prove that he reasonably relied on GMAC CF's alleged misrepresentations, GMAC CF is entitled to summary judgment on Count I.

### 2. Landay Waived His Fraud Claims.

Even if Landay could prove all of the elements necessary to sustain his fraud claim, GMAC CF would still prevail because Landay waived the right to assert it. As noted by the New York Court in its summary judgment ruling, waiver provisions like the one contained in Landay's Ratification have been enforced to deny a guarantor's claims based on fraud and fraudulent inducement. *See* Ex. 31 at 12. *See also Raven El. Corp. v. Finkelstein*, 223 A.D. 2d 378 (N.Y.. App. Div. 1996) and *BNY Fin. Corp. v. Clare*, 172 A.D. 2d 203, 205 (N.Y. App. Div. 1991). In his Ratification of Guaranty, Landay agreed that the amounts owed to GMAC CF were due "without offset, defense or counterclaim of any kind, nature or description whatsoever." Ex.

---

[12] Landay's allegation that GMAC CF falsely represented "that it would forebear and provide additional financing if Landay increased his guaranty and collateral," *see* Am. Compl. ¶ 63, is actually confusing since GMAC CF did forebear from exercising its contract rights on August 9, 2005, and it did provide additional financing to the Borrowers shortly thereafter. Presumably, Landay meant to allege that GMAC CF made false representations regarding the amount and timing of the financing it would provide, but as stated in the text, Landay has admitted that all disbursements were within GMAC CF's discretion.

11 at 1. Holding Landay to his contractual undertaking requires the entry of judgment in favor of GMAC CF on Count I.

### C.   Landay Cannot Prove The Damages Necessary To Support Count VI.

Nowhere in his Amended Complaint or in any other filing has Landay articulated the specific legal theory underlying his claim for violation of his rights as a junior creditor (Count VI). Presumably, Landay ultimately will rely on Article 9, Part 6 of the Uniform Commercial Code, but whether he does this or relies instead on some obscure tort theory, he will have to prove: (1) that he was in fact a junior creditor of Seneca; (2) that GMAC CF failed to dispose of Seneca's assets in a commercially reasonable manner; and (3) that this failure harmed Landay <u>as a junior creditor</u>. *See e.g., Georgia-Pacific Corp. v. First Wisconsin Financial Corp.*, 805 F.Supp. 610, 616-618 (N.D. Ill. 1992); *River Valley State Bank v. H.O. Peterson*, 154 Wis. 2d 442, 446-447, 453 N.W. 2d 193 (1990); *McGowan v. Nebraska State Bank*, 229 Neb. 471, 427 N.W. 2d 772, 775 (1988); *Ramsey v. Ernoko, Inc.*, 74 Ohio App. 3d 749, 755, 600 N.E. 2d 701, 705 (1991).[13] Expert testimony is required to prove at least the latter two elements. *In re Mayfair Mills, Inc.*, 295 B.R. 827, 838 (Bankr. D.S.C. 2002); *Sunjet, Inc. v. Ford Motor Credit Co.*, 703 S.W.2d 285 (Tex. Ct. App. 1986); *Wilmington Trust Co. v. Ruggerio*, 1978 WL 139209, *1 (Del. Com. Pl. 1978). While Landay purports to present expert testimony from Lowey on these subjects, as explained more fully in a separate motion, Lowey's testimony fails to meet the standards for expert testimony required by *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and its progeny. As a result, Landay cannot meet his burden of proof on Count VI.

Moreover, even if Lowey is permitted to testify as an expert on the subject of commercial reasonableness, his testimony is insufficient to prove that Landay was damaged by GMAC CF's

---

[13]   Massachusetts courts often look to other jurisdictions for guidance on interpreting the U.C.C. *See, e.g., New Bedford Institution for Savings v. C.L. Gildroy*, 36 Mass. App. Ct. 647, 651 n.5 (1994).

alleged failure to conduct a commercially reasonable sale of the Borrowers' assets. In order to meet this burden, Landay must point to some evidence – whether testimony from Lowey or from some other source – that could support the conclusion that the proceeds from a commercially reasonable sale of the Borrowers' assets would have yielded sufficient proceeds to both satisfy the Borrowers' debt to GMAC CF and to create a surplus that would fall to Landay. As the *River Valley State Bank Court* explained:

> Given Peterson's superior lien position ... [the UCC] entitles Peterson to credit the amounts realized from the sale to the tenant's indebtedness. The bank's subordinate interest in the distribution of the sale proceeds comes into play only after Peterson's interest has been satisfied. Thus, if the sale proceeds are insufficient to satisfy Peterson's interest, the bank takes nothing. Consequently, the bank can only be said to suffer a loss due to the lack of notice if a commercially reasonable sale would have produced an amount in excess of Peterson's lien.

*River Valley State Bank*, 154 Wis.2d 442, 447 (1990); *see also McGowen v. Nebraska State Bank*, 229 Neb. 471 (1988). The same analysis applies in this case, but Landay has not – and cannot – show that a commercially reasonable sale, even as he defines such an exercise, would have yielded proceeds in excess of GMAC CF's debt.

In his initial report, Lowey opined that a commercially reasonable sale of the Borrowers' assets would have generated only an additional $360,360.[14] This amount would not even come close to satisfying Seneca's obligations to GMAC CF, which never dipped below $1 million after January 1, 2002.[15] Since Landay cannot introduce any evidence from which a fact finder could conclude that a commercially reasonable liquidation of the Borrower's assets would have

---

[14] Even under Lowey's Revised Report which Landay served well after the deadline for doing so, his estimate of the recovery shortfall is only $445,074.

[15] The fact that Lowey's report did not include any estimate of the value of the Borrowers' intellectual property simply means that Landay is precluded from offering any evidence at trial relating to the value of his intellectual property. *See* Fed. R. Civ. P. 26(a)(2) advisory committee's note to 1993 amendments; *Ortiz-Lopez v. Sociedad Espanola De Auxilio Mutuo Y Beneficiencia de Puerto Rico*, 248 F.3d 29, 35 (1st Cir. 2001) (affirming exclusion of expert testimony, where expert's report did not comply with requirements of Rule 26(a)(2)).

generated proceeds in excess of the total debt due to GMAC CF, summary judgment must enter in favor of GMAC CF on Count VI.

### D. Landay's Chapter 93A Derives From His Other Claims And Should Be Dismissed.

Landay's amended complaint provides few details on his Chapter 93A claim (Count VII) other than to say it is based on the "acts and practices" described elsewhere in the pleading. *See* Ex. 1 ¶¶ 93-94. In short, Landay's 93A claim derives whatever remaining vitality it possesses from Counts I, II and VI. It necessarily follows that if this Court enters summary judgment for GMAC CF on Counts I, II and VI, there will be nothing left to give substance to Count VII. Thus, summary judgment should enter for GMAC CF on that claim as well.

## IV. CONCLUSION

On the basis of the undisputed facts set forth in the Statement of Undisputed Facts, GMAC CF is entitled to judgment as a matter of law on each of Counts I, II, VI and VII of Landay's Amended Complaint for the reasons advanced in this memorandum.[16] *See* Gulf Coast Bank & Trust Co. v. Reder, 355 F.3d 35, 39 (1st Cir. 2004). Accordingly, this Court should grant GMAC CF's motion for summary judgment.

Respectfully submitted,
GMAC COMMERCIAL FINANCE LLC

November 23, 2005

/s/ John A. Houlihan
/s/ Mark B. Dubnoff
John A. Houlihan (BBO # 542038)
Mark B. Dubnoff (BBO # 637212)
EDWARDS ANGELL PALMER & DODGE LLP
101 Federal Street
Boston, MA  02110
(617) 439-4444

---

[16] For the purpose of preserving its argument on appeal, GMAC CF also renews its contention that the New York ruling should operate as both *res judicata* and *collateral estoppel* for this case. GMAC CF relies on the same arguments in support of this contention that it raised in its memorandum of law supporting its motion for judgment on the pleadings, Docket No. 23, and incorporates such arguments by reference.