UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| DAVID L. LANDAY | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     v. | ) | Civil Action No. 04-cv-11955-WGY |
| | ) | |
| GMAC COMMERCIAL CREDIT LLC | ) | |
| and GMAC COMMERCIAL FINANCE | ) | |
| LLC, | ) | |
|     Defendants. | ) | |

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1 of the United States District Court for the District of

Massachusetts, defendant GMAC Commercial Finance LLC ("GMAC CF") submits the

following statement of undisputed material facts in support of its motion for summary judgment

against plaintiff David L. Landay ("Landay").[1]

    1.    Landay is the former president and CEO of Seneca Sports, Inc. ("Seneca"), a

sporting goods distributor, and Brookfield International, Inc. ("Brookfield"), a company that sold

juvenile sports equipment and sports toys. Am. Compl. ¶¶ 1, 7-8.[2]

    2.    Landay started working as Seneca in or about 1990. Deposition of David L.

Landay ("Landay Depo.")[3] at 22:23-23:1. Landay believes his title at that time was

president/treasurer. *Id.* 23:4-5. Prior to working at Seneca, Landay had been an executive vice

president of Hyde Athletic Industries. *Id.* 21:12, 22:1-5. From about 1967 until about 1985,

Landay had been president of Brookfield Athletic Shoe, where his duties included general

---

[1]    In accordance with the requirements of Fed. R. Civ. P. 56, GMAC CF presents the facts in the light most favorable to Landay. However, GMAC CF does not concede the accuracy of any of Landay's factual assertions for any purpose other than the pending motion for summary judgment.

[2]    A copy of the Amended Complaint is attached as Exhibit 1. For ease of reference, all of the exhibits to this Statement of Undisputed Facts are being submitted collectively in an Appendix of Exhibits.

[3]    Copies of all cited pages from Landay's deposition minuscript are attached as Exhibit 2.

management of the company and running the manufacturing and warehousing. *Id.* 19:21-20:20.
From 1963 until 1967, Landay had worked for Green Shoe Manufacturing. *Id.* 19:8-10. Landay
obtained his MBA from Boston University in 1963. *Id.*

3.     In 2000, Landay sought financing from GMAC CF, then a New York limited
liability company with its principal place of business in New York City, to assist Seneca in an
effort to acquire Brookfield. Am. Compl. ¶¶ (Exhibit 1) 2, 8-9.

4.     GMAC CF entered into a commercial factoring agreement with Seneca and
Brookfield (collectively, the "Borrowers") dated September 19, 2000 (the "Factoring
Agreement"). *Id.* ¶¶ 11-12.

5.     A true and accurate copy of the Factoring Agreement, which was Deposition
Exhibit 63, is attached as Exhibit 3 in the Appendix of Exhibits. Landay Depo. (Exhibit 2)
66:23-67:4.

6.     Landay, after consulting with counsel, signed the Factoring Agreement on behalf
of Seneca and Brookfield as their President. *See* Factoring Agreement (Exhibit 3) at 13; Landay
Depo. (Exhibit 2) 7:5-18.

7.     The Factoring Agreement provided for GMAC CF to extend a factoring facility
line of credit up to $10 million to the Borrowers, secured by the Borrowers' accounts receivable
and other assets. Am. Compl. (Exhibit 1) ¶ 12; Factoring Agreement (Exhibit 3) at 1, 10.

8.     Among other things, the Factoring Agreement expressly stated that:

- "[n]otwithstanding anything to the contrary [in the Factoring Agreement] or
  elsewhere, all Loans or Advances [under the Factoring Agreement] are to be
  made on a totally discretionary basis on [GMAC CF's] part." Factoring
  Agreement (Exhibit 3), § 4(a), at 1-2.

- GMAC CF could charge the Borrowers interest on the average daily balance of all advances and other loans at a rate of no less than six percent (6 %) per annum and no greater than the highest rate permitted by New York law. *Id.* § 4(b)(i), at 2.

- GMAC CF could charge the Borrowers' account commissions on receivables, *Id.* § 4(b)(ii), at 2.

- GMAC CF could charge the Borrowers' account bank charges for wire transfers when due. *Id.* § 4(b)(iii), at 2.

- GMAC CF could charge the Borrowers' account all applicable letter of credit fees. *Id.* § 4(b)(iv), at 3.

- GMAC CF could charge the Borrowers' account an unused facility fee (the "Unused Line Fee"). *Id.* § 4(b)(vi), at 3.

- GMAC CF could charge the Borrowers' account "the amount of legal fees (including fees, expenses and costs payable or allocable to attorneys retained or employed by us) and other costs, fees and expenses incurred by us in negotiating or preparing this agreement and legal documentation required by us or requested by you in connection with this agreement or any amendments or supplements thereof, or in enforcing our rights hereunder or in connection with the litigation of any controversy arising out of this agreement, or in protecting, preserving or perfecting our interest in, any Collateral, including without limitation all taxes assessed or payable with respect to any Collateral, and the costs of all public record filings, appraisals and searches relating to any Collateral. *Id.* § 14(d), at 12.

- it "shall be governed by and construed according to the laws of the State of New York (without giving effect to choice of law principles)." *Id.* § 13, at 11.

9.      The Factoring Agreement also stated: "This agreement cannot be changed or terminated orally and is for the benefit of and binding upon the parties and their respective successors and assigns except that you may not assign or transfer any of your rights or obligations under this Agreement without our prior written consent, and no such assignment or transfer of any such obligation shall relieve you thereof unless we have consented to such release in a writing specifically referring to the obligation from which you are to be released. This agreement, and any concurrent or subsequent written supplements thereto or amendments thereof signed by both of us, represent our entire understanding and supersede all inconsistent agreements and communications, written or oral, between your and our officers, employees, agents and other representatives." *Id.* § 14(g), at p.12.

10.     As a condition of, and in conjunction with the Factoring Agreement, Landay executed a personally guaranty of the Borrowers' obligations to GMAC CF, up to a maximum indebtedness of $3.5 million (the "Guaranty"). *Id.* § 10(viii), at 7 & § 12, at 10; Am. Compl. (Exhibit 1) ¶ 13.

11.     A true and accurate copy of the Guaranty, which was Deposition Exhibit 64, is attached as Exhibit 4 in the Appendix of Exhibits. Landay Depo. (Exhibit 2) 68:9-12.

12.     Landay, after consulting with counsel, signed the Guaranty on September 19, 2000, before a notary in Putnam County, New York. Landay Depo. (Exhibit 2) 68:13-22; Guaranty (Exhibit 4) at 2.

13.     Among other things, the Guaranty stated that:

- Landay's liability on the guaranty "shall be direct, immediate, absolute, continuing, unconditional and unlimited and not conditional or contingent upon the pursuit by [GMAC CF] of whatever remedies it may have against [the Borrowers or their] successors, executors, administrators or assigns, or the security or liens it may possess … ." Guaranty (Exhibit 4) at 1;

- it was to "be governed by and construed and interpreted in accordance with the laws of the State of New York (without giving effect to New York law on conflicts of law)." *Id.* at 2.

- Landay waived "the right to assert in any action or proceeding upon this guaranty any defenses, offsets or counterclaims which the undersigned may now or hereafter have." *Id.*

14.     Also on September 19, 2000, Landay provided GMAC CF with a Standby Letter of Credit (the "First Standby Letter of Credit") in the amount of $4.1 million, Am. Compl. (Exhibit 1) ¶ 14, and executed a contract to subordinate to GMAC CF certain indebtedness of Seneca to Landay in the amount of $3,450,000 (the "Subordination Agreement") (collectively, with the Factoring Agreement, the Guaranty, the First Standby Letter of Credit and other ancillary documents, the "2000 Loan Agreements"). Am. Compl. (Exhibit 1) ¶ 15.

15.     A true a true and accurate copy of the First Standby Letter of Credit, which was Exhibit 3 to GMAC CF's Answer (Docket No. 7), is attached as Exhibit 5 in the Appendix of Exhibits. *See* Am. Compl. (Exhibit 1) ¶ 14.

16.     A true and accurate copy of the Subordination Agreement, which was Deposition Exhibit 65, is attached as Exhibit 6 in the Appendix of Exhibits. Landay Depo. (Exhibit 2) 79:7-16.

17.    Prior to signing the 2000 Loan Agreements, Landay had numerous conversations with GMAC CF account representative Paul Fitzgerald. Am. Compl. (Exhibit 1) ¶¶ 8-10; Landay Depo. (Exhibit 2) 46:18-54:20. According to Landay, Fitzgerald repeatedly told him that in the event of a default, GMAC CF would look first to the assets of the Borrowers to satisfy any debt before it would try to collect on Landay's Guaranty or other personal collateral. Am. Compl. (Exhibit 1) ¶ 10; Plaintiff David L. Landay's Answers to Defendants' First Set of Interrogatories ("Landay's Interrogatory Answers"),[4] Answer No. 3, at 3.

18.    Landay claims that one such conversation occurred after GMAC CF sent him a term sheet regarding the 2000 Loan Agreements on or about July 31, 2000. Landay Depo. (Exhibit 2) 44:21-49:21. He asserts that at this time, Fitzgerald reiterated that in the event of a foreclosure, GMAC CF "would look to the assets of the corporation first." *Id.* 49:15-21

19.    A true and accurate copy of a letter from Fitzgerald together with the term sheet, which was Deposition Exhibit 59, is attached as Exhibit 8 in the Appendix of Exhibits. *Id.* 44:21-45:1. It contained no language consistent with Fitzgerald's alleged representation. *Id.* 53:8-23. *See also* Exhibit 8.

20.    Landay did not bring this fact to Fitzgerald's attention during their discussions. Landay Depo. (Exhibit 2) 54:4-6.

21.    Nor did Landay's lawyer, Gary Hoff, make any reference to Landay's understanding of how the Guaranty would work when he sent a letter to Fitzgerald, dated August 15, 2000, regarding drafts of the 2000 Loan Agreements. *Id.* 65:23-66:2. A true and accurate copy of that letter, which was also Deposition Exhibit 62, is attached as Exhibit 9 in the Appendix of Exhibits. *Id.* 62:1-6.

---

[4]    A copy of Landay's Interrogatory Answers is attached as Exhibit 7 in the Appendix of Exhibits.

22.    Landay's has acknowledged that his understanding that GMAC CF would exhaust the Borrowers' collateral before trying to enforce his Guaranty is not reflected anywhere in the Guaranty itself. *Id.* 69:9-22. He also admits that the text of the Guaranty provides that GMAC CF "can come after me if they want to, at their discretion," *Id.* 74:9-14, and that "any change [to the Guaranty] has to be in writing." *Id.* 74:19-75:1. Landay does not recall ever indicating to anyone at GMAC CF that either of those provisions was inconsistent with his understanding of their agreement. *Id.* 75:10-14.

23.    Landay alleges that while the Factoring Agreement linked the amount of money the Borrowers could obtain at any time from GMAC CF with the Borrowers' outstanding accounts receivable, it also provided that from May to October of 2001, GMAC CF would provide the Borrowers with a "Seasonal Overadvance" of up to $500,000. Am. Compl. (Exhibit 1) ¶ 17. He claims that GMAC CF reaffirmed its "obligation" to make a Seasonal Overadvance in early 2001. *Id.* ¶ 18; Landay's Interrogatory Answers (Exhibit 7), Answer No. 6, at 4.

24.    Landay, however, also admits that under the terms of the Factoring Agreement, GMAC CF's obligation to extend credit to the Borrowers was entirely discretionary, and that GMAC CF "could refuse to lend [to the Borrowers] if they choose to." Landay Depo. (Exhibit 2) 97:18-98:2.

25.    GMAC CF never extended the Seasonal Overadvance to the Borrowers. *Id.* 98:5-7.

26.    As of August 9, 2001, the Borrowers were in default of numerous provisions of the 2000 Loan Agreements. *Id.* 120:3-11.

27.    The Borrowers entered into Forbearance Agreement with GMAC CF, dated August 9, 2001 (the "Forbearance Agreement"). Am. Compl. (Exhibit 1) ¶ 32.

28.    A true and accurate copy of the Forbearance Agreement is attached as Exhibit 10 in the Appendix of Exhibits.  Am. Compl. (Exhibit 1) ¶ 32; Landay Depo. (Exhibit 2) 114:14-18.[5]

29.    Landay signed the Forbearance Agreement as president of both Seneca and Brookfield.  Landay Depo. (Exhibit 2) 114:23-115:3; Forbearance Agreement (Exhibit 10) at 7.

30.    Landay consulted with counsel before executing the Forbearance Agreement. Landay Depo. (Exhibit 2) 116:24-118:13.

31.    In the Forbearance Agreement, the Borrowers acknowledged and confirmed that as of August 8, 2001, they owed GMAC CF the aggregate principal amount of $6,719,177.62, plus other obligations.  Forbearance Agreement (Exhibit 10) §1, at 2.  The Borrowers also released and discharged GMAC CF:

> and its successors and assigns from any and all actions, causes of actions, suits, debts, dues, sums of money, accounts …, contracts, controversies, agreements, promises, … claims and demands whatsoever, in law, admiralty or equity, which against [GMAC], any [Borrower], or any of its respective successors or assigns, ever had, now or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of this Forbearance Agreement arising under or in any way connected with the [2000 Loan Agreements] or this Forbearance Agreement.

*Id.* § 4 at 2-3.  The Forbearance Agreement expressly provided that it would be governed by New York law.  *Id.* § 9(c), at p.5.  It also stated that it "sets forth the entire understanding of the parties with respect to the matters set forth herein and supersedes in their entirety any and all understandings and agreements, whether written or oral, of the parties with respect to the foregoing."  *Id.* § 9(f), at p.6.

---

[5]    The cited portion of Landay's deposition testimony refers to Deposition Exhibit 71, which was an undated version of the Forbearance Agreement.

32.    In conjunction with the Forbearance Agreement, Landay, after consulting with counsel, signed a Ratification and Amendment of Guaranty ("Ratification of Guaranty") on August 9, 2001.  Am. Compl. (Exhibit 1) ¶ 32.

33.    A true and accurate copy of the Ratification of Guaranty, which was Deposition Exhibit 74, is attached as Exhibit 11 in the Appendix of Exhibits.  Landay Depo. (Exhibit 2) 126:3-11.

34.    Landay reviewed the Ratification of Guaranty with counsel before signing it.  *Id.* 126:12-14.

35.    Among other things, the Ratification of Guaranty ratified "all terms and provisions of the Guaranty," acknowledged Landay's consent to the execution of the Forbearance Agreement, and increased the limit on his personal exposure to GMAC CF from $3.5 million to $4.5 million.  Ratification of Guaranty (Exhibit 11) at 1.

36.    In the Ratification of Guaranty, Landay confirmed that his obligations under the Guaranty were due and owing to GMAC CF "without offset, defense or counterclaim of any kind, nature or description whatsoever."  *Id.*  Landay also acknowledged that the Ratification "sets forth the entire agreement and understanding" between him and GMAC CF regarding the subject of the agreement.  *Id.* at 2.

37.    Neither the Forbearance Agreement nor the Ratification of Guaranty contained language reflecting Landay's understanding that in the event of a default, GMAC CF would not try to enforce the Guaranty until after it had thoroughly exhausted the Borrowers' collateral. Landay Depo. (Exhibit 2) 135:10-14.  *See also generally* Exhibits 10 and 11.

38.    Landay did not raise this issue with his counsel or anyone at GMAC CF before signing either document.  Landay Depo. (Exhibit 2) 135:21-136:5.

39.    In addition to providing GMAC CF with the Ratification of Guaranty, Landay provided GMAC CF with an additional $1,000,000.00 in cash collateral (the "Cash Collateral"). Am. Compl. (Exhibit 1) ¶ 33.

40.    A true and accurate copy of a letter from GMAC CF to Landay regarding the Cash Collateral, which also was Deposition Exhibit 75, is attached as Exhibit 12 in the Appendix of Exhibits.  Landay Depo. (Exhibit 2) 127:19-128:3, 128:10-129:15.

41.    The delivery of the Cash Collateral was an express condition of the Forbearance Agreement.  Forbearance Agreement (Exhibit 10), at 4, § 7(c)(ii).

42.    Also in conjunction with, and as a condition of, the Forbearance Agreement, Landay extended the term of a $250,000 Standby Letter of Credit (the "Second Standby Letter of Credit") (collectively with the Forbearance Agreement, the Ratification of Guaranty and the letter referring to the Cash Collateral, the "Forbearance Documents") that he had first issued in favor of GMAC CF in February 2001.[6]  Am. Compl. (Exhibit 1) ¶¶ 18-19, 33; Forbearance Agreement (Exhibit 10), at 4, § 7(d).  Landay claims that he originally provided GMAC CF with the Second Standby Letter of Credit because Fitzgerald told him that in return, GMAC CF would make an additional $250,000 of credit available to the Borrowers prior to May 2001, when the Seasonal Overadvance was scheduled to be supplied.  Am. Compl. (Exhibit 1) ¶¶ 18-19. Originally, the Second Standby Letter of Credit had an expiration date of May 2001, but Landay extended it first to October 30, 2001, and then to March 31, 2002.  *Id.* ¶¶ 19, 25, 33; Second Standby Letter of Credit (Exhibit 13).

43.    Landay claims that prior to executing the Forbearance Documents, he advanced Seneca approximately $52,000 to "bridge" certain business expenses in reliance upon alleged

---

[6]    A true and accurate copy of the Second Standby Letter of Credit, which was Exhibit 5 to the Answer, is attached as Exhibit 13 in the Appendix of Exhibits.

representations from GMAC CF that this payment would be reimbursed after execution. Am. Compl. (Exhibit 1) ¶ 31. He claims that such reimbursements never occurred. *Id.* ¶ 42 (mistakenly referring to Paragraph 29). *See also* Landay Depo. (Exhibit 2) 129:16-134:21; Depo Exs. 76-80.[7]

44. Nothing in any of the Forbearance Documents references or authorizes such alleged "reimbursements. *See generally* Exhibits 11-13.

45. On or about September 25, 2001, GMAC CF sent separate letters to Landay and to the Borrowers declaring that the Borrowers were in default of the Forbearance Agreement. Am. Compl. (Exhibit 1) ¶ 45. True and accurate copies of those letters, which were Deposition Exhibits 89 and 90, are collectively attached as Exhibits 15 in the Appendix of Exhibits. Landay Depo. (Exhibit 2) 147:14-149:5.

46. On or about October 15, 2001, GMAC CF collected the $4.1 million from Landay's First Standby Letter of Credit. Am. Compl. (Exhibit 1) ¶ 48.

47. Within the next couple of days, GMAC CF collected the $1 million Cash Collateral and the $250,000 from Landay's Second Standby Letter of Credit. Am. Compl. (Exhibit 1) ¶ 49.

48. All three collections were credited to the Borrowers' account with GMAC CF on or about October 17 or 18, 2001, and were used to lower the Borrowers' loan balance. Deposition of Kathleen A. Pappalardo of August 19, 2005 ("Pappalardo Depo. Day 2")[8] 16:13:17:9.

---

[7]    True and accurate copies of Deposition Exhibits 76-80 are attached collectively as Exhibit 14 in the Appendix of Exhibits. Landay Depo. (Exhibit 2) 129:16-134:21.

[8]    Pappalardo has been deposed on three different days in this case, August 18, August 19, and November 10. Copies of all cited pages from Pappalardo's deposition minuscript for August 19 are attached as Exhibit 16 in the Appendix of Exhibits.

49.    True and accurate copies of the client statements that GMAC CF generated for the Borrowers' account between October 2001 and September 2002, which comprised Deposition Exhibit 4, are attached as Exhibit 17 in the Appendix of Exhibits.  Deposition of Kathleen A. Pappalardo of August 18, 2005 ("Pappalardo Depo. Day 1")[9] 42:14-43:5.

50.    The credits for the collections of the Cash Collateral and the two Standby Letters of Credit are reflected on the page Bates numbered GLAN 01518.  Pappalardo Depo. Day 2 16:23-17:9.

51.    On or about October 22, 2001, GMAC CF took possession of the Borrowers' assets.  Am. Comp. (Exhibit 1) ¶ 50.

52.    GMAC CF hired RAS Management Advisors, Inc. ("RAS") to liquidate the Borrowers' inventory and fixed assets.  Pappalardo Depo. Day 1 123:18-124:2; Massachusetts Deposition of John Rijo ("Rijo Depo.")[10] 34:3-6.  RAS employee John Rijo ("Rijo") oversaw this liquidation.  *Id.*

53.    A true and accurate copy of a spreadsheet entitled "Seneca Sports Deals by Location," which was also Deposition Exhibit 162, is attached as Exhibit 20 in the Appendix of Exhibits.  Rijo Depo. (Exhibit 19) 114:24-118:2.  According to this spreadsheet, Rijo's inventory liquidation efforts generated approximately $304,943 in net proceeds for GMAC CF.  Depo. Ex. 162 (Exhibit 20).  Landay has not identified any evidence to contradict these claims.  *See generally* Landay's Interrogatory Answers (Exhibit 7), Answer Nos. 9-12, 16.

54.    GMAC CF also made efforts to collect on the Borrowers' outstanding accounts receivables.  GMAC CF's Supplemental Response to Landay's First Set of Interrogatories

---

[9]    Copies of all cited pages from Pappalardo's deposition minuscript for August 18 are attached as Exhibit 18 in the Appendix of Exhibits.

[10]    Mr. Rijo has been deposed both in this lawsuit and in the New York Action.  The citation in the text is to his Massachusetts deposition, which occurred on November 14, 2005.  Copies of the cited pages of his transcript are attached as Exhibit 19 in the Appendix of Exhibits.

("GMAC CF's Interrogatory Answers"),[11] at 2-7; Pappalardo Depo. Day 1 (Exhibit 18) 164:10-21.

55.    GMAC CF claims that it received approximately $588,000 in net proceeds from the collection of accounts receivable, all of which it credited to the Borrowers' account for the purpose of lowering the Borrowers' loan balance. GMAC CF's Interrogatory Answers (Exhibit 21) at 3, 6; Pappalardo Depo. Day 1 (Exhibit 18) 164:10-21. Landay has not identified any evidence to contradict these claims. *See generally* Landay's Interrogatory Answers (Exhibit 7), Answer Nos. 9-12, 16.

56.    Landay has identified Keith D. Lowey, a CPA, as an expert witness to testify on his behalf. Lowey submitted a report dated October 10, 2005, in which he opined that GMAC CF's liquidation of the Borrowers' assets was commercially unreasonable. *See* Expert Witness Report of Keith D. Lowey, CPA ("Lowey Report"),[12] § VII, at pp. 3-7. Lowey also opined that if GMAC CF had acted in a commercially reasonable manner, it would have generated an additional $360,360 in net proceeds from Seneca's inventory and accounts receivable.[13] *Id.* § VII, at p.8 & Ex. A. His calculations, however, were based in part upon the assumption that "GMAC claims that it has received approximately $255k from the sale of inventory." Lowey Report (Exhibit 22). As stated earlier, GMAC CF actually claimed that it had received approximately $304,000 from the sale of inventory.[14]

---

[11]    Copies of the cited pages are attached as Exhibit 21 in the Appendix of Exhibits.

[12]    A copy of the Lowey Report is attached as Exhibit 22 in the Appendix of Exhibits.

[13]    As detailed below, Landay provided GMAC CF with a First Supplement to Expert Report of Keith D. Lowey, CPA ("Lowey's Supplemental Report"), on November 11, 2005. See ¶ 93, *infra*. A copy of this report is attached as Exhibit 23 in the Appendix of Exhibits. In this report, Lowey has increased his damage estimate to $445,074. *Id.* at p.3 & Ex. A. GMAC CF is moving to strike this "supplemental" report on the grounds that it was produced more than one month after the deadline for Landay to produce an expert report and is based on the same data that was available for Lowey's inspection prior to submitting his original report.

[14]    In his Supplemental Report, Lowey made further adjustments in his assumptions, stating that GMAC CF was claiming recovery of $345,893.95 through inventory liquidation and $497,726.72 in recovery of accounts receivable, for a total recovery of $843,620.67. *See* Lowey's Supplemental Report (Exhibit 23), Ex. M. Although

57.    Lowey's report stated that his damages estimate did not take into consideration any value that GMAC CF might have been able to obtain for the Borrowers' intellectual property (including licenses, trademarks and patents), but he "was not able to assign a value to the intellectual property at this time." *Id.*

58.    At his deposition, Lowey reiterated that he had no opinion as to the value of the Borrowers' intellectual property. Deposition of Keith A. Lowey ("Lowey Depo.")[15] 78:15-17.

59.    From the inception of the loan on September 19, 2000, until GMAC CF foreclosed on October 22, 2001, the Borrowers received periodic reports of account activity from GMAC CF. Deposition of Neal J. Finklestein ("Finklestein Depo.")[16] 75:23-76:3, 77:5-13.

60.    Among the documents that the Borrowers received from GMAC CF were monthly summaries of account activity, dated as of the last day of each month, some of which were labeled "Client Ledger Account" (the "Client Statements"). *Id.* 77:10-13.

61.    The Borrowers routed these monthly Client Statements and all related documents from GMAC CF to Seneca's Controller, Neal J. Finklestein, who had full authority to act on the Borrowers' behalf with regard to these statements. Landay Depo. (Exhibit 2) 78:20-24; 145:4-11, 173:23-174:4.

62.    True and accurate copies of the client statements for the period of September 2000 through September 2001, which also were Deposition Exhibit 106, are attached as Exhibit 26 in the Appendix of Exhibits. Finklestein Depo. (Exhibit 22) 81:11-82:16.

---

GMAC CF actually claims that it netted more than $891,000 in net proceeds from inventory liquidation and the collection of accounts receivable, but for purposes of this summary judgment, GMAC CF will presume that Lowey correctly summarized GMAC CF's claim.

[15]    Copies of the cited portions of Lowey's deposition minuscript are attached as Exhibit 24 in the Appendix of Exhibits.

[16]    Copies of the cited portions of Finklestein's deposition minuscript are attached as Exhibit 25 in the Appendix of Exhibits.

63.    Each of the monthly Client Statements that GMAC CF sent to the Borrowers from September 2000 through September 2001 contained the following statement:

> "THIS STATEMENT OF ACCOUNT SHALL BE FULLY BINDING UPON YOU AND SHALL CONSTITUTE AN ACCOUNT STATED UNLESS WE RECEIVE YOUR WRITTEN OBJECTION THERETO WITHIN NINETY (90) DAYS."

*See* Exhibit 26 (in particular, the documents Bates numbered GMAC-LANDAY00136 (September 2000), GMAC-LANDAY00132 (October 2000), GMAC-LANDAY00127 (November 2000), GMAC-LANDAY00118 (December 2000), GMAC-LANDAY00107 (January 2001), GMAC-LANDAY00092 (February 2001), GMAC-LANDAY00079 (March 2001), GMAC-LANDAY00066 (April 2001), GMAC-LANDAY00056 (May 2001), GMAC-LANDAY00044 (June 2001), GMAC-LANDAY00034 (July 2001), GMAC-LANDAY00023 (August 2001), GMAC-LANDAY00006 (September 2001)).

64.    Finklestein remembers seeing such statements during his tenure as the Borrowers' Controller.  Finklestein Depo. (Exhibit 22) 77:14-78:1.

65.    It would have been part of Finklestein's job as Controller to make sure that the Client Statements the Borrowers received from GMAC CF were accurate and to submit any written objections regarding inaccuracies to GMAC CF.  *Id.*. 78:6-9, 82:1-5; Landay Depo. (Exhibit 2) 146:3-8, 173:23-174:4.

66.    It also was part of Finklestein's job to notice if the Borrowers had not received any of the Client Statements from GMAC CF.  Finklestein Depo. (Exhibit 22) 78:17-23.

67.    Finklestein believes he received and reviewed Client Statements from GMAC CF in every month from September 2000 through September 2001.  *Id.* 78:24-79:7.

68.    Finklestein does not recall submitting written objections to GMAC CF regarding any of the Client Statements.  *Id.* 78:2-5, 85:6-8.

69.     GMAC CF continued to generate monthly Client Statements for the Borrowers following the October 22, 2001 acquisition of the Borrowers' assets. *See generally* Depo. Ex. 4 (Exhibit 17); Pappalardo Depo. Day 2 (Exhibit 16) 13:24-14:3.

70.     According to the Client Statement for October 2001, the Borrowers' outstanding loan balance as of October 1, 2001, was $7,376,884.31.  Depo. Ex. 4 (Exhibit 17) at GLAN 01517.  As of October 16, 2001, the loan balance had been reduced to $6,904,766.02. *Id.* at GLAN 01518; Pappalardo Depo. Day 1 (Exhibit 18) 94:21-24.

71.     On October 17, 2001, GMAC CF applied credits of $4,100,000.00 for the First Standby Letter of Credit and $1,004,023.50 for the Cash Collateral.  Depo. Ex. 4 (Exhibit 17) at GLAN 01518; Pappalardo Depo. Day 2 (Exhibit 16) 16:15-17:7.

72.     The next day, GMAC CF applied a credit of $250,000.00 for the Second Standby Letter of Credit. *See* Depo. Ex. 4 (Exhibit 17) at GLAN 01518; Pappalardo Depo. Day 2 (Exhibit 16) 17:8-9.

73.     As of Friday, October 19, 2001, the last day that the Borrowers were in business for themselves, their loan balance with GMAC CF stood at $1,457,250.85. *See* Depo. Ex. 4 (Exhibit 17) at GLAN 01518.

*74.*     On October 22, 2001, the balance stood at $1,427,511.19. *Id.*

75.     At the end of October 2001, the loan balance was $1,436,970.25. *Id.* at GLAN 01519.

76.     According to the October 2001 Client Statement, the Borrowers' average loan balance for the month was $3,578,698.09. *Id.* GMAC CF assessed a total of $27,063.11 in interest charges on the loan in October 2001, which amounted to an annualized rate of 8.782% on the average balance. *Id.*

77.    GMAC CF's Client Statement for the Borrowers' account as of November 30, 2001, showed an average monthly balance of $1,163,493.27 and an ending balance of $1,009,056.70. *Id.* at GLAN 01522-01523. The final number included $8,095.98 in interest charges, which amounted to annualized rate of 8.350% on the average balance. *Id.* at GLAN 01523.

78.    GMAC CF's Client Statement for the Borrowers' account as of December 31, 2001, showed an average monthly balance of $1,055,743.39 and an ending balance of $1,057,223.38. *Id.* at GLAN 01526-01527. The final number included $7,353.81 in interest, which amounted to annualized rate of 8.089% on the average balance. *Id.* at GLAN 01527.

79.    GMAC CF continued to generate monthly Client Statements for the Borrowers after December 2001. *See generally id.*; Pappalardo Depo. Day 2 (Exhibit 16) 13:24-14:3.

*80.*    Among other things, these Client Statements showed that GMAC CF continued to apply credits and debits to the Borrowers' account for various collections and charges after 2001. *See generally id.* at GLAN 01529-01556. They also showed that at no time after January 1, 2002, did the Borrowers' loan balance dip below $1 million. *See generally id.*

81.    GMAC CF vice president Kathleen A. Pappalardo has prepared a chart titled Seneca Sports Damages Calculation, which purports to track Seneca's outstanding debt to GMAC CF from October 22, 2001 through August 17, 2005. Pappalardo Depo. Day 1 (Exhibit 18) 38:5-25. A true and accurate copy of this chart, which was Deposition Exhibit 3, is attached as Exhibit 27 in the Appendix of Exhibits. *Id.* 41:10-20.

82.    According to Ms. Pappalardo's chart, the Borrowers' loan balance had risen to $1,584,048.16 as of August 17, 2005. *See* Depo. Ex. 3 (Exhibit 27).

83.    Landay's Amended Complaint includes allegations that the Client Statements for November and December of 2001 show that "the interest, fees and charges made to the loan by [GMAC CF] were at usurious levels." Am. Compl. (Exhibit 1) ¶ 59.  More specifically, Landay alleges that the November 2001 Client Statement shows that interest, fees and charges in that month "appear to total 7% of the loan balance, or 84% annualized," and that the December 2001 Client Statement shows that interest, fees and charges in that month "appear to total 18% of the loan balance, or 216% annually."  *Id.  See also* Landay's Interrogatory Answers (Exhibit 7), Answer No. 14, at p.9.

84.    Lowey expanded on Landay's allegations in his expert witness report.  *See* Lowey Report (Exhibit 22), § VI, at pp. 2-3 & Exs. D-F.  He opined that between October 22, 2001, and January 31, 2003, GMAC CF charged the Borrowers a total of $411,480.80 in "interest and expenses," as those terms are interpreted under the Massachusetts usury statute, which Lowey said translated to an annualized interest rate of 27.10 percent.  *Id.* § VI, at p.2, Exs. D-F.  Lowey further opined that if GMAC CF had charged the Borrowers only 20 percent in "interest and expenses" during that time, the total charges would have been $303,805.40.  *Id.* Exs. D & E.  Thus, he concluded, "[t]he effect of interest being charged at a rate in excess of 20% (the 'Usury Interest Damages') for the period 10/22/01 to 1/31/03 amounts to $107,775.20."[17]  *Id.* § VI, at p.3.

85.    To reach his conclusions, Lowey did not look only at the actual interest that GMAC CF assessed against the Borrowers' account each month.  *See generally id.*, § VI, at pp.2-3, Exs. D-F; Lowey Depo. (Exhibit 24) 46:21-49:21, 51:22-53:2, 55:10-56:19.  For the time

---

[17]    In Lowey's Supplemental Report, Lowey has increased his usury damages estimate to $121,822.98, based on total usury-related charges of $425,628.38.  See Supplemental Report (Exhibit 23) at 1 & Exs. D, E & F.  GMAC CF is moving to strike this "supplemental" report on the grounds that it was produced more than one month after the deadline for Landay to produce an expert report and is based on the same data that was available for Lowey's inspection prior to submitting his original report.

period that he considered, those charges totaled only $144,922.08, which is less than half of what Lowey believed was the permissible amount under the statute. *See* Depo. Ex. 3 (Exhibit 27).

86.    Lowey's tabulation of alleged usury-related charges also included "overadvance charges," which were assessed because the Borrowers were "out of formula" with regard to the Factoring Agreement's required ratio of outstanding accounts receivable to the existing loan balance, *see generally* Depo. Ex. 4 (Exhibit 17); Pappalardo Depo. Day 1 (Exhibit 18) 56:3-13; "commissions charges," which were applied because the Borrowers had failed to meet a minimum sales target, *see generally* Depo. Ex. 4 (Exhibit 17); Pappalardo Depo. Day 1 (Exhibit 18) 57:8-16; wire charges, which were fees assessed for each outgoing or incoming wire, *see generally* Depo. Ex. 4 (Exhibit 17); Pappalardo Depo. Day 1 (Exhibit 18) 58:10-14; letter of credit charges and other bank charges incurred by GMAC CF in connection with a letter of credit that it issued to Disney on behalf of the Borrowers, *see generally* Depo. Ex. 4 (Exhibit 17); Pappalardo Depo. Day 1 (Exhibit 18) 58:15-17, 60:18-24; and "facility fees" or "unused line fees," which were assessed for the Borrowers' failure to use the entire line of credit. *See generally* Depo. Ex. 4 (Exhibit 17); Pappalardo Depo. Day 1 (Exhibit 18) 82:13-18; Lowey Report (Exhibit 22), § VI & Exs. D-F; Lowey Depo. (Exhibit 24) 44:22-45:17.

87.    His tabulation also included a $56,908.22 payment that GMAC CF made to Disney on the letter of credit, *Id.*, Ex. F, p.4, which Lowey later admitted was a mistake. Lowey Depo. (Exhibit 24) 40:11-44:02. If one subtracts this $56,908.22 error from Lowey's "Usury Interest Damages" estimate of $107,775.20, the remainder is $50,866.98.

88.    Lowey's tabulation of alleged usury-related charges also included all legal fees incurred by GMAC CF and charged to the Borrowers in connection with collecting the Borrowers' debt. Lowey Report, § VI & Exs. D-F; Lowey Depo. 46:21-49:21. These legal fees

totaled at least $71,204.47. Pappalardo Depo. Day 2 (Exhibit 16) 21:10-23; 22:8-16; 26:15-27:2; 27:17-19; 27:24-28:9, 28:17-29:4 (citing the documents Bates numbered GLAN 01526, 01534, 01540, 01543, 01796, 01831-43, 01847-52, 01862-63, 01872, 01890, 01912, 01941, 01959).[18] Since that sum exceeded $50,866.98, if Lowey had not included these fees in his calculation of "interest and expenses," it would have led to the conclusion that the rate charged by GMAC CF did not exceed 20%.

89.     Lowey decided to include all of these charges in his calculation after receiving clarification from Landay's lawyer, Alan Hoffman, about how the Massachusetts usury statute should be interpreted. Lowey Depo. (Exhibit 24) 24:2-25:2; 46:21-47:14. Lowey did not read any case law or commentary on the usury statute before drafting the usury section of his report. *Id.* 27:6-9; 45:18-46:1.

90.     Lowey testified that while his report focused on the period between October 22, 2001, and January 2003, he also had done calculations for two other time periods: (1) from the inception of the loan on September 19, 2000, through November 2003 when GMAC CF "wrote it off" its books; and (2) from the execution of the Forbearance Agreement through the "write-off" date. *Id.* 30:17-31:21. The annualized interest rates for the first time period was less than 20 percent, and Lowey does not remember what the precise rate was for the second period. *Id.* 31:22-32:16.

91.     Lowey said that based on his understanding of the usury statute, as illuminated by Attorney Hoffman, he actually could have performed his analysis based on charges assessed on a single day. *Id.* 24:16-25:11.

---

[18]     True and accurate copies of each of these documents are attached as Exhibit 28 in the Appendix of Exhibits.

92.    He also said that since he believed fees and charges imposed in connection with various loan defaults were among the charges contemplated by the Massachusetts usury statute, any time a fee is imposed on a particular day, and the amount of the fee multiplied by 360 is greater than 20 percent of the loan balance on that day, there would be a technical violation of the statute. *Id.* 25:3-27:5; 56:6-19; 122:16-123:9. Thus, in Lowey's view, if a debtor had a line of credit for $1 million that it never used and as a result, was charged a $20 unused line fee, the loan would be usurious. *Id.* 56:6-19; 122:16-123:9.

93.    On November 11, 2005, Landay presented GMAC CF with a First Supplement to Expert Report of Keith D. Lowey, CPA ("Lowey's Supplemental Report"). *See* n.14, *supra*. In this report, Lowey has increased his damage estimate on the usury claim to $121,822.98 as well as his damages estimate on Landay's commercial unreasonableness claim to $445,074. *See* Lowey's Supplemental Report (Exhibit 23) at 2-3. GMAC CF has filed a motion to exclude this report on the grounds that it has been filed out of time.

94.    A true and accurate copy of the complaint that GMAC CF filed against Landay in the Supreme Court of the State of New York, County of New York, Index No. 602338/02 (the "New York Action"), minus exhibits, is attached as Exhibit 29 in the Appendix of Exhibits.

95.    A true and accurate copy of Landay's Answer and Counterclaims, minus exhibits, in the New York Action is attached as Exhibit 30 in the Appendix of Exhibits.

96.    A true and accurate copy of the court's May 25, 2004 opinion on summary judgment is attached as Exhibit 31 in the Appendix of Exhibits.

Respectfully submitted,
GMAC COMMERCIAL FINANCE LLC

/s/ John A. Houlihan

DATED:  November 23, 2005         /s/ Mark B. Dubnoff
                                  John A. Houlihan (BBO # 542038)
                                  Mark B. Dubnoff (BBO # 637212)
                                  EDWARDS ANGELL PALMER & DODGE LLP
                                  101 Federal Street
                                  Boston, MA  02110
                                  (617) 439-4444