# EXHIBIT 2

David L. Landay                                      10/18/2005

VOL. I, PAGES 1 - 201


UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-CV-11955-WGY


DAVID L. LANDAY

                    Plaintiff

V.

GMAC COMMERCIAL CREDIT, LLC and

GMAC COMMERCIAL FINANCE, LLC

                    Defendants


- - - - - - - -

Deposition of David L. Landay

Tuesday, October 18, 2005

9:42 a.m.

Edwards & Angell, LLP

101 Federal Street

Boston, Massachusetts

- - - - - - - -

Reporter:  Deborah Roth, RPR/CSR

f0b6b1ae-affe-4330-82cc-3512d4628ae4

**Page 6**

1          P-R-O-C-E-E-D-I-N-G-S
2              It is hereby stipulated and agreed to
3     by the attorneys for the respective parties that
4     all objections, except as to the form of the
5     question, and motions to strike shall be reserved
6     to the time of trial.
7              It is further stipulated that the
8     witness will read and sign the transcript under the
9     pains and penalties of perjury, with notarization
10    being waived.
11             David L. Landay,
12        having been satisfactorily identified
13    by the production of his driver's license, and duly
14    sworn by the Notary Public, was examined and
15    testified as follows:
16           DIRECT EXAMINATION
09:23:36 16  BY MR. HOULIHAN:
09:42:36 18     Q.  Please state your name for the record.
09:42:38 19     A.  David L. Landay.
09:42:41 20         (A discussion off the record.)
09:42:59 21     Q.  Mr. Landay, we have met before, but just to
09:43:08 22  refresh your recollection, my name is John
09:43:09 23  Houlihan, and I represent the defendants, GMAC
09:43:14 24  Commercial Credit, LLC, and GMAC Commercial

**Page 7**

09:43:18 1  Finance, LLC.
09:43:19 2          For ease of communication, if it is
09:43:24 3  acceptable to you, I will refer to both of them
09:43:27 4  jointly as "GMAC." Is that agreeable?
09:43:29 5     A.  Yes.
09:43:33 6     Q.  If during the course of today's deposition
09:43:39 7  either I or Mr. Hoffman ask you a question that you
09:43:42 8  do not understand, I do not want you to answer it.
09:43:45 9  Is that understood?
09:43:46 10    A.  Yes.
09:43:46 11    Q.  If you do not understand the question, tell
09:43:49 12  me, and we will frame a question in a manner that
09:43:53 13  you can understand. Agreeable?
09:43:58 14    A.  Yes.
09:44:00 15    Q.  When a question calls for a yes-or-no
09:44:03 16  answer, please answer with a yes or no, as opposed
09:44:06 17  to an uh-huh or unh-unh, or with a nod of the head,
09:44:10 18  as either of those latter responses can be
09:44:13 19  ambiguous when read on a paper transcript. Is that
09:44:16 20  agreeable?
09:44:16 21    A.  Yes.
09:44:18 22    Q.  And finally, it's my practice to
09:44:22 23  accommodate witnesses when they request a break.
09:44:26 24  So if you would like to take a break at any time, I

**Page 8**

09:44:31 1  am happy to accommodate you. I would prefer that
09:44:34 2  we not take a break while a question is pending,
09:44:38 3  unless it is necessary for you to consult with your
09:44:41 4  counsel concerning an issue of privilege. Is that
09:44:43 5  agreeable?
09:44:44 6     A.  Yes.
09:44:52 7     Q.  Are you on any medication today that would
09:44:55 8  affect your ability to testify?
09:44:56 9     A.  No.
09:44:57 10    Q.  Did you do anything to prepare for today's
09:45:00 11  deposition?
09:45:01 12    A.  Yes.
09:45:01 13    Q.  What did you do?
09:45:02 14    A.  Reviewed documents.
09:45:04 15    Q.  Did you meet with anyone other than
09:45:08 16  Mr. Hoffman to prepare for today's deposition?
09:45:11 17    A.  No.
09:45:12 18    Q.  Did you meet with Mr. Hoffman, yes or no?
09:45:15 19    A.  Yes.
09:45:15 20    Q.  When?
09:45:16 21    A.  Today.
09:45:17 22    Q.  Did you speak with Mr. Hoffman prior to
09:45:20 23  today about your deposition?
09:45:22 24    A.  Yes.

**Page 9**

09:45:22 1     Q.  When?
09:45:22 2     A.  Yesterday.
09:45:23 3     Q.  How long did that conversation last?
09:45:26 4     A.  Various conversations. Probably lasted an
09:45:32 5  hour in total.
09:45:34 6     Q.  You said that you reviewed documents in
09:45:36 7  preparation for today's deposition?
09:45:37 8     A.  Yes.
09:45:38 9     Q.  Did any of those documents refresh your
09:45:41 10  recollection concerning the contents of the
09:45:46 11  documents?
09:45:47 12    A.  Yes.
09:45:49 13    Q.  What documents did you review that
09:45:52 14  refreshed your recollection?
09:45:55 15    A.  I reviewed nearly all the documents that
09:46:03 16  had been produced in this case, including the
09:46:09 17  liquidation analyses by Mr. Rijo.
09:46:13 18    Q.  Did you review the factoring agreement?
09:46:28 19    A.  I glanced at the factoring agreement
09:46:33 20  yesterday.
09:46:34 21    Q.  How about your personal guaranty?
09:46:37 22    A.  No.
09:46:39 23    Q.  Did you review the ratification agreement?
09:46:41 24    A.  No.

LegaLink Boston
(617) 542-0039

f0b6b1ae-affe-4330-82cc-3512d4628ae4

David L. Landay                                          10/18/2005

---

### Page 18

09:58:31 1   Q. And what's the name of your 42-year-old
09:58:35 2   child?
09:58:35 3   A. William Landay.
09:58:37 4   Q. And what's the name of your 40-year-old
09:58:39 5   child?
09:58:40 6   A. Suzanne Robinson.
09:58:51 7      THE WITNESS: May I ask counsel a
09:58:53 8   question.
09:58:53 9      MR. HOULIHAN: Certainly.
09:59:06 10    (Witness and counsel confer.)
09:59:07 11   Q. At any point in time since October 1, 2001,
10:00:03 12   have you given any gifts to any of your children in
10:00:10 13   excess, with a value in excess of $5,000?
10:00:16 14   A. No.
10:00:17 15     MR. HOFFMAN: Wait a second. I object.
10:00:20 16   I instruct the witness not to answer on the basis
10:00:24 17   that I don't see any possible relevancy to this
10:00:27 18   case.
10:00:28 19      It seems to me an effort to find out
10:00:32 20   about Mr. Landay's assets and whether in fact he
10:00:37 21   disgorged GMAC, and I believe it's inappropriate
10:00:43 22   until a judgment has been entered.
10:00:45 23   Q. Mr. Landay, you received your B.A. in
10:00:50 24   economics from Brandeis University in 1960,

### Page 19

10:00:54 1   correct?
10:00:54 2   A. Yes.
10:00:54 3   Q. Your MBA from Boston University in 1963?
10:00:57 4   A. Yes.
10:00:58 5   Q. Other than those degrees, have you received
10:01:00 6   any other degrees from any other institutions?
10:01:03 7   A. No.
10:01:04 8   Q. From 1963 until 1967, you worked for a
10:01:09 9   company called Green Shoe Manufacturing?
10:01:12 10   A. Yes.
10:01:12 11   Q. Where was that company located?
10:01:14 12   A. Boston.
10:01:16 13   Q. What were your duties for Green Shoe
10:01:19 14   Manufacturing?
10:01:19 15   A. I was in charge all of the purchasing and
10:01:24 16   relations with outside manufacturing locations away
10:01:28 17   from the main factory.
10:01:35 18   Q. At the time that you left Green Shoe
10:01:38 19   Manufacturing, did you have a title?
10:01:39 20   A. I believe it was director of purchasing.
10:01:42 21   Q. In or about 1967, you became affiliated
10:01:57 22   with company called Brookfield Athletic Shoe; is
10:02:00 23   that correct?
10:02:01 24   A. Yes.

### Page 20

10:02:01 1   Q. And how did you come to be associated with
10:02:06 2   Brookfield Athletic Shoe?
10:02:07 3   A. I bought 50 percent of the stock.
10:02:09 4   Q. Who were the other stockholders?
10:02:15 5   A. There was only one other stockholder, Alvin
10:02:20 6   Wolf.
10:02:24 7   Q. What was the nature of Brookfield Athletic
10:02:28 8   Shoe's business?
10:02:28 9   A. It was a manufacturer and importer of
10:02:31 10   athletic footwear.
10:02:35 11   Q. Were you employed by Brookfield?
10:02:39 12   A. Yes. I was president of the company.
10:02:40 13   Q. What were your duties as president?
10:02:42 14   A. General management of the company and
10:02:47 15   running the manufacturing and warehousing.
10:02:55 16   Q. Now, at some point in time, did you sell
10:02:58 17   Brookfield?
10:02:59 18   A. In March of -- yes.
10:03:02 19   Q. When?
10:03:03 20   A. March of 1985.
10:03:06 21   Q. As of March 1985, were you still a 50
10:03:13 22   percent stockholder, or did you have a greater or
10:03:15 23   lesser interest in the company?
10:03:16 24   A. Greater.

### Page 21

10:03:17 1   Q. What was your interest in the company at
10:03:19 2   that point in time?
10:03:20 3   A. A hundred percent.
10:03:30 4   Q. I take it you sold your stock in
10:03:40 5   Brookfield?
10:03:40 6   A. No.
10:03:41 7   Q. Describe that transaction for me, please.
10:03:43 8   A. I sold certain of the assets of Brookfield,
10:03:50 9   and the purchaser assumed certain of the
10:03:53 10   liabilities.
10:03:58 11   Q. Who was the purchaser?
10:04:00 12   A. Hyde Athletic Industries.
10:04:04 13   Q. Did Hyde continue to operate the Brookfield
10:04:09 14   shoe business after the purchase?
10:04:10 15   A. Yes.
10:04:11 16   Q. How did they do that?
10:04:13 17   A. They formed a subsidiary of Hyde, and I
10:04:21 18   forget the legal title of the subsidiary.
10:04:24 19   Q. Did it have a business operating name?
10:04:27 20   A. Brookfield -- I don't recall if it was
10:04:33 21   still Brookfield Athletic, or if that's when we
10:04:36 22   came up with the name Brookfield International.
10:04:39 23      I honestly don't recall. It was still
10:04:41 24   Brookfield something.

6  (Pages 18 to 21)

f0b6b1ae-affe-4330-82cc-3512d4628ae4

David L. Landay                                        10/18/2005

---

**Page 22**

10:04:46 1    Q. After the sale, did you come to be employed
10:04:49 2    by Hyde?
10:04:50 3    A. Yes.
10:04:51 4    Q. In what capacity?
10:04:52 5    A. Executive vice president.
10:04:54 6    Q. And what were your responsibilities as an
10:04:56 7    executive vice president at Hyde?
10:04:58 8    A. I was in charge of the Brookfield
10:05:04 9    operation. I believe I had the title of CEO of
10:05:07 10   Brookfield, and I was in charge of all of the
10:05:09 11   manufacturing of athletic footwear, the
10:05:14 12   warehousing, the importation, the product
10:05:18 13   development of all of the athletic footwear for
10:05:23 14   Hyde, and I had one account that I sold. I was
10:05:28 15   responsible for one retail account.
10:05:31 16   Q. Which account was that?
10:05:32 17   A. Big Five Sports, California.
10:05:40 18   Q. And at some point in time did you cease to
10:05:43 19   be employed by Hyde?
10:05:45 20   A. Yes.
10:05:45 21   Q. When was that?
10:05:46 22   A. July of 1990.
10:05:51 23   Q. Starting in 1990, you became employed by
10:05:57 24   Seneca Sports?

---

**Page 23**

10:05:58 1    A. Yes.
10:05:59 2    Q. As a CEO?
10:06:01 3    A. I believe --
10:06:03 4    Q. What was your title?
10:06:05 5    A. I believe it was president/treasurer.
10:06:10 6    Q. As of 1990, were you a stockholder in
10:06:13 7    Seneca?
10:06:13 8    A. Yes.
10:06:14 9    Q. Do you recall what percentage of the Seneca
10:06:16 10   stock you held in 1990?
10:06:18 11   A. I believe it was 37.
10:06:19 12   Q. And did you acquire that 37 percent
10:06:22 13   interest in 1990?
10:06:23 14   A. Yes.
10:06:24 15   Q. Can you identify the other stockholders as
10:06:29 16   of 1990?
10:06:30 17   A. Charles Chen, Charles Landay, Roger Landay,
10:06:36 18   Frederick Greer, Kenneth Pratt.
10:06:41 19   Q. Roger and Charles Landay are your brothers?
10:06:44 20   A. Yes.
10:06:47 21   Q. Is Mr. Pratt a relation?
10:06:53 22   A. No.
10:06:54 23   Q. In-law?
10:06:55 24   A. No.

---

**Page 24**

10:06:55 1    Q. Former in-law?
10:06:56 2    A. No.
10:06:57 3    Q. How about Mr. Greer?
10:07:02 4    A. I assume you're asking the same question:
10:07:05 5    Is he a relation?  Former in-law?
10:07:07 6    Q. Correct.
10:07:08 7    A. The answer is no to all of those.
10:07:14 8    Q. How long have you known Mr. Chen?
10:07:16 9    A. I have known Mr. Chen since the late 1960s.
10:07:27 10   Q. When was the last time that you spoke to
10:07:29 11   Mr. Chen?
10:07:30 12   A. I haven't spoken to Mr. Chen since 2001.
10:07:43 13   Q. Before or after October 22, 2001?
10:07:47 14   A. After.
10:07:56 15   Q. Do you recall roughly the percentage
10:08:00 16   interest that Mr. Chen held in Seneca as of 1990?
10:08:04 17   A. I would have to calculate it.  He owned 950
10:08:12 18   shares.
10:08:16 19   Q. Would it be fair to say that you were the
10:08:18 20   largest shareholder?
10:08:19 21   A. At what point in time?
10:08:21 22   Q. In 1990.
10:08:22 23   A. No.  Mr. Chen was.
10:08:35 24   Q. At some point in time, the ownership

---

**Page 25**

10:08:46 1    interest in Seneca changed and you became the
10:08:49 2    majority stockholder?
10:08:51 3    A. Yes.
10:08:51 4    Q. When was that?
10:08:53 5    A. I believe it was in 2000.
10:08:56 6    Q. And describe for me how that change came to
10:09:05 7    pass.
10:09:05 8    A. Neal Finkelstein, who was the controller,
10:09:14 9    suggested that, for the risk I was taking on, that
10:09:17 10   I deserved some sort of additional compensation.
10:09:24 11   He suggested, because there were
10:09:26 12   authorized but unissued shares, that those shares,
10:09:30 13   I believe 975 shares, should be issued to me.
10:09:40 14   I reviewed that with Attorney Hoff, and
10:09:43 15   we got approval of the shareholders or directors, I
10:09:47 16   forget which, to do that, and I believe that was in
10:09:53 17   2000, but I'm not sure.
10:09:56 18   Q. Was that before or after the GMAC closing?
10:10:03 19   A. It probably would have been slightly
10:10:08 20   before.
10:10:17 21   Q. You testified that Mr. Finkelstein -- who
10:10:23 22   is Mr. Finkelstein?
10:10:25 23   A. He was the controller, and I believe,
10:10:28 24   assistant treasurer, clerk of the company.

LegaLink Boston
(617) 542-0039

f0b6b1ae-affe-4330-82cc-3512d4628ae4

David L. Landay                                             10/18/2005

### Page 42

10:37:12  1      Q. And why did the transaction, the financing
10:37:15  2   with Wells Fargo, not go forward?
10:37:18  3      A. I got a call one morning from Mr. Horsman,
10:37:21  4   who ran the Boston office of Wells Fargo, who said
10:37:25  5   he didn't want to go forward, even though they were
10:37:27  6   at the stage where we were doing signature cards,
10:37:30  7   setting up bank accounts. I believe we had bank
10:37:32  8   account numbers assigned already.
10:37:36  9      Q. Did Mr. Horsman explain why Wells Fargo
10:37:43 10   didn't go forward?
10:37:44 11      A. No. They didn't want to do it, and that
10:37:47 12   was Mr. Horsman's representation, that they could
10:37:51 13   do things like that.
10:37:53 14      Q. Did you Mr. Horsman or anybody else at
10:37:55 15   Wells Fargo --
10:37:56 16      A. No. I had no choice. He wasn't going
10:37:59 17   forward. So I had to go to my next proposal, which
10:38:02 18   was from GMAC. It didn't matter why he wasn't
10:38:06 19   going forward. I had to move to get this deal
10:38:10 20   done.
10:38:15 21      Q. Didn't it strike you as odd that you would
10:38:20 22   get to a point in a transaction where bank account
10:38:25 23   numbers had been assigned and signature cards were
10:38:28 24   being executed, and then there would be an

### Page 43

10:38:32  1   unexplained decision not to go forward?
10:38:34  2      A. Yes. But I had always understood that
10:38:41  3   Mr. Horsman was odd, as you called it.
10:38:50  4      Q. You testified that after Wells Fargo
10:38:57  5   decided not to go forward with the proposed
10:39:01  6   refinancing, that you moved on to the next
10:39:04  7   proposal, which was from GMAC?
10:39:06  8      A. Yes.
10:39:08  9      Q. I take it then that GMAC's proposal was
10:39:14 10   more favorable to the borrower than any of the
10:39:20 11   other proposals that you had?
10:39:23 12      A. I wouldn't say that.
10:39:25 13      Q. Why did you choose to go forward with GMAC?
10:39:29 14      A. Because I had a written proposal from them,
10:39:33 15   and it was the quickest and easiest thing to do
10:39:36 16   after Wells Fargo.
10:39:37 17      Q. Did you have a written proposal from any of
10:39:40 18   the other companies from which you had solicited
10:39:43 19   proposals?
10:39:43 20      A. No.
10:39:45 21      Q. You solicited proposals from GE?
10:39:50 22      A. Yes.
10:39:51 23      Q. Citizens?
10:39:52 24      A. Yes.

### Page 44

10:39:55  1      Q. Any others?
10:39:57  2      A. I don't recall.
10:39:59  3      Q. Citibank?
10:40:00  4      A. No.
10:40:03  5      Q. In any event, the only other entity that
10:40:09  6   responded to your request for proposal was GMAC?
10:40:13  7      A. Yes.
10:40:17  8      Q. So after Wells Fargo decided not to go
10:40:22  9   forward, GMAC essentially was the only option that
10:40:27 10   Seneca had available?
10:40:29 11      A. At that point in time, yes.
10:40:43 12      Q. I apologize, Mr. Landay, if I asked this
10:41:08 13   question before, but did Seneca have an executed
10:41:12 14   commitment letter with Wells Fargo?
10:41:15 15      A. I don't recall if it was a commitment
10:41:19 16   letter or term sheet. I'm not sure at this point
10:41:23 17   in time, and I have no copies of anything.
10:43:02 18        (A recess was taken from
10:43:04 19        10:43 to 10:46 a.m.)
10:46:55 20        EXHIBIT NO. 59 MARKED
10:47:07 21      Q. Mr. Landay, can you identify Exhibit 59 for
10:47:11 22   me?
10:47:11 23      A. I believe this is a letter that was brought
10:47:17 24   to me by Paul Fitzgerald with the company term

### Page 45

10:47:22  1   sheet dated July 31, 2000.
10:47:31  2      Q. And if you turn to Page 4 of the letter --
10:47:36  3      A. I am sorry, the letter is an approval
10:47:39  4   letter, I would characterize it.
10:47:41  5      Q. You said you would characterize the letter
10:47:48  6   as an approval letter?
10:47:50  7      A. Yes.
10:47:50  8      Q. Why?
10:47:51  9      A. It says, "GMAC Commercial Credit LLC (GMAC
10:48:27 10   CC) hereby confirms that we have obtained approval
10:48:33 11   from our credit committee."
10:47:58 12      Q. Go on. "Subject to"?
10:48:04 13      A. "And the attached term sheet of the same
10:48:06 14   date."
10:48:09 15        How far do you want me to read?
10:48:12 16      Q. That's sufficient. Read the rest of that
10:48:21 17   portion of the sentence slowly.
10:48:22 18      A. "GMAC Commercial Credit LLC (GMAC CC)
10:48:31 19   hereby confirms that we have obtained approval from
10:48:34 20   our credit committee, subject to and upon terms and
10:48:38 21   conditions set forth in this letter and the
10:48:41 22   attached term sheet of the same date."
10:48:46 23      Q. If you turn to Page 4 of Exhibit 59, is
10:48:53 24   that your signature under Seneca Sports?

12  (Pages 42 to 45)

f0b6b1ae-affe-4330-82cc-3512d4628ae4

David L. Landay                                                    10/18/2005

| | |
|---|---|
| **Page 46** | **Page 48** |

**Page 46**

10:48:55 1     A. Yes.

10:48:55 2     Q. And you signed as president of Seneca

10:48:59 3  Sports?

10:48:59 4     A. Yes.

10:49:00 5     Q. Can you read that date?

10:49:01 6     A. August 1, 2000.

10:49:07 7     Q. The attached term sheet is the term sheet

10:49:11 8  that was attached to the letter when you received

10:49:13 9  it?

10:49:13 10    A. I believe so.

10:49:18 11    Q. Both you and Seneca were represented by

10:49:20 12  counsel at this time, correct?

10:49:26 13    A. Yes. But counsel was not present when this

10:49:31 14  letter was presented.

10:49:34 15    Q. Did you discuss this letter with

10:49:36 16  Mr. Fitzgerald when he presented it to you?

10:49:39 17    A. Of course.

10:49:39 18    Q. And the term sheet, you discussed it with

10:49:41 19  Mr. Fitzgerald?

10:49:42 20    A. Yes.

10:49:47 21    Q. Do you recall that discussion with

10:49:49 22  Mr. Fitzgerald?

10:49:51 23    A. Partially, yes.

10:49:53 24    Q. What do you recall discussing with

**Page 47**

10:49:56 1  Mr. Fitzgerald?

10:50:01 2    A. We reviewed the terms of the term sheet,

10:50:04 3  what the advance ratios would be, the collateral

10:50:08 4  ratios, what I had to put up as principal.

10:50:13 5      We reviewed the payment, because there

10:50:16 6  was a deposit, as you could see on Page 4, the

10:50:22 7  second line from the top, the amount of what they

10:50:27 8  call a transaction expense was lowered, because

10:50:31 9  that was an incorrect number in the letter, and I

10:50:36 10  obviously discussed that with Mr. Fitzgerald.

10:50:39 11      We discussed the date on the term

10:50:43 12  sheet, which was obviously incorrect, and changed

10:50:47 13  it to reflect July 31st. You will see the top line

10:50:52 14  says "7/31/00," and the third line down says,

10:50:56 15  "Subject to the 7/26/00 cover letter," and the

10:51:00 16  cover letter is dated 7/31. So we discussed that.

10:51:04 17      We discussed the seasonal over-advance.

10:51:08 18  We discussed how in general a bank would look to

10:51:14 19  the guaranties, or a lending institution.

10:51:17 20  I call it a bank. I guess you would

10:51:19 21  not call GMAC Commercial Credit a bank, officially.

10:51:29 22    Q. Anything else that you can recall

10:51:30 23  discussing with Mr. Fitzgerald?

10:51:32 24    A. No.

**Page 48**

10:51:37 1     Q. Do you know whether Mr. Fitzgerald is alive

10:51:40 2  or dead?

10:51:41 3    A. I have been told, I believe it was in

10:51:45 4  Mr. Fitzpatrick's deposition in the New York

10:51:48 5  action, that Mr. Fitzgerald has passed away.

10:52:01 6    Q. You testified a moment ago that when

10:52:13 7  Mr. Fitzgerald delivered Exhibit 59 you discussed

10:52:17 8  the seasonal over-advance.

10:52:21 9      Do you recall what was said about the

10:52:26 10  seasonal over-advance?

10:52:27 11    A. The seasonal over-advance was always a part

10:52:30 12  of the negotiation and important to Seneca; because

10:52:33 13  as we did our projections into 2001, we knew we had

10:52:36 14  to have a seasonal over-advance during the slow

10:52:41 15  sales time of the year in order to bring an

10:52:44 16  inventory and build up inventory for the fourth

10:52:47 17  quarter, which was always the busiest time of the

10:52:52 18  year.

10:52:53 19    Q. And you explained that to Mr. Fitzgerald?

10:52:56 20    A. Of course. That was part of our budgets in

10:52:58 21  the beginning as we negotiated with them.

10:53:05 22    Q. Did Mr. Fitzgerald say anything to you

10:53:07 23  about the issue of seasonal over-advance?

10:53:10 24    A. He confirmed that it was a part of the

**Page 49**

10:53:13 1  deal.

10:53:13 2    Q. You testified a moment ago when

10:53:25 3  Mr. Fitzgerald delivered Exhibit 59 you discussed

10:53:30 4  the issue of guaranties. Do you recall what was

10:53:32 5  discussed about the guaranties?

10:53:34 6    A. I believe I said we had a discussion, which

10:53:38 7  was how banks looked at the guaranties, and when

10:53:41 8  they call upon -- because this was a substantial

10:53:44 9  guaranty and was higher than the guaranty that I

10:53:47 10  had with the Bank of Boston, and Mr. Fitzgerald and

10:53:51 11  I talked about that. If I recall, he used to be

10:53:56 12  with the First National Bank of Boston, and while I

10:53:58 13  did not know him from the First National Bank of

10:54:03 14  Boston, we knew a lot of the same people.

10:54:04 15    Q. Do you recall anything that Mr. Fitzgerald

10:54:08 16  stated about the issue of the guaranty?

10:54:14 17    A. Just that the normal banking way of doing

10:54:16 18  things was that in the case, God forbid, that

10:54:20 19  there's a foreclosure, that the lending institution

10:54:25 20  -- and I use that word instead of "bank" -- would

10:54:29 21  look to the assets of the corporation first.

10:54:32 22    Q. Had you had a discussion to that effect

10:54:45 23  with Mr. Fitzgerald prior to the time that he

10:54:51 24  delivered Exhibit 59?

f0b6b1ae-affe-4330-82cc-3512d4628ae4

David L. Landay                                        10/18/2005

Page 50

10:54:52  1    A. I'm sure we did in the negotiation of the
10:54:56  2  deal.
10:54:56  3    Q. In fact, that's what you allege in your
10:54:58  4  complaint, correct?
10:54:59  5    A. Yes. Excuse me, I don't recall the exact
10:55:04  6  words in the complaint.
10:55:05  7    Q. I am not asking you to recall the exact
10:55:07  8  words of the complaint.
10:55:08  9    A. Okay. You are saying I allege --
10:55:10 10    Q. Do you allege --
10:55:12 11    A. I don't recall the exact allegations of the
10:55:14 12  complaint.
10:55:15 13    Q. Let me ask you this: Sitting here today,
10:55:19 14  do you claim that Mr. Fitzgerald made
10:55:25 15  representations to you concerning the operation of
10:55:27 16  a guaranty before your discussion when he delivered
10:55:30 17  Exhibit 59?
10:55:31 18    A. Yes.
10:55:33 19    Q. And with respect to those representations
10:55:40 20  that were made prior to the delivery of Exhibit 59,
10:55:43 21  can you tell me what those representations were?
10:55:46 22    MR. HOFFMAN: Before the one he has
10:55:47 23  just testified to?
10:55:48 24    MR. HOULIHAN: Correct.

Page 51

10:55:49  1    A. Those representations would have been
10:55:52  2  general discussions about how banks looked to a
10:55:57  3  guarantor after they looked to the assets of the
10:56:00  4  company first, which was my experience in previous
10:56:05  5  discussions with the other lending institutions
10:56:10  6  that I had done deals with, that was always my
10:56:13  7  understanding.
10:56:13  8    Q. In any of your prior transactions, had any
10:56:16  9  lending institution ever made a demand on a
10:56:21 10  guaranty that you had executed?
10:56:22 11    A. No.
10:56:22 12    Q. So you had no firsthand experience with the
10:56:27 13  manner in which banks actually -- or lending
10:56:30 14  institutions actually enforced guaranties, correct?
10:56:36 15    A. No. Fortunately.
10:56:38 16    Q. No, you had no such experience?
10:56:40 17    A. No. Correct. "No" is the answer.
10:56:42 18    Q. At any point in time, did Mr. Fitzgerald
10:56:53 19  say anything to you about GMAC's specific practices
10:56:57 20  with respect to the enforcement of guaranties?
10:57:00 21    A. No.
10:57:02 22    Q. In connection with the negotiations that
10:57:53 23  you had with Wells Fargo -- and I am drawing a
10:57:57 24  blank on the gentleman's name that you negotiated

Page 52

10:58:00  1  with at Wells Fargo --
10:58:03  2    A. Mr. Horsman.
10:58:05  3    Q. In your discussion with Mr. Horsman, did
10:58:09  4  you talk about the manner in which financial
10:58:11  5  institutions enforce guaranties?
10:58:13  6    A. I'm sure we did.
10:58:15  7    Q. And do you recall any of those discussions?
10:58:18  8    A. Not in detail, but I'm sure that he
10:58:22  9  confirmed my experience --
10:58:23 10    Q. And that --
10:58:25 11    A. -- because I would not have gone forward
10:58:27 12  with Wells Fargo if it was otherwise.
10:58:30 13    Q. Did you have such discussions with
10:58:37 14  Ms. Larson at Bank of Boston -- I may not have the
10:58:43 15  name correct.
10:58:44 16    A. You're correct with the name.
10:58:46 17    I don't recall that I had such
10:58:48 18  discussions, because the initial transaction with
10:58:56 19  Bank of Boston was with someone other than with
10:58:59 20  Ms. Larson. I believe it was a Mrs. Munroe.
10:59:06 21    Q. And you already had a guaranty with Bank of
10:59:09 22  Boston, correct?
10:59:10 23    A. The guaranty with Bank of Boston was
10:59:16 24  limited, and it was myself, Mr. Greer, Mr. Pratt

Page 53

10:59:20  1  and Mr. Chen were all in on the guaranty.
10:59:24  2    Q. And did that Bank of Boston guaranty afford
10:59:28  3  the bank the right to pursue remedies against a
10:59:36  4  guarantor before pursuing remedies against the
10:59:41  5  underlying debtor?
10:59:47  6    A. I don't recall what the document said, and
10:59:49  7  I don't have a copy of it.
11:00:02  8    Q. Now, if you turn to the first page of the
11:00:06  9  term sheet in Exhibit 59, there's a discussion of
11:00:16 10  the guaranty right at the top of the page, correct?
11:00:19 11    A. Yes.
11:00:21 12    Q. Did you ever say to Mr. Fitzgerald that the
11:00:30 13  language in the term sheet did not reflect your
11:00:32 14  understanding of the way the guaranty operated?
11:00:35 15    A. I don't know that there's a conflict
11:00:42 16  reading this.
11:00:43 17    Q. I am not suggesting that there is --
11:00:45 18    A. I thought your question suggested that
11:00:48 19  there was.
11:00:49 20    Q. This language does not say, does it, that
11:00:52 21  the bank will only pursue the guaranty after it
11:00:58 22  exercises some other rights?
11:01:05 23    A. You're correct.
11:01:06 24    Q. Did you bring that fact to Mr. Fitzgerald's

14  (Pages 50 to 53)

f0b6b1ae-affe-4330-82cc-3512d4628ae4

David L. Landay                                    10/18/2005

---

### Page 54

11:01:11 1    attention?
11:01:11 2        A. No. We had had a general discussion about
11:01:13 3    how guaranties worked.
11:01:14 4        Q. And you didn't say to him, "This doesn't
11:01:18 5    reflect our prior discussion"?
11:01:20 6        A. No, not that I recall.
11:01:37 7        Q. In any of the conversations that you had
11:01:40 8    with Mr. Fitzgerald concerning the way in which
11:01:42 9    guaranties operate, was anyone else ever present?
11:01:49 10       A. No, not that I recall.
11:01:59 11       Q. As of July 2000, who represented you
11:02:11 12   personally in connection with this transaction?
11:02:13 13       A. Gary Hoff.
11:02:17 14       Q. Yes or no, did you tell Mr. Hoff about the
11:02:20 15   conversations that you had with Mr. Fitzgerald
11:02:22 16   concerning the guaranty?
11:02:23 17       A. Not that I recall.
11:02:26 18       Q. Yes or no, did you tell Mr. Hoff about the
11:02:43 19   conversations that you had with Mr. Fitzgerald
11:02:48 20   concerning the seasonal over-advance?
11:02:50 21       A. Not that I recall.
11:02:51 22       Q. Was the issue of the way in which the
11:03:55 23   guaranty operated important to you?
11:03:56 24       A. Yes.

### Page 55

11:03:58 1        Q. But you have no recollection of discussing
11:04:01 2    it with your attorney?
11:04:02 3        A. Correct.
11:04:03 4        Q. The same question with respect to the issue
11:04:07 5    of seasonal over-advance, was that important?
11:04:09 6        A. Yes.
11:04:10 7        Q. But you have no recollection of discussing
11:04:12 8    that with your attorney?
11:04:13 9        A. No.
11:04:13 10       Q. Would it be fair to say that because you
11:04:26 11   believed the issue of the operation of the guaranty
11:04:28 12   to be important, that that was an issue you
11:04:31 13   personally were paying attention to during the
11:04:33 14   course of negotiations with GMAC?
11:04:34 15       A. Yes.
11:04:35 16       Q. Would it be fair to say that because you
11:04:40 17   believed that the operation of the guaranty was
11:04:42 18   important, that that is an issue that you expected
11:04:45 19   your attorney to be paying attention to during the
11:04:50 20   negotiations with GMAC?
11:04:52 21       A. I would have assumed my attorney would pay
11:04:55 22   attention to it.
11:04:56 23       Q. The same with respect to the way the
11:05:00 24   seasonal over-advance operated?

### Page 56

11:05:01 1        A. Yes.
11:05:01 2        Q. Would you agree with me, Mr. Landay, that
11:05:06 3    your understanding of the way in which the guaranty
11:05:19 4    operated is not reflected anywhere in Exhibit 59?
11:05:24 5        A. I would not agree, without reading every
11:05:32 6    page of Exhibit 59.
11:05:34 7        Q. Be my guest.
11:06:02 8            EXHIBIT NO. 60 MARKED
11:09:14 9        A. Do you want to ask your question again?
11:09:18 10       Q. Sure. Would you agree with me, Mr. Landay,
11:09:21 11   that your understanding of the way in which the
11:09:24 12   guaranty operated is not reflected anywhere in
11:09:26 13   Exhibit 59?
11:09:27 14       A. Yes.
11:09:28 15       Q. Mr. Landay, I have just handed you a
11:09:41 16   document we have marked as Exhibit 60.
11:09:46 17           Have you ever seen this document
11:09:48 18   before?
11:09:49 19       A. Yes.
11:09:50 20       Q. What is it?
11:09:52 21       A. It appears to be a new -- well, it's titled
11:09:57 22   "GMAC Commercial Credit Corporate New Client
11:10:00 23   Report," and I believe it has attached to it a
11:10:10 24   write-up to the marketing credit committee from

### Page 57

11:10:15 1    GMAC CC Boston, June 22, 2000, Subject: Seneca
11:10:26 2    Sports.
11:10:26 3            The new client report has a notation at
11:10:32 4    the bottom that it was printed 7/19/00, and I
11:10:39 5    believe some of the pages attached are excerpts
11:10:42 6    from an independent auditor's report that was done
11:10:48 7    for GMAC. I believe the company that did it was
11:10:52 8    Edward Isaacs and Company, and there is also
11:11:06 9    document -- discussion -- term sheet not a
11:11:09 10   commitment, and more pages I believe that come from
11:11:16 11   the Edward Isaacs' report that I reviewed recently.
11:11:20 12       Q. In what context did you first see this
11:11:23 13   document?
11:11:23 14       A. This document was produced as part the New
11:11:26 15   York litigation by GMAC.
11:11:28 16       Q. Now, I would like you to turn, if you
11:11:43 17   would, to the page that bears the Bates number GLAN
11:11:50 18   00101, to the bottom portion of that page. There
11:12:02 19   is a heading "Personal Financial Statement." Do
11:12:05 20   you see that?
11:12:05 21       A. Yes.
11:12:05 22       Q. I would like you to read that to yourself,
11:12:13 23   that section to yourself, and let me know when
11:12:17 24   you're finished, please.

15 (Pages 54 to 57)

Page 62

11:20:08 1       EXHIBIT NO. 62 MARKED
11:20:32 2       Q. Mr. Landay, I just handed you a document
11:20:35 3   that has been marked Exhibit 62.
11:20:37 4       Can you identify that document for me?
11:20:39 5       A. It appears to be a memorandum from Gary
11:20:43 6   Hoff to Paul Fitzgerald and Lou Marcus.
11:20:46 7       Mr. Fitzgerald was in charge of the
11:20:50 8   Boston office of GMAC. Mr. Marcus who was an
11:20:53 9   outside attorney that handled all the documentation
11:20:56 10  for GMAC.
11:20:57 11      Q. Mr. Hoff was your attorney?
11:20:58 12      A. That's correct.
11:21:01 13      Q. The date on the document?
11:21:02 14      A. It says August 15, 2000.
11:21:06 15      Q. Yes or no, do you have any recollection of
11:21:09 16  discussing Exhibit 62 with Mr. Hoff?
11:21:13 17      A. I have no recollection at this time, no.
11:21:21 18      Q. Have you ever seen Exhibit 62 prior to
11:21:23 19  today?
11:21:24 20      A. Yes.
11:21:26 21      Q. Did you see Exhibit 62 before it was sent
11:21:32 22  to Mr. Fitzgerald and Mr. Marcus?
11:21:35 23      A. No.
11:21:37 24      Q. Was it Mr. Hoff's practice to copy you on

Page 63

11:21:48 1   documents or materials that he sent to GMAC?
11:21:52 2       A. I believe in general he would copy, yes.
11:21:58 3       Q. Do you know whether or not you received a
11:22:00 4   copy of Exhibit 62 at or about the time that it was
11:22:03 5   sent to Mr. Fitzgerald and Mr. Marcus?
11:22:07 6       A. I have no recollection as to when I
11:22:09 7   received it.
11:22:25 8       Q. Would you agree with me that in Exhibit 62
11:22:34 9   Mr. Hoff is directing the attention of
11:22:40 10  Mr. Fitzgerald and Mr. Marcus to various issues
11:22:48 11  wherein in the opinion of Mr. Hoff the initial
11:22:53 12  draft documents are at variance with the commitment
11:22:58 13  letter?
11:22:58 14      A. I would not agree with that. I don't know
11:23:05 15  if it is in regards to the initial draft documents
11:23:08 16  are at variance with the commitment letter or
11:23:10 17  subsequent drafts.
11:23:11 18      I have no idea. I can't say that this
11:23:14 19  says...
11:23:16 20      Q. Fair point. Would you agree that, whether
11:23:19 21  they were the initial drafts or subsequent drafts,
11:23:22 22  Mr. Hoff is pointing out that the documents that he
11:23:26 23  received yesterday, the date before he wrote the
11:23:30 24  memo, are at variance, in his view, from the

Page 64

11:23:35 1   commitment letter, in the ways identified in the
11:23:37 2   memo?
11:23:38 3       A. He says, if I may quote, starting on Line
11:23:42 4   2, "are either at variance from the commitment
11:23:46 5   letter or are otherwise of significant concern to
11:23:51 6   Seneca."
11:23:53 7       Q. And if you turn to Page 2, you'll see that
11:23:57 8   one of the issues that is discussed is your
11:24:00 9   guaranty, correct?
11:24:01 10      A. Yes.
11:24:02 11      Q. And the statement indicates that the
11:24:10 12  guaranty is limited in amount to $3,500,000,
11:24:17 13  correct?
11:24:17 14      A. Yes.
11:24:17 15      Q. Do you recall whether any of the draft
11:24:25 16  versions of the guaranty contained a limit other
11:24:36 17  than $3,500,000?
11:24:39 18      A. I don't recall.
11:24:40 19      Q. Do you recall that there was any issue or
11:24:43 20  concern about the documents not reflecting the 3.5
11:24:48 21  million limit?
11:24:49 22      A. I don't recall.
11:24:52 23      Q. Would you agree that nothing in Exhibit 62
11:25:00 24  references your understanding of the way in which

Page 65

11:25:03 1   the guaranty was to operate?
11:25:05 2       A. I am not sure I understand -- I think I
11:25:11 3   understand your question, but I think you should be
11:25:13 4   more specific.
11:25:14 5       Q. Okay. You testified earlier today about
11:25:19 6   your understanding of the way in which guaranties
11:25:23 7   operate, correct?
11:25:24 8       A. Yes.
11:25:27 9       Q. And I think we established that there was
11:25:32 10  nothing in the commitment letter that reflected
11:25:35 11  that understanding.
11:25:37 12      I'm asking you if there is anything in
11:25:40 13  Exhibit 62 that reflects that understanding.
11:25:42 14      A. Are you saying that the letter that
11:25:46 15  Fitzgerald gave to me on July 31 was a commitment
11:25:48 16  letter? I'm not sure that we've characterized it
11:25:52 17  that way, and I don't mean to be picky.
11:25:56 18      Q. I think you referred to it as an approval
11:25:58 19  letter. We will use your terminology, or better
11:26:04 20  yet, let's just refer to it as Exhibit 59, and I
11:26:07 21  will rephrase my question.
11:26:08 22      A. Okay.
11:26:08 23      Q. Would you agree with me, Mr. Landay, that
11:26:15 24  nothing in Exhibit 62 reflects your understanding

17 (Pages 62 to 65)

Page 66

11:26:21 1  of the way in which guaranties operate?
11:26:24 2      A. Yes.
11:26:25 3      Q. Mr. Hoff represented you at that time,
11:26:36 4  correct?
11:26:37 5      A. And the company.
11:26:47 6      Q. The $3.5 million guaranty that was being
11:27:29 7  required of you in connection with the GMAC
11:27:31 8  transaction represented a substantial increase over
11:27:35 9  the existing guaranty correct?
11:27:37 10     A. Yes.
11:27:37 11     Q. More than double the existing guaranty,
11:27:44 12 correct?
11:27:44 13     A. Yes.
11:27:46 14     Q. I would assume, therefore, that the manner
11:27:58 15 in which that guaranty operated was even of greater
11:28:01 16 importance to you than it might otherwise have
11:28:04 17 been, given the size of the guaranty?
11:28:12 18     A. It was of importance.
11:28:21 19         EXHIBITS NOS. 63 THROUGH 68 MARKED
11:30:32 20     Q. Okay. Mr. Landay, there are a series of
11:30:48 21 documents in front of you. Let's start with
11:30:50 22 Exhibit 63.
11:30:57 23         Can you identify Exhibit 63 for me,
11:30:59 24 please.

Page 67

11:30:59 1      A. Exhibit 63 appears to be a copy of the
11:31:03 2  signed and dated factoring agreement between Seneca
11:31:08 3  Sports, Brookfield International and GMAC
11:31:10 4  Commercial Credit dated 19 September 2000.
11:31:14 5      Q. And if you turn to Page 13 of the document,
11:31:28 6  is that your signature on behalf of Seneca and
11:31:30 7  Brookfield?
11:31:31 8      A. Yes.
11:31:32 9      Q. And you signed as an officer of both
11:31:34 10 companies?
11:31:34 11     A. Yes.
11:31:36 12     Q. Did you read the document before you signed
11:31:38 13 it?
11:31:39 14     A. I'm sure I glanced at the document before I
11:31:41 15 signed it.
11:31:43 16     Q. Did you review the document with Mr. Hoff
11:31:47 17 before you signed it, yes or no?
11:31:50 18     A. Yes.
11:31:53 19     Q. Were you represented by -- were either you
11:31:56 20 personally or Seneca or Brookfield represented by
11:31:59 21 any other attorney other than Mr. Hoff at the
11:32:02 22 September closing?
11:32:03 23     A. No.
11:32:05 24     Q. Had you reviewed prior drafts of Exhibit

Page 68

11:32:10 1  63 --
11:32:10 2      A. I'm sure.
11:32:12 3      Q. -- before attending the closing?
11:32:14 4      A. I'm sure I reviewed them.
11:32:16 5      Q. Did you consider, as of the closing, you
11:32:18 6  were familiar with the terms of Exhibit 63?
11:32:24 7      A. I would say I would be familiar with the
11:32:28 8  generality of document, not the specifics.
11:32:30 9      Q. Let's turn now to Exhibit 64.
11:32:45 10         Can you identify Exhibit 64 for me?
11:32:47 11     A. Exhibit 64 appears to be a guaranty dated
11:32:51 12 September 19, 2000, which is signed by me.
11:33:00 13     Q. And that's signed in your individual
11:33:05 14 capacity, correct?
11:33:05 15     A. Yes.
11:33:07 16     Q. And did you read Exhibit 64 before you
11:33:10 17 signed it?
11:33:10 18     A. I would have read it quickly, surely.
11:33:13 19     Q. Yes or no, did you review Exhibit 64 with
11:33:17 20 Mr. Hoff before you signed it?
11:33:19 21     A. I would have reviewed it generally with
11:33:21 22 Mr. Hoff, yes.
11:33:22 23     Q. And did you review Exhibit 64 or drafts of
11:33:34 24 Exhibit 64 before attending the closing?

Page 69

11:33:36 1      A. I would have reviewed drafts of this in
11:33:39 2  general, yes.
11:33:41 3      Q. Did you consider yourself familiar with the
11:33:43 4  terms of Exhibit 64 at the time that you executed
11:33:47 5  it?
11:33:47 6      A. Not in detail, but in generality, surely,
11:33:51 7  especially the dollar amount which is reflected on
11:34:00 8  Page 2 of $3,500,000.
11:34:11 9      Q. Is there any language in Exhibit 64 that
11:34:15 10 reflects your understanding of the way in which the
11:34:19 11 guaranty was to operate?
11:34:20 12     A. You want me to read this obviously now?
11:34:24 13     Q. If you have to.
11:34:25 14     A. I have to, yes.
11:34:26 15     Q. Then please do.
11:36:06 16     A. I have read it.
11:36:08 17     Q. Is there any language in Exhibit 64 that
11:36:12 18 reflects your understanding of the way in which the
11:36:15 19 guaranty was to operate?
11:36:16 20     A. I would say, not being an attorney, I don't
11:36:20 21 understand all of the details of this, but I see
11:36:23 22 nothing.
11:36:27 23     Q. At any point either during the closing or
11:36:34 24 before the closing, did you say to anybody at GMAC,

LegaLink Boston
(617) 542-0039

f0b6b1ae-affe-4330-82cc-3512d4628ae4

David L. Landay                                          10/18/2005

---

Page 74

11:43:40  1  the pursuit by the company of whatever remedies it
11:43:42  2  may have against the client or the client's
11:43:46  3  successors" -- skipping on -- "or the security or
11:43:53  4  liens that it may possess." Do you see that?
11:43:55  5      A. Yes.
11:43:56  6      Q. Do you have an understanding of what that
11:43:57  7  language means?
11:43:58  8      A. In general.
11:43:59  9      Q. And what's your general understanding of
11:44:02 10  what it means?
11:44:02 11      A. My general understanding, it is saying that
11:44:05 12  according to this document, that the company which
11:44:09 13  is defined at the top as GMAC Commercial Credit can
11:44:13 14  come after me if they want to, at their discretion.
11:44:22 15      Q. Now, if you turn to Page 2, at the very
11:44:32 16  bottom of the big paragraph that is immediately
11:44:37 17  above the boldface type. Do you see that?
11:44:40 18      A. Yes.
11:44:40 19      Q. The last sentence reads, "This guaranty
11:44:43 20  cannot be altered or discharged orally," correct?
11:44:46 21      A. That's what it says.
11:44:47 22      Q. Do you have an understanding of that
11:44:49 23  language?
11:44:50 24      A. It means that any change has to be in

---

Page 75

11:44:54  1  writing.
11:44:57  2      Q. And the boldface text immediately
11:45:09  3  underneath that contains language in which you
11:45:14  4  agree to waive your right to trial by jury in
11:45:18  5  actions by or against the company, correct?
11:45:21  6      A. Yes.
11:45:23  7      Q. Did you, yes or no, did you discuss either
11:45:30  8  of those subjects with Mr. Hoff?
11:45:38  9      A. Not that I recall.
11:45:44 10      Q. At any time at or before the closing, did
11:45:48 11  you indicate to anyone at GMAC that either of those
11:45:52 12  provisions were inconsistent with your
11:45:54 13  understanding of the agreement?
11:45:57 14      A. Not that I recall.
11:45:59 15      Q. Lastly, if you look at the second sentence
11:46:06 16  of that large paragraph, at the end of Page 2, it
11:46:12 17  indicates that "this guaranty shall be governed by
11:46:16 18  and construed and interpreted in accordance with
11:46:20 19  the laws of New York." Do you see that?
11:46:21 20      A. "Laws of the State of New York," yes.
11:46:23 21      Q. Correct. Excuse me.
11:46:26 22          In the interest of completion, the
11:46:30 23  precise language is, "This guaranty shall be
11:46:33 24  governed by and construed and interpreted in

---

Page 76

11:46:36  1  accordance with the laws of the State of New York,
11:46:39  2  without giving effect to New York law on conflicts
11:46:43  3  of law."
11:46:44  4          Do you have an understanding of that
11:46:49  5  language, Mr. Landay?
11:46:50  6      A. It says it is governed by New York law.
11:46:52  7      Q. Did you discuss that with Mr. Hoff, yes or
11:46:55  8  no?
11:46:55  9      A. I don't recall.
11:46:57 10      Q. Did you understand that statements of
11:47:15 11  account that GMAC delivered to Seneca and
11:47:23 12  Brookfield were binding upon you individually as a
11:47:28 13  guarantor?
11:47:29 14      A. No. I never heard of that before.
11:47:32 15      Q. Look at Exhibit 64, Paragraph 3. The last
11:47:42 16  sentence. I am going to read it, and I would like
11:47:46 17  you to confirm I have read it correctly.
11:47:48 18          "Any statement of account which is
11:47:50 19  binding on the client under the agreement shall be
11:47:54 20  binding on the undersigned for all purposes under
11:47:58 21  this guaranty."
11:47:59 22          MR. HOFFMAN: Which paragraph?
11:48:02 23          MR. HOULIHAN: Third paragraph, Page 1.
11:48:04 24      Q. Did I read it correctly, Mr. Landay?

---

Page 77

11:48:08  1      A. You did.
11:48:09  2      Q. Do you have an understanding of what that
11:48:11  3  language means?
11:48:12  4      A. A statement of account that's binding on
11:48:14  5  the client -- the client has been defined up at the
11:48:17  6  top as the companies, the corporations -- would be
11:48:20  7  binding on the undersigned. The undersigned is me.
11:48:25  8      Q. Did you discuss that provision with anyone
11:48:28  9  at GMAC either at the closing or before the
11:48:31 10  closing?
11:48:31 11      A. Not that I recall.
11:48:33 12      Q. Yes or no, did you ask Mr. Hoff any
11:48:39 13  questions concerning that provision?
11:48:41 14      A. Not that I recall. I am not even sure what
11:48:48 15  a statement of account is.
11:48:59 16      Q. Before we move on, Mr. Landay, I just want
11:49:05 17  to make sure I understood that last comment.
11:49:08 18          Is it your testimony that you don't --
11:49:09 19  do not have an understanding of what a statement of
11:49:12 20  account is?
11:49:13 21      A. I don't know that I have ever seen a
11:49:16 22  document that says, "statement of account."
11:49:19 23      Q. Do you have an understanding as a
11:49:21 24  businessman what a statement of account is?

---

20  (Pages 74 to 77)

f0b6b1ae-affe-4330-82cc-3512d4628ae4

David L. Landay                                                    10/18/2005

Page 78

11:49:24 1    A. In general, it says this is what the
11:49:27 2 statement is, you know, depending on what it is.
11:49:32 3    In the case of GMAC, it would probably
11:49:34 4 be some sort of a loan document or a summary of
11:49:39 5 charges or some sort of document provided by the
11:49:42 6 lender.
11:49:46 7    In other cases it may be an invoice.
11:49:48 8 It may be -- I have no idea.
11:49:50 9    Q. In the course of -- in the course of its
11:49:53 10 business, did Seneca from time to time send
11:49:57 11 statements of account to companies that owed it
11:50:03 12 money?
11:50:03 13    A. We would send a statement. I don't know
11:50:07 14 that we ever called it a statement of account.
11:50:09 15    Q. And you understand that those statements
11:50:13 16 that Seneca sent to its debtors were intended to
11:50:21 17 tell the debtor the amount that was owed, correct?
11:50:26 18    A. Yes. Usually the debtor would request the
11:50:28 19 statement.
11:50:29 20    Q. And as president of Seneca and Brookfield,
11:50:38 21 didn't you expect to receive from GMAC periodic
11:50:43 22 statements that would show how much was owed by
11:50:48 23 Seneca --
11:50:49 24    A. They were sent to Mr. Finkelstein.

Page 79

11:51:00 1    Q. And you understood that those periodic
11:51:06 2 statements constituted statements of account,
11:51:11 3 didn't you?
11:51:12 4    A. No. I just assumed he got statements, and
11:51:16 5 he would reconcile them and discuss them with the
11:51:19 6 proper people at GMAC.
11:51:22 7    Q. I direct your attention to Exhibit 65. Can
11:51:48 8 you identify that document for me?
11:51:49 9    A. This appears to be a subordination
11:51:52 10 agreement, two pages, signed by me on September 19,
11:51:57 11 2000, wherein the debt, the money that was owed to
11:52:04 12 me by Seneca, which was a present unpaid balance of
11:52:08 13 $3,450,000, was subordinated to GMAC.
11:52:27 14    Q. You signed Exhibit 65 in your capacity as
11:52:30 15 president of Seneca, correct?
11:52:33 16    A. Yes.
11:52:57 17    Q. How long had the outstanding balance on the
11:53:04 18 debt that Seneca owed to you been $3,450,000?
11:53:10 19    A. I honestly don't know.
11:53:12 20    Q. Do you recall that in the months
11:53:16 21 immediately preceding the closing that the debt
11:53:22 22 that Seneca supposedly owed to you went from
11:53:26 23 approximately $2.3 million to $3.45 million?
11:53:31 24    A. I don't know the exact time period.

Page 80

11:53:34 1    I do know the debt increased through
11:53:36 2 this level because of the delays in the closing
11:53:40 3 with GMAC.
11:53:40 4    Q. And how did the delays in the closing with
11:53:45 5 GMAC cause the debt that Seneca owed to you to
11:53:50 6 increase?
11:53:51 7    A. We had needs to do purchases, bring in
11:53:54 8 inventory at that time of year, and I had to
11:53:59 9 advance the company money in order to do what we
11:54:04 10 had to do.
11:54:08 11    Q. Do I understand your testimony that during
11:54:11 12 the months leading up to the closing you were
11:54:14 13 loaning funds to Seneca so it had enough operating
11:54:18 14 cash to keep its business going?
11:54:20 15    A. To purchase the inventory that we had to
11:54:23 16 purchase to build for the season.
11:54:26 17    Q. Did you receive any payments from Seneca
11:54:51 18 other than salary?
11:55:17 19    MR. HOFFMAN: What time period?
11:55:19 20    MR. HOULIHAN: Summer of 2000.
11:55:23 21    A. Not that I recall.
11:56:08 22    Q. Mr. Landay, do you have any recollection
11:56:10 23 between the time frame of June 14, 2000 and
11:56:15 24 September 11, 2000 of receiving payments from

Page 81

11:56:20 1 Seneca in excess of $698,000?
11:56:23 2    A. No.
11:56:27 3    Q. Mr. Landay, I direct your attention to
11:56:55 4 Exhibit 66. Can you identify Exhibit 66?
11:57:09 5    A. This is a promissory note from Seneca to
11:57:14 6 me, if I remember correctly, at the time of the
11:57:18 7 closing. This is dated September 19, 2000, which
11:57:22 8 was date of the closing.
11:57:24 9    All of the previous notes were
11:57:27 10 consolidated into this one note.
11:57:30 11    Q. Okay. And that's your signature on behalf
11:57:37 12 of the company on Page 2?
11:57:39 13    A. Yes.
11:57:44 14    Q. I direct your attention to Exhibit 67. Can
11:57:49 15 you identify that document for me?
11:57:51 16    A. It's titled "Letter of Credit Financing
11:57:55 17 Supplement to Factoring Agreement," dated September
11:58:00 18 19, 2000, and I believe that this had to do with
11:58:09 19 Seneca and Brookfield issuing letters of credit for
11:58:16 20 purchases.
11:58:16 21    Q. And that's your signature on Page 4?
11:58:18 22    A. On Page 4, that's my signature, and
11:58:21 23 apparently Mr. Frank Imperato from GMAC Commercial
11:58:27 24 Credit.

21 (Pages 78 to 81)

f0b6b1ae-affe-4330-82cc-3512d4628ae4

David L. Landay                                    10/18/2005

---

**Page 94**

12:30:09  1    I said to her, "Please, look, the guy
12:30:11  2  who was doing all of the paperwork at the initial
12:30:15  3  time was Lou Marcus, and if it is any problem, it's
12:30:19  4  his problem, not mine."
12:30:20  5    We had been very cooperative, and all
12:30:21  6  of a sudden, all of this paperwork came from Lou
12:30:25  7  Marcus through Fitzgerald, which included not only
12:30:30  8  drafts of letters that he was demanding from the
12:30:32  9  licensors, but UCC filings, warehouse waivers. I
12:30:37 10  believe there was also patent and trademark
12:30:41 11  assignment, some sort of forms.
12:31:00 12    Q. Ms. Frangos told you there were certain
12:31:04 13  outstanding documents that had to be taken care of
12:31:07 14  before any seasonal over-advance would be approved,
12:31:10 15  correct?
12:31:10 16    A. Yes.
12:31:11 17    Q. And she identified those items as including
12:31:19 18  license waiver letters?
12:31:21 19    A. No. She identified only the licensor
12:31:24 20  waiver letters, okay.
12:31:26 21    Q. Somebody else at GMAC identified additional
12:31:34 22  items --
12:31:35 23    A. Yes. I believe -- well, they identified by
12:31:38 24  sending drafts and looking for filings, and that

---

**Page 95**

12:31:42  1  would have been Lou Marcus through Mr. Fitzgerald.
12:31:45  2    Q. And those items included landlord waivers?
12:31:51  3    A. If that's the proper terminology, or
12:31:53  4  warehouse waivers. I don't know what is the proper
12:31:58  5  terminology.
12:31:58  6    Q. UCC forms?
12:32:00  7    A. Yes.
12:32:04  8    Q. Patent or trademark assignment forms?
12:32:17  9    A. Yes.
12:32:18 10    Q. Did you have an understanding of whose
12:32:20 11  obligation it was to provide those forms in the
12:32:24 12  first instance?
12:32:26 13    A. I would have assumed those would have been
12:32:28 14  the package that GMAC would have put together to be
12:32:32 15  done.
12:32:33 16    Q. Did you --
12:32:34 17    A. And if they didn't do UCC filings back in
12:32:37 18  September 2000, when we did the deal, and waited
12:32:41 19  until May 2001, you know, we would certainly
12:32:45 20  cooperate as much as possible, because they were
12:32:48 21  our lender.
12:32:49 22    I was looking for good relationships
12:32:51 23  with them. I had no reason to fight with them over
12:32:54 24  that.

---

**Page 96**

12:32:54  1    Q. Isn't it true, Mr. Landay, that in order to
12:32:58  2  make those filings, GMAC required documentation
12:33:01  3  that could only be executed by Seneca and
12:33:04  4  Brookfield?
12:33:04  5    A. I believe we had to sign that, yes.
12:33:11  6    Q. Did you discuss with Mr. Hoff or any other
12:33:16  7  attorneys, yes or no, whose obligation it was to
12:33:20  8  provide this documentation?
12:33:22  9    A. No. I had done UCC filings before, and I
12:33:27 10  knew there was a space on it where the company had
12:33:29 11  to sign.
12:33:33 12    Q. And the licensor waiver letters, those are
12:33:46 13  also documents that required Seneca or Brookfield
12:33:54 14  to obtain signatures?
12:33:55 15    A. Yes.
12:33:58 16    Q. And the warehouse waivers, the same thing?
12:34:01 17    A. Yes. Because the people at -- whether it
12:34:04 18  was in the warehouse or licensor were people we
12:34:08 19  dealt with, and I didn't want Lou Marcus dealing
12:34:10 20  with these people directly.
12:34:12 21    Q. The same with the patent and trademark
12:34:21 22  assignments?
12:34:23 23    A. Well, that would be the company assigning
12:34:26 24  them to the lender.

---

**Page 97**

12:34:29  1    Q. Were those documents ultimately delivered
12:34:42  2  to GMAC by Seneca-Brookfield?
12:34:45  3    A. If I remember correctly, some of the
12:34:51  4  warehouse waivers were -- I don't recall if every
12:34:58  5  warehouse where we had property, if they all signed
12:35:01  6  off, and I don't recall if every licensor signed
12:35:05  7  off.
12:35:08  8    Q. So you're unable to say that you were
12:35:11  9  provided --
12:35:11 10    A. I do know that we did the patent and
12:35:13 11  trademark assignments, and I have seen documents
12:35:17 12  that show that GMAC did the UCC filings.
12:35:22 13    Q. But you cannot testify that all of the
12:35:26 14  documentation that GMAC requested was ultimately
12:35:30 15  provided?
12:35:31 16    A. No, I can't. I am basing my knowledge on
12:35:35 17  the documents that GMAC has produced.
12:35:43 18    Q. Did you understand that under the terms of
12:36:21 19  the factoring agreement, GMAC's obligation to
12:36:25 20  extend credit was entirely discretionary?
12:36:27 21    A. Extend credit to who?
12:36:33 22    Q. Seneca-Brookfield.
12:36:35 23    A. It's discretionary, yes.
12:36:39 24    Q. And what's your understanding of what that

25  (Pages 94 to 97)

f0b6b1ae-affe-4330-82cc-3512d4628ae4

David L. Landay                                        10/18/2005

---

Page 98

12:36:41 1  means?
12:36:42 2      A. It means they could refuse to lend you if
12:36:48 3  they choose to. I believe that would be language
12:36:51 4  common in every loan agreement.
12:36:53 5      Q. Okay. Did GMAC ever extend the seasonal
12:37:20 6  over-advance?
12:37:20 7      A. No.
12:37:21 8      Q. I take it from your prior answer that when
12:37:24 9  GMAC did not extend the seasonal over-advance, you
12:37:28 10 never considered claiming a breach of the factoring
12:37:35 11 agreement?
12:37:36 12     A. No. Because, from my point of view, I
12:37:40 13 needed the money, and I wanted to continue a
12:37:42 14 relationship.
12:37:43 15     It did not consider litigation against
12:37:47 16 GMAC. It was more important to get the money to
12:37:51 17 continue the business.
12:37:52 18     Q. Did you believe that as of the end of May
12:37:59 19 GMAC had violated the terms of the factoring
12:38:05 20 agreement?
12:38:06 21     A. Surely, yes.
12:38:11 22     Q. Why?
12:38:11 23     A. Because they hadn't made the seasonal
12:38:12 24 over-advance.

---

Page 99

12:38:15 1      Q. I thought you testified earlier that you
12:38:18 2  understood that GMAC's obligation to extend
12:38:23 3  financing was entirely discretionary?
12:38:25 4      A. I know that, and I also said that that is
12:38:28 5  probably a term that's in every loan agreement with
12:38:31 6  every bank. But my understanding going into the
12:38:34 7  deal with GMAC is that there would be a $500,000
12:38:37 8  uncollateralized seasonal over-advance starting May
12:38:42 9  1st, 2001.
12:38:43 10     I had never experienced a lending
12:38:46 11 institution that didn't live up to their word, and
12:38:54 12 I thought the excuse was being given, because of
12:38:58 13 paperwork, was flimsy.
12:38:59 14     Q. At that point in time did you do anything
12:39:02 15 to explore the possibility of seeking financing
12:39:05 16 elsewhere?
12:39:06 17     A. Not at that time, no.
12:39:07 18     Q. Why not?
12:39:08 19     A. Because it was more important to me to
12:39:11 20 rescue the relationship with the current lender.
12:39:21 21     Q. And what steps did you take to rescue the
12:39:25 22 relationship with the current lender?
12:39:26 23     A. Mr. Fitzgerald recommended to me I hire a
12:39:31 24 consultant. He recommended RAS, who I did

---

Page 100

12:39:39 1  interview, but did not hire. I interviewed other
12:39:44 2  people.
12:39:44 3      I was essentially forced into what
12:39:46 4  became the forbearance agreement.
12:39:50 5      Q. Whom did you hire for a consultant?
12:39:53 6      A. Resolution Capital is the name of the
12:39:55 7  company.
12:39:55 8      Q. When did you hire them?
12:39:59 9      A. July of 2001.
12:40:02 10     Q. And was there a written contract with
12:40:05 11 Resolution?
12:40:06 12     A. I honestly don't recall.
12:40:10 13     Q. Do you remember when you first spoke with
12:40:21 14 Resolution Capital?
12:40:21 15     A. It would have been July of '01.
12:40:23 16     Q. In July?
12:40:26 17     A. June or July. I don't recall. It was
12:40:28 18 somewhere around that time.
12:40:36 19     Q. How did you come to have your initial
12:40:40 20 contact with Resolution Capital?
12:40:41 21     A. It was a recommendation from my accountant.
12:40:44 22     Q. Your accountant's name is?
12:40:46 23     A. David Souers.
12:40:50 24     Q. And who retained Resolution Capital?

---

Page 101

12:40:59 1      A. Seneca.
12:41:01 2      Q. At this point in time, sort of the
12:41:06 3  June/July 2001 time frame, did you seek separate
12:41:10 4  counsel?
12:41:10 5      A. No. I'm sorry. It was around this time
12:41:15 6  that I was having meetings with Madoff regarding
12:41:22 7  the handling of GMAC, because I didn't know what to
12:41:26 8  do.
12:41:27 9      I had met Madoff -- his firm was
12:41:30 10 recommended by Robert Murphy at Casner & Edwards.
12:41:35 11 I had met him through -- if I remember the
12:41:40 12 circumstances, it was a client of ours, a customer,
12:41:46 13 Service Merchandise -- used to have stores all over
12:41:50 14 the country.
12:41:51 15     They were in bankruptcy, and they were
12:41:53 16 claiming that Seneca -- that they overpaid Seneca,
12:41:57 17 and they were claiming money back.
12:42:00 18     It was through the Bankruptcy Court,
12:42:02 19 and I sought -- I thought that I would need someone
12:42:07 20 who is experienced in bankruptcy.
12:42:10 21     I asked Murphy, and he recommended Dan
12:42:16 22 Cohn. Dan Cohn was not available. Madoff was. I
12:42:21 23 knew Madoff, and I hired that firm.
12:42:23 24     Q. Were Mr. Madoff and Mr. Cohn in the same

---

26  (Pages 98 to 101)

f0b6b1ae-affe-4330-82cc-3512d4628ae4

David L. Landay                                          10/18/2005

---

**Page 114**

14:10:58 1     A. I don't recall that I had those
14:11:03 2  discussions. Certainly I knew Mr. Greer or
14:11:06 3  Mr. Pratt couldn't come up with anything to share
14:11:10 4  the risk of the guaranty.
14:11:25 5     Q. Did Resolution Trust help Seneca-
14:11:51 6        Brookfield --
14:11:52 7     A. You mean Resolution Capital?
14:11:54 8     Q. Yes. Did Resolution Capital help Seneca-
14:12:00 9  Brookfield prepare a workout plan?
14:12:01 10    A. Yes.
14:12:02 11    Q. Is that part of what you asked them to do?
14:12:05 12    A. Yes. That was attached to the forbearance
14:12:08 13  agreement, if I remember correctly.
14:12:17 14        EXHIBIT NO. 71 MARKED
14:12:35 15    Q. Mr. Landay, I handed you Exhibit 71. Can
14:12:41 16  you identify that document for me.
14:12:42 17    A. This Exhibit 71 appears to be a copy of the
14:12:48 18  forbearance agreement that was -- it's undated. It
14:13:00 19  is illegible as to who signed as a president and
14:13:06 20  CEO of GMAC Commercial Credit, and my signature,
14:13:09 21  and it has various other documents attached as
14:13:14 22  exhibits.
14:13:27 23    Q. You signed Exhibit 71 on behalf of both
14:13:31 24  Seneca and Brookfield, correct?

---

**Page 115**

14:13:32 1     A. Yes.
14:13:32 2     Q. As president of both companies?
14:13:34 3     A. Yes.
14:13:35 4     Q. What part of Exhibit 71 did Resolution
14:13:40 5  Capital prepare?
14:13:41 6     A. They prepared Exhibit C, which is a part of
14:13:53 7  the attachment. There were more financial
14:13:56 8  schedules than this. There were other pages by my
14:14:05 9  recollection. I think this is incomplete.
14:14:42 10    (A discussion was held off the record.)
14:14:46 11    Q. What form did the workout plan that
14:15:52 12  Resolution Capital prepared take?
14:15:58 13    A. I'm sorry, I don't understand what you mean
14:16:01 14  by that.
14:16:02 15    Q. You testified that Resolution Capital
14:16:06 16  developed a workout plan. What I am trying to
14:16:09 17  understand is, what did that workout plan consist
14:16:12 18  of? Was it simply a series of schedules, or was
14:16:15 19  there a narrative that went with the schedules?
14:16:18 20  What was the final work product that Resolution
14:16:21 21  Capital --
14:16:21 22    A. It was a series of schedules of which, I
14:16:24 23  believe, this was one page. If I remember
14:16:26 24  correctly, there were two or three pages of backup

---

**Page 116**

14:16:30 1  to this one summary page, which would reflect the
14:16:39 2  loan balance on certain sales and collateral levels
14:16:44 3  that had to be attained on a weekly basis, and that
14:16:51 4  was attached to the forbearance agreement, because
14:16:53 5  Resolution Capital would come in and do a report to
14:16:57 6  GMAC during the week, Rijo from RAS who I had to
14:17:03 7  hire would come in to double-check that and do his
14:17:06 8  own report to GMAC, and this contemplated that GMAC
14:17:15 9  would advance funds, and by the end of January of
14:17:21 10  2002, that the company would have been liquidated,
14:17:27 11  and there would be a surplus of availability of
14:17:31 12  close to a million three hundred thousand.
14:17:36 13    Q. Did you participate in the negotiation of
14:17:47 14  the terms of the forbearance agreement?
14:17:49 15    A. Yes.
14:17:50 16    Q. And with whom at GMAC did you negotiate?
14:17:53 17    A. The negotiations with GMAC were, I believe,
14:18:00 18  with Jane Frangos and their attorney, a Richard
14:18:09 19  Stehl.
14:18:10 20    Q. S-T-E-H-L?
14:18:14 21    A. I believe that's how he spelled his name.
14:18:21 22    Q. Was he from New York?
14:18:25 23    A. Yes.
14:18:29 24    Q. And who assisted you with the negotiations

---

**Page 117**

14:18:33 1  on behalf of Seneca-Brookfield?
14:18:36 2     A. David Madoff, an attorney in Boston, and
14:18:43 3  Doug Rangle from Resolution Capital.
14:18:53 4     Q. Before you signed the forbearance
14:18:57 5  agreement, did you feel that you had an
14:18:58 6  understanding of the pros and cons of the
14:19:01 7  transaction?
14:19:04 8     A. I had an understanding. It was either do
14:19:10 9  it or be put out of business immediately, and this
14:19:16 10  schedule allowed us to do an orderly liquidation by
14:19:19 11  having a surplus of collateral at the end of
14:19:22 12  January of '02 in excess of a million dollars.
14:19:22 13        Then my million-dollar-cash account
14:19:24 14  should not be called upon, and certainly I would be
14:19:28 15  -- the standby letters of credit, and the
14:19:33 16  million-dollar-cash account would continue to -- it
14:19:35 17  certainly would not cost me as much, because the
14:19:38 18  cash account was an interest-bearing account.
14:19:41 19        So it would continue to accrue
14:19:44 20  interest, and this contemplated, as you can see,
14:19:51 21  the loan going up, and then coming down, to create
14:19:56 22  the surplus collateral.
14:19:59 23        It was a very orderly thought process
14:20:03 24  that went into this, and the company would not

---

30  (Pages 114 to 117)

f0b6b1ae-affe-4330-82cc-3512d4628ae4

David L. Landay                                        10/18/2005

---

Page 118

14:20:07 1  really be harmed by letting a lot of people go and
14:20:11 2  destroying ourselves until well into the schedule,
14:20:15 3  which gave time to try and find a substitute
14:20:19 4  lender, which led to the whole, as you aware, the
14:20:23 5  entire Platinum Funding transaction.
14:20:26 6      Q. Did you read the forbearance agreement,
14:20:31 7  Exhibit 71, before you signed it?
14:20:32 8      A. I'm sure I glanced at it. I'm sure I
14:20:35 9  relied on Mr. Madoff to do the legal technicalities
14:20:38 10 of it.
14:20:39 11     Q. Yes or no, did you discuss the terms of
14:20:41 12 Exhibit 71 with Mr. Madoff?
14:20:43 13     A. I'm sure I did.
14:20:54 14     Q. Did Seneca-Brookfield suggest changes or
14:20:56 15 modifications to the forbearance agreement to GMAC?
14:21:00 16     A. I believe we did.
14:21:00 17     Q. Were some of those changes or modifications
14:21:03 18 accepted or rejected?
14:21:04 19     A. I just remember one communication from
14:21:08 20 Madoff that said that GMAC was refusing to go along
14:21:11 21 with some of the changes recommended.
14:21:17 22     Q. Do you recall what the nature of those
14:21:19 23 changes or modifications was?
14:21:22 24     A. No.

Page 119

14:21:23 1      Q. Did you discuss the terms of the
14:21:40 2  forbearance agreement with Resolution Capital
14:21:44 3  before you signed it?
14:21:46 4      A. Probably only with -- when you say
14:21:50 5  "Resolution Capital," you mean anyone from
14:21:52 6  Resolution Capital?
14:21:53 7      Q. Correct.
14:21:54 8      A. I'm sure with Rainville.
14:21:56 9      Q. Do you recall any of those discussions?
14:21:59 10     A. No.
14:22:01 11     Q. Do you recall whether or not Mr. Rainville
14:22:08 12 felt it in was Seneca-Brookfield's interest to do
14:22:12 13 the forbearance agreement?
14:22:13 14     A. I don't recall that Mr. Rainville commented
14:22:16 15 on that. I do recall Mr. Madoff commenting --
14:22:19 16     MR. HOFFMAN: Don't talk about what
14:22:22 17 Mr. Madoff said.
14:22:24 18     THE WITNESS: Sorry.
14:22:28 19     Q. Did you discuss with Mr. Rainville whether
14:22:32 20 or not the forbearance agreement was in your
14:22:36 21 personal best interest?
14:22:37 22     A. No, not that I recall.
14:22:41 23     Q. Yes or no, did you discuss with Mr. Madoff
14:22:46 24 whether or not the forbearance agreement was in

Page 120

14:22:48 1  your personal best interest?
14:22:56 2      A. Yes.
14:24:08 3      Q. I direct your attention to the second
14:24:11 4  whereas clause in Exhibit 71, Page 1. That clause
14:24:22 5  identifies a series of events of default under the
14:24:25 6  agreement, correct?
14:24:27 7      A. Yes.
14:24:34 8      Q. Do you agree that as of August 9, 2001,
14:24:52 9  Seneca-Brookfield was in default for the reasons
14:24:54 10 identified in the second whereas clause?
14:24:57 11     A. Yes.
14:24:59 12     Q. Do you have any personal knowledge as to
14:25:09 13 when the various events of default identified in
14:25:12 14 this second whereas clause first arose?
14:25:16 15     A. No.
14:25:17 16     Q. If you turn to Page 2 of Exhibit 71,
14:25:48 17 Paragraph 1. Do you agree that the principal
14:26:01 18 amount of $6,719,177.62 was due to GMAC as of
14:26:18 19 August 9, 2001?
14:26:20 20     A. I believe the paragraph says as of August
14:26:23 21 8.
14:26:23 22     Q. Excuse me. You are correct.
14:26:25 23     A. I agree that's in this document.
14:26:28 24     Q. Do you agree that that's accurate?

Page 121

14:26:30 1      A. I can't say that, sitting here four or five
14:26:34 2  years later, that that is correct. I agree that
14:26:37 3  this document says that.
14:26:38 4      Q. Would you agree it would have been
14:26:41 5  inappropriate for you as president of Seneca-
14:26:45 6  Brookfield to agree that the debt was owed if it
14:26:48 7  was not in fact owed?
14:26:51 8      MR. HOFFMAN: Objection. You may
14:26:52 9  answer.
14:26:53 10     A. I would agree with that.
14:26:55 11     Q. Now, if you look at the conclusion of that
14:27:09 12 first paragraph, if you look at the conclusion part
14:27:14 13 that's numbered paragraph 1, "The forbearance
14:27:19 14 agreement indicates that the existing debt is due
14:27:26 15 and owing by the clients jointly and severally to
14:27:31 16 the factor without offset defense or counterclaim
14:27:34 17 of any kind, nature or description whatsoever."
14:27:37 18     Do you see that language?
14:27:38 19     A. I do.
14:27:38 20     Q. Would you agree with me that it would have
14:27:42 21 been inappropriate for you as president of
14:27:46 22 Seneca-Brookfield to agree to that statement if it
14:27:49 23 were not in fact true?
14:27:50 24     MR. HOFFMAN: Objection. You may

31 (Pages 118 to 121)

f0b6b1ae-affe-4330-82cc-3512d4628ae4

David L. Landay                                          10/18/2005

---

## Page 126

14:36:19 1  that time, and I probably would not have re-sent to
14:36:25 2  her one that was five months old.
14:37:26 3         EXHIBIT NO. 74 MARKED
14:37:50 4      Q. Mr. Landay, I have handed you a document
14:37:52 5  marked Exhibit 74. Can you identify that document
14:37:55 6  for me?
14:37:55 7      A. It's a letter to GMAC Commercial Credit
14:37:59 8  dated August 9th, 2001, entitled "Ratification and
14:38:04 9  Amendment of Guaranty," signed by me individually
14:38:07 10 and countersigned by someone, president and CEO of
14:38:14 11 GMAC Commercial Credit.
14:38:39 12     Q. Did you review this document before you
14:38:41 13 signed it?
14:38:42 14     A. I'm sure I did.
14:38:47 15     Q. Did you discuss this document before you
14:38:49 16 signed it with your counsel, yes or no?
14:38:52 17     A. I'm sure I did.
14:39:07 18     Q. Did you understand that in executing this
14:39:18 19 document you were acknowledging Seneca-Brookfield's
14:39:28 20 obligations as identified in the forbearance
14:39:36 21 agreement to be due without offset, defense or
14:39:39 22 counterclaim of any kind, nature or description
14:39:43 23 whatsoever?
14:39:44 24     A. I can't say that was my understanding in

## Page 127

14:39:48 1  signing this document, no.
14:39:50 2      Q. Sitting here today, do you acknowledge that
14:39:53 3  that is what the document says? I direct your
14:39:55 4  attention to the third paragraph.
14:39:59 5      A. That starts, "As an inducement"?
14:40:02 6      Q. Correct.
14:40:10 7      A. That's what the document says.
14:40:39 8      Q. Mr. Landay, I am showing you Exhibit 71. I
14:41:41 9  would just like you to confirm that the Exhibit 74
14:41:45 10 that you executed is the same as Exhibit A that's
14:41:50 11 incorporated and referenced in Exhibit 71.
14:44:00 12     A. I'm sorry, your question again?
14:44:03 13     Q. Can you confirm that the Exhibit 74 that
14:44:06 14 you executed is the same as Exhibit A incorporated
14:44:10 15 in and referenced in Exhibit 71?
14:44:13 16     A. My quick reading is that they are the same
14:44:16 17 document, with the exception that Exhibit 74 has
14:44:22 18 signatures on it.
14:43:46 19        EXHIBIT NO. 75 MARKED
14:44:32 20     Q. I am handing you a document that has been
14:44:36 21 marked Exhibit 75. Can you identify that
14:44:38 22 document?
14:44:40 23     A. It's a letter from GMAC Commercial Credit
14:44:43 24 to me, dated August the 9th, 2001, with the heading

## Page 128

14:44:48 1  "Re: Cash Deposit," signed by me, agreed by me
14:44:52 2  individually, signed by someone as president and
14:44:57 3  CEO of GMAC Commercial Credit.
14:45:02 4      Q. Before I forget, let me direct your
14:45:05 5  attention back to Exhibit 74 for a minute.
14:45:08 6         Would you agree with me, Mr. Landay,
14:45:10 7  that among other things Exhibit 74 increased the
14:45:16 8  cap on your guaranty to $4,500,000?
14:45:23 9      A. Yes.
14:45:27 10     Q. And can you confirm for me, Mr. Landay,
14:45:30 11 that Exhibit 75 is the same as Exhibit B
14:45:43 12 incorporated and referenced in Exhibit 71, but for
14:45:49 13 the signatures?
14:45:52 14     A. I would have to say the words appear to be
14:48:41 15 the same. The lines do not line up identically
14:48:46 16 from Exhibit B of Exhibit 71 to Exhibit 75.
14:48:53 17        In other words, on Page 1 of LAN 0029
14:49:08 18 compared to Page LAN 0040, you'll note that the
14:49:14 19 last paragraph in 0040 has four lines and 0029 has
14:49:20 20 five lines.
14:49:22 21     Q. Would you agree with me, Mr. Landay, that
14:49:25 22 the two documents are substantially in the same
14:49:27 23 form?
14:49:27 24     A. Yes.

## Page 129

14:49:30 1      Q. I direct your attention to the third
14:49:35 2  paragraph of Exhibit 75.
14:49:40 3         In the middle of that paragraph,
14:49:42 4  there's a reference to the pledger. Is that you?
14:49:48 5      A. I believe so.
14:49:49 6      Q. And the pledger is to deliver cash deposits
14:49:55 7  of $400,000 on or about August 11, 2001. Did you
14:50:00 8  do that?
14:50:00 9      A. I believe so. If there was a delay, it was
14:50:04 10 because Jane Frangos was delayed in giving me the
14:50:08 11 account number to wire the money to.
14:50:11 12     Q. It goes on to say there will be an
14:50:12 13 additional deposit of $600,000 on or about August
14:50:16 14 15, 2001. Did you do that?
14:50:18 15     A. I believe so, yes.
14:51:02 16        EXHIBITS NOS. 76 THROUGH 79 MARKED
14:52:07 17     Q. Mr. Landay, the first of the documents that
14:52:21 18 I have handed you is marked Exhibit 76. Can you
14:52:24 19 identify that document?
14:52:24 20     A. It appears to be an e-mail from me to Jane
14:52:29 21 Frangos, copy to Neal Finkelstein.
14:52:32 22     Q. Dated July 31, 2001?
14:52:35 23     A. Yes. 11:01 a.m.
14:52:38 24     Q. And I direct your attention to paragraph

33 (Pages 126 to 129)

f0b6b1ae-affe-4330-82cc-3512d4628ae4

David L. Landay                                           10/18/2005

---

Page 130

14:52:43  1  numbered 4.
14:52:46  2         Would it be fair to say that in
14:52:47  3  Paragraph 4 you alert Ms. Frangos to the need to
14:52:53  4  cover certain expenses over the next couple of
14:52:57  5  days?
14:52:57  6     A. Yes.
14:52:58  7     Q. And that you indicate that you would intend
14:53:24  8  to advance those funds and be reimbursed; is that
14:53:29  9  correct?
14:53:31 10     A. I don't know that it says that.
14:53:33 11         If Paragraph 4 -- I believe I am
14:53:36 12  assuming and looking for her confirmation. I say,
14:53:40 13  "I would assume that as we are so close that this
14:53:45 14  request would be honored as these are part of the
14:53:47 15  submitted plan."
14:53:49 16         In other words, I assumed that she
14:53:52 17  would advance the funds.
14:53:54 18     Q. Okay. Could you identify 77 for me.
14:54:01 19     A. E-mail from Jane Frangos to me dated July
14:54:06 20  31, at 12:28 p.m., in which she says my assumption
14:54:13 21  is not correct.
14:54:14 22     Q. And GMAC will not fund until --
14:54:17 23     A. Right. Also -- "So I must suggest that you
14:54:21 24  bridge this expense" -- "so I must suggest that you

Page 131

14:54:26  1  bridge this expense until we complete documents."
14:54:29  2     Q. And then can you identify Exhibit 78 for
14:54:33  3  me.
14:54:33  4     A. Exhibit 78 is an e-mail from me to Jane
14:54:41  5  Frangos, obviously from sometime in August. It is
14:54:45  6  undated because it says, "You may recall that two
14:54:48  7  weeks ago, July 31st."
14:54:53  8     Q. Okay.
14:54:54  9     A. I asked that GMAC fund a request for
14:54:57 10  payroll, payroll taxes and real estate taxes.
14:55:00 11         This was in the context of we were --
14:55:03 12  "We all were hoping to have documents signed the
14:55:07 13  very next day. As we well know, nothing was signed
14:55:11 14  until last week and no funds were advanced until
14:55:14 15  yesterday."
14:55:16 16     Q. You then suggest that --
14:55:19 17     A. "You suggested" -- you, Jane, suggested --
14:55:22 18  "that I bridge this expense until we complete
14:55:26 19  documents, which I did. I plan to have amount
14:55:30 20  repaid to me in the next few days, and I wanted you
14:55:33 21  to know this in advance."
14:55:39 22     Q. And can you identify Exhibit 79 for me?
14:55:43 23     A. Exhibit 79 is an e-mail from Jane Frangos
14:55:47 24  to me of Thursday, August 16 at 3:40 p.m., in which

Page 132

14:55:53  1  she says -- obviously it's in reply to Exhibit 78.
14:56:00  2         So I have to assume that Exhibit 78 is
14:56:03  3  sent on August 16. "Your plan is a covenant. No
14:56:08  4  disbursements should be made that were not in the
14:56:12  5  plan."
14:56:17  6     Q. Did you ever understand Ms. Frangos' e-mail
14:56:21  7  that you were not to reimburse yourself?
14:56:24  8     A. Correct.
14:56:25  9     Q. Did you in fact cause a check to be cut on
14:56:33 10  Seneca-Brookfield's account payable to you to cover
14:56:38 11  the expenses that you had previously --
14:56:40 12     A. Yes. That's the way we did things. We
14:56:43 13  would cut checks based on the anticipation of the
14:56:46 14  money being advanced based on sales being pledged
14:56:51 15  or inventory being pledged.
14:56:53 16     Q. You did that even though Ms. Frangos told
14:56:59 17  you that was contrary to her understanding to the
14:57:02 18  way the agreement worked?
14:57:03 19     A. I would have to see the date of check to
14:57:06 20  know that I did it in advance or not, but my
14:57:11 21  understanding from her was when she said "you
14:57:14 22  bridge," it means I should temporarily take care of
14:57:18 23  it, whereas the expenses I was bridging were a part
14:57:23 24  of the plan that they would be approved.

Page 133

14:58:06  1         EXHIBIT NO. 80 MARKED
14:58:28  2     Q. Can you identify Exhibit 80 for me?
14:58:37  3     A. Exhibit 80 appears to be a payment voucher
14:58:42  4  to me for $52,000, account loan repayment, and the
14:58:48  5  second page is a copy of the check to me for loan
14:59:00  6  repayment.
14:59:00  7     Q. Do you know whether or not this check
14:59:02  8  relates at all to the exchange between you and Jane
14:59:08  9  Frangos that was captured in Exhibit 76, 77, 78 and
14:59:13 10  79?
14:59:13 11     A. I believe it does.
14:59:14 12     Q. At the time that the check that is part of
14:59:31 13  Exhibit 80 was cut, do you know whether Seneca-
14:59:38 14  Brookfield had sufficient funds in its account to
14:59:41 15  cover that check?
14:59:42 16     A. I would assume that she did not advance the
14:59:45 17  funds, as I anticipated she would, and that there
14:59:49 18  were nonsufficient funds, and I believe the check
14:59:50 19  was bounced for nonsufficient funds.
14:59:53 20     Q. And why did you anticipate that Ms. Frangos
14:59:59 21  would advance the funds?
15:00:00 22     A. Because the forbearance agreement and the
15:00:05 23  schedule attached anticipated that we would, as we
15:00:09 24  made sales and pledged collateral, that more funds

34 (Pages 130 to 133)

f0b6b1ae-affe-4330-82cc-3512d4628ae4

David L. Landay                                    10/18/2005

## Page 134

15:00:16 1    would be advanced.
15:00:17 2        Q. Didn't Ms. Frangos tell you that it would
15:00:36 3    be best to ensure that the sales were in fact made
15:00:41 4    in accordance with the weekly plan before you cut
15:00:44 5    any checks to reimburse yourself?
15:00:47 6        A. I'm sorry, where are you reading?
15:00:51 7        Q. I am not reading. I am paraphrasing from
15:00:53 8    Exhibit 79.
15:01:00 9        A. I believe we did have sales, and I believe
15:01:03 10   what she did was she would not advance any funds
15:01:08 11   beyond the million-dollar-cash account I put in,
15:01:10 12   even though the schedule attached to the
15:01:12 13   forbearance agreement contemplated that there would
15:01:15 14   be advances of funds based on sales being pledged.
15:01:18 15       Q. Is it your testimony, Mr. Landay, that
15:01:22 16   Seneca-Brookfield ever achieved sales in accordance
15:01:26 17   with the weekly plan that was part of the
15:01:28 18   forbearance agreement?
15:01:29 19       A. I believe we did in some weeks, despite the
15:01:32 20   fact there was a week's delay in the signing and
15:01:37 21   the funding of the plan.
15:02:11 22           EXHIBITS NOS. 81 THROUGH 85 MARKED
15:04:55 23           (A recess was taken from
15:04:59 24               3:02 to 3:09 p.m.)

## Page 135

15:10:29 1        Q. Mr. Landay, before we start on the next
15:10:49 2    topic, I want to circle back and ask one or two
15:10:53 3    more questions on the ratification of guaranty and
15:11:07 4    the forbearance agreement, Exhibit 71 and 74.
15:11:15 5           Is there any language in Exhibit 71 or
15:11:21 6    74 that reflects your understanding of the way the
15:11:29 7    guaranty was to operate?
15:11:30 8        A. I'm sorry, would you repeat the question,
15:14:03 9    again?
15:14:04 10       Q. Certainly. Is there any language in
15:14:06 11   Exhibit 71 or Exhibit 74 that reflects your
15:14:11 12   understanding of the way the guaranty was to
15:14:13 13   operate?
15:14:14 14       A. No. But then I never thought the guaranty
15:14:18 15   would come into effect because you would have a
15:14:20 16   surplus of collateral by January 30.
15:14:24 17       Q. If that's the case, Mr. Landay, why were
15:14:27 18   you worried about the guaranty at all?
15:14:29 19       A. Because my relationship with GMAC was,
15:14:34 20   quote, strained, unquote. So you worry.
15:14:40 21       Q. Did you raise -- yes or no -- with your
15:14:44 22   attorney the issue that neither the ratification of
15:14:52 23   the guaranty nor the forbearance agreement
15:14:56 24   contained language reflecting your understanding of

## Page 136

15:14:57 1    the way the guaranty was to operate?
15:14:59 2        A. Not that I recall.
15:15:00 3        Q. Did you raise that issue with anyone at
15:15:03 4    GMAC?
15:15:04 5        A. Not that I recall. I think you asked that
15:15:07 6    this morning.
15:15:09 7        Q. I did with respect to the guaranty.
15:15:11 8        A. My mistake.
15:15:15 9        Q. It is getting late in the day, Mr. Landay,
15:15:26 10   and if at any point you need to take a break, you
15:15:28 11   let me know, and we will do it, if you feel your
15:15:36 12   concentration is lagging.
15:15:37 13           I am going to direct your attention to
15:15:41 14   Exhibit 81. Can you identify Exhibit 81?
15:15:44 15       A. Exhibit 81 appears to be a report from John
15:15:47 16   Rijo to Jane Frangos, dated August 27, 2001.
15:15:51 17       Q. And there is a copy to a gentleman by the
15:15:55 18   name of Dick Sebastiao?
15:15:58 19       A. Yes.
15:15:58 20       Q. Who was Mr. Sebastiao?
15:16:00 21       A. He was Rijo's boss.
15:16:02 22       Q. There is a copy to Mr. Rainville. Who is
15:16:04 23   Mr. Rainville?
15:16:05 24       A. He worked for Resolution Capital.

## Page 137

15:16:08 1        Q. And they were employed by Seneca-
15:16:09 2    Brookfield?
15:16:09 3        A. Correct.
15:16:10 4        Q. There is copy to John Crowley?
15:16:12 5        A. Yes.
15:16:12 6        Q. Who is Mr. Crowley?
15:16:14 7        A. Mr. Crowley was an employee in the GMAC
15:16:18 8    Boston office on Merrimack Street.
15:16:22 9        Q. There is a copy to you, correct?
15:16:24 10       A. That's what it says.
15:16:25 11       Q. Do you recall seeing a copy of Exhibit 81?
15:16:29 12       A. No.
15:16:29 13       Q. Do you recall seeing Exhibit 81 before
15:16:32 14   today?
15:16:32 15       A. I believe I have seen this before today,
15:16:34 16   yes.
15:16:36 17       Q. I direct your attention to the first
15:17:06 18   heading. It says, "Exhibit 1, Cash Flow Summary."
15:17:09 19   Do you see that?
15:17:10 20       A. Yes.
15:17:11 21       Q. Do you agree with the second sentence of
15:17:15 22   that paragraph which says, "Uses of cash total just
15:17:20 23   under $450,000, almost $400,000 below plan due to
15:17:25 24   delays in enacting the plan"?

LegaLink Boston
(617) 542-0039

f0b6b1ae-affe-4330-82cc-3512d4628ae4

David L. Landay                                                    10/18/2005

---

**Page 142**

15:25:03 1    I ship it to you. Now I've created
15:25:06 2 from that $30,000 borrowing, I now created $90,000
15:25:11 3 in borrowing. I get 90 percent of that hundred-
15:25:17 4 thousand-dollar invoice to you.
15:25:19 5    Now I have gone from 30 to 90 of
15:25:22 6 borrowing power, and eventually when you pay the
15:25:27 7 hundred thousand dollars, now the loan goes down by
15:25:29 8 a hundred thousand dollars.
15:25:38 9    Do you understand that?
15:25:40 10    Q. Unfortunately, Mr. Landay, you don't get to
15:25:46 11 ask the questions.
15:25:57 12    Would it be fair to say that at the
15:25:59 13 most simplistic level, what Seneca-Brookfield
15:26:07 14 needed to do in order to obtain additional
15:26:14 15 borrowing capacity on the existing loan facility
15:26:18 16 was to (A) make more sales and (B) collect on the
15:26:22 17 outstanding sales that were out on the books?
15:26:26 18    A. You are missing a factor. It had to
15:26:36 19 purchase the goods to make more sales, and then to
15:26:39 20 collect on the sales.
15:26:44 21    Q. Mr. Landay, sitting here today, are you in
15:26:54 22 a position to agree or disagree with any of the
15:26:58 23 conclusions that are reached by Mr. Rijo in
15:27:02 24 Exhibits 81 through 85?

---

**Page 143**

15:27:07 1    A. I am not in any position to agree or
15:27:10 2 disagree.
15:27:32 3    Q. So if Mr. Rijo were to testify that as of
15:27:39 4 August 31, 2001, the workout plan that was part of
15:27:54 5 the forbearance agreement was unattainable, you
15:27:58 6 would have no basis for disputing that conclusion,
15:28:05 7 correct?
15:28:05 8    A. I am not sure I could dispute the
15:28:08 9 conclusion. I would have to go to the reasons
15:28:10 10 behind the conclusion.
15:28:11 11    Q. Mr. Landay, I direct your attention to
15:29:19 12 Exhibit 81, and to Exhibit 2 to Exhibit 81, which
15:29:24 13 is located at Bates number RAS 00135.
15:29:39 14    Under the heading "Collateral," there
15:29:41 15 is a column for actual and a column for projected
15:29:44 16 and the difference between the two. Do you see
15:29:46 17 that?
15:29:47 18    A. Yes.
15:29:49 19    Q. Do you see that this document shows
15:29:54 20 additional collateral supplied: Projected,
15:29:56 21 $1 million; Actual, $400,000; week ending August
15:30:02 22 17th?
15:30:04 23    A. Correct.
15:30:05 24    Q. Do you agree that as of the week ending

---

**Page 144**

15:30:12 1 August 17 the additional collateral that you agreed
15:30:18 2 to supply had not been completely supplied?
15:30:25 3    A. I can't agree. I can only say that's what
15:30:28 4 this piece of paper says.
15:30:30 5    Q. Do you disagree, or you just don't know?
15:30:33 6    A. I just don't know.
15:33:17 7       EXHIBITS NOS. 86 THROUGH 88 MARKED
15:33:19 8    Q. Can you identify Exhibit 86 for me.
15:33:27 9    A. Exhibit 86 is a document, GMAC Commercial
15:33:32 10 Credit LLC heading, and the words "Client Ledger
15:33:36 11 Account," as of date 8/31/01. It's five pages. It
15:33:47 12 has the Bates number GMAC_Landay 00294 through
15:33:55 13 00298.
15:33:55 14    Q. Do you recall receiving client ledger
15:34:00 15 account statements like Exhibit 86 from GMAC?
15:34:05 16    A. What time period?
15:34:06 17    Q. Any time period.
15:34:07 18    A. The only time I have ever seen the client
15:34:10 19 ledger account reports such as these has been
15:34:14 20 documents produced in the New York litigation, and
15:34:17 21 in this -- these documents here that you have just
15:34:20 22 produced.
15:34:22 23    Q. How did Seneca-Brookfield handle its mail?
15:34:37 24    A. The mail was picked up usually at the Post

---

**Page 145**

15:34:40 1 Office -- we had a Post Office box -- and the
15:34:44 2 majority of the mail came in through the box, and
15:34:47 3 someone would pick it up and distribute it.
15:34:51 4    Q. And if mail came into Seneca Sports, Inc.,
15:34:57 5 not to anyone's particular attention?
15:35:02 6    A. If it was to a customer, it would be
15:35:05 7 directed to the lady who ran customer service. If
15:35:09 8 it was a bank like Fleet or GMAC, we'd put them
15:35:12 9 into the banking category, and it would go to Neal
15:35:17 10 Finkelstein, unless it had someone's name on it, in
15:35:21 11 which case it would be given to that person.
15:35:23 12    Q. Did Mr. Finkelstein ever indicate that he
15:35:28 13 had an issue with account statements received from
15:35:34 14 GMAC?
15:35:35 15    A. His only comment over time was that he
15:35:38 16 always had a problem reconciling them, especially
15:35:42 17 with the screen, because we would go on the
15:35:45 18 computer every day to check what we would call the
15:35:49 19 screen, which was a computer-generated report from
15:35:53 20 GMAC, which would show your status as of a given --
15:35:59 21 as of that moment in time.
15:36:00 22    Q. Did Mr. Finkelstein ever indicate to you
15:36:13 23 that he wanted to challenge any of the client
15:36:19 24 ledger account statements received from GMAC?

---

37 (Pages 142 to 145)

f0b6b1ae-affe-4330-82cc-3512d4628ae4

David L. Landay                                                    10/18/2005

Page 146

15:36:21 1    A. No. I believe I just mentioned to you what
15:36:25 2  his comment was.
15:36:25 3    Q. Did Mr. Finkelstein ever mention to you he
15:36:29 4  wanted to object to any of the client ledger
15:36:32 5  account statements received from GMAC?
15:36:35 6    A. I assumed that if he had any problems with
15:36:38 7  reconciliation, that they would work them out with
15:36:41 8  people at GMAC.
15:36:45 9    Q. Mr. Finkelstein never brought to your
15:36:53 10 attention any specific objection that he had with a
15:36:57 11 GMAC ledger account?
15:37:00 12   A. No. The only thing that he ever brought to
15:37:04 13 my attention at one point in time was we asked
15:37:10 14 Toys-R-Us for money in anticipation. Fitzgerald
15:37:16 15 was concerned we were bumping up against the $10
15:37:21 16 million line of credit.
15:37:22 17       If I remember correctly, Toys-R-Us sent
15:37:25 18 in $1.7 million, and Finkelstein and Barry Hutch,
15:37:33 19 who was in charge of credit and collections, were
15:37:36 20 concerned that it was not being credited to the
15:37:39 21 account properly. That's the only instance that I
15:37:43 22 recall.
15:37:43 23   Q. Do you recall what time frame that occurred
15:37:45 24 in?

Page 147

15:37:45 1    A. That would have been, I believe it was late
15:37:50 2  in the year of 2000.
15:37:52 3    Q. In any event, before the forbearance
15:37:55 4  agreement was executed?
15:37:57 5    A. Oh, yes.
15:37:58 6    Q. Do you know Mr. Finkelstein's current
15:38:04 7  address?
15:38:05 8    A. I know he lives in Revere, that's all.
15:38:09 9    Q. His first name?
15:38:11 10   A. Neal. N-E-A-L.
15:38:36 11       EXHIBIT NO. 89 AND 90 MARKED
15:40:00 12   Q. Mr. Landay, I handed you two documents,
15:40:03 13 Exhibits 89 and 90.
15:40:05 14       Let's start with 89. Can you identify
15:40:07 15 Exhibit 89?
15:40:08 16   A. 89 is a letter to me from GMAC Commercial
15:40:12 17 Credit. I believe this was a letter saying that
15:40:16 18 there are additional defaults under the forbearance
15:40:19 19 agreement, and the forbearance period is
15:40:21 20 terminated.
15:40:28 21   Q. Did you receive Exhibit 89?
15:40:31 22   A. Yes.
15:40:32 23   Q. Did you respond to Exhibit 89?
15:40:34 24   A. I believe it was responded to when I met

Page 148

15:40:39 1  with Jane Frangos as a part -- with Robert
15:40:45 2  Schwartz, David Madoff and Richard Lamontagne.
15:40:50 3  When we went to New York on October 15th.
15:40:53 4    Q. You responded during that October 15th
15:40:58 5  meeting?
15:40:58 6    A. Yes.
15:40:58 7    Q. You never responded via a writing or an
15:41:02 8  e-mail?
15:41:03 9    A. I don't recall. I might have. Madoff, I
15:41:11 10 believe, was in touch with Richard Stehl about
15:41:20 11 this.
15:41:20 12   Q. Did you ever see any letter or e-mail from
15:41:24 13 Madoff to Mr. Stehl responding to Exhibit 89?
15:41:27 14   A. I don't recall specifically.
15:41:31 15   Q. Do you agree or disagree that as of
15:41:36 16 September 25 additional defaults existed under the
15:41:40 17 forbearance agreement?
15:41:40 18   A. I would have to say I -- there are no --
15:41:46 19 let's see.
15:41:48 20       They don't go through what the
15:41:50 21 additional defaults were; and if there were any
15:41:54 22 defaults, I would say it was because of GMAC.
15:41:58 23   Q. Can you identify Exhibit 90 for me?
15:42:12 24   A. A letter from GMAC Commercial Credit to

Page 149

15:42:16 1  Seneca Sports and Brookfield, with the same date,
15:42:21 2  announcing there are additional defaults under the
15:42:27 3  forbearance agreement.
15:42:27 4    Q. Did Seneca-Brookfield receive Exhibit 90?
15:42:31 5    A. Yes.
15:43:10 6       EXHIBIT NO. 91 MARKED
15:43:27 7    Q. I direct your attention to Exhibit 91. Can
15:43:31 8  you identify that document for me?
15:43:32 9    A. It appears to be a letter from GMAC
15:43:37 10 Commercial Credit to Seneca and Brookfield, dated
15:43:41 11 October 11th, that says in Paragraph 2 that on
15:43:45 12 September 25th the companies were advised of
15:43:50 13 additional defaults, and in the next paragraph,
15:43:57 14 "RAS has determined that certain of the clients'
15:43:59 15 invoices do not have the proper notation indicating
15:44:01 16 that such invoices are payable solely to factor,"
15:44:08 17 et cetera.
15:44:08 18   Q. Did Seneca-Brookfield receive Exhibit 91?
15:44:12 19   A. I would assume so, because it was sent via
15:44:17 20 facsimile and certified mail. I would assume it
15:44:23 21 was received.
15:44:23 22   Q. Did Seneca-Brookfield ever respond to
15:44:25 23 Exhibit 91?
15:44:26 24   A. I'm sure that I turned it over to Madoff to

38  (Pages 146 to 149)

f0b6b1ae-affe-4330-82cc-3512d4628ae4

David L. Landay                                                    10/18/2005

---

Page 170

16:18:18 1    filing bankruptcy?
16:18:19 2        A. No, I did not.
16:18:23 3        Q. I take it that you, after consulting with
16:18:29 4    Mr. Madoff, decided not to seek bankruptcy
16:18:36 5    protection for either Seneca or Brookfield?
16:18:41 6        A. That's quite apparent, yes.
16:18:43 7        Q. Do you contend that any of the charges that
16:19:01 8    GMAC imposed on Seneca-Brookfield prior to the
16:19:07 9    execution of the forbearance agreement were
16:19:22 10   anything other than to correct the problem?
16:19:23 11       A. I have no idea, because I don't know what
16:19:27 12   charges GMAC imposed on Seneca-Brookfield prior to
16:19:33 13   the forbearance agreement.
16:19:33 14       Q. In the forbearance agreement, you
16:19:34 15   acknowledge that the debt was due and owing without
16:19:39 16   offsetting of any kind, correct?
16:19:40 17       A. If I remember, that's what the sentence
16:19:42 18   said.
16:19:43 19       Q. And you agreed that that was accurate,
16:19:45 20   correct?
16:19:45 21       A. I agreed that's what the sentence said.
16:19:49 22       Q. On behalf of Seneca and Brookfield, you
16:19:54 23   stated that neither company had an offset defense
16:19:58 24   or counterclaim to the debt that was owed as of the

---

Page 171

16:20:01 1    time of the forbearance agreement, correct?
16:20:03 2        A. I believe that's what the forbearance
16:20:06 3    agreement says.
16:20:10 4        Q. Would you agree with me that on behalf of
16:20:18 5    Seneca-Brookfield, you had acknowledged that the
16:20:21 6    charges imposed up to that point in time were
16:20:23 7    correct and proper?
16:20:25 8        A. I am not sure that is what it says. So I'm
16:20:28 9    not sure that I can answer your question
16:20:31 10   positively.
16:20:34 11       Q. Mr. Landay, I direct your attention to the
16:21:44 12   paragraph numbered one on Page 2 of Exhibit 71.
16:21:48 13       I would ask you to read that to
16:21:50 14   yourself and let me know when you are finished.
16:21:54 15       A. Yes. I read it.
16:22:14 16       Q. Would you agree with me, Mr. Landay, that
16:22:18 17   on behalf of Seneca-Brookfield you acknowledged in
16:22:39 18   the forbearance agreement that the charges imposed
16:22:41 19   up to the point in time that the forbearance
16:22:44 20   agreement was executed were correct and proper?
16:22:48 21       A. I don't believe it says that.
16:22:51 22       I believe it says -- it doesn't say --
16:22:59 23   use those words, "correct and proper," at all in
16:23:02 24   here.

---

Page 172

16:23:03 1        Q. If the charges imposed by GMAC were
16:23:06 2    anything other than correct and proper, then
16:23:09 3    Seneca-Brookfield would have an offset defense or
16:23:12 4    counterclaim, would it not?
16:23:14 5        A. I don't know that that is true under the
16:23:17 6    law of New York, and I believe that this was under
16:23:22 7    the law of New York, knowledge that I am bitterly
16:23:31 8    experiencing now.
16:23:39 9        Q. Mr. Landay, do you contend that any of the
16:25:09 10   interest fees or charges imposed -- strike that --
16:25:18 11   do you contend that any of the interest fees or
16:25:21 12   charges made by GMAC in connection with the
16:25:29 13   Brookfield-Seneca financing were usurious prior to
16:25:36 14   November 2001?
16:25:37 15       A. I believe my expert's report, who analyzed
16:25:47 16   the period from October 22nd on, I don't know if he
16:25:50 17   breaks out that eight- or nine-day period prior to
16:25:54 18   November 1, which is the date you just mentioned.
16:25:57 19       I don't believe he chose to go prior to
16:26:01 20   the date of October 22nd. For whatever reasons, he
16:26:07 21   chose -- Ms. Pappalardo's damages calculation
16:26:13 22   starts on October 22nd and goes before that.
16:26:22 23       MR. HOULIHAN: Could we take a break
16:26:29 24   for a couple of minutes.

---

Page 173

16:26:30 1        MR. HOFFMAN: That would be a good
16:26:32 2    idea.
16:26:32 3        (A recess was taken from
16:26:34 4        4:26 to 4:36 p.m.)
16:40:17 5        EXHIBIT NO. 96 MARKED
16:40:40 6        Q. Mr. Landay, I have handed you a three-page
16:40:57 7    document marked Exhibit 96.
16:40:58 8        Have you ever seen Exhibit 96 before
16:41:02 9    today?
16:41:02 10       A. No.
16:41:15 11       MR. HOFFMAN: Do you want him to read
16:41:16 12   it?
16:41:17 13       Q. Why don't you read Exhibit 96 and see if
16:41:21 14   that refreshes your recollection.
16:42:40 15       A. I have read it quickly.
16:42:43 16       Q. Do you have any recollection of seeing
16:42:46 17   Exhibit 96 before today?
16:42:46 18       A. No. It is undated. I don't recall this.
16:42:50 19   I don't know who wrote it.
16:42:52 20       Q. Would you recognize Mr. Finkelstein's
16:42:57 21   writing style if you saw it?
16:42:58 22       A. Not really.
16:43:07 23       Q. Okay. Was Mr. Finkelstein authorized to
16:43:15 24   act on behalf of Seneca-Brookfield with respect to

---

44 (Pages 170 to 173)

f0b6b1ae-affe-4330-82cc-3512d4628ae4

David L. Landay                                      10/18/2005

Page 174

16:43:20 1    the monthly client ledger accounts that GMAC sent
16:43:31 2    to Seneca-Brookfield?
16:43:32 3        A. The answer is yes. He is the only one that
16:43:36 4    saw them, to the best of my knowledge.
16:43:43 5        Q. In connection with the promissory note that
16:43:52 6    Seneca executed in your favor, Exhibit 66, did
16:44:29 7    Seneca execute a security agreement?
16:44:34 8        A. No. I believe there were previous security
16:44:39 9    agreements on previous notes.
16:44:41 10       Q. In connection with Exhibit 66, was there a
16:44:45 11   separate security agreement?
16:44:46 12       A. Not that I recall.
16:44:48 13       Q. In connection with Exhibit 66, did Seneca
16:44:55 14   or you make any UCC filings of any kind?
16:44:58 15       A. Not that I recall.
16:45:03 16       Q. What's your basis for claiming to be a
16:45:09 17   secured creditor of Seneca?
16:45:11 18       A. In my previous notes, I had a security
16:45:16 19   interest, and I believe there were UCC filings, and
16:45:20 20   I believe those still existed at the time of the
16:45:24 21   consolidation.
16:45:26 22       What this note was, a consolidation of
16:45:28 23   all of the previous notes into one note, which I
16:45:31 24   believe was done at the request of GMAC.

Page 175

16:45:40 1        Q. Did you seek any legal advice as to whether
16:45:46 2    or not the consolidation of the earlier notes into
16:45:48 3    a new note affectively extinguished the old notes?
16:45:53 4        A. I left that up to Mr. Hoff. I am not sure
16:45:57 5    I was capable of asking that question.
16:46:05 6        Q. Yes or no, did you receive any legal advice
16:46:07 7    as to whether or not whatever security interest
16:46:12 8    existed with respect to the old notes survived the
16:46:16 9    execution of Exhibit 66?
16:46:18 10       A. Not that I recall.
16:46:19 11       Q. Now, I think we established earlier today
16:46:29 12   that the extent of the debt that Seneca owed to you
16:46:41 13   increased significantly during the last couple of
16:46:47 14   months prior to the GMAC closing, correct?
16:46:50 15       A. I believe we discussed that this morning.
16:47:25 16       Q. Again, round figures, I think we agreed
16:48:09 17   that the debt went from approximately $2.3 million
16:48:13 18   to approximately $3.45 million?
16:48:21 19       A. We have seen subordinated debt from 2.3 to
16:48:26 20   3.45, which was the final figure.
16:48:30 21       Q. That difference, 1.15, was that difference
16:48:46 22   ever secured?
16:48:55 23       MR. HOFFMAN: Objection to the form.
16:48:56 24   You may answer.

Page 176

16:48:56 1        A. Secured by itself, or I believe the initial
16:49:00 2    security covered it.
16:49:12 3        Q. Can you explain that last part.
16:49:14 4        Your testimony is you believe the
16:49:16 5    initial security covered it, what do you mean?
16:49:18 6        A. In other words, let's say, as an example,
16:49:22 7    hypothetical, there are 15 notes; and in the first
16:49:27 8    note I get security on all of the assets, as an
16:49:32 9    example, and I then loan again and loan again and
16:49:36 10   loan again.
16:49:41 11       The amount due to me increases with
16:49:41 12   each note, but the security, I can't get any more
16:49:44 13   security than if I got security on all of the
16:49:46 14   assets anyway. What more security is there?
16:49:49 15       Am I correct in my logic? I know, I am
16:50:04 16   not supposed to ask you questions.
16:50:06 17       Q. Did there come a point in time in your
16:50:30 18   discussions with Mr. Fitzgerald that he indicated
16:50:33 19   to you that he no longer had responsibility for the
16:50:44 20   Seneca-Brookfield relationship?
16:50:47 21       A. He indicated to me that he had to answer to
16:50:50 22   Jane Frangos, but he did not step away from it,
16:50:55 23   because he was still the contact in Boston, and he
16:50:59 24   was the conduit for bringing draft documents to us

Page 177

16:51:05 1    that Lou Marcus supplied from time to time, and it
16:51:09 2    was Fitzgerald who made the suggestion of hiring a
16:51:13 3    consultant. I believe he suggested RAS Associates.
16:51:19 4        So he really didn't step out of the
16:51:23 5    picture completely. He made it clear that he
16:51:27 6    answered to Jane Frangos.
16:51:29 7        Q. Did there come a point in time in the
16:51:31 8    relationship with GMAC where Mr. Fitzgerald made it
16:51:37 9    plain that substantive decisions were going to be
16:51:41 10   made by others?
16:51:42 11       A. No. I never understood it any differently
16:51:51 12   than I just mentioned.
16:52:13 13       Q. Mr. Landay, do you contend that any actions
16:52:29 14   by GMAC in connection with this lawsuit, the
16:52:36 15   Massachusetts lawsuit -- and by that I mean any
16:52:42 16   actions that GMAC has taken in connection with the
16:52:48 17   way in which this lawsuit has been conducted -- do
16:52:52 18   you contend that any GMAC actions in the
16:52:55 19   Massachusetts case violate Massachusetts law?
16:52:59 20       A. Yes. I believe that's the basis of the
16:53:02 21   complaint.
16:53:03 22       MR. HOFFMAN: Why don't you clarify
16:53:05 23   your question. I understand it. I am not sure he
16:53:09 24   understands it.

45 (Pages 174 to 177)

f0b6b1ae-affe-4330-82cc-3512d4628ae4