# EXHIBIT 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-CV-11955-WGY

DAVID L. LANDAY, )
)
Plaintiff, )
)
v. )
)
GMAC COMMERCIAL CREDIT, LLC and )
GMAC COMMERCIAL FINANCE, LLC, )
)
Defendants. )
_____)



## PLAINTIFF DAVID L. LANDAY'S ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff David L. Landay ("Landay" or "Plaintiff") hereby responds to Defendants' First Set of Interrogatories as follows:

## GENERAL OBJECTIONS

The following objections are asserted in response to each and every interrogatory propounded by Defendants (hereinafter "GMAC" or "Defendants"). Each objection will not be restated in each response, but instead will be incorporated by reference. A response does not constitute a waiver of any objection asserted.

1. Plaintiff objects to Defendants' interrogatories insofar as they seek information which is beyond the scope of discovery permitted by Rule 26 of the Federal Rules of Civil Procedure or by any other discovery law or rules.

2. Plaintiff objects to Defendants' interrogatories on the grounds of the attorney-client privilege and the attorney-work product privilege. Plaintiff will not provide

a response to any interrogatory to the extent it seeks information subject to the attorney-client privilege, the attorney work-product privilege or other applicable privilege or protection.

3. Plaintiff objects to these interrogatories to the extent that they purport to impose obligations upon Plaintiff beyond those required by the Federal Rules of Civil Procedure.

4. Plaintiff objects to these interrogatories to the extent that they call for Plaintiff to describe documents or information in the possession, custody or control of Defendants. It is impossible for Plaintiff to provide complete answers without obtaining from Defendants documents and information that Plaintiff has requested. Plaintiff reserves his right to supplement his answers to these interrogatories with material obtained from Defendants.

## INTERROGATORIES

### INTERROGATORY NO. 1

Identify any false statements that you have made to GMACCF in connection with the Loan Agreements, orally or in writing, including any false statements regarding your personal finances.

### ANSWER NO. 1

Plaintiff objects to this interrogatory on the ground that it calls for information not relevant to any of the claims or defenses in this action and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Without waiving this objection, Plaintiff states that he is not aware of any false statements.

### INTERROGATORY NO. 2

Please identify each person whom you expect to call as an expert witness at trial of this matter, and for each such person, please state: the subject matter on which the purported expert is expected to testify; the substance of the facts and opinions to which the purported expert is expected to testify; all documents that reflect the facts to which the purported expert is expected to testify; and all documents and things which each

2

purported expert used, referred to, or consulted in formulating the opinions on which he is expected to testify.

## ANSWER NO. 2

Plaintiff has selected an expert witness but because of the unavailability of numerous relevant documents, including those belonging to Seneca Sports, Inc. and Brookfield International, Inc. (the "Borrowers"), the expert has not yet completed his analysis and report. Upon completion of the expert's report it will be delivered to the Defendants and the answer to this interrogatory will be supplemented to the extent required by the Rules of Civil Procedure. Be that as it may, Plaintiff objects to this interrogatory insofar as it purports to require him to identify "all documents that reflect the facts to which the purported expert is expected to testify" as vague, ambiguous, burdensome and in violation of the attorney work-product privilege.

## INTERROGATORY NO. 3

State the basis for the allegation in Paragraph 10 of the Complaint that "Fitzgerald represented to Landay that GMAC would look first to the assets of Seneca and Brookfield to satisfy any debt before it would seek to satisfy debt from Landay or any assets that Landay might provide personally as collateral."

## ANSWER NO. 3

This is what Paul Fitzgerald said to Plaintiff in various conversations in the period July – September 2000. Plaintiff specifically recalls statements of this nature made by Mr. Fitzgerald to Plaintiff in conversations they had at the end of July-first week of August 2000 in relation to the term sheet that Mr. Fitzgerald presented to Plaintiff and Borrowers.

## INTERROGATORY NO. 4

State the basis for the allegation in Paragraph 15 of the Complaint that Landay was "a secured creditor" of Seneca as of September 19, 2000.

## ANSWER NO. 4

As of September 19, 2000, Landay had loaned Seneca a total of $3,450,000. Seneca executed notes evidencing this debt and provided Landay with a security interest in all its assets to secure such debt. These loans and their related security interest predated GMAC's loan to Seneca/Brookfield. All of the notes and security documents should be among the Seneca/Brookfield documents confiscated by GMAC and in its possession, custody and control. Landay would have to have ready access to those documents to describe the notes and security documents with greater specificity. Although he understands that some documents were delivered to counsel on Tuesday morning September 6, 2005, there has been insufficient time to review them before

3

answering. The various notes were consolidated into a note dated 9/19/00 of which GMAC has a copy and which is referred to in paragraph 1 of the Subordination Agreement.

**INTERROGATORY NO. 5**

Identify all creditors of Seneca other than GMACCF and yourself as of October 22, 2001, by their names and amounts of indebtedness.

**ANSWER NO. 5**

Plaintiff objects to this interrogatory on the ground that it calls for information not relevant to any of the claims or defenses in this action and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Without waiving this objection, Plaintiff states as follows: Landay has no independent recollection of the names of creditors and/or the amounts owed except to state that after the transaction with GMAC, the only secured creditors were GMAC and Landay. The creditors can probably be identified from the Seneca and Brookfield records that GMAC confiscated on October 22, 2001; Landay does not have ready access to those documents which are in GMAC's possession custody and control. Landay refers GMAC to such documents; it can identify creditors from those documents more readily than can Landay.

**INTERROGATORY NO. 6**

State the basis for the allegation in Paragraph 18 of the Complaint that in early 2001 "GMAC reaffirmed its obligation to provide the Seasonal Overadvance and stated its intention to make those funds available."

**ANSWER NO. 6**

Landay recalls several conversations with Paul Fitzgerald to this effect and there are several GMAC memos (GLAN 00203, GLAN00432 and GLAN 00538) as well. There is also a facsimile from Fitzgerald to Landay dated 4/12/01 which is Exhibit 5 to the October 24, 2003 Landay Affidavit in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Cross-Motion filed in the New York action (hereinafter, the "Landay Affidavit").

**INTERROGATORY NO. 7**

Identify all of the "other advances" that you reference in Paragraph 21 of the Complaint.

4

## ANSWER NO. 7

Landay recalls that Seneca and Brookfield issued checks in reliance on representations by Frangos and/or Fitzgerald that GMAC would advance certain funds and that the checks bounced. Landay would have to review the documents that GMAC seized from Borrowers' to be more specific as to dates, times and/or amounts. See Answer No. 4.

## INTERROGATORY NO. 8

State the basis for the allegation in Paragraph 22 of the Complaint that "[a]s a result of GMAC's actions, Seneca and Brookfield lost sales."

## ANSWER NO. 8

Seneca and Brookfield needed product to fulfill orders. When GMAC did not supply the funds with which to purchase, import and ship the product, Seneca/Brookfield lost the ability to make sales of product. For example, customers had ordered goods from Seneca/Brookfield to be delivered to them by certain dates. Seneca and Brookfield could not obtain product because they had no money. Consequently such orders were cancelled. The lost sales from May 2001 were analyzed and reported to GMAC in June of 2001 (Exhibit 6 to the Landay Affidavit) and were a direct result of GMAC not providing the Seasonal Overadvance. See also, Landay Affidavit, paragraphs 21 – 22; paragraph 3 of 10/19/01 e-mail from Neal Finklestein (Seneca/Brookfield) to Jane Frangos Re: Collateral Reconciliation and Inventory Listings. GMAC's continuing refusal to fund the business and provide funds in accordance with the schedule of the Forbearance Agreement destroyed the business of Seneca and Brookfield. Without funds to purchase product to fill orders and, thus, generate necessary sales, the business of Borrowers' was brought to a virtual standstill. Landay would have to review the Borrowers' documents in the possession, custody and control of GMAC to provide more specifics. See Answer No. 4.

## INTERROGATORY NO. 9

State the basis for the allegation in Paragraph 51 of the Complaint that after October 22, 2001, "GMAC and its agent RAS proceeded to dispose of the assets of Seneca and Brookfield in an irresponsible fashion, not designed in any way to maximize collection but, rather in derogation of Landay's rights as a guarantor, a creditor and a shareholder of Seneca and Brookfield."

## ANSWER NO. 9

The basis for these allegations are the facts contained in the documents produced by GMAC in this action and the New York action, the Borrowers' documents that GMAC confiscated on October 22, 2001 that are in GMAC's possession, custody and control, the deposition testimony of John Rijo of RAS Associates, GMAC's agent,

5

and Landay's own knowledge of the industry and the money that should have been collected and applied to Borrowers' debt (see answer to Interrogatory 12 below). Based on information received from GMAC in discovery, it appears that GMAC collected only a small portion of the $1,306,000 in accounts receivable shown in RAS 01507-01565 (October 23, 2001 Accounts Receivable Aging Report printed off the Seneca computer by Mr. Rijo). It allowed Borrowers' customers to deduct large amounts from bills owed Borrowers without any explanation or justification. It apparently made very little effort to pursue customers that owed money to Seneca/Brookfield, despite the fact that all sales to all customers had been approved in advance by GMAC as being credit-worthy and collectable. GMAC did not call upon Landay or any other employee of Borrowers to help collect the accounts receivable and/or to explain and challenge the actions of the customers. When GMAC had any questions, it appears to have sent letters to Borrowers that Borrowers could not possibly answer because the premises, books, records and all assets had been seized by GMAC, and its liquidator was in complete control of the premises. Among the Seneca/Brookfield documents recently produced by GMAC are unopened mail sent by GMAC to Borrowers' address which contained such letters as are contained in Exhibit 1 to Landay's First Set of Interrogatories. See GMAC documents attached as Exhibit 1 to Landay's First Set of Interrogatories in the instant action. Put simply, GMAC made very little effort to follow through to collect what was owed; it simply accepted anything the customers chose to pay. In at least one instance GMAC allowed one customer a deduction or refund that exceeded the amount bought by that customer from Seneca/Brookfield that year. (Compare GLAN 01656-63, 01638-44, 01694-01703, 01813-19, 01821-30, 01891-98 to GLAN 02002-02013 ) As to inventory: The RAS agent in charge of the liquidation was inexperienced. He sold only half of the inventory and abandoned the rest in warehouses. The portion that he did sell was sold for less than should have been realized as illustrated by the offer from Rand that he botched. (GLAN 00085) The RAS agent missed out on a significant offer from Rand to purchase inventory because he erroneously determined that a patent that was sought as part of the purchase had expired; he did not bother to call Landay or any other employee of Seneca/Brookfield to locate the patent information. (The cavalier treatment of the Borrowers' assets is demonstrated by GMAC's recent production of Borrowers' documents that included envelopes of cash collected from Borrowers' retail store. This cash had been thrown in among Borrowers' documents and was placed in storage by RAS and GMAC for the past almost-four years.) As to other intellectual property: GMAC has done little if anything with the intellectual property it confiscated from Borrowers' – despite direct inquiries made by potential buyers that have been referred to GMAC's attorneys. (See letters from Landay's New York attorney to GMAC's New York attorney, including Exhibit 10(a)-(g) attached to Landay's 10/24/03 affidavit in opposition to GMAC's motion for Summary Judgment in the New York case.) To the best of Landay's knowledge, GMAC has done nothing to keep the patents and trademarks current and has allowed them to loose their value. To the best of Landay's knowledge, GMAC made no attempt to sell or assign valuable licenses. As to other assets: GMAC will not reveal to Landay what became of Borrowers' other assets (such as the computers); he can only surmise that they have been abandoned or destroyed.

**INTERROGATORY NO. 10**

State the basis for the allegation in Paragraph 53 of the Complaint that "GMAC's disposition, [of the assets] (sic) of Seneca and Brookfield amounted to waste."

**ANSWER NO. 10**

See Answer to Interrogatory 9 above.

**INTERROGATORY NO. 11**

State the value that you believe GMAC should have been able to obtain for "the assets of Seneca and Brookfield" and state the basis for your belief.

**ANSWER NO. 11**

Landay's belief is as follows: The cost value of the inventory seized by GMAC was approximately $1,800,000. (See LAN 0167) A proper liquidation should have resulted in about 40% of this value. The accounts receivable were approximately $1,306,000 (RAS 01565). Historically, Seneca's dilution did not exceed 5% of the total balance; Borrowers typically were able to collect 95% of the receivables. Allowing for a liquidation situation, GMAC should have collected at least three quarters of the $1,306,000 owed, especially where, as here, (a) GMAC had approved the accounts as credit worthy and collectable and (b) Jane Frangos had told Landay on October 15, 2001 in front of Robert Schwartz, Richard Lamontagne, David Madoff, Esq., and GMAC lawyers that GMAC is relentless with accounts receivable and can collect 100% of all moneys due. The intellectual property had value that Landay cannot estimate. However, he believes that there may be a reasonable basis for estimating such value based on either or both of Seneca's financial records, not in his possession at this time, or the Brookfield acquisition papers. He believes that certain licenses could have been sold or assigned and he knows that certain patents and trademarks could have been sold. In addition to purchase inquires that Landay's attorney forwarded to GMAC to no avail (see Answer to Interrogatory 9), according to documents produced by GMAC, Rand inquired into one patent that it wanted to buy along with inventory. (GLAN 00085) but RAS mistakenly decided that the patent was expired. Additional documents which support this allegation are contained among the Borrowers documents not currently in Landay's possession. See Answer to Interrogatory No. 4. Landay reserves his right to put a dollar figure on the intellectual property after he obtains further discovery from GMAC.

**INTERROGATORY NO. 12**

State the basis for the allegation contained in paragraph 56 of the Amended Complaint that "[a]ccording to Landay's calculations, the day he was excluded from the premises, the assets of Seneca and Brookfield were more than sufficient to satisfy the

7

net balance allegedly due to GMAC and, in fact, there were sufficient assets to entitle Landay to a refund of some of the $5,300,000 collateral GMAC collected from him.

**ANSWER NO. 12**

See answer to Interrogatory 11 above. GMAC's "screen" (LAN 0167-68) shows a balance due of $1,535,162.11 (LAN 0168 "Total Investment"). Once GMAC collected the $250,000 Letter of Credit still shown as uncollected on that "screen" (LAN 0167, "Other Collat"), the balance became $1,285,162.11. Even without selling any other assets (such as the intellectual property) if GMAC had collected 75% of the accounts receivable ($1,306,000x.75=$979,500) and 40% of the inventory value ($1.8Mx .40=$ 720,000) the debt would have been more than satisfied and Landay could have money back.

**INTERROGATORY NO. 13**

State the basis for your contention in Paragraph 63 of the Complaint that "[e]ach time GMAC represented to Landay that it would make the Seasonal Overadvance, it had a preconceived intent not to do so."

**ANSWER NO. 13**

Various GMAC loan committee minutes indicate that the intent was not to make the "Seasonal Overadvance," the promised advance of $500,000. Instead, GMAC intended to lend only as much as it could talk Landay into securing with additional collateral – essentially making Landay into the lender. See GLAN 00524, GLAN 00341, GLAN 00342, GLAN 00335 and RAS 00445. Jane Frangos sent an internal e-mail that shows she intended to get Landay to put up more collateral. GLAN 01064-5. RAS did a liquidation analysis in June 2001 at the same time that Frangos and Fitzgerald were telling Landay that GMAC would advance money to Borrowers if Landay increased his collateral. See RAS 00090-114  Moreover, in retrospect, the reasons given by Jane Frangos at various times for refusing the overadvance appear disingenuous at best and calculated to force Landay into increasing his personal risk and to create a liquidation scenario for GMAC. In or about May or June 2001 Frangos told Landay that she was not releasing funds because she was waiting for her legal department to perfect some overlooked paperwork. However, this overlooked paperwork had not prevented the loan from being funded from September 2000 through April 2001, and it appears that this was an excuse designed to avoid further funding while extracting more collateral from Landay and positioning GMAC to foreclose on the loan.

**INTERROGATORY NO. 14**

State the basis for the allegation in Paragraph 67 of the Complaint that "GMAC's transactions with Seneca, Brookfield and Landay were in violation of the Massachusetts usury statute (M.G.L. 271, Section 49)."

8

## ANSWER NO. 14

The total of interest, fees and other charges charged by GMAC appears to exceed the 20% limit of the Massachusetts usury statute. In order to answer this interrogatory fully, Landay must obtain from GMAC the documents he has requested (and which GMAC has refused to produce) so that his expert may prepare a detailed study. However, in documents produced by GMAC in the New York action, the interest, fees and other charges in November 2001 appear to total 7% of the loan balance, or 84% annualized and the December interest, fees and charges appear to total 18% of the loan balance, or 216% annually. (See GLAN 01522-23 and GLAN 01526-27). Moreover, calculations made by GMAC witness Pappalardo (Exhibits 1 and 3 to her deposition) although different from the foregoing, still show interest and charges in the month of November 2001 at 5.8% of the loan balance (69% annualized) and 6.3% for December (76% annualized). It is Landay's understanding that GMAC did not make a timely filing with the Attorney General and is, therefore, subject to the usury statute. See GLAN 01165 and 01167.

## INTERROGATORY NO. 15

State the basis for the allegation in Paragraph 71 of the Complaint that as a result of GMACCF's alleged usury, Landay suffered damages, "including but not limited to the $5,350,000 [Landay has] already paid to GMAC."

## ANSWER NO. 15

Overcharges to Borrowers result in overcharges that a guarantor is asked to pay for ultimately. Overcharges also destroy the underlying business and cause exposure to the guarantor. Landay reserves his right to more fully respond after GMAC has completed its document production and answered all Landay's interrogatories – all of which are necessary for review by Landay's expert before Landay can fully answer this interrogatory.

## INTERROGATORY NO. 16

State the basis for the allegation in Paragraph 90 of the Complaint that as a result of GMACCF's alleged violation of Landay's rights as a junior creditor, "Landay, as guarantor and creditor, has been damaged in an amount…no less than $3,450,000."

## ANSWER NO. 16

$3,450,000 is the amount of money that Landay had loaned to Borrowers' whose business was totally destroyed beyond repair by GMAC and all assets decimated by GMAC.

**INTERROGATORY NO. 17**

State the basis for your claim that GMACCF violated Section 11 of Massachusetts General Laws, Chapter 93A.

**ANSWER NO. 17**

The First Amended Complaint describes the basis for Landay's Chapter 93A claim. GMAC is referred to the facts alleged in the First Amended Complaint which Landay incorporates by reference into his answer to this interrogatory. To summarize those facts (without purporting to limit or change them) and to supplement them with recently discovered information:

GMAC engaged in sharp practices to Landay's damage. GMAC utilized deception in inducing and manipulating Landay into exposing his personal assets to collection by GMAC at the inception of the relationship and throughout the relationship. (See Landay's answers to Interrogatories 3, 6 and 13) At the inception of the relationship Landay was told by Paul Fitzgerald that GMAC would look to Borrowers' assets first (see answer to Interrogatory 3); this turned out not to be true. As the relationship progressed, GMAC insisted that Landay provide more collateral before GMAC would advance funds to Borrowers that it had committed to lend. This occurred both with respect to the Seasonal Overadvance and to funds scheduled to be released pursuant to the Forbearance Agreement – in essence, it made Landay the lender as to these funds. GMAC did not release to Borrowers the $500,000 Seasonal Overadvance. Rather, GMAC released to Borrowers only an additional amount that did not exceed the $250,000 Letter of Credit that Landay posted in response to Paul Fitzgerald's false representations that GMAC would release the $500,000 Seasonal Overadvance if Landay provided this Letter of Credit. (Landay extended the expiration date on this Letter of Credit based on additional false representations that the Seasonal Overadvance would be forthcoming. See First Amended Complaint, paragraphs 18-25) Similarly, rather than the funds called for by the Schedule attached to the Forbearance Agreement, GMAC released to Borrowers only an amount that corresponded with the $1 million in cash that Landay had provided to GMAC in conjunction with the Forbearance Agreement. Jane Frangos of GMAC induced Landay to pay the salaries of Borrowers' employees and Borrowers' other operating expenses with representations that Landay would be reimbursed with funds that GMAC would provide to Borrowers. (See Exhibits 13(A)-13(D) to the Landay Affidavit). After Landay paid such salaries and expenses out of his own pocket, GMAC refused reimbursement (Id.), continuing to position itself for a foreclosure on Landay's collateral and on the Borrowers' business and assets. In fact, as early as June 2001, GMAC consulted at least two firms about liquidating Borrowers (see GLAN 01456-58 and RAS 00090-14), and as early as April 2001, Frangos had been planning to extricate GMAC from the loan and to obtain as much money as possible from Landay (see GLAN 01064, Landay Affidavit Exhibit 15, Landay Affidavit, paragraph 23). In late June-early July 2001, without revealing to Landay that RAS was engaged by GMAC to prepare a liquidation analysis of Borrowers' business (See RAS 00090-114), Paul Fitzgerald of GMAC induced Landay to consult with RAS Associates and to provide RAS with proprietary details. Fitzgerald told

10

Landay in several conversations that GMAC would look more favorably on releasing funds to Borrowers if Landay had on board a consultant such as RAS. (When Borrowers ultimately hired another consultant, GMAC insisted that RAS be used as well.) The Forbearance Agreement and related documents, represented by GMAC to be a means to allow Landay to wind down the business of Borrowers in an orderly fashion and to pay back GMAC over the period August 1, 2001 – January 18, 2002 (see schedule to Forbearance Agreement) were designed to extract additional funds from Landay: At the time the Forbearance Agreement was entered, RAS had already prepared for GMAC its own liquidation plan. (See RAS 00090-114). Moreover, Frangos of GMAC refused Landay's requests to adjust the schedule of the Forbearance Agreement to reflect GMAC's delay in executing it and releasing funds, thereby placing Borrowers' in a default position and exposing Landay to collection of his assets by GMAC. Landay was induced by GMAC to increase his guaranty and to provide GMAC with an additional $1 million in cash collateral by promises that GMAC would fund according to schedule. See Schedule to Forbearance Agreement. Instead, as noted above, GMAC funded only so much as Landay provided as additional collateral. GMAC failed to give due consideration to proposals from Platinum Funding to pay off GMAC despite telling Landay that the proposals were under consideration; GMAC lulled Landay into a false sense of security while preparing to seize as much of Landay's assets as possible. On October 15, 2001, the day that a Platinum proposal was first presented to GMAC, GMAC cashed Landay's $4.1 million Standby Letter of Credit, but Frangos told Landay that same day that she could refuse or refund the proceeds if the proposal was acceptable. Thereafter, Frangos advised Landay that GMAC was considering the Platinum proposals and that she would discuss them with him on October 22, 2001. (See Landay notes of 10/19/01 telephone conversation with Frangos; 10/19/01 e-mail from Neal Finklestein to Frangos Re: Collateral reconciliation and inventory listings; Frangos 10/19/01 e-mail to Landay Re: collateral reconciliation and inventory listings; RAS 00266-279). On Monday, October 22, 2001, without responding to Landay concerning the Platinum proposals, GMAC proceed with a foreclosure. It engaged in abusive and intimidating tactics in expelling Landay from Borrowers' premises; it threatened a hostile take-over of the premises unless Landay turned over immediately his keys and all assets, books and records to RAS. (See RAS 00801). Denying Landay records that were rightfully his and/or the Borrowers has hindered Landay in pursuing his rights vis a vis GMAC. Rather than liquidating the assets of Borrowers in a commercially reasonable manner and then looking to Landay for any shortfall, GMAC seized Landay's assets as a substitute for expending any effort to reasonably liquidate Borrowers' assets. GMAC engaged in a wasteful series of exercises concerning Borrowers' assets whereby it failed to collect and/or abandoned a large portion of them. (See answer to Interrogatory 9) During the liquidation, it sent letters to Borrowers that purported to seek information that would be necessary to an orderly, proper liquidation. However, this was no more than another sharp practice of GMAC because there was no one at Borrowers to receive the letters; GMAC had assumed control of the premises and the books, records and assets of the Borrowers. In fact, some of those letters surfaced less than two weeks ago – unopened – among the Borrowers' documents that GMAC's agent RAS had placed in storage. Following GMAC's abandonment of its liquidation efforts, it sought to collect from Landay an

11

alleged shortfall; however, it refused to tell Landay how it had arrived at the figure it sought. Despite the fact that GMAC acknowledges it owes Landay an accounting, it has steadfastly refused such accounting. When Landay asked for such accounting in an attempt to understand GMAC's claim and to avoid litigation, GMAC refused to provide the accounting and told Landay he would have to litigate if he wanted to know how GMAC arrived at its figures (see Exhibit 12 to Landay Affidavit, i.e., August 6, 2002 letter from GMAC counsel Lorraine S. Fields to Stephen Rosenberg, Esq.). In essence, it has continued to be GMAC's position that Landay should pay it whatever amount it demands without any showing that the amount is owed. As a result, Landay is engaged in protracted litigation with GMAC that is exhausting his resources. GMAC's heavy-handed tactics have continued throughout the New York litigation and GMAC still refuses to provide Landay with an accounting. In fact, it is only through the instant litigation that Landay has discovered that GMAC has been denying him access to documents that were in its possession, custody or control (or that of its New York attorneys) but which it had claimed could not be located. See GMAC's Responses to Landay's First Set of Interrogatories and Deposition Transcript of Ms. Pappalardo taken August 18-19, 2005. Rather than being mere discovery abuses, these failures are part of GMAC's sharp business practices that include a refusal to explain what happened to assets that should have satisfied Borrowers' debt and as to which Landay also has a claim. Finally, but not least, the interest, fees and other charges GMAC made to the loan were usurious. (See answer to Interrogatory 14). In fact, it appears that there were charges made to the loan after the seizure of assets and the cessation of business (October 22, 1005) that relate to a going business; they should not have been made but have been sought from Landay by GMAC without any explanation or justification. (See e.g., Pappalardo 8/19/05 deposition, pp.18-36 and GLAN numbers discussed therein and Pappalardo Deposition Exhibit 3: Advances, Overadvance Charges, Commission Charges, Wire Charges, Bank Charges, etc). There are also GMAC accounting practices that Ms. Pappalardo did not explain but which appear to have caused inflations of the loan balance upon which interest was inappropriately calculated, thereby adding to the usurious nature of the loan (see Pappalardo 8/18/05 deposition, e.g., pp. 50-53; and e.g., GLAN 01552). Landay requires further discovery from GMAC and consultation with an expert on these matters; accordingly, Landay reserves his right to supplement his answer upon receiving further information.

In addition to the documents cited above, there are numerous GMAC documents, RAS documents and correspondence between Landay and GMAC that support Landay's claims...including the very terms of the underlying agreements. Landay will produce all such documents, with the exception of documents produced by GMAC and its agent RAS in this action and in the New York action. Landay reserves his right to supplement his answers to interrogatories after obtaining full discovery from GMAC – including full review of Borrowers' documents that GMAC confiscated on October 22, 2001 and kept from Landay until August 23, 2005. See Answer to Interrogatory No. 4.

12

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS 6th DAY OF SEPTEMBER, 2005.

_____
DAVID L. LANDAY

As to Objections:

_____
Alan R. Hoffman, BBO# 236860
Lynch, Brewer, Hoffman & Fink, LLP
101 Federal Street, 22nd Floor
Boston, MA 02110
(617) 951-0800

198307_1