# EXHIBIT 18

Page 1

1
2           UNITED STATES DISTRICT COURT
3             DISTRICT OF MASSACHUSETTS
4
5  DAVID L. LANDAY,                )
                                   )
6           Plaintiff,             )  No. 04-CV-11955-WGY
                                   )
7           vs.                    )
                                   )
8  GMACCF COMMERCIAL CREDIT,       )
   LLC, and GMACCF COMMERCIAL      )
9  FINANCE, LLC,                   )
                                   )
10          Defendants.            )
   ------------------------------- )
11
12
13
14
15
16       DEPOSITION OF KATHLEEN A. PAPPALARDO
17              New York, New York
18           Thursday, August 18, 2005
19
20
21
22
23

    Reported by:
24  ANDREA L. KINGSLEY, RPR
    CSR NO. 001055
25  JOB NO. 4765

Page 38

1    Pappalardo
2    August 17, 2005, marked for
3    identification, as of this date.)
4    BY MR. HOFFMAN:
5        Q. Ms. Pappalardo, we placed in
6    front of you what has been marked for
7    identification Exhibits 1, 2 and 3.
8        For the record, Exhibit 1 is a
9    document that is entitled Seneca Sports
10   Damages Calculation, it appears to go from
11   10/22/2001 to 10/26/04.
12       Exhibit 2 is a document which has
13   the same heading, Seneca Sports Damages
14   Calculation, and it appears to go from
15   6/18/2002 to June 2004.
16       And Exhibit 3 has the same
17   heading, Seneca Sports Damages Calculation,
18   and it goes or appears to go from
19   10/22/2001 to August 17, 2005.
20       Have you ever seen these three
21   documents before?
22       A. Yes.
23       Q. Do you know who created these
24   documents?
25       A. I did.
     TSG Reporting - Worldwide   212-702-9580

Page 39

1    Pappalardo
2        Q. Can you take a look at Exhibit 2
3    and can you explain to us what Exhibit 2
4    is?
5        A. Exhibit 2 is probably when I
6    started without a lot of knowledge of the
7    dates and then I believe I was instructed
8    to go to Exhibit 1 and begin with 10/22/01.
9        Q. Was Exhibit 2 created in or about
10   June or July of 2004? I see the last date
11   is June 2004.
12       A. Most likely.
13       Q. Can you compare for me Exhibits 1
14   and 2 and just look at the line entry for
15   June 2004 on each of those two documents.
16       A. Um-hmm.
17       Q. Are they the same or are they
18   slightly different?
19       A. They're slightly different --
20       MR. HOULIHAN: June.
21       A. Oh, June. They are slightly
22   different.
23       Q. As you sit here today, do you
24   know why the two documents are slightly
25   different?
     TSG Reporting - Worldwide   212-702-9580

Page 40

1        Pappalardo
2        A. It would have depended on the
3    beginning point. And then all the
4    information pulled forward.
5        Q. Which of these two documents did
6    you create first, to the best of your
7    memory?
8        A. Exhibit 2.
9        Q. Do you know why you selected a
10   start date of 6/18/2002?
11       A. I don't recall.
12       Q. Then you later were asked to go
13   back to an earlier date?
14       A. Yes.
15       Q. Do you know who asked you to do
16   that?
17       A. I don't recall.
18       Q. How did you select the date of
19   October 22, 2001, if you know?
20       A. That was the date, I believe,
21   that we seized the assets.
22       Q. You see the balance on that date?
23       A. Yes.
24       Q. Now we're looking at Exhibit 1
25   for the purposes of the record.
     TSG Reporting - Worldwide   212-702-9580

Page 41

1        Pappalardo
2        Do you recall where you got the
3    balance from?
4        A. From a document called the
5    client's statement.
6        Q. By the way, did you do this by
7    yourself or did anyone else help you create
8    Exhibit 2 and 3?
9        A. I did it myself.
10       Q. Were client statements the
11   principal source that you used to develop
12   the figures?
13       MR. HOULIHAN: Objection.
14       A. Yes.
15       Q. Did you use any other source to
16   the best of your memory?
17       A. After a certain point the client
18   statements were no longer generated. I
19   used other company records to get some of
20   the charges, such as legal fees.
21       Q. Do you know what point the
22   company stopped generating client
23   statements?
24       A. I believe it was sometime in the
25   fall of 2003.
     TSG Reporting - Worldwide   212-702-9580

## Page 42

```
 1        Pappalardo
 2        MR. HOFFMAN: Why don't we mark
 3   this as a group exhibit and, if you
 4   want to, we can break it down later. I
 5   don't know if it will be necessary. It
 6   was an exhibit to the interrogatories
 7   and it's a series of documents which I
 8   believe the witness will identify as
 9   client statements.
10        (Landay Exhibit 4, client
11   statements, marked for identification,
12   as of this date.)
13        (Discussion off the record.)
14   Q.   Ms. Pappalardo, can you look
15   through Exhibit 4 and I will ask you if you
16   can identify those documents?
17   A.   They're client statements.
18   Q.   I notice that there's a different
19   format or there's several different
20   formats. Are they all client statements?
21   A.   Yes.
22   Q.   They appear -- the first one says
23   as of date 10/31/01; correct?
24   A.   Correct.
25   Q.   That's the first page which is
```
TSG Reporting - Worldwide   212-702-9580

## Page 43

```
 1        Pappalardo
 2   GLAN 1516. What is the date of the last
 3   statement that appears on this exhibit?
 4   A.   It's either 9/30/02 or 8/30/02.
 5   It's pretty blurry.
 6   Q.   Let's use Exhibit 3 for a moment.
 7   If you take a look at Exhibit 3, you will
 8   see -- let's look on the interest. There's
 9   an interest charge September 2003. Do you
10   see that?
11   A.   Okay.
12   Q.   Does that interest charge appear
13   on the last client statement?
14   A.   Well, the last client statement
15   here is '02.
16   Q.   I see. Let's work -- what
17   interest charge appears on the last client
18   statement?
19   A.   It looks like September of '02,
20   $7,976.59.
21   Q.   Do you see that in September of
22   '02 that figure appears on Exhibit 3 under
23   interest?
24   A.   Yes.
25   Q.   So can we safely assume that this
```
TSG Reporting - Worldwide   212-702-9580

## Page 44

```
 1        Pappalardo
 2   is the September statement?
 3   A.   Yes.
 4   Q.   The interest charges go all the
 5   way to the end, correct, on Exhibit 3?
 6        MR. HOULIHAN: Objection.
 7   A.   That's correct.
 8   Q.   There's an over advance charge
 9   that goes through September of 2003. Do
10   you see that?
11   A.   Yes.
12   Q.   So is it your memory that you had
13   client statements at least through
14   September of 2003 to look at in preparing
15   Exhibit 3?
16        MR. HOULIHAN: Objection.
17   A.   Yes.
18   Q.   Do you still have those documents
19   somewhere?
20   A.   Yes.
21   Q.   Up through September of 2003?
22   A.   Yes.
23   RQ   MR. HOFFMAN: I would like
24        production of those documents. I don't
25        think we've gotten them.
```
TSG Reporting - Worldwide   212-702-9580

## Page 45

```
 1        Pappalardo
 2        MR. HOULIHAN: I have no idea
 3        whether you have them or not but if you
 4        do not have them then we will produce
 5        them.
 6        MR. HOFFMAN: Okay. That's fair
 7        enough.
 8   Q.   Now can you -- are these client
 9   statements, are they records which were
10   made by I guess it would be -- either GMAC
11   Commercial Credit or GMAC Commercial
12   Finance in the regular course of their
13   business?
14   A.   Yes.
15   Q.   Can you explain to me how you
16   used Exhibit 4 documents, i.e. the client
17   statements, to create the Seneca Sports
18   damages calculation?
19   A.   I used the information from all
20   these statements and laid it out on a
21   spreadsheet so it would just be easier to
22   view on one document without having to flip
23   through several pages. Every month end
24   where we had a client statement was tied
25   out to the month end on the client
```
TSG Reporting - Worldwide   212-702-9580

## Page 54

1       Pappalardo
2  that.
3       Q. And are the client statements
4  specific on the nature of the -- of a
5  collection?
6       A. No. It just shows it as like an
7  incoming wire.
8       Q. Interest I guess is
9  self-explanatory.
10          Loan is, to this day, still
11 accruing interest; correct? That's what
12 these figures are in the interest column?
13      A. Correct.
14      Q. Do you know what rate is being
15 used in this calculation?
16      A. I believe it's prime plus 3 and a
17 quarter.
18      Q. Does that rate include some
19 default charge above and beyond the
20 original interest?
21      A. I don't know that.
22      Q. On what do you base your belief
23 that it's prime plus 3 and a quarter?
24      A. Based on documents I've seen.
25      Q. Can you describe any of the

TSG Reporting - Worldwide   212-702-9580

## Page 55

1       Pappalardo
2  documents that you've seen?
3          MR. HOULIHAN: Objection.
4       A. An internal setup form.
5       Q. Is that on your computer, is that
6  where you see it?
7       A. No.
8       Q. It's a hard copy?
9       A. Yes.
10      Q. Who do you get that from?
11      A. I saw it in the production of
12 documents.
13      Q. So you believe it's actually in
14 the documents that were produced?
15      A. I believe so. I'm not one
16 hundred percent.
17      Q. What's the name of this document
18 again? Some sort of a setup form?
19      A. I don't know the exact title.
20      Q. What information is contained on
21 it, to the best of your memory, on that
22 document that you are making reference to?
23      A. It's information that's taken
24 from source documents to our operations
25 group so they know what parameters to set

TSG Reporting - Worldwide   212-702-9580

## Page 56

1       Pappalardo
2  up in the system.
3       Q. The column is over advance
4  charge. Can you explain what that is?
5       A. It's a charge for the facility
6  being in an over advance.
7       Q. What does that mean, being in an
8  over advance, as you understand?
9       A. Out of formula.
10      Q. What does out of formula mean?
11      A. It means he has negative
12 availability or the account's in negative
13 availability.
14      Q. So this charge was continued to
15 be imposed after the default; correct?
16      A. That's how it appears.
17      Q. Then apparently it ends in
18 September of 2003. Do you see that?
19      A. Yes.
20      Q. Do you know the basis for it
21 ending at that time?
22      A. That must be at the point that
23 the client statements stopped being
24 produced.
25      Q. Do you know how the over advance

TSG Reporting - Worldwide   212-702-9580

## Page 57

1       Pappalardo
2  charge was calculated, interest basis, what
3  the principal was, on a percent basis what
4  the principal was?
5          MR. HOULIHAN: Objection.
6       A. I don't know off the top of my
7  head.
8       Q. Then we have some commission
9  charges. Can you tell us what these
10 commission charges are?
11      A. It's a minimum commission charge,
12 a minimum sales commission charge that
13 contractually a company would commit to a
14 minimum amount of sales; if they don't
15 reach that, they would be charged a fee
16 based on the shortfall.
17      Q. I see one of these is January of
18 2002. Can you explain why there was a
19 commission charge in January of 2002 after
20 a default?
21      A. I don't know.
22      Q. Let's take a look at the exhibit
23 in front of you, Exhibit 4. Can you locate
24 the statement that would have that charge?
25      A. It would be on the statement for

TSG Reporting - Worldwide   212-702-9580

Page 58

1    Pappalardo
2  January 2002. It's on GLAN 00013. These
3  don't necessarily go in order. I guess
4  you're right, go with 1530.
5    Q. I see that. Where is that on --
6    A. It's about a little more than
7  halfway down in the third column from the
8  right. January 30, minimum commission
9  charge.
10   Q. Next column is wire charges. Can
11 you tell us what that is?
12   A. Wire charges is a per wire fee
13 when an advance is made or an outgoing
14 wire, each wire there's an amount.
15   Q. Next one is LC charge. What is
16 that? Is that a letter of credit charge?
17   A. Letter of credit charge.
18   Q. Are you familiar with a Disney
19 letter of credit that may have been
20 involved in the account?
21   A. I'm familiar with the letter of
22 credit that was originally 110,000, I don't
23 know that it was Disney.
24   Q. So are you familiar with a
25 110,000 letter of credit?

TSG Reporting - Worldwide    212-702-9580

Page 59

1    Pappalardo
2    A. Yes.
3    Q. What does this particular
4  charge -- does this charge relate to that
5  110?
6    A. The $56,908.22 was a draw on a
7  portion of that LC. The draw plus I think
8  there was some minimal commission charges
9  in there.
10   Q. So that would increase the loan
11 balance; correct?
12   A. Correct.
13   Q. So that's why it's not bracketed?
14   A. That's correct.
15   Q. Do you know whatever -- if you
16 subtract -- let's call it 57 from 110 you
17 get 53. Do you know what happened to the
18 other 53,000 on that letter of credit?
19   A. It most likely expired.
20   Q. What would the significance of
21 that be to the account if the letter of
22 credit expired?
23        MR. HOULIHAN: Objection.
24   A. It would be taken out of the
25 reserves for availability.

TSG Reporting - Worldwide    212-702-9580

Page 60

1    Pappalardo
2    Q. Would the loan balance go down?
3    A. No.
4    Q. Why not?
5    A. It was never drawn -- an LC is
6  like a sublimit of your revolver. So if
7  you have an LC outstanding, it basically
8  reduces your availability to borrow on the
9  revolver.
10   Q. So the 110 never shows up on the
11 balance when the LC is issued? Does the
12 balance go up 110 --
13   A. No. What it does, it reduces
14 availability. You can borrow up to 110,000
15 against your revolver.
16   Q. All right. That explains it.
17 Thank you.
18       The next column is bank charges.
19 What is your understanding of that column?
20   A. That is the monthly LC, like
21 commission, just for having the LC open.
22 As you can see in the month of April when
23 the LC was drawn, so the LC amount
24 outstanding was reduced, the fee reduced.
25   Q. And then there's no fee in June,

TSG Reporting - Worldwide    212-702-9580

Page 61

1    Pappalardo
2  right, at least according to this?
3    A. Correct.
4    Q. What does that indicate to you,
5  if anything?
6    A. I don't know. Possibly that the
7  LC expired at that time.
8    Q. The next column is legal. If you
9  can tell me, what is included in the legal
10 column?
11   A. Legal invoices.
12   Q. In connection with the account?
13   A. Yes.
14   Q. Including the litigation in New
15 York?
16   A. Yes.
17   Q. Maybe in Boston?
18   A. I don't know the nature of them
19 without looking at them.
20   Q. What about the next column,
21 miscellaneous charges, do you know what
22 they represent?
23   A. There's a number of things in
24 there.
25   Q. Can you go to each statement and

TSG Reporting - Worldwide    212-702-9580

Page 82

1      Pappalardo
2  debit? Is that what they are, debits?
3      A. They would be debits, yes.
4      Q. And you can identify the page
5  number maybe so we can know what you are
6  talking about.
7      A. GLAN 02398 is a charge that
8  actually occurred on 10/22 but I took my
9  beginning balance as of the end of day on
10 1022 so that 553.07 charge on GLAN 02398 is
11 already included. So that is not broken
12 out.
13     Q. What is a facility fee?
14     A. A facility fee is actually the
15 unused line fee.
16     Q. There's a fee on the amount of
17 the line of credit which is not being used?
18     A. Correct.
19     Q. Why don't you go on to the next
20 one. The next one is GLAN 02401. What
21 about the pages in between, is that all
22 part of the first one?
23     A. I don't know without --
24     Q. All right. Do you know what 2399
25 is?

TSG Reporting - Worldwide    212-702-9580

Page 83

1      Pappalardo
2      A. 2346 -- not of the top of my
3  head. I don't know how it relates to.
4      Q. What is the next page?
5      A. The next page is a page from a
6  client statement, it looks like the last
7  page of the September '01 statement. And I
8  don't know why it's included in the backup.
9      Q. So the next page we're going to
10 talk about is 02401?
11     A. Yes.
12     Q. Is that a miscellaneous debit?
13 Do you know what that $627 figure relates
14 to?
15     A. It's a fee for legal charges. Do
16 you want to see where that coincides on the
17 client statement?
18     Q. Sure. By way of example.
19     A. If you go to GLAN 01522, November
20 8, about halfway down the page, third
21 column from the right, $627.
22     Q. All right. I see, there's an
23 invoice, that's the next page, it's like a
24 supporting document, 02042 supports 02401?
25     A. Correct.

TSG Reporting - Worldwide    212-702-9580

Page 84

1      Pappalardo
2      Q. So the next debit is 02403. What
3  is that?
4      A. That is also a legal charge. And
5  you can see that item on GLAN 01522 right
6  below the other one.
7      Q. All right. Who's providing the
8  legal services on that $216 item?
9      A. That I don't know.
10     Q. Because it says on the next page
11 Larry Siegal. Do you know who Larry Siegal
12 is?
13     A. I don't.
14     Q. Did GMAC have an in-house legal
15 department?
16     A. Yes.
17     Q. You don't know whether Larry
18 Siegal worked for that department?
19     A. I don't know that.
20     Q. What's the next one, which would
21 be 2405? GLAN 2405.
22     A. November 5, you can see that on
23 the client statement a couple lines above
24 the other two that we spoke about, this
25 looks like a charge for UCC searches.

TSG Reporting - Worldwide    212-702-9580

Page 85

1      Pappalardo
2  That's what it appears to me. Legal
3  related.
4      Q. You're getting that information
5  from the following page, 02406?
6      A. That's correct.
7      Q. What page on Exhibit 4 does all
8  that appear on? Did we identify the
9  specific Bates stamp?
10     A. GLAN 01522.
11     Q. What's the next one? Why don't
12 you give us the page number?
13     A. Page number of the backup or
14 of --
15     Q. The backup.
16     A. GLAN 02407. $250. You can also
17 see that on GLAN 01522.
18     Q. Do you know what that represents?
19 It says service charge.
20     A. This I don't know.
21     Q. The next one is 2408.
22     A. Yes.
23     Q. That's another legal research fee
24 dated November 5, '01?
25     A. That's how it appears, yes.

TSG Reporting - Worldwide    212-702-9580

Page 94

Pappalardo

1  
2  example, take a look at page 01517.
3      A. Which balance are you referring
4  to?
5      Q. The column on the right.
6      A. That is the revolver balance.
7      Q. Have you ever heard the term
8  investment used in the factoring business?
9      A. I'm familiar with what the term
10 investment is. It appears on our screens.
11     Q. Can you tell us what your
12 understanding of the term investment on
13 your screens is?
14         MR. HOULIHAN: Objection.
15     Q. If you know.
16     A. Well, it appears in more than one
17 place so I guess I would need to see a
18 sample of the screen.
19     Q. We'll show you a sample later and
20 maybe you can help us out.
21        As you understand, let's take one
22 of these figures, 7,376,884.31 which
23 appears on GLAN 01517. Is that the
24 outstanding balance of the loan?
25     A. Of the revolver.

TSG Reporting - Worldwide   212-702-9580

Page 95

Pappalardo

1  
2      Q. What is the revolver?
3      A. The revolving loan balance.
4      Q. Let me give you a specific
5  hypothetical. If there's a letter of
6  credit outstanding like the 110,000 letter,
7  would that be included in that 7,376,848.31
8  figure?
9      A. No, it would not.
10     Q. Why would it not be?
11     A. It's not part of the loan
12 balance.
13     Q. What is the column -- what are
14 the two columns to the left of the balance
15 column, on GLAN 01517?
16     A. The debits and credits, it's all
17 the transactions that occurred.
18     Q. Let me ask you this question:
19 Again, speaking about that letter of credit
20 that we talked about earlier, would it show
21 up on any of these customer -- client
22 statements?
23         MR. HOULIHAN: Objection.
24     Q. In the ordinary course.
25         MR. HOULIHAN: Off the record.

TSG Reporting - Worldwide   212-702-9580

Page 96

Pappalardo

1  
2        (Discussion off the record.)
3      Q. Let's take the first one. If the
4  letter of credit, the $110,000 is
5  outstanding, would it show up on a client
6  statement?
7      A. If it is undrawn it would not.
8      Q. Let us suppose it's drawn to the
9  tune of $50,000, hypothetically, would it
10 show up?
11     A. The drawn portion would show up.
12     Q. In which column?
13     A. It would show up in the debit
14 column.
15     Q. I'm going to have marked as the
16 next three exhibits what I believe to be
17 screens but I will ask you. One is dated
18 10/22/01, one is dated 10/29/01 and one is
19 dated I believe 12/13/01.
20         (Landay Exhibit 6, screen dated
21 10/22/01, marked for identification, as
22 of this date.)
23         (Landay Exhibit 7, screen dated
24 10/29/01, marked for identification, as
25 of this date.)

TSG Reporting - Worldwide   212-702-9580

Page 97

Pappalardo

1  
2        (Landay Exhibit 8, screen dated
3  12/13/01, marked for identification, as
4  of this date.)
5      Q. Can identify the first one,
6  Exhibit 6?
7          MR. HOULIHAN: You don't have
8  additional copies of these?
9          MR. HOFFMAN: I don't think so.
10         MR. HOULIHAN: What's going to
11 happen to the original at the end of
12 the day?
13         MR. HOFFMAN: I will give you my
14 copies and I will take the originals.
15     Q. Can you identify Exhibit 6?
16     A. Is it LAN 01617?
17     Q. Yes.
18     A. That's what we call the
19 availability screen.
20     Q. Can you explain what the
21 availability screen is?
22     A. The availability screen gives the
23 adjusted balance, all of the reserves or
24 ineligibles, and it comes up with an amount
25 at the bottom where the amount that's

TSG Reporting - Worldwide   212-702-9580

Page 122

1       Pappalardo
2   aside.
3       Are the screen documents still
4   here? We talked about the investment and I
5   just have one additional question.
6       Is the investment figure which
7   appears on the screen documents -- what
8   exhibit do you have in front of you for the
9   record?
10      A. Exhibit 6.
11      Q. Is that the equivalent of the
12  amount owed by the borrower?
13      MR. HOULIHAN: Objection.
14      A. I can't say. I don't know.
15      (Witness and counsel confer.)
16      MR. HOULIHAN: Would the witness
17  like to amend your last answer?
18      Q. Please feel free.
19      A. The answer is no.
20      Q. That investment, to the best of
21  your knowledge, is not the same as the
22  investment on the screen, like on Exhibit 6
23  is not the same amount as the amount owed;
24  is that to the best of your understanding?
25      A. Yes.

TSG Reporting - Worldwide    212-702-9580

Page 123

1       Pappalardo
2       Q. Do you know how it differs to the
3   amount owed?
4       A. He would not owe the amount for
5   the letter of credit unless it was drawn.
6       Q. Is that the only difference as
7   you understand it between the investment
8   figure on a screen like you have in front
9   of you, Exhibit 6, and the amount owed by
10  the borrower?
11      MR. HOULIHAN: Objection.
12      A. I don't know.
13      Q. But you do know that it would not
14  be the same because the investment figure
15  includes the outstanding letter of credit?
16      MR. HOULIHAN: Objection.
17      A. Correct.
18      Q. Are you aware of the fact that at
19  a certain point in time -- at several
20  points in time in the year 2000 GMACCF
21  Commercial Credit engaged a company called
22  RAS to do some work for it?
23      MR. HOULIHAN: In the year 2000?
24      MR. HOFFMAN: 2001. I'm sorry.
25  My mistake.

TSG Reporting - Worldwide    212-702-9580

Page 124

1       Pappalardo
2       A. I'm aware of it.
3       Q. Do you know what the purpose of
4   retaining RAS was?
5       MR. HOULIHAN: Objection.
6       A. My understanding, it was to
7   liquidate the inventory.
8       Q. In the course of that work, did
9   you become aware that in the course of that
10  work RAS submitted reports to various
11  GMACCF personnel?
12      A. I'm aware that reports were
13  submitted.
14      Q. Are you aware that prior to its
15  being retained as liquidators, that RAS was
16  also retained some months earlier to do a
17  liquidation analysis on behalf of GMACCF?
18      A. I'm aware of it.
19      Q. Are you also aware of the fact
20  that they did a cash flow projection on
21  behalf of GMACCF on or about July of 2001?
22      A. I'm not aware of that.
23      (Landay Exhibit 25, document,
24  marked for identification, as of this
25  date.)

TSG Reporting - Worldwide    212-702-9580

Page 125

1       Pappalardo
2       (Landay Exhibit 26, Seneca
3   Sports, Inc. liquidation analysis as of
4   June 30, 2001, marked for
5   identification, as of this date.)
6       (Landay Exhibit 27, memo to Doug
7   Rainville dated 7/20/2004, marked for
8   identification, as of this date.)
9       (Landay Exhibit 28, report from
10  John Rijo dated October 19, 2001,
11  marked for identification, as of this
12  date.)
13      (Landay Exhibit 29, memo dated
14  October 22, 2001, marked for
15  identification, as of this date.)
16      (Landay Exhibit 30, memo dated
17  October 23, 2001, marked for
18  identification, as of this date.)
19      (Landay Exhibit 31, memo dated
20  October 24, 2001, marked for
21  identification, as of this date.)
22      (Landay Exhibit 32, memo dated
23  October 25, 2001, marked for
24  identification, as of this date.)
25      (Landay Exhibit 33, memo dated

TSG Reporting - Worldwide    212-702-9580

Page 162

1    Pappalardo
2  not utilize that document in any damage
3  calculation that you've done on behalf of
4  GMACCF?
5    A.  That's correct.
6    Q.  I want to go back to your answers
7  to interrogatories briefly.  This is an
8  answer to response to interrogatory number
9  1C.  I will just -- I will read into the
10 record a portion of it.  Maybe counsel has
11 his copy there.  Do you --
12       THE WITNESS:  This is Exhibit 52.
13       (Discussion off the record.)
14   Q.  I will show you Exhibit 49 which
15 is the answers to interrogatories.  I will
16 read a certain portion of it into the
17 record and just ask you if I read
18 correctly.
19       "To the best of GMACCF's
20 knowledge, all of the records of GMACCF
21 seized from the borrowers on or about
22 October 22, 2001 either have been produced
23 to Landay in connection with the New York
24 action and this litigation or are still in
25 the storage facility referenced by Mr. Rijo
     TSG Reporting - Worldwide   212-702-9580

Page 163

1    Pappalardo
2  at his deposition," and it says, "See
3  GMACCF's RESP.2b above.  The facility is
4  called Armor Self Storage and is located at
5  498 Fortune Boulevard in Milford, Mass."
6       Do you see that?
7    A.  Yes.
8    Q.  Did I read that correctly to the
9  best of your knowledge?
10   A.  Yes.
11   Q.  When did you personally become
12 aware of the fact that there might be
13 certain documents in a storage facility
14 which had been seized by GMACCF from the
15 borrowers on October 22, 2001?
16   A.  When we were preparing the
17 responses to the interrogatories.
18   Q.  In the Boston case?
19   A.  Yes.
20   Q.  If you became aware of it from
21 someone other than counsel, who did you
22 become aware of it from?
23   A.  It wasn't from someone other than
24 counsel.
25   Q.  Have you read the Rijo deposition
     TSG Reporting - Worldwide   212-702-9580

Page 164

1    Pappalardo
2  yourself?
3    A.  I glanced through it.
4    Q.  Was that in connection with the
5  answers to interrogatories or preparation
6  for this deposition or was it before that?
7    A.  In preparation.
8    Q.  For this deposition?
9    A.  Yes.
10   Q.  I'm going to read from another
11 portion of the answers to interrogatories
12 which is Exhibit 49.  This is on page 12
13 and it's a part of a response to
14 interrogatory number 2a, 2b, 2c and 2f.  I
15 will read the last line.  It says "GMACCF
16 also states that as of October 22, 2001,
17 the total amount of accounts receivables
18 owed to the borrowers was $869,885.82.
19 GMACCF collected 588,000."
20       Did I read that correctly?
21   A.  Yes.
22   Q.  Can you tell me the source of the
23 figure for total amount of accounts
24 receivables owed to the borrowers as of
25 October 22, 2001?
     TSG Reporting - Worldwide   212-702-9580

Page 165

1    Pappalardo
2    A.  It's in the GLAN -- it's in the
3  produced -- the screen print that we were
4  looking at earlier.  If you can give that
5  to me I can show it to you.
6    Q.  This would be Exhibit 6 I
7  believe.
8    A.  Yes.
9    Q.  Does that figure appear on
10 Exhibit 6?
11   A.  Accounts receivable outstanding
12 869,885.82.
13   Q.  When you did that damages
14 calculation, did you have a screen for that
15 date?  For 10/22/01?
16   A.  Yes.
17   Q.  Do you know whether it was one
18 that Mr. Landay produced in the New York
19 litigation or it was some other copy of it?
20   A.  I don't know.
21   Q.  But you used that as the -- you
22 didn't use that in your damage calculation?
23   A.  No.
24   Q.  But you used it to answer the
25 interrogatories?
     TSG Reporting - Worldwide   212-702-9580