# EXHIBIT 19

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF MASSACHUSETTS
 3
 4    - - - - - - - - - - - - - - x
 5   DAVID L. LANDAY,
 6         Plaintiff,              Civil Action
 7   vs.                           No. 04-CV-11955-WGY
 8   GMACCF COMMERCIAL CREDIT, LLC,
 9   and GMACCF COMMERCIAL
10   FINANCIAL, LLC.,
11         Defendants.
12    - - - - - - - - - - - - - - x
13
14       DEPOSITION OF JOHN RIJO, a witness called by and
15   on behalf of the Plaintiff, taken pursuant to the
16   provisions of the Federal Rules of Civil Procedure,
17   before Dana Welch, a Registered Professional Reporter
18
19   and Notary Public in and for the Commonwealth of
20
21   Massachusetts, at the offices of Lynch Brewer, 101
22
23   Federal Street, Boston, Massachusetts, on Monday,
24
25   November 14, 2005, commencing at 9:46 a.m.
```

Page 34

1  A   That's not my responsibility. I'm sure he has, but
2      I can't say what those were or when they were.
3  Q   Okay. What -- as you understood it, what was your
4      initial assignment regarding Seneca?
5  A   To my recollection, it was to go in and review the
6      company and perform a liquidation analysis.
7  Q   Okay. And what did you do to carry out that
8      assignment?
9  A   I met with Dick Sebastiao, discussed the project,
10     and walked through the data that we'd be looking
11     at, the analysis we'd be preparing and perform
12     certain analyses and work with Dick to prepare to
13     write up the liquidation analysis.
14         (Proceedings interrupted at 10:27 a.m.
15     and reconvened at 10:40 a.m.)
16     BY MR. HOFFMAN:
17 Q   All right. In connection with that work, can you
18     tell us approximately how many days you spent on
19     the premises of Seneca?
20     MR. HOULIHAN: Objection.
21     THE WITNESS: As part of that initial
22     write up?
23     BY MR. HOFFMAN:
24 Q   Yes.
25 A   Again, I'd have to go back to the specific

TSG Reporting - Worldwide   212-702-9580

Page 35

1      invoices, but it was somewhere between a week to
2      two weeks.
3  Q   Okay. And did you talk to any company employees?
4  A   Yes.
5  Q   Okay. Do you recall which company employees you
6      talked to?
7  A   Would have been several, David Landay, Neil
8      Finkelstein, Barry Hutch, Cindy Foscarota. Might
9      be mispronouncing certain names. Various other
10     people.
11 Q   Do you recall what you spoke to Barry Hutch about?
12 A   Typically, Barry was the accounts receivable
13     collections person. So it would have been going
14     through the receivable balances, trying to identify
15     which accounts had problems, just get an
16     understanding of the different accounts.
17 Q   Were the company employees that you talked to
18     cooperative with you?
19 A   Yes.
20 Q   Did you tell any of the company employees what your
21     purpose was in coming in to Seneca and talking to
22     them?
23     MR. HOULIHAN: Objection.
24     THE WITNESS: I don't recall what I
25     specifically said at that time.

TSG Reporting - Worldwide   212-702-9580

Page 36

1  BY MR. HOFFMAN:
2  Q   Do you recall whether you told any of the company
3      employees that you were -- your assignment was to
4      conduct a liquidation analysis?
5  A   I don't recall ever saying that.
6  Q   I'm sorry?
7  A   I don't recall ever saying that to any of the
8      specific employees at that time.
9  Q   Okay. Do you recall anything you said to any of
10     the employees about what your -- the reason you
11     were on the premises?
12 A   The specific reason, no, I don't recall what I
13     would have said and what my actual conversations
14     were related to that.
15 Q   Okay. I'm going to show you what I've had
16     premarked Exhibit 121. Can you identify
17     Exhibit 121?
18 A   Yes.
19 Q   And what is Exhibit 121?
20 A   This appears to be the liquidation analysis we were
21     just discussing.
22 Q   Is that the one that you produced?
23 A   It would have been.
24     MR. HOULIHAN: Objection.
25     THE WITNESS: In combination with myself

TSG Reporting - Worldwide   212-702-9580

Page 37

1      and Dick Sabastiao.
2      BY MR. HOFFMAN:
3  Q   Was that done in the regular course of the business
4      of RAS?
5  A   Yes.
6  Q   Do you recall whether it was transmitted to GMAC?
7  A   I believe it was, to the best of my knowledge.
8  Q   Now, there are a number of exhibits to this
9      document. Can you tell me what each of the
10     exhibits is and who prepared each one as between
11     yourself and someone employed by Seneca?
12     MR. HOULIHAN: Objection.
13     THE WITNESS: Exhibit 1 is just the
14     liquidation summary, which would have been prepared
15     by RAS.
16     BY MR. HOFFMAN:
17 Q   Okay.
18 A   Exhibit 2 is the accounts receivable analysis,
19     which again, would have been prepared by RAS, given
20     the books and record information that was provided
21     to us by the company; but the actual physical
22     document was prepared by RAS.
23 Q   Okay.
24 A   Next one is just an inventory, a net summary
25     liquidation value of the inventory, that again, was

TSG Reporting - Worldwide   212-702-9580

Page 114

```
 1    abandoned," correct?
 2  A  Yes.
 3  Q  On the second page of this exhibit, paragraph
 4     three, you wrote, under File and Storage, "All
 5     applicable office records were removed from
 6     Seneca's offices on Wednesday and placed into a
 7     local storage facility. All storage facility
 8     documentation and keys will be forwarded to the
 9     GMAC Boston office." Did I read that correctly?
10  A  Yes.
11  Q  And did you do that; did you send the keys to the
12     Boston office?
13  A  Yes.
14  Q  And that was Exhibit 153?
15  A  Three.
16  Q  All right. Exhibit 154 is a memo to Jane Frangos
17     dated November 26, 2001. Is Exhibit 154 to the
18     best of your recollection the final report you made
19     in connection with the liquidation?
20  A  To the best of my recollection, it was the last
21     memo. There's probably other correspondence in
22     some e-mails, but I believe this was the last
23     official board memo.
24  Q  Did you ever calculate the total dollar value of
25     the inventory that you were able to sell in the
```
TSG Reporting - Worldwide    212-702-9580

Page 115

```
 1     liquidation?
 2  A  Yes.
 3  Q  And --
 4        MR. HOULIHAN: Objection.
 5  BY MR. HOFFMAN:
 6  Q  Do you know what that total dollar value is or was?
 7        MR. HOULIHAN: Objection.
 8        THE WITNESS: Off the top of my head, I
 9     don't have the exact number; but I know there was
10     an exhibit.
11  BY MR. HOFFMAN:
12  Q  One that we looked at?
13  A  No. We haven't looked at it.
14  Q  We haven't looked at it today?
15  A  I haven't seen it today.
16  Q  What was the nature of the exhibit?
17  A  It was a liquidation summary exhibit.
18  Q  Okay. Was this prepared contemporaneous with these
19     reports that you were making that you looked at
20     today or was it prepared at some later date?
21  A  I think it was probably prepared in conjunction
22     with one of these final memos.
23  Q  And it isn't in the pile?
24  A  No, not that I -- I haven't seen it.
25  Q  I'm going to give you some figures to see if these
```
TSG Reporting - Worldwide    212-702-9580

Page 116

```
 1     figures refresh your recollection. And if they do,
 2     great; if they don't, tell me. But I have some
 3     figures here that say gross sales 312,064; gross
 4     collections 304,493. Do those figures refresh your
 5     memory as to the approximate numbers?
 6  A  They sound familiar; but again, without that, I
 7     really wouldn't want to specifically say without
 8     seeing that summary exhibit.
 9  Q  Okay. All right. What did this particular exhibit
10     that we can't find look like?
11        MR. HOULIHAN: Objection. You can
12     answer.
13        THE WITNESS: We -- the cover page had --
14     when I've seen it presented to me in the past in my
15     prior deposition and at prior testimony. It had a
16     little one page handwritten note with the summary
17     stapled to it. And one behind it was a one page
18     Excel spreadsheet that listed the customers on the
19     side and the details on the sales across kind of
20     the general matrix.
21  BY MR. HOFFMAN:
22  Q  Okay. You had a deposition in the New York case
23     years ago, correct?
24  A  Correct.
25  Q  Was it presented as an exhibit at that deposition?
```
TSG Reporting - Worldwide    212-702-9580

Page 117

```
 1  A  Yes. To the best of my knowledge, yes.
 2  Q  Was it also presented at the trial in New York?
 3  A  Yes.
 4  Q  Okay. All right. Oh, maybe this is it. A, what
 5     do you know. I'm going --
 6        (Exhibit No. 162 marked for
 7     identification.)
 8  BY MR. HOFFMAN:
 9  Q  I'll tell you what I just covered up, Mr. Einstein,
10     when the exhibits were coming in, put the exhibit
11     number. But let's see whether this is --
12        MR. HOULIHAN: I take it we haven't seen
13     or the witness hasn't seen Exhibits 154 through
14     162?
15        MR. HOFFMAN: What was the last one we
16     looked at? 154, I think.
17        THE WITNESS: 154 was the last one.
18        MR. HOULIHAN: So he hasn't seen 155.
19     155 is the forbearance agreement.
20  BY MR. HOFFMAN:
21  Q  Let me show you Exhibit 162. Can you identify
22     Exhibit 162?
23  A  Yes. I believe this is the summary of the sales
24     that I was just referencing.
25  Q  And in accordance with your testimony, you created
```
TSG Reporting - Worldwide    212-702-9580

Page 118

1  that summary sometime back in 2001?
2  A  Yes.
3  Q  And did you send it to GMAC?
4  A  I believe so.
5  Q  All right. And there's a column that says, "sale
6     as a percent of cost." Can you identify what that
7     column means?
8  A  That is the value of the sale, divided by the
9     original cost value of the item.
10 Q  Is that -- and do you know what the original cost
11    was based on; was it wholesale cost?
12 A  The company's books and records, the book value of
13    the inventory, based upon the company's records.
14 Q  Okay. Thank you. And you believe that this is the
15    sum total of the liquidation proceeds that you were
16    able to obtain during the October/November
17    liquidation of the inventory?
18 A  I don't --
19    MR. HOULIHAN: Objection.
20    THE WITNESS: In looking at this now, I
21    don't see anything that's missing in terms of the
22    sale that was consummated.
23    BY MR. HOFFMAN:
24 Q  Okay. And can you -- can you tell us -- were all
25    these sales cash on delivery or cash in advance?

TSG Reporting - Worldwide    212-702-9580

Page 119

1  A  Can I review it?
2  Q  Yeah. Please.
3  A  They were all cash in advance except for the JC
4     Penny one. And I'd have to go back to the specific
5     invoice, but I think that one ultimately got out,
6     got released on like an expedited seven-day term.
7  Q  Okay. What was the circumstance of doing that with
8     JC Penny?
9  A  That was probably because it was for 100 percent of
10    cost, but primarily it was all Mattel licensed
11    product. And at this point, we were extremely
12    concerned about our ability to ship out any Mattel
13    licensed product, if an injunction was placed on
14    the product. So based upon my conversations with
15    Dick and Jane, Jane got comfortable to release this
16    one out on terms, given the other issues associated
17    with their product. It was better than letting it
18    sit in the warehouse and possibly have an
19    injunction placed on it.
20 Q  Okay. The last question on this, why was there a
21    difference between the net collection and gross
22    collection?
23 A  For these -- for these Name Brand and Olympia, I
24    believe they had an outstanding receivable balance
25    outstanding at the time I consummated these sales.

TSG Reporting - Worldwide    212-702-9580

Page 120

1  So prior to shipping them, any of the new goods, we
2  required that they pay their full balance on the
3  receivables to ensure if there were any damages,
4  mishipments, shortages, et cetera, they wouldn't
5  have any right to offset their other receivable.
6  And just to ensure collection, that they weren't
7  already planning to not pay for that receivable.
8  So in order to get these goods, they have to pay
9  for those goods, as well as all the past due
10 balances; and as compensation for that, we offered
11 them a three percent discount.
12 Q  On the --
13 A  On the total value.
14 Q  Of the two sets?
15 A  Right. So for example, the original sale was
16    13,950, but they only had -- we only accepted
17    13,532, three percent discount off that. And then
18    if their receivable balance was, say 10,000, they
19    would have paid that at the same time, at
20    97 percent.
21 Q  Are the collections of the receivable balance in
22    that exhibit?
23 A  No. This is just the inventory liquidation
24    summary.
25 Q  And which company was that with that we were just

TSG Reporting - Worldwide    212-702-9580

Page 121

1  talking about?
2     MR. HOULIHAN: Objection.
3     THE WITNESS: That I was talking about
4     the discounts?
5     BY MR. HOFFMAN:
6  Q  Yeah. Which company?
7  A  I believe it's the top two that have the three
8     percent on the column.
9  Q  It says Name Brand and then Name Brand II?
10 A  Name Brand and then Olympia.
11 Q  Oh, Olympia, also?
12 A  I believe Olympia has it. Yeah, as the top three
13    and then there's the discount.
14 Q  I see. Okay. Does that account for the entire
15    $8,000 difference or are there other items?
16 A  Oh, I'm sorry. Yeah, I didn't see the one at the
17    very bottom. Leon Korol, who purchased the
18    inventory located at the Toledo warehouse and was
19    very hesitant about paying cash in advance as well.
20    Basically once we got to the final price, 121, we
21    offered them as much as a five percent discount to
22    pay in advance.
23 Q  Okay. All right.
24 A  I'm not sure, again I'd have to go back. I don't
25    have the receivables records on me, but it might

TSG Reporting - Worldwide    212-702-9580