# EXHIBIT 24

Page 1

VOL. I, PAGES 1 - 150

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-CV-11955-WGY

DAVID L. LANDAY

            Plaintiff

V.

GMAC COMMERCIAL CREDIT, LLC and

GMAC COMMERCIAL FINANCE, LLC

            Defendants

- - - - - - - -

Deposition of Keith D. Lowey

Thursday, October 20, 2005

10:34 a.m.

Edwards & Angell, LLP

101 Federal Street

Boston, Massachusetts

- - - - - - - -

Reporter: Deborah Roth, RPR/CSR

### Page 22

```
10:59:09  1      A. The company or someone wanting to free up
10:59:13  2   the inventory on the company's behalf.
10:59:17  3      Q. Did Mr. Finkelstein indicate that Seneca or
10:59:23  4   Brookfield had engaged in that practice at some
10:59:27  5   point prior to October 22?
10:59:28  6      A. Yes.
10:59:37  7      Q. Did you ask Mr. Finkelstein whether he was
10:59:43  8   aware of any effort that was made to access a
10:59:50  9   smaller portion of the inventory in storage after
10:59:59 10   October 22?
11:00:01 11      A. What he told me was that he was not
11:00:04 12   consulted in any way and does not know what efforts
11:00:08 13   Mr. Rijo did. He pretty much worked on his own and
11:00:11 14   didn't involve himself at all.
11:00:13 15      Q. So for as you are aware, Mr. Finkelstein
11:00:18 16   has no knowledge as to whether or not GMAC made any
11:00:21 17   effort to strike a similar sort of resolution to
11:00:27 18   the one that he described?
11:00:28 19      A. That's correct.
11:00:29 20      Q. Because Mr. Finkelstein has no knowledge on
11:00:33 21   that point, I assume you have no knowledge on that
11:00:35 22   point?
11:00:35 23      A. Only what I read in the regional memos.
11:00:38 24      Q. Prior to preparing the portion of your
```

### Page 23

```
11:00:55  1   report that relates to usury, did you read the
11:01:00  2   factoring agreement between GMAC and Seneca-
11:01:06  3   Brookfield?
11:01:06  4      A. I'm sorry, could you repeat the question.
11:01:09  5      Q. Sure. In connection with preparing the
11:01:17  6   portion of your report that relates to the usury
11:01:21  7   issue, did you read the factoring agreement between
11:01:26  8   GMAC and Seneca-Brookfield?
11:01:28  9      A. I definitely looked at it. I'm not sure I
11:01:32 10   read every page, but I definitely looked at it,
11:01:35 11   yes.
11:01:35 12      Q. How about the forbearance agreement between
11:01:41 13   GMAC and Seneca-Brookfield, did you read that
11:01:44 14   document in connection with the preparation of the
11:01:47 15   usury portion of your report?
11:01:48 16      A. Again, I looked at it. I don't think I
11:01:53 17   read the entire agreement.
11:01:56 18      Q. Do you believe that either of those
11:01:58 19   documents have any bearing on the usury analysis?
11:02:02 20      A. They certainly could. It doesn't affect
11:02:20 21   what I -- the period of time that I utilize in my
11:02:24 22   report, but in general, it could.
11:02:27 23      Q. Did you consult with any attorneys
11:02:29 24   concerning the interpretation of the usury statute?
```

### Page 24

```
11:02:35  1      A. No.
11:02:35  2      Q. Did I consult with any attorneys concerning
11:02:38  3   any aspect of the usury section of your report?
11:02:44  4      A. I spoke to Mr. Hoffman about it.
11:02:48  5           If I correct my earlier statement, I
11:02:51  6   spoke to Mr. Hoffman, who is an attorney, but he is
11:02:53  7   the only one.
11:02:55  8      Q. Did Mr. Hoffman indicate to you how he
11:03:19  9   believed the usury statute should be interpreted?
11:03:23 10      A. He gave me some very broad guidelines, but
11:03:29 11   specifically, no.
11:03:31 12      Q. Did you take Mr. Hoffman's views concerning
11:03:43 13   the interpretation of the usury statute into
11:03:47 14   consideration in preparing your report?
11:03:48 15      A. Yes.
11:03:52 16      Q. What did Mr. Hoffman tell you concerning
11:03:57 17   the broad guidelines of how the usury statute
11:04:00 18   should be interpreted?
11:04:00 19      A. All Mr. Hoffman really did was clarify what
11:04:05 20   the statute said, which is you can take a look at
11:04:10 21   the usury period -- it's undefined in the statute,
11:04:15 22   and you can look at it from up -- as small a period
11:04:19 23   as a day and a much broader period, which led me to
11:04:24 24   have to give it some extensive thought as to what
```

### Page 25

```
11:04:26  1   period we would present in the report and what made
11:04:30  2   sense.
11:04:53  3      Q. Can you explain for me, Mr. Lowey, how the
11:05:31  4   usury statute would work when viewed from as small
11:05:39  5   a period of time as one day?
11:05:41  6      A. Well, you would have to figure out what the
11:05:48  7   -- assuming there was a payment made relative to a
11:05:51  8   loan -- you would need to take that disbursement as
11:05:55  9   a percentage of that outstanding balance for that
11:05:57 10   day, and annualize the rate as to what that would
11:06:04 11   be, represented on an annualized basis.
11:06:16 12      Q. When you say "on an annualized basis," what
11:06:25 13   do you mean?
11:06:25 14      A. To calculate what the interest rate would
11:06:31 15   be in terms of over the full course of a year. So
11:06:34 16   as if that same activity would have happened
11:06:37 17   consistently over a 360- or 365-day basis,
11:06:41 18   depending on how the specific calculation is being
11:06:45 19   done.
11:06:48 20      Q. Which would you use, a 360-day basis or a
11:06:52 21   365-day basis?
11:06:53 22      A. Well, in this particular case, the loan
11:06:59 23   agreement calls for interest to be calculated on a
11:06:59 24   365-day basis, so that's what we used.
```

**Page 38**

```
11:31:24  1  all other factors the same -- that would have an
11:31:26  2  impact of lowering the annualized effective
11:31:30  3  interest rate?
11:31:30  4     A. Assuming no other transaction happened
11:31:32  5  after that time, yes.
11:31:44  6     Q. And in your report you say that you ignored
11:31:47  7  the period from February 1, '03 through to the
11:31:56  8  writeoff date of November 24, '03.
11:32:00  9         Why did you feel that was appropriate?
11:32:01 10     A. There wasn't any significant activity that
11:32:05 11  had occurred on the loan based on the detailed
11:32:09 12  analysis we did of all of the loan transactions
11:32:13 13  that occurred.
11:32:13 14         So I wasn't sure -- there was no
11:32:16 15  information to provide -- that I became aware of as
11:32:20 16  why to GMAC had written off the loan as of December
11:32:26 17  '03. I believe it was December or late November of
11:32:28 18  '03.
11:32:29 19         I didn't know whether it was arbitrary
11:32:31 20  or what. I was just going to cut it at the last
11:32:36 21  transaction, the month that that occurred.
11:32:40 22     Q. Supposing that I were to ask you to
11:32:43 23  recalculate the annualized effective interest rate
11:32:49 24  using different periods of time, but keeping all
```

**Page 39**

```
11:32:53  1  other factors of your report the same, other than a
11:33:00  2  calculator, what would you need to do that?
11:33:06  3     A. You would need certainly to define the
11:33:08  4  period we wanted to look at, and just a calculator,
11:33:20  5  perhaps a calendar.
11:33:44  6     Q. I would like to turn now to Exhibit D.
11:34:31  7         Where did you find the data to -- that
11:34:37  8  falls under the heading "Cumulative Charges"?
11:34:42  9     A. That is the sum of the column that's
11:34:49 10  identified as "Monthly Charges," which is the third
11:34:54 11  column on the left.
11:34:56 12     Q. And where did you get the data for the
11:35:01 13  monthly charges?
11:35:02 14     A. That came off our analysis, the more
11:35:06 15  detailed analysis that we discussed earlier.
11:35:10 16     Q. Have you provided us with a copy of that
11:35:13 17  detailed analysis? Was that among the materials
11:35:15 18  that you produced?
11:35:16 19     A. No.
11:35:17 20         MR. HOULIHAN: I would like to have a
11:35:21 21  copy of that document.
11:35:22 22         MR. HOFFMAN: I have one here
11:35:25 23  (indicating). You can have it photocopied. Do you
11:35:33 24  want to have that photocopied?
```

**Page 40**

```
11:39:57  1         (A recess was taken from
11:39:59  2         11:35 to 11:39 a.m.)
11:40:58  3     Q. Mr. Lowey, I would like you to turn to
11:41:03  4  Exhibit 4, and to the page that bears the Bates
11:41:12  5  number GLAN 01540.
11:41:29  6         Do you have that page?
11:41:29  7     A. Yes, I do.
11:41:30  8     Q. Do you remember looking at this particular
11:41:33  9  page in preparing your usury analysis?
11:41:35 10     A. I don't.
11:41:39 11     Q. Do you see that under the column it looks
11:41:43 12  like "Debit," there is an entry for $56,908.22?
11:41:50 13     A. Yes.
11:41:51 14     Q. Do you know what that was?
11:41:56 15     A. I believe that was a charge against the
11:42:00 16  loan for either a royalty or commission that was
11:42:03 17  due to Disney against a letter of credit.
11:42:14 18     Q. Is that charge included in your total
11:42:25 19  monthly charges for April 2002?
11:42:27 20     A. I'm not sure. If I could look at the
11:42:35 21  analysis that is getting copied now, I might be
11:42:38 22  able to tell you.
11:42:39 23     Q. Okay. Let's wait until that gets back.
11:42:45 24         One other question. Did you read the
```

**Page 41**

```
11:42:51  1  portion of Ms. Pappalardo's deposition testimony
11:42:54  2  where she discussed that $56,908.22 figure?
11:43:02  3     A. I recall seeing it, yes.
11:43:05  4         MR. HOFFMAN: That reference to that
11:43:32  5  figure, is that January or is it April?
11:43:35  6         MR. HOULIHAN: April.
11:43:36  7         MR. HOFFMAN: Okay. It's hard to read.
11:44:01  8     Q. Mr. Lowey, I am going to read you some
11:44:04  9  testimony from Ms. Pappalardo's deposition for
11:44:09 10  Thursday, August 18, 2005, and I am going to read
11:44:14 11  from Pages 58 and 59, and I am going to start with
11:44:26 12  Line 15 on Page 58.
11:44:29 13         "Question: Next one is LC charge.
11:44:45 14  What is that? Is that a letter of credit
11:44:48 15  charge?
11:44:48 16         "Answer: Letter of credit charge.
11:44:52 17         "Question: Are you familiar with a
11:44:55 18  Disney letter of credit that may have been
11:44:57 19  involved in the account?
11:44:59 20         "Answer: I'm familiar with the letter
11:45:02 21  of credit that was roughly -- excuse me -- that
11:45:07 22  was originally $110,000. I don't know that it
11:45:11 23  was Disney.
11:45:12 24         "Question: So are you familiar with a
```

### Page 42

```
11:45:15  1    $110,000 letter of credit?
11:45:18  2         "Answer: Yes."
11:45:22  3         I am now on Page 59.
11:45:23  4         "Question: What does this particular
11:45:26  5    charge -- does this charge relate to that 110?
11:45:31  6         "Answer: The $56,908.22 was drawn on a
11:45:39  7    portion of that LC. The draw, plus, I think,
11:45:43  8    there were some minimal charges in there.
11:45:47  9         "Question: So that would increase the
11:45:50 10    loan balance, correct?
11:45:52 11         "Answer: Correct."
11:45:55 12         Based on that testimony, what is your
11:45:58 13    understanding of the nature of the $56,908.22
11:46:06 14    charge?
11:46:07 15    A. It was an advance against the loan.
11:46:11 16    Q. In effect, an advance of principal?
11:46:19 17    A. Yes.
11:46:19 18    Q. Additional loan?
11:46:20 19    A. Yes.
11:46:20 20    Q. As an advance of principal, additional
11:46:25 21    loan, is it properly included as interest or other
11:46:30 22    charges under the usury statute?
11:46:32 23    A. It shouldn't be.
11:46:48 24         EXHIBIT NO. 102 MARKED
```

### Page 43

```
11:47:03  1    Q. Mr. Lowey, I have just handed you a
11:47:06  2    document that we have marked as Exhibit 102.
11:47:08  3         First of all, can you identify that
11:47:10  4    document for me?
11:47:12  5    A. This is a schedule that we prepared that
11:47:15  6    summarizes all of the loan activity from inception
11:47:19  7    to the date of the writeoff.
11:47:24  8    Q. By reference to Exhibit 102, can you tell
11:47:28  9    me whether the charge for the $56,908.22 that we
11:47:36 10    have just identified as an advance of additional
11:47:42 11    principal on the loan is included as a charge in
11:47:45 12    your analysis?
11:47:45 13    A. I believe it is.
11:47:55 14    Q. Can you show me where it appears?
11:47:57 15    A. It appears as though it is included in the
11:48:02 16    number $68,590.19 for the period April 1st, 2002
11:48:13 17    through April 30, 2002.
11:48:17 18    Q. And what page of Exhibit 102 are you
11:48:20 19    referring to?
11:48:20 20    A. Page 22.
11:48:29 21    Q. So the $56,908 appears on that page in the
11:48:46 22    fourth or fifth column opposite the date 4/02/02?
11:48:52 23    A. In the third column, identified as "Monthly
11:48:56 24    Charges."
```

### Page 44

```
11:48:56  1    Q. Your testimony is that that is an error?
11:49:00  2    A. That's correct.
11:49:25  3         EXHIBIT NO. 103 MARKED
11:49:36  4    Q. Mr. Lowey, do you recognize Exhibit 103?
11:49:41  5    A. I do.
11:49:42  6    Q. What is it?
11:49:43  7    A. It's the usury statute.
11:49:50  8    Q. Can you direct me to that portion of the
11:49:52  9    statute that you considered in determining what to
11:50:01 10    include as interest in your analysis?
11:50:05 11    A. In the first paragraph, it identifies in a
11:50:11 12    sentence that, "For the purposes of this section,
11:50:13 13    the amount to be paid upon any loan for interest or
11:50:16 14    expenses shall include all sums paid or to be paid
11:50:18 15    by or on behalf of the borrower for interest,
11:50:20 16    brokerage, recording fees, commissions, services,"
11:50:23 17    and it continues through the end of that sentence.
11:50:26 18    Q. Okay. That's the sentence that you looked
11:50:31 19    to to determine what constituted interest for the
11:50:36 20    purposes of statute?
11:50:37 21    A. To do our calculation, yes.
11:50:42 22    Q. And I take it that you in your analysis
11:50:48 23    included as interest items other than just
11:50:50 24    interest?
```

### Page 45

```
11:50:50  1    A. Yes.
11:50:53  2    Q. Other than just interest, what kind of
11:50:55  3    charges did you include?
11:50:56  4    A. We essentially, from the analysis that we
11:51:00  5    prepared, the items that we included was everything
11:51:09  6    other than the items included in the column marked
11:51:13  7    "Advances."
11:51:15  8    Q. So if it wasn't an advance, you treated it
11:51:22  9    as a properly includable charge?
11:51:26 10    A. More specifically, we included the items in
11:51:29 11    the column "Interest," and I'm referring to Exhibit
11:51:33 12    102.
11:51:34 13    Q. Okay.
11:51:35 14    A. The column heading marked "Interest, Bank
11:51:37 15    Charges/LOC Fees, Miscellaneous, Last Journal Entry
11:51:44 16    Fees, Month and Charge on Sales," and I believe
11:51:51 17    that's it.
11:51:58 18    Q. In connection with preparing the usury
11:52:00 19    portion of your analysis -- I apologize if I asked
11:52:10 20    this question before -- did you read any case law?
11:52:12 21    A. No.
11:52:15 22    Q. In connection with preparing your usury
11:52:18 23    analysis, did you review any commentary on the
11:52:23 24    usury statute?
```

33de74b2-bc41-4018-a87f-26ccf352bf70

### Page 46

```
11:52:23  1     A. No.
11:52:24  2     Q. Okay. Do you know whether or not the usury
11:52:33  3  statute is a criminal statute?
11:52:34  4     A. All I know is what it says in the statute.
11:52:40  5  It says, "criminal usury." Whether it is criminal
11:52:42  6  or civil, I don't know.
11:52:45  7     Q. Assume for the stake of this question,
11:52:55  8  Mr. Lowey, that the usury statute is a criminal
11:52:58  9  statute.
11:53:00 10         Do you know what significance, if any,
11:53:02 11  that that fact might have in terms of the
11:53:05 12  interpretation and application of the statute?
11:53:09 13     A. No.
11:53:12 14     Q. Do you know whether or not there are any
11:53:29 15  charges for legal fees included among the
11:53:32 16  miscellaneous charges?
11:53:34 17     A. Yes.
11:53:36 18     Q. Are there legal fees included among the
11:53:39 19  miscellaneous charges?
11:53:40 20     A. Yes.
11:53:40 21     Q. Do you have a view as to whether or not it
11:54:17 22  is appropriate to include legal fees as interest
11:54:25 23  within the meaning of the Massachusetts usury
11:54:31 24  statute?
```

### Page 47

```
11:54:31  1     A. We did consider them as part of our
11:54:34  2  calculation.
11:54:35  3     Q. Why?
11:54:35  4     A. We interpreted the statute -- where it
11:54:41  5  identifies services on behalf of -- to be paid on
11:54:45  6  behalf of the borrower for interest, et cetera.
11:54:48  7         We had also -- I recall having a
11:54:52  8  conversation -- that my initial interpretation --
11:54:54  9  and I did ask Mr. Hoffman for a clarification as to
11:54:59 10  whether or not those were appropriately included,
11:55:02 11  as we had done, and he had indicated yes.
11:55:04 12     Q. So Mr. Hoffman told you that in his view it
11:55:08 13  was appropriate to include attorneys fees?
11:55:11 14     A. Yes.
11:55:13 15     Q. Can you point me to the language that you
11:55:15 16  relied upon in the statute?
11:55:17 17     A. Again, in that same sentence, where it says
11:55:23 18  -- starts, "For the purposes of this section," and
11:55:25 19  then it continues, "All sums paid or to be paid by
11:55:29 20  or on behalf of the borrower for interest,
11:55:31 21  brokerage, recording fees, commissions, services,"
11:55:43 22  and then it continues further in that same
11:55:45 23  sentence, "And all other sums charged against or
11:55:45 24  paid or to be paid by the borrower for making or
```

### Page 48

```
11:55:45  1  securing directly or indirectly the loan and shall
11:55:45  2  include all such item when paid by or on behalf of
11:55:45  3  or charged against the borrower for or on account
11:56:02  4  of making or securing the loan."
11:56:02  5     Q. Based on the language you just read, do you
11:56:06  6  believe that it would be appropriate to distinguish
11:56:09  7  between legal fees that were incurred in connection
11:56:12  8  with making or securing the loan and legal fees
11:56:18  9  that might be incurred for other purposes in
11:56:21 10  connection with the loan?
11:56:22 11     A. I understand the distinction that you are
11:56:30 12  trying to make, but for purposes our calculation, I
11:56:34 13  don't believe it's relevant.
11:56:35 14     Q. Why is that?
11:56:36 15     A. I think it -- I don't think there's the
11:56:40 16  distinction in here.
11:56:45 17     Q. Why is that?
11:56:46 18     A. Because it says, "The amounts be paid upon
11:57:03 19  any loan for interest or expenses shall include all
11:57:06 20  sums paid or to be paid by or on behalf of the
11:57:08 21  borrower for interest," and it defines all of the
11:57:12 22  items that are included in that sentence, and
11:57:16 23  further ends with, "Shall include all such items
11:57:18 24  when paid by or behalf of the borrower for or on
```

### Page 49

```
11:57:21  1  account of making or securing the loan directly or
11:57:25  2  indirectly to or by any person other than the
11:57:27  3  lender if such payment or charge was known to
11:57:31  4  lender."
11:57:31  5         So, in terms -- it's a charge in terms
11:57:35  6  of -- that came under the loan. So, therefore, any
11:57:42  7  -- any of the charges that were charged to the
11:57:50  8  borrower in connection with that loan, I believe,
11:57:54  9  falls under the description that's provided for
11:57:58 10  there.
11:57:58 11     Q. I think I understand your testimony,
11:58:00 12  Mr. Lowey. Let me make sure.
11:58:02 13         Are you saying that it is your view
11:58:08 14  that if a charge is paid by the borrower in
11:58:13 15  connection with the loan, it is properly included
11:58:18 16  as interest regardless of whether or not the charge
11:58:25 17  was incurred for making or securing the loan?
11:58:31 18     A. Yes.
11:58:33 19     Q. And your analysis is based upon that
11:58:44 20  interpretation of the statute?
11:58:46 21     A. Yes.
11:58:46 22     Q. And so would you agree if that
11:58:48 23  interpretation of the statute is not correct as a
11:58:51 24  matter of law, that your analysis is likewise of no
```

## Page 50

```
11:58:55  1   value in this case?
11:58:56  2        MR. HOFFMAN: Objection to the form.
11:58:57  3   You may answer.
11:59:01  4        A. It would be incorrect.
11:59:04  5        Q. Mr. Lowey, did you include all legal fees
11:59:48  6   in connection -- charged to the borrower in your
11:59:52  7   analysis?
11:59:52  8        A. I believe so, yes. To extent that they
12:00:05  9   were included on the activities that were
12:00:08 10   identified within the loan, yes.
12:00:39 11        (A recess was taken from
12:00:41 12         12:00 to 12:05 p.m.)
12:05:03 13        Q. Mr. Lowey, would you agree that if your
12:05:13 14   interpretation of the statute is not correct as a
12:05:17 15   matter of law, that your usury, the usury portion
12:05:21 16   of your report would therefore be inaccurate?
12:05:30 17        A. I guess it all depends on how incorrect it
12:05:34 18   is. As it is currently stated, yes.
12:05:40 19        Q. I would like you to look at Exhibit 103,
12:05:49 20   please. I would like to focus for a minute on the
12:05:53 21   very last clause of Subpart A, the clause that
12:05:58 22   begins, "If such payment or charge." Do you see
12:06:02 23   that?
12:06:02 24        A. Yes.
```

## Page 51

```
12:06:02  1        Q. And it goes on to say, "Was known to the
12:06:07  2   lender at the time of making the loan or might have
12:06:09  3   been ascertained by reasonable inquiry." Do you
12:06:12  4   see that?
12:06:12  5        A. Yes.
12:06:13  6        Q. First of all, do you agree with me that
12:06:17  7   clause applies to everything that precedes in that
12:06:23  8   sentence?
12:06:23  9        A. Yes.
12:06:27 10        Q. How do you interpret that language?
12:06:30 11        A. I guess you have to break it down by
12:06:39 12   segment.
12:06:41 13        So it basically -- "if any of the above
12:06:45 14   described charges were known to the lender at the
12:06:48 15   time of making the loan," I guess at the time of
12:06:51 16   funding --
12:06:52 17        Q. They would be included?
12:06:54 18        A. It would be included, or "might have been
12:06:57 19   ascertained by reasonable inquiry," which meant it
12:06:59 20   could anticipate or that the possibility exists of
12:07:03 21   that charge coming due.
12:07:10 22        Q. What do you think that means?
12:07:13 23        A. My interpretation is that anything that was
12:07:21 24   contemplated as a possibility of being charged
```

## Page 52

```
12:07:25  1   against the loan would be included as part of this
12:07:29  2   calculation.
12:07:36  3        Q. In your view, what is it that the lender
12:08:18  4   needs to be able to know or ascertain by reasonable
12:08:26  5   inquiry in order to have it fall under the meaning
12:08:29  6   of the statute?
12:08:30  7        A. I guess my layperson's interpretation of
12:08:39  8   that is that if the lender could anticipate the
12:08:43  9   possibility of that kind of charge being asserted
12:08:47 10   against the borrower.
12:08:50 11        Q. So is it your testimony that if the lender
12:08:53 12   could foresee the possibility of that type of a
12:08:59 13   charge, but not the amount of the charge --
12:09:05 14        A. Yes.
12:09:05 15        Q. -- it would fall within the statute, or
12:09:08 16   not?
12:09:08 17        A. Yes.
12:09:09 18        Q. Yes? I'm sorry?
12:09:10 19        A. Yes, to the type.
12:09:15 20        Q. If a lender knows that it's theoretically
12:09:23 21   possibly that a charge may be imposed on a borrower
12:09:27 22   at some point in the future, but has no way of
12:09:30 23   determining the amount of the charge, you believe
12:09:33 24   it would be appropriate to include that charge in a
```

## Page 53

```
12:09:38  1   usury analysis?
12:09:38  2        A. Yes.
12:10:18  3        Q. I would like to direct your attention to
12:10:19  4   the last paragraph of your usury analysis.
12:10:22  5        MR. HOFFMAN: Exhibit 101?
12:10:29  6        MR. HOULIHAN: Correct. Exhibit 101.
12:10:32  7        Q. The last paragraph of section Roman VI. It
12:10:39  8   appears on Page 3.
12:10:51  9        Do I understand the statement you make
12:10:53 10   in that paragraph, correctly, Mr. Lowey? If the
12:11:06 11   charges assessed during the period 10/22/01 through
12:11:15 12   1/31/03 -- strike that.
12:11:23 13        If it turns out that the charges
12:12:01 14   properly assessed is reduced by a number equal to
12:12:08 15   or greater than $107,775.20, keeping all other
12:12:17 16   factors the same in your analysis, am I correct
12:12:23 17   that the usury rate under your analysis would fall
12:12:28 18   below 20 percent?
12:12:29 19        A. Not necessarily.
12:12:37 20        Q. Why not?
12:12:39 21        A. That figure that we refer to in that
12:12:42 22   paragraph?
12:12:43 23        Q. Yes.
12:12:43 24        A. That represents the difference of what was
```

## Page 54

```
12:12:50  1   charged -- the incremental amount of the interest
12:12:52  2   from -- greater than 20 percent.
12:12:54  3        So to the extent we determined the
12:12:58  4   effective interest rate for that period was, I
12:13:02  5   believe it was 27 percent and change, I can't
12:13:04  6   recall, but that number represents the difference
12:13:11  7   between what would have been charged if the rate
12:13:17  8   had been capped at 20 percent versus the amount --
12:13:20  9   the effective amount of the interest that was
12:13:22 10   charged.
12:13:26 11        So to get back -- I will let you ask
12:13:34 12   the question.
12:13:35 13       Q. I think we are saying the same thing,
12:13:38 14   albeit differently.
12:13:42 15        In order to effectively cap the
12:13:45 16   interest rate under your analysis at 20 percent,
12:13:52 17   one would have to reduce the total charges made
12:13:57 18   during the relevant period as defined by you by at
12:14:03 19   least $107,775.20?
12:14:08 20       A. I don't know what the number -- you would
12:14:11 21   need to reduce it from the effective rate that we
12:14:15 22   calculated it to be, to 20 percent, because it
12:14:18 23   depends on when the charge would hit and how much
12:14:23 24   it is.
```

## Page 55

```
12:14:28  1       Q. I take it, therefore, that you cannot opine
12:14:53  2   today what the -- whether or not the effective --
12:15:01  3   the annualized effective interest rate would be
12:15:06  4   above or below 20 percent under your analysis if
12:15:11  5   the only thing that was changed was a reduction in
12:15:15  6   the charges by $108,000?
12:15:23  7       A. Again, it would depend on when that
12:15:26  8   reduction were to take place within that period of
12:15:28  9   time.
12:15:33 10       Q. Among the charges included in the usury
12:17:07 11   analysis are unused line fees, correct?
12:17:11 12       A. Yes.
12:17:11 13       Q. Why did those fall within the usury
12:17:19 14   statute?
12:17:19 15       A. Because that was essentially another charge
12:17:29 16   or another fee charged by the bank pursuant to the
12:17:32 17   loan.
12:17:32 18       Q. How did you understand the unused line fee
12:18:01 19   to operate?
12:18:01 20       A. I didn't do a thorough analysis of that
12:18:05 21   particular fee, but my understanding is there's a
12:18:08 22   -- there is a charge for the bank providing that
12:18:11 23   facility for that entity; and to the extent that
12:18:14 24   there was a portion that wasn't used, there was a
```

## Page 56

```
12:18:17  1   fee calculated for that unused piece.
12:18:22  2       Q. How did you arrive at that understanding of
12:18:26  3   unused line fee?
12:18:28  4       A. I have come across the term before in other
12:18:33  5   matters.
12:18:39  6       Q. So, hypothetically, if a debtor has a line
12:19:06  7   of credit for a million dollars and never uses it,
12:19:19  8   and as a result incurs unused line fee charges. On
12:19:32  9   the day on which the total of the unused line fee
12:19:39 10   charges equal 20 percent of the total of -- on an
12:19:52 11   annualized basis, that transaction becomes
12:19:58 12   usurious, in your view?
12:19:59 13       A. Not if it is 20 percent.
12:20:05 14       Q. The minute it exceeds 20.001 percent, it
12:20:10 15   becomes usurious at that time?
12:20:12 16       A. Yes.
12:20:13 17       Q. Even though the borrower never use any
12:20:15 18   funds?
12:20:15 19       A. Yes.
12:20:55 20       Q. I would like now, Mr. Lowey, to direct your
12:20:59 21   attention to Page 3 of your report, to Section 7,
12:21:08 22   "Commercial Reasonableness."
12:21:11 23        There is a reference in the opening
12:21:12 24   sentence to RAS. Who is RAS?
```

## Page 57

```
12:21:15  1       A. RAS was a company that was retained by GMAC
12:21:22  2   to actually perform the liquidation and take over
12:21:26  3   the location in Milford.
12:21:27  4       Q. Have you ever worked with RAS?
12:21:29  5       A. No.
12:21:29  6       Q. Have you ever offered an opinion in
12:21:38  7   connection with any matter in which RAS has been
12:21:41  8   involved?
12:21:41  9       A. Not that I'm aware of, no.
12:21:53 10       Q. Now, you indicated that the primary
12:22:09 11   documents that you relied upon included the GMAC
12:22:13 12   Commercial Credit new client report, dated July 19,
12:22:21 13   2000, correct?
12:22:22 14       A. Yes.
12:22:57 15       Q. I am showing you a document that was marked
12:22:59 16   as Exhibit 60. Is that the document that you
12:23:06 17   referenced in your report?
12:23:07 18       A. Yes.
12:23:18 19       Q. What is Exhibit 60?
12:23:23 20       A. I believe it's the writeup that was
12:23:26 21   prepared that went to what they call the marketing
12:23:29 22   committee to give its approval as to whether to
12:23:31 23   give the loan.
12:23:35 24       Q. Do you have an understanding of the purpose
```

Keith D. Lowey                                                                                    10/20/2005

## Page 78

```
14:01:23  1         A. We looked at it.
14:01:28  2            We didn't value those assets. I think
14:01:31  3   we specifically say that -- I say that in the
14:01:34  4   report.
14:01:35  5            But we were aware of those issues. But
14:01:40  6   to investigate, as I said earlier, some -- there
14:01:44  7   were schedules that identified some of those
14:01:46  8   issues. So I was aware of those.
14:01:48  9         Q. Thank you. I understand that you were
14:01:50 10   aware of the issues.
14:01:51 11            You did not conduct sufficient analysis
14:01:54 12   of those issues to form an opinion as to the value
14:01:58 13   of the intellectual property, correct?
14:01:59 14         A. That's correct.
14:02:01 15         Q. So you have no opinion as to the value of
14:02:04 16   the intellectual property, correct?
14:02:05 17         A. Yes.
14:02:25 18         Q. Have you ever been involved in liquidating
14:02:32 19   assets in a company involved in the sporting goods
14:02:39 20   or toy industries?
14:02:40 21         A. Sporting goods.
14:02:42 22         Q. Which company was that?
14:02:43 23         A. Nordic Track.
14:02:48 24         Q. Would you agree with me that the sporting
```

## Page 79

```
14:02:52  1   goods and toy industries are affected by seasonal
14:02:57  2   variances?
14:02:58  3         A. Yes.
14:03:06  4         Q. And what is your understanding of how those
14:03:08  5   industries are affected by seasonal variance?
14:03:12  6         A. A lot of the time they peak around
14:03:15  7   Christmastime or the end of year.
14:03:16  8         Q. When you say "they peak" --
14:03:18  9         A. That's where they may have their highest
14:03:21 10   amount of sales concentrated throughout the year.
14:03:27 11         Q. Do you know from reviewing any of the
14:03:30 12   materials that you reviewed in connection with
14:03:33 13   issuing your report whether or not Seneca and
14:03:38 14   Brookfield sales were affect by seasonal issues?
14:03:41 15         A. Yes.
14:03:42 16         Q. How were the Seneca-Brookfield sales
14:03:44 17   affected by seasonal issues?
14:03:51 18         A. What we were told by Mr. Landay is that
14:03:54 19   things needed to go out by no later than the end of
14:03:57 20   November, otherwise pretty much sales would slow
14:04:03 21   down drastically. They wouldn't go to zero, but
14:04:07 22   they would be drastically less after that point in
14:04:10 23   time.
14:04:13 24         Q. Would you agree with me that in order to
```

## Page 80

```
14:04:15  1   take advantage of the peak holiday sales season, it
14:04:20  2   was important for Seneca-Brookfield to get its
14:04:23  3   product out to its customers by the end of
14:04:27  4   November?
14:04:28  5         A. Yes.
14:04:29  6         Q. And to the extent that the company retained
14:04:35  7   inventory after the end of November, that inventory
14:04:41  8   would decrease -- would be less valuable after the
14:04:45  9   holiday season than it was before the holiday
14:04:49 10   season?
14:04:50 11         A. For an immediate period of time, yes, but
14:04:54 12   depending on whether it was stuff that would go out
14:04:59 13   of style, if it was material that wouldn't go out
14:05:02 14   of style, it may not be saleable right away, but
14:05:05 15   there would be some interest after this -- that
14:05:08 16   particular Christmas period and perhaps retain its
14:05:12 17   value to be sold during the next cycle.
14:05:15 18         Q. Based on your experience in liquidating
14:05:19 19   companies, would you agree with me that there is a
14:05:23 20   category of inventory which essentially becomes
14:05:31 21   valueless because it's been held for so long that
14:05:40 22   it has little or no value?
14:05:43 23         A. Certainly if it is tied to like an event or
14:05:46 24   a date or something like that, there is certainly a
```

## Page 81

```
14:05:50  1   segment of inventory that could be valueless after
14:05:54  2   a point in time.
14:05:55  3         Q. So if you are looking at the inventory of a
14:05:58  4   company and analyzing the extent to which it is
14:06:04  5   saleable, is one of the factors that you have to
14:06:06  6   consider the amount of time that the various items
14:06:14  7   have been in inventory?
14:06:17  8         A. It would be in consideration, sure.
14:06:20  9         Q. Would you agree with me, as a general
14:06:22 10   proposition, the longer a particular item is in
14:06:26 11   inventory, the less likely it is to be saleable?
14:06:32 12         A. In a lot of instances, yes, but not
14:06:35 13   necessarily. It could be just a matter that they
14:06:38 14   were bad purchasers of inventory and overbought.
14:06:45 15         Q. In connection with your report, did you do
14:06:56 16   any analysis of the kind of specific items that
14:07:02 17   were in the Seneca-Brookfield inventory as of
14:07:09 18   October 22, 2001?
14:07:11 19         A. No.
14:07:15 20         Q. And I take it, therefore, that you did not
14:07:17 21   do any analysis of how long any of the various
14:07:22 22   elements of the Seneca-Brookfield inventory had
14:07:26 23   been in inventory as of October 22, 2001?
14:07:30 24         A. That's correct.
```

21 (Pages 78 to 81)