# EXHIBIT 31

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY
PRESENT:     Hon. Herman Cahn                                    PART   49
                                    Justice

GMAC Commercial Finance LLC

                        Plaintiff

- against -

LANDSAFE [illegible]

                        Defendants

INDEX NO.      602338/0?
MOTION DATE    [illegible]
MOTION SEQ. NO.   001
MOTION CAL. NO.   __

The following papers, numbered 1 to ___ were read on this motion to/for ___

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | |
| Answering Affidavits — Exhibits | |
| Replying Affidavits | |

Cross-Motion:    ☐ Yes    ☒ No

MOTION IS DECIDED IN ACCORDANCE
WITH ACCOMPANYING MEMORANDUM
DECISION IN MOTION SEQUENCE . . . . .

Dated:  5/28/04                              /s/ Herman Cahn
                                                  J.S.C.
Check one:    ☐ FINAL DISPOSITION    ☒ NON-FINAL DISPOSITION

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE ___ DATED:

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : IAS PART 49
-----------------------------------------------------------X
GMAC COMMERCIAL FINANCE LLC,

                Plaintiff,

-against-                                  Index No. 602338/02

DAVID L. LANDAY,

                Defendant.
-----------------------------------------------------------X

**Herman Cahn, J.:**

    Plaintiff-counterclaim defendant GMAC Commercial Finance LLC moves for summary judgment to recover $1,235,055, together with attorneys' fees, pursuant to an absolute guaranty executed by defendant-counterclaim plaintiff David L. Landay, CPLR 3212. Landay cross-moves to compel GMAC to produce documents and respond to interrogatories regarding the amount allegedly owed and the disposition of the collateral, CPLR 3124.

*The Facts as Alleged:*

    GMAC is in the business of factoring and commercial finance.

    Landay, a Massachusetts resident, was, at all relevant times, president of nonparty Seneca Sports, Inc., which was engaged in marketing sports equipment. He was also president of nonparty Brookfield International, Inc., which was in the business of marketing a line of licensed children's toys.

On September 19, 2000, Seneca and Brookfield (collectively, the borrowers) entered into a factoring agreement with GMAC that provided for a $10,000,000 line of credit, secured by present and future accounts receivable, together with assets.

On the same day, Landay executed an unconditional personal guaranty of the borrowers' obligations under the factoring agreement, up to the amount of $3,500,000. In addition, he provided a standby letter of credit in the amount of $4,350,000 drawn in favor of GMAC, as additional collateral for the borrowers' payment obligations. Landay also executed a subordination agreement in which he subordinated his rights to repayment of a $3,450,000 debt by Seneca, to GMAC.

Pursuant to the terms of the factoring agreement, GMAC collected the receivables paid by the borrowers' customers and then advanced to the borrowers amounts equal to 90% of such receivables and specified percentages against inventory and other assets. The agreement also provides that, from May through October 2001, GMAC would make a seasonal advance of up to $500,000 in excess of the advances otherwise provided. Landay alleges that this provision was intended to permit the borrowers to operate during this period, when sales were customarily slow.

Landay alleges that GMAC failed to make the seasonal over advances. He also alleges that GMAC failed to fund other advances it had promised to make, causing the borrowers to issue checks that they were unable to pay when presented.

Landay's guaranty provides that he waives the right to assert any defenses, offsets,

or counterclaims, in any action to enforce the guaranty" (see Guaranty, at 1).

GMAC alleges that, in August 2001, the borrowers defaulted in repayment of their obligations under the factoring agreement. Specifically, it alleges that they breached the following provisions: repayment of excess obligations (see Factoring Agr., at ¶ 4[a]); furnishing financial statements (see Factoring Agr., at ¶ 7 [c]); indebtedness (see Factoring Agr., at ¶ 9 [ii]); maintaining a tangible net worth (see Factoring Agr., at ¶ 9 [iv]); fixed charge coverage ratio (see Factoring Agr., at ¶ 9 [v]); pre-tax profits (see Factoring Agr., at ¶ 9 [vi]); license fees (see Factoring Agr., at ¶ 10 [i] [c]); discharge of obligations (see Factoring Agr., at ¶ 10 [ii]); notification of events of default (see Factoring Agr., at ¶ 10 [iii]); and providing certified financial statements (see Factoring Agr., at ¶ 19 [iv]).

Landay argues that the defaults were the result of GMAC's failure to make the advances, which caused the borrowers to be unable to fill orders and purchase inventory to generate the volume of sales required to comply with the terms of the factoring agreement. He further alleges that GMAC's improper actions forced the borrowers to execute a forbearance agreement modifying the factoring agreement and the guaranty.

*The Forbearance Agreement:*

On August 9, 2001, GMAC and the borrowers entered into a forbearance agreement, pursuant to which GMAC agreed "to forbear from exercising the rights and remedies of [GMAC] under the [Factoring] Agreement and other Factoring Documents

for a limited period of time" in order to permit the borrowers to "continue to conduct an orderly liquidation of their business and assets" (Forbearance Agr., at 2). In the forbearance agreement, GMAC and the borrowers acknowledge the occurrence and preservation of certain existing defaults and outstanding obligations of "not less than $6,719,177.62," together with other sums, under the factoring agreement (Forbearance Agr., at 2).

GMAC agreed to forbear in consideration for, among other things, Landay's agreement to increase his maximum personal liability from $3.5 million to $4.5 million and his pledge and deposit of additional collateral of $1 million cash into a trust account (see Forbearance Agr., at ¶ 7 [b]; Letter Agr. re: ratification & amendment of guaranty; Letter Agr. re: cash deposit). The period of forbearance is defined as beginning on August 9, 2001, and "ending on the earlier to occur of (i) January 30, 2002 and (ii) the date of occurrence of an Additional Default" (Forbearance Agr., at ¶ 3).

On August 9, 2001, Landay executed a ratification letter by which he ratified the guaranty, acknowledged his consent to the forbearance agreement, and confirmed that his "obligations (as defined under the guaranty) are due and owing by [Landay] to [GMAC] without offset, defense or counterclaim of any kind, nature or description whatsoever" (Ratification Letter, at 1).

The forbearance agreement includes a list of events that constitute additional defaults (see Forbearance Agr., at ¶ 8). In relevant part, the list provides that "if, as of the

4

Friday of each week during the Forbearance Period, [the Borrowers] fail to maintain 'Net Availability', as determined by [GMAC] in its sole and absolute discretion, equal to or greater than the 'Net Availability' amounts for each week set forth on the line identified as 'Net Availability' on the Seneca Sports Projected Availability annexed," then such failure would constitute an "Additional Default" under the forbearance agreement (Forbearance Agr., at ¶ 8 [a] [iv]). Thus, the borrowers' failure to meet the sales projections on a weekly basis would constitute a default under the forbearance agreement.

By letter dated September 25, 2001, GMAC notified the borrowers of its termination of the forbearance period, based on the occurrence of additional defaults including the "Net Availability" provisions, discussed above, and demanded payment in full of the outstanding debt of $7,372,000, together with accrued interest, commissions, costs, fees, and expenses, including attorneys' fees, in accordance with the terms of the factoring agreement. By letter of the same date, GMAC notified Landay of the borrowers' breaches, advised that the forbearance period was terminated, and demanded immediate payment in full, in accordance with the terms of the guaranty.

Neither the borrowers nor Landay made any payments.

On October 22, 2001, GMAC seized the collateral, consisting of the borrowers' accounts receivable, inventory, patents, trademarks, licenses, office equipment, warehouse equipment, and cash. By letters dated October 24, 2001, GMAC notified the borrowers and Landay that it would hold a private sale of the inventory sometime after

October 29, 2001, and that each was entitled to an accounting of the unpaid indebtedness secured by that inventory. Within the next 12 months, GMAC had liquidated the borrowers' assets.

GMAC alleges that, after application of the cash collateral and liquidation proceeds against the debt, there remains an outstanding principal balance of $1,235,055, plus contractual interest accruing from June 18, 2002, and costs of collection, including attorneys' fees.

Upon Landay's failure to pay the demanded amount, GMAC commenced this action against Landay to recover $1,235,055, together with contractual interest and attorneys' fees, on theories of breach of contract and account stated.

*The Answer and Counterclaims*:

In the answer, Landay denies the material allegations of the complaint, and asserts affirmative defenses based on theories of fraudulent inducement, breach of the covenant of good faith and fair dealing, failure to sell the borrowers' assets in a commercially reasonable manner, failure to provide an accounting, and other, related defenses.

He also asserts seven counterclaims based primarily on allegations that GMAC failed to provide the agreed upon funding in a timely manner, thus forcing the borrowers to breach the factoring agreement, and failed to liquidate the collateral in a commercially reasonable manner.

In the first counterclaim for breach of implied contractual covenants, Landay

6

alleges that GMAC intentionally delayed executing the forbearance agreement and improperly refused to release funds in excess of Landay's $1 million cash deposit, and, thus, rendered the borrowers unable to fill orders previously placed by customers. He also alleges that GMAC foreclosed on the collateral in October, prior to the winter holiday season, thus preventing the borrowers from realizing profits anticipated from holiday sales. He alleges that, almost immediately after executing the forbearance agreement, GMAC notified the borrowers of their defaults and seized the collateral. He argues that this constitutes a breach of the covenant of good faith and fair dealing implicit in the forbearance agreement. On these allegations, Landay seeks to recover $10 million. Landay also argues that this conduct resulted in a failure of consideration for his $1 million cash deposit.

In the second counterclaim, for fraudulent inducement, Landay alleges that, during negotiations held in summer 2001 relating to the forbearance agreement, GMAC represented to him that it would begin providing financing to the borrowers as of the August 9, 2001, effective date of the agreement, that it would lend the borrowers funds in excess of the $1 million cash deposit, and that it would reimburse him for certain expenses listed in the financial plan annexed to the forbearance agreement. Landay further alleges that he relied on these representations in providing the additional collateral and increasing the amount of his maximum personal liability. He also alleges that, at the time GMAC made these representations, it had no intention of honoring them and,

instead, made it impossible for the borrowers to honor their commitments to their customers and to pay down the debt to GMAC. Landay further alleges that GMAC seized the collateral, including the cash deposit and additional collateral, and failed to liquidate the inventory in a commercially reasonable manner. On these allegations, Landay seeks to recover $10 million, together with punitive damages.

In the third counterclaim, Landay seeks an accounting relating to GMAC's collection and liquidation of the borrowers' assets.

In the fourth counterclaim, Landay seeks to recover compensatory and punitive damages, on allegations that GMAC failed to liquidate the collateral in a commercially reasonable manner, resulting in the sale of some of the inventory at distressed prices by warehouse owners to pay warehouse fees. He further alleges that this misconduct constitutes a breach GMAC's fiduciary duty to Landay as the junior creditor of Seneca under the subordination agreement and a breach of the covenants of good faith and fair dealing implied in that agreement.

In the fifth counterclaim, Landay alleges that GMAC's conduct constitutes predatory lending practices and caused him to significantly increase his personal liability. He seeks to recover $10 million, together with compensatory and punitive damages.

In the sixth counterclaim, Landay alleges that GMAC's improper conduct has deprived him of profits that he would have otherwise received as a shareholder of the borrowers and wiped out his investment. Landay seeks to recover compensatory and

punitive damages.

In the seventh and final counterclaim, Landay alleges that GMAC's improper conduct constitutes unfair and deceptive trade practices in violation of Chapter 93A of Massachusetts General Laws, section 11.

*The Within Motion*:

GMAC now seeks summary judgment against Landay to recover $1,235,055, together with interest from June 18, 2002, under the guaranty.

In opposition to the motion, Landay contends that GMAC failed to liquidate the borrowers' assets in a commercially reasonable manner, that the value of the assets exceeded twice the outstanding debt at the time they were seized, and that, therefore, GMAC owes Landay the excess funds. Landay cross-moves to compel GMAC to produce documents and answer interrogatories, primarily regarding GMAC's disposition of the collateral.

*Decision*:

The motion for summary judgment is granted to the extent that judgment as to liability only is granted in favor of GMAC and against Landay.

"On a motion for summary judgment to enforce a written guaranty, all that the creditor need prove is an absolute and unconditional guaranty, the underlying debt, and the guarantor's failure to perform under the guaranty" (City of New York v Clarose Cinema Corp., 256 AD2d 69, 71 [1st Dept 1998]; see Chemical Bank v Nemeroff, 233

AD2d 239 [1st Dept 1996]; CPLR 3212). "To defeat a motion for summary judgment * * *, the opposing party must assemble and lay bare its affirmative proof to demonstrate that genuine triable issues of fact exist * * *. A bona fide triable issue must be established * * * and reliance upon mere suspicion or surmise is insufficient for this purpose" (Kornfeld v NRX Technologies, Inc., 93 AD2d 772, 773 [1st Dept 1983], affd 62 NY2d 686 [1984] [internal citations omitted]). Here, Landay has failed to meet this burden with regard to liability, but has raised triable issues with regard to the amount owed.

The guaranty expressly provides that Landay personally guaranties "the prompt payment at maturity, or whenever they may become due in accordance with any of their terms, of all now existing and hereafter arising liabilities, indebtedness and obligations of the [Borrowers] to [GMAC] * * * whenever and however arising or acquired by [GMAC], whether direct or indirect, absolute or contingent (Guaranty, at 1). It further provides that his liability "shall be direct, immediate, absolute, continuing, unconditional and unlimited and not conditional or contingent upon the pursuit by [GMAC] of whatever remedies it may have against the [Borrowers]" (Guaranty, at 1). Further, it provides that it "shall be construed as being and intended to be, a continuing guaranty of payment of any and all Obligations either made, endorsed or contracted by the [Borrowers]" (Guaranty, at 1).

The guaranty is, thus, by its clear and unambiguous terms, absolute and unconditional. "It is axiomatic that a contract is to be interpreted so as to give effect to

10

the intention of the parties as expressed in the unequivocal language employed" (Morlee Sales Corp. v Manufacturers Trust Co., 9 NY2d 16, 19 [1961]). Thus, "clear, complete writings should generally be enforced according to their terms" (W.W.W. Assocs., Inc. v Giancontieri, 77 NY2d 157, 160 [1990]). Guaranties are to be "construed like other contracts so as to give effect to the parties' intentions" (Fehr Bros, Inc. v Scheinman, 121 AD2d 13, 15 [1st Dept 1986]).

Landay is bound by the terms of the guaranty. Courts have construed similar provisions and found them to be binding (see e.g. Manufacturers & Traders Trust Co. v Mega-B, Inc., 169 AD2d 632 [1st Dept 1991]). Moreover, in the ratification letter executed in connection with the forbearance agreement, Landay ratified the obligations imposed upon him by the guaranty.

In addition, Landay, in his capacity as the borrowers' president, affirmatively acknowledged in the forbearance agreement that "Events of Default have occurred under the [Factoring] Agreement and the other Factoring Documents, which Events of Default continue to exist and which [GMAC] has suffered to exist," and that "as a result of the Existing Defaults, [GMAC] is entitled, as of the date hereof, to terminate the [Factoring] Agreement and to exercise any and all of its rights and remedies under the Agreement, the other Factoring Documents, applicable law or otherwise to realize upon the Collateral and to collect the obligations owing to [GMAC] under the [Factoring] Agreement and the other Factoring Documents" (Forbearance Agr., at 1). Moreover, there is no dispute that,

within two months after the forbearance agreement was entered into, the borrowers failed to meet the sales projections for a particular week, an event which constituted an additional default, as defined by the forbearance agreement.

Landay has waived the right to assert counterclaims and defenses, with one exception, discussed below. "The liability of the guarantor may be broader than and exceed the scope of that of the principal where the guarantee, which is a separate undertaking, is, by its unqualified language, enforceable against the guarantor" (Raven El. Corp. v Finkelstein, 223 AD2d 378, 378-79 [1st Dept], lv dismissed 88 NY2d 1016 [1996]). The guaranty expressly provides that Landay "waives the right to assert in any action or proceeding upon this guaranty any defenses, offsets or counterclaims which [Landay] may now or hereafter have" (Guaranty, at 2). Such waiver provisions are enforceable (see e.g. Milliken & Co. v Stewart, 182 AD2d 385 [2d Dept 1992]; New Jersey Bank, Natl. Assn. v Varano, 120 AD2d 505 [2d Dept 1986]; Rusch Factors v Sheffler, 58 AD2d 557 [1st Dept 1977]).

Similar waiver provisions have been enforced and courts have specifically denied the guarantor's counterclaims and defenses based upon allegations of: (1) lack of consideration (see e.g. General Trading Co. v A & D Food Corp., 292 AD2d 266 [1st Dept 2002]); (2) fraud and fraudulent inducement (see e.g. Raven El. Corp. v Finkelstein, 223 AD2d 378, supra; BNY Financial Corp. v Clare, 172 AD2d 203 [1st Dept 1991]); and (3) breach of the covenant of good faith and fair dealing (see e.g. Greater New York Sav.

Bank v 2120 Realty Inc., 202 AD2d 248 [1st Dept 1994]).

Landay's contention that he is entitled to assert claims and defenses belonging to the borrowers because he is their former president and majority shareholder is unavailing. "Although certain exceptions exist to the rule that a guarantor may not raise claims of its principal, where that principal is controlled by the guarantors, as in the case where the guarantors are the directors and sole shareholders of a closely-held corporate principal, * * * such exception does not apply where, * * * the principal is bankrupt and is no longer a going concern" (First New York Bank for Business v DeMarco, 130 BR 650, 655 [Bankr SD NY 1991] [internal citations omitted]). Thus, even assuming that Landay had not expressly waived his right to assert the borrowers' claims and defenses, he would not be able to do so now because he no longer controls the borrowers and lacks the right to speak for them inasmuch as the borrowers are no longer going concerns and Landay did not own 100% of their stock.

Moreover, in the forbearance agreement, the borrowers expressly waived all defenses and counterclaims that they may otherwise have been entitled to assert prior to the execution of the agreement. In relevant part, the forbearance agreement provides that:

> [i]n consideration of the agreement of [GMAC] to forbear
> from exercising its rights and remedies arising in connection
> with the Existing Defaults, each of the [Borrowers] forever
> releases and discharges [GMAC] * * * from any and all
> actions, * * * promises, * * * claims and demands
> whatsoever, in law, admiralty or equity, which against
> [GMAC], any [Borrower] * * * ever had, now or hereafter
> can, shall or may, have for, upon, or by reason of any matter,

13

cause or thing whatsoever...

(Forbearance Agr., at ¶ 2.)

An unambiguous release provision, such as the provision here, bars actions on any cause of action prior to its execution (see Blog v Battery Park City Auth., 234 AD2d 99 [1st Dept 1996]; Stone v National Bank & Trust Co., 188 AD2d 865 [3d Dept 1992]).

Landay has raised triable issues regarding whether the collateral was disposed of in a commercially reasonable manner and, therefore, as to the amount due under the guaranty. The statutory obligation of a lender "to deal in a commercially reasonable manner with collateral securing a loan may not be waived by a guarantor as a matter of law" (NatWest Bank N.A. v Gauberd, 228 AD2d 337, 338 [1st Dept 1996]; see UCC Art. 9, secured transactions).

Collateral is disposed of in a commercially reasonable manner if the disposition is made: "(1) in the usual manner on any recognized market; (2) at the price current in any recognized market at the time of the disposition; or (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition" (UCC § 9-627 [b]; see 96 NY Jur 2d, Secured Transactions § 285). "The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in

14

a commercially reasonable manner" (UCC § 9-627 [a]; see 96 NY Jur 2d, Secured Transactions § 285, supra). However, a wide discrepancy between the gross proceeds from the sale of the collateral and its fair market value signals a need for close scrutiny (Orix Credit Alliance, Inc. v East End Dev. Corp., 260 AD2d 454 [2d Dept 1999]).

Landay has demonstrated that further discovery is necessary to determine whether GMAC disposed of the collateral in a commercially reasonable manner. The collateral consisted of inventory and assets located at the borrowers' premises in Massachusetts, in outside warehouses and in transit, and took approximately one year to liquidate. Although GMAC has produced numerous documents relating to the disposition of the collateral, many require additional explanation or interpretation regarding how a particular debit was arrived at. Landay alleges that, on the date GMAC seized the collateral, there existed more than $900,000 in accounts receivable (net of reserves) and $1.8 million in inventory (at cost), and that, in addition, the collateral seized included patents, trademarks, and licenses, as well as office equipment, warehouse equipment, and miscellaneous other assets. He further alleges that the collateral was worth more than twice the amount allegedly owed on November 30, 2001. The record includes documents which may support these allegations, particularly with regard to the collection of the accounts receivable and unexplained debits against the collections. It also appears that GMAC has failed to produce some of the liquidator's day-to-day reports regarding the disposition of the inventory and documents relating to the final disposition of office

15

equipment seized from the borrowers' offices.

Landay's contention that the entire transaction is void on the ground that GMAC violated a Massachusetts statute prohibiting interest at a usurious rate, absent registration, is raised for the first time in his reply papers and, therefore, is not properly before the court (see Azzopardi v American Blower Corp., 192 AD2d 453 [1st Dept 1993]).

In any event, a violation of the statute does not result in mandatory voidance of the transaction. Massachusetts General Law, Chapter 271, section 49 (d) provides that a loan is immune from attack as usurious if the creditor notifies the attorney general of its intent to engage in a transaction or transactions which would otherwise exceed the maximum allowable interest rate and maintains records of any such transaction (see Levites v Chipman, 30 Mass App Ct 356, review denied 410 Mass 1102 [1991]). The notice must be on file with the attorney general's office at the time the loan proceeds are distributed (Hakim Enters., Inc. v Reinhardt, 30 Mass App Ct 911 [1991]; id.).

By letter dated September 19, 2000, GMAC notified the Office of the Attorney General, Criminal Division, of the Commonwealth of Massachusetts, that, "[i]n accordance with G.L.c.271, § 49, GMAC * * * intends to engage in a transaction with the Borrower pursuant to a Factoring Agreement dated as of September 19, 2000, which, but for the provisions of paragraph (d) of Section 49, may be proscribed" under the statute.

Landay alleges that, because the letter was sent by certified mail on the same day that funds were disbursed to Seneca, it could not have been received by the attorney

16

general's office prior to that disbursement. However, the statute does not require that a loan with interest in excess of 20% which is bargained for, charged, or received, must be declared void, in the absence of circumstances and conditions which would cause the integrity of the loan itself to be questionable; rather, the statute provides a permissive civil remedy which may include reformation of the loan terms and a refund or credit to the borrower of the amount constituting the excess interest charged, without necessarily voiding the loan (Beach Assocs., Inc. v Fauser, 9 Mass App Ct 386 [1980]).

Finally, GMAC seeks to recover attorneys' fees and other costs of collection in accordance with the express terms of the guaranty. Regarding payment of attorneys' fees, the guaranty obligates Landay to make "prompt payment at maturity * * * of all now existing and hereafter arising liabilities, indebtedness and obligations of [the Borrowers] to [GMAC] * * *, including the cost of protest and all legal expenses of or for collection, or for realization upon any collateral for the Obligations" (Guaranty, at 1). Similar provisions have been upheld and enforced (see e.g. Raven El. Co. v Finkelstein, 223 AD2d 378, supra). The guaranty further provides that, in the event that it is placed with an attorney for collection, Landay is required to pay attorneys' fees equal to 15% of the principal and interest due and demanded (see Guaranty, at 1).

That branch of the motion for summary judgment on GMAC's claim to recover costs of collection and attorneys' fees is granted as to liability only. The issue shall be referred to a Special Referee to hear and report after the amount of principal and interest

17

due plaintiff is determined.

The parties may have discovery on the issues referred to the Special Referee.

Accordingly, it is

ORDERED that the motion is granted to the extent that partial summary judgment on liability only is granted against defendant David L. Landay and in favor of plaintiff GMAC Commercial Finance LLC; and it is further

ORDERED that the issues of whether or not the collateral was disposed of in a commercially reasonable manner, and the net amount, if any, due to plaintiff from defendant, are referred to a Special Referee to hear and report; and it is further

ORDERED that after the above hearing is held, the issue of the reasonable amount of collection expenses and attorneys' fees incurred by plaintiff, shall be considered by the Special Referee who shall hear and report thereon; and it is further

ORDERED that the cross motion having been previously resolved at various court appearances, is granted to the extent that the parties are to comply with the discovery orders made at such appearances.

This constitutes the decision and order of the Court.

Dated: May 25, 2004

ENTER:

_____
J.S.C.