# EXHIBIT E

**RESPONSE TO "INTERROGATORY NO. 1b."**

GMACCF also specifically objects to what Landay has labeled subpart "b" of "Interrogatory No. 1" on the grounds that the terms "otherwise disposed of" and "books and records" are vague and ambiguous; it is unduly burdensome; and it is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its general or specific objections, GMACCF responds to "Interrogatory No. 1b" as follows:

GMACCF has not knowingly destroyed any records that it obtained from the Borrowers on or about October 22, 2001. While it is possible that some documents that it obtained from the Borrowers on or about October 22, 2001 or copies thereof have been accidentally misplaced or discarded, such conduct would not have been undertaken pursuant to any GMACCF policy or practice. GMACCF also refers Landay to the deposition transcript of John Rijo of RAS Management Advisers, Inc. ("RAS"), who was deposed in connection with the lawsuit that GMACCF filed against Landay in the Supreme Court of the State of New York, in a case docketed at Case No. 602338/02 (the "New York Action"). GMACCF specifically directs Landay's attention to the following portions of the transcript: Page 26, Line 16 through Page 28, Line 15, and Page 79, Line 11 through Page 81, Line 9. In light of the foregoing, subparts (i) through (v) of "Interrogatory No. 1b" are not applicable and require no additional response.

**RESPONSE TO "INTERROGATORY NO. 1c."**

GMACCF also specifically objects to what Landay has labeled subpart "c" of "Interrogatory No. 1" on the grounds that the terms "disposed of" and "books and records" are vague and ambiguous; and that it is compound in nature. Subject to and without waiving its general or specific objections and notwithstanding its compound nature, GMACCF will regard "Interrogatory No. 1c" as a single interrogatory and respond to it as follows:

Page 25

[1] J. Rijo
[2] time this happened?
[3] A: It would have been — I don't
[4] remember the specific date, no.
[5] Q: Can you generally?
[6] A: Generally the entire process I was
[7] at Seneca, the liquidation was only months, it
[8] would have been the early October, end of
[9] November.
[10] Q: The only thing you know about it is
[11] what's reflected in your memos?
[12] A: I don't quite understand what you're
[13] asking.
[14] Q: Here's what I'm trying to avoid,
[15] sir. We all can read your memos and I don't
[16] want you to have sit here day after day reading
[17] those memos. There are a lot of memos.
[18] I'm saying if you're going to tell
[19] me, the only thing I know is what's in my memo,
[20] I don't need to yank it out and I can just read
[21] it on my own. If you know something in addition
[22] to what's reflected in your memo, then tell us.
[23] A: That's the only thing that I recall.
[24] Q: Is in your memos?
[25] A: About the accounts receivable,

Page 26

[1] J. Rijo
[2] correct.
[3] Q: Did you maintain duplicates of that
[4] backup information on accounts receivable that
[5] you sent to GMAC?
[6] A: No, not that I recall. Don't
[7] remember.
[8] Q: At a certain point in time you no
[9] longer were involved with Seneca, correct?
[10] A: Correct.
[11] Q: And at that point in time there was
[12] still additional inventory, correct, you hadn't
[13] sold everything?
[14] A: Correct, there was still some
[15] inventory.
[16] Q: There was still records at the
[17] company, correct?
[18] A: I believe there was still some
[19] records at the company.
[20] Q: Do you know what happened to those
[21] records?
[22] A: The majority of the records were
[23] relocated to the storage units down the street
[24] from Seneca.
[25] Q: Under whose name were those records

Page 27

[1] J. Rijo
[2] kept?
[3] A: The storage units was taken out in
[4] GMAC's name.
[5] Q: Do you know how long there was a
[6] lease on that storage unit?
[7] A: I don't recall. Most storage units
[8] have some lease. I don't recall the specifics
[9] with this lease, but there was some kind of
[10] agreement.
[11] Q: Did you have anything to do with
[12] entering into that lease?
[13] A: Yes.
[14] Q: What did you do?
[15] A: I located and coordinated with the
[16] unit available to have the records moved to.
[17] Q: You said it was down the street from
[18] Seneca?
[19] A: Yes.
[20] Q: What street was that?
[21] A: I believe it was Fortune Boulevard.
[22] Q: Do you remember the name of the
[23] storage facility?
[24] A: The specific name, no idea.
[25] Q: Anywhere close to it?

Page 28

[1] J. Rijo
[2] A: The name?
[3] Q: Yes.
[4] A: Not honestly, I don't. It's a
[5] public storage right down the street from the
[6] office.
[7] Q: Same block?
[8] A: No. Less than probably a mile,
[9] though.
[10] Q: On Fortune?
[11] A: I believe on Fortune. I'm not sure
[12] if there's a name change of the street after you
[13] pass a certain length, but it's basically the
[14] same street. Seneca's address was Fortune, so I
[15] assume it's the same street.
[16] Q: Other than the accounts receivable
[17] backup that you sent to GMAC, are you aware of
[18] any other documents regarding accounts
[19] receivables other than the ones that you were
[20] involved with, because those were ongoing
[21] clients of Seneca?
[22] MR. WAGNER: Objection to the
[23] form. You can answer it if you understood
[24] it.
[25] A: I don't understand it.

Page 77

J. Rijo

[2] A: Correct.
[3] Q: Did you have any conversation with
[4] anyone at GMAC about that liquidation analysis
[5] at any point in time?
[6] A: I did not, no.
[7] Q: Did Mr. Sebastiao tell you that he
[8] did?
[9] A: I don't recall.
[10] Q: So you have no idea either by
[11] hearsay or any other way of what GMAC's reaction
[12] to the liquidation analysis was, correct?
[13] A: My personal knowledge, no.
[14] Q: Even what somebody told you?
[15] A: Not that I can recall.
[16] Q: You submitted a number of written
[17] reports to GMAC during the time you worked in
[18] Seneca, correct?
[19] A: Yes.
[20] Q: What was the purpose of those
[21] reports?
[22] A: The purpose, I guess, varying upon
[23] the time you mentioned — there were two
[24] different periods here.
[25] Q: Let's separate it out. There's the

Page 78

J. Rijo

[2] pre-liquidation purpose, what was the purpose
[3] there?
[4] A: Pre-liquidation purpose was to just
[5] primarily update them on the budget to actuals
[6] that the company was reporting.
[7] Q: Okay. What about the liquidation
[8] period?
[9] A: The liquidation period was primarily
[10] documentation of my notes and the key issues and
[11] items that were occurring during liquidation.
[12] Q: During the liquidation period, what
[13] was your understanding of the property you were
[14] supposed to be liquidating?
[15] MR. WAGNER: Objection to the form.
[16] Q: Do you understand my question?
[17] A: Can you rephrase?
[18] Q: What were you supposed to do during
[19] the liquidation period?
[20] A: I was supposed to sell off the
[21] inventories.
[22] Q: Anything else?
[23] A: And just gain control of the
[24] general — the physical assets that were in
[25] place at the time.

Page 79

J. Rijo

[2] Q: What does that mean?
[3] A: Just, you know, control. Make sure
[4] the records were there, and just maintain the
[5] physical property.
[6] Q: Was one of your responsibilities to
[7] make sure that when you left, the records would
[8] continue to be available if anybody needed
[9] them?
[10] A: I don't understand what you mean.
[11] Q: How come when you left and you
[12] finished your job you didn't throw all the
[13] records away?
[14] A: It's common practice, you never just
[15] throw records away.
[16] Q: Why?
[17] A: Because in case somebody needs the
[18] information that's in those records. GMAC asked
[19] us to identify a location to store the records
[20] that we had relocated to that other office area,
[21] and that's what we did.
[22] Q: Did you give them an index as to the
[23] records that you were storing?
[24] A: I don't recall giving him a specific
[25] index, but I know — I think we did some kind of

Page 80

J. Rijo

[2] log of what was there. But we basically took
[3] all the books and records of the company that
[4] existed at least since the time that their loan
[5] was initiated.
[6] Q: What happened to the books and
[7] records from before the time the loan was
[8] initiated?
[9] A: I believe they were still at the
[10] Seneca location.
[11] Q: So you left and you left the records
[12] there?
[13] A: Certain records. The ones that we
[14] hadn't relocated were left there.
[15] Q: What records were left there?
[16] A: Marketing materials and then any
[17] records that I would have identified that were
[18] from prior to the GMAC loan.
[19] Q: Who, if anyone, did you tell you
[20] were leaving the records there?
[21] A: To GMAC.
[22] Q: Anyone else?
[23] A: And Dick Sebastiao.
[24] Q: Not Landay?
[25] A: No, I didn't have any specific

Page 81

[1] J. Rijo
[2] conversation with David.
[3] Q: With respect to the documents that
[4] you sent to the storage facility, did you make a
[5] list in some way of what was in what box?
[6] A: I believe all cabinets and boxes
[7] were labeled. And I don't recall, but I believe
[8] we took a list of all the documents that were
[9] relocated to the storage units.
[10] Q: Did you produce such a list for your
[11] counsel?
[12] A: I would have. If I did have it, it
[13] was in the books and records.
[14] Q: Do you remember seeing it?
[15] A: I have to look at the box.
[16] Q: During the course of your attempt to
[17] liquidate the Seneca inventory, did you ever
[18] place any ads?
[19] A: What do you mean by ads?
[20] Q: Have you ever used advertisements
[21] and ads?
[22] A: There are several types of
[23] advertisements; there are periodicals, e-mail
[24] attachments, et cetera.
[25] Q: Right. Did you do it in any way?

Page 82

[1] J. Rijo
[2] A: We did not place any ads in the
[3] paper per se, no.
[4] Q: Did you place any ads of any type in
[5] any forum?
[6] A: Just directly with specific
[7] customers. We issue inventory lists, we solicit
[8] bids directly with customers. It was called
[9] direct marketing.
[10] Q: When you say with customers, how did
[11] you determine which customers to do that?
[12] A: The key from the first day was look
[13] at — given the inventory that we had available
[14] to us, we looked at who the customers were that
[15] had open customer orders for that product. So
[16] we did a communication to contact for anyone of
[17] material nature.
[18] We didn't call people if they had a
[19] $300 order for a couple of skate boards, for
[20] example. But anyone who had a material order in
[21] place that was for product that we had available
[22] to us, we contacted them and confirmed if they
[23] were still interested in fulfilling their order,
[24] and also sent them the full list of the
[25] additional inventory if they would be interested

Page 83

[1] J. Rijo
[2] in purchasing additional inventory.
[3] Q: Other than those customers, did you
[4] do any other kind of advertising either by
[5] direct mailing or otherwise?
[6] A: No. Outside of directly contacting
[7] customers.
[8] Q: Those customers who had large
[9] orders?
[10] A: Large orders or key large customers
[11] that didn't necessarily have orders.
[12] Q: When you say key large customers
[13] when they didn't have large orders, how would
[14] you identify such entities?
[15] A: Just looking at their top customer
[16] list.
[17] Q: Those were prior customers of
[18] Seneca?
[19] A: Correct.
[20] Q: Other than direct communication with
[21] Seneca's present or prior customers, large
[22] customers, what did you do to advertise?
[23] A: We also distributed the inventory
[24] list to both Gordon Brothers and did Ozer Groups
[25] who are two kind of leading liquidation firms

Page 84

[1] J. Rijo
[2] that specialized in obtaining product like this,
[3] and purchasing inventory like this.
[4] Q: Other than that, what did you do to
[5] advertise the existence of this inventory?
[6] A: I don't recall any specifics.
[7] Q: Did you put up any public notices of
[8] sale anywhere?
[9] A: No.
[10] Q: Did you attempt to run an auction?
[11] A: No.
[12] Q: How come you didn't advertise in any
[13] periodicals?
[14] A: The answer you asked for,
[15] periodicals like communication, for example, as
[16] well as auction, we didn't do either, primarily
[17] because we were very concerned given the state
[18] of the licenses and the fact that material
[19] amount of the remaining inventory of licensed
[20] product that, first off, that publicly
[21] advertising an auction or a sale would
[22] potentially heighten or expedite any actions
[23] taken by licensors to restrict us from being
[24] able to sell that product for anything.
[25] An auction, for example, to do it