# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-CV-11955-WGY

DAVID L. LANDAY, )
)
       Plaintiff, )
)
v. )
)
GMAC COMMERCIAL CREDIT, LLC and )
GMAC COMMERCIAL FINANCE, LLC, )
)
       Defendants. )
_____)

## AFFIDAVIT OF KEITH D. LOWEY

I, Keith D. Lowey, hereby depose and say as follows:

1. I was retained by David L. Landay, plaintiff in this case, and defendant in a suit brought against him by GMAC Commercial Credit LLC in state court in New York.

2. Exhibit A hereto is a copy of my Expert Report dated October 10, 2005, without exhibits.

3. Exhibit B hereto is a copy of my Supplemental Report dated November 10, 2005, with exhibits.

4. Between October 10, 2005 and November 10, 2005, I was deposed by Attorney Houlihan – on October 20, 2005 – and did further work and analysis, principally in connection with my expected testimony in the New York action, the trial of which commenced on October 27, 2005. This work included review of additional documents, attendance at meetings and conference calls with David Landay, and interviews of two witnesses, neither of which I was able to contact prior to my initial expert report. I testified and was qualified as an expert witness on "commercial reasonableness" in the New York action on November 4, 2005.

5.   The Supplemental Report does not change in any way the opinions expressed in the initial report on liability issues.

6.   In the usury section of my Supplemental Report, I merely corrected mistakes in classifying certain line items which were misclassified in the original report due to our reliance on the classifications which GMAC made in its "Client Statements," the documents which Ms. Pappalardo, GMAC's 30(b)(6) witness had testified were used in calculating damages.

7.   The need for a revision and a review of GMAC's classification of line items was made known to me during my deposition when Mr. Houlihan, GMAC's counsel, pointed out to me that one item which I had characterized as an expense for purposes of the usury calculation was incorrectly classified. This realization led to our undertaking a further review of GMAC's Client Statements to determine the accuracy of GMAC's classification of line items by reviewing any underlying documentation relating to such entries which had been produced in the litigation.

8.   Exhibit C consists of GMAC records containing six line items which we determined that GMAC has misclassified. The pages of Exhibit C were part of Deposition Exhibit 4 marked at the deposition of Ms. Pappalardo. Bates GLAN #01540 shows that GMAC characterized a line item in the amount of $56,908.22 as an "LC Charge." Our research revealed that this was a payment of an outstanding Letter of Credit in favor of the Disney Company and was not properly classified as a "charge" to the loan. Bates GLAN #01526 showed line items of $7,140.00 and $35,042.00 as advances. Our research revealed that GMAC had misclassified these items since the back-up showed that they were payments to RAS, GMAC's consultant and liquidator. Bates GLAN #01519 showed a line item in the amount of $16,115.00 as an advance.

2

Our further review revealed that this line item was a payment to RAS for consulting and/or for liquidation services. Similarly, Bates GLAN #01522 shows a line item in the amount of $10,763.00 as an advance. Our research revealed that this was also a payment to RAS. Finally, Bates GLAN #01534 shows a line item $1,896.00 as an advance. However, we determined this item to be a miscellaneous charge, not an advance.

9. While the first item relating to the Disney Letter of Credit should not have been included as interest or an expense in a usury calculation, the last five items should have been included as an expense for purposes of a usury calculation but were not due to GMAC's erroneous classifications. The revised charts, Exhibits E and F to the Supplemental Report, effectuate the correction of errors in the initial report due to reliance on GMAC's summary documents, i.e. the Client Statements.

10. The results of our revisions are set forth under "Adjustments" at page 1 of the Supplemental Report. The net effect of the adjustments was to increase the effective interest rate from 27.10% to 28.02% and to increase the usury damages from $107,775.20 to $121,822.98.

11. While in my initial report I accepted GMAC's statement of the breakdown between inventory and accounts receivable receipts, in the course of my work, I determined that, again, GMAC had misclassified in its internal records inventory receipts as accounts receivable receipts and vice versa. I summarized the specific misclassifications in Exhibit M to the Supplemental Report. As shown in Exhibit M, this analysis did not effect the damages calculation since the total which GMAC collected remained the same. It merely changed the breakdown between receipts from sale of inventory and accounts receivable receipts.

3

12.     The balance of the Supplemental Report resulted from additional work which I performed after my initial report in preparation for my testimony in the New York case. With the assistance of Mr. Landay, I was able to refine my analysis of the value of the inventory. This analysis led to an increase in damages of about $85,000.00 resulting from GMAC's commercial unreasonableness.

13.     During this time, I was able to compare the Stock Status Report of 10/22/01 with the Open Order Report of 10/23/01 to determine what orders could have been filled. My analysis of the value of what I called "Allocated Inventory" is shown in Exhibit J to the Supplemental Report. See, also, Supplemental Report, p. 2. I valued the unallocated inventory by using the same percentages as GMAC's liquidator. This actually lowered the percentage valuation from my initial report. See Supplemental Report, p. 2 and Exhibit J to Supplemental Report.

14.     In response to GMAC's expert's statement that the product mix of the inventory had deteriorated from the date of May, 2000, the date of the Ozer report referred to in my initial report, I conducted a study which established that the product mix on October 22, 2001 was comparable to that of May 2000. See Supplemental Report p. 2 and Exhibit J to Supplemental Report.

15.     Finally, after my initial report, I was able to interview Neal Finklestein, Seneca's former comptroller, and a custom's broker to confirm what Mr. Landay had previously indicated to me that Seneca would have been able to free up one container for sale without paying charges relating to all in-port inventory. Therefore, as indicated in my Supplemental Report at p. 3 and Exhibit L, I included the sale of pre-sold inventory in one particular container as part of my damages calculation.

16. Although I had tried to contact Mr. Finklestein prior to the due date for my initial report, I had not been successful in these efforts.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS __5th__ DAY OF DECEMBER, 2005.

_____
Keith D. Lowey

231179_1