UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
DAVID L. LANDAY                     )
       Plaintiff,                   )
                                    )
       v.                           )     Civil Action No. 04-cv-11955-WGY
                                    )
GMAC COMMERCIAL CREDIT LLC          )
and GMAC COMMERCIAL FINANCE         )
LLC,                                )
       Defendants.                  )
                                    )
```

## MEMORANDUM SUPPORTING DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE PLAINTIFF'S PROFFERED EXPERT TESTIMONY

Plaintiff David L. Landay ("Landay") tendered accountant Keith D. Lowey ("Lowey") as an expert witness in support of his claims that defendant GMAC CF breached the Massachusetts usury statute (Count II) and violated Landay's rights as a junior creditor (Count VI). Landay, therefore, bears the burden of establishing that Lowey's opinions are admissible. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). Landay does not – and cannot – meet that burden.

For at least three reasons, Lowey's proffered opinions concerning usury are inadmissible. First, to the extent that Lowey seeks to interpret Mass. Gen. Laws ch. 271, § 49, he usurps this Court's role as arbiter of the law. *See Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997). Second, Lowey is entirely unqualified to testify as a usury expert, having been spoon-fed all of his information on the usury statute by Landay's lawyer. Finally, Lowey's "opinions" are not the proper subject of expert testimony.

Lowey's opinions regarding GMAC CF's liquidation of the Seneca/Brookfield assets are also inadmissible – again for at least three reasons. First, Lowey's opinion concerning the liquidation of the Seneca/Brookfield assets focuses on the *proceeds* obtained by GMAC CF for

Seneca's assets, instead of the liquidation *process*. Accordingly, Lowey's opinions are legally irrelevant under Fed. R. Evid. 401-402. *See Nadler v. Baybank Merrimack Valley, N.A.*, 733 F.2d 182 (1st Cir. 1984). Second, given his sparse personal experience in the actual process of liquidating toys and sporting goods, Lowey lacks the personal expertise to offer an opinion concerning the reasonableness of the Seneca/Brookfield liquidation process. Finally, the methodology underlying Lowey's opinions is unreliable. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148 (1999).

Accordingly, this Court should grant GMAC CF's motion and preclude Landay from introducing any of Lowey's opinions as evidence either in opposition to GMAC CF's motion for summary judgment, in support of Landay's own motion for summary judgment, or at trial.

## I.     FACTS

Landay is the former president and CEO of Seneca Sports, Inc. ("Seneca"), a sporting goods distributor, and Brookfield International, Inc. ("Brookfield"), a company that sold juvenile sports equipment and sports toys. Am. Compl. ¶¶ 1, 7-8. In his Amended Complaint, Landay alleges, among other things, that GMAC CF violated Mass. Gen. Laws ch. 271, § 49, in connection with a loan that it made to Seneca and Brookfield (the "Borrowers"), id. ¶¶ 66-71, and that GMAC CF violated Landay's rights as a junior creditor of Seneca. Id. ¶¶ 85-90. In support of those claims, Landay proffered Lowey as an expert witness.

On October 10, 2005, Landay served GMAC CF with a document titled "Expert Witness Report of Keith D. Lowey, CPA ("Lowey's Report").[1] In his report, Lowey claims the benefit of twenty-two years of accounting experience and states that he is "President of Verdolino & Lowey, P.C., ("V&L"), a diverse accounting firm offering forensic accounting, business liquidation services, litigation support, business advisory, management consulting as well as tax

---

[1]        A copy is attached as Exhibit 1.

BOS_513345_3/JZANETTI

planning and compliance services." Lowey's Report at 1. However, nowhere in either his

Report or his resume does Lowey cite to any prior familiarity or experience with the

Massachusetts usury statute. *See generally id.* At his deposition, Lowey acknowledged that he

learned most of what he knows about the Massachusetts usury statute from conversations that he

had with Landay's lawyer in this case, Alan Hoffman. *See* Deposition of Keith D. Lowey, Oct.

20, 2005, 24:2-25:2; 46:21-47:14.[2] Lowey also admitted that he did not read any case law or

commentary on the usury statute before formulating his opinions in this case. *Id.* 27:6-9; 45:18-

46:1.[3]

In his resume Lowey asserts that V&L has been employed in "many liquidations" and

lists nineteen specific engagements. *See* Lowey Report, Exhibit G, at p.1. At his deposition,

however, Lowey conceded that only three of the nineteen companies referenced on his resume –

NordicTrack, Learningsmith, and Toysmart – were engaged in the wholesale or retail sale of toys

or sporting goods. Lowey Dep. 136:24-137:1. Furthermore, Lowey's testimony revealed that

for at least eleven of the nineteen engagements listed on Lowey's resume, Lowey's partner rather

than Lowey, bore primary responsibility for the project. *Id.* 124:9-135:20.[4] Lowey described his

involvement in those liquidations as more "administrative," *id.* 126:20; 127:3, or "general." *Id.*

130:19. Of the remaining eight liquidations, one involved a "joint effort" of Lowey and his

partner, *id.* at 132:1-3, and for one, Lowey's role was unclear. *Id.* 124:9-125:19.

---

[2]     Copies of all cited pages from Lowey's deposition minuscript are attached as Exhibit 2.

[3]     Hoffman's influence upon Lowey's opinions was so strong that in an earlier draft of his report (attached as Exhibit 3), Lowey repeatedly used the pronoun "we" instead of "I" when attributing the opinions. For example, the draft stated that "we" calculated the interest rate to be 27.10% and "we" calculated damages to be $107,775.20, whereas the final report attributed such calculations to "I." *Compare* Ex. 3 at pp. 3-4 *with* Ex. 1 at pp. 3-4.

[4]     This list includes Learningsmith, *id.* 126:7-24; Toysmart, *id.* 127:1-3; Buck-a-Book, *id.* 127:13-16; Ground Round, *id.* 128:23-129:1; ACT, *id.* 130:6-8; Digital Broadband, *id.* 130:8-10; Olympus Healthcare Services, *id.* 130:12-22; Service Sense, *id.* 130:23-131:1; Molten Metals Technology, *id.* 131:2-4; Ironbridge, *id.* 133:4-6; and Bess Eaton. *Id.* 134:13-15.

BOS_513345_3/JZANETTI

More significantly, none of the jobs on which Lowey exercised primary responsibility required that he oversee a substantial inventory liquidation at closeout. *See id.* 125:2-13 (for NordicTrack, Ozer Valuation Services did the actual liquidation, while V&L provided accounting services and worked as a broker to liquidate "remaining equipment and factory stuff"); 127:17-128:22 (after MotherNature.com spent "about a month" selling off "a good part" of its inventory, it hired V&L to take over the collection of receivables, the sale of some intellectual property and the remaining inventory); 129:2-130:2 (for Newport Creamery, V&L helped the bankruptcy trustee reduce the number of stores from thirty-four to twelve and sell off some remaining assets in those other locations); 131:5-24 (the Send.com engagement did not involve any inventory liquidation); 132:1-133:3; 133:10-19; 134:16-135:1; 135:8-15 (likewise no inventory was involved in the Anton Noll liquidation, the Adero liquidation, the Dunkin' Donuts liquidation, or the Holland Mark liquidation).

Despite Lowey's complete lack of familiarity with the Massachusetts usury statute and his inexperience with large-scale, closeout inventory liquidations, he blithely rendered "expert" opinions on both topics in this case. Based on the understanding of the usury statute that he gleaned from conversations with attorney Hoffman, Lowey "calculated the annualized effective interest rate for the period from October 22, 2001 ... to January 31, 2003 as being 27.10%." Lowey's Report at 2. He then opined that Landay suffered "Usury Interest Damages" during that time period of $107,775.20. *Id.* at 3. Lowey reached this conclusion by including in his tabulations many charges that GMAC CF had assessed against the Borrowers other than actual interest.[5] *Id.* at 2-3 and Exs. D-F; Lowey Dep. 46:21-49:21, 51:22-53:2, 55:10-56:19.

---

[5]    For example, Lowey included in his tabulation a $56,908.22 payment that GMAC CF made to Disney, *id.*, Exhibit F, p.4; Lowey Dep. 40:11-44:02, and more than $70,000 in legal fees that GMAC CF had incurred after the Borrowers' default. *See* Defs.' Statement of Undisputed Material Facts (Docket No. 54) ¶ 88 & Appendix of Exhibits (Docket No. 55), Exhibit 28.

BOS_513345_3/JZANETTI

Lowey decided to include these charges only after receiving clarification from attorney Hoffman about how the Massachusetts usury statute should be interpreted. Landay Dep. 24:2-25:2; 46:21-47:14.

Lowey's Report also included his opinion that GMAC CF "was not commercially reasonable in its liquidation of the Seneca assets that remained as of 10/22/01." Lowey Report at 8. Lowey based his conclusion on his review of documents from GMAC CF's loan file, reports prepared by the company hired by to liquidate the Borrowers' inventory and fixed assets, and liquidation analyses conducted prior to October 22, 2001. *Id.* at 3 and Exhibit H. Lowey used those documents to estimate the value of the Borrowers' assets. Because GMAC CF failed to recover an amount equal to or greater than his estimate of value, Lowey concluded that GMAC CF must not have acted in a commercially reasonable manner during the liquidation. *Id.* at 3-7. Finally, Lowey opined that the difference between the net proceeds that GMAC CF obtained from its liquidation of the Borrowers' inventory and accounts receivable and the amount that it should have obtained was $360,360, *id.* at 8.

Significantly, Lowey's Report fails to make any comparison of the methods employed by GMAC CF during its liquidation of the Borrowers' assets and the methods employed by other liquidators in similar circumstances. *See generally* Lowey's Report at 3-8. Lowey also neglected to mention the particular issues that a toy and sporting good retailer might would likely encounter during the months preceding the holiday shopping season or the difficulties that a company closing its doors might encounter when trying to collect outstanding accounts receivable. *Id.*

BOS_513345_3/JZANETTI

## II.    ARGUMENT

Fed. R. Evid. 702 governs the admissibility of expert testimony.  It provides:

> If scientific, technical, or specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliable to the facts of the case.

Fed. R. Evid. 702.  Thus, when faced with a proffer of expert testimony, a district court must first determine whether the proposed expert possesses the knowledge, skill, training, or education required to testify as an expert.  *Bogosian v. Mercedes-Benz of North America*, 104 F.3d 472, 476 (1st Cir. 1997).  If the expert passes that test, the court then must decide if the proposed subject matter of the expert opinion properly concerns scientific, technical, or other specialized knowledge.  *Id.*  "Finally, the court performs a gatekeeping function to ascertain whether the testimony is helpful to the trier of fact, *i.e.*, whether it rests on a reliable foundation and is relevant to the facts of the case."  *Id.* (citing *Vadala v. Teledyne Indus., Inc.*, 44 F.3d 36, 39 (1st Cir. 1995) and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993)).  Application of these principles in this case necessarily leads to the preclusion of Lowey's proffered testimony with respect to both usury and commercial reasonableness.

### A.    Lowey's Proffered Testimony on Usury Is Inadmissible Because It Usurps the Court's Role in Interpreting the Law; Is Not Based on Specialized Knowledge; and Is Not The Proper Subject of Expert Testimony.

#### 1.    *Lowey's Interpretation of The Usury Statute is Per Se Inadmissible.*

"It is black-letter law that 'it is not for witnesses to instruct [the factfinder] as to applicable principles of law, but for the judge.'"  *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d at 99 (citation omitted).  Thus, expert testimony proffered to establish the meaning of a law is

presumptively improper. *United States v. Mikutowicz*, 365 F.3d 65, 73 (1st Cir. 2004); *United States v. Prigmore*, 243 F.3d 1, 18 n.3 (1st Cir. 2001). *See also American Nat'l Fire Ins. Co. v. Mirasco, Inc.*, 265 F. Supp. 2d 240, 252 (S.D.N.Y. 2003) (explaining that the use of expert testimony must be carefully circumscribed to assure that the expert does not usurp the role of the trial judge as to the applicable law). In this case, Lowey's conclusion that GMAC CF violated the Massachusetts usury statute is based entirely on his (or, more precisely, Hoffman's) opinion of how the statute should be interpreted. Under *Nieves-Villanueva* and *Mikutowicz*, such opinions are *per se* inadmissible. This Court should reject Landay's thinly veiled effort to give his proposed interpretation of the usury statute artificial *gravitas* by masquerading it as "expert" testimony.[6] It should, in short, preclude Lowey from opining that GMAC CF committed usury.

### 2. *Lowey Is Not an Expert on the Massachusetts Usury Statute.*

Lowey's purported "expert" testimony on the Massachusetts statute is doubly problematic because the subject matter – Massachusetts usury law – is not even remotely related to Lowey's purported field of expertise. Lowey is an accountant, not a lender or a lawyer. So far as he has revealed to date, prior to his engagement as a purported expert in this case, Lowey never had occasion to consider the Massachusetts usury statute. Indeed, Lowey readily admits that he did not read any commentary on the statute or any cases interpreting the statute before rendering his "expert" opinions on the topic. Instead, he received his entire "education" on the statute from Landay's attorney. Fortunately, a crash course in usury offered by trial counsel cannot suffice to establish the "knowledge, skill, training, or education" required by Rule 702.

---

[6]     It is easy to understand why Landay felt compelled to engage in such a charade, since his usury claim hinges on a tortured reading of Mass. Gen. Laws ch.271, § 49. Indeed, under Landay's theory, any time a creditor assesses a fee on a given day, and the amount of the fee multiplied by 360 is greater than 20 percent of the loan balance on that day, there would be a violation of the statute. Lowey Dep. 25:3-27:5; 56:6-19; 122:16-123:9. Thus, in Landay's view, if a debtor had a line of credit for $1 million that it never used and as a result, was charged a $20 unused line fee, the loan would be usurious. *Id.* 56:6-19; 122:16-123:9.

In *Bogosian v. Mercedes-Benz*, the First Circuit ruled that a district court acted within its discretion when it precluded an automobile repair specialist from opining that a design defect caused a particular accident. *Bogosian*, 104 F.3d at 477. The proffered expert possessed an impressive background in the field of automotive repair. *Id.* at 476-477. He was certified to teach vocational automotive mechanics and as a "master automobile technician for diagnosis and repair of various vehicles, including passenger cars." *Id.* However, he did not have an engineering degree, and his formal education in engineering was limited. *Id.* at 477. He also had never professionally designed any automobile components and had no formal training in manufacturing automobiles or their components. *Id.* The district court concluded that while the would-be expert was "a very well qualified master mechanic," his expertise did not extend to the alleged design defect. *Id.* As a result, the court properly excluded his testimony. *Id.*

The same analysis applies here. No doubt Mr. Lowey is an experienced accountant who might well be qualified to testify as an expert on a range of sophisticated accounting issues, but this case presents no such issues. More to the point, notwithstanding his accounting experience Lowey plainly lacks the specialized knowledge necessary to render an "expert" opinion on whether GMAC CF violated the Massachusetts usury statute, and if so, what Landay's "usury interest damages" would be. Indeed, this case falls far short of Rule 702's threshold requirement that an expert be "qualified by knowledge, skill, training, or education," for if Lowey is qualified to offer expert testimony concerning the Massachusetts usury statute, then virtually anyone willing to take instruction from trial counsel could testify as an expert on virtually any topic. This Court cannot uphold an argument grounded on such an absurd proposition. Accordingly, this Court should apply the *Bogosian* rationale and preclude Lowey from testifying in in support of Landay's Count II usury claim.

3.    *Lowey's Mathematical Calculations Do Not Rise to the Level of "Expert" Testimony.*

Finally, to the extent that Lowey simply plugs numbers into a formula provided to him by

Landay's attorney, his testimony is inadmissible under Rule 702 because it is does not advance

this court's understanding of the facts in dispute. *See Hardin v. Ski Venture, Inc.*, 50 F.3d 1291,

1296 (4th Cir. 1995) (stating that "[t]he touchstone of whether a witness may testify as an expert

under Fed. R. Evid. 702 is … whether he would be 'helpful' … to the trier of fact.") (emphasis

deleted); *United States v. Cook*, 922 F.2d 1026, 1036 (2d Cir. 1991) (similar); *Sawyer v.

Southwest Air. Co.*, 243 F. Supp. 2d. 1257, 1266 (D. Kan. 2003) (similar).  Thus, if Landay can

convince this Court to accept his interpretation of the usury statute, he does not need an expert to

add up all the relevant charges.  He could simply present evidence that certain charges were

assessed against the Borrowers' loan balance and trust the Court to do its own math. *See United

States v. Fuentes-Cariaga*, 209 F.3d 1140, 1142 n.3 (9th Cir. 2000) (stating that "[w]here an

expert offers general testimony about an issue within the ken of the [factfinder's] knowledge, it

is not an abuse of discretion to exclude such testimony under Rule 702.").

### B.    Lowey's Opinion Concerning the Commercial Reasonableness of the GMAC CF' Liquidation Efforts Is Inadmissible Because It Focuses on a Legally Irrelevant Question; Lowey Lacks The Expertise To Render Such an Opinion; and His Opinion Is Not Based On Any Reliable Methodology.

1.    *Lowey's Report Focuses on the Irrelevant Issue of Proceeds rather than Process.*

To be admissible, Lowey's testimony must, at a minimum, have some tendency to make

the existence of any fact that is *of consequence to the determination of the action* more or less

probable than it would be without his testimony.  Fed. R. Evid. 401-402.  Lowey's opinion that

GMAC CF's liquidation of the Borrowers' assets was not commercially reasonable fails this

most basic of tests because it purports to answer the wrong question.  Instead of considering

whether the method, manner, time and terms of GMAC CF's liquidation conformed with

industry standards and practices, *see* Mass. Gen. Laws ch. 106, § 9-610(b), § 9-627[7], Lowey

focuses almost entirely on how much GMAC CF *should have realized* on the liquidation of

various classes of assets.

As a matter of clearly established law, "[t]he primary focus of commercial

reasonableness is not the *proceeds* received from the sale but rather the *procedures* employed."

*Nadler v. Baybank Merrimack Valley, N.A.*, 733 F.2d 182, 184 (1st Cir. 1984). *See also* Mass.

Gen. Laws ch. 106, § 9-627(a) (stating that "[t]he fact that a greater amount could have been

obtained by a collection, enforcement, disposition, or acceptance at a different time or in a

different method from that selected by the secured party is not of itself sufficient to preclude the

secured party from establishing that the collection, enforcement, disposition or acceptance was

made in a commercially reasonable manner."); *Waxman v. Kasper*, 1994 WL 879960 at *6

(Mass. Super. May 13, 1994) ("The fact that a secured party could have gotten a better price for

the collateral by selling it at one time rather than another does not, in itself, constitute a failure to

act in a commercially reasonable manner.")  "Such a rule is necessary to prevent every

disgruntled debtor from making a jury case by talking price." *Nadler*, 733 F.2d at 184.

Notwithstanding this rule, Lowey dedicates more than a quarter of his discussion to

GMAC CF's loan file and the values that Seneca, Brookfield and by implication according to

Lowey, GMAC CF placed on the Seneca/Brookfield assets.  According to Lowey the fact that

GMAC accepted the Borrowers' valuation of their assets in connection with its internal credit

approval processes, somehow suggests that GMAC CF should have recovered a higher

percentage of that value a year and a half later when it obtained possession of the

Seneca/Brookfield assets. *See* Lowey's Report at 3-5.  Turning the UCC on its head, Lowey

---

[7]      Chapter 106, Section 9-627 is captioned "Determination of Whether *Conduct* Was Commercially Reasonable" (emphasis added). Section captions are relevant in interpreting the U.C.C. Mass. Gen. Laws ch. 106, § 1-109.

BOS_513345_3/JZANETTI

argues that since GMAC CF failed to recover a sufficiently high percentage of the value that it noted as part of its loan approval process, it must have done something wrong. Without pausing to discuss what other inventory and account liquidators have done in similar circumstances, Lowey simply posits that based on his review of the file, an orderly liquidation of the Borrowers' inventory should have generated proceeds equal to at least 47 percent of the products' cost value. *See id.* at 6-7 and Ex. A.[8] He then concludes that since GMAC CF's liquidation failed to meet that target, it was commercially unreasonable, and that Landay's damages are equal to the difference between the money generated and Lowey's arbitrary liquidation target. *Id.* Even if Lowey's analysis on these points were sound – and it is not – it would be legally irrelevant since it focuses improperly on *proceeds* instead of on *procedure*.

Lowey does genuflect briefly in the general direction of process. In one sentence he summarily concludes that the reason that GMACCF did not recover his target liquidation recovery total was "that GMAC: (1) made little or no effort to liquidate Seneca's intellectual property; (2) did not conduct an 'orderly liquidation' of Seneca's inventory since it failed to take at least six weeks to conduct the liquidation in favor of a 'fire sale' time line; [and] (3) did not retain key employees to maximize the recovery related to the intellectual property, A/R and the inventory." *See* Lowey's Report at 7-8. Critically, however, the only support for this conclusion is Lowey's assertion that a greater price should have been obtained. *See generally id.*

Lowey does not provide sufficient explanations for the three opinions contained in his lone legally relevant sentence. For example, while he criticizes GMAC CF for making no effort to liquidate GMAC CF's intellectual property, Lowey never indicates what actions are normally undertaken in liquidations of this nature or what actions GMAC CF should have taken in this

---

[8]    "Cost value" is simply the amount of money that the Borrowers spent on a particular product. Thus, Lowey believed that for every dollar the Borrowers spent on particular products, GMAC CF should have been able to generate at least 47 cents from sales of those products.

particular case or whether the cost of liquidating the intellectual property might exceed any proceeds generated by such sales. *See generally id.* Similarly, while Lowey opines that GMAC CF should have spent "at least six weeks" to liquidate Seneca's inventory, *id.* at 6, his report contains no discussion of the main reason cited by GMAC CF for its shortened timetable: namely, that unless it liquidated the Seneca/Brookfield assets sufficiently in advance of the Holiday shopping season to give retailers a reasonable prospect of selling the inventory during the Holiday shopping season, the inventory would dramatically lose value over the succeeding months. *See generally id.* Finally, Lowey's critique of GMAC CF for failing to retain "key employees" of the Borrowers to "maximize the recovery" is unsupported by any explanation of what these "key employees" would have done differently or why any additional recovery generated by such employees would likely have exceeded the cost of retaining their services. *See generally id.*

Under both settled Massachusetts law and the Revised UCC, Lowey's Report focuses on a legally irrelevant question – the value of the Seneca/Brookfield inventory. Further, Lowey fails to support his purported conclusions with any reference to liquidation practices and procedures that other inventory and account liquidators have employed in similar circumstances. Lowey's fixation with asset values and target recoveries combined with his failure to address the liquidation *process* renders his Report and his testimony inadmissible under Fed. R. Evid. 401-402 because neither the report nor the testimony address any fact that is *of consequence to the determination of the action* in a manner that makes that fact more or less probable than it would be without the testimony.

2.      *Lowey Lacks Sufficient Expertise To Critique GMAC CF's Liquidation Efforts.*

Even if Lowey properly focused his analysis on the process employed by GMAC CF during its liquidation of the Borrowers' assets, his opinions on that topic would be inadmissible because he lacks the specialized knowledge required by Fed. R. Evid. 702 with respect to liquidation processes. Lowey is an accountant, not a liquidator. While his company, V&L, has sometimes been hired to assist in various liquidations, its role has often been limited to providing accounting services as opposed to actually conducting the liquidations. *See, e.g.*, Lowey Dep. 125:8-13 (discussing NordicTrack liquidation). Significantly, Lowey himself cannot identify a single instance in which he personally performed the type of work that John Rijo performed for GMAC CF in this case. Furthermore, he did not identify any toy or sporting goods wholesaler or retailer that employed him to sell its inventory, so he apparently has no first-hand knowledge of the need that such companies have to sell their products in time for the Holiday season. For that matter, Lowey only identified one company, MotherNature.com, for which he oversaw any inventory liquidation at closeout, and even there, "a good part" of the inventory already had been sold off. *Id.* 128:7-17.

Thus, while Lowey might be amply qualified to render opinions about proper accounting practices, he is in no position to criticize GMAC CF's inventory liquidation efforts. In short, like the auto mechanic in *Bogosian,* Lowey should be barred from offering any "expert" testimony on a subject matter beyond the scope of his expertise. He simply lacks the "specialized knowledge" required by Rule 702 to opine on the liquidation process employed by GMAC CF.

3.      *The Methodology Underlying Lowey's Opinions Is Unreliable.*

In *Daubert v. Merrell Dow Pharm., Inc.*, the Supreme Court held that Fed. R. Evid. 702 "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony …

is not only relevant, but reliable.'" *Daubert*, 509 U.S. at 589, *quoted in Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. at 147. Six years later, the Court clarified that this "basic gatekeeping obligation" extended to all expert testimony not only to "scientific" testimony. *Kumho Tire Co.*, 526 U.S. at 147. A trial court's assessment of reliability is flexible, but "an expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was consistent with standards of the expert's profession." *SMS Sys. Maintenance Servs., Inc. v. Digital Equipment Corp.*, 188 F.3d 11, 25 (1st Cir. 1999).

Furthermore, one "very significant fact" that courts should consider when making such assessments is "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying." *Daubert v. Merrell Dow Pharm. Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). While the fact that an expert is testifying for money does not necessarily cast doubt on the reliability of his testimony, a court "may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office." *Id.*[9]

In this case, Lowey has not even attempted to explain how his opinions comport with the standards of the accounting or liquidating professions. Lowey's report makes no mention of industry practices for liquidating inventory of companies closing their doors, especially where the companies in question have a seasonal market. Nor does it reference commonly accepted standards for trying to collect accounts receivables. Lowey does not explain, for example, the frequency with which a company in GMAC CF's position would contact a customer of the company being liquidated, or the tactics that would commonly be used to maximize account

---

[9] The fact that this case does not concern "scientific" testimony does not impair the basic logic of the Ninth Circuit's analysis in *Daubert*, post-remand. *See Kumho Tire*, 526 U.S. at 147.

BOS_513345_3/JZANETTI

receivable collections. Nor does Lowey draw any distinction between normal collection rates on accounts receivable and the rates that should be expected when the customers know that the companies are going out of business. He also makes no mention of the methods typically used to sell the intellectual property of a dying company or how liquidators typically determine whether or not it is economically efficient to liquidate such assets. Without such descriptions, it is impossible to test his conclusions that GMAC CF's liquidation approach was unreasonable.

Landay cannot defend these omissions by complaining that Lowey did not have enough information about GMAC CF's collection efforts at the time he wrote his report. Regardless of what he knew about GMAC CF's particular conduct, Lowey still should have been able to describe the common practices in the industry. Had he done so, one could then compare the procedures for collecting accounts receivable and selling intellectual property that GMAC CF claimed to follow with the procedures that Landay believed GMAC CF should have followed. One also could have tested Lowey's theories by examining the procedures undertaken by other liquidators in similar circumstances. Instead, Lowey provided a report that is filled with theories that cannot be tested. Such theories, which clearly were developed solely for the purpose of testifying, are unreliable and should be excluded. *See Daubert*, 43 F.3d at 1317.

## Conclusion

For all the foregoing reasons, this Court should grant GMAC CF's motion *in limine* to preclude Landay's proffer of expert testimony from Keith Lowey.

DATED:  December 13, 2005

/s/ John A. Houlihan
/s/ Mark B. Dubnoff
John A. Houlihan (BBO # 542038)
Mark B. Dubnoff (BBO # 637212)
EDWARDS ANGELL PALMER & DODGE LLP
101 Federal Street
Boston, MA  02110
(617) 439-4444

BOS_513345_3/JZANETTI