# EXHIBIT 3

## Keith Lowey

| | |
|---|---|
| From: | Keith Lowey |
| Sent: | 10/10/2005 10:27 AM |
| To: | Alan R. Hoffman Esq. (E-mail) |
| Cc: | Keith Shelansky |
| Subject: | draft #1 |



Expert Report.doc


Keith D. Lowey, CPA
Verdolino & Lowey, P.C.
124 Washington Street, Suite 101
Foxboro, MA  02035
Phone   508-543-1720  x225
Fax       508-543-4114
Cell       508-889-1989
e-mail    klowey@vlpc.com

1

United States District Court
District of Massachusetts
Civil Action No. 04-11955WGY
David L. Landay v. GMAC Commercial Credit LLC et al.
Expert Witness Report of Keith D. Lowey, CPA
October 10, 2005

### I.     Background

The Plaintiff in this litigation matter, David L. Landay ("Landay"), was the CEO, president, director and majorority shareholder of Seneca Sports, Inc. ("Seneca"), a distributor of adult and children's sporting good products and Brookfield International, Inc. ("Brookfield"), a purveyor of juvenile sports equipment and sports toys. In the summer of 2000, Landay, on Seneca's behalf, sought financing from GMAC Commercial Credit LLC ("GMAC") to purchase Brookfield. On or about September 19, 2000, Seneca and GMAC entered into a commercial factoring agreement with a line of credit up to $10,000,000 (the "Factoring Agreement") that was secured by Seneca's and Brookfield's accounts receivable and inventory, and by a personal guaranty and standby letter of credit from Landay. Seneca and Brookfield defaulted on the covenants of the Factoring Agreement. On or about August 9, 2001, Seneca and Brookfield executed a Forbearance Agreement with GMAC that modified the Factoring Agreement and required Landay to increase his personal guaranty and put up $1,000,000 in cash collateral. The Forbearance Agreement included a financial plan that provided a schedule for loan draws, loan payments and established a formula for eligible accounts receivable. On or about October 15, 2001, GMAC collected Landay's $1,000,000 in cash collateral and collected on his standby letters of credit totaling $4.35MM. On or about October 22, 2001, GMAC seized Seneca's and Brookfield's assets and proceeded to liquidate them.

### II.    The Issues

In my capacity as expert for the plaintiff, I have been asked to assess: 1) whether the interest and expenses charged by GMAC on the Factoring Agreement exceeded the 20% ceiling under the Massachusetts usury statute as articulated in M.G.L. 271, Section 49 and 2) whether GMAC and/or its agents acted in a commercially reasonable manner to maximize the return on the liquidation of the Seneca collateral securing the Factoring Agreement, specifically the accounts receivable, inventory and intellectual property.

### III.   Qualification as Expert

I am President of Verdolino & Lowey, P.C. ("V&L"), a diverse accounting firm offering forensic accounting, business liquidation services, litigation support, business advisory, management consulting and tax planning and compliance services. I have 22 years of accounting experience: three at one of the former international Big Six accounting firms, four at a well-known privately-held company in the capacity as

CFO and Controller and the remaining 15 at my present practice. I am a Certified Public Accountant, licensed to practice in Massachusetts and Rhode Island. Over the past 19 years, the largesse of my practice has focused on complex business issues and analysis and business litigation in connection with bankruptcy, insolvent or otherwise under performing enterprises. A copy of my current Curriculum Vitae is attached as Exhibit I.

My firm has incurred total fees of $21,561.00 through September 30, 2005 in connection with this litigation. Additional fees and expenses may be billed between now and the time of trial if additional work is requested by counsel for Landay. My compensation is not contingent on the outcome of this litigation.

### IV.   Documentation Reviewed

In connection with the work performed in this engagement, numerous documents and records were reviewed; including but not limited to, complaints, responses to interrogatories, deposition transcripts and related exhibits and various company records. For a complete list of documents reviewed see Exhibit J.

### V.   Findings

In my expert opinion, (1) GMAC, on its own or through its Agent (RAS) was commercially unreasonable in their effort to liquidate Seneca and (2) that Seneca was charged interest and expenses in excess of 20% for the period October 22, 2001 to January 31, 2003.

### VI.   Usury

In order to calculate the overall interest rate charged on the GMAC loan, a schedule was prepared that re-created the loan activity for the history of the loan. This recreation effort was performed as a result of GMAC not being able to provide the plaintiff with a similar schedule. GMAC provided the plaintiff with a summarized schedule (by month) of the loan activity, monthly client statements and some daily cash records. But in order to validate the activity, and prepare an accurate calculation of the periodic interest being charged on the loan, this comprehensive activity analysis was prepared. This analysis ultimately allowed us the opportunity to review the loan activity by transaction (i.e., individual charges to the loan, individual payments / receipts posted to the loan, draws against the loan, adjustments to the loan balance, etc.) for propriety. As of the writing of this report, there are still numerous transactions for which no support has been provided by GMAC.

We calculated the annualized effective interest rate for the period from October 22, 2001 (the "Takeover Date") to January 31, 2003 as being 27.10%. The rational for specifically identifying this period was that it begins with the date that GMAC took control of the Seneca business and ends at the end of the month that includes the last

significant transaction that was posted to the loan balance (on 1/9/03 a collection of $103,341.50 was posted against the outstanding loan balance). GMAC wrote the balance of the loan off on 11/24/03. During the period from 2/1/03 to 11/24/03, only monthly interest and over advance fees were charged to the loan along with two de minimus receipts (totaling less than $300). Since we could not determine the reason that GMAC wrote-off the loan in November 2003, we ignored the period from 2/1/03 to 11/24/03 in preparing our usury calculation.

We calculated the affect of interest being charged at a rate in excess of 20% (the "Usury Interest Damages") for the period 10/22/01 to 1/31/03, as being $107,775.20. See Exhibit D for this calculation. Additionally, see Exhibit E for our calculation of the interest rate being charged on the loan and Exhibit F for the loan transaction activity for this period.

**VII.    Commercial Reasonableness**

In assessing whether or not GMAC (or its agent RAS) acted commercially reasonable, we considered all of the documents made available to us to review. See Exhibit J for a complete list of these documents. The primary documents relied upon include the GMAC Commercial Credit Corp. **New Client Report** dated July 19, 2000 (see Exhibit B for excerpts from the report) and the periodic update reports (including various liquidation analyses) prepared by John Rijo representing RAS (the liquidating agent for GMAC) for the period June 30, 2001 to November 26, 2001. The liquidation analyses that were reviewed (and included as part of the reports prepared for those dates) were prepared as of June 30, 2001, October 5, 2001 and October 19, 2001.

Our observations in this area include:

- The loan was considered by GMAC to be primarily a collateral based loan – a majority of which is secured by the assets of David Landay (56% of the estimated original loan advance). "Strong collateral loan with over 50% of the initial funding supported by a Standby LC, A/R to be factored with retailers we know well, and **a advance rate against inventory supported by a liquidation value appraisal**."

- Despite GMAC recognizing that Seneca "performed poorly with increasing losses over the past three years" and that "the balance sheet is weak with a negative retained earnings and a sizeable deficit in working capital" they still approved the loan.

- GMAC acknowledged the importance of David Landay's industry experience including his knowledge of the licenses, trademarks and patents (collectively "the intellectual property") and his personal resources in the loan write-up. Examples of this include the following excerpts "a

$3.5MM personal guaranty of the President and majority owner, David Landay, secured by a $4MM Letter of Credit issued by Fleet Bank **tying him very closely to our loan**". "Seneca primarily through David Landay, has a long established credibility in the industry within which he has more than thirty years experience." ".....with Landay's personal exposure in this loan it would appear **he would have incentive to liquidate for the highest possible return**. Additionally **he would have the opportunity to sell the licenses to another distributor/manufacturer who is in the industry to further enhance any recovery**." "David Landay is absorbing a large portion of the risk with his $4.0MM letter of credit and $2.9MM of subordinated debt, with GMAC being in a strong position of control, utilizing our factoring product and in possession of his Letter of Credit."

- GMAC acknowledges the value of Seneca's (and Brookfield's) intellectual property. It funds the purchase of the Brookfield intellectual property (intangibles) for $1.6MM with its loan to Seneca. Further recognition includes (excerpts from the loan write-up) "Seneca's distinction is its long time participation in this industry, and subsequent relationships it has developed, and its **strong licensed brand recognition in the market place**." "Competition in toys is keen, however start-ups in this category are rare due to the need to garner licensed brands. Seneca/Brookfield have long-term license agreements with the premier brands which management knows intimately." In making its recommendation for the loan, the report writer sites "a good strategic acquisition in Brookfield International, and a good list of license agreements which are key to their marketing efforts."

- In preparing the Liquidation Analyses as of June 30, 2001 and October 5, 2001, John Rijo from RAS (the "liquidator") provides for a liquidation that is projected to take 12 and 10 weeks respectively and the retention of key employees in accounting, shipping, sales and accounts receivable for a period of 5 to 10 weeks. **This is important to note.** If the goal is to maximize the overall return in a liquidation, sufficient time needs to be provided to allow the liquidating party the opportunity to administer/liquidate the remaining assets. In this case the remaining assets were inventory, accounts receivable, intellectual and personal property. If sufficient time is not provided, the liquidator may be forced to accept lesser offers than they might otherwise (if they had more time). Further, from a cost, efficiency and effective perspective, it is generally important to retain those individuals who are most familiar with the important assets that are being liquidated in a given situation. These individuals are usually cheaper than the professionals being retained and as a result of their familiarity and experience with the company and/or particular assets, are in a position to liquidate a particular asset more efficiently and effectively.

Although the Liquidator intends (as of 10/5/01) to retain certain key employees to assist him with the liquidation over the proposed 10 to 12 week period AND GMAC acknowledges David Landay's experience and knowledge with the intellectual property and his potential motivation in maximizing any recovery in a liquidation scenario (see above), this is not what happened. The Liquidator took control, on very short notice (notice being given on the day of the seizure) on October 22, 2001. Based on our review of the periodic update reports prepared by the Liquidator, the majority of the liquidation was completed by November 16, 2001 – **27 days.** The remaining assets were negligible (primarily offsite inventory with little net benefit to the company - approximately $6k). The Liquidator did use certain key company personnel but only on a very limited basis – customer service and A/R person 22 hours, accounting staff (CFO) 32 hours, computer systems person 12 hours and shipping/warehouse person 152.75 hours. GMAC took responsibility for collecting the A/R. It appears as though they were given supporting documentation on the remaining accounts with outstanding balances but company personnel were not utilized to assist them in dealing with the high volume of credits and adjustments that were being sought by many of Seneca's customers. No one was retained to assist the Liquidator in selling the remaining inventory – a further discussion to follow on this. No one was retained and little if any effort was made to try and recover anything with regard to the intellectual property (despite GMAC's recognition of its value AND their funding of the Seneca purchase of the Brookfield intangibles for $1.6MM thirteen months earlier).

- The accounts receivable were collected by GMAC. Customer checks were received via lockbox by GMAC and any discrepancies between company records and payment received were identified. The determination as to the propriety of any credit taken by a customer was up to Seneca to investigate and follow-up on. GMAC acted merely as a recipient of payments and record keeper of same. We have not been able to determine what if any collection effort was made by GMAC. In the event of a discrepancy between invoice and payment amount, GMAC generated and sent a letter to Seneca giving them 60 days to investigate and resolve the discrepancy identified. Initially, these discrepancy letters were sent to the company at its main location in Milford, Massachusetts. Unfortunately, after 10/22/01, there was no one there to respond to these letters. Further, eventually these letters ended up being forwarded back to GMAC when the Milford location was vacated (in late November) and the mail forwarded to GMAC (in effect they were sending themselves the letters). David Landay and his Attorney found unopened discrepancy letters in the records that were retrieved from the off-site storage facility during the document production process. GMAC has represented that they collected approximately $588k from A/R (on a balance of $1.3MM).

Due to insufficient information being provided, we have not been able to verify this amount. In order to project a liquidation value of the company's A/R (as of 10/22/01), we reviewed the analyses prepared by the Liquidator and other relevant information provided to us. As a result of this analysis, we have utilized an overall 41% expected recovery rate - the same utilized by the Liquidator in his 10/19/01 analysis. In prior analyses (as of 6/30/00 and 10/5/00) the Liquidator used an overall 53% and 55%, respective rate. The company historically had a 90% to 94% collection rate – but this does not take into consideration certain credits and allowances that were made available to various large customers. Thus, I would characterize the overall collection rate (41%) used for projection purposes as being conservative.

•

## VIII. Additional Information

During the course of our work, we observed that GMAC continued to charge Seneca Over Advance and Facility Fee Charges subsequent to GMAC taking over the company on 10/22/01. These charges totaled $53,319.90 (including interest). We have been unable to determine whether or not these fees were properly charged Seneca. See Exhibits G and H for a list of the dates and amounts of the charges and calculation of the related interest expense.

I reserve the right to supplement my conclusion and analysis included herein should additional information become available.

Keith D. Lowey
October 10, 2005