UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-CV-11955-WGY

| | |
|---|---|
| DAVID L. LANDAY, )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>GMAC COMMERCIAL CREDIT, LLC and )<br>GMAC COMMERCIAL FINANCE, LLC, )<br>)<br>    Defendants. )<br>) | **PLAINTIFF DAVID L. LANDAY'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF MATERIAL FACTS IN DISPUTE** |

Now comes the Plaintiff and hereby opposes the Defendants', GMAC Commercial Credit, LLC and GMAC Commercial Finance, LLC ("GMAC"), Motion for Summary Judgment. In support of this Opposition Landay has attached his Statement of Material Facts In Dispute and Exhibits. In further support of this Opposition, Landay is filing herewith a supporting memorandum.

                                                        Respectfully submitted,
                                                        DAVID L. LANDAY,
                                                        By his attorney,

                                                        /s/ Alan R. Hoffman
                                                        Alan R. Hoffman, BBO# 236860
                                                        Lynch, Brewer, Hoffman & Fink, LLP
                                                        101 Federal Street, 22nd Floor
                                                        Boston, MA 02110
                                                        (617) 951-0800

Dated:  December 14, 2005

**STATEMENT OF MATERIAL FACTS IN DISPUTE**

Pursuant to Local Rule 56.1, Landay submits the following statement of material facts in dispute in opposition to GMAC's Motion for Summary Judgment.

**A.    Facts Described By GMAC As Undisputed Material Facts.**

3.    GMAC has omitted from its paragraph 3 that at all relevant times it had a Boston office and that Landay dealt with Mr. Fitzgerald in that office. In fact, Landay's initial contacts with GMAC were with Mr. Fitzgerald of the Boston office and during the course of Borrowers' and Landay's relationship with GMAC, Landay dealt with the Boston office. Exhibit A, Landay Affidavit, ¶¶21-23, 26-27, 30-31. [1]

8.    Contrary to GMAC's characterization of the terms of the Factoring Agreement (paragraph 8):

    a.    GMAC was not permitted to charge up to the highest rate permitted by New York law. Because GMAC did not timely file with the Massachusetts Attorney General, it was limited to what it could charge under the Massachusetts Usury statutes. Exhibit C to Landay's Motion for Summary Judgment on Usury Count, Deposition Exhibit 50 (excerpted).

    b.    GMAC was not permitted to charge to the Borrowers' account various fees that related to a going concern after it seized the assets of Borrowers and put them out of business. Among the fees it was not permitted to charge after Borrowers were out of business and in the hands of GMAC were "overadvance" charges[2] (Defendants' Appendix, Exhibit 3, p. 10, definitions), unused facility fee" or "unused line fee", (Id., p. 3, §4(b)(vi))

---

[1] Unless otherwise described, the lettered exhibits referenced are those attached to this document.
[2] Defendants' Statement of Undisputed Facts #8, does not mention overadvance changes.

"commission charges," (Id., p. 2 §4(b)(ii)) and attorney fees related to a law suit on the Guaranty. Id., p. 12, §4(d). Essentially, Landay disputes the propriety of most of the post-seizure charges, the imposition of which were sharp business practices prohibited by 93A.

19-21. Contrary to GMAC's suggestion that the term sheet conflicted with Fitzgerald's representations to Landay (GMAC paragraphs 19-21), while the term sheet did not contain language which affirmed Fitzgerald's representations, it did not contain language that contradicted those representations. Exhibit A, Landay Affidavit, Exhibit 2, Deposition Exhibit 59.

22, 24. GMAC mischaracterizes Landay's deposition testimony by focusing on isolated lines (GMAC paragraphs 22 and 24 ) This is testimony where, in response to a reading of certain passages of the documents by GMAC's attorney, Landay admitted that the attorney read the passages correctly. Moreover, Landay does not believe that provisions of the Guaranty are inconsistent with his understanding of his agreement with GMAC concerning his personal collateral or the Seasonal Overadvance. See, B, Additional Material Facts in Dispute, "Fraud".

37-38. While neither the Forbearance Agreement nor Ratification and Amendment of Guaranty ("Amended Guaranty") contain language reflecting Landay's understanding with GMAC that it would look to Borrowers' collateral before it looked to his (GMAC paragraphs 37-38), nothing in those documents affects or contradicts Landay's understanding with GMAC on those issues. GMAC did not ask Landay about the second half of this proposition on deposition. Defendants' Appendix, Exhibits 10 and 11.

53. Contrary to GMAC's Statement, the actual amount of Rijo's inventory collections was $345,894. Defendants' Appendix, Exhibit 23, Lowey's Supplemental Expert Witness Report, Exhibit A to Report.

55. Contrary to GMAC's statement, the actual amount of GMAC's accounts receivable collections was $497,727. Defendants' Appendix, Exhibit 23, Lowey's Supplemental Expert Witness Report, Exhibit A to Report.

56. Lowey's calculations were arrived at independently of the assumption that "GMAC claims it received approximately 255K from the sale of inventory." Defendants' Appendix, Exhibit 22, Lowey's Expert Witness Report, Exhibit A to Report.

69. Contrary to GMAC's implication that Borrowers' or Landay received Client Statements following GMAC's seizure of Borrowers' business (GMAC paragraph 69), if GMAC generated and sent such statements, it sent them to itself. On October 22, 2001 GMAC's agent John Rijo of RAS took control of the premises and expelled all personnel. In November 2001 he put in a change-of-address for Borrowers that directed all mail be sent to GMAC. Exhibit A, Landay Affidavit, ¶¶38-39; Exhibit B, 30(b)(6) Deposition of Joseph Lennon, pp. 42-44; Exhibit C, Deposition of John Rijo, pp. 65-69, 109, 113 and Exhibits 134 and 152.

70-78. Ms. Pappalardo has no personal knowledge concerning the statements about what she testified (GMAC paragraphs 70 et. seq. ). Her testimony relates only to what the documents purport to show. GMAC has provided no backup for many of the entries on the statements. Exhibit G, Landay Deposition, p. 181; Exhibit A, Landay Affidavit, ¶52.

79.     Denied.  To the extent that such statements were generated, they were generated for GMAC's own purposes and not for the Borrowers or for Landay.  See, <u>supra</u> 69.

88.     As per Lowey's Supplemental Report, the exclusion of legal fees would not have led to the inclusion that the rate charged by GMAC did not exceed 20%.  Exhibit F, Affidavit of Keith Lowey and Exhibit 3 thereto.

**B.     Additional Material Facts In Dispute.**

**Usury**

1.     Landay incorporates herein the entire Statement of Undisputed Facts filed in connection with his Motion for Summary Judgment on Usury.  Landay contends that they are undisputed and that, therefore, he is entitled to summary judgment on Count II of the Amended Complaint.  To the extent that any material fact included therein is disputed, Landay states that a genuine issue of material fact is presented.

**Fraud**

2.     The Guaranty contains no integration clause.  Defendants' Appendix, Exhibit 4.

3.     The integration clause of the Forbearance Agreement reads in part as follows: "This Forbearance Agreement sets forth the entire understanding of the parties with respect to the matters set forth herein and supersedes in their entirety any and all understandings and agreements, whether written or oral, of the parties with respect to the foregoing."  Thus, it is expressly limited to the matters addressed in it.  Defendants' Appendix, Exhibit 10, p. 6.

4.      The integration clause of the Amended Guaranty reads in part as follows: "This agreement sets forth the entire agreement and understanding of the Guarantor and the Company with respect to the matters set forth herein, and supersedes any and all prior agreements and understandings of the parties with respect to the foregoing,…" Thus, it is expressly limited to the matters addressed in it.  Defendants' Appendix, Exhibit 11, p. 2.

5.      During the negotiations leading up to the Factoring Agreement and the Guaranty, loan officer Paul Fitzgerald represented to Landay that GMAC would make an uncollateralized Seasonal Overadvance of $500,000 to Seneca and that, upon a default, GMAC would exhaust Seneca's assets before it called on Landay's personal collateral or his Guaranty.  Exhibit A, Landay Affidavit, ¶¶21-22.

6.      Landay relied on these representations in causing Seneca to proceed with the Factoring Agreement in executing the Guaranty, and in providing a $4.1 million Letter of Credit.  Exhibit A, Landay Affidavit, ¶¶21-22, 25.

7.      There is nothing in the Guaranty which contradicted Fitzgerald's representation regarding the Seasonal Overadvance.  Defendants' Appendix, Exhibit 4.

8.      Landay did not sign the Factoring Agreement in his personal capacity, and therefore, the discretionary language in it did not bind him.  Defendants' Appendix, Exhibit 13, p. 13.

9.      Landay's reliance on Fitzgerald's representations regarding the $500,000 Seasonal Overadvance was reasonable.  Exhibit A, Landay's Affidavit, ¶21; Defendants' Appendix, Exhibit 4; Defendants' Appendix, Exhibit 13, p. 13.

10. The Letter of Credit provided by Landay was separate and apart from his obligations under the Guaranty. In this regard, the Guaranty provides in part as follows: "Notwithstanding anything to the contrary contained herein, the undersigned's liability hereunder shall not exceed a total maximum aggregate amount of $3,500,000. Such amount shall be in addition to a certain Standby Letter of Credit open for the account of the undersigned and/or the Client for the benefit of the Company." Defendants' Appendix, Exhibit 4, p. 2.

11. There is nothing in the Guaranty which contradicts Fitzgerald's representations regarding collecting Seneca's assets before seeking to collect from Landay with regard to the aforementioned $4.1 million Letter of Credit. Defendants' Appendix, Exhibit 4.

12. The language in the Guaranty on which GMAC relies does not directly contradict Fitzgerald's promise, even with regard to a suit on the Guaranty. Defendants' Appendix, Exhibit 4, p. 1.

13. Landay's reliance on Fitzgerald's representations regarding GMAC's first resort to Seneca's assets was reasonable. Exhibit A, Landay Affidavit, ¶22; Defendants' Appendix, Exhibit 4, p. 1 and 2.

14. Fitzgerald represented to Landay in early 2001 that, if Landay would provide an additional $250,000 Letter of Credit to GMAC, GMAC would make the full $500,000 Seasonal Overadvance in May of 2001. Exhibit A, Landay Affidavit, ¶27.

15. Landay posted an additional Letter of Credit in that amount and then renewed it in reliance on Fitzgerald's representations. Exhibit A, Landay Affidavit, ¶¶27, 28.

16. Neither the Factoring Agreement or the Guaranty address the issuance of this additional Letter of Credit. Defendants' Appendix, Exhibits 3, 4.

17. The Factoring Agreement and the Guaranty were executed prior to the 2001 representations which Fitzgerald made regarding the $500,000 Seasonal Overadvance. Defendants' Appendix, Exhibits 3 and 4.

18. The Amended Guaranty references the Letters of Credit as separate from the increased limit of the Guaranty. "Such continuing liability shall (i) be in addition to and shall not be reduced or satisfied from the proceeds of certain Standby Letters of Credit in the aggregate original face amount of $4,350,000…." Defendants' Appendix, Exhibit 11, p. 2.

19. Landay's reliance on Fitzgerald's representations regarding the Seasonal Overadvance was reasonable. Exhibit A, Landay's Affidavit, ¶¶27-28; Defendants' Appendix, Exhibit 3, 4 10 and 11.

20. During the negotiations leading up to the execution of the Forbearance Agreement and the Amended Guaranty, Jane Frangos of GMAC's New York office told Landay that, if he paid certain pressing expenses of Seneca, he would be reimbursed when funding resumed. Exhibit A, Landay Affidavit, ¶31.

21. Landay paid personally approximately $52,000 of Seneca's expenses in reliance of these representations. Exhibit A, Landay Affidavit, ¶32.

22. As noted above, the Forbearance Agreement's integration clause, like the Amended Guaranty, is limited in scope. See #4 supra.

23. Landay was not a party to the Forbearance Agreement. Defendants' Appendix, Exhibit 10, p. 7.

24. Neither the Forbearance Agreement nor the Amended Guaranty addressed the issue of the "bridge loans". Defendants' Appendix, Exhibit 10 and 11.

25. Landay's reliance on Frangos' representation regarding the "bridge loans" was reasonable. Exhibit A, Landay Affidavit, ¶¶31-32; Defendants' Appendix, Exhibits 10 and 11.

26. In reliance on GMAC's promises regarding the Forbearance Agreement which included a schedule calling for the first advance to Seneca in the week of August 10, 2001, Landay extended his $250,000 Letter of Credit, increased his personal guaranty by $1,000,000 and deposited $1,000,000 in cash collateral in a bank in GMAC's favor. Exhibit A, Landay's Affidavit, ¶¶31-33.

27. The promise of a draw during the week ending August 10, 2001 was reflected in a document attached to the Forbearance Agreement. Exhibit A, Landay's Affidavit, ¶33 and Exhibit 4 to Affidavit.

28. The Amended Guaranty does not address the posting of the $1,000,000 cash collateral. Defendants' Appendix, Exhibit 11.

29. Landay's reliance on the agreed to schedule was reasonable. Exhibit A, Landay Affidavit, ¶¶31-33 and Exhibit 4; Defendants' Appendix, Exhibit 11.

**Junior Creditor/Waste**

30. GMAC did not act in a commercially reasonable manner in liquidating the assets of Seneca. Defendants' Appendix, Exhibit 22, Lowey Report, pp. 2, 3-8.

31. Lowey's opinion covered GMAC's commercial unreasonableness with regard to inventory, accounts receivable collections and intellectual property. Defendants' Appendix, Exhibit 22, Lowey Report, pp. 2, 3-8.

9

32. The damages which Lowey calculated were $360,360. Defendants' Appendix, Exhibit 22, Lowey Report, p. 8.

33. This amount did not take into account any value for the intellectual property. Defendants' Appendix, Exhibit 22, Lowey Report, p. 8.

34. With regard to accounts receivable collections, GMAC's 30(b)(6) witness, Joseph Lennon, testified that GMAC never made an effort to contact Seneca's former personnel to deal with issues raised by customer chargebacks other than to send correspondence to Seneca's office. Exhibit C, Deposition of Joseph Lennon, pp. 42-44.

35. John Rijo, GMAC's liquidator, took over Seneca's office on October 22, 2001; and, upon completing his work, he arranged for Seneca's mail to be forwarded to GMAC's Boston office. Exhibit D, Deposition of John Rijo, pp. 65-69, 109, 113 and Deposition Exhibits 134, 152.

36. Therefore, all GMAC did was to send <u>itself</u> correspondence; and Seneca employees were not utilized to address and reverse customer claims of chargebacks. Exhibit C, Deposition of Joseph Lennon, pp. 42-44; Exhibit D, Deposition of John Rijo, pp. 65-69, 109, 113 and Deposition Exhibits 134, 152.

37. GMAC took no substantial affirmative steps to obtain value for Seneca's patents and trademarks. Exhibit B, Deposition of Kathleen Pappalardo, pp. 10-31 and Exhibit 119.

38. Landay has had substantial experience with the very intellectual property at issue in this case, the trademarks and patents belonging to Seneca. Exhibit A, Landay's Affidavit, ¶¶6-11, 15-18.

10

39. Seneca acquired a portion of those trademarks and patents in 2000 for $250,000. Exhibit A, Landay Affidavit, ¶16.

40. Seneca acquired another portion of those trademarks and patents from Craft House on September 19, 2000 for $1,300,000. Exhibit A, Landay Affidavit, ¶41 and Exhibit 1 to Affidavit, p. 5, and Schedules 1.1(b) and 1.1(c).

41. The value of the Seneca trademarks and patents was $2,000,000 as of October 2001. Exhibit A, Landay Affidavit, ¶¶42-44.

**Chapter 93A**
**Facts In Addition To The Above That**
**Also Support Landay's Chapter 93A Claim**

42. GMAC deceived Landay into giving access to Borrowers' books, records and operations to John Rijo of RAS (and to pay RAS's fees) on the pretext that the involvement of this independent expert would cause GMAC to release funds to Borrowers. However, Rijo and RAS had already been engaged by GMAC to draft a liquidation scenario for Borrowers, a fact unrevealed and unknown to Landay. Rijo was not on premises to help Landay and Borrowers; rather he was there to help GMAC improve its position for a liquidation that it was engineering. Exhibit E, Landay's Interrogatory Answers, Answer #17, pp. 10-11; Exhibit A, Landay Affidavit, ¶¶30-38.

43. While representing to Landay that actions required of him were to ensure an orderly wind-down of the Borrowers, GMAC was, instead, positioning itself to call the loan and to maximize its recovery from Landay's own personal assets. To that end, GMAC took the following steps:

    a. It duped Landay into giving Rijo access to Borrowers.

    b. It obtained additional personal financial commitments from Landay.

  c. It delayed execution and funding of the Forbearance Agreement while refusing to make corresponding changes in Borrowers' obligations, thereby engineering a default almost immediately after Landay provided additional personal collateral and increased his guaranty.

Exhibit E, Landay's Interrogatory Answers, Answer #17; Exhibit A, Landay's Affidavit, ¶¶30-35, 37.

44. Landay presented a proposal to GMAC in October of 2001 by which an alternative Lender, Platinum Credit Corp, would have provided financing and GMAC would have been made whole. Exhibit A, Landay Affidavit, ¶36.

45. GMAC did not accept this proposal but instead collected Landay's collateral and took over Seneca's assets. Exhibit A, Landay Affidavit, ¶¶37-38.

46. GMAC conducted the liquidation in bad faith. Contrary to all prior representations to Landay, it chose to look to his collateral and his guaranty rather than make the effort to liquidate properly. Exhibit E, Landay's Interrogatory Answers, Answer #9 and #13.

47. During the liquidation GMAC engaged in numerous sharp business practices to Landays detriment. These include:

  a. It expelled Landay from the business premises and would not give him access to his own business records. It thereafter locked those records away in a warehouse for four years. Exhibit E, Landay's Interrogatory Answers, Answer #17; Exhibit A, Landay's Affidavit, ¶38.

  b. It sent letters addressed to the Borrowers demanding that Borrowers resolve collections issues or suffer the consequences. However, the

       Borrowers had been expelled from the premises to which the letters were sent and no employee of Borrowers ever received such letters. Moreover, since GMAC had seized all books and records along with the premises, Borrowers employees (including Landay) could not possibly take action. Exhibit E, Landay's Interrogatory Answers, Answer #17; Exhibit A, Landay Affidavit, ¶46.

   c. After GMAC left Borrowers' premises in November 2001, it continued to issue such self-serving letters. At that point the letters were sent from GMAC to GMAC's Boston office because GMAC had arranged all Borrowers' mail to be sent to itself at its Boston office. Exhibit E, Landay's Interrogatory Answers, Answer #17; Exhibit D, Deposition of John Rijo, pp. 109, 113 and Deposition Exhibit 152.

48. GMAC promised Seneca and Landay in writing that it would provide an accounting. Exhibit A, Landay Affidavit, ¶48, and Exhibit 10.

49. Instead of providing an accounting, GMAC served a Summons with Notice on Landay in June of 2002. Exhibit A, Landay Affidavit, ¶49.

50. GMAC's Attorney told Landay's attorney that, if he wanted an accounting, he would have to litigate. Exhibit A, Landay Affidavit, ¶49, and Exhibit 11.

51. GMAC never gave Landay an accounting, despite his continued requests. Exhibit A, Landay Affidavit, ¶48.

52. Landay repeatedly requested copies of the documents that GMAC had seized from Seneca on October 22, 2001. Exhibit A, Landay Affidavit, ¶50.

53. GMAC finally produced the Seneca documents, which had been stored in a Massachusetts warehouse, in August of 2005.  Exhibit A, Landay Affidavit, ¶51.

54. GMAC's sharp business practices extend to its bookkeeping.  These include:

   a. GMAC made numerous charges to the loan balance that were not appropriate in the case of a seized business.  See Landay's Response to GMAC's purportedly Undisputed Fact, #8 supra.

   b. GMAC has charged to the loan balance its attorney fees for this action as well as its attorney fees from the New York action on the Guaranty.  Exhibit H, Pappalardo Trial Testimony of October 28, 2005, p. 92.  However, charging such fees to Borrowers' loan balance is not in accordance with the loan documents.  Moreover, under the Guaranty, Landay is responsible for fees relating to collection under the Guaranty in the liquidated amount of 15% of whatever GMAC may recover in the New York action.  Defendants' Appendix, Exhibit 4, Guaranty, first paragraph.  If Landay prevails in New York, GMAC has no claim to fees against him.

   c. GMAC appears to have no back-up with which to substantiate many of the charges it has made to the loan.  Exhibit G, Deposition of David Landay, p. 181; Exhibit A, Landay Affidavit, ¶52.

232162_1