# EXHIBIT 1

AMENDED AND RESTATED

ASSET PURCHASE AGREEMENT

by and between

BROOKFIELD INTERNATIONAL, INC.

and

SENECA SPORTS, INC.

September 19, 2000

L00481

AMENDED AND RESTATED

ASSET PURCHASE AGREEMENT

AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (this *"Agreement"*) dated September __, 2000 by and between BROOKFIELD INTERNATIONAL, INC., a Delaware corporation (the *"Seller"*), and SENECA SPORTS, INC., a Delaware corporation (the *"Buyer"*).

WHEREAS, the Seller is engaged in the business of selling the recreational sports products identified on Exhibit A hereto (the *"Products"*, such business being herein the *"Brookfield Business"*); and

WHEREAS, the Buyer desires to purchase from the Seller and the Seller desires to sell to the Buyer certain of the assets constituting the Brookfield Business; and

WHEREAS, the Buyer and the Seller entered into an Asset Purchase Agreement, dated June 2, 2000 (the *"Prior Agreement"*); and

WHEREAS, concurrent herewith, an affiliate of Seller and the Buyer are entering into an Amended and Restated Transitional Services Agreement, a copy of which is attached hereto as Exhibit B, pursuant to which the Seller's affiliate has agreed to provide certain services, all as more fully set forth therein (the *"Transitional Services Agreement"*); and

WHEREAS, the Prior Agreement provided the Buyer and the Seller with certain termination rights and also provided that the Purchase Price (as hereinafter defined) be paid entirely in cash; and

WHEREAS, the Buyer and the Seller wish to amend the Prior Agreement to, among other things, amend the termination rights of the parties and provide for payment of a portion of the Purchase Price by a promissory note.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions hereinafter set forth, and intending to be legally bound hereby, the parties hereto hereby agree that the Prior Agreement is hereby amended and restated in its entirety as follows:

ARTICLE I.

PURCHASE AND SALE OF ASSETS

1.1.    Purchase and Sale of Assets.  At the Closing (as hereinafter defined), the Seller shall sell, transfer, assign and deliver to the Buyer, and the Buyer shall purchase, accept, assume and receive, all of the Seller's right, title and interest in and to the

L00482

following Assets (all such assets, other than the Excluded Assets, being the "*Purchased Assets*"):

    (a)    All finished goods, including goods in transit, work-in-process, packaging materials and raw materials (the "*Inventory*");

    (b)    The trademarks identified on Section 1.1(b) of the Disclosure Schedule attached hereto and made a part hereof (the "*Disclosure Schedule*") and all trade dress, trade names, brand names, service marks, logos, logotypes, packaging style and symbols dedicated exclusively to the Products, together with the goodwill associated therewith, any registrations associated therewith, including any applications, renewals, modifications or extensions (collectively, "*Registrations*");

    (c)    All rights in and to the subject matter of that certain Patent Application and those certain Patents, and the underlying technology, in each case as identified on Section 1.1(c) of the Disclosure Schedule (the "*Assigned Patents*");

    (d)    All marketing materials and rights to the extent dedicated exclusively to the promotion, marketing and advertisement of the Products, other than trade show booths and displays;

    (e)    All existing lists of suppliers, customers and distributors of the Brookfield Business;

    (f)    Those molds and other tangible assets used in the Brookfield Business as identified in Section 1.1(f) of the Disclosure Schedule;

    (g)    all rights under the Material Contracts (as hereafter defined) identified as being "Assigned Agreements" on Section 4.9(a)(2) and (a)(3) of the Disclosure Schedule (each such contract an "*Assigned Agreement*" and, collectively, the "*Assigned Agreements*");

    (h)    All prepaid expenses, as identified in Section 1.1(h) of the Disclosure Schedule;

    (i)    The Seller's rights, if any, to exhibitor space and exhibitor hotel rooms in respect of the annual Sporting Goods Manufacturer's Association trade show (the "*Trade Show Rights*");

    (j)    All accounts receivable from account debtors for goods or services delivered or rendered (excluding the Note (as hereafter defined) and excluding accounts receivable from Corporecian Silverado (a/k/a Silverado Ltd.; customer number 16095)) (collectively, the "*Purchased Receivables*"); and

L00483

(k)    The Seller's rights to the Uniform Code Council UPC numbers being used on packaging for the Products.

1.2.    _Excluded Assets_.  All other assets, including the following, are expressly excluded from the Purchased Assets being acquired by the Buyer hereunder (the "_Excluded Assets_"):

(a)    The corporate minute books and stock records of the Seller;

(b)    Any rights which the Seller may have to enforce the obligations of the Buyer pursuant to this Agreement and the other documents and agreements contemplated hereby;

(c)    The books of account and other records which are required by law to be kept in the Seller's possession, including but not limited to tax returns (except that Buyer shall be given access to such books and records as reasonably necessary or desirable for the conduct by the Buyer of the Brookfield Business);

(d)    Real property leases relating to real property used in the Brookfield Business, and the furniture, fixed assets and other tangible personal property located at such premises;

(e)    The booths and other display units which have been used in respect of the Products and/or the Brookfield Business;

(f)    The Note, all accounts receivable from Corporecian Silverado (a/k/a Silverado Ltd.; customer number 16095), other rights to receive payments (other than the Purchased Receivables), causes of actions against any third parties, cash or cash equivalents;

(g)    All of the rights, properties and assets used in the Brookfield Business which are transferred or disposed of prior to the Closing in the ordinary course of business, consistent with past practice; and

(h)    The trademark "Craft House" and "CHI" (the "_Excluded Marks_").

1.3.    _Assumed Liabilities_.  At the Closing, the Buyer shall assume, and shall be solely and exclusively liable with respect to, the following liabilities and obligations of the Seller (the "_Assumed Liabilities_"):

(a)    All open orders for trade purchases of finished goods for the Brookfield Business;

(b)    All liabilities and obligations (including without limitation customs duties, customs entry fees, and shipping and freight forwarding fees and charges)

-3-

L00484

for finished goods for the Brookfield Business in transit, to the extent such finished goods are not included in Inventory in transit identified on <u>Section 2.1(a)</u> of the Disclosure Schedule;

    (c)    All liabilities and obligations for promotional allowances, discounts, returns and other trade allowances for all periods before and after Closing, including without limitation the "Terms and Conditions of Sale" disclosed on <u>Section 4.9(a)(3)</u> of the Disclosure Schedule; and

    (d)    The obligations for the period after the Closing as set forth in the Assigned Agreements.

After the Closing, the Buyer shall discharge and satisfy in full when due all Assumed Liabilities; <u>provided</u>, <u>however</u>, that nothing herein shall be deemed to prevent or limit the Buyer's right to contest with third parties any claim that the Buyer is liable for any such liability, or the amount thereof.

1.4.    <u>Excluded Liabilities and Obligations</u>. Except as expressly set forth in Section 1.3 above, the Buyer shall not assume and shall not be liable or responsible for any debt, obligation or liability of the Seller or any affiliate of the Seller, or any claim against any of the foregoing, of any kind, whether known or unknown, contingent, absolute or otherwise, whether or not relating to the Brookfield Business (the "*Excluded Liabilities and Obligations*"). After the Closing, the Seller shall discharge and satisfy in full when due all Excluded Liabilities and Obligations; <u>provided</u>, <u>however</u>, that nothing herein shall be deemed to prevent or limit the Seller's right to contest with third parties any claim that the Seller is liable for any such liability, or the amount thereof.

1.5.    <u>Legal Effect of Certain Consents</u>. Pursuant to Section 3.2(c) hereof, Seller is obtaining consents from the other parties to the Assigned Agreements to the assignment thereof to the Buyer as contemplated hereby (the "*Assignment Consents*"). As part of such Assignment Consents, the Seller and the Buyer have been requested by certain of the other parties to the Assigned Agreements to enter into various agreements as to the liabilities of the Seller and the Buyer to such other parties in respect of obligations under the Assigned Agreements. It is specifically agreed that any obligations undertaken by the Seller and/or the Buyer to third parties in connection with obtaining the Assignment Consents shall have no legal impact on the parties' liabilities to each other as specified herein, or on the definitions of Purchased Assets, Excluded Assets, Assumed Liabilities, and Excluded Liabilities and Obligations. By way of example, unless otherwise specifically provided herein: (i) any assumption by Buyer in an Assignment Consent of liabilities under an Assigned Agreement relating to the period prior to the Closing Date (other than an assumption of liabilities and obligations for promotional allowances, discounts, returns and other trade allowances for all periods before and after Closing) shall not relieve the Seller of such liabilities, nor create an inference that such liabilities constitute Assumed Liabilities under this Agreement, and (ii) any agreement by Seller in

-4-

an Assignment Consent to remain liable for obligations under an Assigned Agreement relating to the period following the Closing Date shall not relieve the Buyer of such liabilities, nor create an inference that such liabilities constitute Excluded Liabilities and Obligations. Each party agrees to fully indemnify the other party in accordance with the provisions of Article X in respect of any Losses subject to indemnification thereunder regardless of any liability that may have been imposed on the party seeking indemnification pursuant to the terms of any Assignment Consent.

## ARTICLE II.

### CONSIDERATION FOR TRANSFER

2.1.    Consideration.

(a)    The aggregate consideration for the Brookfield Business and the Purchased Assets shall be an amount (the "*Purchase Price*") equal to (i) the book value of the Inventory and the other tangible assets forming a part of the Purchased Assets as reflected on the Closing Statement (including without limitation Inventory in transit identified on Section 2.1(a) of the Disclosure Schedule), plus (ii) the prepaid expenses identified on Section 1(h) of the Disclosure Schedule existing at the Effective Time, plus (iii) eighty percent (80%) of the gross amount of the Purchased Receivables at the Effective Time, plus (iv) $1,600,000 representing consideration for the intangible Purchased Assets.

(b)    At the Closing, the Buyer shall pay and deliver the Purchase Price by delivery to Seller of (i) cash in the amount of (1) $100,000 plus (2) the book value of the Inventory and other tangible assets forming a part of the Purchased Assets as reflected on the Closing Statement (including without limitation Inventory in transit identified on Section 2.1(a) of the Disclosure Schedule), plus (3) the amount of prepaid expenses identified on Section 1(h) of the Disclosure Schedule existing at the Effective Time, plus (4) eighty percent (80%) of the gross amount of the Purchased Receivables at the Effective Time (collectively, the "*Cash Portion*"), plus (ii) a promissory note, made by the Buyer in favor of the Seller, in the principal amount of $1,500,000, which note shall be in substantially in the form attached hereto as Exhibit E (the "*Note*").

(c)    At the Closing, the Buyer shall pay and deliver to Seller $107,500 representing Buyer's portion of the License Transfer Fees identified on Section 3.2(c) of the Disclosure Schedule.

2.2.    Preparation of Closing Statement.   The Seller shall prepare and deliver to the Buyer a Closing Statement reflecting (a) the book value the Inventory and other tangible assets forming a part of the Purchased Assets as of the Closing Date (including without limitation Inventory in transit identified on Section 2.1(a) of the

-5-

L00486

Disclosure Schedule), (b) the amount of prepaid expenses identified on Section 1(h) of the Disclosure Schedule existing at the Effective Time, and (c) eighty percent (80%) of the gross amount of the Purchased Receivables at the Effective Time, certified as being true and correct by the Chief Financial Officer of the Seller. The Seller and the Buyer have agreed that, except as shown on Section 2.2 of the Disclosure Schedule, the valuation currently applied by the Seller to the Inventory and other tangible assets included in the Purchased Assets is the appropriate valuation to be used in determining the Purchase Price. A physical inventory was conducted with a representative of the Buyer present during the week of August 14, 2000, as part of the preparation of the Closing Statement. The Buyer and Seller agree that, after the conduct of such physical inventory, there is no dispute regarding the physical count (quantity) of such inventory. The physical count of such inventory shall be adjusted, pursuant to the Seller's shipment records, to reflect any change through the Closing Date. Unless the Buyer shall dispute the physical count (quantity) of the Purchased Assets as reflected on the Closing Statement prior to the Closing, then the valuation thereof shall be conclusive for purposes of determining the Purchase Price.

2.3.   Goods in Transit.  In the event that there shall be a short fall or an overage in the Inventory which is not included in the physical count because such Inventory is in transit to the Seller, then the parties agree to adjust the Purchase Price accordingly to reflect such shortfall or overage and, as appropriate, the Seller or the Buyer shall promptly remit the amount of such adjustment to the other party.

## ARTICLE III.

## THE CLOSING AND TRANSFER OF ASSETS

3.1.   Deliveries by the Buyer.  At the Closing, the Buyer shall deliver the following:

(a)   The Cash Portion of the Purchase Price, by wire transfer to an account designated by Seller, less, if applicable, the Disputed Amount;

(b)   The Note, duly executed by an authorized officer of the Buyer;

(c)   An instrument of assumption in substantially the form of Exhibit C;

(d)   A certified copy of resolutions of the Board of Directors of the Buyer providing authority for the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(e)   A certificate, dated the Closing Date, executed on behalf of the Buyer by its chief executive officer, to the effect that the Buyer has fulfilled the conditions specified in Section 8.3, unless the Closing Date shall occur simultaneously with the execution hereof on behalf of the Buyer;

-6-

(f)     A letter of credit in the amount of $130,000 with an expiry date of May 31, 2002 in favor of Disney Enterprises, Inc. required by that certain Consent to Transfer among Disney Enterprises, Inc., Seller, Buyer and a subsidiary of Buyer;

(g)     Evidence of insurance as required by Section 11 hereof; and

(h)     Such other instruments or documents as may be necessary or appropriate to carry out the transactions contemplated hereby.

3.2.    Deliveries by the Seller.  At the Closing, the Seller shall deliver the following:

(a)     A general assignment and bill of sale for the Purchased Assets in substantially the form of Exhibit D;

(b)     Trademark and patent assignments contemplated by this Agreement, in a form appropriate for recording with the United States Patent and Trademark Office and such foreign offices as Buyer may request;

(c)     Assignment Consents identified on Section 3.2(c) of the Disclosure Schedule in respect of the assignments of the Assigned Agreements, in form reasonably satisfactory to Buyer;

(d)     Release letters from creditors of the Seller together with UCC-3 termination statements with respect to financing statements filed against the Brookfield Business or any of the Purchased Assets;

(e)     A certified copy of resolutions of the Board of Directors of the Seller providing authority for the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(f)     A certificate, dated the Closing Date, executed on behalf of the Seller by a duly authorized officer of the Seller, to the effect that the Seller has fulfilled the conditions specified in Section 8.2, unless the Closing Date shall occur simultaneously with the execution hereof;

(g)     Evidence that the lien on the Purchased Assets held by The Bank of New York has been released (such evidence may be furnished post-Closing if not reasonably practical to furnish at Closing, provided that a payoff letter from such Bank in form reasonably satisfactory to Buyer shall be delivered to the Buyer at or prior to Closing); and

(h)     Such other instruments or documents as may be necessary or appropriate to carry out the transactions contemplated hereby;

-7-

L00488

3.3.    Closing.  The transfer of assets contemplated by this Agreement (the "*Closing*") shall occur at the offices of Cummings & Lockwood, Four Stamford Plaza, Stamford, Connecticut, at 10:00 a.m., Eastern Standard Time, on September ___, 2000, or such other date as the parties shall mutually agree (the "*Closing Date*").  The effective time of the Closing shall be 12:01 a.m. on the Closing Date (the "*Effective Time*").

3.4.    Closing Agreements.  At the Closing, parties shall execute, acknowledge and deliver such instruments or documents as may be necessary or appropriate to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

## ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents, warrants and covenants to the Buyer as follows:

4.1.    Organization and Qualification.  The Seller is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, with all requisite power and authority and legal right to own, operate and carry on the Brookfield Business.  The Seller is duly qualified to do business and is in good standing in every jurisdiction where the nature of the Brookfield Business requires such qualification, except in such jurisdictions where the failure to so qualify would not have a material adverse effect on the business, revenues, financial condition, properties or assets of the Brookfield Business (a "*Material Adverse Effect*").  The Seller has delivered to the Buyer complete and correct copies of the Seller's Certificate of Incorporation and By-Laws.

4.2..    Authorization.  The Seller has full corporate power, authority and legal right to execute and deliver and to perform its obligations under this Agreement.  The execution and delivery of this Agreement by the Seller and the performance by the Seller of its obligations hereunder have been duly authorized by all requisite corporate action, including, without limitation, by its Board of Directors and shareholders.  No other action on the part of the Seller is necessary to authorize the execution and delivery of this Agreement or the performance of its obligations hereunder.  This Agreement has been duly and validly executed and delivered by the Seller and constitutes a legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, except to the extent that such enforcement may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights and remedies generally.

4.3.    No Violation.  Except for the consents required in respect of the Assigned Agreements (see Section 4.9 to the Disclosure Schedule), neither the execution

-8-

L00489

and delivery of this Agreement by the Seller, the consummation of the transactions contemplated hereby, nor the performance by the Seller of its obligations hereunder will:

(a)    Violate or result in any breach of any provision of the Certificate of Incorporation and By-laws of the Seller;

(b)    Violate, conflict with or result in a violation or breach of, or constitute a default (with or without due notice or lapse of time or both) under, or permit the termination of, or require the consent of any other party to, any of the Assigned Agreements;

(c)    Violate any order, writ, judgment, injunction, decree, statute, law, rule, regulation or ordinance of any court or governmental, quasi-governmental or regulatory department or authority ("*Governmental Authority*") applicable to the Seller, the Brookfield Business or the Purchased Assets; nor

(d)    Result in the imposition of any lien on the Purchased Assets.

4.4.    <u>Consents and Approvals</u>.  No filing or registration with, no notice to and no permit, authorization, consent or approval of any governmental, quasi-governmental or regulatory department or authority is necessary for the execution and delivery of this Agreement, or the consummation of the purchase and sale of the Brookfield Business.

4.5.    <u>Condition of Purchased Assets</u>.  All Purchased Assets that are tangible assets including, without limitation, finished goods in Inventory and tooling, are being sold on an "as is", "where is" basis, with the Buyer having full opportunity to conduct such due diligence in respect thereof as the Buyer shall determine.

4.6.    <u>Litigation</u>.  Except as set forth in <u>Section 4.6</u> of the Disclosure Schedule, there is no action, suit, judicial or administrative proceeding, arbitration or investigation (collectively referred to as "*Claims*") relating to the Brookfield Business or the Purchased Assets, including, without limitation, Claims relating to product liability or consumer safety, pending or threatened against the Seller, before any court, arbitrator or administrative or governmental body, nor is there any judgment, decree, injunction, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator outstanding against, and unsatisfied by, the Seller relating to the Brookfield Business or the Purchased Assets (any of the foregoing being herein referred to as "*Existing Litigation*") nor does the Seller know of any fact, event or condition which could reasonably be expected to serve as a basis for the assertion of any Claim.  Without limiting the generality of the foregoing, to the knowledge of the Seller, there are no investigations or proceedings currently existing or threatened relating to the Brookfield Business or the Purchased Assets before the Consumer Product Safety Commission ( the "*CPSC*").  Seller is in compliance with all domestic laws and government rules and regulations applicable to

-9-

L00490

the Brookfield Business and the Purchased Assets, except to the extent that any non-compliance could not reasonably be expected to have a Material Adverse Effect. The Seller has in effect such product liability insurance as the Seller believes is reasonable and customary for its business and, to Seller's knowledge, Seller is in compliance with the terms thereof, except to the extent that any non-compliance could not reasonably be expected to have a Material Adverse Effect.

4.7.    Absence of Certain Changes; Customers. Since January 1, 2000, the Seller has conducted the Brookfield Business in the ordinary and usual course, consistent with past practice. Since such date, to the Seller's knowledge, there have not been any facts or developments that could reasonably be expected to have a Material Adverse Effect. As of the date hereof, the Seller has not received notice from any of its major customers that any such major customer intends to significantly curtail its purchases of Products from the Seller.

4.8.    Title to Assets. The Seller has good and marketable title to all of the Purchased Assets, free and clear of any and all mortgages, pledges, liens, encumbrances, equities, claims, title retention or other security arrangement or obligations to other persons ("Encumbrances") except as shown on Schedule 4.8 to the Disclosure Schedule, which Encumbrances shall be released as of the Closing.

4.9.    Material Contracts.

a)    Section 4.9 (a) of the Disclosure Schedule sets forth a list of all contracts, agreements and arrangements, whether written or oral, formal or informal, which are material (either singly or in the aggregate) to the Brookfield Business (sometimes hereinafter collectively referred to as the "*Material Contracts*"). Without limiting the generality of the foregoing, Material Contracts include, without limitation, any and all noncompetition agreements, guarantees, loan or other financing agreements, collective bargaining or other union agreements, distribution and sales representative agreements. Those Material Contracts that are Assigned Agreements are identified as such on Section 4.9(a) of the Disclosure Schedule.

b)    All Assigned Agreements are in full force and effect; and, to Seller's knowledge, there exists no event, occurrence or act (including, after giving effect to consents, the execution of this Agreement and the consummation of the transactions contemplated hereby) which, with the giving of notice or the lapse of time, or both, could reasonably become a default by either party to such Assigned Agreements.

c)    The Seller has no knowledge of any default under any Assigned Agreement, nor of any event, occurrence, condition or act which, with the giving of notice or the lapse of time, could reasonably become a default by the Seller or any

-10-

L00491

third party under any Assigned Agreement, the result of which could reasonably be expected to have a Material Adverse Effect.

     d)     Except as set forth in <u>Section 3.2(c)</u> of the Disclosure Schedule, no consent by, notice to or approval from any third party is required under any of the Assigned Agreements as a result of or in connection with the execution, delivery or performance of this Agreement and the consummation of the transactions contemplated hereby.

     4.10.   <u>Brokers' Fees and Commissions</u>.  Neither the Seller nor any of its directors, officers, employees or agents has employed any investment banker, broker, finder or intermediary, and no fee or other commission is owed to any third party, in connection with the transactions contemplated herein.

     4.11.   <u>Proprietary Rights</u>.

     (a)     Set forth in <u>Section 1.1(b)</u> to the Disclosure Schedule is a list of all federal trademark registrations owned by the Seller, and applications for registrations made by the Seller, in each case as included in the Purchased Assets, and set forth in <u>Section 1.1(c)</u> to the Disclosure Schedule is a list of all federal patents and patent applications owned by Seller and included in the Purchased Assets (the "*Proprietary Rights*").  The Seller is the sole and exclusive owner of the Proprietary Rights, and has the sole and exclusive right to use, license, sublicense, assign or sell the Proprietary Rights without liability to, or consent of, any person.

     (b)     Except as set forth on <u>Section 4.11 (b)</u> of the Disclosure Schedule, to the Seller's knowledge, the use of the Proprietary Rights does not infringe upon the rights of any other person or entity, whether or not registered, patented or copyrighted.

     (c)     Except as set forth on <u>Section 4.11 (c)</u> of the Disclosure Schedule, to the Seller's knowledge there is no infringement or improper use by any third party of the Proprietary Rights, nor has the Seller or any affiliate instituted any action, suit or proceeding in which an act constituting an infringement of any of the Proprietary Rights was alleged to have been committed by a third party.

     (d)     Except as set forth on <u>Section 4.11 (d)</u> of the Disclosure Schedule, there are no licenses, sublicenses or agreements relating to (i) the use by third parties of the Proprietary Rights or (ii) the use by the Seller of the Proprietary Rights.

     (e)     Included as Material Contracts on <u>Section 4.9(a)</u> of the Disclosure Schedule are all material license, royalty or similar agreements entitling the Seller to use any trademarks or patents of third parties.

-11-

L00492

4.12.   _Regulatory Reports._ The Seller has filed all material reports, registrations and statements, together with any amendments required to be made with respect thereto, that were required to be filed in respect of the Brookfield Business in the last two (2) year period with any federal, state, local or foreign governmental, quasi-governmental or regulatory department, authority or agency, including, without limitation, the CPSC or the Federal Trade Commission (hereinafter sometimes collectively referred to as the "_Regulatory Agencies_"), and has paid all fees or assessments due and payable in connection therewith. Except for normal periodic examinations conducted by the applicable Regulatory Agency in the regular course of the Brookfield Business, no Regulatory Agency has initiated any proceeding or investigation into the business or operations of the Brookfield Business in the last two (2) year period, nor has the Seller initiated any such proceeding. To Seller's knowledge, there is no unresolved violation, criticism or exception by any Regulatory Agency with respect to any report or statement relating to an examination of the Brookfield Business.

4.13.   _Agreements with Regulatory Agencies._ The Seller is not subject to any cease-and-desist or other order issued by, or a party to any written agreement or memorandum of understanding with, any Regulatory Agency that materially restricts or may adversely impact the conduct of the Brookfield Business.

4.14.   _Accounts Receivable._ Except as set forth in _Section 4.14_ of the Disclosure Schedule, all Purchased Receivables (a) are due and valid claims against account debtors for goods or services delivered or rendered in the ordinary course of business, subject to promotional allowances, discounts, returns and other trade allowances, including without limitation the "Terms and Conditions of Sale" disclosed on Section _4.9(a)(3)_ of the Disclosure Schedule. Seller knows of no disputes, counterclaims, rights of set off or credit with respect to the Purchased Receivables, except for the "Terms and Conditions of Sale" disclosed on _Section 4.9(a)(3)_ of the Disclosure Schedule.

4.15.   _Goods in Transit._ To the knowledge of the Seller, all Inventory in transit is identified on _Section 2.1(a)_ of the Disclosure Schedule.

4.16.   _Knowledge of the Seller, Etc._ To the extent that the Seller represents and warrants itself to have had knowledge or belief as to any event, fact, condition or other matter set forth in this Agreement, "knowledge" or "belief" (or similar words) shall mean the knowledge or belief of the officers of the Seller.

4.17.   _Copies of Documents._ The Seller has caused to be made available for inspection and copying by the Buyer and its advisers true, complete and correct copies of all documents referred to in any Section of the Disclosure Schedule.

4.18.   _Disclosure._ No representation or warranty as to the Seller contained in this Agreement and no statement made by the Seller in the Disclosure Schedule contains any untrue statement of a material fact, or omits to state any material fact necessary, in

-12-

L00493

light of the circumstances under which it was made, in order to make the statement herein or therein not misleading.

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents, warrants and covenants to the Seller as of the date hereof as follows:

5.1. <u>Organization and Qualification</u>. The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, with all requisite power and authority to own, operate and lease its properties and assets and to carry on its business as it is now being conducted, and is qualified or licensed to do business and is in good standing in each jurisdiction in which the ownership or leasing of property by it or the conduct of its business requires such licensing or qualification, except in such jurisdictions wherein the failure to so qualify would not have a material adverse effect on the ability of the Buyer to consummate the transactions contemplated hereby.

5.2. <u>Authorization</u>. The Buyer has full power and authority to execute and deliver this Agreement and the Note and to consummate the transactions contemplated herein and therein. The execution and delivery of this Agreement and the Note by the Buyer and the performance by the Buyer of its obligations hereunder and thereunder have been duly authorized by its Board of Directors. This Agreement has been (and the Note, upon execution and delivery at the Closing, will be) duly and validly executed and delivered by the Buyer, and constitutes (and the Note, upon execution and delivery at the Closing, will be) a legal, valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with their respective terms, except to the extent that such enforcement may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights and remedies generally.

5.3. <u>No Violation</u>. Neither the execution and delivery of this Agreement or the Note by the Buyer, nor the performance by the Buyer of its obligations hereunder or thereunder, will:

(a)    Violate or result in any material breach of any provision of the Certificate of Incorporation or By-Laws of the Buyer;

(b)    Violate any order, writ, judgment, injunction, decree, statute, rule or regulation of any court or Governmental Authority applicable to the Buyer or its properties or assets which, in any case, could reasonably be expected to have a material adverse effect on ability of Buyer to consummate the transactions contemplated hereby.

-13-

L00494

5.4. <u>Consents and Approvals</u>. No filing or registration with, no notice to and no permit, authorization, consent or approval of any third party or any public or governmental body or authority is necessary for the consummation by the Buyer of the transactions contemplated herein.

5.5. <u>Broker's Fees and Commissions</u>. Neither the Buyer nor any of its shareholders, directors, officers, employees or agents has employed any investment banker, broker, finder or intermediary, and no such fee or other commission is owed to any third party, in connection with the transactions contemplated herein.

5.6. <u>Disclosure</u>. No representation or warranty as to the Buyer contained in this Agreement and no statement made by the Buyer in the Disclosure Schedule contains any untrue statement of a material fact, or omits to state any material fact necessary, in light of the circumstances under which it was made, in order to make the statement herein or therein not misleading.

5.7. <u>Knowledge of the Buyer, Etc.</u> The Buyer confirms that it has had full opportunity to conduct due diligence in respect of the Brookfield Business and that it has fully inspected the tangible Purchased Assets including, without limitation, finished goods in Inventory and tooling, and deems them fully acceptable, and acknowledges that it is purchasing such tangible Purchased Assets "as is" and "where is". Buyer confirms and acknowledges that Buyer has conducted its own credit analysis with respect to the Purchased Receivables and that Seller has not guaranteed or otherwise assured Buyer of collectibility of such receivables. Buyer further confirms and acknowledges that the Purchased Receivables are subject to promotional allowances, discounts, returns and other trade allowances, including without limitation the "Terms and Conditions of Sale" disclosed on <u>Section 4.9(a)(3)</u> of the Disclosure Schedule, and that Seller shall have no liability to Buyer arising out of such allowances, discounts and/or returns. The Buyer further has no knowledge of any fact, condition or circumstance concerning the Buyer which constitutes a material breach of any representation, warranty or covenant contained in this Agreement, or any document, instrument or agreement delivered pursuant hereto or in connection herewith which is not properly disclosed herein, therein or in the Disclosure Schedule.

## ARTICLE VI.

## COVENANTS OF THE SELLER

The Seller hereby agrees to keep, perform and fully discharge the following covenants and agreements:

6.1. <u>Interim Conduct of Brookfield Business</u>. From the date hereof until the Closing, the Seller shall use its good faith efforts to preserve, protect and maintain the Brookfield Business and the Purchased Assets, and shall operate the Brookfield Business

-14-

consistent with prior practice and in the ordinary course of business. Without limiting the generality of the foregoing, from the date hereof until the Closing, except for transactions expressly approved in writing by the Buyer, the Seller shall, with respect to the Brookfield Business, use its good faith efforts to:

(a)    Maintain the tangible assets included in the Purchased Assets in good repair, order and condition, reasonable wear and tear excepted;

(b)    Maintain and keep in full force and effect all insurance on the tangible Purchased Assets, and all liability insurance, in each case as presently carried;

(c)    Maintain the organization and reputation of the Brookfield Business and the good will of suppliers, licensors, customers and others having business relationships with the Brookfield Business;

(d)    Not sell, lease or otherwise dispose of or agree to sell, lease or otherwise dispose of any Purchased Assets, other than in the ordinary course of business;

(e)    Not enter into any Material Contracts, except in the ordinary course, and in amounts obligating the Brookfield Business for more than $150,000 in the aggregate;

The Seller shall promptly notify the Buyer of any material change in the normal course of business of the Brookfield Business and shall keep the Buyer fully informed of such events.

6.2.    Cooperation; Access. From the date hereof through the Closing Date, the Seller shall cooperate fully in assisting the Buyer in the planning and implementation of a transitional plan for the transfer of the Brookfield Business, including allowing reasonable access to its employees involved in the Brookfield Business and others having business relationships with the Brookfield Business.

6.3.    Transfer of Inventory. Title to the Purchased Assets shall pass to Buyer effective as of the Closing Date. Seller will retain custody of the tangible Purchased Assets as a bailee and the parties' respective agreements in connection therewith shall be set forth in the Transitional Services Agreement. At Closing, Seller will deliver to Buyer all negotiable bills of lading then in Seller's possession with respect to Inventory in transit identified on Section 2.1(a) of the Disclosure Schedule. Following Closing, Seller will promptly deliver to Buyer upon receipt thereof all negotiable bills of lading coming into Seller's possession with respect to the balance of the Inventory in transit identified on Section 2.1(a) of the Disclosure Schedule.

-15-

L00496

6.4.   Best Efforts.  The Seller shall use its best efforts to consummate the transactions contemplated by this Agreement.

6.5.   Further Assurances.  Following the Closing, the Seller shall take all action reasonably requested by the Buyer to confirm, facilitate or perfect the transfer of the Purchased Assets. Seller further agrees that if it receives any payments that relate to the Purchased Receivables or the sale of Products by the Buyer following the Closing, it will promptly remit the amount thereof to the Buyer.

## ARTICLE VII.

## COVENANTS OF THE BUYER

The Buyer hereby agrees to keep, perform and fully discharge the following covenants and agreements:

7.1.   Best Efforts.  The Buyer shall use its best efforts to consummate the transactions contemplated by this Agreement.

7.2.   Further Assurances.  Following the Closing, the Buyer shall take all action reasonably requested by the Seller to confirm, facilitate or perfect the transfer of the Purchased Assets.

## ARTICLE VIII.

## CLOSING CONDITIONS

8.1.   Conditions to Each Party's Obligations Under this Agreement.  The respective obligations of each party under Articles I and II of this Agreement shall be subject to the satisfaction, or the waiver by such party hereto, at or prior to the Closing of each of the following conditions precedent: No injunction, restraining order or other ruling or order issued by any court of competent jurisdiction or governmental, quasi-governmental or regulatory department or authority or other law, rule, regulation, legal restraint or prohibition preventing the purchase and sale of the Brookfield Business and the Purchased Assets, and no action, suit or proceeding brought by any governmental, quasi-governmental or regulatory department or authority shall be pending or threatened as of the Closing Date which seeks any injunction, restraining order or other order which would prohibit the purchase and sale of the Brookfield Business or the Purchased Assets or materially impair the ability of the Buyer to own and operate the Brookfield Business after the Closing.

8.2.   Conditions to the Obligations of the Buyer under this Agreement.  The obligations of the Buyer under Article I of this Agreement shall be further subject to

-16-

L00497

the satisfaction, or to the waiver by the Buyer, at or prior to the Closing, of the following conditions precedent:

a)    Each of the obligations of the Seller required to be performed by the Seller at or prior to the Closing pursuant to this Agreement, including, without limitation, delivery of the items required to be delivered by the Seller under Section 3.2 hereof, shall have been duly performed and complied with in all material respects; each of the representations and warranties of the Seller contained in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing (except as to any representation or warranty which specifically relates to another date).

b)    Any and all consents, waivers, clearances, approvals and authorizations from third parties under the Assigned Agreements listed on <u>Section 4.9(d)</u> of the Disclosure Schedule as being required to be obtained prior to the Closing shall have been obtained at no cost to the Buyer other than as contemplated by Section 11.5 hereof and without any adverse effect on the terms of such contracts.

8.3.  <u>Conditions to the Obligations of the Seller under this Agreement</u>.  The obligations of the Seller under Article I of this Agreement shall be further subject to the satisfaction, or to the waiver by the Seller, at or prior to the Closing, of the following conditions precedent:

(a)  The Buyer shall have been substituted as the responsible party for all open purchase orders as of the Closing so that the Buyer shall be fully responsible for the payment in respect thereof, or the Buyer shall have made other arrangements satisfactory to the Seller (such as providing for a letter of credit) so that Seller shall have no liability to the vendors/suppliers in respect of such open purchase orders.

(b)  Each of the obligations of the Buyer required to be performed by it at or prior to the Closing pursuant to the terms of this Agreement, including, without limitation, delivery of the Closing Payment and the items required to be delivered by the Buyer under Section 3.1, hereof, shall have been duly performed and complied with in all material respects, and the representations and warranties of the Buyer contained in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing (except as to any representation or warranty which specifically relates to another date).

## ARTICLE IX

## TERMINATION AND ABANDONMENT

-17-

L00498

9.1.  Termination.  This Agreement may be terminated and the purchase and sale of the Purchased Assets contemplated hereby may be abandoned at any time prior to the Closing:

a)     by the mutual written consent of the Buyer and the Seller;

b)     by the Buyer if there shall have been a material breach of any representation, warranty, covenant or agreement on the part of the Seller, set forth in this Agreement, in the case of a representation or warranty or, in the case of a covenant or agreement, within fifteen (15) business days following receipt by the Seller of notice of such breach, subject in each case to a reasonable opportunity to cure such breach (but in no event more than fifteen (15) business days following such breach unless the parties otherwise agree);

c)     by the Seller if there shall have been a material breach of any representation, warranty, covenant or agreement on the part of the Buyer set forth in this Agreement, in the case of a representation or warranty or, in the case of a covenant or agreement, within fifteen (15) business days following receipt by the Buyer of notice of such breach, subject in each case to a reasonable opportunity to cure such breach (but in no event more than fifteen (15) business days following such breach unless the parties otherwise agree);

d)     by the Buyer:

(i)     if the condition precedent to the Buyer's obligations set forth in Sections 8.1 and 8.2 shall not have been satisfied by September 29, 2000; or

(ii)     if the Closing shall not have occurred on or before September 29, 2000; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(e)(ii) shall not be available to the Buyer if (A) the Buyer's material breach of this Agreement, or (B) the Buyer's failure to have satisfied the conditions to the Seller's obligations under Section 8.3, has been the cause of, or resulted in, the failure of the Closing to occur on or before such date;

e)     by the Seller:

(i)     if the condition precedent to the Seller's obligations set forth in Sections 8.1 and 8.3 shall not have been satisfied by September 29, 2000; or

(ii)     if the Closing shall not have occurred on or before September 29, 2000; provided, however, that the right to terminate this Agreement pursuant to Section 9.1(f)(ii) shall not be available to the Seller

-18-

L00499

if (A) the Seller's material breach of this Agreement, or (B) the Seller's failure to have satisfied the conditions to the Buyer's obligations under Section 8.2, has been the cause of, or resulted in, the failure of the Closing to occur on or before such date.

9.2.  Procedure and Effect of Termination.  In the event of the termination of this Agreement and the abandonment of the purchase and sale of the Purchased Assets pursuant to Section 9.1 hereof, written notice thereof shall forthwith be given to the other party to this Agreement and this Agreement shall terminate and the purchase and sale of the Purchased Assets shall be abandoned, without any further action by any of the parties hereto.  If this Agreement is terminated as provided herein:

a)      upon request therefor, each party will redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether obtained before or after the execution hereof, to the party furnishing the same; and

b)      no party hereto shall have any liability or further obligation to any other party to this Agreement resulting from such termination, except (i) that the provisions of this Section 9.2 shall remain in full force and effect, (ii) the terms of the Confidentiality Agreement shall remain in full force and effect, and (iii) to the extent that any such termination results from a breach by such party of any of its representations, warranties, covenants or agreements set forth in this Agreement, or any failure to satisfy the conditions to the other party's obligations under Section 8.2 (in the case of Seller) or 8.3 (in the case of Buyer), the other party may recover its out-of-pocket costs in connection with the preparation and negotiation of this Agreement, and all other related transactional expenses incurred by such other party.

## ARTICLE X.

## SURVIVAL AND INDEMNIFICATION

10.1.  Survival.  All representations, warranties and covenants contained in this Agreement shall survive the Closing; provided that any such representations, warranties, covenants and agreements shall be fully effective and enforceable only for a period of one year following the Closing Date (the "Survival Period"), and shall thereafter be of no further force or effect.  Additionally, the parties agree that the indemnification obligations set forth in this Article X shall survive with respect to any claims made within the Survival Period until finally resolved or judicially determined, including any appeal thereof.

10.2.  Indemnification of the Buyer.  Subject to the limitations set forth herein, from and after the Closing, the Seller and Craft House International, the Seller's

-19-

L00500

parent corporation (collectively with Seller, the "Seller Indemnitors") agree to indemnify, defend and save the Buyer and its directors, officers, employees, owners, agents and affiliates (each a "*Buyer Indemnified Party*"), harmless from and against, and to promptly pay to a Buyer Indemnified Party or reimburse a Buyer Indemnified Party for any and all losses, damages, expenses, suits, actions, claims, deficiencies, liabilities or obligations (collectively, the "*Losses*") sustained or incurred by such Buyer Indemnified Party relating to, caused by or resulting from:

     (a)    Any misrepresentation or breach of warranty, or failure to fulfill or satisfy any covenant made by the Seller contained herein; and

     (b)    The Excluded Liabilities and Obligations.

     10.3.    <u>Indemnification of the Seller</u>. Subject to the limitations set forth herein, from and after the Closing, the Buyer agrees to indemnify, defend and save the Seller and its respective legal representatives, heirs, successors, assigns, agents and affiliates (each, a "*Seller Indemnified Party*") harmless from and against, and to promptly pay to a Seller Indemnified Party or reimburse a Seller Indemnified Party for, any and all Losses sustained or incurred by such Seller Indemnified Party relating to, caused by or resulting from (a) any misrepresentation or breach of warranty, or failure to fulfill or satisfy any covenant made by the Buyer contained herein, and (b) the Assumed Liabilities.

     10.4.    <u>Limitations</u>. The maximum aggregate liability of the Seller for any Losses or other claims brought in respect of this Agreement or the transactions contemplated hereby, howsoever denominated, shall be $800,000. The Seller shall have no liability for any Losses until the aggregate amount of Losses subject to indemnification shall aggregate $50,000, and thereafter only to the extent of the excess over that amount; provided, however, that Seller shall indemnify Buyer from the first dollar of any Losses in respect of a breach of Section 4.8 (Title to Assets), which Section 4.8 Losses shall not be included in calculating the $50,000 threshold for purposes of determining indemnification obligations in respect of other Losses.

     10.5.    <u>Indemnification Procedure for Third Party Claims Against Indemnified Parties</u>.

     (a)    In the event that subsequent to the Closing any Buyer Indemnified Party or Seller Indemnified Party (each, an "*Indemnified Party*") receives notice of the assertion of any claim or of the commencement of any action, suit or proceeding by any entity which is not a party to this Agreement (including, without limitation, any governmental, quasi-governmental or regulatory agencies) (a "*Third Party Claim*") against such Indemnified Party, with respect to which the Buyer or the Seller (the "*Indemnifying Party*"), as the case may be, are required to provide indemnification under this Agreement, the Indemnified Party shall promptly give written notice, together with a statement of any available information regarding

-20-

such claim (collectively, the "*Third Party Indemnification Notice*"), to the Indemnifying Party within thirty (30) days after learning of such claim (or within such shorter time as may be necessary to give the Indemnifying Party a reasonable opportunity to respond to such claim). The Indemnifying Party shall have the right, upon delivering written notice to the Indemnified Party (the "*Defense Notice*") within thirty (30) days after receipt from an Indemnified Party of a Third Party Indemnification Notice (or within such shorter time as may be necessary to give the Indemnifying Party a reasonable opportunity to respond to such claim), to conduct, at the Indemnifying Party's sole cost and expense, the defense against such Third Party Claim in the Indemnifying Party's own name, or, if necessary, in the name of the Indemnified Party; provided, however, that the Indemnified Party shall have the right to reasonably approve the defense counsel representing the Indemnifying Party, which approval shall not be unreasonably withheld, and in the event that the Indemnifying Party and the Indemnified Party cannot agree upon such counsel within ten (10) days after the Defense Notice is provided, then the Indemnifying Party shall propose an alternate defense counsel, which shall be subject again to the Indemnified Party's reasonable approval in accordance with the terms hereof.

(b)     In the event that the Indemnifying Party shall fail to give the Defense Notice within the time and as prescribed by Section 10.4(a) hereof, then in any such event the Indemnified Party shall have the right to conduct such defense in good faith, but the Indemnified Party shall be prohibited from compromising or settling any such claim without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld and shall be deemed given in the absence of providing the Indemnified Party with a written response within ten (10) days of any request therefor. If the Indemnified Party fails to reasonably defend such claim or settles any such claim without the Indemnifying Party's prior written consent or otherwise breaches this Article X, the Indemnified Party will be liable for all costs, expenses, settlement amounts or other Losses paid or incurred in connection therewith and the Indemnifying Party shall have no obligation to indemnify the Indemnified Party with respect to such claim.

(c)     In the event that the Indemnifying Party does deliver a Defense Notice and thereby elects to conduct the defense of the subject Third Party Claim, the Indemnified Party will cooperate with and make available to the Indemnifying Party such assistance and materials as the Indemnifying Party may reasonably request, all at the sole cost and expense of the Indemnifying Party. Regardless of which party defends such claim, the other party hereto shall have the right at its own cost and expense to participate in the defense assisted by counsel of its own choosing. Without the prior written consent of the Indemnified Party, which consent shall not be unreasonably withheld and which shall be deemed given in the absence of providing the Indemnifying Party with a written response within ten (10) days of any request therefor, the Indemnifying Party will not enter into any settlement of any Third Party Claim if pursuant to or as a result of such settlement,

-21-

L00502

such settlement would lead to liability or create any financial or other obligation on the part of the Indemnified Party for other than the payment of money for which the Indemnified Party is fully indemnified hereunder. If a firm decision is made to settle a Third Party Claim, which offer the Indemnifying Party is permitted to settle under this Section 10.4(c), and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party will give at least five (5) days' prior written notice to the Indemnified Party to that effect, setting forth in reasonable detail the terms and conditions of any such settlement (the "*Settlement Notice*"). If the Indemnified Party objects to such firm offer within ten (10) calendar days after its receipt of such Settlement Notice, the Indemnified Party may continue to contest or defend such Third Party Claim and, in such event, the maximum liability of the Indemnifying Party as to such Third Party Claim will not exceed the amount of such settlement offer described in the Settlement Notice, plus costs and expenses paid or incurred by the Indemnified Party up to the point such Settlement Notice had been delivered. If an Indemnified Party settles any Third Party Claim without the prior written consent of the Indemnifying Party, the Indemnifying Party shall have no obligation to indemnify the Indemnified Party under this Article X with respect to such Third Party Claim.

(d)     Any judgment entered or settlement agreed upon in the manner provided herein shall be binding upon the Indemnifying Party, and shall be conclusively deemed to be an obligation with respect to which the Indemnified Party is entitled to prompt indemnification hereunder, subject to the Indemnifying Party's right to appeal an appealable judgment or order. Such indemnification shall be required to be made no later than the tenth (10th) day following the expiration of any period in which an appeal may be taken, and shall be satisfied by payment of the amount thereof in cash.

10.6.   Failure to Give Timely Third Party Indemnification Notice. Any failure by an Indemnified Party to give a timely, complete or accurate Third Party Indemnification Notice as provided in this Article X will not affect the rights or obligations of any party hereunder except and only to the extent that, as a result of such failure, any party entitled to receive such Third Party Indemnification Notice was deprived of its right to recover any payment under its applicable insurance coverage or was otherwise adversely affected or damaged as a result of such failure to give a timely, complete and accurate Third Party Indemnification Notice.

10.7.   Exclusive Remedy. The remedies set forth in this Article X shall be the sole remedy for any claims that may be brought by any Buyer Indemnified Party or Seller Indemnified Party for any Losses or other claims brought in respect of this Agreement or the transactions contemplated hereby, howsoever denominated.

10.8.   Notice of Claims. In the case of a claim for indemnification under Section 10.2 or Section 10.3 hereof, upon determination by a Buyer Indemnified Party or a

-22-

L00503

Seller Indemnified Party, as the case may be, that it has a claim for indemnification, the Indemnified Party shall deliver notice of such claim to the Indemnifying Party, setting forth in reasonable detail the basis of such claim for indemnification (each, an "*Indemnification Notice*"). Upon the Indemnification Notice having been given to the Indemnifying Party, the Indemnifying Party shall have thirty (30) days in which to notify the Indemnified Party in writing (the "*Dispute Notice*") that the amount of the claim for indemnification is in dispute, setting forth in reasonable detail the basis of such dispute. In the event that a Dispute Notice is not given to the Indemnified Party within the required thirty (30) day period the Indemnifying Party shall be obligated to pay to the Indemnified Party the amount set forth in the Indemnification Notice within sixty (60) days after the date that the Indemnification Notice had been given to the Indemnifying Party.

In the event that a Dispute Notice is timely given to an Indemnified Party, the parties hereto shall have thirty (30) days to resolve any such dispute. In the event that such dispute is not resolved by such parties within such period, the parties shall have the right to pursue all available legal remedies to resolve such dispute.

10.9.    Offset Against Note. If at any time (i) any amount is finally determined to be due and owing to the Buyer by the Seller pursuant to this Article X or any other provision of this Agreement (the "*Contract Amount*") and (ii) there is any amount outstanding under the Note (the "*Note Balance*"), then, at the election of the Seller, such Contract Amount shall, to the fullest extent possible, be offset against and reduced by the Note Balance. If the Note Balance exceeds the Contract Amount, the amount offset pursuant to this Section 10.9 shall be deemed a partial prepayment under the Note, and the Note shall remain outstanding. If the Contract Amount equals or exceeds the Note Balance, the Note shall be deemed paid in full and cancelled, and the excess, if any, shall be paid to the Buyer pursuant to the terms of this Agreement.

## ARTICLE XI.

## OTHER AGREEMENTS

11.1.    Returns.

From and after the Closing Date, all returns of finished goods (whether from trade or consumers, and whether returned to Buyer or Seller) shall be the responsibility of Buyer, regardless of when such finished goods were originally shipped and sold. From and after the Closing Date, the Buyer shall not authorize or instruct customers (whether wholesale or consumers) to return any finished goods to the Seller. Any finished goods returned to the Seller from and after the Closing Date shall be shipped to the Buyer at Buyer's expense.

11.2.    Product Liability; Insurance.

-23-

L00504

(a) For purposes of determining the liability of the parties resulting from a Third Party Claim in the nature of a product liability claim, (i) the Seller shall assume full responsibility for all liability and Losses related thereto, and shall indemnify Buyer to the fullest extent provided in Article X, when it can be determined the cause of the Third Party Claim resulted from a product sold by Seller before the Closing Date, and (ii) the Buyer shall assume full responsibility for all liability and Losses related thereto, and shall indemnify Seller to the fullest extent provided in Article X, when it can be determined the cause of the Third Party Claim resulted from a product sold by Buyer on or after the Closing Date. In the event that it cannot be ascertained whether the cause of the Third Party Claim was a product sold by the Buyer or the Seller, it shall be presumed that (a) any event that occurs on or after the six-month anniversary of the Closing that leads to a Third Party Claim shall be the responsibility of the Buyer, and the Buyer shall assume full responsibility for all liability and Losses related thereto, and shall indemnify Seller to the fullest extent provided in Article X, and (b) any event that occurs prior to the six-month anniversary of the Closing that leads to a Third Party Claim shall be the responsibility of the Seller, and the Seller shall assume full responsibility for all liability and Losses related thereto, and shall indemnify Buyer to the fullest extent provided in Article X. When the date of an event can not be determined to be either before, on or after the six-month anniversary and the seller of the product can not be reasonably determined, the liability of the parties shall be determined by using the date the Third Party Claim is made in place of the date of the event.

(b) Each of Buyer and Seller (or an affiliate of Seller) agrees to maintain product liability coverage in the amounts shown on Attachment 11.2 hereto for a period commencing on the Closing Date and ending on the second anniversary of the Closing Date as to Seller, and the third anniversary of the Closing Date as to Buyer. Each party agrees that it will provide on an annual basis certificates showing that such insurance remains in effect. Prior to the Closing, each party will furnish evidence of such insurance being in effect, and evidence that the carrier has been irrevocably instructed to provide Seller thirty days' notice prior to any reduction, lapse or termination of such coverage (whether for non renewal, or otherwise).

11.3.  Use of Name.  Buyer agrees that Seller may continue to use the "Brookfield" name in connection with winding up its affairs, collecting outstanding accounts receivable, filing tax returns and similar matters.

11.4.  Taxes.  Buyer and Seller agree to cooperate in preparing tax returns and otherwise reporting the sale of the Purchased Assets pursuant hereto.

11.5.  Payment for Consents.  The Buyer and the Seller agree that they shall each pay half of the cost of obtaining the consent of the licensors in respect of the Assigned Agreements. Buyer shall remit payment to the Seller in accordance with Section 2.1(c).

L00505

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

12.1. <u>Waiver; Modification</u>. No provision of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing and signed by a duly authorized representative of each of the parties hereto.. No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

12.2. <u>Invalidity</u>. If any provision of this Agreement shall be determined by any court of competent jurisdiction to be unenforceable or invalid to any extent, the remainder of this Agreement shall not be affected thereby, and this Agreement shall be construed to the fullest extent possible so as to give effect to the intentions of the provision found unenforceable or invalid.

12.3. <u>Parties in Interest</u>. This Agreement shall be binding upon and inure solely to the benefit of each party hereto, and nothing in this Agreement, expressed or implied, is intended to confer upon any other person any rights or remedies of any nature whatsoever under or by reason of this Agreement.

12.4. <u>Expenses</u>. Except as otherwise specifically provided for herein, each party hereto shall bear all expenses incurred by it in connection with this Agreement including, without limitation, the charges of its counsel, accountants and other experts.

12.5. <u>Notices</u>. All notices and other communications provided for hereunder shall be in writing and shall be delivered to each party hereto by hand or sent by reputable overnight courier, with receipt verified, or by facsimile, with receipt verified, or by registered or certified mail, return receipt requested, addressed as follows:

(a)      If to the Buyer:

Seneca Sports, Inc.
75 Fortune Blvd, PO Box 719
Milford, MA  01757
Attention: David L. Landay
President
Telephone: (508) 634-3616
Facsimile: (508) 634-8154

With a copy to:

-25-

L00506

Casner & Edwards, LLP
One Federal Street
Boston, MA 02110
Attention: Gary Hoff, Esq.
Telephone: (617) 426-5900
Facsimile: (617) 426-8810

(b)     If to the Seller:

Brookfield International, Inc.
c/o Brynwood Partners III
Two Sound View Drive
Greenwich, CT 06820
Telephone: (203) 622-1790
Facsimile: (203) 622-8223

With a copy to:

Martin A. Clarke, Esq.
Cummings & Lockwood
Four Stamford Plaza
107 Elm Street
Stamford, Connecticut 06904-0120
Telephone: (203) 351-4238
Facsimile: (203) 351-4499

or at such other address as either party may specify by notice to the other party given as aforesaid. Such notices shall be deemed to be effective when the same shall be deposited, postage prepaid, in the mail and/or when the same shall have been delivered by hand or overnight courier, and/or upon facsimile transmission, as the case may be.

12.6.   <u>Governing Law; Forum</u>.  The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Connecticut without regard to its conflicts of law principles.  The parties hereto do hereby consent and submit to the venue and jurisdiction of the State or Federal Courts sitting in Connecticut as the sole and exclusive forum for such matters of dispute, and further agree that, in the event of any action or suit as to any matters of dispute between the parties, service of any process may be made upon the other party by mailing a copy of the summons and/or complaint to the other party at the address set forth herein and a party's refusal to accept any such notice shall be equivalent to service.

12.7.   <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

-26-

L00507

12.8.  <u>Headings</u>.  All headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of any provision or provisions of this Agreement.

12.9.  <u>Integration</u>.  This Agreement, and the documents to be delivered in connection therewith, and the exhibits and schedules thereto, together with the Confidentiality Agreement previously executed between the parties, set forth the entire agreement of the parties hereto in respect of the subject matter contained herein and supersedes all prior and contemporaneous agreements, promises, covenants, arrangements, understandings, arrangements, communications, representations or warranties, whether oral or written, by any officer, partner, employee or representative of any party hereto; and any prior agreement of the parties hereto in respect of the subject matter contained herein is hereby terminated and cancelled.  No agreements or representations, whether written, oral, express or implied, with respect to the subject matter hereof have been made by either party that are not set forth expressly in this Agreement and the other documents to be delivered in connection herewith and therewith.

-27-

L00508

12.10.  Assignment.  Neither party may assign its rights hereunder without the prior written consent of the other party; provided, however, that the Buyer may assign its rights to any wholly-owned subsidiary of the Buyer, provided such affiliate agrees in writing to be bound to all of the terms and liabilities of this Agreement to the same extent that the Buyer is bound.

12.11.  Publicity.  No party shall issue any press release or public announcement of any kind concerning the transactions contemplated by this Agreement without the prior written consent of the other parties hereto, except as may be required by law or by the rules of any stock exchange, and if so required the parties shall to the extent that it is reasonably practicable consult with each other prior to such publicity.  The parties agree to issue an announcement following the Closing in form and content satisfactory to each of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

SENECA SPORTS, INC.

By _____
    Name:  David Landay
    Title:  President

BROOKFIELD INTERNATIONAL, INC.

By _____
    Name:  D. Gregory Chesnutt
    Title:  President

.StmLib1:832718.1 09/06/0000/31/0000/30/00

-28-

L00509

DISCLOSURE SCHEDULE 1.1(b)
BROOKFIELD INTERNATIONAL, INC. TRADEMARKS

EXHIBIT 1

1-14924

| TM Reg No./ App. No. | Country | Trademark | Filed | Registered |
|---|---|---|---|---|
| 74,749 | Panama | BROOKFIELD | | 03/10/1995 |
| 156,058 | Austria | BROOKFIELD | 10/14/1994 | 12/29/1994 |
| 164,202 | Ireland | BROOKFIELD | 10/17/1994 | 04/25/1994 |
| 171,328 | Norway | BROOKFIELD | 10/07/1994 | 02/28/1996 |
| 174,597 | Colombia | BROOKFIELD | 10/31/1994 | 03/15/1995 |
| 424,047 | Switzerland | BROOKFIELD | 10/20/1994 | 10/20/1994 |
| 447,112 | Chile | BROOKFIELD | | 06/23/1995 |
| 486,478 | Mexico | BROOKFIELD | 12/16/1994 | 12/16/1994 |
| 559,791 | Benelux | BROOKFIELD | 10/17/1994 | 10/17/1994 |
| 1,915,174 | U.S. | BROOKFIELD | 04/25/1994 | 08/29/1995 |
| 2,912,066 | Germany | BROOKFIELD | 10/11/1994 | 10/11/1994 |
| 00/700,089 | Italy | BROOKFIELD | 10/24/1994 | 12/30/1996 |
| 94/540,559 | France | BROOKFIELD | 10/17/1994 | 10/17/1994 |
| B1,587,586 | Great Britain | BROOKFIELD | 10/10/1994 | 04/25/1994 |
| VR8604 | Denmark | BROOKFIELD | | 12/09/1994 |
| 1,842,444 | U.S. | EASY ROLLERS | 02/02/1993 | 06/28/1994 |
| 2,067,917 | U.S. | COOL FLO SYSTEM | 10/27/1995 | 06/03/1997 |
| 2,151,672 | U.S. | MISCELLANEOUS DESIGN | 01/31/1996 | 04/21/1998 |
| 1,960,188 | Argentina | BROOKFIELD | 02/07/1995 | |
| 1508B/94 | Venezuela | BROOKFIELD | 11/11/1994 | |

3

L00563

DISCLOSURE SCHEDULE 1.1(c)
BROOKFIELD INTERNATIONAL, INC. ASSIGNED PATENTS

1-14924

EXHIBIT 1

| Patent No./ App. No. | C'ntry | Title | Filed | Issued |
|---|---|---|---|---|
| 5,400,484 | U.S. | ADJUSTABLE ROLLER SKATE – H. Gay | 10/23/1992 | 03/28/1995 |
| 5,522,609 | U.S. | ADJUSTABLE SKATE BRAKE – H. Gay | 03/18/1994 | 06/04/1996 |
| 5,845,913 | U.S. | SKATE WITH ANIMATED FIGURES OR FEATURES – Santarsiero | 03/03/1997 | 12/08/1998 |
| 5,954,348 | U.S. | ROLLER SKATE WHEEL CONTROL MECHANISM – Santarsiero et al | 01/05/1996 | 09/21/1999 |
| D373,609 | U.S. | ROLLER SKATE (DESIGN) Santarsiero et al. | 07/28/1995 | 09/10/1996 |
| 395,478 | U.S. | SKATE BOOT TOE VENT – Santarsiero | 04/30/1996 | 06/23/1998 |
| D353,429 | U.S. | CHILD'S IN-LINE SKATE (DESIGN) H. Gay et al. | 10/23/1992 | 12/13/1994 |
| D394,890 | U.S. | IN-LINE SKATE – Santarsiero | 10/15/1996 | 06/02/1998 |
| 60/119,860 | U.S. | ADJUSTABLE IN-LINE SKATE MECHANISM – Santarsiero | 02/12/1999 | |
| PCT/US00/ 03610 | INT'L | ADJUSTABLE IN-LINE SKATE MECHANISM – Santarsiero Based on 60/119/860 dated 2/12/99 | 02/11/2000 | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

3

L00564