# EXHIBIT D

```
 1                UNITED STATES DISTRICT COURT
 2                  DISTRICT OF MASSACHUSETTS
 3
 4    - - - - - - - - - - - - - - - x      ORIGINAL
 5    DAVID L. LANDAY,
 6              Plaintiff,              Civil Action
 7    vs.                               No. 04-CV-11955-WGY
 8    GMACCF COMMERCIAL CREDIT, LLC,
 9    and GMACCF COMMERCIAL
10    FINANCIAL, LLC.,
11              Defendants.
12    - - - - - - - - - - - - - - - x
13
14        DEPOSITION OF JOHN RIJO, a witness called by and
15    on behalf of the Plaintiff, taken pursuant to the
16    provisions of the Federal Rules of Civil Procedure,
17    before Dana Welch, a Registered Professional Reporter
18
19    and Notary Public in and for the Commonwealth of
20
21    Massachusetts, at the offices of Lynch Brewer, 101
22
23    Federal Street, Boston, Massachusetts, on Monday,
24
25    November 14, 2005, commencing at 9:46 a.m.
```

  MR. HOULIHAN: Objection.

  THE WITNESS: I don't recall any similar to the previous liquidation analysis that we discussed. My conversations were likely with Dick Sabastiao, and Dick Sebastiao likely had conversations with GMAC.

BY MR. HOFFMAN:

Q Okay. Did you learn at or about the time of that collateral analysis that Mr. Landay was negotiating with a company called Platinum Funding?

  MR. HOULIHAN: Objection. Outside the scope. You may answer.

  THE WITNESS: Similar to what I had just previously noted, I know that they were working with Resolution Capital. And again, information I wasn't privy to, but I did hear that name before, so I would assume that was one of the organizations or entities they were talking with as far as potential plans.

BY MR. HOFFMAN:

Q At some point in time, were you given the assignment of taking peaceful possession of the Seneca premises?

  MR. HOULIHAN: Objection.

  THE WITNESS: I had -- I went to the

Seneca office location to take basically control of the premises.

BY MR. HOFFMAN:

Q   Okay. And who asked you to do that?

MR. HOULIHAN: You may answer that question by responding to the name of the person with whom -- you may answer that question by responding with the name of the person who asked you to take that action, but nothing more.

THE WITNESS: I believe I had conversations with Dick Sebastiao that would have -- to discuss the process of going there.

BY MR. HOFFMAN:

Q   Do you recall what Mr. Sebastiao told you?

A   Again, I don't know -- I don't remember the specifics of the conversation. But that I believe that I was informed that peaceful possession had taken place and that I should go down there to take control of the premises.

Q   Okay. And I take it, you did go there?

A   Yes.

Q   On a particular day?

A   Yes.

Q   And did you write a summary of the events of that day?

A    I believe I did, yes.

Q    I'm going to show you Exhibit 134. And ask you whether that is a memo that you prepared on or about October 22, 2001 on behalf of RAS in connection with its work for GMAC?

A    Yes.

Q    And who is Richard Rosenstein?

A    I believe he was a local counsel for GMAC.

Q    Boston counsel?

A    I believe so.

Q    Okay. And is it your recollection that you sent this memo to him?

A    Yes.

Q    Was it by e-mail?

A    I'm not sure.

Q    Okay. Did you send it to anyone else?

A    I don't recall. There's no one copied on it, so I'm not sure.

Q    Okay.

A    I'm not sure who.

Q    Did you ever discuss this memo with Mr. Rosenstein?

    MR. HOULIHAN: You can answer that question yes or no.

    THE WITNESS: Yes.

BY MR. HOFFMAN:

Q   Do you recall what was said?

   MR. HOULIHAN: You can answer that question yes or no.

   THE WITNESS: Not specifically.

BY MR. HOFFMAN:

Q   Okay. Have you read this memo in preparation for this deposition?

A   Not specifically.

Q   And I'd ask you to read it to yourself, please.

A   Okay.

   MR. HOULIHAN: Alan, before you ask any questions further on this document, I'd like to speak to the witness concerning potential privilege issues with respect to this document.

   MR. HOFFMAN: Okay.

   (Proceedings interrupted at 11:42 a.m. and reconvened at 11:46 a.m.)

BY MR. HOFFMAN:

Q   You have in front of you Exhibit 134?

A   Yes.

Q   Was this a memo that you wrote for RAS in connection with its representation of GMAC on the Seneca matter?

A   Yes.

Q    And was it written by you in the regular course of RAS's business?

    MR. HOULIHAN: Objection. Do you understand what Mr. Hoffman is asking you?

    THE WITNESS: Not completely.

BY MR. HOFFMAN:

Q    All right. Was it written in the course of RAS's business, as far as you understand it?

A    In the course of RAS's business?

Q    (Nodding head up and down).

A    In terms of as part of our assignment to the Seneca case?

Q    Yes.

A    Yes.

Q    And were you trying to record in this document events which occurred on October 22nd, 2001, as accurately as you can -- as you could?

A    To summarize as best I could.

Q    And when you read this document just a couple of minutes ago, did you find anything in it which you now believe not to be accurate?

A    Not to my recollection.

Q    Okay. Bullet point number five, where it says, "David expressed concerns that the inventory will be liquidated at too low of cost and that he

Q  Do you recall whether the files had already been sent to the storage facility at that time?

A  I'm not -- right now, I'm not sure. It might be documented in my memos.

Q  You don't have an independent recollection?

A  Just sitting here, I don't have an independent recollection of which happened first.

Q  Do you remember any GMAC -- while the files were still on the premises of Seneca, of looking at the files, going through the files for any purpose?

A  Excuse me?

Q  Do you remember any employee of GMAC who came to the Seneca facility looking at any files?

A  I have no recollection.

Q  Okay. All right. Do you remember any other conversations you had with Mr. Crowley?

A  Again, similar to Jane Frangos, I talked to him sporadically throughout the process about various updates, issues, deals, customers, stuff like that, but no specific.

Q  No specifics come to mind?

A  Nothing that wasn't related to the issues that were discussed in my memos.

Q  Okay. With -- when you were in charge at the Seneca facility between October 22, 2001 and

1  November 26, 2001, what was your procedure with
2  regard to incoming mail?
3         MR. HOULIHAN: Objection. It's beyond
4  the scope of the 30(b)(6) notice. But you may
5  answer to the extent you know.
6         THE WITNESS: Can you repeat the
7  question?
8         (Preceding question was read by the
9  stenographer.)
10        MR. HOULIHAN: Objection. Just to be
11 clear, that's an objection to form and to the scope
12 of the question. You may answer.
13        THE WITNESS: I believe, the best of my
14 recollection, the mail came in two different
15 sources; it either came directly to the front door
16 or there was a post office box set up at the local
17 Milford post office. If mail came to the office, I
18 piled it over by the front door. And then as Neil
19 Finkelstein came to the office, I believe I asked
20 him to actually collect the mail at the post office
21 box.
22 BY MR. HOFFMAN:
23 Q    What --
24        MR. HOULIHAN: Are you finished with your
25 answer?

1   THE WITNESS: No. And then Neil,
2   whenever he was there, would go through the mail.
3   If any FedEx's, for example, came that were for
4   David, I would set that aside. If it appeared to
5   be a general company correspondence, I think it was
6   just left with the general mail to go through.
7       And then at some point, and I don't
8   recall if myself or Neil, but we went to the post
9   office to get change of address. So at the time
10  that I left the post office box and the office area
11  was directly forwarded to the Boston GMAC office.
12  BY MR. HOFFMAN:
13  Q   Mr. Crowley's office?
14  A   Mr. Crowley and Brant McDougal's office.
15  Q   What you have just described, was that -- well,
16      strike that. Was what you have just described the
17      customary procedure that you employed between the
18      time of October 22 and sometime in November when
19      mail would arrive at the Seneca premises?
20      MR. HOULIHAN: Objection.
21      THE WITNESS: Can you restate the
22  question?
23      (Preceding question was read by the
24  stenographer.)
25      THE WITNESS: Again, the best of my

knowledge, that's what happened. If mail came to the front door, I would have likely received it and had it by, close to the front door. When Neil was there, I asked him to go to the post office to pick up anything that was at the post office box.

At some point I know that I had to have Neil inform me on where the post office was and how to get there. So I probably made some trips to the post office as well. But for the most part that was the general procedure.

BY MR. HOFFMAN:

Q When you were in charge, who opened the mail, you, yourself, Neil or any other person?

MR. HOULIHAN: Objection as to form and beyond the scope of the notice. You may answer.

THE WITNESS: I honestly don't recall. I know that Neil would have gone through the mail and opened the mail when he was going through it. I don't recall -- I don't recall what mail I would have opened and didn't open at the time.

BY MR. HOFFMAN:

Q Okay. Was Mr. Finkelstein there every day during that period of time?

A Not every day. But in the beginning, he was there more often and he showed up from time to time

1  thereafter.
2  Q    If he wasn't there on a particular day, who would
3       open the mail?
4             MR. HOULIHAN: Objection. Scope and form
5       of the question. You may answer.
6             THE WITNESS: I would have -- I would
7       have probably have seen it, so I'm not sure what --
8       I don't recall. I mean, I would have been the one
9       that gathered it. So I would have either set it
10      aside for Neil to go through on his next visit. If
11      it was purely marketing material, I would have, you
12      know, just basically put it in a separate pile or
13      thrown it away if it was just advertising, stuff
14      like that. If there was any specific bill looking
15      items or potential other notices, I would have, you
16      know, either documented it in my memo.
17 BY MR. HOFFMAN:
18 Q    Do you recall whether you received any mail during
19      the period of time in which you were in charge of
20      the liquidation from GMAC in New York addressed to
21      Seneca?
22            MR. HOULIHAN: Objection. Form of the
23      question and beyond the scope of the 30(b)(6)
24      notice. You may answer.
25            THE WITNESS: I'm not sure. I'm assuming

Page 112

1  it would have gone through the post office box. So
2  in the beginning, I'm sure probably Neil would have
3  received it. And then at some point, I probably
4  would have gone to the post office box and received
5  something that might have been from GMAC. But I
6  don't have any specific recollection of a specific
7  document or --
8  BY MR. HOFFMAN:
9  Q    Okay. What's the next exhibit?
10 A    150, we were just on 149, believe.
11 Q    And is exhibit -- can I see 150? I just want to
12      make sure -- 149 is -- I see 150? Okay. All
13      right. Exhibit 150 is a memorandum to Jane Frangos
14      dated November 15, 2001, correct?
15 A    Yes.
16 Q    Okay. Exhibit 151, is that a memorandum to Jane
17      Frangos dated November 19, 2001?
18 A    Yes.
19 Q    Exhibit 152, is a memorandum to Jane Frangos dated
20      November 20, 2001, correct?
21 A    2001 -- did you say 2002?
22 Q    2001?
23 A    November 20, 2001, yes.
24 Q    And if you turn to the third page, which is the one
25      where there are five bullet points on the bottom --

1  A    Uh-huh.

2  Q    -- and the first one is "mail"?

3  A    Yes.

4  Q    And reads, "Arrangements have been made to have all mail forwarded to John Crowley at GMAC." Did I read that correctly?

7  A    Yes.

8  Q    Is that what you did?

9  A    Yes.

10 Q    What exhibit was that one?

11 A    152.

12 Q    Exhibit 153 is a memorandum to Jane Frangos dated November 21, 2001, correct?

14 A    Yes.

15 Q    Okay. And in the first paragraph you wrote, "I left Seneca on Wednesday evening" -- I'm reading it -- "will all merchandise shipped, applicable files and records moved to a local storage unit. Forklift was also shipped with final merchandise to Warehouse Outlet Liquidators, parens WOL, caps. All computers, CPUs and certain office equipment were taken by Brant McDougal of GMAC." Did I read that correctly?

24 A    Yes.

25 Q    And then you wrote, "All other assets are being

1  abandoned," correct?
2  A  Yes.
3  Q  On the second page of this exhibit, paragraph three, you wrote, under File and Storage, "All applicable office records were removed from Seneca's offices on Wednesday and placed into a local storage facility. All storage facility documentation and keys will be forwarded to the GMAC Boston office." Did I read that correctly?
10 A  Yes.
11 Q  And did you do that; did you send the keys to the Boston office?
13 A  Yes.
14 Q  And that was Exhibit 153?
15 A  Three.
16 Q  All right. Exhibit 154 is a memo to Jane Frangos dated November 26, 2001. Is Exhibit 154 to the best of your recollection the final report you made in connection with the liquidation?
20 A  To the best of my recollection, it was the last memo. There's probably other correspondence in some e-mails, but I believe this was the last official board memo.
24 Q  Did you ever calculate the total dollar value of the inventory that you were able to sell in the

To:    Richard Rosenstein
From:  John Rijo
Date:  October 22, 2001
RE:    Seneca Sports, Inc.

Richard,

Below is a summary of my afternoon at Seneca today.

- I arrived at Seneca at 1pm and immediately stopped into David Landay's office to notify him I was there and that we needed to talk. He called Neal Finklestein into his office to discuss the current situation.

- I instructed him the first step was for me to gain control of the premises and that I needed to get all copy of keys held by employees and information to contact the security company to change all passwords. David's first reaction was that he needed to have those instructions provided to him by his lawyer but eventually agreed to provide me with my request.

- I also instructed David to notify all employees of the situation and asked him to provide me with an employee listing with contact numbers for future follow up. I also instructed Neal that I would like him, Richard Herman (MIS), and James Hart (Warehouse) to return the next day to help organize needed information and inventory for liquidation.

- David stated that he would be taking certain records with him, including company tax records and payroll information. I instructed him that he could organize everything and make a list of requested information and would have to arrange a time to pick up the information after I had a chance to review it. He did not provide any list to me.

- David expressed concerns that the inventory would be liquidated at too low of cost and that he thought all customers orders outstanding should be filled to maximize the liquidation value.

- After initially meeting with David Landay, I walked out to the warehouse to ensure no further shipping activity. James Hart informed me that one order had been picked up in the morning and two others had scheduled picked ups in the afternoon. I researched the orders and noted that one was to Closeout Wholesalers as was for approximately 40% of cost and the other was to JC Penney Catalog, a customer that has a significant return allowance that may dispute receivable payments. I then returned to the warehouse within a half-hour and noticed the orders being loaded on to trucks. I instructed James Hart to pull all goods off the truck and stop all future shipments until further instructed.

- I called a local locksmith and instructed him to come to Seneca and change the locks. He arrived at approximately 4pm and re-keyed all locks, providing me with the only keys. I also arranged for the security company come to Seneca and change all passwords the next morning.

- Between 3pm and 4pm, the remaining employees finished packing up their personal belonging and began to exit the property. David made a few of phone calls during that time and continued to pack personal belongings. He also made certain copies of records, including some of GMAC's daily cash sheets. I am not aware of any original documents that were removed from the location.

- I set up my computer near the front door and witnessed the employee's departure.

- At 4pm, once all other employees besides Neal had left, I asked David how much longer he planned to be there. He stated he was leaving as soon as he went to the bathroom. Shortly after that he left with his personal belongings.

- I instructed Neal he was free to go and that I would meet with him in the morning to discuss what information I needed from him.

- The locksmith finished re-keying all the doors at approximately 6pm.



To: Jane Frangos
Cc: Dick Sebastiao
RE: Seneca Update
Date: November 20, 2001

Key updates on Seneca through the end of the day on Tuesday, November 20, 2001 include:

1. **Remaining Inventory Deals:** The remaining inventory not in Port, that has potential liquidation value with additional deals include:

|  | CAL CARTAGE | | KLWY-CA | | KLWY-MA | | ALL | |
|---|---|---|---|---|---|---|---|---|
|  | TOTAL WHLS | TOTAL COST | TOTAL WHLS | TOTAL COST | TOTAL WHLS | TOTAL COST | TOTAL WHLS | TOTAL COST |
| HELMETS | 0 | 0 | 0 | 0 | 24,552 | 15,345 | 24,552 | 15,345 |
| PROT. GEAR | 15,885 | 8,048 | 101,634 | 59,417 | 0 | 0 | 117,519 | 67,465 |
| SKATE BAGS | 61,542 | 28,939 | 0 | 0 | 0 | 0 | 61,542 | 28,939 |
| OTHER | 0 | 0 | 0 | 0 | 49,152 | 33,028 | 49,152 | 33,028 |
| TOTAL | 77,427 | 36,987 | 101,634 | 59,417 | 73,704 | 48,373 | 252,765 | 144,777 |

Updates on offer previously discussed and/or outstanding for this inventory include:

- **JCP:** I contacted JCP on Tuesday. They stated they did have any interest in fulfilling any open orders for the remaining merchandise. Reasons included, no demand, lack of desire to plan logistics internally to pick up at our outside warehouses, liability concerns, etc.

- **Olympia Sports:** Since this is only for a partial order for inventory stored at Kellaway, I need to have further settlement discussions with Kellaway before any deal is made. Also, since JCP is backing out of their orders, selling this inventory in one bulk sale (see Leon Korol) will be more efficient and economical given the low demand on certain items (e.g., accessory skate bags).

- **Leon Korol:** I have instructed Gary Korol of Leon Korol that I am working on settlement agreements with the outside storage facilities and I will follow up with him at the end of this week or the beginning of next week to discuss his offer in detail. He stated that was not a problem since he would not be able to complete any deal this week given the holiday.

- **The Marsden Company, Inc.:** No response to inventory listing forwarded.

- **Lion Sports:** No response to inventory listing forwarded.

- **Name Brand Closeouts (NBC):** I followed up with Bryan Meeks of NBC, and informed him of the remaining inventory. He requested a listing that I emailed and will follow up with me on his interest.

A key to realizing value from this inventory is negotiating releases of the merchandise from the third party locations. Updates include:

- **Kellaway:** I called several times yesterday and left two messages with the owner yesterday requesting follow up on expenses owed. I received no response. I will continue to follow up today.

- **Cal Cartage:** I have requested a sales representative for the Seneca account to contact me this week to discuss a final settlement of these goods. I will continue to follow up today. The amount owed, per my previous conversation this week was



GLAN 00041

only approximately $2,000. I will continue to follow up so we can work a potential settlement by the end of the month (before any new charges are applied).

As previously noted, the best opportunity to liquidate these goods would likely be to finalize a deal with Leon Korol or another purchaser that will make a bulk offer (especially since the JCP orders, at full cost, are officially cancelled). The key, again, will be negotiations with Kellaway to release their product.

| LEON KOROL OFFER | REMAINING INV | |
|---|---|---|
| LOCATIONS/STORAGE COMPANIES | TOTAL OFFER $ | TOTAL COST $ |
| KELLAWAY | 29,220 | 107,790 |
| CAL CARTAGE | 8,272 | 36,987 |
| TOTAL | 37,492 | 144,777 |
| FINAL OFFER TO COST ANALYSIS: | | |
| Percent of Cost, Kellaway Inventory | | 27% |
| Percent of Cost, Cal Cartage Inventory | | 22% |
| Percent of Cost at Total Remaining Inventory | | 26% |

2. *Furniture, Equipment, and Other Bulk Items Liquidation:* Assuming all goes well today with moving the files and final merchandise inventory, I should be able to vacate the facility this week. I have asked Richard Stehl what if any notification we need to provide to David since we will be abandoning the majority of the fixed assets, as well as all records (pre-fiscal 2000). My concerns are that Neal did request that David have access to remove all records we abandon. In addition, I wanted to ensure David does not have any claims that we did not provide him an opportunity to protect himself against any liabilities that could be brought against him (e.g., if the landlord come in and start to liquidate all remaining assets to recoup any costs, including leased equipment that will be charged to Dayid for not returning). Richard stated he would think through what notification, if any, we should provide.

To date the forklift remains the only company asset that has notable liquidation value and will be officially sold by the end of today.

- *Forklift:* A bill of sale was forwarded to Warehouse Outlet Liquidators (WOL). Rob Pisarik of WOL stated he had overnighted a cashier's check for $1,600 and the signed bill of sale to the Boston GMAC office. Upon confirmation today, the forklift will be loaded onto WOL's provided freight carrier, along with the final warehouse inventory purchased.

- *Other Items:* There are a few other large items that will be abandoned in the warehouse this week. These include, but are not limited to air compressors, other older random machinery, Seneca's tradeshow booth, and several large "home-made" component storage contraptions (wood framed storage bins for items such as soccer balls to be stored).

Given the timing requirement to leave the building without paying additional rent and other associated expenses (utilities, etc.), abandoning the fixed assets remains more economical than furthering liquidation attempts, since the total value of all assets appears to be much less than the monthly rent alone.

3.  *File and Storage:* All office records have been completely boxed and ready to be removed from Seneca's offices on Wednesday. As previously noted, Neal Finklestein stopped in the office Monday to follow up on any employee benefits and related items for Seneca and asked about records we were to abandon. He stated that he wanted access to move all abandoned records to a separate storage facility for David. I told him I would have all records we were retaining out of the office this week and that he could follow up with my at the end of the week to discuss the remaining records.

    Brandt McDoogle of the GMAC Boston office is supposed to stop at Seneca on Wednesday pick up all PC CPU's to be stored in the Boston office.

4.  *Employee's Time:* The following personnel have been used for the first four weeks of the liquidation process:

| Name | Position/ Liquidation Task | Hours (1st two weeks) | Salary Rate | Amount Owed |
|---|---|---|---|---|
| James Hart | WHSE – Inv. organization, packing, shipping, etc. | 126.75 | $31.50 | $3,993 |
| Richard Herman | MIS – System Back Up, JCP EDI Labels | 12 | $26.50 | $318 |
| Cynthia Foscarota | Customer Service – Preparing AR back up, Ozer requests | 18 | $26.50 | $477 |
| Neal Finklestein | Finance – Wire transfers, running reports, general admin | 32 | $38.87 | $1,244 |

By the end of this week there should be no further temporary help booked, with the total estimated payments due being approximately $7,200. I am going to make another attempt to have Seneca's payroll company cut these checks since it still appears to be the most efficient option. If they still will not do it, I will contact other local payroll service companies and temporary agencies to see if they will process 1099 checks for a minimal fee.

5.  *Other Important Calls/Correspondences and Issues (some carried over from previous report):*

    - MAIL: Arrangements have been made to have all mail forwarded to John Crowley at GMAC.

    - LANDLORD: Once I ensure all records are removed from the office and I follow up with Richard Stehl as to any notification we will potentially provide to David about our intentions to vacate the facility, I will inform the Landlord that GMAC has completed what they needed to do at Seneca and that he will need to follow up with David as to all final logistics, etc.

    - INSURANCE: Cancellation notices have been received with the major insurance policies set to be terminated on 11/26/01.

    - UTILITIES: A shut off notice for the gas company was received Monday. Shut off is set for 11/29/01. A shut off notice for electric was received on Tuesday. Shut off is set for November 29, 2001.

    - CUSTOMS: All customs documentation received to date has been forwarded to Richard Stehl for review. This includes "courtesy notices" of entries scheduled for liquidation. The notices appear to be liquidation receipts since they have been getting received after the noted liquidation date. The documents also note there is a 90-day protest period after

GLAN 00043

the liquidation if there is dissatisfaction with the liquidation amount. Given the significant amounts owed by Seneca, there does not appear to be any recovery potential through any liquidation protest. I will follow up with Richard again today, to ensure there are not specific legal actions that we should be taking on these liquidations.

GLAN 00044