UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-CV-11955-WGY

| | | |
|---|---|---|
| DAVID L. LANDAY, | ) | |
| | ) | |
| Plaintiff, | ) | **PLAINTIFF DAVID L.** |
| | ) | **LANDAY'S MEMORANDUM IN** |
| v. | ) | **OPPOSITION TO** |
| | ) | **DEFENDANTS' MOTION FOR** |
| GMAC COMMERCIAL CREDIT, LLC and | ) | **SUMMARY JUDGMENT** |
| GMAC COMMERCIAL FINANCE, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **ARGUMENT**

I.  <u>LANDAY, NOT GMAC, IS ENTITLED TO SUMMARY JUDGMENT ON THE
    USURY CLAIM, COUNT II OF THE AMENDED COMPLAINT</u>.

In addition to repeating, and, to some extent, tweaking arguments previously made and rejected on their Motion for Judgment on the Pleadings – choice-of-law, standing and waiver – Defendants have engaged in a major revision of M.G.L. c. 271, §49(a) in a futile effort to eviscerate Landay's expert's usury calculations.  Landay contends that each of GMAC's four usury arguments is completely meritless and that the Court should enter summary judgment in his favor pursuant to his motion.

A.  <u>The Massachusetts Usury Statute Is Applicable To GMAC's Conduct.</u>

GMAC reiterates essentially the same argument which this Court previously rejected in denying its Motion for Judgment on the Pleadings.  Moreover, the very case on which GMAC relies provides a ringing endorsement of Landay's position.

In <u>Stagecoach Transportation, Inc. v. Shuttle, Inc.</u>, 50 Mass. App. Ct. 812, 817-819 (App. Ct. 2001), the Appeals Court considered language – "[t]his Agreement shall

be governed and interpreted in accordance with the laws of the State of New York" –
which is virtually identical to the language in the Factoring Agreement and in the
Guaranty[1], on which GMAC relies.  In holding, under New York law, that this language
did <u>not</u> encompass related tort claims (specifically a Chapter 93A claim in that case),
the Appeals Court cited the same line of cases which Landay has cited in support of his
Motion for Summary Judgment on Usury Count, including the lead case of <u>Krock v.
Lipsay</u>, 97 F.3d 640, 645 (2d Cir. 1996).  <u>See</u>, <u>also</u>, <u>Fin. One Public Co. v. Lehman
Bros. Special Fin., Inc.</u>, 414 F.3d 325, 335 (2d Cir. 2005) ("Under New York law, then,
tort claims are outside the scope of contractual choice-of-law provisions that specify
what law governs construction of the contract,…").

        Without citing a single precedent, GMAC proceeds to contend that the civil claim
of usury is "obviously contract-based, not tort-based."  GMAC's Memorandum, p. 9.
The authorities are to the contrary.  <u>See</u>  authorities cited at pp. 7-8 of Landay's
Memorandum in Support of Motion for Summary Judgment on Usury Count ("Landay's
Usury Memorandum") which establish that a civil claim of usury is a tort.

        GMAC purports to make two additional arguments – each in a single sentence –
which, if they are not waived[2], should be rejected on the merits.  First, GMAC states that
"the Factoring Agreement and the Guaranty expressly state that New York's choice-of-
law principles do not apply."  GMAC's Memorandum, p. 9.  This argument is a voyage to
nowhere.  While the Guaranty does provide that it is to be construed in accordance with

---

[1] The language in the Guaranty is as follows: "This guaranty shall be governed by and construed and
interpreted in accordance with the laws of the State of New York (without giving effect to New York's law
on conflicts of law)."  Defendants' Appendix, Exhibit 4, p. 2.

[2] "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed
argumentation, are deemed waived."  <u>King v. Town of Hanover</u>, 116 F.3d 965, 970 (1st Cir. 1997) (internal
citation omitted); <u>Nextel Commc'ns of the Mid-Atlantic, Inc. v. Town of Hanson</u>, 311 F.Supp.2d 142, 152
n.8 (D. Mass 2004).

New York law "without giving effect to New York's law on conflicts of law", the latter
phrase does not change the result required by <u>Stagecoach Transportation, Inc.</u> and
<u>Krock</u>.  These cases did not apply New York's law on "conflicts of law" but rather
interpreted the scope of a choice-of-law contractual provision pursuant to New York law.
<u>See</u> <u>Fin. One Public Co.</u>, 414 F.3d at 334.

Finally, GMAC also argues that, even if tort-based, the Usury claim would be
governed by New York law because New York, where GMAC "resided and applied the
allegedly usurious interest charges, has the most significant relationship to this claim."
GMAC's Memorandum, p. 9.  To the contrary, the "interest analysis" under Restatement
(Second) Conflict of Law §145 (1971) clearly mandates application of Massachusetts
law.  In this regard, (a) the place where the injury occurred, i.e., where the usurious
charges were imposed, was Seneca's office in Massachusetts; (b) while the conduct
<u>may</u> have emanated from GMAC's New York office from which the Client Statements
containing the usurious charges were sent, GMAC had a Boston office, with which
Seneca and Landay dealt, and GMAC has proffered no evidence on the issue of which
office <u>decided to</u> impose the illegal charges; (c) as to residence, Seneca, GMAC and
Landay had residences in Massachusetts; and (d) there is no question that on the
critical factor, "the place where the relationship … between the parties is centered",
Massachusetts, Seneca's principal place of business and the home of GMAC's branch
office which negotiated and administered the loan, was the epicenter of the disastrous
relationship between the parties.  In this regard, GMAC's purported filing of a Usury
letter with the Massachusetts Attorney General pursuant to M.G.L. c. 271, §49 (Exhibit

C to Landay's Motion for Summary Judgment on Usury Count) constitutes further proof

of the centrality of Massachusetts to the Usury issue.[3]

      B.     <u>Landay Has Standing To Assert The Usury Claim</u>.

      As argued more fully in Landay's Usury Memorandum, pp. 9-10, the law in

Massachusetts, as set forth in the case of <u>LBM Financial, LLC v. Edgewater Investment</u>

<u>Ltd. Partnership</u>, Nos. 01798, 01656, 02286, 2004 WL 2075565, at *3-4. (Mass. Super.

Aug 5, 2004), establishes Landay's standing to assert the usury claim as junior creditor

or as guarantor.  GMAC's argument to the contrary cites inapplicable foreign law and

mischaracterizes the Supreme Court case and the one Massachusetts case it cites.

      Three of the cases relied on by GMAC were decided under foreign law:  <u>First</u>

<u>Nat'l Bank of Jacksboro v. Lasater</u>, 196 U.S. 115 (1905) (Texas); <u>Focus Investment</u>

<u>Assocs, Inc. v. America Title Insurance Company</u>, 992 F.2d 1231 (1st Cir. 1993) (Rhode

Island); and <u>Harrington v. Norex Am., Inc.</u>, No. 01-93-011161, 1995 WL 19219 (Tex.

App. – Hous. Jan 19, 1995) (Texas) (not designated for publication).  <u>National Bank of</u>

<u>Jacksboro</u> does not stand for the proposition for which it is cited.  Rather it held that a

guarantor cannot pursue a usury claim, which he failed to disclose to the trustee, after

his bankruptcy had been terminated.  The Massachusetts case, <u>Beach Associates, Inc.</u>

<u>v. Fauser</u>, 9 Mass. App. Ct. 386 (App. Ct. 1980), also does not stand for the proposition

for which GMAC cites it.  At least by implication, GMAC contends that the <u>Beach</u>

---

[3] Even if the Court were to find that the parties agreed that New York law applied to the Usury claim or that interest analysis pointed to the application of New York law, this Court should, nonetheless, apply M.G.L. c. 271, §49 on grounds of the strong public policy of the Commonwealth.  <u>Greenwood Trust Co. v. Massachusetts</u>, 776 F. Supp. 21, 41-42 (D. Mass. 1991), <u>rev'd on other grounds</u>, 971 F.2d 818 (1st Cir. 1992).  "The public policy against usury is clearly a matter for grave legislative concern, …"  <u>Begelfer v. Najarian</u>, 381 Mass. 177, 185 (1980).

<u>Associates</u> case <u>holds</u> that <u>only</u> the borrower has standing under M.G.L. c. 271, §49.[4]

To the contrary, the <u>Beach Associates</u> case held only that the equitable remedy of

declaring the underlying loan void provided by Section 49(c) was permissive, not

mandatory.  Therefore, <u>LBM Financial, LLC</u>, the only Massachusetts case which has

addressed the issue of whether a party other than the borrower has standing to sue

under the Usury Statute, should <u>not</u> "be disregarded as inconsistent" with the Statute,

the <u>Beach Associates</u> case or the totally inapposite Supreme Court case on which

GMAC relies.  Instead, it should be regarded as a correct statement of Massachusetts

law:  a party other than the borrower, i.e., a junior creditor or guarantor, has standing

under Section 49(c) as "the public policy interests of the usury statute are furthered by

the present claim."  <u>LBM Financial, LLC</u>, 2004 WL 2075565, at *3-4.

     C.    <u>The Usury Claim Has Not Been Waived</u>.

    GMAC argues that usury claims may be waived and that the borrowers and

Landay waived this claim in the Forbearance Agreement and the Guaranty.  Again,

Defendants are wrong on both counts.

    Because interpretation of these agreements is to be governed by New York law,

the case of <u>Hammelburger v. The Foursome Inn Corp.</u>, 76 A.D.2d 646, 649-650 (N.Y.

App. Div., 2d Dept. (1980), <u>modified</u>, 5 N.Y. 2d 580 (1981), is controlling.  In

<u>Hammelburger</u>, the Appellate Division held that a defense based on a criminal usury

statute could not be waived ("we hold that a defense of criminal usury may be asserted

by a mortgagor against a mortgagee …, notwithstanding the existence of an estoppel

[4] "Thus, only the Borrowers possess standing under Section 49(c)."  GMAC's Memorandum, p. 10.  "To the extent that <u>LBM's Fin. LLC v. Edgewater Investment Ltd. P'ship</u>, 2004 WL 2075565 (Mass. Super. Aug. 5, 2004), suggests a contrary result, it should be disregarded as inconsistent with … the Massachusetts Appeals Court decision in <u>Beach Associates</u>."  GMAC's Memorandum, p. 10, n. 7.

certificate previously executed by the mortgagor").  It based this holding on a policy favoring the enforcement of rules created for the protection of the public, stating, "[a]ccordingly, it would seem to follow that a party cannot waive his right to be protected from criminally usurious loans."

Of the seven cases cited by GMAC in its argument, five, the three New York precedents referenced at p. 10 and p. 11 of its Memorandum, and the two Massachusetts appellate decisions at p. 11, do not involve a usury defense or counterclaim but merely address the issue of contractual waivers generally or as to causes of action other than usury.  The two others address usury but are inapposite Giorgio v. DeFusco, 862 F.2d 933 (1st Cir. 1998) was decided under Rhode Island law and did not concern a contractual waiver but, rather, a prior consent judgment. Tarvezian v. Debral Realty, No. 921437, 1996 WL 1249891 (Mass. Super. Sept 27, 1996), which, like Georgio, did involve a usury claim, also did not address the issue of a contractual waiver.  Rather, the Massachusetts Superior Court held that a proposed amendment to plaintiff's complaint to add a claim under M.G.L. c. 271, §49 after a trial and after the creditor sought summary judgment on its counterclaim was untimely. Tarvezian, 1996 WL 1249891, at *2.   The Court also noted that Tarvezian had waived the claim because he testified at trial that he had no concern about rates and because he had not objected during the trial that the rates were usurious.  Id. at *4.  None of these precedents should dissuade this Court from relying on the holding of the New York Court in the Hammelburger case.[5]

---

[5] There are additional reasons supporting Landay's position.  While the Guaranty contains language of waiver, New York law limits such a waiver to defenses or counterclaims asserted in a suit on the guaranty, a guarantor's claims can be asserted in a separate action like the case at bar.  United Bank of Africa, P.L.C., New York Branch v. Odimayo, No. 93 Civ. 3998, 1994 WL 185826 (S.D.N.Y. May 10,

    D.    <u>The GMAC Loan Was Usurious As A Matter Of Law</u>.

The version of the Usury Statute for which GMAC advocates might be the law had M.G.L. c. 271, §49(a) been written by the banking lobby.  However, fortunately for the people of this Commonwealth, the General Court did not write it as per GMAC's specifications.  Despite GMAC's tortured and completely unsupportable misconstruction of Section 49(a), all the expenses or charges to the loan included in Landay's usury calculation are properly includible.  <u>See</u> Exhibit F hereto Affidavit of Keith D. Lowey (Landay's expert) and Exhibit 3 to Affidavit, and Landay's Usury Memorandum, p. 12.  GMAC argues that many of the expenses and charges to the loan cannot be included in the usury calculation unless they were known or ascertainable at the time the loan was made.  This is a distortion of the statute.

In this regard, GMAC truncates the last sentence of Section 49 so that it appears that the ultimate clause – "if such payment or charge was known to the lender at the time of making the loan, or might have been ascertained by reasonable inquiry" – modifies "interest and expenses."  GMAC's Memorandum, p. 12.  However, a cursory perusal of the entire, unexpurgated sentence[6] shows that the condition contained in the quoted language applies only to payments made by the borrower <u>to third parties</u>, <u>e.g.</u>, to a mortgage broker.  GMAC has effectuated this legal legerdemain by omitting the

---

1994).  <u>See</u> <u>infra</u>, pp.12-13.  Moreover, the Forbearance Agreement was not signed by Landay in his individual capacity.

[6] "For the purposes of this section the amount to be paid upon any loan for interest or expenses shall include all sums paid or to be paid by or on behalf of the borrower for interest, brokerage, recording fees, commissions, services, extension of loan, forbearance to enforce payment, and all other sums charged against or paid or to be paid by the borrower for making or securing directly or indirectly the loan, and shall include all such sums when paid by or on behalf of or charged against the borrower for or on account of making or securing the loan, directly or indirectly, to or by any person, other than the lender, if such payment or charge was known to the lender at the time of making the loan, or might have been ascertained by reasonable inquiry."  M.G.L. c. 271, §49 (Second Sentence).

phrase, "and shall include all such sums when paid by or on behalf of or charged against the borrower for or on account of making or securing the loan, directly or indirectly, <u>to or by any person, other than the lender</u>, …" (emphasis added), which precedes the portion of the last sentence of Section 49 which GMAC has italicized.

Massachusetts Courts have given an <u>expansive</u> reading to the "interest and expenses" language of Section 49(a), a reading which is fully consistent with the plain meaning of the statute, and have never imposed a requirement that each charge, other than interest, be known in advance <u>in character and in amount</u> by the lender.  For example, in <u>Comstock v. Steinbergh</u>, No. 20042093J, 2004 WL 3120554, at *3 (Mass. Super. Dec. 16, 2004), the Court wrote that "Massachusetts courts also have determined that the 'interest and expenses' calculation under G.L. c. 271, §49(a) includes default provisions that trigger additional interest payments, mortgage brokers' fees, and attorneys fees."  <u>See also</u>, <u>Tavares v. Sprunk (In re Tavares)</u>, 298 B.R. 195, 203 (Bankr. D. Mass. 2003) ("Because the usury statute expressly refers to both interest <u>and</u> expenses which in the aggregate exceed an amount greater than 20% per annum, the Debtor's position that the broker's fee and the attorney's fees should be added to the 18% contract rate set forth in the note and mortgage in favor of Sprunk is supported by the plain language of the statute").  Nothing in the cases cited by GMAC is to the contrary.

Because GMAC's argument – that attorneys fees should not be included in the usury calculation – is based on a flawed legal premise, it should be rejected.  Moreover, for the reasons stated in Landay's Usury Memorandum, pp. 9-12, summary judgment should be entered for Landay on Count II of the Amended Complaint.

II.    LANDAY'S FRAUD CLAIMS ARE VIABLE.

    A.    Landay's Proofs Support A Finding Of Reasonable Reliance.

A proper understanding of the issue of whether Landay's fraud claims are barred, as a matter of law, requires an analysis of the operative documents – the Guaranty, Defendants' Appendix, Exhibit 4, and the Ratification and Amendment of Guaranty, ("the Amended Guaranty"), Defendants' Appendix, Exhibit 11.  Unlike the Factoring Agreement and the Forbearance Agreement, the Guaranty contains no integration clause.  While the Amended Guaranty does contain an integration clause[7], it is expressly limited to the matters addressed in it.  Thus, for this reason, and for the reasons stated below, GMAC's argument that Landay cannot prove that his reliance was reasonable should be rejected.

GMAC is incorrect in asserting that the Guaranty contradicts "Landay's claim that GMAC promised to look to the Borrowers' assets before collecting his personal collateral." GMAC Memorandum, p. 16.  See Exhibit A to this Opposition, Affidavit of David L. Landay, ¶22.  First, the "collateral" provided by Landay was separate and apart from his obligations under the Guaranty.  Consequently the language of the Guaranty on which GMAC relies is not applicable to it.  Second, the language of the Guaranty is not inconsistent with the proposition that GMAC would exhaust Seneca's assets before it called on the collateral which Landay posted or even before it sought to enforce the Guaranty.

---

[7] "This agreement sets forth the entire agreement and understanding of the Guarantor and the Company with respect to the matters set forth herein, and supersedes any and all prior agreements and understandings of the parties hereto with respect to the foregoing, and this agreement cannot be changed, modified, amended or terminated except in writing executed by the party to be charged" (emphasis added).  Defendants' Appendix, Exhibit 11, p. 2.

Landay's obligations under the Guaranty were unrelated to the collateral which he was required to post or to GMAC's oral representations to him respecting that collateral.  Rather, the $4.1M Standby Letter of Credit that Landay provided was security in addition to the Guaranty; it had an existence outside the Guaranty. ("Notwithstanding anything to the contrary contained herein, the undersigned's liability hereunder shall not exceed a total maximum aggregate amount of $3,500,000.  Such amount shall be in addition to a certain Standby Letter of Credit open for the account of the undersigned and/or the Client for the benefit of the Company." (Guaranty, Defendants' Appendix, Exhibit 4, p. 2).   Accordingly, the language on which GMAC relies is not applicable to the $4.1 million Letter of Credit.  For the same reason, the language of the September 19, 2000 Guaranty does not apply to the $250,000 Letter of Credit that Landay provided as security in 2001.  Moreover, this security was provided in response to, and in reliance on, representations by GMAC that followed execution of the Guaranty.  Thus, the Guaranty was not a subsequently-signed document that could nullify prior inconsistent representations with respect to the 2001 Letter of Credit.

Landay's execution of the Amended Guaranty does not change the conclusions expressed above. The Amended Guaranty simply increased Landay's liability under his guaranty.  It, too, specifically recited that liability under the Amended Guaranty was separate from the Letters of Credit Landay provided.[8]  Moreover, as noted above, its integration clause was limited in scope to matters addressed in the document.

---

[8] "Such continuing liability shall (i) be in addition to and shall not be reduced or satisfied from the proceeds of certain Standby Letters of Credit in the aggregate original face amount of $4,350,000…." Amended Guaranty, Defendants' Appendix, Exhibit 11, p.2.

With regard to loan officer Fitzgerald's pre-guaranty representations regarding the $500,000 Seasonal Overadvance, which Landay avers was an essential basis for his proffering the collateral and the Guaranty (Exhibit A, ¶21), a similar logic prevails. The Guaranty had no integration clause and, in this instance, contained no arguably contradictory language. The Amended Guaranty's integration clause does not cover the Seasonal Overadvance since the issue was not addressed therein. The language in the Factoring Agreement regarding the lender's discretion could not bind Landay as he did not sign it in his individual capacity. Nor did it eviscerate the reasonableness of Landay's reliance on Fitzgerald's representations in light of the fact that GMAC had a duty of good faith and fair dealing under the Factoring Agreement.

Landay's reliance on Fitzgerald's reiteration of GMAC's intention to fund the Seasonal Overadvance, which induced Landay to post an additional Letter of Credit in the amount of $250,000, Exhibit A, ¶26-27, was even more reasonable. These representations were made after the Factoring Agreement and arguably constituted an oral modification of the Factoring Agreement.[9] Be that as it may, there was no inconsistency between the discretionary language in the Forbearance Agreement and Fitzgerald's 2001 representations which would render Landay's reliance unreasonable as a matter of law. This is so because Fitzgerald's representations amounted to a promise that GMAC would exercise its discretion to make the Seasonal Overadvance in

---

[9] Both New York and Massachusetts Courts have upheld an oral modification of a written agreement which, like the Factoring Agreement, contains a clause requiring all modifications to be in writing. See Rose v SPA Realty Ass'n, 42 N.Y.2d 338, 344 (1977) ("Once a party to a written agreement has induced another's significant and substantial reliance upon an oral modification, the first party may be estopped from invoking the [New York Statute of Frauds] to bar proof of that oral modification"). Nat'l Westminster Bank USA v. Ross, 676 F.Supp. 48, 53 (S.D.N.Y. 1987) (same with regard to guarantor's counterclaim and lender's oral modification of loan agreement); and Cambridgeport Sav. Bank v. Boersner, 413 Mass. 432, 439 (1992) and cases cited.

May of 2001.  Therefore, GMAC should be estopped from denying Fitzgerald's representations.[10]

GMAC also claims that Landay could not reasonably rely on its promise to reimburse Landay for making "bridge loans" because this promise was not incorporated into the Forbearance Agreement.  See Exhibit A, ¶¶31-32.  Like the Amended Guaranty, the Forbearance Agreement recites that it "sets forth the entire understanding of the parties with respect to the matters set forth herein and supersede[s] all understandings…of the parties with respect to the foregoing"  Defendants' Appendix, Exhibit 10, p. 6 (emphasis added).  Thus, this provision cannot nullify GMAC's representation regarding the bridge loans for two reasons: (1) Landay was not a party to the Forbearance Agreement, and (2) the bridge loans were not a subject of the Forbearance Agreement or the more pertinent Amended Guaranty. Therefore, nothing in the Forbearance Agreement or the Guaranties demonstrates that Landay's reliance was unreasonable as a matter of law.

Similarly, GMAC's argument that Landay could not reasonably rely on promises made to him personally concerning forbearance and/or scheduling of payments is incorrect.  Those representations form the basis of his fraud claim whereby he was induced to further expose his personal assets to GMAC, Exhibit A, ¶¶31-33; and the Amended Guaranty's integration clause does not render Landay's reliance unreasonable since the extension of the Letter of Credit and the posting of the $1,000,000 cash collateral was not a subject of the Amended Guaranty.

---

[10] See Rose, 42 N.Y.2d at 344 (equitable estoppel found where conduct is not incompatible with agreement as written); and Nat'l Westminster Bank USA, 676 F. Supp. at 52-53 (same, as to fraud counterclaims).
.

In a word, GMAC has not shown that Landay's reliance was unreasonable with respect to <u>any</u> of the misrepresentations which he alleges.

     B.    <u>Landay Did Not Waive The Right To Assert Fraud Claims In This Action</u>.

GMAC contends that the language contained in the Amended Guaranty whereby "Landay agreed that the amounts owed to GMACCF were due 'without offset, defense or counterclaim of any kind, nature or description whatsoever'" [11] (GMAC's Memorandum, p. 17), constituted a waiver of the fraud claims. However, the case of <u>United Bank of Africa P.L.C., New York Branch v. Odimayo</u>, 1994 WL 185826, held that a virtually identical waiver does not apply to a claim asserted <u>in an independent action</u> like the case at bar.  The guaranties at issue in <u>Odimayo</u> each stated that "[t]his Guaranty shall be construed as a continuing, absolute, and unconditional guaranty of payment…without regard to any defense, setoff, or counterclaim…" <u>Id.</u>, at *1.  In dismissing the counterclaims asserted by the guarantors, the Court wrote: "[b]oth guaranties prohibit the bringing of 'any counterclaims' in an action for its enforcement. This can not be construed as prohibiting any separate suit on any claims the defendants might assert."  <u>Id.</u>, at *4.  Therefore, GMAC's waiver claim should be rejected.[12]

---

[11] This clause is simply an acknowledgement of the language in the Guaranty that provides as follows: "[t]he undersigned also waives the right to assert in <u>any action or proceeding upon this guaranty</u> any defenses, offsets or counterclaims which the undersigned may now or hereafter have."  Defendants' Appendix, Exhibit 4, p. 2 (emphasis added).

[12] Even if the waiver clause on which GMAC relies is deemed to apply to independent actions, there is authority for the proposition that it would not preclude a fraud claim.  <u>See</u> <u>Nat'l Westminster Bank USA</u>, 676 F. Supp. 48, at 53-54 ("defenses based upon allegations of fraud may not be waived"); and <u>Barclay's Bank of New York, N.A. v. Heady Electric Co., Inc.</u>, 174 A.D.2d 963, 965-966 (App. Div., 3d Dept. 1991).

III.    <u>LANDAY HAS A VIABLE JUNIOR CREDITOR CLAIM</u>.

Defendants seek dismissal of Count VI of the Amended Complaint on the ground that Landay cannot establish damages.[13]  GMAC's argument is that damages <u>must</u> be proved by expert testimony and that, since Plaintiff's expert did not quantify the damages attributable to GMAC's commercially unreasonable liquidation of Seneca's <u>intellectual property</u>, Landay will be unable to establish damages greater than the amount which GMAC claims that Seneca is indebted to it.  GMAC is wrong on both counts.

The three cases cited by GMAC at p. 18 of its Memorandum are slim reeds, indeed, on which to rest its argument that expert testimony is a requirement on the issues of commercial unreasonableness and damages.  <u>Mayfair Mills, Inc. v. Spartanburg County (In re Mayfair Mills, Inc.)</u>, 295 B.R. 827, 838 (Bankr. D.S.C. 2002) is a tax valuation case between a debtor and a taxing authority in which the Court stated, at the page cited by GMAC, "in this instance, this Court believes it <u>may be necessary</u> to present expert testimony regarding such factors as…the commercial reasonableness of the sale…" (emphasis added).  In <u>Sunjet, Inc. v. Ford Motor Credit Co.</u>, 703 S.W.2d 285 (Tex. Ct. App. 1986), a Uniform Commercial Code case involving a Learjet aircraft, the Court wrote: "In sales of collateral of this nature, the testimony of an expert <u>may be necessary</u> to establish that procedures used complied with practices normally followed in the industry, or that the sale was otherwise commercially

---

[13] Count VI lies pursuant to M.G.L. c. 106 § 9-625 (b) and (c) or its New York counterpart.  In this regard, Landay has alleged facts showing that GMAC failed to comply with Article 9 of the Code in the liquidation of Seneca's assets in violation of § 9-625(b), and that Landay is a junior creditor of Seneca and is thus entitled to recover damages under § 9-625 (c)(1).  There is evidentiary support for Landay's capacity as a secured junior creditor and for GMAC's commercial unreasonableness.  See Affidavit of David L. Landay, Exhibit A to Landay's Motion for Summary Judgment on Usury Count, and Affidavit of Keith D. Lowey, and attached reports, Exhibit 3 to Landay's Opposition to Motion to Strike Supplemental Expert Report.

reasonable." Id. at 289 (emphasis added).  Finally, the only case cited by GMAC which

refers to valuation, Wilmington Trust Co. v. Ruggerio, No. 95-28,1978 WL 139209, at *1

(Del. Com. Pl. 1978), is a one-page decision, which cites no authorities and contains no

description of the underlying facts.  In denying a motion for a new trial, the Common

Pleas Judge wrote:

> Moreover, plaintiff fully anticipated the need to litigate the commercial
> reasonableness of the sale and should have been prepared with expert
> testimony on the market value of the collateral in connection with the
> commercial reasonableness issue, since, had the Court held the sale to
> have been commercially unreasonable, such expert testimony would have
> been necessary.

Clearly, this case cannot possibly support the proposition that expert testimony is

always necessary to prove damages in an unreasonable liquidation case.

The case of American State Bank of Killdeer v. Hewson, 411 N.W.2d 57, 64-65

(N.D. 1987) refutes GMAC's extreme and unsupportable position.  In Hewson, the trial

court had granted summary judgment for the bank against the debtor on a deficiency

notwithstanding the debtor's challenge to the commercial reasonableness of the sale of

the collateral, a "tractor with dozer", for $8,700.  Hewson had offered no expert

testimony but only his affidavit setting forth the circumstances of the sale and his

opinion that the fair market value of the collateral was $20,000.  The Court reversed,

holding that the owner of property was fully competent to testify to its value and that the

evidence of disparity between Hewson's opinion and the sales price, taken in

conjunction with the other statements in his affidavit, raised a genuine issue of fact as to

commercial unreasonableness.

Therefore, Landay submits that GMAC has not demonstrated a special rule

governing Uniform Commercial Code cases which renders expert testimony on liability

15

or damages a <u>sine qua non</u> of recovery. To the contrary, ordinary principles of civil jurisprudence which permit non-expert testimony should obtain. [14] In this regard, Fed. R. Evid. 701 authorizes the admission of a non-expert opinion of damages by a witness with Landay's credentials.

As set forth in his Affidavit, Landay has had substantial experience with the very intellectual property at issue in this case, the trademarks and patents which GMAC seized on October 22, 2001, but did nothing to market or sell Exhibit A, ¶¶6-11, 15-18. In Landay's opinion, this bundle of assets had a liquidation value of $2,000,000 as of that time. <u>Id.</u>, ¶¶42-44. This value is supported by the fact that Seneca acquired just a part of those trademarks and patents for $1,300,000 and $250,000 in 2000. <u>Id.</u>, ¶41. If one adds the value of the intellectual property to Lowey's opinion evidence of the damages due to commercial unreasonableness in selling inventory and collecting receivables, it is clear that Landay has suffered substantial damages above the alleged amount of the deficiency.

The admission of Landay's opinion evidence is supported by a line of cases allowing a corporate officer to testify as a non-expert, under Fed. R. Evid. 701, on the

---

[14] GMAC suggests that, because Lowey "fails to meet the standards for expert testimony required by <u>Daubert</u>…", GMAC's Memorandum, p. 18, Landay cannot meet his burden on commercial unreasonableness as well. While Landay is confident that Lowey's report will pass muster if challenged, because he disagrees that expert testimony is required under the egregious circumstances of this case, he is also relying on the 30(b)(6) Deposition of Kathleen Pappalardo, pp. 10-31 and Deposition Exhibit 119, Exhibit B, and the 30(b)(6) Deposition of Joseph Lennon, pp. 18-29, 31-35, 37, 42-44, 46-49, 52-58 and Deposition Exhibits 120, 121 and 4, GLAN# 01543, Exhibit C, in addition to Lowey's opinion on this issue. Pappalardo in essence admits that GMAC did nothing to obtain value from the intellectual property. According to Lennon, GMAC never made any effort to contact Seneca's former personnel to deal with issues raised by customers' taking chargebacks on accounts receivable in the liquidation other than to send correspondence to Seneca's office. However, GMAC's liquidator took over on October 22, 2001, and upon completing his work, in November of 2001, Rijo arranged for Seneca's mail to be forwarded to GMAC's Boston office. Exhibit D, Deposition of John Rijo, pp. 65-69, 109, 113 and Deposition Exhibits 134, 152. Therefore, all GMAC did was to send <u>itself</u> correspondence purportedly to give Seneca the opportunity to address customer chargeback issues.

16

issue of his Company's damages or the value of property owned by his company.. <u>See</u> <u>Securitron Magnalock Corp. v. Schnabolk</u>, 65 F.3d 256, 265 (2d Cir. 1995) (Rule 701 permits a president of a company to testify to as to lost profits). <u>See also</u>, <u>Glosband v.</u> <u>Watts Detective Agency</u>, 21 B.R. 963, 981 (D. Mass. 1981) (president of a company could give an opinion of its value under Rule 701 as a non-expert or under Rule 702).[15] Indeed, in the instant case, where liquidation occurred shortly after Seneca had paid $1.3 million for the Brookfield patents and trademarks and $250,000 for the Hutch-Foster trademarks (Exhibit A, ¶¶16, 40-42), opinion testimony is unnecessary to establish that the intellectual property had a value of at least $1,550,000. <u>Schonfeld v.</u> <u>Hilliard</u>, 218 F.3d 164, 178 (2d Cir. 2000) ("a recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value"). In light of the above, Landay submits that GMAC has not demonstrated a dearth of genuine issues of material fact on Count VI.

IV.    <u>LANDAY'S CHAPTER 93A CLAIM IS SUSTAINABLE</u>.

GMAC makes a single argument for summary judgment on Count VII of the Complaint, the Chapter 93A claim: Because "whatever remaining vitality it possesses" is derived from Counts I, II and VI, "[i]t necessarily follows that if this Court enters summary judgment for GMACCF on Counts I, II and VI, there will be nothing left to give substance to Count VII." GMAC's Memorandum, p. 20. Landay contends that, since the other counts of the Amended Complaint should survive, so must the Chapter 93A Count. <u>See</u> <u>McEvoy Travel Bureau, Inc. v. Norton Co.</u>, 408 Mass. 704, 714 (1990), and

---

[15] Although not listed in the history of <u>Glosband</u>, the case of <u>Robinson v. Watts Detective Agency, Inc.</u>, 685 F.2d 729, 738-739 (1st Cir. 1982) addresses Judge Nelson's decision and affirms the admissibility of the company president's opinion.

Tavares, 298 B.R. at 203, which held, respectively, that common law fraud or violation

of the Massachusetts Usury Statute, standing alone, supports a Chapter 93A claim.  Be

that as it may, Landay submits that GMAC's argument must fail because it is based on

flawed legal and factual premises.

GMAC's legal theorem – dismissal of a common law or statutory claim requires

dismissal of a Chapter 93A claim based on the conduct underlying such claim – has

been rejected by both the Appeals Court and the Supreme Judicial Court.  In this

regard, the Court in Grand Pacific Finance Corp. v. Brauer, 57 Mass. App. Ct. 407, 420

n. 9 (App. Ct. 2003), wrote as follows:

> The dismissal of the common-law claims of fraud as to all defendants and
> the common-law conversion claim as to Decnos is not inconsistent with
> the imposition of liability under G.L. c. 93A.  Rather, the differences in
> result are attributable to different elements of proof and to the more
> expansive reach of G.L. c. 93A.  This act, which sounds in terms of
> fraudulent and deceptive trade practice, is a 'statute of broad impact which
> creates new substantive rights and provides new procedural devices for
> the enforcement of those rights.  The relief available under c. 93A is sui
> generis.  It is neither wholly tortious nor wholly contractual in nature, and is
> not subject to the traditional limitations of preexisting causes of action.  It
> mak[es] conduct unlawful which was not unlawful under the common law
> or any prior statute.  Thus, a cause of action under c. 93A is not
> dependent on traditional tort or contract law concepts for its definition.
> [A]nalogies between common law claims for breach of contract, fraud, or
> deceit and claims under c. 93A are inappropriate because c. 93A
> dispenses with the need to prove many of the essential elements of those
> common law claims.' (citations and internal quotations omitted).

See, also, Kattar v. Demoulas, 433 Mass. 1, 12 (2000) (The Chapter 93A claim is not

merely the sum of the other claims in the complaint; it has a separate existence and

"dispenses with the need to prove many of the essential elements of those common law

claims") (internal citation omitted).

In light of the Grand Pacific Finance Corporation and Kattar cases, Landay submits that the Chapter 93A claim should survive a dismissal of his fraud claim because the very element that GMAC has attacked, reasonable reliance, is not an element of a Chapter 93A claim based on a misrepresentation.  The cases in support of this proposition are legion.  See Aspinall v. Philip Morris Companies, Inc., 442 Mass. 381, 394 (2004) ("A successful G.L. c. 93A action based on deceptive acts or practices does not require proof that a plaintiff relied on the representation,…, or that the defendant intended to deceive the plaintiff,…, or even knowledge on the part of the defendant that the representation was false") (internal citations omitted).  See also, Fraser Engineering Company, Inc. v. Desmond, 26 Mass. App. Ct. 99, 104 (App. Ct. 1988); Zayre Corp. v. Computer Systems of Am., Inc., 24 Mass. App. Ct. 559, 570 (App. Ct. 1987) ("Reasonable reliance, however, is not necessarily a prerequisite of recovery under G.L. c. 93A, §11"); Sebago, Inc. v. Beazer East, Inc., 18 F. Supp. 2d 70, 103-104 (D. Mass. 1998); and Phalon v. Varrasso (In re Varrasso), 194 B.R. 537, 540 (Bankr. D. Mass. 1996).  In addition, apart from the allegations relevant to Counts I, II and VI, there are additional factual allegations of GMAC's sharp practices and business misconduct which support the viability of the Chapter 93A claim.  See, Exhibit A, ¶¶36-37, 49-52, and Exhibit E, Landay's Answers to Interrogatories, pp. 10-12.

With regard to GMAC's refusal to consider the Platinum Credit Corp. buy-out of its loan, Exhibit A, ¶¶36-37, and its refusal to provide Landay an accounting or realistic access to his own business records, Id., ¶¶49-52, there is case support for the proposition that such conduct on GMAC's part constitutes a violation of or, in the latter case, part of a pattern of conduct constituting a violation of Chapter 93A.  See Snowden

v. Chase Manhattan Mortgage Corp., No. 03-0001B, 2003 WL 22519518, at *3 (Chapter

93A is violated where mortgagee refused to consider a buyer willing to pay an amount

which would have resulted in full recovery of the amount due the mortgagee).  See also,

as to GMAC's failure to account and provide Landay access to business records, United

States v. United States Trust Co., 660 F. Supp. 1085, 1090 (D. Mass. 1986), where the

Court imposed triple damages under Chapter 93A based, in part, on defendant's failure

to answer communications and failure to give an accounting to the plaintiff.

> I conclude also that the conduct of US Trust was knowingly and willfully unfair.  Its adamant behaviour in failing to answer communications of the plaintiff with respect to the funds, its refusal to recognize the import of its own action in making no interest charge upon receipt of the check and the copy of the Form 1034, its refusal to give an accounting of the money which had been disbursed to someone, merit judgment in the form of treble damages.

> In a word, Landay's sworn averments regarding the Platinum Credit Corp.

proposal and GMAC's failure to account or provide access to Seneca's records also

supports the Chapter 93A claim.

### CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment

should be denied.

> Respectfully submitted,
> DAVID L. LANDAY,
> By his attorney,
>
>
> /s/ Alan R. Hoffman
> Alan R. Hoffman, BBO# 236860
> Lynch, Brewer, Hoffman & Fink, LLP
> 101 Federal Street, 22nd Floor
> Boston, MA 02110
> (617) 951-0800

Dated:  December 14, 2005
231577_1