# EXHIBIT E

Page 1

VOL. I, PAGES 1 - 201

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-CV-11955-WGY

DAVID L. LANDAY

                Plaintiff

V.

GMAC COMMERCIAL CREDIT, LLC and

GMAC COMMERCIAL FINANCE, LLC

                Defendants

- - - - - - - -

Deposition of David L. Landay

Tuesday, October 18, 2005

9:42 a.m.

Edwards & Angell, LLP

101 Federal Street

Boston, Massachusetts

- - - - - - - -

Reporter: Deborah Roth, RPR/CSR

Page 10

| | | |
|---|---|---|
| 09:46:42 | 1 | Q. I am going to rephrase that last question. |
| 09:46:54 | 2 | Did you review the forbearance |
| 09:46:59 | 3 | agreement? |
| 09:46:59 | 4 | A. No. |
| 09:47:00 | 5 | Q. Did you review the ratification of your |
| 09:47:04 | 6 | guaranty? |
| 09:47:04 | 7 | A. No. |
| 09:47:12 | 8 | Q. Did you review your answers to |
| 09:47:14 | 9 | interrogatories? |
| 09:47:14 | 10 | A. Yes. |
| 09:47:20 | 11 | Q. Did you review the affidavit that you filed |
| 09:47:23 | 12 | in connection with the New York litigation? |
| 09:47:26 | 13 | A. No. |
| 09:47:30 | 14 | Q. Can you recall any other specific documents |
| 09:47:32 | 15 | that you reviewed that refreshed your recollection? |
| 09:47:34 | 16 | A. The complaint in this action. |
| 09:47:40 | 17 | Q. Anything else? |
| 09:47:41 | 18 | A. Not that I recall. |
| 09:47:46 | 19 | Q. Have you ever given deposition testimony |
| 09:47:48 | 20 | before? |
| 09:47:48 | 21 | A. Yes. |
| 09:47:49 | 22 | Q. How many times? |
| 09:47:50 | 23 | A. Perhaps six or seven times. |
| 09:47:53 | 24 | Q. When was the last time you gave deposition |

Page 11

| | | |
|---|---|---|
| 09:47:55 | 1 | testimony? |
| 09:47:55 | 2 | A. I believe it was in August. |
| 09:48:00 | 3 | Q. Of this year? |
| 09:48:01 | 4 | A. Of this year. |
| 09:48:02 | 5 | Q. In connection with what case did you give |
| 09:48:05 | 6 | deposition testimony in August? |
| 09:48:06 | 7 | A. Litigation with Attorneys Hoff and Madoff. |
| 09:48:13 | 8 | Q. Is that litigation that you are bringing |
| 09:48:15 | 9 | against those attorneys? |
| 09:48:16 | 10 | A. Yes. |
| 09:48:17 | 11 | Q. With what firm do Mr. Hoff and Madoff |
| 09:48:23 | 12 | practice? |
| 09:48:23 | 13 | A. Mr. Hoff is with Casner & Edwards. |
| 09:48:27 | 14 | Mr. Madoff was with -- it used to be Cohn Khoury |
| 09:48:34 | 15 | Madoff & Whitesell. I don't know that he is still |
| 09:48:35 | 16 | with that firm. |
| 09:48:38 | 17 | Q. What is the nature of the claims that you |
| 09:48:42 | 18 | have made in that action? |
| 09:48:43 | 19 | A. Malpractice. |
| 09:48:44 | 20 | Q. In connection with what transaction? |
| 09:48:46 | 21 | A. With the loan from GMAC and the forbearance |
| 09:48:52 | 22 | agreement and the entire GMAC transaction. |
| 09:48:58 | 23 | Q. Who did Mr. Hoff represent in connection |
| 09:49:07 | 24 | with the GMAC transaction? |

Page 12

| | | |
|---|---|---|
| 09:49:11 | 1 | A. Seneca Sports and myself. |
| 09:49:19 | 2 | Q. Did you have an engagement letter with |
| 09:49:22 | 3 | Mr. Hoff, either you personally or Seneca? |
| 09:49:25 | 4 | A. Not that I recall. |
| 09:49:27 | 5 | Q. And who did Mr. Madoff represent in |
| 09:49:32 | 6 | connection with the GMAC transaction? |
| 09:49:35 | 7 | A. Seneca, Brookfield and myself. |
| 09:49:39 | 8 | Q. Did either Seneca-Brookfield or you |
| 09:49:43 | 9 | personally have an engagement letter with |
| 09:49:48 | 10 | Mr. Madoff? |
| 09:49:49 | 11 | A. Not that I recall. |
| 09:50:01 | 12 | Q. Can you summarize for me the claims that |
| 09:50:10 | 13 | you've made against Mr. Hoff and Mr. Madoff in that |
| 09:50:14 | 14 | action? |
| 09:50:14 | 15 | A. The claims, I believe, could be summarized, |
| 09:50:22 | 16 | from my understanding, as (A), there was a conflict |
| 09:50:25 | 17 | of interest, because in both cases I should have |
| 09:50:29 | 18 | been advised to -- they should -- they could not be |
| 09:50:34 | 19 | counsel to both myself and the companies, because |
| 09:50:37 | 20 | the interests of the parties would -- could be at |
| 09:50:43 | 21 | odds and would be at odds; and in the case of Hoff, |
| 09:50:49 | 22 | that he did not properly outline the pitfalls of |
| 09:50:55 | 23 | the GMAC documents and how the laws of the State of |
| 09:50:59 | 24 | New York would deprive me of my, I guess you could |

Page 13

| | | |
|---|---|---|
| 09:51:04 | 1 | call it, counterclaims and defenses. |
| 09:51:06 | 2 | In the case of Madoff, that I probably |
| 09:51:15 | 3 | -- and perhaps the corporations -- would have been |
| 09:51:18 | 4 | better off declaring -- have the corporation |
| 09:51:21 | 5 | declare bankruptcy prior to GMAC coming in and |
| 09:51:25 | 6 | seizing the assets. |
| 09:51:29 | 7 | I believe that would be a fair summary |
| 09:51:31 | 8 | from a layman's point of view. |
| 09:51:36 | 9 | Q. Do you contend that in the case of |
| 09:51:44 | 10 | Mr. Madoff, he should have advised you to declare |
| 09:51:47 | 11 | personal bankruptcy or that he should have advised |
| 09:51:51 | 12 | Seneca and Brookfield to declare bankruptcy? |
| 09:51:54 | 13 | A. The companies. |
| 09:52:00 | 14 | Q. Prior to giving deposition testimony in |
| 09:52:03 | 15 | August of this year, in the malpractice case that |
| 09:52:07 | 16 | you've just described, when was the last time that |
| 09:52:10 | 17 | you gave deposition testimony? |
| 09:52:15 | 18 | A. I believe it was in March or April of this |
| 09:52:18 | 19 | year. |
| 09:52:19 | 20 | Q. In connection with what case did you give |
| 09:52:20 | 21 | deposition testimony in March or April? |
| 09:52:23 | 22 | A. Litigation against my former wife in Lead |
| 09:52:27 | 23 | County, Florida. |
| 09:52:29 | 24 | Q. What is the nature of that litigation? |

### Page 34

```
10:23:57  1   recall signing prior to the GMAC transaction
10:24:02  2   require the financial institution to exhaust
10:24:05  3   certain remedies before pursuing rights against the
10:24:10  4   guarantor?
10:24:11  5       A. It was always the understanding that the
10:24:14  6   financing institution would -- if it came to a
10:24:20  7   closedown of the loan, that they would look to the
10:24:24  8   assets of the borrower, that is, the corporation,
10:24:28  9   before they would look to the guarantor for
10:24:30 10   anything.
10:24:31 11       Q. You say it was always the understanding.
10:24:34 12   What do you mean by that?
10:24:34 13       A. Because it was in conversations with the
10:24:37 14   loan officer.
10:24:38 15       Q. Did any of the guaranties actually say
10:24:41 16   that?
10:24:42 17       A. I don't recall, because I don't have any
10:24:44 18   copies of any of the guaranties.
10:24:48 19       Q. You testified a few minutes ago that the
10:25:13 20   purpose of the September 2000 financing with GMAC
10:25:16 21   was to permit Seneca to acquire the assets of
10:25:24 22   Brookfield, correct?
10:25:25 23       A. Yes.
10:25:28 24       Q. Did the September 2000 GMAC financing have
```

### Page 35

```
10:25:34  1   any other purpose?
10:25:34  2       A. It also paid off a line of credit that was
10:25:41  3   in place, a loan that was in place from Fleet Bank,
10:25:52  4   and also enabled -- it gave operating funds to
10:25:56  5   Seneca to purchase merchandise, pay expenses and
10:26:00  6   continue as a going business.
10:26:01  7       Q. Did Seneca seek financing from any entities
10:26:33  8   other than GMAC in connection with the transactions
10:26:43  9   you've just described?
10:26:44 10       A. Yes.
10:26:44 11       Q. From whom did it seek financing?
10:26:48 12       A. Bank of Boston and Wells Fargo.
10:26:53 13       Q. Now, at the time that it was -- that Seneca
10:27:01 14   was seeking this financing, it had an existing
10:27:07 15   banking relationship with Bank of Boston, correct?
10:27:11 16       A. Yes.
10:27:11 17       Q. Bank of Boston was the lender on the
10:27:14 18   existing financing agreement, correct?
10:27:17 19       A. Yes.
10:27:17 20       Q. Were there other banking relationships that
10:27:20 21   Seneca had with Bank of Boston?
10:27:22 22       A. Other than you mean running our checking
10:27:28 23   account through the Bank of Boston, a lock box --
10:27:32 24   is that what you mean?
```

### Page 36

```
10:27:34  1       Q. Correct.
10:27:35  2       A. Yes. We have a lock box where all of our
10:27:39  3   receivables were paid to. We had an operating
10:27:42  4   account from which we paid bills.
10:27:47  5           I believe our payroll, also, we had a
10:27:51  6   company, outside company, that did the payroll, and
10:27:53  7   they ran everything through Bank of Boston; and we
10:27:57  8   would have used Bank of Boston to pay withholding
10:28:02  9   taxes, Social Security, whatever was required.
10:28:06 10       Q. Anything else that you can recall in terms
10:28:08 11   of a relationship with Bank of Boston?
10:28:10 12       A. We would have used them to open letters of
10:28:13 13   credit, if we needed letters of credit.
10:28:16 14           We used Bank of Boston in the Orient, I
10:28:19 15   believe. We had an account in Hong Kong. It would
10:28:26 16   be a total banking relationship.
10:28:41 17       Q. Did you personally have a banking
10:28:43 18   relationship with Bank of Boston at that time?
10:28:45 19       A. Yes.
10:28:45 20       Q. What was the nature of that relationship?
10:28:49 21       A. Bank of Boston managed my assets, and I had
10:28:53 22   a personal checking account with the Bank of
10:29:02 23   Boston.
10:29:02 24       Q. At some point in time, did you approach
```

### Page 37

```
10:29:07  1   Bank of Boston about providing financing to acquire
10:29:11  2   Brookfield?
10:29:11  3       A. Yes.
10:29:11  4       Q. And what was the response?
10:29:13  5       A. The response was that they would do it.
10:29:17  6       Q. When did you approach Bank of Boston about
10:29:19  7   the Brookfield transaction?
10:29:20  8       A. Probably in February of 2000, when it
10:29:25  9   became apparent that we could do a deal.
10:29:28 10       Q. Who was the bank officer that you were
10:29:31 11   dealing with?
10:29:32 12       A. I believe at that time it was Deborah
10:29:34 13   Larson.
10:29:37 14       Q. And Ms. Larson told you that Bank of Boston
10:29:42 15   would do the deal?
10:29:43 16       A. Yes.
10:29:44 17       Q. Why did Seneca not go forward with Bank of
10:29:47 18   Boston?
10:29:47 19       A. She then later told me, because of the
10:29:53 20   merger with Fleet, that the rules had changed, and
10:29:56 21   they would no longer be able to do the deal.
10:29:59 22       Q. When did Ms. Larson tell you that?
10:30:02 23       A. Prior to the merger, and I believe the
10:30:06 24   merger was April 1st, 2000.
```

Page 38

```
10:30:13  1      Q. Did Ms. Larson tell you specifically why
10:30:23  2   the new rules would preclude Fleet from providing
10:30:29  3   the financing that Seneca was seeking?
10:30:32  4      A. No.
10:30:32  5      Q. Did you ask?
10:30:33  6      A. No.
10:30:39  7      Q. Did anyone at Fleet or Bank of Boston ever
10:30:53  8   inform Seneca that the bank intended to terminate
10:30:57  9   the existing credit facility?
10:30:58 10      A. No. And as a matter of fact, they stayed
10:31:01 11   on until September 19th, 2000, with the existing
10:31:06 12   credit facility, when they were paid off by GMAC.
10:31:12 13      Q. Did you ever learn that Fleet or Bank of
10:31:20 14   Boston wanted to terminate the existing credit
10:31:23 15   facility?
10:31:24 16      A. Yes.
10:31:26 17      Q. When did you learn that?
10:31:27 18      A. I believe it was in August of this year,
10:31:33 19   during my deposition, either in the Hoff or the
10:31:36 20   Madoff matter. I am not sure which day of the
10:31:39 21   deposition.
10:31:39 22      Q. How did you learn that?
10:31:41 23      A. One of the attorneys for either Hoff or
10:31:45 24   Madoff presented a copy of a document from Fleet.
```

Page 39

```
10:31:50  1      Q. Do you recall what that document was?
10:31:54  2      A. That they were looking for -- no, I don't
10:31:57  3   recall the exact title.
10:31:59  4      Q. Do you recall, what was the substance of
10:32:03  5   the document?
10:32:03  6      A. The substance of the document was that they
10:32:05  7   were looking for a -- I believe they called it
10:32:10  8   something like a soft exit.
10:32:13  9      Q. Did the document indicate why the bank was
10:32:16 10   looking for a soft exit?
10:32:19 11      A. I don't recall, no.
10:32:20 12      Q. At any point in time prior to September
10:32:31 13   2000, had Seneca been in default of its obligations
10:32:36 14   under the Fleet/BankBoston financing?
10:32:45 15      A. Not that I recall.
10:32:47 16      Q. As of the first quarter of 2000, was Seneca
10:32:53 17   a healthy business?
10:32:55 18      A. I would say not.
10:32:59 19      Q. Why not?
10:33:00 20      A. Decreasing sales, which is why we were
10:33:03 21   looking to purchase the assets of Brookfield.
10:33:09 22      Q. Was Seneca a healthy business in 1999?
10:33:14 23      A. I don't recall.
10:33:17 24      Q. Do you recall whether Seneca was a
```

Page 40

```
10:33:33  1   profitable business in 1999?
10:33:36  2      A. No, I don't.
10:33:37  3      Q. Do you recall whether Seneca was a
10:33:48  4   profitable business in 1998?
10:33:50  5      A. No, I don't.
10:33:51  6      Q. 1997?
10:33:52  7      A. No.
10:33:56  8      Q. Did the Fleet or Bank of Boston credit
10:34:10  9   facility provide for seasonal over-advances?
10:34:16 10      A. I believe so, yes.
10:34:17 11      Q. In 2000, did either Fleet or Bank of Boston
10:34:21 12   inform Seneca that they would not approve seasonal
10:34:28 13   over-advances?
10:34:28 14      A. Not that I recall.
10:34:47 15      Q. Do you recall ever learning that Fleet or
10:34:50 16   Bank of Boston chose not to approve an over-advance
10:34:53 17   to Seneca in 2000 because it decided to exit the
10:35:01 18   credit due to poor performance over the past few
10:35:06 19   years?
10:35:06 20      A. No.
10:35:07 21      Q. Would you agree that Seneca's performance
10:35:09 22   over the few years preceding the spring of 2000 was
10:35:13 23   poor?
10:35:13 24      A. I would not necessarily use that word to
```

Page 41

```
10:35:20  1   characterize it. So I would disagree.
10:35:25  2      Q. Would you agree that Seneca's performance
10:35:28  3   over the few years preceding the spring of 2000
10:35:31  4   made the new financing that you were seeking a
10:35:33  5   risky proposition from a lender's standpoint?
10:35:36  6      A. No.
10:35:43  7      Q. As of September 2000, when you closed with
10:35:56  8   GMAC, did Seneca have outstanding proposals to do a
10:36:05  9   transaction with any other finance company or bank?
10:36:09 10      A. No.
10:36:16 11      Q. After Fleet/Bank of Boston declined make a
10:36:28 12   proposal for new -- for the new financing that
10:36:31 13   Seneca was seeking, Seneca sought financing from
10:36:38 14   other sources, correct?
10:36:39 15      A. Yes.
10:36:40 16      Q. From what other sources?
10:36:43 17      A. Wells Fargo, General Electric, various
10:36:50 18   banks in the Boston area.
10:36:54 19      Q. Let's start with Wells Fargo. How far did
10:36:57 20   the negotiations --
10:36:59 21      A. Wells Fargo made a proposal.
10:37:03 22      Q. Did Wells Fargo sign a commitment letter?
10:37:05 23      A. Yes. I believe we have had a terms sheet
10:37:10 24   from Wells Fargo.
```

| | Page 42 | | Page 44 |
|---|---|---|---|
| 10:37:12  1 | Q. And why did the transaction, the financing | 10:39:55  1 | Q. Any others? |
| 10:37:15  2 | with Wells Fargo, not go forward? | 10:39:57  2 | A. I don't recall. |
| 10:37:18  3 | A. I got a call one morning from Mr. Horsman, | 10:39:59  3 | Q. Citibank? |
| 10:37:21  4 | who ran the Boston office of Wells Fargo, who said | 10:40:00  4 | A. No. |
| 10:37:25  5 | he didn't want to go forward, even though they were | 10:40:03  5 | Q. In any event, the only other entity that |
| 10:37:27  6 | at the stage where we were doing signature cards, | 10:40:09  6 | responded to your request for proposal was GMAC? |
| 10:37:30  7 | setting up bank accounts. I believe we had bank | 10:40:13  7 | A. Yes. |
| 10:37:32  8 | account numbers assigned already. | 10:40:17  8 | Q. So after Wells Fargo decided not to go |
| 10:37:36  9 | Q. Did Mr. Horsman explain why Wells Fargo | 10:40:22  9 | forward, GMAC essentially was the only option that |
| 10:37:43 10 | didn't go forward? | 10:40:27 10 | Seneca had available? |
| 10:37:44 11 | A. No. They didn't want to do it, and that | 10:40:29 11 | A. At that point in time, yes. |
| 10:37:47 12 | was Mr. Horsman's representation, that they could | 10:40:43 12 | Q. I apologize, Mr. Landay, if I asked this |
| 10:37:51 13 | do things like that. | 10:41:08 13 | question before, but did Seneca have an executed |
| 10:37:53 14 | Q. Did you Mr. Horsman or anybody else at | 10:41:12 14 | commitment letter with Wells Fargo? |
| 10:37:55 15 | Wells Fargo -- | 10:41:15 15 | A. I don't recall if it was a commitment |
| 10:37:56 16 | A. No. I had no choice. He wasn't going | 10:41:19 16 | letter or term sheet. I'm not sure at this point |
| 10:37:59 17 | forward. So I had to go to my next proposal, which | 10:41:23 17 | in time, and I have no copies of anything. |
| 10:38:02 18 | was from GMAC. It didn't matter why he wasn't | 10:43:02 18 | (A recess was taken from |
| 10:38:06 19 | going forward. I had to move to get this deal | 10:43:04 19 | 10:43 to 10:46 a.m.) |
| 10:38:10 20 | done. | 10:46:55 20 | EXHIBIT NO. 59 MARKED |
| 10:38:15 21 | Q. Didn't it strike you as odd that you would | 10:47:07 21 | Q. Mr. Landay, can you identify Exhibit 59 for |
| 10:38:20 22 | get to a point in a transaction where bank account | 10:47:11 22 | me? |
| 10:38:25 23 | numbers had been assigned and signature cards were | 10:47:11 23 | A. I believe this is a letter that was brought |
| 10:38:28 24 | being executed, and then there would be an | 10:47:17 24 | to me by Paul Fitzgerald with the company term |

| | Page 43 | | Page 45 |
|---|---|---|---|
| 10:38:32  1 | unexplained decision not to go forward? | 10:47:22  1 | sheet dated July 31, 2000. |
| 10:38:34  2 | A. Yes. But I had always understood that | 10:47:31  2 | Q. And if you turn to Page 4 of the letter -- |
| 10:38:41  3 | Mr. Horsman was odd, as you called it. | 10:47:36  3 | A. I am sorry, the letter is an approval |
| 10:38:50  4 | Q. You testified that after Wells Fargo | 10:47:39  4 | letter, I would characterize it. |
| 10:38:57  5 | decided not to go forward with the proposed | 10:47:41  5 | Q. You said you would characterize the letter |
| 10:39:01  6 | refinancing, that you moved on to the next | 10:47:48  6 | as an approval letter? |
| 10:39:04  7 | proposal, which was from GMAC? | 10:47:50  7 | A. Yes. |
| 10:39:06  8 | A. Yes. | 10:47:50  8 | Q. Why? |
| 10:39:08  9 | Q. I take it then that GMAC's proposal was | 10:47:51  9 | A. It says, "GMAC Commercial Credit LLC (GMAC |
| 10:39:14 10 | more favorable to the borrower than any of the | 10:48:27 10 | CC) hereby confirms that we have obtained approval |
| 10:39:20 11 | other proposals that you had? | 10:48:33 11 | from our credit committee." |
| 10:39:23 12 | A. I wouldn't say that. | 10:47:58 12 | Q. Go on. "Subject to"? |
| 10:39:25 13 | Q. Why did you choose to go forward with GMAC? | 10:48:04 13 | A. "And the attached term sheet of the same |
| 10:39:29 14 | A. Because I had a written proposal from them, | 10:48:06 14 | date." |
| 10:39:33 15 | and it was the quickest and easiest thing to do | 10:48:09 15 | How far do you want me to read? |
| 10:39:36 16 | after Wells Fargo. | 10:48:12 16 | Q. That's sufficient. Read the rest of that |
| 10:39:37 17 | Q. Did you have a written proposal from any of | 10:48:21 17 | portion of the sentence slowly. |
| 10:39:40 18 | the other companies from which you had solicited | 10:48:22 18 | A. "GMAC Commercial Credit LLC (GMAC CC) |
| 10:39:43 19 | proposals? | 10:48:31 19 | hereby confirms that we have obtained approval from |
| 10:39:43 20 | A. No. | 10:48:34 20 | our credit committee, subject to and upon terms and |
| 10:39:45 21 | Q. You solicited proposals from GE? | 10:48:38 21 | conditions set forth in this letter and the |
| 10:39:50 22 | A. Yes. | 10:48:41 22 | attached term sheet of the same date." |
| 10:39:51 23 | Q. Citizens? | 10:48:46 23 | Q. If you turn to Page 4 of Exhibit 59, is |
| 10:39:52 24 | A. Yes. | 10:48:53 24 | that your signature under Seneca Sports? |

David L. Landay                                                          10/18/2005

### Page 122

```
14:27:52  1   answer.
14:27:52  2       A. That would have been something that I would
14:27:56  3   have left up to my attorney.
14:27:58  4       Q. In any event, Mr. Landay, you don't dispute
14:28:17  5   as president of Brookfield and Seneca you agreed
14:28:24  6   that those companies owed the debt to GMAC without
14:28:30  7   offset, defense or counterclaim of any kind,
14:28:33  8   correct?
14:28:34  9       A. I would only agree that this is what this
14:28:37 10   document says.
14:28:38 11       Q. And you signed it?
14:28:39 12       A. And that I signed it.
14:28:41 13       Q. At the time you were negotiating the
14:29:33 14   forbearance agreement on behalf of Seneca-
14:29:37 15   Brookfield, were you at all concerned about your
14:29:39 16   personal exposure on your guaranty?
14:29:43 17       A. Yes, I was concerned.
14:29:45 18       Q. What was the nature of your concern?
14:29:48 19       A. Worry. Concern. Angst.
14:29:55 20       Q. About what?
14:29:56 21       A. About whether or not my guaranty would be
14:30:00 22   called upon.
14:30:00 23            EXHIBIT NO. 72 MARKED
14:30:55 24       Q. Mr. Landay, can you identify Exhibit 72 for
```

### Page 123

```
14:31:10  1   me?
14:31:10  2       A. It appears to be a copy of the facsimile
14:31:13  3   sent to Jane Frangos on July 24, 2001.
14:31:18  4       Q. By you?
14:31:19  5       A. By me, my copy, because I see nothing at
14:31:23  6   the top that has any evidence that it was faxed.
14:31:27  7       Q. Do you know whether or not this was to --
14:31:33  8       A. I believe it was.
14:31:39  9       Q. The document references an attached updated
14:31:50 10   personal financial statement. Do you see that?
14:31:52 11       A. Yes.
14:31:54 12       Q. Do you know what updated financial
14:31:58 13   statement you attached to Exhibit 72?
14:32:00 14       A. No. It's not here.
14:32:05 15            EXHIBIT NO. 73 MARKED
14:32:28 16       Q. Mr. Landay, I have just handed you a
14:32:30 17   document marked Exhibit 73. Can you identify that
14:32:34 18   document for me?
14:32:35 19       A. It appears to be a personal financial
14:32:39 20   statement dated February 19, '01, a GMAC form with
14:32:43 21   attached backup.
14:32:48 22       Q. On Page 4, RAS 00467, is that your
14:32:57 23   signature?
14:32:57 24       A. Yes. With a date of February 10, '01.
```

### Page 124

```
14:33:01  1       Q. If you proceed to the next page, there
14:33:03  2   appears to be a Fleet private clients group
14:33:07  3   investment account statement. Do you see that?
14:33:09  4       A. Yes.
14:33:10  5       Q. Can you identify that for me?
14:33:12  6       A. It appears to be the cover sheet for a
14:33:14  7   Fleet private clients group investment statement
14:33:17  8   dated December 31, 2000.
14:33:20  9       Q. That's your investment account?
14:33:22 10       A. Yes.
14:33:22 11       Q. And the account number on that is
14:33:27 12   No. 9073530?
14:33:28 13       A. That's what it says.
14:33:29 14       Q. So checks deposited to that account would
14:33:33 15   be checks that were payable to you?
14:33:35 16       A. Not necessarily. I don't know that
14:33:41 17   anything in that deposited to an investment account
14:33:44 18   would be payable to me, because an investment
14:33:47 19   account would not necessarily be a checking
14:33:50 20   account.
14:33:51 21       Q. Anything deposited into that account would
14:33:56 22   be deposited for your benefit?
14:33:58 23       A. That would be the conclusion, yes.
14:34:12 24       Q. Can you tell me whether or not Exhibit 73
```

### Page 125

```
14:34:14  1   is the updated personal financial statement
14:34:20  2   referenced in Exhibit 72?
14:34:22  3       A. No, I cannot.
14:34:28  4       Q. Mr. Landay, I am going to hand you a copy
14:34:53  5   of Exhibit 70, which we looked at earlier today,
14:34:59  6   and Exhibit 70 references a discrepancy between the
14:35:09  7   amount of the note payable to you from Seneca and
14:35:15  8   the financial statement that you had provided to
14:35:20  9   GMAC prior -- in connection with the factoring
14:35:25 10   agreement, correct?
14:35:27 11       A. It references the financial statements. I
14:35:30 12   don't know what those financial statements were,
14:35:32 13   whether they were company financial statements that
14:35:35 14   are internally generated or personal financial
14:35:38 15   statements.
14:35:40 16       Q. Can you tell after reviewing both Exhibit
14:35:48 17   72 and Exhibit 70 whether Exhibit 73 was prepared
14:35:54 18   by you in connection with either one of those
14:35:58 19   documents?
14:35:59 20       A. No. I can't answer that, because Exhibit
14:36:08 21   72 is dated July 24th, and it references that Doug
14:36:12 22   Rainville, that Jane was looking for an updated
14:36:16 23   financial statement.
14:36:16 24            So I suspect I would have done one at
```

32 (Pages 122 to 125)