# EXHIBIT F

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAVID L. LANDAY        )
    Plaintiff,        )
                 )
                 )
v.        )        Civil Action No. 04-cv-11955-WGY
                 )
GMAC COMMERCIAL CREDIT LLC        )
and GMAC COMMERCIAL FINANCE        )
LLC,        )
    Defendants.        )

## AFFIDAVIT OF LOUIS G. MARCUS IN SUPPORT OF GMAC CF'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I, Louis G. Marcus, upon oath, depose and state as follows:

1.    I am over 18 years of age, am competent to testify, and have personal knowledge of the facts set forth herein.

2.    I am an attorney licensed to practice in New York State. I am an active member and in good standing of the bar of New York State.

3.    I have represented GMAC Commercial Credit LLC, a company based in New York City. I have been informed that GMAC Commercial Finance LLC is the successor by merger of GMAC Commercial Credit LLC. For ease of reference, I will use the name "GMAC CF" to refer to both entities in this affidavit.

4.    I was counsel for GMAC CF during its negotiation and closing of a commercial factoring agreement with Seneca Sports, Inc. ("Seneca") and Brookfield International, Inc. ("Brookfield") (collectively, the "Borrowers"), the terms of which are detailed in a Factoring Agreement dated September 19, 2000. A true and accurate copy of this Factoring Agreement is attached as Exhibit 1 to this affidavit.

5.      There were several other loan documents referenced in the Factoring Agreement that were also executed on or about September 19, 2000. One such document was a personal Guaranty executed by David L. Landay ("Landay"). A true and accurate copy of this Guaranty is attached as Exhibit 2 to this affidavit. For ease of reference, I will refer to the Factoring Agreement, the Guaranty and the ancillary documents as the 2000 Loan Agreement.

6.      Throughout the negotiations and closing of the 2000 Loan Agreement, Gary L. Hoff of the law firm Casner & Edwards, LLP, represented Landay and the Borrowers. I had numerous communications with Mr. Hoff regarding the 2000 Loan Agreement by telephone and facsimile. For each of the communications, I was in New York State.

7.      The closing of the 2000 Loan Agreement occurred in New York City on or about September 19, 2000. Mr. Landay signed all of the relevant loan documents in New York City following many hours of final negotiations, all of which occurred in New York City.

8.      Before the deal was finalized, Mr. Hoff provided me with a letter from stating, among other things, that it was the opinion of Casner & Edwards that "[a] court sitting in Massachusetts would give effect to the choice of laws provisions of the Factoring Agreement and other Loan Documents." A true and accurate copy of this "Opinion Letter" is attached as Exhibit 3 to this affidavit.

9.      The Opinion Letter referred to a Massachusetts usury statute and suggested that GMAC CF should send a usury notification letter to the Massachusetts Attorney General's Office. Although there was no reason to believe that GMAC CF had to comply with a Massachusetts statute, in light of the New York choice-of-law provision and the fact that all of the significant events relating to the loan occurred in New York, GMAC CF sent a letter to the Massachusetts Attorney General's Office.

- 2 -

SWORN TO AND SUBSCRIBED UNDER THE PAINS AND PENALTIES OF

PERJURY THIS __13ᵗʰ__ DAY OF DECEMBER 2005.

Louis G. Marcus

BOS_514340_1/MDUUNOFF

# EXHIBIT 1

**GMAC COMMERCIAL CREDIT LLC**
**FACTORING AGREEMENT**

Seneca Sports, Inc.
75 Fortune Boulevard
Milford, MA 01757

Brookfield International, Inc.
75 Fortune Boulevard
Milford, MA 01757

We are pleased that you have chosen us to act as your sole factor, effective as of *Sept 19,* 2000 ("Effective Date"), and have agreed to do so upon the following terms:

1.    **COVERED SALES; SECURITY INTEREST**

( a )    You (any reference herein to "you" and "your" shall be deemed to refer herein to both Seneca Sports, Inc. and Brookfield International, Inc. ((a Massachusetts corporation) individually and collectively and/or jointly and severally, as applicable), hereby assign and sell to us, as absolute owner, and we hereby purchase from you, all Receivables, now existing or created on or after the Effective Date, which arise from your sale of merchandise or rendition of services. Our purchase of and acquisition of title to each Receivable will be effective as of the date of its creation and will be entered on our books when you furnish us with a copy of the respective invoice.

( b )    You hereby grant to us a continuing security interest in all of your present and future Receivables and in all Collateral, as security for all Obligations.

2.    **CUSTOMER CREDIT APPROVAL**

You shall submit to us the principal terms of each of your customers' orders for our written credit approval. We may, in our discretion, approve in writing all or a portion of your customers' orders, either by establishing a credit line limited to a specific amount for a specific customer, or by approving all or a portion of a proposed purchase order submitted by you. No credit approval shall be effective (i) unless in writing; (ii) unless the goods are shipped or the services rendered within the time specified in our written credit approval or within forty-five (45) days after the approval is given, if no time is specified and (iii) unless the assignment of the invoice evidencing the applicable Receivable is received by us within five (5) business days from the date of such invoice. After the customer has accepted delivery of the goods or performance of the services, we shall then have the Credit Risk (but not the risk of non-payment for any other reason), to the extent of the dollar amount specified in the credit approval, on all Receivables evidenced by invoices which arise from orders approved by us in writing except for those Receivables evidenced by invoices less than One Hundred Fifty Dollars ($150.00) and invoices evidencing charges for samples supplied to your customers. We shall have neither the Credit Risk nor the risk of non-payment for any other reason on Receivables arising from orders not approved by us in writing. We may withdraw our credit approval or withdraw or adjust a credit line at any time before you deliver the goods or render the services.

3.    **PURCHASE PRICE OF RECEIVABLES**

The purchase price of Receivables is the net face amount thereof less our commission. The term "net face amount" means the gross face amount of the invoice, less returns, discounts (which shall be determined by us where optional terms are given), anticipation reductions or any other unilateral deductions taken by customers, and credits, and allowances to customers of any nature. The purchase price will be credited to your account and remitted to you on the "Settlement Date" (hereinafter described). The Settlement Date for each Receivable on which we have the Credit Risk and which is not due from a department or chain store shall be three (3) business days after the day on which the Receivable is actually collected by us or becomes one hundred twenty (120) days past due, whichever is earlier. The Settlement Date for all other Receivables shall be three (3) business days after the day on which the Receivable is actually collected by us. We may deduct, from the amount payable to you on any Settlement Date, reserves for all Obligations then chargeable to your account and Obligations which, in our sole judgment, may be chargeable, to your account (including but not limited to the sum of all ineligible Receivables, disputed items, deductions, allowances, credits, consignment sales, outstanding letters of credit, steamship guaranties, airway releases, and any other offsets asserted or granted, ineligible inventory including but not limited to packaging materials, samples, work-in-process, and such additional reserves, whether or not related to receivables or inventory deemed appropriate in our sole discretion), thereafter ("Reserves").

4.    **ADVANCES; INTEREST; COMMISSIONS; LATE PAYMENT CHARGES**

( a )    If you request, we may in our discretion make payments to you of the purchase price of Receivables in advance of the Settlement Date ("Advances") and cause documentary Letters of Credit ("Letters of Credit") to be issued for your account, subject to our right to withhold Reserves. All amounts which we pay or make available to you or for your account in excess of the purchase price of Receivables are loans and shall be chargeable to your account when paid or made available to you. Notwithstanding anything to the contrary

 S260/D4                                          - 1 -                                          **GLAN 00603**

herein or elsewhere, all Loans or Advances hereunder are to be made on a totally discretionary basis on our part. In no event, however, shall (i) the aggregate amount of all outstanding Obligations (including but not limited to Advances, loans, the Seasonal Overadvance and all other amounts then charged or chargeable to your account including but not limited to amounts of outstanding Letters of Credit and any amounts due and owing by you to us in connections with Letters of Credit) exceed (i) the lesser of the Maximum Loan Amount or the Borrowing Base, plus (ii) the aggregate amount of outstanding Letters of Credit and amounts due and owing by you to us in connection with Letters of Credit exceed $500,000.00. If the outstanding Obligations at any time exceed the lesser of the Maximum Loan Amount or the Borrowing Base, in addition to our other rights, you shall pay us the excess forthwith. Any payments which we shall make with respect to drawings under any Letters of Credit shall be deemed to be Advances made to you pursuant to this Agreement. You agree to use the Advances and loans, if any, and the proceeds thereof, only for working capital purposes in the ordinary course of business. Without limiting the discretionary nature of the Advances, upon the occurrence of an Event of Default, we may at our sole discretion make no further Advances to you.

(b)     For our services, we shall charge to your account

(i)     monthly, as of the last day of each month, interest on the average daily balance of all Advances and all other loans and amounts charged and chargeable to your account hereunder (said Advances, loans and amounts being herein collectively called "Interest Bearing Obligations") which are outstanding during such month at the Borrowing Rate; provided, however, that if the Interest Bearing Obligations plus the face amount of outstanding Letters of Credit outstanding on each of five (5) or more days in any month exceed the Borrowing Base on such days, then the average daily balance of the Interest Bearing Obligations in that month shall bear interest at the Overadvance Rate; provided further, that said interest rate shall not be less than six percent (6%) per annum and shall in no event be higher than the highest rate permitted by New York law. Interest shall be calculated on the basis of the actual number of days elapsed over a year of three hundred sixty (360) days. Upon and after the occurrence of an Event of Default, and during the continuation thereof, the Interest Bearing Obligations shall bear interest at the Default Rate.

(ii)     monthly, as of the 15th day of each month, a commission at the rate of sixty-five hundredths of one percent (.65%) of the gross face amount of each invoice evidencing a Receivable purchased hereunder during such month on terms not exceed sixty (60) days (including dating), plus an additional one-quarter of one percent (1/4%) for each additional thirty (30) days or portion thereof of selling terms; provided, however, that if you change the terms of any invoice (whether or not we consent to such change, it being understood that nothing in this provision diminishes our rights or your obligations under any other provision hereof including but not limited to Paragraph 8), then the commission on the gross face amount of that invoice shall be the commission hereinabove set forth plus one-quarter of one percent (1/4%) for each thirty (30) days or portion thereof of such change. Our commission on any invoice evidencing a Receivable purchased hereunder shall not be less than Five Dollars ($5.00).  However, the aggregate amount of Receivables with respect to which you are obligated to pay commissions and which you sell and assign to us ("Volume") shall not be less than $20,000,000.00 ("Minimum") in each Calendar Year (the twelve month period starting January 1st of each year, commencing prior to date on which this Agreement may be terminated under the terms of the second sentence of Section 11A(i) hereof, or the part of the last Calendar Year, commencing prior to date of which this Agreement is terminated under the terms of Section 11A(i) hereof if it is terminated before the end of a Calendar Year ("Partial Last Year"); provided, however, that the Volume for the part of the first Calendar Year during which this agreement is in effect if the Effective Date is after January 1 of such Calendar Year ("Partial First Year"), shall not be less than the amount equal to the Minimum multiplied by a fraction, the numerator of which is the number of months (a month shall mean any calendar month or portion thereof) between the Effective Date and December 31 of such Calendar Year and the denominator of which is 12 ("Reduced Minimum"). If the Volume in any Calendar Year or Partial Last Year (if any) is less than the Minimum, or in the Partial First Year (if any) is less than the Reduced Minimum, we shall charge to your account the difference ("Minimum Volume Charge") between the commission on the Minimum or Reduced Minimum, as the case may be, and the commission on the Volume for the Calendar Year or Partial Last Year, or the Partial First Year, respectively. We shall compute the Minimum Volume Charge, if any, on a calendar quarterly basis and charge your account therefor for each calendar quarter in the month following the end of such calendar quarter, or in the month following the effective date of termination of this agreement in the case of a Partial Last Year. However, if an Event of Default occurs, and if we so elect, and whether or not we then or thereafter exercise any of our rights of termination hereunder (including but not limited to our rights under Paragraph 11(a)(ii)), or your termination of the Agreement, pursuant to Section 11A(i) or otherwise, we may on or at any time after the occurrence of such Event of Default compute and charge your account for the Minimum Volume Charge for the period starting on such occurrence and ending on the last day of the Calendar Year during which the next date as of which you may terminate this agreement under Paragraph 11(a)(i) occurs, and for the purpose only of computing such Minimum Volume Charge, we may assume that your Volume for the period will be zero, subject, of course, to subsequent adjustment if such Volume in fact is more than zero.

Notwithstanding anything to the contrary herein, if you terminate this agreement prior to the term ending on the then effective Termination Date as stated in Section 11(a)(i), we may charge your account as of such termination or you shall pay us prior to such termination an amount (the "Early Termination Fee") equal to the sum of (x) an amount equal to 3% of the Maximum Loan Amount if this facility is terminated prior to the first anniversary date of the Effective Date, 2% of the Maximum Loan Amount if terminated after the first anniversary date of the Effective Date, but prior to the second anniversary date of the Effective Date or 1% of the Maximum Loan Amount if this Agreement is terminated after the second anniversary date of the Effective Date but prior to the third anniversary date of the Effective Date or prior to any other anniversary of the Effective Date after the third anniversary of the Effective Date (while this Agreement is in effect) plus (y) the factoring commissions due us under the terms of the preceding paragraph on the Minimum calculated for the remainder of the term prior to the then effective Termination Date as described in Section 11(a)(i) as if you had not terminated this agreement prior to such then effective Termination Date.

(iii)     all bank charges for wire transfers when due.

S260/D4                                    -2-                            GLAN 00604

(iv)   on the last day of each month we shall charge to your account all applicable Letter of Credit Fees as provided for in the Letter of Credit Financing Supplement to Factoring Agreement.

(v)   on the closing date hereof, the second $50,000.00 installment of the Closing Fee (provided however that if your account shall not contain sufficient funds you shall deposit with us in your account amounts to cover such second installment of the Closing Fee).

(vi)   on the first day of every month the amount of the Unused Facility Fee accrued for each previous month.

### 5.   MATURED FUNDS

On the last day of each month, we shall credit your account with interest at the Matured Funds Rate in effect during such month on the average daily balance during such month of any amounts payable by us to you hereunder (as confirmed by us by appropriate credit to your account with us) which are not drawn by you on the Settlement Date, while held by us after the Settlement Date.

### 6.   CHARGES; BALANCES; RESERVES

We may charge to your account all Obligations. Unless otherwise specified, all Obligations, including any debit balance in your account, shall be payable on demand. Recourse to security will not be required at any time. All credit balances or other sums at any time standing to your credit and all Reserves on our books, and all of your property in our possession at any time or in the possession of any parent, affiliate or subsidiary of ours or on or in which we or any of them have a lien or security interest, may be held and reserved by us as security for all Obligations. We will account to you monthly and each monthly accounting statement will be fully binding on you and will constitute an account stated, unless, within thirty (30) days after such statement is mailed to you or within thirty (30) days after the mailing of any adjustment thereof we may make, you give us specific written notice of exceptions.

### 7.   REPRESENTATIONS AND WARRANTIES

( a )   You warrant and represent that you have good title to the Receivables free of any encumbrance except in our favor; each Receivable purchased hereunder is a bona fide, enforceable obligation created by the absolute sale and delivery of goods or the rendition of services in the ordinary course of business; your customer is unconditionally obligated to pay at maturity the full amount of each Receivable purchased hereunder without defense, counterclaim or offset, real or alleged; all documents in connection therewith are genuine; and the customer will accept the goods or services without alleging any Dispute.

( b )   You further represent and warrant that (i) your address set forth above is that of your chief place of business and chief executive office and the location of all Collateral (except as set forth on Schedule "A" attached hereto) and of your books and records relating to the Receivables; (ii) by a separate writing you have disclosed to us the locations of all of your other places of business as well as all Trade Names; and (iii) except after thirty (30) days prior written notice to us of your intention to do so, you will not make any change in your name or corporate structure (whether by merger, reorganization or otherwise) nor make any other change which would have the effect of rendering inaccurate or incomplete the representations contained in this subparagraph (b).

( c )   You shall furnish to us, and you shall cause all corporate guarantors of the Obligations, if any, to furnish to us monthly and quarterly financial statements within fifteen days after the end of each month with respect to the monthly statements and thirty (30) days after the end of each of your fiscal quarters, and annual financial statements within ninety (90) days after the end of each of your fiscal years, all in form and substance acceptable to us, reviewed in the case of monthly and quarterly statements, and audited, in the case of annual statements, by an independent certified public accountant acceptable to us. All such statements provided to us by you shall also be certified by your Chief Financial Officer. In addition, you shall also provide us with semi-annual inventory Certificates certified by such certified public accountant. You shall also cause all individual guarantors of the Obligations, if any, to furnish to us his/her personal financial statement in form and substance acceptable to us within thirty (30) days after each anniversary of the date on which he/she furnishes to us the first such statement. You shall also provide us with annual projections of your operating status, balance sheets and cash flows on a monthly basis.

( d )   You shall provide us with daily sales and credit assignments to be transmitted to us electronically in form and substance acceptable to us. You shall promptly provide us with duplicate originals of all credits which you issue to your customers and immediately notify us of any merchandise returns or Disputes. You will settle all Disputes at no cost or expense to us; our practice is to allow you a reasonable time to do so. Should we so elect, we may at any time in our discretion (i) withdraw your authority to issue credits to your customers without our prior written consent; (ii) litigate Disputes or settle them directly with the customers on terms acceptable to us; or (iii) direct you to set aside, identify as our property and procure insurance satisfactory to us on any Retained Goods. All Retained Goods (and the proceeds thereof) shall be (A) held by you in trust for us as our property; and (B) subject to a security interest in our favor as security for the Obligations; and (C) disposed of only in accordance with our express written instructions.

( e )   Our Credit Risk, if any, on a Receivable shall immediately terminate without any action on our part in the event that (i) your customer asserts a Dispute (regardless of merit) as a ground for non-payment of the Receivable or returns or attempts to return the goods represented thereby; or (ii) any warranty as to the Receivable is breached. We may charge to your account at any time the gross face amount of any Receivable purchased hereunder (or portion thereof) on which we do not then have the Credit Risk,

together with interest thereon from the Settlement Date of such Receivable to the date of chargeback; such action on our part shall not be deemed a reassignment of such Receivable and will not impair our rights thereto or security interest therein, which will continue to be effective until all Obligations are fully satisfied.

(f)    YOU WARRANT THAT YOU WILL NOT GRANT A SECURITY INTEREST IN ANY OF YOUR RECEIVABLES OR IN ANY OF YOUR INVENTORY TO ANYONE EXCEPT US WITHOUT OUR PRIOR WRITTEN CONSENT.

(g)    YOU WARRANT AND REPRESENT THAT YOU ARE IN COMPLIANCE WITH ALL APPLICABLE LAWS, REGULATIONS AND RULES, INCLUDING BUT NOT LIMITED TO THOSE RELATED TO ENVIRONMENTAL LAWS AND SANCTION/EMBARGO PROGRAMS.  YOU COVENANT AND AGREE THAT YOU SHALL REMAIN IN COMPLIANCE THEREWITH.

(h)    You represent that you and your subsidiaries have reviewed the effect that the Year 2000 Issue would have on your respective businesses. The costs to you and your subsidiaries of any reprogramming required to avoid the Year 2000 Issue to permit the proper functioning of your and your subsidiaries' computer software, hardware and firmware systems and equipment containing embedded microchips and the proper processing of data, and the testing of such reprogramming, and of the reasonably foreseeable consequences of the Year 2000 Issue to you and your subsidiaries (including reprogramming errors and the failure of systems or equipment supplied by others or with which your and your subsidiaries' computer systems interface) are not reasonably expected to result in an Event of Default or to have a material adverse effect on your business, assets, operations, prospects or condition (financial or otherwise) or those of your subsidiaries. You warrant that you shall take, and shall cause each of your subsidiaries to take, all necessary action to complete such reprogramming and the testing of such systems and equipment, as so reprogrammed, in all materials respects no later than September 1,2000. At our request, you shall provide, and shall cause each of your subsidiaries to provide, to us reasonable assurance of your and their compliance with the preceding sentence.

(i)    You represent that you have evaluated and assessed the potential impact of the Year 2000 Issue upon your and your subsidiaries' customers, key suppliers and vendors and their efforts to eliminate the risks arising out of the Year 2000 Issue, and that you have determined that those risks have been eliminated and, therefore, that your business, assets, operations, prospects and condition (financial and otherwise) and those of your subsidiaries shall not be adversely affected by any such impact or risks.

8.    INVOICING; PAYMENTS; RETURNS; NOTIFICATION

(a)    Each of your invoices and all copies thereof shall bear a notice (in form satisfactory to us) that it is owned by and payable directly and only to us at locations designated by us, and you shall furnish us with duplicate originals of your invoices accompanied by a confirmatory assignment thereof. Your failure to furnish such specific assignments shall not diminish our rights. You shall procure and hold in trust for us and furnish to us at our request satisfactory evidence of each shipment and delivery or rendition of services. Each invoice shall bear the terms stated on the customer's order, as submitted to us, whether or not the order has been approved by us, and no change from the original terms of the order shall be made without our prior written consent. Any such change not so approved by us shall automatically terminate our Credit Risk, if any, on the Receivable arising from your performance of the order. You will hold in trust for us and deliver to us any payments received from your customers in the form received, and hereby irrevocably authorize us to endorse your name on all checks and other forms of payment. Each payment made by a customer shall first be applied to Receivables, if any, on which we have the Credit Risk, and the balance, if any, of such payment shall be applied to other Receivables due from such customer. You understand that we shall not be liable for any selling expenses, orders, purchases, contracts or taxes of any kind resulting from any of your transactions, and you agree to indemnify us and hold us harmless with respect thereto, which indemnity shall survive termination of this agreement.

(b)    We shall have the right to communicate with and instruct the account debtors on your general intangibles to make payments in respect thereof directly to us.

9.    NEGATIVE COVENANTS

You covenant and agree that, until the later of the termination of this agreement or the satisfaction in full of all of the Obligations, you will not:

(i)    permit any of your property (including but not limited to Receivables, Inventory, machinery, Equipment, furniture, fixtures, plant and real estate) to be encumbered by any security interest, lien, mortgage, or other encumbrance of any nature whatsoever except liens in our favor, (other than Permitted Liens as listed on Schedule 9(i) attached hereto), unless you have obtained our prior written consent;

(ii)    incur any indebtedness of any nature whatsoever, including but not limited to guaranties and contingent obligations, except (a) unsecured debt to your trade suppliers in the ordinary course of your business, (b) debt subordinated to the Obligations in amounts and on terms acceptable to us in our sole discretion ("Subordinated Debt"), and (c) the promissory note in the amount of $1,500,000.00 payable to Brookfield International, Inc. issued in connection with the purchase of certain assets of Brookfield International, Inc.;

(iii)    prepay any amounts to become due on Subordinated Debt. Furthermore, you will not make any principal or interest payments on Subordinated Debt unless and until due and permitted by the terms of the applicable subordination agreement;

S260/D4

GLAN 00606

(iv)    permit your minimum Tangible Net Worth on a consolidated basis to be less than the amount stated opposite each fiscal quarter in the table below calculated as of the end of each such fiscal quarter;

| Fiscal Quarter Ending | Amount |
|---|---|
| 9/30/00 | ($3,606,000.00) |
| 12/31/00 | ($3,393,000.00) |
| 3/31/01 | ($3,617,000.00) |
| 6/30/01 | ($3,338,000.00) |
| 9/31/01 | ($2,811,000.00) |
| 12/31/01 | ($2,599,000.00) |
| 3/31/02 | ($2,819,000.00) |
| 6/30/02 | ($2,539,000.00) |
| 9/30/02 | ($2,013,000.00) |
| 12/31/02 | ($1,800,000.00) |
| 3/31/03 | ($2,020,000.00) |
| 6/30/03 | ($1,741,000.00) |
| 9/30/03 | ($1,214,000.00) |

(v)    permit your Fixed Charge Coverage Ratio, on a consolidated basis, to be less than then ratio set forth opposite each fiscal quarter as stated in the table below, calculated at the end of each quarter through the end of the fiscal quarter ending on December 31, 2001 and calculated at the end of each fiscal quarter on a rolling four quarter basis beginning with the first quarter in 2002;

| Fiscal Quarter Ending | Ratio |
|---|---|
| 12/31/00 | .35 to 1.0 |
| 3/31/01 | (.20) to 1.0 |
| 6/30/01 | 1.10 to 1.0 |
| 9/31/01 | 1.75 to 1.0 |
| 12/31/01 | .95 to 1.0 |
| 3/31/02 | .95 to 1.0 |
| 6/30/02 | 1.0 to 1.0 |
| 9/30/02 and at the end of each fiscal quarter thereafter calculated on a rolling four quarter basis | 1.10 to 1.0 |

(vi)    permit your pre-tax profits (defined in accordance with GAAP), on a consolidated basis, as calculated quarterly at quarter end to be other than positive (except for the first fiscal quarter of each of your fiscal years, in which case your pre-tax losses for such quarter shall not exceed ($230,000.00));

(vii)    deliberately left blank

(viii)    deliberately left blank

(ix)    deliberately left blank

(x)    make Capital Expenditures, on a consolidated basis, to exceed $150,000.00 during any fiscal year;

(xi)    purchase or acquire obligations or stock of, or any other interest in, any entity, except (A) obligations issued or guaranteed by the United States of America or any agency thereof, (B) commercial paper with maturities of not more than 180 days and a published rating of not less than A-1 or P-1 (or the equivalent rating), (C) certificates of time deposit and bankers' acceptances having maturities of not more than 180 days and repurchase agreements backed by United States government securities of a commercial bank if (x) such bank has a combined capital and surplus of at least $500,000,000.00, or (y) its debt obligations, or those of a holding company of which it is a subsidiary, are rated not less than A (or the equivalent rating) by a nationally recognized investment rating agency, (D) U.S. money market funds that invest solely in obligations issued or guaranteed by the United States of America or an agency thereof, and (E) Eurodollar time deposits with financial institutions with a published rating of not less than A-1 or P-1 (or the equivalent rating), except that you may purchase or acquire obligations or stock of, or any other interest in, any entity in the ordinary course of your business provided that you have obtained our prior written consent;

(xii)    make Advances, loans or extensions of credit to any person or entity;

(xiii)    declare, pay or make any dividend or distribution in any amounts on any shares of common stock or preferred stock or apply any of your funds, property or assets to the purchase, redemption or other retirement of any common or preferred stock, or of any options to purchase or acquire any such shares of your common or preferred stock;

(xiv)    substantially change the nature of the business in which you are presently engaged, nor except as specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than (A) in the ordinary course of business or (B) assets or property which are useful in, necessary for and are to be used in your business as presently conducted;

(xv)    directly or indirectly, purchase, acquire or lease any property from, or sell, transfer or lease any property to, or otherwise deal with, any affiliate, except (A) disclosed transactions in the ordinary course of business, on an arm's-length basis on terms no less favorable than terms which would have been

obtainable from a person other than an affiliate, and (B) transactions arising pursuant to an agreement between you and any affiliate in form and substance acceptable to us in our sole discretion;

( xvi )    enter into any partnership, joint venture or similar arrangement without our prior written consent;

( xvii )    enter into any merger, consolidation or other reorganization with or into any other entity, acquire all or a substantial portion of the assets or stock of any other entity, or permit any other entity to consolidate or merge with you;

( xviii )    sell, lease, transfer or otherwise dispose of any of your properties or assets, except in the ordinary course of business or with our prior written consent, which consent will not be unreasonably withheld;

( xix )    change your fiscal year from ending on December 31 of any year or make any change (i) in accounting treatment and reporting practices except as required by GAAP or (ii) in tax reporting treatment except as required by law;

( xx )    close any place of business or surrender possession of any leased premises prior to the expiration of the lease without our prior written consent, which consent will not be unreasonably withheld;

(xxi)    permit a Change of Ownership.

10.    AFFIRMATIVE COVENANTS

You covenant and agree that, until the later of the termination of this agreement or the satisfaction in full of all of the Obligations, you will:

( i )    conduct continuously and operate actively your business according to good business practices and maintain all of your properties useful or necessary in your business in good working order and condition (reasonable wear and tear excepted) including, without limitation, all licenses, patents, copyrights, trade names, trade secrets and trademarks; (b) keep in full force and effect your existence and comply in all material respects with the laws and regulations governing the conduct of your business; and (c) make all such reports and pay all such franchise and other taxes and license fees and do all such other acts and things as may be lawfully required to maintain your rights, licenses, leases, powers and franchises under the laws of the United States or any political subdivision thereof.

( ii )    discharge all of your obligations of any nature whatsoever, whether now existing or hereafter arising, owing to any person, firm, corporation or governmental agency in the ordinary course as they become due.

(iii)    give us prompt written notice of any breach, default or Event of Default, or the occurrence of an event which with notice or lapse of time would permit us to terminate this agreement or constitute a breach, default or Event of Default, under this agreement, or any other agreement material to your business (including but not limited to all license agreements relating to Inventory), your violation of any law, rule, order or regulation of any governmental agency applicable to you or the Collateral, and the commencement or assertion by or against you of any claim, suit, action or proceeding of a civil, criminal or administrative nature or the occurrence of any events adversely affecting the value of the Collateral or our rights or your condition or prospects. We may, upon ten (10) days prior notice to you, cure any such breach, default, Event of Default or violation and, if we elect to do so, you will on demand reimburse us for the costs and expenses incurred by us in connection therewith, but we shall not be obligated to cure any such breach, default, Event of Default or violation.

(iv)    concurrently with the delivery of the financial statements required hereunder, you shall deliver to us certificates signed by your Chief Financial Officer stating, to the best of his/her knowledge, that you are in compliance in all material respects with all federal, state and local laws including but not limited to those relating to environmental protection and control and employees.

(v)    at your own cost and expense, in amounts and with carriers reasonably acceptable to us, (i) keep all properties in which you have an interest insured against such hazards and for such amounts, as is customary for companies engaged in businesses similar to yours; (ii) maintain a bond in such amounts as is customary for companies engaged in businesses similar to yours, insuring against criminal misappropriation of your employees; (iii) maintain marine cargo insurance covering Inventory in transit against such hazards and for such amounts as is customary for companies engaged in businesses similar to yours; (iv) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (v) maintain all such workers' compensation or similar insurance as may be required under the laws of any jurisdiction in which you are engaged in business; and (vi) furnish us with (A) copies of all policies and evidence of the maintenance of such policies, and (B) appropriate loss payable endorsements in form and substance satisfactory to us, naming us as loss payee as our interest may appear with respect to all insurance coverage referred to in clauses (i), (ii) and (iii) above with respect to the Collateral, any other property in which we may have a security interest under this agreement or the Other Documents, and proceeds thereof. If a loss occurs thereunder, (A) the carriers named therein hereby are directed by you and us to make payment for such loss to us and not to you and us jointly, (B) if any insurance losses are paid by check, draft or other instrument payable to you or to you and us jointly, we may endorse your name thereon and do such other things as we may deem advisable to reduce the same to cash, and (C) we are hereby authorized to adjust and compromise claims under insurance coverage referred to in clauses (i), (ii), (iii) and (vi) above. All loss recoveries received by us upon such insurance may be applied to the Obligations in such order as we in our sole discretion shall determine. In the event that the amount of the loss exceeds the amount of the recovery, such deficiency shall be paid by you to us, on demand; and in the event that all loss recoveries exceed the amount of all outstanding

S260/D4

GLAN 00608

Obligations and no Event of Default has occurred, we shall pay such excess to you unless we determine, in our sole discretion, that one or more third parties are entitled to all or part of such excess by contract or operation of law or one or more third parties assert a claim to all or part of such excess.

(vi) submit to us for our approval prior to execution any agreements pursuant to which you will sell or distribute your inventory.

(vii) you shall implement and have operating (if not already implemented and operating) within six months of the Effective Date a perpetual inventory control system acceptable to us in our sole and absolute discretion.

(viii) you shall on or before the Effective Date deliver to us in form and substance acceptable to us in our sole discretion in the following documents duly executed by you or the appropriate parties thereto;

      (A) the Guarantee,
      (B) the Inventory Security Agreement,
      (C) the Equipment Security Agreement,.
      (D) the Standby Letter of Credit,
      (E) the Subordination Agreement,
      (F) the Letter of Credit Financing Supplement,
      (G) your Certificate of Incorporation and By-laws,
      (H) all other documents required to be delivered hereunder or which we may request including but not limited to evidence of insurance and appropriate insurance policies (including but not limited to loss payee certificates).

(ix) you shall on the Effective Date, have on a consolidated basis, an excess availability, under all applicable formulas calculated pursuant to the Borrowing Base of at least $1,000,000.00 after applicable Reserves and payment and application of all proceeds of the Initial Advances and payment of all fees and expenses as provided for hereunder

    11.    TERMINATION

(a)    This agreement shall remain in full force and effect until terminated as follows:

(I)    We may terminate this agreement at any time upon ninety (90) days prior written notice to you. If not so terminated, this agreement shall remain in full force and effect unless you give us written notice of termination (by certified mail, return receipt requested) no less than ninety (90) days prior to and effective as of the third anniversary of the Effective Date; or any subsequent anniversary date of the Effective Date after the third anniversary date of the Effective Date (such third anniversary of the Effective Date and each anniversary of the Effective Date after the third anniversary date shall hereinafter be referred to as a "Termination Date").

(II)    If you shall suspend business, sell all or a significant portion of your assets, become insolvent or unable to pay debts as they mature, or if you do not pay any of the Obligations when required in accordance with the terms hereof, make an assignment for the benefit of creditors; or apply for an extension from creditors; or if a meeting of your creditors is called; or if a Receiver or Trustee shall be appointed for you or your property; or if your property shall become subject to any lien or attachment; or if a petition under the Federal Bankruptcy Code shall be filed by or against you; or if you shall seek relief under any insolvency statute, federal, state or other; or if a custodian shall be appointed for all or substantially all of your property; or if you shall breach this agreement or any other agreement between us; or any representation or warranty made by you hereunder or any of the related documents executed of even date herewith shall be untrue or false, or if you shall fail to pay any Obligation when due; or if any guaranty of the Obligations shall be terminated; or if ownership or control of twenty percent (20%) or more of your aggregate outstanding stock, stock equivalents and any other equity changes after the Effective Date; or if any other significant change in the identity of those in control of you (whether or not qualifying under the preceding "20%" provision) or any significant change in your management occurs after the Effective Date; or there occurs a material adverse change in your financial conditions or your business prospects as determined by us and our sole discretion, then in any of such events, we may terminate this agreement at any time without notice.

(iii)    notwithstanding Section 11(a)(i) you may also terminate this agreement at any time by giving us ninety (90) days prior notice to the requested termination date and by paying to us the Early Termination Fee and all other Obligations, as provided for in the second paragraph of Section 4(b)(ii).

(b)    On the effective date of termination all Obligations shall become immediately due and payable in full without further notice or demand. Our rights with respect to Obligations owing to us, or chargeable to your account, arising out of transactions having their inception prior to the effective date of termination, will not be affected by termination. Without limiting the foregoing, all of our security interests and other rights in and to all Collateral shall continue to be operative until such Obligations have been fully and finally satisfied or you have given us an indemnity satisfactory to us.

12.    **DEFINITIONS**

As used herein

"<u>Advances</u>" shall have the meaning set forth in Paragraph 4(a) hereof.

"<u>Alternate Base Rate</u>" shall mean, for any day, a rate per annum equal to the higher of (i) the Prime Rate in effect on such day and (ii) the Federal Funds Rate in effect on such day plus one-half of one percent (1/2%).

"<u>Bank</u>" shall mean The Bank of New York, New York, New York.

"<u>Borrowing Base</u>" shall mean the lesser of (a) $10,000,000.00 or (b) the sum of (i) ninety percent (90%) of Eligible Receivables, (which percentage may be decreased or adjusted at any time, in our sole discretion), plus (ii) the lesser of (x) fifty percent (50%) of Eligible Inventory or (y) $2,500,000 plus (iii) 100% of the face amount of the Standby Letter of Credit plus (iv) $500,000.00 during the period of May through October only during your fiscal year 2001 ("Seasonal Overadvance"), minus (v)  the face amount of any, outstanding Letters of Credit minus (iv) Reserves.

"<u>Borrowing Rate</u>" for each month shall mean an interest rate per annum which is one and one-quarter percent (1 1/4%) in excess of the average Alternate Base Rate in effect during such month.

"<u>Capital Expenditures</u>" shall mean, for any period, all payments made by or due (whether or not paid) from you during such period in respect of any asset which would be classified as property. Plant or equipment (including any payment in respect of any capital lease) or included in a comparable classification on your balance sheet prepared in accordance with GAAP.

"<u>Change of Ownership</u>" shall mean a change in the ownership of at least 51% of your capital common stock from the ownership by the Original Owners.

"<u>Closing Fee</u>" shall mean a non-refundable fee of $100,000.00 payable in two equal installments of $50,000.00 each the first of which shall have been paid at the time of your execution of the July 31, 2000 proposal letter and the other which shall be due and payable at the time of the closing of this Agreement.

"<u>Collateral</u>" shall mean all Receivables (including but not limited to all of your right, title and interest in and under the purchase agreement in respect of the assets of and/or capital stock of Brookfield International, Inc. a subsidiary of CHI Holdings, Inc.), all Inventory, all Equipment, Retained Goods, credit balances, and any other property in our possession or in the possession of any parent, affiliate or subsidiary of ours and any other security for the Obligations, whether coming into existence or into our or their possession before, on or after the Effective Date of termination and all proceeds thereof.

"<u>Credit Risk</u>" shall mean the risk of loss resulting solely and exclusively from the financial inability of your customer to pay at maturity a Receivable purchased hereunder. .

"<u>Default Rate</u>" shall mean an interest rate per annum which is two percent (2%) in excess of the Borrowing Rate or the Overadvance Rate, as the case may be.

"<u>Dispute</u>" shall mean any cause for nonpayment of Receivables, including, without limitation, any alleged defense, counterclaim, offset, dispute or other claim whether arising from or relating to the sale of goods or rendition of services or arising from or relating to any other transaction or occurrence, including, without limitation, any Year 2000 issue of your customer(s), except for financial inability of your customer to pay a Receivable at maturity.

"<u>EBITDA</u>" shall mean earnings before interest, taxes, depreciation and amortization.

"<u>Effective Date</u>" shall mean the date set forth in the introductory paragraph hereto.

"<u>Eligible Inventory</u>" shall mean and include all finished goods inventory (and raw materials and work in progress acceptable to us in our sole discretion) in good condition and fully packaged for retail sale which is located in the United States of America on premises of the Borrower, or at warehouses under contract to the Borrower (for which you have delivered to us warehouseman's waivers acceptable to us), valued at the lower of cost or market value, determined on a first-in-first-out basis, which is not, in our opinion, obsolete, slow moving or unmerchantable and which we, in our sole discretion, shall not deem ineligible inventory, based on such considerations as we may from time to time deem appropriate including, without limitation, whether the inventory is subject to a perfected, first priority security interest in our favor, whether the inventory conforms to all standards imposed by any governmental agency, division or department thereof which has regulatory authority over such goods or the use or sale thereof, and whether the inventory is currently usable or salable in the normal course of your business. We may from time to time after due diligence revise the standard of eligibility solely in our discretion exercised in good faith.

"<u>Eligible Receivables</u>" shall mean each Receivable on which we shall have the Credit Risk arising in the ordinary course of your business and which we, in our sole credit judgment, shall deem to be an Eligible Receivable, based on such considerations as we may from time to time deem appropriate. In general, a Receivable shall not be deemed eligible unless such Receivable is subject to our perfected security interest

and no other lien, and is evidenced by an invoice or other documentary evidence that arises out of a credit approved order and is otherwise satisfactory to us. In addition, no Receivable shall be an Eligible Receivable if:

(a)     it arises out of a sale made by you to an affiliate or to an entity controlled by an affiliate;

(b)     any covenant, representation or warranty contained in this agreement with respect to such Receivable has been breached;

(c)     the account debtor is also your creditor or supplier, or the account debtor has disputed liability, or the account debtor has made any claim with respect to any other Receivable due from such account debtor to you, or the Receivable otherwise is or may become subject to any right of setoff by the account debtor;

(d)     the account debtor has commenced a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or made an assignment for the benefit of creditors, or if a decree or order for relief has been entered by a court having jurisdiction in the premises in respect of the account debtor in an involuntary case under any state or federal bankruptcy laws, as now constituted or hereafter amended, or if any other petition or other application for relief under any state or federal bankruptcy law has been filed against the account debtor, or if the account debtor has failed, suspended business, ceased to be solvent, called a meeting of its creditors, or consented to or suffered a receiver, trustee, liquidator or custodian to be appointed for it or for all or a significant portion of its assets or affairs;

(e)     the sale is to an account debtor outside the continental United States, unless the sale is on letter of credit, guaranty or acceptance terms, in each case acceptable to us in our sole discretion;

(f)     the sale to the account debtor is on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment or any other repurchase or return basis or is evidenced by chattel paper;

(g)     we believe, in our sole judgment, that collection of such Receivable is insecure or that such Receivable may not be paid by reason of the account debtor's financial inability to pay;

(h)     the account debtor is the United States of America, any state or other governmental entity or any department, agency or instrumentality of any of them, unless you assign your right to payment of such Receivable to us pursuant to the Assignment of Claims Act of 1940, as amended (31 U.S.C. Section 203, *et seq.*), or have otherwise complied with other applicable statutes or ordinances;

(i)     the goods giving rise to such Receivable have not been shipped and delivered to and accepted by the account debtor or the services giving rise to such Receivable have not been performed by you and accepted by the account debtor or the Receivable otherwise does not represent a final sale;

(j)     the Receivables of the account debtor exceed a credit limit determined by us, in our sole discretion, to the extent such Receivable exceeds such limit;

(k)     the Receivable is subject to any offset, deduction, defense, dispute, or counterclaim or if the Receivable is contingent in any respect or for any reason;

(l)     you have made any agreement with any account debtor for any deduction therefrom, except for discounts or allowances made in the ordinary course of business for prompt payment, all of which discounts or allowances are reflected in the calculation of the face value of each respective invoice related thereto;

(m)     shipment of the merchandise or the rendition of services has not been completed;

(n)     any return, rejection or repossession of the merchandise has occurred;

(o)     such Receivable is not payable to you; or

(p)     such Receivable is not otherwise satisfactory to us as determined in good faith by us in the exercise of our discretion in a reasonable manner.

"Equipment" shall mean and include all present and hereafter acquired equipment, as defined in the Uniform Commercial Code, wherever located; and proceeds of the foregoing.

"Equipment Security Agreement" shall mean the Equipment Security Agreement of even date herewith granting GMAC COMMERCIAL CREDIT LLC a first priority lien in all of your Equipment.

"Event of Default" shall mean the occurrence of any of the events set forth in Paragraph 11(a)(ii) hereof.

"Federal Funds Rate" shall mean, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or if such day is not a business day, for the next preceding business day) by the Federal Reserve Bank of New York, or if such rate is not so published for any day which is a business day, the

average of quotations for such day on such transactions received by the Bank from three Federal funds brokers of recognized standing selected by the Bank.

"Fixed Charge Coverage Ratio" shall mean with respect to any computation period the ratio of EBITDA, less Capital Expenditures during any computation period to (B) the sum of (i) your total Interest Expense plus (ii) your total principal payments due under any other agreement, plus (iii) cash taxes during such computation period, plus (iv) capitalized lease payments during such computation period. Such Fixed Charge Coverage Ratio shall be measured quarterly at the end of each fiscal quarter.

"GAAP" shall mean generally accepted accounting principles in the United States of America in effect from time to time.

"Guarantee" shall mean a Guarantee of even date herewith executed by David Landay in a maximum amount of $3,500,000.00.

"Interest Bearing Obligations" shall have the meaning set forth in Paragraph 4(b)(i) hereof.

"Interest Expense" shall mean, for any period, interest expense with respect to all your outstanding indebtedness for such period in accordance with GAAP.

"Inventory" shall mean all of your now owned and hereinafter acquired goods, merchandise and other personal property, wherever located, to be furnished under any contract of service or held for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description which are or might be used or consumed in your business or used in selling or furnishing such goods, merchandise or other personal property, all documents of title or other documents representing them and all products and proceeds of the foregoing.

"Inventory Security Agreement" shall mean the Inventory Security Agreement of even date herewith granting a first priority lien to GMAC COMMERCIAL CREDIT LLC in all of your Inventory.

"Letters of Credit" shall mean all Letters of Credit opened or facilitated by us for your account pursuant to the Letter of Credit Financing Supplement to the Factoring Agreement which shall have an expiration date not later than the next following Termination Date.

"Letters of Credit Fees" shall mean the fees payable by you as stated in the Letter of Credit Financing Supplement to the Factoring Agreement.

"Letters of Credit Financing Supplement to Factoring Agreement" shall mean the Letter of Credit Financing Supplement to Factoring Agreement executed as of even date with this Agreement.

"Matured Funds Rate" shall mean the rate of interest, announced by us from time to time, as the rate applicable to matured funds, such rate to be adjusted automatically on the effective date of any change in such rate as announced by us.

"Maximum Loan Amount" shall mean $10,000,000.

"Minimum" shall have the meaning set forth in Paragraph 4(b)(ii) hereof.

"Minimum Volume Charge" shall have the meaning set forth in Paragraph 4(b)(ii) hereof.

"Obligations" shall mean and include all loans, Advances, debts, liabilities, obligations, covenants, duties and amounts of any nature whatsoever, for which you are now or hereafter obligated to us (or to any corporation that directly or indirectly controls or is controlled by or is under common control with us, including without limitation any parent, subsidiary and affiliate of ours), of every kind and description (whether or not evidenced by any note or other instrument and whether or not for the payment of money or the performance or non-performance of any act), direct or indirect, absolute or contingent, due or to become due, contractual or tortious, liquidated or unliquidated, whether arising under this or any other present or future agreement or other documentation, or by operation of law or otherwise, now existing or hereafter arising (whether before or after the filing of any petition in bankruptcy by or against you or the commencement of any other insolvency proceeding, including but not limited, to an assignment for the benefit of creditors), including, without limitation, any debt, liability or obligation now or hereafter owing from you to others, including without limitation any other present or future client(s) of ours, which we may have obtained or may obtain, by purchase, assignment, participation or otherwise, and further including without limitation, all interest, charges or any other payments you are required to make to us, together with all expenses and attorneys' fees and costs chargeable to your account or incurred by us in connection with your account, whether provided for herein or in any such other agreement or documentation.   Without limiting the foregoing, Obligations shall include the amounts of all Advances, loans, interest, commissions, customer late payment charges and bank related charges, costs, fees, expenses, taxes and all Receivables charged or chargeable to your account hereunder.

"Original Owners" shall mean the owners of the total outstanding stock issued by you as of the Effective Date.

"Overadvance Rate" for each month shall mean an interest rate per annum which is three and one-half percent (3.5%) in excess of the Alternate Base Rate in effect during such month.

"Partial First Year" shall have the meaning set forth in Paragraph 4(b)(ii) hereof.

"Partial Last Year" shall have the meaning set forth in Paragraph 4(b)(ii) hereof.

"Prime Rate" shall mean the prime commercial lending rate of the "Bank" as publicly announced to be in effect from time to time, such rate to be adjusted automatically, without notice, on the effective date of any change in such rate.

"Receivables" shall mean all amounts and all forms of obligations now or hereafter owing to you (including but not limited to accounts, instruments, contract rights, documents and chattel paper) and general intangibles (including but not limited to patents, copyrights, trademarks, trade names, licenses and tax refunds); all security therefor and guaranties thereof; all of your rights as an unpaid seller of goods and your rights to goods sold which may be represented thereby (including but not limited to your rights of replevin and stoppage in transit); all of your books of account, records, files, and documents relating thereto and the equipment containing said books, records, files and documents; all of your rights under insurance policies relating to the foregoing; the right to use the Trade Names in connection with our rights with respect to the goods; and all proceeds of the foregoing.

"Reduced Minimum" shall have the meaning set forth in Paragraph 4(b)(ii) hereof.

"Reports" shall have the meaning set forth in Paragraph 12(d) hereof.

"Reserves" shall have the meaning set forth in Paragraph 3 hereof.

"Retained Goods" shall mean returned or repossessed merchandise or other goods which by sale resulted in Receivables theretofore assigned to us.

"Sanction/Embargo Programs" shall mean economic and other sanctions and embargo program restrictions promulgated by the government of the United States of America or any officer or agency thereof including but not limited to the President and the Office of Foreign Assets Control of the Treasury Department, or either of them.

"Settlement Date" shall have the meaning set forth in Paragraph 3.

"Standby Letter of Credit" shall mean a Standby Letter of Credit issued by a bank acceptable to GMAC COMMERCIAL CREDIT LLC in its sole discretion, with a face amount of at least $4,100,000.00, in form and substance acceptable to GMAC COMMERCIAL CREDIT LLC in its sole discretion, to be delivered on a date of the closing of this Agreement.

"Subordination Agreement" shall mean the Subordination Agreement of even date herewith executed by David Landay by which he subordinates obligations owing to him by you in amounts of not less than $3,450,000.00.

"Tangible Net Worth" shall mean, at a particular date, all amounts which would be included under shareholders' equity plus subordinated debt minus intangible assets, all as reported on your balance sheet and determined in accordance with GAAP as at such date.

"Trade Names" shall mean all trade names or styles, trademarks, divisions or other names under which you conduct business.

"Unused Facility Fee" shall mean a fee per annum of one-quarter of one (1/4 of 1%) percent calculated on the difference between the Maximum Loan Amount and outstanding Advances as of the day of such calculation.

"Volume" shall have the meaning set forth in Paragraph 4(b)(ii) hereof.

"Year 2000 Issue" shall mean the inability of computer software, hardware and firmware systems and/or equipment containing embedded computer chips owned or operated by an individual, corporation, trust, unincorporated organization or other entity (each a "person") or used or relied upon in the conduct of a person's business (including systems and equipment supplied by others or with which such person's computer systems interface) to properly receive, transmit, process, manipulate, store, retrieve, re-transmit, without errors or delays, or in any other way to accurately recognize or otherwise utilize data and information in all respects in relation to the year 2000 or the inclusion of dates on or after January 1, 2000.

13.    PLACE OF PAYMENT; NEW YORK LAW AND COURT

(a)    All Obligations shall be paid at our office in New York, New York.

(b)    This agreement shall be governed by and construed according to the laws of the State of New York (without giving effect to its choice of law principles). All terms used herein, unless otherwise defined herein, shall have the meanings given in the New York Uniform Commercial Code.

(c)    You agree that all actions and proceedings arising out of or relating directly or indirectly to this agreement or any ancillary agreement or any other obligations shall be litigated in the United States District Court for the Southern District of New York or, at our option, in any other courts located in New York State or elsewhere as we may select, that such courts are convenient forums, and that you submit to the personal jurisdiction of such courts. You hereby consent to the service of process therein by registered or certified mail, return receipt requested, directed to you at your address set forth above, and you agree that service so made shall be deemed complete five (5) days after the date of mailing.

14.    REPORTS; RECORDS; ASSURANCES; WAIVERS; REMEDIES; ETC.

( a )    Upon request you shall periodically furnish us with statements showing your financial condition and the results of your operations. We may at all times have access to, and inspect, audit, and make extracts from, all of your records, files and books of account, and we may charge your account with the costs, fees or expenses incurred in connection therewith.

( b )    You shall perform all acts requested by us to perfect and maintain our security interest and other rights in the Collateral.

( c )    Failure by us to exercise any right, remedy or option under this agreement or delay by us in exercising the same will not operate as a waiver; no waiver by us will be effective unless we confirm it in writing and then only to the extent specifically stated.

( d )    We may charge to your account, when incurred by us, the amount of legal fees (including fees, expenses and costs payable or allocable to attorneys retained or employed by us) and other costs, fees and expenses incurred by us in negotiating or preparing this agreement and any legal documentation required by us or requested by you in connection with this agreement or any amendments or supplements thereof, or in enforcing our rights hereunder or in connection with the litigation of any controversy arising out of this agreement, or in protecting, preserving or perfecting our interest in, any Collateral, including without limitation all taxes assessed or payable with respect to any Collateral, and the costs of all public record filings, appraisals and searches relating to any Collateral. We may also charge to your account our then standard price for furnishing to you or your designees copies of any statements, records, files or other data (collectively "Reports") requested by you or them other than Reports of the kind furnished to you and our other clients on a regular, periodic basis in the ordinary course of our business. We may file Financing Statements under the Uniform Commercial Code without your signature or, if we so elect, sign and file them as your agent.

( e )    Our rights and remedies under this agreement will be cumulative and not exclusive of any other right or remedy we may have hereunder or under the Uniform Commercial Code or otherwise. Without limiting the foregoing, if we exercise our rights as a secured party we may, at any time or times, without demand, advertisement or notice, all of which you hereby waive, sell the Collateral, or any part of it, at public or private sale, for cash, upon credit, or otherwise, at our sole option and discretion, and we may bid or become purchaser at any such sale, free of any right of redemption which you hereby waive. After application of all Collateral to your Obligations (in such order and manner as we in our sole discretion shall determine), you shall remain liable to us for any deficiency.

( f )    We shall have no liability hereunder (i) for any losses or damages (including indirect, special or consequential damages) resulting from our refusal to assume, or delay in assuming, the Credit Risk, or any malfunction, failure or interruption of communication facilities, or labor difficulties, or other causes beyond our control; or (ii) for indirect, special or consequential damages arising from accounting errors with respect to your account with us. Our liability for any default by us hereunder shall be limited to a refund to you of any commission paid by you during the period starting on the occurrence of the default and ending when it is cured or waived, or when this agreement is terminated, whichever is earlier and any amount (but not including any consequential damages) which should have been, but was not, credited to your account pursuant to the terms hereof during such period due to any accounting error on our part.

( g )    This agreement cannot be changed or terminated orally and is for the benefit of and binding upon the parties and their respective successors and assigns except that you may not assign or transfer any of your rights or obligations under this Agreement without our prior written consent, and no such assignment or transfer of any such obligation shall relieve you thereof unless we have consented to such release in a writing specifically referring to the obligation from which you are to be released. This agreement, and any concurrent or subsequent written supplements thereto or amendments thereof signed by both of us, represent our entire understanding and supersede all inconsistent agreements and communications, written or oral, between your and our officers, employees, agents and other representatives.

( h )    This agreement shall not be effective unless signed by you below, and signed by us at the place for our acceptance.

( i )    TO THE EXTENT LEGALLY PERMISSIBLE, BOTH YOU AND WE WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY LITIGATION RELATING TO TRANSACTIONS UNDER THIS AGREEMENT, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

15.    APPLICATION OF PAYMENTS

We shall have the continuing and exclusive right to apply or reverse and reapply any and all proceeds of Collateral to any portion of the Obligations. To the extent that you make a payment or we receive any payment or proceeds of the Collateral for your benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause, then, to such extent, the Obligations or part thereof intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by us.

16.    INDEMNITY

You shall indemnify us from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against us in any litigation, proceeding or investigation instituted or conducted by any governmental agency or instrumentality or any other entity with respect to any aspect of, or any transaction contemplated by,

S260/D4

- 12 -

GLAN 00614

or referred to in, or any matter related to, this agreement, whether or not we are a party thereto, except to the extent that any of the foregoing arises out of our gross negligence or willful misconduct.

**17.     JOINT AND SEVERAL LIABILITY**

For purposes of clarification, Seneca Sports, Inc. and Brookfield International, Inc. shall be jointly and severally liable for all Obligations hereunder, and, each individually and collectively shall be deemed to have granted any and all assignments and security agreements granted or given under this Agreement.

Very truly yours,
GMAC COMMERCIAL CREDIT LLC

AGREED TO on this _19th_ day of September, 2000.

ATTEST:

_____
Secretary - Asst.

[SEAL]

SENECA SPORTS, INC.

By: _____
Title: _pres._

ATTEST:

_____
Secretary Asst.

[SEAL]

BROOKFIELD INTERNATIONAL, INC.

By: _____
Title: _pres._

ACCEPTED at New York, New York, as of the above date.

ATTEST:

_____
Secretary

[SEAL]

GMAC COMMERCIAL CREDIT LLC

By: _____
Title:

1290 Avenue of the Americas

SCHEDULE "A"

Additional Locations of Inventory

328 North Westwood Avenue
Toledo, Ohio 43607-3343

520 East Dresden
Kalkaska, Michigan 49840

6 South Main Street
Uxbridge, Massachusetts 01569
(retail store)

S260/D4

- 14 -

GLAN 00616

# EXHIBIT 2

## GUARANTY

**TO:    GMAC COMMERCIAL CREDIT LLC**

In consideration of your entering into or your refraining from terminating at this time a Factoring Agreement with Seneca Sports, Inc. and Brookfield International, Inc. (jointly and severally "Client"), bearing the effective date of September 19_____, 2000 (said Factoring Agreement as heretofore or hereafter amended, supplemented and/or restated is hereinafter called the "Agreement") the undersigned hereby guarantees to GMAC COMMERCIAL CREDIT LLC (hereinafter called the "Company"), its successors and assigns, the prompt payment at maturity, or whenever they may become due in accordance with any of their terms, of all now existing and hereafter arising liabilities, indebtedness and obligations of the Client to the Company (including "Obligations," as defined in the Agreement, if such term is defined therein), whenever and however arising or acquired by the Company, whether direct or indirect, absolute or contingent (collectively, the "Obligations") and whether the same may now be or hereafter become due from the Client or the executors, administrators, successors or assigns of the Client, including the cost of protest and all legal expenses of or for collection, or for realization upon any collateral for the Obligations ("Collateral") or other guaranty.  If this guaranty and/or any Obligation is placed with an attorney for collection, the undersigned further agrees to pay an attorney's fee of fifteen percent of any principal and interest due and demanded, which is hereby agreed to be just and reasonable and which shall be recoverable with the amount due under this guaranty.

Demand of payment, presentment, protest and notice of dishonor or non-payment are hereby expressly waived, and if any of the Obligations are payable on demand, the Company may, in its sole and absolute discretion, determine the reasonableness of the period, if any, to elapse prior to the making of demand.

The undersigned hereby consents and agrees that, without notice to or further assent from the undersigned, the time of payment of all or any of the Obligations, or any other provisions of the Obligations, may be extended, changed or modified, the parties thereto discharged, any or all Collateral released without obtaining other Collateral in substitution therefor, and any composition or settlement consummated and accepted, and that the undersigned will remain bound upon this guaranty notwithstanding one or more such extensions, changes, modifications, discharges, releases, compositions or settlements.  The undersigned further consents and agrees that this guaranty shall not be impaired or otherwise affected by any failure to call for, take, hold, protect or perfect, continue the perfection of or enforce any security interest in or other lien upon, any Collateral or by any failure to exercise, delay in the exercise, exercise or waiver of, or forbearance or other indulgence with respect to, any right or remedy available to the Company.  Any statement of account which is binding on the Client under the Agreement shall be binding on the undersigned for all purposes under this guaranty.

The Company may also at any time in its discretion sell, assign, transfer and deliver the whole of the Collateral, or any part thereof, or any substitutes therefor, or any additions thereto, at public or private sale, at any time or place selected by the Company, at such prices as it may deem best and either for cash or for credit or future delivery, at the option of the Company without either demand, advertisement or notice of any kind to the undersigned, which are hereby expressly waived.

The undersigned assigns, pledges and grants a security interest to the Company in any money or property belonging to the undersigned at any time in the possession of the Company or in the possession of any parent, affiliate or subsidiary of the Company (hereinafter called a "Related Company"), including any deposit balances and all property held by the Company or a Related Company for any purpose including safekeeping, custody, transmission, collection, or pledge, and all proceeds of the foregoing, as security for the performance by the undersigned of the obligations under this guaranty, whether due or not, with full power and authority to apply any such money, property and proceeds to the extinguishment of any such obligations and to sell, enforce, collect or otherwise realize on said money, property or proceeds in accordance with applicable law.

The undersigned agrees that the Company is not to be obligated in any manner to inquire into the powers of the Client, or its successors, its or their directors, officers, or agents, acting or purporting to act on its or their behalf, and any liabilities purporting to be contracted for the Client, or its successors, by its or their directors, officers, or agents, in the professed exercise of such powers, shall be deemed to form a part of the liabilities guaranteed hereunder even though the incurrence of such liabilities be in excess of the powers of the Client, its successors, or its or their directors, officers, or agents aforesaid, or shall be in any way irregular, defective or informal.

The liability of the undersigned on this guaranty shall be direct, immediate, absolute, continuing, unconditional and unlimited and not conditional or contingent upon the pursuit by the Company of whatever remedies it may have against the Client or the Client's successors, executors, administrators or assigns, or the security or liens it may possess, and this guaranty shall be and shall be construed as being and intended to be, a continuing guaranty of the payment of any and all Obligations either made, endorsed or contracted by the Client, or any successor of the Client, prior to the receipt by the Company of written notice of the revocation of this guaranty by the undersigned, and of all extensions or renewals thereof in whole or in part; and notwithstanding the death of, or the revocation of this guaranty by, the undersigned guarantor, the liability of the guarantor so revoking and of the estate of the guarantor who dies shall continue as to Obligations incurred or contracted by the Client, or any successor of the Client, prior to such revocation or death and as to all extensions and renewals thereof, in whole or in part.

**GLAN 00647**

If any payment of the Obligations is made by or for the benefit of the Client and is repaid by the Company to the Client or any other party pursuant to any federal, state or other law, including those relating to bankruptcy, insolvency, preference or fraudulent transfer, then to the extent of such repayment, the liability of the undersigned with respect to such Obligation shall continue in full force and effect. The undersigned agrees that if the Company gives to the undersigned written notice of the institution of any action or proceeding, legal or otherwise between the Company and the Client, the undersigned shall be conclusively bound by the adjudication in any such legal or other proceeding, or by any judgment or award decree entered therein.

Until such time as the Obligations have been fully and indefeasibly paid, the undersigned waives any claim or other right which the undersigned may now have or hereafter acquire against the Client or any other person that is primarily or contingently liable on any obligation that arises from the existence or performance of the undersigned's obligations under this guaranty, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution, or indemnification.

Notwithstanding anything to the contrary contained herein, the undersigned's liability hereunder shall not exceed a total maximum aggregate amount of $3,500,000.00. Such amount shall be in addition to a certain Standby Letter of Credit open for the account of the undersigned and/or theClient for the benefit of the Company.

The undersigned also waives the right to assert in any action or proceeding upon this guaranty any defenses, offsets or counterclaims which the undersigned may now or hereafter have. This guaranty shall be governed by and construed and interpreted in accordance with the laws of the State of New York (without giving effect to New York law on conflicts of law). All actions and proceedings arising out of or in connection with this guaranty, the Agreement and/or any transactions relating hereto and thereto, including without limitation for recognition or enforcement of any judgment, may be brought in the federal or state courts of the State of New York or, at the Company's option, in any other courts as the Company may select and the undersigned agrees that such courts are convenient forums and the undersigned unconditionally and irrevocably submits, for the undersigned and its property, to the nonexclusive personal jurisdiction of such courts. The undersigned agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. The undersigned additionally hereby waives: (a) personal service of process and consents that service of process upon the undersigned may be made by certified or registered mail, return receipt requested, directly to the undersigned at the address of the undersigned appearing below and service so made shall be deemed completed two (2) days after the same shall have been so mailed; (b) any claim that the undersigned is not personally subject to the jurisdiction of the above named courts; and (c) notice of the acceptance of this guaranty.   This guaranty cannot be altered or discharged orally.

THE UNDERSIGNED WAIVES THE RIGHT TO TRIAL BY JURY IN ALL ACTIONS BROUGHT BY OR AGAINST THE COMPANY.

IN WITNESS WHEREOF, the undersigned has duly executed these presents this _19_ day of _September_, 2000.

_____
Signature of Individual

David Landay
Typed Name of Individual

_85 E. India Row  #40F_
_Boston, MA    02110_
Address

STATE OF New York
                    } ss.
COUNTY OF New York

On this _19th_ day of _September_____, 2000, before me personally appeared David Landay to me known and known to me to be the individual described in and who executed the foregoing instrument and that such individual duly acknowledged to me that such individual executed same.

JOAN H. HIGHLAND
Notary Public, State of New York
No. 4984973
Qualified in Putnam County
Certificate filed in New York County
Commission Expires August 5, 2001

_____
Notary Public

GLAN 00648

# EXHIBIT 3

ANDREW J. CASNER, JR.
(1974-1999)
THOMAS D. EDWARDS
(1976-1987)
HASKELL A. KASSLER
WALTER H. MAYO III
MARTIN E. GREENBLATT
CHARLES M. HAMANN
ROBERT A. MURPHY
ROBERT E. COWDEN III
JOHN H. ASHBY
DOUGLAS K. MANSFIELD
ANDREW M. HIGGINS
TERRANCE J. HAMILTON
ANITA W. ROBBOY

**CASNER & EDWARDS, LLP**

ATTORNEYS AT LAW

ONE FEDERAL STREET

BOSTON, MASSACHUSETTS 02110

TELEPHONE

(617) 426-5900

FACSIMILE (617) 426-8810

ROBERT S. KUTNER
DAVID J. CHAVOLLA
STEPHEN M. PERRY
PETER A. CARO
GARY L. HOFF
GREGG S. BLACKBURN
LINDA A. OUELLETTE
JOAN M. GRIFFIN
DONNA B. MACKENNA
GARY L. KEMP
MATTHEW T. MURPHY
MARK W. WILLIAMSON
WILLIAM F. MCSWEENY III
CHRISTOPHER P. MAFFUCCI
KATHLEEN A. BROWN-PEREZ

September 19, 2000

GMAC Commercial Credit LLC
1290 Avenue of the Americas
New York, New York 10104

     Re: Factoring Arrangement between GMAC Commercial Credit LLC and
        Seneca Sports, Inc.

Gentlemen:

     We have acted as counsel to Seneca Sports, Inc., a Delaware corporation (the
"Borrower") and Brookfield International, Inc., as co-borrower, a Massachusetts corporation
(the "Corporate Guarantor"), in connection with the establishment of a factoring and lending
arrangement with you pursuant to a Factoring Agreement of even date herewith (the "Factoring
Agreement") and the following enumerated documents, each dated the date hereof, such
documents together with the Factoring Agreement being hereinbelow referred to collectively as
the "Loan Documents":

     1.     Letter of Credit Financing Supplement to Factoring Agreement;

     2.     Guaranty (the "Personal Guaranty") given by David L. Landay (the "Personal
Guarantor");

     3.     Guaranty (the "Corporate Guaranty") given by the Corporate Guarantor;

     4.     Subordination Agreement between the Personal Guarantor and you;

     5.     Equipment Security Agreement;

     6.     Inventory Security Agreement;

     7.     Factoring Agreement Letter of Credit Supplement; and

     8.     UCC-1 Financing Statements (the "Financing Statements").

GLAN 00635

## CASNER & EDWARDS, LLP

GMAC Commercial Credit LLC
September 19, 2000
Page 2

We have also acted as counsel to the Borrower and the Corporate Guarantor in connection with the purchase of specified assets (the "Assets") from Brookfield International, Inc., a Delaware Corporation (the "Seller") pursuant to an Amended and Restated Asset Purchase Agreement (the "Asset Agreement").

In connection with this opinion, we have examined executed copies or each of the Loan Documents and have also examined the Articles of Organization, the By-Laws and records of the corporate proceedings of the Borrower and the Corporate Guarantor and have examined and relied upon such other documents and certificates as to factual matters as we have deemed appropriate for purposes of this opinion. In our examination, we have assumed the genuineness of all signatures other than those of the Individual Guarantor, and officers or other representatives of the Borrower and the Corporate Guarantor. We have also assumed the authenticity of all documents submitted to us as originals, the conformity to original documents of documents submitted to us as certified or photostatic copies and the authenticity of the originals of such documents. We have assumed that you have all requisite power and authority and have taken all necessary action to enter into the transactions contemplated by the Loan Documents and to effect and to complete the transactions set forth therein.

Although we have made inquiries with respect to following matters and have relied upon representations of the officers and employees of the Borrower and the Corporate Guarantor (and nothing has come to our attention leading us to question the accuracy of such information), we have not, except as specifically noted herein, made any independent review or investigation of agreements, instruments, orders, judgments, rules or other regulations or decrees by which the Borrower or the Corporate Guarantor or any of their respective properties may be bound; the existence of actions, suits, investigations or proceedings, if any, pending or threatened against the Borrower or the Corporate Guarantor; or the validity or existence of the Borrower's or Corporate Guarantor's title to any property which either of them has transferred to you or with respect to which a security interest has been granted to you.

Our opinion is qualified to the extent that the validity or enforceability of any provisions in the Loan Documents or of any rights granted to you by the Borrower or other parties pursuant to any of such documents may be subject to and affected by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

In rendering the opinion set forth below we have assumed in reliance upon the Borrower's representations in the Loan Documents (i) that all accounts receivable arise from or relate to the sale of merchandise or services rendered by the Borrower or the Seller in the ordinary course of business; (ii) that the Borrower has, with respect to those properties as to

GLAN 00636

CASNER & EDWARDS, LLP

GMAC Commercial Credit LLC
September 19, 2000
Page 3

which a security interest or lien has been granted under the Loan Documents, "rights" in such property within the meaning of Section 9-203 of the Uniform Commercial Code as enacted in the Commonwealth of Massachusetts, G.L.c. 106 (the "Code"), consistent with and sufficient for purposes of granting security interests or liens therein, (iii) that the Financing Statements will be filed with the appropriate filing offices in those jurisdictions in which such property is located;

On the basis of the foregoing, and having regard to legal considerations which we deem relevant, we are of the opinion that:

1.      Based on the Certificate of the Secretary of State of Delaware, a copy of which is attached hereto as Exhibit A, the Borrower is a corporation duly organized, validly existing, and in corporate good standing under the laws of the State of Delaware and has been duly qualified and is in good standing as a foreign corporation under the laws of Commonwealth of Massachusetts and in each jurisdiction wherein the nature of the business transacted by it or its ownership of property requires such qualification. The Corporate Guarantor is a corporation duly organized, validly existing, and in corporate good standing under the laws of the Commonwealth of Massachusetts and as of the date of this opinion is not required to be qualified in any other jurisdiction.

2.      The Borrower and the Corporate Guarantor each has all requisite corporate power and authority to execute and deliver the Factoring Agreement and each of the other Loan Documents to which each of them, respectively, is a party and to consummate each of the transactions contemplated thereby.

3.      The execution, delivery and performance by the Borrower and the Corporate Guarantor of the Loan Documents to which either of them is a party have been duly authorized by all necessary action on the part of each of them respectively, and the execution delivery and performance of the Loan Documents and the consummation of the transactions contemplated thereby does not and will not, with the passage of time, the giving of notice, or both, (i) violate the Certificate of Incorporation or By-Laws of the Borrower or the Articles of Organization or By-Laws of the Corporate Guarantor, (ii) contravene any law, governmental rule or regulation applicable to the Borrower or the Corporate Guarantor, (iii) and, to our knowledge, violate or constitute a default under any contract, agreement or instrument to which the Borrower or the Corporate Guarantor is a party or by which any of their respective assets are bound.

4.      The Factoring Agreement and the other Loan Documents to which the Borrower is a party constitute the valid and binding agreements and obligations of the Borrower, enforceable against it in accordance with their respective terms. The Factoring Agreement and the other Loan Documents to which the Corporate Guarantor is a party constitute the valid and

CASNER & EDWARDS, LLP

GMAC Commercial Credit LLC
September 19, 2000
Page 4

binding agreements and obligations of the Corporate Guarantor, enforceable against it in
accordance with their respective terms.

5.    The security interests and liens granted by the Borrower to you under the Loan
Documents constitute valid security interests and liens upon the property therein described which
security interests and liens will be perfected upon compliance with the filing or recording
requirements of those jurisdictions in which such property is located.

6.    To our knowledge, the Borrower has all license, permits or authorities required to
conduct its business as such business is currently conducted.

7.    The Subordination Agreement and the Guaranty constitute the valid and binding
agreements of the Individual Guarantor, each enforceable against the Individual Guarantor in
accordance with their respective terms.

8.    To our knowledge, there are no actions, suits, or proceedings pending or, to the
knowledge of the Borrower, threatened against or affecting the Borrower in any court or before
any governmental commission, board or authority, which if adversely determined, will have a
material adverse effect on the ability of the Borrower to perform its obligations under the Loan
Documents.

9.    The purchase by the Borrower of the Assets from the Seller has occurred
concurrently with the closing of the transactions contemplated by the Loan Documents and the
funding of the credit facility under the Factoring Agreement. All material transfers of
intellectual property licenses and other consents required to be obtained under the Purchase
Agreement in order to put the Borrower or the Corporate Guarantor in possession of the Assets
have been received.

10.    We have been informed that the Seller is not licensed to do business as a foreign
corporation in the State of Ohio. Although we are not qualified to practice in the State of Ohio,
we direct your attention to §1703.29 of the Ohio Revised Code which provides, in part, that:

"[t]he failure of any corporation to obtain a license under sections 1703.01 to
1703.31, inclusive, of the Revised Code, does not affect the validity of any
contract with such corporation, but nor foreign corporation which should have
obtained such license shall maintain any action in any court until it has obtained
such license."

11.    You have also made inquiry with respect to the compliance or absence of
compliance with the bulk sales provisions of the Uniform Commercial Code as enacted in Ohio

CASNER & EDWARDS, LLP

GMAC Commercial Credit LLC
September 19, 2000
Page 5

(the "Ohio Code"). Having reviewed the Ohio Code, we note that the provisions thereof relating to bulk transfers were repealed effective August 15, 1996.

12.      A court sitting in Massachusetts would give effect to the choice of laws provisions of the Factoring Agreement and other Loan Documents.

13.      Provided you have complied with the applicable provisions of G.L. c. 271, §49, by making the required filing in the form attached hereto with the Criminal Bureau of the Attorney General of the Commonwealth of Massachusetts and by keeping records at the location within the Commonwealth of Massachusetts as specified therein, the transactions contemplated by the Factoring Agreement and other Loan Documents will not result in collections from the Borrower of any sums which would cause this transaction to be in violation of the usury laws of the Commonwealth of Massachusetts or other applicable laws of the Commonwealth of Massachusetts regulating the charges which may be imposed upon a borrower for the loan or use of money.

In basing the opinions and other matters set forth herein on our knowledge, the words "our knowledge" signify that, in the course of our representation of the Borrower in matters with respect to which we have been engaged by the Borrower as its counsel, no information has come to our attention which would give us actual knowledge or actual notice that any such opinions or other matters are not accurate or that any of the foregoing documents, certificates, reports and information on which we have relied are not accurate and complete. Except as otherwise stated herein, we have undertaken no independent investigation or verification of such matters. The words "our knowledge" and similar language used herein are intended to be limited to the knowledge of the lawyers within our firm who have recently worked on matters on behalf of the Borrower.

We are admitted to practice law only in the Commonwealth of Massachusetts, and accordingly, we express no opinion with respect to the laws of any jurisdiction other than those of the Commonwealth of Massachusetts and the federal laws of the United States.

The opinions expressed in this letter are solely for your use and the use of your assignees and these opinions may not be relied on by any other persons without our prior written approval.

Very truly yours,

Casner & Edwards LLP

# 165631

GLAN 00639