# EXHIBIT G

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                    SUPERIOR COURT DEPARTMENT
                                                CIVIL ACTION NO. 03-5879E

---

DAVID L. LANDAY,

        Plaintiff

v.

GARY L. HOFF, CASNER & EDWARDS, LLP,
DAVID B. MADOFF, and CONN, KHOURY,
MADOFF & WHITESELL LLP,

        Defendants.

---

## **COMPLAINT**

### **The Parties**

1.    Plaintiff David L. Landay ("Landay") is an individual domiciled in the State of Florida.

2.    Gary L. Hoff ("Hoff") is an attorney and a member of the Bar of the Commonwealth Massachusetts, with his principal place of business at Boston, Massachusetts. On information and belief, Hoff is a partner of Casner & Edwards, LLP.

3.    Casner & Edwards, LLP is a limited partnership duly formed for the practice of law pursuant to the laws of the Commonwealth of Massachusetts, with its principal place of business at Boston, Massachusetts.

4.    David B. Madoff ("Madoff") is an attorney and a member of the Bar of the Commonwealth of Massachusetts, with his principal place of business at Boston, Massachusetts. On information and belief, Madoff is a partner of Cohn, Khoury, Madoff & Whitesell LLP.

5.  Cohn, Khoury, Madoff & Whitesell, LLP is a limited partnership duly formed for the practice of law pursuant to the laws of the Commonwealth of Massachusetts, with its principal place of business at Boston, Massachusetts.

## COUNT I

### Professional Negligence against Hoff and Casner & Edwards, LLP

6.  The allegations in paragraphs 1-5 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

7.  Seneca Sports, Inc. ("Seneca") is a corporation duly organized under the laws of the State of Delaware, which, as of January 1, 2000 was engaged in the business of distributing various sporting goods products to large retail chains and other stores.

8.  As of this date, Landay was President, Chief Executive Officer and a large stockholder of Seneca.

9.  Commencing on or about February 1, 2000, Landay began negotiations with representatives of Craft House International for the sale of certain assets of its subsidiary, Brookfield International, Inc. ("Brookfield").

10. At all relevant times, Hoff and Casner & Edwards, LLP represented Seneca in connection with the Brookfield Acquisition and the financing that was related to such acquisition. For example, pursuant to this engagement, on or about February 28, 2001, Hoff drafted a letter of intent with regard to the Brookfield acquisition. Also, beginning in April of 2000, Hoff performed services on behalf of Seneca with respect to documenting the terms of the proposed purchase and sale.

11. At all relevant times, Hoff and Casner & Edwards, LLP also advised and represented Landay personally with respect to matters relating to the Brookfield

2

Acquisition and the financing related to that acquisition. For example, on or about May 18, 2000, Hoff reviewed and revised a letter prepared by Landay to the other stockholders in which Landay requested the stockholders to approve the issuance of additional shares of stock to him in light of the necessity for him to put up cash collateral and a personal guaranty in connection with the borrowing necessary to effectuate the proposed acquisition.

12. In the Spring and Summer of 2000, Hoff and Casner & Edwards, LLP continued to represent Seneca and Landay with regard to the Brookfield acquisition, with regard to the proposed financing of the transaction and the refinancing of the credit line which the company used for its day-to-day operations.

13. On or about July 31, 2000, the proposed lender, GMAC Commercial Credit LLC ("GMAC") issued a letter of intent, which Landay signed on August 1, 2000.

14. According to this letter of intent and the accompanying term sheet, GMAC would provide revolving advances and loans, potentially in the amount of $10,000,000; Seneca and Brookfield International, Inc. (Seneca's new subsidiary, "Brookfield II") would provide a first priority security interest in their assets, and Landay would agree to subordinate an existing secured loan of $3,250,000 which Seneca owed Landay, put up personally a Stand-By Letter of Credit in the amount of $4,100,000 and issue a personal guaranty of the loan obligations of Seneca and Brookfield II (the "Borrowers") in the amount of $3,500,000.

15. As part of his work on behalf of Seneca and Landay, Hoff began reviewing and commenting on the various documents prepared by GMAC's attorneys.

16. For example, on August 15, 2000, Hoff forwarded comments to GMAC's attorneys regarding the Factoring Agreement and the Subordination Agreement, which

Landay was to provide pursuant to the July 31, 2000 letter of intent, as well as his Personal Guaranty.

17.     Simultaneously, Hoff was continuing to negotiate changes to the "Amended and Restated Purchase Agreement" with Brookfield and Craft House International.

18.     In the course of his joint representation of Seneca and Landay, Hoff gave substantial attention to the final documentation of both the Brookfield acquisition and the GMAC financing. In the course of this work, Hoff specifically reviewed and commented on the documents which Landay was required to sign in his personal capacity in order to facilitate the GMAC financing and the Brookfield acquisition. These documents included a Subordination Agreement, a Stand-by Letter of Credit in the amount of $4,100,000 and a Personal Guaranty in the additional amount of $3,500,000.

19.     In the Personal Guaranty, the following language appeared: "[t]he undersigned also waives the right to assert in any action or proceeding upon this guaranty any defenses, offsets or counterclaims which he may now or hereinafter have. The guaranty shall be governed by and construed and interpreted in accordance with the laws of the State of New York . . . ."

20.     On September 19, 2000, the GMAC financing and the Brookfield acquisition closed. The terms of the financing transaction with GMAC were essentially as outlined in paragraphs 14, 18 and 19 above. Hoff was present at the closing.

21.     During the course of their representation of Landay, Defendants' conduct was below the standard of care of the average qualified corporate attorney practicing in the Boston metropolitan area.

4

22. In this regard, Defendants' conduct with respect to their representation of Landay in the Brookfield acquisition and the GMAC financing was negligent and amounted to a breach of their professional duties to Landay in at least the following respects:

(a) Hoff never advised Landay that he should seek independent legal advice in light of the actual or potential conflict of interest between his position and Seneca's;

(b) Hoff did not appropriately analyze the transaction on Landay's behalf and explain to him the nature of the risks which Landay would be incurring in that transaction;

(c) Hoff did not explain to Landay the significance of the language in the Personal Guaranty; and

(d) Hoff failed to advise Landay with regard to all relevant considerations, including the nature of the risks which he was being asked to take in connection with the GMAC financing.

(e) Hoff failed to provide for Landay to have any security interest in the assets of Seneca/Brookfield II with respect to his guaranty of the GMAC debt which Landay might be called upon to satisfy; and he also failed to provide Landay with the legal means to protect his interests following any GMAC collection from him pursuant to the terms of his guaranty.

23. Had Hoff advised Landay that he should seek independent legal advice with regard to the proposed transactions, competent counsel would have advised Landay of the risks inherent in the proposed GMAC financing, as further enhanced by the language of the Personal Guaranty.

24. Had Landay received competent advice with regard to the proposed GMAC financing, he would not have accepted the GMAC proposal.

25. In the Fall of 2001, claiming Borrowers' default and nonpayment, GMAC collected the September 19, 2000 Letter of Credit, a $250,000 Letter of Credit which Landay had provided as additional collateral, and $1,000,000 which Landay had subsequently deposited as additional security, took possession of Seneca's assets, and

5

proceeded to liquidate the assets of Seneca/Brookfield II. Thereafter, GMAC sued Landay under the Personal Guaranty for an additional sum of money in the courts of the State of New York.

26. As a direct and proximate result of Defendants' breach of their professional duties to him, Landay has suffered damages, including but not limited to sums collected or to be collected from him by GMAC, as well as legal fees incurred or to be incurred in defending the New York action.

WHEREFORE, Landay demands judgment for the full amount of damages suffered by him, together with interest and costs.

## COUNT II

### Breach of Fiduciary Duty against Hoff and Casner & Edwards, LLP

27. The allegations in paragraphs 1-26 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

28. As Landay's attorneys, Hoff and Casner & Edwards owed him a fiduciary duty to act fairly and in good faith in their dealings with him, and to act with absolute fidelity to Landay's genuine interests throughout their representation of him.

29. Hoff and Casner & Edwards, LLP breached that duty with respect to the representation of Landay.

30. As a direct and proximate result of Defendants' breach of their professional duties to him, Landay has suffered damages, including but not limited to sums collected or to be collected from him by GMAC, as well as legal fees incurred or to be incurred in defending the New York action.

WHEREFORE, Landay demands judgment for the full amount of damages suffered by him, together with interest and costs.

## COUNT III

### Chapter 93A Claim against Hoff and Casner & Edwards, LLP

31. The allegations in paragraphs 1-30 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

32. Landay and Hoff and Casner & Edwards, LLP are and were at all relevant times engaged in trade or commerce in the Commonwealth of Massachusetts within the meaning of Mass. Gen. L. c. 93A.

33. Defendants' conduct as set forth above constitutes unfair and deceptive acts or practices in violation of Mass. Gen. L. c. 93A, §§2 and 11.

34. As a direct and proximate result of Defendants' conduct, Landay has suffered a loss of money or property, including but not limited to sums collected or to be collected from him by GMAC, as well as legal fees incurred in defending the New York action.

WHEREFORE, Landay demands judgment of the full amount of damages suffered under Mass. Gen. L. c. 93A, plus interest, costs, and reasonable attorneys' fees.

## COUNT IV

### Professional Negligence against Madoff and Cohn, Khoury, Madoff & Whitesell LLP

35. The allegations in paragraphs 1-20 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

36. The principal vehicle by which GMAC agreed to finance the day-to-day operations of Seneca and Brookfield II was a Factoring Agreement providing for a line of credit of up to $10,000,000 secured by the accounts receivable, inventory and certain other assets of the Borrowers.

7

37. On or about July 1, 2001, GMAC claimed that the Borrowers were in default of the requirements of the Factoring Agreement.

38. At about this time, Landay, both on his own behalf and on behalf of Seneca/Brookfield II, consulted the firm Cohn & Kelakos, LLP, as the firm of Cohn, Khoury, Madoff & Whitesell LLP was then known, which firm held itself out as bankruptcy and work-out specialists. Madoff undertook to represent Seneca/Brookfield II and Landay on behalf of that firm.

39. In his initial discussions with Madoff, Landay reviewed the overall situation which then presented itself to Seneca/Brookfield II and to him personally and specifically asked Madoff whether he should take steps to put Seneca/Brookfield II into bankruptcy. Madoff advised Landay not to do so.

40. In reliance on this advice, Landay entered a Forbearance Agreement with GMAC. Madoff provided the legal services on behalf of both Landay and Seneca/Brookfield II in connection with this Forbearance Agreement, including the negotiation and review of its terms and those of related documents. Because of delays on GMAC's part, the Forbearance Agreement was not signed by GMAC until on or about August 9, 2001.

41. In connection with the Forbearance Agreement, Landay personally provided to GMAC additional collateral in the form of a $1,000,000 cash deposit in a Bankers Trust account in GMAC's name, agreed to an extension of the expiration date of a Letter of Credit that he had previously provided, and agreed to increase the amount of the limit on his liability to GMAC under his Personal Guaranty, from $3,500,000 to $4,500,000. He also executed a ratification of the terms of his Personal Guaranty.

42. The Forbearance Agreement incorporated a financial plan that, inter alia, (a) called for borrowings from GMAC in accordance with a schedule and (b) called for the Borrowers to meet specific projections on a weekly basis. The funding of the loan in accordance with the schedule would enable Seneca and Brookfield II to meet their projections on schedule.

43. GMAC delayed its execution of the Forbearance Agreement and its funding to a date that caused the Borrowers to be in default under the Forbearance Agreement from the outset. Specifically, the late execution and funding made it impossible for the Borrowers to meet their projections.

44. Notwithstanding the fact that, due to the delayed execution and implementation of the Forbearance Agreement, the Borrowers were placed in default of its terms, Madoff did not advise Landay not to execute or implement the Forbearance Agreement and instead cause Seneca and Brookfield to file for bankruptcy.

45. On September 25, 2001, relying on certain alleged "Additional Defaults," GMAC terminated the Forbearance Agreement and wrote letters to Seneca/Brookfield and to Landay in his personal capacity demanding full payment of the claimed $7,372,000 indebtedness of the Borrowers.

46. Again, Landay, acting on his own behalf as well as Borrowers' behalf, discussed with Madoff the advisability of putting Seneca and Brookfield II in bankruptcy. Again, Madoff advised Landay not to do so.

47. Thereafter, GMAC collected the September 19, 2000 $4,100,000 Letter of Credit given by Landay, an additional $250,000 Letter of Credit subsequently given by Landay and the $1,000,000 Cash Deposit provided by Landay in connection with the Forbearance Agreement.

9

48. Additionally, on or about October 22, 2001, GMAC seized all other collateral pledged by Seneca/Brookfield II, including all accounts receivable and inventory. When Landay sought Madoff's advice concerning seizure of assets by GMAC and the option of bankruptcy, Madoff again advised against bankruptcy and told Landay to give GMAC the keys to Seneca's office

49. GMAC credited the Borrowers (and Landay) with far less for the liquidation of these assets than would have been obtained from an orderly collection of receivables and liquidation of inventory and other assets in bankruptcy. Subsequently, GMAC sued Landay in the Courts of the State of New York for a claimed balance on his Personal Guaranty.

50. At no time did Madoff advise Landay that he should seek independent legal advice in light of the actual or potential conflict of interest between his position and that of Seneca/Brookfield II.

51. During the course of their representation of Landay, Defendants' conduct was below the standard of care of the average qualified attorney specializing in bankruptcy and business work-outs practicing in the Boston metropolitan area.

52. In this regard, Defendants' conduct with respect to their representation of Landay with regard to bankruptcy matters and to the GMAC Forbearance Agreement was negligent and amounted to a breach of their professional duties to Landay.

53. Had Madoff advised Landay to obtain independent counsel, a competent attorney would have advised Landay that he should not sign the Forbearance Agreement and provide the extra $1,000,000 guarantee and cash collateral, but should cause Seneca/Brookfield II to seek the protection of the Bankruptcy Court.

54. Landay would have followed this advice, had it been given, and caused Seneca/Brookfield II to file a petition in bankruptcy.

55. Had a bankruptcy petition been filed, the receivables of Seneca and Brookfield II would have been collected in an orderly and reasonable manner and their inventory would have been liquidated in a similar manner, thus significantly reducing the Borrowers' and Landay's indebtedness to GMAC.

56. As a direct and proximate result of Defendants' breach of their professional duties to him, Landay has suffered damages including but not limited to sums collected or to be collected from him by GMAC, as well as legal fees incurred or to be incurred in defending the New York action.

WHEREFORE, Landay demands judgment of the full amount of damages suffered by him, together with interest and costs.

## COUNT V

### Breach of Fiduciary Duty against Madoff and Cohn, Khoury, Madoff & Whitesell LLP

57. The allegations in paragraphs 1-20 and 35-56 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

58. As Landay's attorney, Madoff and Cohn, Khoury, Madoff and Whitesell LLP owed him a fiduciary duty to act fairly and in good faith in their dealings with Landay, and to act with absolute fidelity to Landay's genuine interests throughout their representation of Landay.

59. Madoff and Cohn, Khoury, Madoff and Whitesell LLP breached that duty with respect to their representation in connection with giving bankruptcy and other legal advice.

60. As a direct and proximate result of Defendants' breach of their professional duties to him, Landay has suffered damages including but not limited to sums collected or to be collected from him by GMAC, as well as legal fees incurred or to be incurred in defending the New York action.

WHEREFORE, Landay demands judgment of the full amount of damages suffered by him, together with interest and costs.

### COUNT VI

### Chapter 93A Claim against Madoff and Cohn, Khoury, Madoff & Whitesell LLP

61. The allegations in paragraphs 1-20 and 35-60 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

62. Landay and Madoff and Cohn, Khoury, Madoff & Whitesell LLP are and were at all relevant times engaged in trade or commerce in the Commonwealth of Massachusetts within the meaning of Mass. Gen. L. c. 93A.

63. Defendants' conduct as set forth above constitutes unfair and deceptive acts or practices in violation of Mass. Gen. L. C. 93A, §§2 and 11.

64. As a direct and proximate result of Defendants' conduct, Landay has suffered a loss or money or property including but not limited to sums collected or to be collected from him by GMAC, as well as the legal fees incurred or to be incurred in defending the New York action.

WHEREFORE, Landay demands judgment of the full amount of damages suffered under Mass. Gen. L. C. c. 93A, plus interest, costs and attorneys' fees.

## DEMAND FOR JURY TRIAL

Plaintiff demands a Jury Trial on all issues in his Complaint so triable.

DAVID LANDAY,

By his attorneys,

*Alan R. Hoffman*
Alan R. Hoffman, BBO #236860
LYNCH, BREWER, HOFFMAN & FINK, LLP
101 Federal Street, 22nd Floor
Boston, MA 02110-1800
(617) 951-0800

Dated: 12/15/03

169259_2.DOC

13