UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID L. LANDAY,<br>　　　Plaintiff,<br><br>　　　v.<br><br>GMAC COMMERCIAL CREDIT LLC<br>and GMAC COMMERCIAL FINANCE<br>LLC,<br>　　　Defendants. | )<br>)<br>)<br>)<br>)　　Civil Action No. 04-cv-11955-WGY<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON USURY COUNT

Plaintiff David L. Landay's summary judgment memorandum leaves no doubt that his usury claim arises out of the September 19, 2000 Factoring Agreement that he executed on behalf of Seneca Sports, Inc. and Brookfield International, Inc. (collectively, the "Borrowers") with defendant GMAC CF (the "Factoring Agreement"). In his memorandum, Landay alleges that GMAC CF violated Mass. Gen. Laws ch. 271, § 49, because it assessed usurious charges against the Borrowers that were "specifically provided for in the Factoring Agreement." Pl.'s Mem. at 12. However, the Factoring Agreement explicitly states that New York law governs the transaction and, more specifically, that GMAC CF can charge "the highest interest permitted under New York law." *See* Statement of Undisputed Material Facts ¶ 8. Thus, the Massachusetts usury statute is not applicable here, and GMAC CF, not Landay, is entitled to summary judgment on Count II.

Even if Landay's usury claim somehow arose out of his personal Guaranty (the "Guaranty") the result is the same because: (1) the Guaranty also contains a New York choice-of-law provision; and (2) even if this Court permitted Landay to ignore the contractual choice of

law provisions in both the Factoring Agreement and the Guaranty, Massachusetts choice-of-law rules require the application of New York law to Landay's usury claim. Furthermore, Landay lacks standing to assert a usury claim against GMAC CF, and he repeatedly waived any right to assert such a claim. Finally, the transaction in question was not usurious. At the very least, factual disputes preclude the entry of summary judgment in Landay's favor.[1]

## I.    FACTS

### A.    Background To Factoring Agreement

Landay is a sophisticated businessman, who possessed more than three decades of corporate executive experience before he executed the 2000 Loan Agreement with GMAC CF. Defs.' Statement of Undisputed Material Facts (Docket No. 54) ¶ 2.[2] From about 1967 until 1985, he served as president of Brookfield Athletic Shoe. *Id.* ¶ 2. He then spent approximately five years as an executive vice president of Hyde Athletic Industries. *Id.* In 1990, Landay moved to Seneca where he became its president, CEO and treasurer. *Id.* ¶¶ 1-2.

During the thirty-three years or so that he worked as a top corporate manager, Landay negotiated and entered into other complex financing arrangements. *See* Statement of Disputed and Additional Facts at 6 ¶ 1. For example, before entering into the 2000 Loan Agreements, Seneca participated in a multi-million-dollar financing arrangement with Bank of Boston. *Id.* ¶ 1. Not surprisingly, Landay first approached Bank of Boston when he sought financing to acquire Brookfield. *Id.* ¶¶ 1-2. For whatever reason, Bank of Boston declined to extend the requested credit. *Id.* Landay then turned to Wells Fargo and General Electric, but they also

---

[1]    The factual disputes that prevent the entry of partial summary in favor of Landay do not impact GMAC CF's motion for summary judgment because they are not germane to any of the grounds relied upon in support of that motion. *See* Docket No. 53.

[2]    The citations are to either the statement of undisputed facts, *see* Docket No. 54 ("Statement of Undisputed Facts"), Defendants' Appendix of Exhibits, *see* Docket No. 55 ("Appx. Ex. __"), or the Defendants' Statement of Disputed Facts and Additional Material Facts ("Statement of Disputed and Additional Facts").

BOS_513707_6.DOC/MDUBNOFF

rejected his request for financing. *Id.* ¶ 3. Only then did Landay seek out GMAC CF, *id.* ¶ 4, a New York limited liability company with its principal office in New York. Statement of Undisputed Facts ¶ 3.

Gary L. Hoff of the law firm Casner & Edwards, LLP ("Casner") represented Landay and the Borrowers throughout their negotiations with GMAC CF. Statement of Disputed and Additional Facts ¶ 5. Louis G. Marcus, an attorney licensed and based in New York, represented GMAC CF. *Id.* Marcus conducted all of his pre-closing communications with Hoff from New York. *Id.* In addition, Landay and Hoff met with Marcus for many hours in New York before agreeing on the final terms of the 2000 Loan Agreement. *Id.* ¶ 6. The closing, itself, took place in New York on or about September 19, 2000. *Id.*

### B.    The 2000 Loan Agreement

Landay signed the Factoring Agreement as President of the Borrowers. Statement of Undisputed Facts ¶ 6. Pursuant to the Factoring Agreement, GMAC CF extended a line of credit of up to $10 million to the Borrowers, secured by the Borrowers' accounts receivable and other assets. *Id.* ¶¶ 5, 7 and Appx. Ex. 3. The Factoring Agreement permitted the Borrowers to request loans or advances from time to time and provided that the future proceeds that the Borrowers expected to receive from separate receivables would secure such loans. *Id.* Over time, the Borrowers paid back some advances, while receiving new ones on a revolving basis. *See generally id.* Thus, there was no single "loan" to the Borrowers.

Each advance that GMAC CF made to the Borrowers took the form of a wire transfer from GMAC CF's New York offices. Statement of Disputed and Additional Facts ¶ 9. The Factoring Agreement permitted GMAC CF to assess interest on each advance at a rate of between six percent (6%) annually and (the highest rate permitted by New York Law)." Appx.

BOS_513707_6.DOC/MDUBNOFF

Ex. 3 at 2, ¶ 4 (b)(i). The Factoring Agreement also allowed for the assessment of charges for wire transfers, letter of credit fees, unused facility fees, and other collection costs. See Statement of Undisputed Facts ¶ 8. Additionally, it stated that all of the Borrower's obligations "shall be paid at our office in New York, New York," Appx. Ex. 3 at 11 ¶ (a), and that the Factoring Agreement was to "be governed by and construed according to the laws of the State of New York (without giving effect to its choice of law principles)." *Id.* at 11 ¶ 13(b).

Landay's Guaranty, like the Factoring Agreement, also stated that it was to be "governed and construed and interpreted in accordance with the laws of the State by New York (without giving effect to New York law on conflicts of law)." Appx. Ex. 4 at 2. The Guaranty further provided that Landay waived "the right to assert in any action or proceeding upon this guaranty any defenses, offsets or counterclaims…" *Id.* at 2. Landay consulted with counsel before executing the Guaranty, Statement of Undisputed Facts ¶ 12, and Casner provided GMAC CF with an Opinion Letter that included, among other things, an acknowledgement that New York law governed all of the loan documents. Statement of Disputed and Additional Facts ¶ 7.

Interestingly, Landay is now suing Hoff and Casner in Massachusetts Superior Court for professional negligence and related torts stemming from their representation of him. *Id.* ¶ 8. In that lawsuit, Landay alleges that his lawyers committed malpractice by, among other things, failing to properly advise him that New York law would govern the Guaranty and that upon execution of the Guaranty, he would waive all of his defenses, offsets and counterclaims. *Id.*

## C.     The 2001 Loan Documents

As of August 9, 2001, the Borrowers were in default of numerous provisions of the Factoring Agreement. Statement of Undisputed Facts ¶ 26. In order to induce GMAC CF not to immediately exercise its rights as a secured creditor, Landay, after consulting with counsel,

BOS_513707_6.DOC/MDUBNOFF

executed a Forbearance Agreement (the "Forbearance Agreement") with GMAC CF on behalf of the Borrowers. *Id.* ¶¶ 27-29. In the Forbearance Agreement, the Borrowers acknowledged that they owed GMAC CF the aggregate principal amount of $6,719,177.62. *Id.* ¶ 31. The Borrowers also released GMAC CF from "any and all actions, causes of actions, suits ... claims and demands whatsoever." *Id.* The Forbearance Agreement further stated that New York law governed its "construction, interpretation and enforcement." *Id.*

In conjunction with the Forbearance Agreement, Landay signed a Ratification and Amendment of Guaranty on August 9, 2001, which ratified "all terms and provisions of the Guaranty" (the "Ratification of Guaranty"). *Id.* ¶¶ 32-35. In the Ratification of Guaranty, Landay confirmed that his obligations under the Guaranty were due and owing to GMAC CF "without offset, defense or counterclaim of any kind, nature or description whatsoever." *Id.* ¶ 36.

### D.    The Borrowers' Post-Default Interest Charges

By letters dated September 25, 2001, GMAC CF notified the Borrowers and Landay of the Borrowers' default under the terms of the Forbearance Agreement and demanded payment. *Id.*¶ 45. After collecting certain personal collateral of Landay and applying it to the Borrowers' loan balance, GMAC CF took peaceful possession of certain of the Borrowers' assets on October 22, 2001. *Id.*¶ 51. As of that day, the Borrowers' outstanding loan balance was $1,427,511.19. *Id.* ¶ 74. By liquidating the Borrowers' inventory through an agent and collecting outstanding accounts' receivable, GMAC CF was able to recover at least $843,620.67 in net proceeds, all of which it credited to the Borrowers' account. *Id.* ¶¶ 53-55. At the same time, GMAC CF continued to assess interest and other charges against the account. *Id.* ¶ 80.

BOS_513707_6.DOC/MDUBNOFF

Landay's purported expert, Keith D. Lowey, submitted a Report[3], in which he opined that GMAC CF charged the Borrowers a total of $411,480.80 in usury-related charges between October 22, 2001 and January 31, 2003, *id.* ¶ 84, but his tabulations included only $144,922.08 in actual interest charges. *Id.* ¶ 85. In addition to interest, Lowey's calculation erroneously included a $56,908.22 payment that GMAC CF made to cover Disney's draw on a letter of credit issued at the request of, and for the benefit of, the Borrowers, *id.* ¶ 87, as well as at least $71,204.47 in legal fees incurred by GMAC CF in connection with its efforts to collect the Borrowers' debt. *Id.* ¶ 88. Additionally, Lowey's Report included within the usury tabulation such things as "overadvance charges," which were assessed because the Borrowers had borrowed too much against accounts receivable; "commission charges," which were applied because the Borrowers failed to meet a minimum sales target; wire charges; bank and other charges incurred by GMAC CF in connection with the Disney letter of credit; and unused line fees. *Id.* ¶ 86.

### E.    The Parties' Contacts With State Agencies

At the behest of Landay's counsel, GMAC CF mailed a so-called "usury notification" letter to the Massachusetts Attorney General's Office, which was received no later than September 22, 2000. *See* Pl.'s Mem. at 4. Most of the advances that GMAC CF made to the Borrowers under the Factoring Agreement did not occur until after September 22, 2000. Statement of Disputed and Additional Facts at 3-4. Meanwhile, according to the public records maintained by the Secretary of State's offices in Massachusetts and Delaware, Landay neglected to file or maintain effective financing statements in either state. *Id.* at 2-3.

---

[3]    On December 13, 2005, GMAC CF filed a motion *in limine* to exclude Lowey's testimony. (*See* Docket No. 60.) GMAC CF refers to Lowey's testimony in connection with its opposition to Landay's motion for partial summary judgment only because Landay relies upon the Lowey Report in support of his motion. For the reasons stated in its motion *in limine* to exclude Lowey's testimony, GMAC CF continues to argue that this Court should decline to admit Mr. Lowey's Report and testimony – particularly as they relate to Count II.

BOS_513707_6.DOC/MDUBNOFF

## II.    ARGUMENT

**A.    New York Law, Not Mass. Gen. Laws ch. 271, § 49, Governs Landay's Usury Claim.**

In diversity cases, federal courts apply the substantive laws of the forum state, including the forum's conflicts of law principles. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 491 (1941); *Reicher v. Berkshire Life Ins. Co. of America*, 360 F.3d 1, 4 (1st Cir. 2004). For more than two decades, Massachusetts courts have applied a functional choice-of-law approach that coincides with the Restatement (Second) of Conflict of Laws (1971). *Bushkin Assoc., Inc. v. Raytheon Co.*, 393 Mass. 622, 631-632 (1985). Under the Restatement, "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." Restatement (Second) of Conflict of Laws § 6(1). Such a directive exists here because GMAC CF's loan to Seneca is within the scope of the Uniform Commercial Code ("UCC") as adopted in Massachusetts. *See* Mass. Gen. Laws ch. 106, § 9-109(a).

The UCC, in turn, provides that "when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties." Mass. Gen. Laws ch. 106, § 1-105. Thus, the UCC conforms with the general policy in Massachusetts favoring enforcement of contractual choice-of-law provisions, as long as those provisions are fair and reasonable. *Stagecoach Trans., Inc. v. Shuttle, Inc.*, 50 Mass. App. 812, 817-818 (2001). *See also Lambert v. Kysar*, 983 F.2d 1110, 1118 (1st Cir. 1993).

Landay contends that the Guaranty's choice-of-law provision is too "narrow" to encompass his usury claim, *see* Pl.'s Mem. at 7, but he does not make the same argument with regard to the Factoring Agreement, which explicitly states that New York law governs and specifically provides that GMAC CF may assess interest at the "highest rate permitted by New

York law." Landay first attempts to dodge this unambiguous language by arguing that his usury

claim arises out of the Guaranty, not the Factoring Agreement. *See id.* at 6. He also cites to

*Greenwood Trust Co. v. Massachusetts*, 776 F. Supp. 21 (D. Mass. 1991), *rev'd*, 971 F.2d 818

(1st Cir. 1992), for the proposition that Massachusetts public policy prohibits the application of a

choice-of-law provision to a usury claim. Both arguments lack merit.

      *1.*    *Landay's Usury Claim Arises Out Of The Factoring Agreement.*

As an initial matter, Landay's assertion that his usury claim arises out of the Guaranty

instead of the Factoring Agreement is inconsistent with his primary contentions as to both

liability and relief. With regard to liability, Landay contends that GMAC CF enforced the

Factoring Agreement against the Borrowers in such a way that the total "interest and expenses"

assessed against the borrowers exceeded an annualized rate of 20%. *See* Pl.'s Mem. at 11-12.

He cites directly to the Factoring Agreement as the source for "six major categories" of allegedly

usurious charges. *See id.* at 12. Nowhere does Landay assert that GMAC CF made usurious

assessments pursuant to the Guaranty. *See generally id.* Similarly, Landay's prayer for relief

under Count II seeks to void "the loan" contemplated by the Factoring Agreement, not the

Guaranty. Given that Landay himself ties his usury claim directly to the Factoring Agreement,

this Court should enforce the choice-of-law provisions in the Factoring Agreement and rule that

Landay cannot state a claim under the Massachusetts usury statute.

      *2.*    *The Guaranty's Choice-Of-Law Clause Governs Landay's Usury Claim.*

Even if Landay's usury claim did arise under the Guaranty instead of the Factoring

Agreement, New York law would apply because the Guaranty, like the Factoring Agreement, is

"governed by" the laws of the State of New York (without giving effect to New York law on

conflicts of law)." *See* Statement of Undisputed Facts ¶ 13. Landay clearly recognizes this, or

BOS_513707_6.DOC/MDUBNOFF

he would not be suing his former lawyers for failing to advise him that New York law governed his Guaranty. Obviously, Landay's attorneys believed that New York law governed the Guaranty, as their Opinion Letter clearly demonstrates.

In an effort to avoid the consequences of his agreement to apply New York law to the Guaranty, Landay argues that usury sounds in tort not contract, and that under New York choice of law principles, contractual choice of law provisions do not reach tort claims. In doing so, Landay ironically ignores the one carve-out contained in the Guaranty's choice-of-law provision – *i.e.*, that it is to be interpreted "without giving effect to New York law on conflicts of law." Therefore, the New York choice of law cases cited by Landay cannot apply here, and the one Massachusetts case that Landay cites in support of this argument undercuts his position. In *Micera v. Neworld Bank*, 412 Mass. 728, 729-30 (1992), the main issue confronting the court was whether a plaintiff's claim under Mass. Gen. Laws ch. 183, § 60, which limits interest rate increases on residential mortgages, is subject to the four-year statute of limitations for consumer protection actions contained in Mass. Gen. Laws ch. 260, §5A, or the six-year statute of limitations for breach of contract actions referenced in Mass. Gen. Laws ch. 260, § 2. *See generally Micera*, 412 Mass. at 729-733. Apparently, neither party argued that the claim sounded in tort and, therefore, was subject to the three-year statute of limitations contained in Mass. Gen. Laws. 260, § 2A. The Court ruled that the four-year statute of limitations for consumer protection actions applied. *Id.* at 731. In so doing, the Court distinguished the plaintiff's claim from complaints seeking to void loan transactions, *id.* at 732, and usury actions. *Id.* at 733. By implication, if the plaintiffs had attempted to void their loan transaction, as Landay does in this case, or if, like Landay, they had alleged usury, their claims would have sounded in contract and have been subject to the six-year statute of limitations. *Cf. Commercial*

*Fin. Co. v. Holder*, 235 N.C. 96, 99 (1952) (holding explicitly that a usury counterclaim sounds in contract). Thus, properly read, *Micera* supports the application of the Guaranty's choice-of-law provision.

        3.    <u>*In the Absence of Choice-Of-Law Provision, New York Law Would Apply.*</u>

Even if the Guaranty's choice-of-law clause were too "narrow" to govern Landay's usury claim, the proper course of action would be to apply the law governing the loan obligation secured by the Guaranty, *i.e.*, GMAC CF's loan to Seneca, which, as Landay apparently concedes, is governed by New York law, per the terms of the Factoring Agreement. *See* Restatement (Second) of Conflict of Laws § 194 (stating that the rights created under a suretyship agreement are usually determined, "in the absence of an effective choice of law by the parties, by the law governing the principal obligation which the contract of suretyship was intended to secure"). *See also Milliken v. Pratt*, 125 Mass. 374, 376 (1878),[4] *cited in New England Merchants Nat'l Bank v. Rosenfeld*, 679 F.2d 467, 471 (5th Cir. 1982); *Sheer Asset Mgmt Partners v. Lauro Thin Films, Inc.*, 731 A.2d 708, 710 (R.I. 1999) (law governing principal loan obligation governs ancillary documents, in absence of contrary choice-of-law contracts); *General Elec. Co. v. Keyser*, 166 W. Va. 456, 466 (1981) (applying Restatement).

The rationale behind this rule is that a guaranty and the underlying loan document will usually be closely related and have many common elements, especially where they were made at around the same time. Restatement (Second) Conflict of Laws § 194, cmt. b. An exception to this rule exists where "with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties," Restatement (Second) Conflict of Laws § 194, but that exception is inapplicable here since New York has the most significant relationship to the allegedly usurious loan.

---

[4]      While *Milliken* predates the *Bushkin* era, its holding is consistent with the Restatement.

                                            BOS_513707_6.DOC/MDUBNOFF

As the Supreme Judicial Court recognized in *Bushkin*, one of the most significant considerations listed in the Restatement (Second) of Conflicts of Laws § 6(2) is the "justified expectations of the parties." *See* 393 Mass. at 635. In this case, as the Opinion Letter makes clear, all of the parties expected that New York law would govern any disputes relating to the 2000 Loan Agreement. Such expectations would have been justified even without any contractual choice-of-law provisions since: (1) Landay sought out a New York lender; (2) the final negotiations over the 2000 Loan Agreement took place in New York; (3) the closing took place in New York; (4) the monetary disbursements were made from New York; and (5) the Borrowers were obligated to pay their obligations at GMAC CF's offices in New York. *Cf. General Elec. Co. v. Keyser*, 166 W. Va. at 468 (stating that guaranties are generally governed by the law where the last act necessary to make them binding takes place, and the last act necessary to make a guaranty binding is the loan of money under the terms of the underlying obligation); *Sarlot-Kantarjian v. First Pa. Mortgage Trust*, 599 F.2d 915, 917 (9th Cir. 1979) (a guaranty is governed by Massachusetts law where the contract was executed in Massachusetts, and the funds were disbursed and the money repaid in Massachusetts).

Each of the other considerations listed in Section 6(2) also militate in favor of applying New York law. It certainly would better serve the needs of the interstate system, *see* Restatement (Second) Conflicts of Laws § 6(2)(a), to have one state's law govern all obligations on the same loan. Otherwise, debtors and guarantors who reside in different states might well face different obligations *on the same loan.* For similar reasons, applying New York law would lead to more certainty, predictability and uniformity of results, *see id.* § 6(2)(f), and would ease the determination of the law to be applied. *Id.* § 6(2)(g). It also would serve the policy goals of both Massachusetts and New York, *see id.* § 6(2)(b) and (c), in enforcing contracts. *Bushkin*,

BOS_513707_6.DOC/MDUBNOFF

393 Mass. at 635. Finally, the use of New York law would further the basic policies underlying the Massachusetts statute. *See id.* § 6(2)(e). The Massachusetts usury statute was intended to provide law enforcement with "an effective tool against organized crime and 'the vicious offense of loansharking.'" *Begelfer v. Najarian*, 381 Mass. 177, 182 (1980) (quoting Message of the Governor, 1970 House Doc. No. 5439 at 3). Nothing suggests that the legislature intended to create a mechanism for sophisticated businessmen like Landay and corporate entities like the Borrowers to evade their responsibilities under freely negotiated commercial loan agreements.[5] In sum, even without a contractual choice-of-law clause, New York law would still govern Count II under the principles laid out in the Restatement and Massachusetts common law.

### 4.    *Landay's Reliance On Greenwood Is Misplaced.*

Landay's reliance on *Greenwood Trust Co. v. Massachusetts*, is misplaced. In *Greenwood*, a Delaware banking corporation that issued credit cards to Massachusetts residents sought a ruling that it could assess late fees on delinquent accounts, notwithstanding the existence of Mass. Gen. Laws ch. 140, § 114B ("Section 114B"), a completely different usury statute than Mass. Gen. Laws ch. 271, § 49. The Delaware bank argued both that federal law preempted Section 114B and that even without preemption, Section 114B could not apply because the credit cardholders each signed membership agreements containing Delaware choice-of-law provisions. *See id.* In declining to enforce the Delaware choice-of-law provision, this Court stated that under *Bushkin* and Section 187(2)(b) of the Restatement, such provisions should be overlooked where "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in

---

[5]    Landay's attempt to portray his dispute with GMAC CF as a David versus Goliath struggle, *see* Docket No. 58 at 3, is both inaccurate and offensive. Prior to seeking out GMAC CF to provide the financing that other lenders rejected, Landay had spent more than three decades as a corporate executive. Unwilling to accept any personal responsibility for his own business failings, he has resorted to suing everyone in sight, from the lender who answered his call for financing to his former attorneys.

determination of the particular issue …" *Greenwood*, 776 F. Supp. at 41. This Court then ruled

that Section 114B itself expressed a fundamental policy of Massachusetts, which outweighed

Delaware's interest in permitting its banks to assess late charges in foreign states. *Id.* On appeal,

the First Circuit reversed that decision on federal preemption grounds. *See Greenwood* 971 F.2d

at 821.

Notwithstanding the First Circuit's ruling and the fact that *Greenwood* concerned a

different usury statute with very different provisions, Landay argues that "the same fundamental

policy on which the *Greenwood* decision turned should be found to exist in the business context

and should serve as a bar to the application of New York law to this case." Pl.'s Mem. at 8.

Amazingly, Landay offers no authority to support the proposition that commercial transactions

like the one at issue here should enjoy the special consideration sometimes given to consumer

transactions. Landay also ignores this Court's statement that Section 114B was designed to

protect "consumers" as well as the substantial body of case law that recognizes the traditional

differences in how the law regards consumer and commercial transactions. *See, e.g.*, Mass. Gen.

Laws ch. 140D, § 2(a) (exempting business and commercial loans from state truth in lending

law); *Levites v. Chipman*, 30 Mass. App. Ct. 356, 641 (1991) (finding commercial loan exempt

from federal and state regulations on consumer loans); *Fleet Nat'l Bank v. Baker*, 263 F. Supp.

2d 150, 153 (D. Mass. 2003) (stating that federal Fair Debt Collection Practices Act applies only

to consumer debts, not business loans). *See also Rodgers v. Tecumseh Bank*, 756 P.2d 1223,

1226 (Okla. 1988) (commercial lenders did not owe borrowers an implied covenant of good faith

and fair dealing because the purpose of a commercial loan "is to provide the funds to facilitate

the taking of a business risk.") These distinctions are particularly relevant when discussing

Mass. Gen. Laws ch. 271, § 49, since it was originally designed to protect individual borrowers

against loan sharks, *see Begelfer v. Najarian*, 381 Mass. at 182, not to protect sophisticated corporations and their officers from themselves.

Moreover, unlike the situation in *Greenwood*, Massachusetts does not have a greater interest than New York does in the outcome of Landay's usury claim. To the contrary, as previously discussed, application of the analysis outlined in § 6(2) of the Restatement shows that New York has the most significant relationship to this claim. As a result, New York law applies; the Massachusetts usury statute is inapplicable; and GMAC CF is entitled to summary judgment on Count II.[6]

### B.    Landay Lacks Standing to Assert a Massachusetts Usury Claim.

Even if the Massachusetts usury statute did apply in this case, Landay could not invoke it. The right to challenge a loan as usurious is a personal right that belongs to the debtor. *First Nat'l Bank of Jacksboro v. Lasater*, 196 U.S. 115, 118 (1905); *Focus Investment Assoc. Inc. v. American Title Ins. Co.*, 992 F.2d at 1231, 1241 (1st Cir. 1993). It does not attach to "strangers to the usurious transaction." *Focus Investment Assoc., Inc.*, 992 F.2d at 1241. Indeed, this principle is reflected in the text of the Massachusetts statute, which bestows standing only on "the person to whom the loan was made." Mass. Gen. Laws ch. 271, § 49(c) ("Section 49(c)").

In this case, the "person[s]" to whom GMAC CF made the allegedly usurious loan were the Borrowers, not Landay. Thus, only the Borrowers possess standing under Section 49(c). *See Beach Assoc., Inc. v. Fauser*, 9 Mass. App. Ct. 386, 389 (1980) (stating that Section 49(c) provides equitable remedies "to the borrower" on a usurious loan). The fact that Landay was a guarantor on the loan is of no legal import. *See Harrington v. Norex America Inc.*, No. 01-93-

---

[6]    Contrary to Landay's suggestion, *see* Pl.'s Mem. at 2, 6, this Court has not already rejected GMAC CF's choice-of-law argument. The Court's Order denying part of GMAC CF's motion for judgment on the pleadings stated only that "GMACCF's motion for judgment on the pleadings on the basis of <u>res judicata</u> is denied." *See* Docket No. 40.

0116-CV, 1995 WL 19219, *4 (Tex. App.-Hous. Jan. 19, 1995) (citations omitted) (stating that "one who is not by law a maker of a note is not an obligor thereon though as an absolute guarantor he is liable for payment under the guaranty contract.").

Landay's reliance on *LBMs Fin. LLC v. Edgewater Investment Ltd. P'ship*, 2004 WL 2075565 (Mass. Super. Aug. 5, 2004), for the proposition that he has standing to challenge GMAC CF's loan to Seneca as both a guarantor of that loan and junior creditor of Seneca is misplaced for at least two reasons. First, *LBM* was wrongly decided and should be disregarded as inconsistent with *Bank of Jacksboro, Focus Investment, Beach Assoc.*, and *Harrington*. In *LBM*, a Massachusetts Superior Court ruled that a junior attaching creditor had standing under Section 49(c) to challenge a senior mortgage securing an allegedly usurious loan. *See* 2004 WL 2075565, at *3-4. In so doing, the Court relied on *Kirk v. McDonald*, 21 Mass. App. Ct. 21, 25 (1985), for the proposition that "a junior attaching creditor who stands to gain surplus proceeds has standing to contest the validity of a senior note and mortgage." *LBM*, 2004 WL 2075565, at *3. The *Kirk* court, however, based it decision on Mass. Gen. Laws ch. 244, § 13, which conveys standing in a foreclosure action broadly upon "all parties interested in the equity of redemption." *See Kirk*, 21 Mass. App. at 24-25. By contrast, the statute at issue here - Section 49(c) - expressly limits standing to "the person to whom the loan was made." The court in *LBM* should have noted the differences between the two statutory texts and concluded that the *LBM* plaintiff, unlike the *Kirk* plaintiff, lacked standing. Its failure to do so constitutes an error that this Court should not follow or reinforce.

Second, even if *LBM* had been correctly decided, its holding is limited to the particular situation of junior secured attaching creditor. Here, a genuine dispute exists as to whether Landay was a secured creditor with a perfected security interests in Seneca's assets at the time

the allegedly usurious charges were assessed. Landay's last relevant Massachusetts UCC filing

occurred on March 21, 1996 and lapsed before the end of March 2001. *See* Mass. Gen. Laws ch.

106, § 9-515; old Mass. Gen. Laws ch. 106, § 9-403 (imposing a five-year limit on the

effectiveness of such filings). So far as the record before this Court shows, Landay never made a

Seneca UCC filing in Delaware, where it was required. *Id.* §§ 9-301, 9-307. As a result, Landay

cannot prove that he was a junior secured creditor of Seneca. It follows that the *LBM* rationale –

to the extent that it possesses any vitality – does not support Landay's argument.

Apparently aware that his position as a secured creditor is anything but secure, Landay

suggests that "[t]he proposition that a guarantor has standing to pursue a usury claim is clearly

within the penumbra of the *LBM Financial, LLC* precedent." Pl.'s Mem. at 10. Once again,

however, Landay ignores important differences between *LBM* and this case. Guarantors differ

from junior secured creditors inasmuch as their rights and obligations arise only in the context of

an effort to collect on the guaranty. In other words, whereas junior creditors have affirmative

rights to vindicate in an action to invalidate a senior debt, a guarantor's rights are purely

defensive. Therefore, outside of an action to collect on their guarantees, the guarantors cannot

meet the constitutional standing requirement of showing an "injury in fact," *see Osediacz v. City

of Cranston*, 414 F.3d 136, 139 (1st Cir. 2005), let alone the statutory standing requirements of

Section 49(c).

### C.    Landay Waived His Right To Challenge The Loan As Usurious.

Usury claims and defenses may be waived, s*ee, e.g.*, *Tarvezian v. Debral Realty*, 1996

WL 1249891, *4 (Mass. Super. Sept. 27, 1996); *Giorgio v. DeFusco*, 862 F.2d 933, 935 (1st Cir.

1998); *Milliken & Co. v. Stewart*, 182 A.D. 2d 385, 387 (N.Y. App. Div. 1992), and the

Forbearance Agreement provides that the Borrowers released and discharged GMAC CF from

BOS_513707_6.DOC/MDUBNOFF

"any and all actions, causes of actions, suits, ... claims demands whatsoever." There can be no genuine dispute that such a release included any alleged usury claim. Landay agreed to the waiver on behalf of the Borrowers, and personally acknowledged and consented to the waiver when he executed the Ratification of Guaranty. Thus, the Borrowers' waiver binds Landay as Guarantor to the same extent that it bound Seneca and Brookfield.

Even in his Guaranty, Landay waived the right to assert "any defenses, offsets or counterclaims which [he] may now or hereafter have" against GMAC CF. Clearly this language encompasses this usury claim, which Landay raised in an effort to offset or otherwise avoid his obligations under the Guaranty. *See, e.g.*, *Cambridgeport Savings Bank v. Boersner*, 413 Mass. 432, 443 (1992); *Milliken & Co. v. Stewart*, 182 A.D.2d at 387; *New Jersey Bank, N.A. v. Varono*, 120 A.D.2d 505, 506 (N.Y. App. Div. 1986). Thus, even if Massachusetts law applied and Landay possessed standing under Section 49(c), GMAC CF still would be entitled to summary judgment on Count II because both the Borrowers and Landay waived any such claim.

### D.  GMAC CF's Loan To The Borrowers Was Not Usurious.

Perhaps the most fundamental reason why Landay is not entitled to summary judgment on Count II is because he has not proven that GMAC CF's loan to the Borrowers violated Mass. Gen. Laws ch. 271, § 49. As explained fully in GMAC CF's memorandum supporting its motion for summary judgment, *see* Docket No. 53 at 11-14, Landay's claim under Count II is based upon a tortured reading of the term "interest and expenses" under the statute. For example, Lowey included a $56,908.22 payment on a letter of credit as well as more than $71,000 in legal fees into his tabulation of usury-related expenses. Such charges clearly "were not known to [GMAC CF] at the time" it made the loan to the Borrowers. *See* Mass. Gen. Laws ch. 271, §

BOS_513707_6.DOC/MDUBNOFF

49(a). Nor could they have been "ascertained by reasonable inquiry." *Id.* Thus, they should not have been part of Lowey's analysis.

The same is true for the overadvance charges, commissions, wire fees and unused line fees that Lowey included in his analysis. Obviously, GMAC CF did not know at the time it entered into the Forbearance Agreement that the Borrowers would incur these default-related charges. Nor is there any evidence in the record that could support the conclusion that such information was ascertainable by reasonable inquiry. Thus, this case differs from *Begelfer v. Najarian*, 381 Mass. at 180-182, and *In re Rolfe*, 25 B.R. 89, 94 (D. Mass. 1982), where the debtors' defaults triggered accelerated *interest* payments that the creditors, at the time of making the loans, knew would exceed 20%. *See Comstock v. Steinbergh*, 2004 WL 3120554, *3 (Mass. Super. Dec. 16, 2004) (noting that the criminal usury statute has generally been applied only to loans that "on their face, contain a yearly interest rate exceeding twenty percent").

Indeed, *Comstock* is instructive because in that case, the plaintiff alleged that a promissory note he executed to facilitate a condominium purchase was usurious because it contained a provision stating that upon his sale of the condominium, he became obligated to pay the lender, "in addition to the principal and interest set forth above, 48 percent of the net proceeds received from the sale of said premises." *Id.* at *1. The plaintiff purchased the condominium at issue for only $43,500, but by the time he wanted to sell it, it had appreciated to an approximate value of $220,000. *Id.* As a result, the holder of the note stood to gain a profit far greater than 20 percent a year if the note's shared-appreciation provision were enforced. *Id.* The plaintiff argued that the proceeds from the condominium sale fit within the usury statute's definition of "interest and expenses" because they would be sums "charged against or paid or to be paid by the borrower for making or securing directly or indirectly the loan." *Id.* at * 3. The

BOS_513707_6.DOC/MDUBNOFF

Court, however, rejected that argument, reasoning that at the time the parties contracted, "it was impossible to predict future market conditions and what positive appreciation of the Property, if any, would materialize." *Id.* Similarly, in this case, it was impossible for GMAC CF to predict at the time it entered into the Factoring Agreement (a) the amount of legal fees and other collection costs it might incur in connection with the loan, (b) the amount of default-related charges that might be assessed against the Borrowers; or (c) what the ratio of those charges to the overall loan balance might be at any particular time in the future.

Moreover, there was no rationality behind Lowey's decision to focus his analysis on the irrelevant time period of October 22, 2001 through January 31, 2003. By Lowey's own admission, the total interest charged – even under his expansive definition – from the inception of the loan on September 19, 2000, through November 2003 when GMAC CF wrote it off its books was less than 20 percent annually. Lowey opted to use the smaller time period only because it gave him a result more favorable to Landay. Such cynical opportunism does not further any goal of the usury statute. Instead, it serves only the improper purpose of helping debtors evade the obligations to repay loans.

E. **Genuine Factual Disputes Preclude Summary Judgment In Favor Of Landay.**

Even if GMAC CF is not entitled to summary judgment on Count II, this Court still should deny summary judgment for Landay because there are factual disputes that undermine his contentions. For example, as Landay has acknowledged, the provisions of Section 49(c) do not apply to lenders who notify the Attorney General's Office of their intent to charge loans that might violate Mass. Gen. Laws ch. 271, §49(a). Mass. Gen. Laws ch. 271, § 49(d). Landay mischaracterizes the nature of the financing when he claims that GMAC CF did not provide such notification until "after credit was extended." Pl.'s Mem. at 4. Contrary to Landay's

representations, there was no single "Seneca loan" that was made on September 19, 2000.

Instead, there were countless, revolving monetary advances, many of which were made long

after September 22, 2000, the date on which the Attorney General's Office received the letter

from GMAC CF. *See id.* Unless Landay can prove that the advances included in the September

19, 2000 payment were among those still on the Borrowers' books in October 2001, and that

GMAC CF assessed "interest and expenses" of greater than 20 percent on those advances, he

will not be able to prevail on Count II, even under his tortured statutory interpretation. Whether

he can do so is an open factual question, precluding the entry of summary judgment in his favor.

### III.   CONCLUSION

For all the foregoing reasons, this Court should not only deny Landay's motion for partial

summary judgment on his usury claim; it should enter summary judgment in favor of GMAC CF

on that claim.

DATED:  December 14, 2005

/s/ John A. Houlihan
/s/ Mark B. Dubnoff
John A. Houlihan (BBO # 542038)
Mark B. Dubnoff (BBO # 637212)
EDWARDS ANGELL PALMER &
DODGE LLP
101 Federal Street
Boston, MA  02110
(617) 439-4444

BOS_513707_6.DOC/MDUBNOFF