# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-CV-11955-WGY

DAVID L. LANDAY, )
)
    Plaintiff, )
)
v. ) **PLAINTIFF**
) **DAVID L. LANDAY'S**
) **AFFIDAVIT IN OPPOSITION TO**
GMAC COMMERCIAL CREDIT, LLC and ) **DEFENDANTS' MOTION FOR**
GMAC COMMERCIAL FINANCE, LLC, ) **SUMMARY JUDGMENT**
)
    Defendants. )
)

I, David L. Landay, hereby depose and say:

1.     I am the plaintiff in this action. I make this affidavit in opposition to GMAC's Motion for Summary Judgment. Many of the facts offered on this affidavit have already been sworn to by me in Answers to Interrogatories, on deposition and at a hearing in the New York action brought by GMAC against me. To the extent that these facts are not found therein, they are covered by the allegations of the Amended Complaint in this matter and I offer them here under oath.

2.     I was born and raised in Massachusetts and, until recently, I lived in Massachusetts all my life. I received an undergraduate degree in economics from Brandeis University in 1960 and an MBA from Boston University in 1963. From 1963 until 1967, I worked for Green Shoe Manufacturing, a Massachusetts company that later became Stride Rite.

3.     In 1967 I went into business for myself when I bought Brookfield Athletic Shoe Company, Inc. ("Brookfield") a manufacturer and importer of athletic footwear located in East Brookfield, Massachusetts. At the beginning, I owned 50% of the stock

and my brother-in-law the other 50%. Ultimately, I bought him out and owned all the stock in Brookfield.

4.  From 1967 through March 1985 (when I sold Brookfield to Hyde Athletic Industries), I was the president and CEO of Brookfield. I had over-all responsibility for the general management of the company, including product development, manufacturing, importing, warehousing, sales and finance. The heads of all departments (sales, product development, manufacturing, accounting, etc.) reported directly to me.

5.  Despite the fact that, at one time, Brookfield had factories in the United States and Canada that employed about 800 persons, it was a small company at the management end and I had a hand in every aspect of the business.

6.  I was intimately involved with Brookfield's patents, trademarks and licenses. In the period 1967-March 1985, Brookfield successfully registered numerous trademarks and patents that it had developed. In the 1970s I was instrumental in negotiating a license with Bobby Orr to put his name on product, including hockey sticks and skates. Thereafter, Brookfield developed and registered many patents and trademarks for Bobby Orr products. In addition to Bobby Orr products, Brookfield's product development/design department created numerous other patents and trademarks that were used on Brookfield products. These products included all manner of footwear-related goods such as shoes, athletic shoes, roller skates and skateboards.

7.  I personally assumed responsibility for dealing with the patents and trademarks. I oversaw transmission of necessary paperwork to Brookfield's trademark

and patent attorneys, Fish and Richardson; and it was I who dealt with such attorneys concerning the issuance of patents and trademarks and the maintenance thereof.

8. In the late 1970's-early 1980's, Brookfield purchased all the patents and trademarks of PF Flyer out of receivership. I negotiated that purchase. After acquiring PF Flyer, I caused Brookfield to develop a juvenile line of PF flyer shoes and sneakers and to develop additional patents and trademarks related to PF Flyer.

9. In addition to the Bobby Orr merchandise and the PF Flyer merchandise, Brookfield developed many other lines of adult and juvenile goods (e.g., athletic shoes, sneakers, roller skates, skate boards, scooters) and trademarks for which it obtained patents and trademark registrations. I negotiated license agreements with various companies so that recognizable names and images could be placed on juvenile products. Brookfield was the first company in the country to produce juvenile roller skates bearing licensed characters. Through my efforts and negotiations Brookfield had licenses for, among others, Star Wars, Coca Cola, Garfield, Strawberry Shortcake, My Little Pony and almost every other license offered by American Greetings and Hasbro Toy.

10. As noted above, in March 1985, I sold Brookfield to Hyde Athletic Industries ("Hyde"). Brookfield became a subsidiary of Hyde, and I was engaged for five and one-half years to run it for Hyde. Essentially, I had the same responsibilities for Brookfield that I had had before the sale. In addition, as an Executive Vice President of Hyde, I had the added responsibilities of being in charge of all product development and manufacturing (domestic and foreign) for the corporate parent. Specifically, I was in charge of product development and manufacturing of Hyde's Saucony and Spot-Bilt

3

footwear. Although Hyde had a sales department (including my Brookfield sales manager) I was also made responsible for sales to Big Five Sports, a large retail customer of Hyde and Brookfield.

11.  In the five and one-half years that I was with Hyde, numerous patents and trademarks were developed, applied for and issued. I also continually explored licenses on behalf of Hyde and Brookfield. Among other licenses, I acquired the Mattel "Barbie" license for Brookfield.

12.  I left Hyde in 1990. At some point after I left, Hyde sold its Brookfield subsidiary to Craft House, Inc.

13.  In 1990, together with other shareholders, I incorporated Seneca Sports, Inc. ("Seneca"), a company with its principal (and only) place of business in Milford, Massachusetts. In 1990 Seneca began doing business as an importer of sporting goods such as balls and related items. It later added roller skates, skate boards and toy-like products to its business.

14.  From the beginning, I was the president, treasurer and CEO of Seneca. Until the year 2000 when my interest increased, I owned 37% of the stock. In 2000, I became the majority stockholder.

15.  My role at Seneca was similar to my role at Brookfield; all departments reported to me. I was responsible for arranging for financing. I negotiated all licenses that Seneca obtained. Conversely, I negotiated and entered into license agreements with a UK company allowing it to use many of Seneca's registered patents and trademarks in the UK. I was responsible for dealing with Seneca's several licensing,

4

patent and trademark attorneys (domestic and foreign) and any issues with respect to licenses, patents, and trademarks.

16. Over the course of its life, Seneca's product development/design department created numerous products that were patented and trademarks that were registered – in the United States and in other countries. In addition to patents and trademarks that Seneca developed itself, Seneca owned Hutch and Foster trademarks that I purchased from a Bankruptcy liquidator on behalf of Seneca for approximately $250,000 in or around 2000. Seneca used the Hutch and Foster trademarks on balls and baseball gloves that it developed especially for use with those names.

17. In early 2000 an opportunity arose for Seneca to acquire assets of Brookfield from Craft House, the company to which Hyde had sold Brookfield. Brookfield owned patents, trademarks and licenses that Seneca desired. Because of changing market conditions that had impacted negatively the sales of small importers such as Seneca and Brookfield (large customers such as Wal-Mart and K-Mart were importing directly from Asia), I saw this as an opportunity to obtain valuable patents, trademarks and licenses that could improve Seneca's sales. Combined together, these two competitors would act as one, thereby reducing costs while increasing Seneca's over-all profit due to its acquisition of some valuable intellectual property.

18. Subject to obtaining financing, Seneca agreed to buy from Craft House the Brookfield name together with patents, trademarks and licenses owned by Brookfield and all Brookfield inventory and accounts receivable for approximately $ 5 million. As of the date of closing (September 19, 2000), the Brookfield intellectual property (patents, trademarks and licenses) had a negotiated value of $1.6 million. See Exhibit 1, p. 5 and

5

Disclosure Schedules 1.1(b) and 1.1(c), a true and correct copy of Seneca's contract with Craft House.

19. Before the Craft House deal for the acquisition of Brookfield's assets, Seneca had an asset-based lending relationship with the Bank of Boston. I had provided that bank with a limited personal guaranty of Seneca's obligation with the understanding that my guaranty would be called upon only if the collateral provided by Seneca proved to be insufficient in liquidation.

20. The financing that I sought for the Brookfield acquisition was ultimately provided by GMAC. The financing was designed to provide the money needed for the acquisition of the Brookfield assets, pay off the Bank of Boston (then Fleet) and provide operating funds to the combined companies (Brookfield became a subsidiary of Seneca).

21. My first contact with GMAC was with Mr. Fitzgerald of GMAC's Boston office. I had several discussions with him about Seneca's needs. In those discussions, I made clear to him that Seneca's business was seasonal and that an uncollateralized seasonal overadvance was an essential part of any loan structure. Seneca's financing arrangement with the Bank of Boston, then in place, provided for such a seasonal overadvance. Mr. Fitzgerald assured me he understood the crucial nature of the overadvance and that it was an essential part of the deal. Without such an overadvance, Seneca would not go forward with the deal, and I certainly would not provide any guaranty or personal collateral.

22. In my several discussions with Mr. Fitzgerald we also discussed the personal guaranty and personal collateral (a Letter of Credit) that GMAC indicated it

would require of me to help secure the loan to Seneca and its to-be-acquired-subsidiary, Brookfield. Mr. Fitzgerald assured me several times that GMAC would look to the collateral provided by the corporations (inventory, accounts receivable and the like) before it would call upon my Letter of Credit or guaranty to satisfy the debt. But for this assurance, I would not have provided a guaranty or collateral and Seneca would not have borrowed from GMAC. I preferred to pass up the acquisition of Brookfield than allow my personal assets to be a primary source of collections for Seneca's debt.

23.     On July 31, 2000, Mr. Fitzgerald came to my Seneca office in Milford, Massachusetts to deliver a letter and a term sheet showing that GMAC's credit committee had approved the loan he and I negotiated. Exhibit 2, Deposition Exhibit 59. During that meeting we reviewed the term sheet together and he confirmed that GMAC would make the seasonal overadvance available to Seneca and Brookfield in May 2001. During our review, he also confirmed that GMAC would not look to my Letter of Credit or other personal assets until it had exhausted those of the Borrowers (Seneca and Brookfield).

24.     On September 19, 2000, the Brookfield purchase was consummated and the formal GMAC loan documents signed. The following day GMAC funded the loan and Craft House was paid by Seneca.

25.     The formal GMAC loan documents included a Factoring Agreement (Exhibit 3 in Defendants' Appendix of Exhibits)[1] , my personal guaranty for $3,500,000 (Exhibit 4 in Defendants' Appendix) and a Subordination Agreement (Exhibit 6 in Defendants' Appendix) whereby I subordinated to GMAC's rights my secured creditor rights for $3,450,000 in loans I had made to Seneca (See my Affidavit attached as

---

[1] Hereinafter referred to as "Defendants' Appendix."

7

Exhibit A to Landay's Motion for Summary Judgment on Usury Count). In addition to signing the formal GMAC loan documents on September 19, 2000, I provided GMAC with the $4,100,000 Standby Letter of Credit (Exhibit 5 in Defendants' Appendix) it had required of me personally as additional collateral for its loan to Seneca and Brookfield (hereinafter referred to jointly as "Seneca").

26.    In early 2001, I asked Mr. Fitzgerald if GMAC would be willing to advance the date for making the uncollateralized seasonal overadvance available to Seneca. After looking into this, Mr. Fitzgerald confirmed GMAC's obligation to provide a seasonal overadvance in May, but declined to make it available earlier. He told me that if I would personally provide an additional $250,000 standby letter of credit to GMAC, GMAC would make $250,000 available to Seneca prior to May and then, in May, it would provide the full $500,000 seasonal overadvance. See, Exhibit 3 hereto, GLAN# 00203.

27.    In reliance on what Mr. Fitzgerald stated, I provided GMAC with an additional $250,000 standby letter of credit with a May 1, 2001 expiration date. (Exhibit 13 in Defendants' Appendix, GLAN# 00659.) Before the May 1 expiration date, Mr. Fitzgerald told me that I should extend the expiration date to late May so that the Letter of Credit would overlap the implementation of the $500,000 seasonal overadvance. Based on his statement that the overadvance would issue in May, I extended the date on the $250,000 Letter of Credit. (Exhibit 13 in Defendants' Appendix, GLAN# 00659).

28.    GMAC did not make the promised seasonal overadvance in May and, before the expiration of the extension on the Letter of Credit I was again persuaded by Mr. Fitzgerald to extend the date by his promises that the overadvance would be forthcoming. I extended the Letter of Credit to October 30, 2001. (Exhibit 13 in

8

Defendants' Appendix, GLAN# 00660)   GMAC never gave Seneca the uncollateralized seasonal overadvance.

29.    GMAC's refusal to provide funds created a desperate situation for Seneca. The financing arrangement with GMAC was a factoring agreement whereby all receivables from sales were paid directly to GMAC by Seneca's customers. Seneca's sole source of funds for merchandise and operating expenses was GMAC.  When GMAC provided no funds, Seneca had no means of obtaining product or doing business.

30.    In desperation, I asked Mr. Fitzgerald how to get GMAC to release funds. He told me that Seneca should hire RAS Management Advisors, Inc ("RAS") as consultants and that GMAC would then look favorably upon Seneca.  Ultimately, Seneca hired another consultant that was acceptable to GMAC, although GMAC insisted that Seneca also pay RAS as GMAC's additional consultant and that it provide RAS employee John Rijo with full access to Seneca's facilities and operating information.

31.    Despite the engagement of consultants, GMAC continued to deny funding. In or about June-July 2001, Mr. Fitzgerald and Ms. Jane Frangos of GMAC's N.Y. office each told me that, if I would again extend the expiration date on my $250,000 Standby Letter of Credit, increase my personal guaranty by $1,000,000 and deposit $1,000,000 in cash collateral in a bank in GMAC's favor, GMAC would provide enough additional funding to Seneca to allow an orderly wind-down. Ms. Frangos also told me that if I paid certain immediate expenses of Seneca I would be reimbursed from funds to be disbursed when funding resumed.

9

32. Based on these representations, I paid personally approximately $52,000 of Seneca's expenses, Seneca thereafter entered into a Forbearance Agreement with GMAC (Exhibit 10 in Defendants' Appendix) and I increased my personal exposure to GMAC. Specifically, I increased the limit on my guaranty to $4,500,000 (Exhibit 11 in Defendants' Appendix), again extended the date on the $250,000 letter of credit to March 29, 2002 (Exhibit 13 in Defendants' Appendix, GLAN# 00661) and deposited $1,000,000 in a trust account in GMAC's favor. (My $4.1 million Letter of Credit also continued to secure the loan; it had a remote expiration date that did not have to be extended.)

33. The Forbearance Agreement that was the consideration for my increased personal exposure involved schedules for (a) GMAC's release of funds to Seneca, (b) loan payments to be made by Seneca, and (c) "net availability," a formula for accounts receivable which was dependent upon sales made. The ability of Seneca to meet its schedules depended on it obtaining funds from GMAC in accordance with the funding schedule. The schedules that I had worked out with GMAC (See Exhibit C to Forbearance Agreement, attached as Exhibit 4) anticipated that the Forbearance Agreement would be executed in late July; the first draw was to be made in the week ending August 10, 2001.

34. GMAC prepared the relevant formal documents and did not send me execution copies until August 9; it did not execute the documents itself until August 10, a day after the date of the documents. This delay in preparing and executing the documents threw all the schedules off, but GMAC refused to change them. Moreover, although GMAC did not advance any funds to Seneca until late in the week of August

17 (a week later than contemplated in the schedule), it held Seneca to its schedules and formulas. Consequently, Seneca was put into default almost immediately.

35.     GMAC refused to release funds to reimburse me for the $52,000 in Seneca expenses I had paid. It also refused to release funds in excess of the $1,000,000 that I had provided, despite the fact that the Forbearance Agreement called for more. As the situation deteriorated, I sought another lender.

36.     In October 2001, I presented proposals to GMAC that would make GMAC whole without resort to the $5,350,000 in Letters of Credit and cash that I had provided personally as collateral. Specifically, (a) I presented a re-financing proposal from Platinum Credit Corp. that provided for GMAC to be paid 90% of the outstanding debt within 60 days, the remaining 10% over a two year period (with interest), payment of that 10% to be secured by me and (b), subsequently, I offered to pay the 10% immediately myself.

37.     Although I was told by Jane Frangos that GMAC was considering these proposals, on October 15, 2001, it collected my $4.1 million Letter of Credit and shortly thereafter it collected the $1,000,000 cash I had provided and my $250,000 Letter of Credit.

38.     On October 22, 2001, with about an hours' telephone notice, John Rijo, the RAS employee that GMAC had placed inside Seneca as a "consultant," showed up at Seneca's premises and expelled me and all other employees from the premises. He seized all of Seneca's books, records and assets on behalf of GMAC. When I asked him for copies of essential Seneca records, he told me I could tag documents for his later review and copying. However, since he pressed me to leave the premises quickly,

11

I had no opportunity to tag anything and was able only to take copies of a few documents. Despite several requests made by attorneys on my behalf beginning in October 2001, I never saw Seneca's books and records again until August 2005 when GMAC produced them in this litigation.

39. In the parking lot (to which Mr. Rijo had escorted me) I expressed concern about the liquidation in which he would engage. I suggested that certain orders be shipped and that certain knowledgeable personnel be retained. I have learned from discovery that Mr. Rijo did neither, despite the fact that my attorney had also urged that GMAC follow my suggestions and had been assured that GMAC would work with me to maximize the value of the assets.

40. On October 22, 2001, Seneca owned hundreds of viable trademarks and patents. This includes the patents and trademarks it had acquired in the Brookfield purchase 13 months earlier (Schedules 1.1(b) and 1.1(c) to Exhibit 1 hereto) and the Hutch-Forster trademarks it had purchased for $250,000 shortly before the Brookfield transaction in 2000.

41. As of September 19, 2000 (the closing of the Brookfield purchase and the GMAC financing) the Brookfield trademarks and patents accounted for approximately $1.3 million of the $1.6 million negotiated purchase price for the intellectual property. The licenses accounted for the remaining $300,000.

42. At the time of the September 19, 2000 closing, the numerous other valid trademarks and patents Seneca had developed and owned (including the Hutch-Forster trademarks for which Seneca had paid $250,000) were worth at least as much as the Brookfield trademarks and patents acquired in the purchase from Craft House. Seneca

and Brookfield were competitors of like size and nature. Seneca had more trademarks and patents than did Brookfield, but Brookfield had some superior patents. The bulk of Seneca's patent and trademarks (including the Hutch-Forster) is shown in Exhibit 5 hereto, a letter and schedule from Timothy French, Seneca's patent and trademark attorney, that was provided to GMAC at the September 19, 2000 closing. In addition to the patents and trademarks shown on the attached exhibit, Seneca owned slumber-bag patents and additional trademarks that were serviced by law firms other than of Mr. French.

43. On October 22, 2001, Seneca owned all the trademarks and patents it had owned 13 months earlier, including the Brookfield patents and trademarks and the Hutch-Forster trademarks. With few exceptions, Seneca had maintained the patents and trademarks by paying all necessary fees. As of October 22, 2001, the package of viable trademarks and patents owned by Seneca was worth $2.6 million and, allowing for a 20% discount, should have commanded a purchase price of $2 million dollars in a liquidation scenario. See Exhibit 6, p. 107 from transcript of Landay's November 1, 2005 testimony in the New York action brought by GMAC against Landay.

44. Through discovery I have learned that GMAC has made no sales of Seneca's trademarks and patents. Indeed, over the past four years it has undertaken no efforts to sell this intellectual property. Although GMAC has recently renewed its UCC filing on those assets (Exhibit 7), essentially it abandoned these assets in 2001.

45. Patents and trademarks lose their value over time when they are not in use on products in the market place. This is especially true of trademarks. GMAC should have offered the Seneca-owned trademarks and patents immediately after

seizing all the assets and putting Seneca out of business. Any sales it is able to make now and in the future will realize far less than could have been realized from sales in late 2001-early 2002.

46. Discovery has confirmed that GMAC also conducted the liquidation and collection of the remainder of Seneca's assets in a wasteful manner. It collected only a small percent of Seneca's accounts receivable whereas, prior to the liquidation, Seneca historically collected 90-95% of the accounts receivable. During the liquidation GMAC sent letters to Seneca which indicated that it would allow customers to pay significantly less than was owed unless Seneca solved the customers' issues. Unfortunately, as GMAC well knew, it had expelled Seneca personnel from the premises, had had its liquidator operate there for a month, and, thereafter, had all of Seneca's mail forwarded to its own Boston office. The result was paltry collections of accounts receivable. Moreover, GMAC realized a small percent of the value of the inventory because it abandoned much of the inventory and/or failed to fill outstanding orders that could have been filled.

47. When GMAC seized Seneca's assets on October 22, 2001, it was owed approximately $1.4 million (after applying to the debt the $5,350,000 it had seized from me). According to Seneca's records (Exhibit 8) on October 22, 2001 Seneca's accounts receivable were approximately $1.3 million and the inventory was worth nearly $1.4 million (Exhibit 9). In addition, there was intellectual property with a liquidation value of approximately $2 million (Paragraph 43 above).

48. After GMAC finished its liquidation, it brought an action against me alleging a shortfall of approximately $1.2 million. Somehow, several millions of dollars

14

in assets had reduced a $1.4 million balance by only around $200,000. Despite my requests for an accounting, and despite GMAC's prior acknowledgement that I was entitled to an accounting (Exhibit 10), GMAC did not provide me with an accounting. To this day, GMAC has not provided me with an accounting.

49.     Instead, GMAC commenced its New York action against me by filing and serving a Summons with Notice dated June 17, 2002. This caused me to engage a New York attorney who (a) sought to ascertain from GMAC how it had arrived at the amount allegedly due and (b) attempted to settle the matter to avoid the terrible expense of litigation. Having already been destroyed financially, I felt I could not afford to litigate. Rather than provide any information to my attorney, GMAC told me to litigate if I wanted an accounting. It was willing to reveal information only if I would commit first to a settlement figure. (Exhibit 11).

50.     Having effectively rejected my settlement overtures, GMAC filed a Complaint in the New York action that required an Answer, and the litigation took off. During the course of that litigation I kept demanding an accounting and/or the information essential to an accounting. I also repeatedly asked for copies of the Seneca documents that had been confiscated by GMAC.

51.     In August 2005, on the eve of the scheduled trial in New York, GMAC's attorneys in the instant case "discovered" the Seneca documents to which I had been seeking access since October 2001, both before and during the New York litigation. These documents had been in a warehouse in Milford, Massachusetts – a warehouse in which they had been placed and maintained by GMAC.

52. The trial in New York was held in November 2005 before a referee. It was on the issues of (a) commercial reasonableness of GMAC's liquidation and (b) the outstanding amount of money allegedly due GMAC on the Seneca loan. In addition to contending that the evidence showed lack of commercial reasonableness, it is my contention that neither the documents produced by GMAC to me prior to the hearing (including in this action) nor GMAC's presentation to the referee has provided substantiation for the alleged loan balance. There is no back-up evidence for a number of the charges made by GMAC and many of its calculations were irregular. This is in line with all of GMAC's bad conduct respecting this loan and me.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS 13 DAY OF DECEMBER, 2005.

_____
DAVID L. LANDAY

232059_1