UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DAVID L. LANDAY, )<br>    Plaintiff, )<br> )<br>v. )<br> )<br>GMAC COMMERCIAL CREDIT LLC )<br>and GMAC COMMERCIAL FINANCE )<br>LLC, )<br>    Defendants. )<br> ) | Civil Action No. 04-cv-11955-WGY |

**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendant GMAC CF[1] submits this reply memorandum in response to the arguments raised by plaintiff David L. Landay in opposition to GMAC CF's motion for summary judgment.

A.   **Landay Misunderstands The Scope Of The Choice-Of-Law Agreements.**

Landay misunderstands the scope of the choice-of-law provisions contained in the Factoring Agreement that GMAC CF executed with Seneca Sports, Inc. and Brookfield International, Inc. (collectively, the "Borrowers") when he suggests that they do not apply to his usury claim (Count II). *See* Pl.'s Mem. (Docket No. 63) at 1-4. For example, he states that the Massachusetts Appeals Court considered "virtually identical" language in *Stagecoach Trans., Inc. v. Shuttle, Inc.*, 50 Mass. App. 812, 817-19 (2001), Pl.'s Mem. at 1-2, even though nothing in the *Stagecoach* opinion suggests that the contract in that case contained any provisions similar to the Factoring Agreement's specific statement that GMAC CF could assess interest on each credit advance "at a rate of between six percent (6%) annually and (the highest rate permitted by

---

[1]   Defendant GMAC Commercial Finance LLC is the successor by merger of defendant GMAC Commercial Credit LLC and a third GMAC entity, GMAC Business Credit LLC. For ease of reference, throughout this memorandum, all three companies are referred to jointly as GMAC CF.

New York Law)." *Compare Stagecoach*, 50 Mass. App. at 817 *with* Defs.' Appx. (Docket No. 55), Ex. 3 at 2, ¶ 4 (b)(i).[2]

Landay also appears to believe that the Factoring Agreement's provisions cannot apply to any of his claims because he signed that document in only a representative capacity. *See* Pl.'s Mem. at 11 (arguing that the integration clause does not bind him because "he did not sign it in his individual capacity"); Docket No. 51[3] at 6 (describing the personal Guaranty that Landay executed in conjunction with the Factoring Agreement as "the principal document which binds Landay to [GMAC CF]"). Thus, Landay contends, the only relevant choice-of-law provision is the one in the Guaranty, which Landay contends is too "narrow" to apply to his usury claim. Pl.'s Mem. at 1-3; Docket No. 51 at 7. This line of reasoning implies that if the Borrowers were the ones bringing the usury allegations, they would be bound by the choice-of-law provisions contained in the Factoring Agreement since they were the parties to that document. Essentially, under Landay's logic, New York law would govern a usury claim asserted by the Borrowers, whereas Massachusetts law governs a usury claim brought by Landay, even though both claims are based on the exact same financing transaction. The Restatement (Second) on Conflicts of Laws frowns on such differential treatment.

Indeed, Section 194 provides that where a suretyship agreement *does not* have an effective choice of law provision, the rights of the parties to that agreement are usually determined by the law governing the principal loan obligation. Restatement (Second) of Conflict

---

[2]   Given the obvious differences in the contractual language between *Stagecoach* and this case, the only relevance of *Stagecoach* is its broad generalizations about Massachusetts choice-of-law rules. *E.g.*, *Stagecoach*, 50 Mass. at 817-818 (stating that Massachusetts favors the enforcement of contractual choice-of-law provisions, as long as those provisions are fair and reasonable).

[3]   Docket No. 51 is Landay's memorandum supporting his motion for summary judgment on the usury claim. To distinguish this document from Landay's memorandum opposing GMAC CF's motion for summary judgment, GMAC CF refers to the former as "Docket No. 51" and the latter as "Pl.'s Mem." in this brief.

of Laws § 194. Any contrary resolution would inevitably give rise to a chaotic situation where multiple guarantors each claim that their home jurisdiction's law trumps the law governing the underlying loan obligation. *Id.* cmt. b.

The most important consideration in the present analysis is that the choice-of-law provisions contained in the Factoring Agreement govern *the loans* referenced in the document, not merely *the parties* who signed the contract, and Landay's usury claim is an attack on the propriety of the loans themselves.[4] That is, while Landay has asserted some claims based on GMAC CF's conduct toward him personally, Count II is not one of them.[5] In Count II, Landay asserts that "the loan" should be voided because the interest and expenses that GMAC CF assessed against the Borrowers *on that loan* were usurious. Thus, it does not matter whether Landay agreed as an individual to the application of New York law of his personal claims against GMAC CF. All that matters is, which state's law governs *the loan*. The Factoring Agreement provides that New York's law does.[6]

### B. Landay's Reliance On *LBM* In Support Of His Standing Argument Is Misplaced.

In defending his standing to raise a usury claim, Landay asks this Court to give greater weight to a solitary state trial court decision than to the opinions of the United States Supreme Court and the First Circuit Court of Appeals. Pl.'s Mem. at 4-5. Landay claims that this Court can disregard the Supreme Court's ruling in *First Nat'l Bank of Jacksboro v. Lasater*, 196 U.S. 115, 118 (1905), that the right to challenge a loan as usurious is a personal right that belongs to the debtor, as well as the First Circuit's holding in *Focus Investment Assocs. Inc. v. American*

---

[4] As explained in GMAC CF's opposition to Landay's motion for summary judgment, the "loan" actually consisted of a series of revolving advances, but the mechanics are not material to GMAC CF's affirmative motion.

[5] Thus, the New York cases distinguishing between tort and contract cases, which Landay cites in his brief, are irrelevant here.

[6] As explained in GMAC CF's memorandum opposing Landay's motion for summary judgment, *Greenwood Trust Co. v. Massachusetts*, 776 F. Supp. 21 (D. Mass. 1991), *rev'd*, 971 F.2d 818 (1st Cir. 1992), is inapposite here.

*Title Ins. Co.*, 992 F.2d at 1231, 1241 (1st Cir. 1993), that the right does not attach to "strangers to the usurious transaction," because those cases "were decided under foreign law." Pl.'s Mem. at 4. Landay urges this Court to instead follow *LBMs Fin. LLC v. Edgewater Investment Ltd. P'ship*, 2004 WL 2075565 (Mass. Super. Aug. 5, 2004). Pl.'s Mem. at 4. Several flaws infect Landay's logic.

For starters, Landay misunderstands *Lasater* if he believes it hinged on an analysis of Texas law. Although the Supreme Court was considering an appeal from a Texas state court decision, its ruling concerned a claim brought under a federal usury statute, § 5198, Revised Statutes, United States, U.S. Comp. Stat. 1901, p. 3493, and the application of general common law principles. Similarly, the First Circuit's affirmation that "the defense of usury is personal to the borrower" was based on cases from multiple jurisdictions, not just Rhode Island. *See Focus Investment Assocs.*, 992 F.2d at 1241 (citing 45 Am. Jur. 2d *Interest and Usury* § 188 (1969), and cases cited therein, as well as cases from Illinois, Nebraska, North Carolina and Texas). Moreover, even if these statements from higher federal courts had been dicta, they still would be binding on this Court. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) (when an opinion issues from the Supreme Court, it is not only the result but also those portions of the opinion necessary to that result by which a court is bound); *Crowe v. Bolduc*, 365 F.3d 86, 92 (1st Cir. 2004)(affirming principle that Supreme Court dicta "should be treated as authoritative."); *Doughty v. Underwriters at Lloyds, London*, 6 F.3d 856, 861 (1st Cir. 1993)(same).

*LBM*, meanwhile, was wrongly decided. In that case, a Massachusetts Superior Court ruled that a junior attaching creditor had standing under Section 49(c) to challenge a senior mortgage securing an allegedly usurious loan. *LBM*, 2004 WL 2075565, at *3-4. In doing so, the Court relied on *Kirk v. McDonald*, 21 Mass. App. Ct. 21, 25 (1985), for the proposition that

"a junior attaching creditor who stands to gain surplus proceeds has standing to contest the validity of a senior note and mortgage." *LBM*, 2004 WL 2075565, at *3. The *Kirk* court, however, based it decision on Mass. Gen. Laws ch. 244, § 13, which conveys standing in a foreclosure action broadly upon "all parties interested in the equity of redemption." *See Kirk*, 21 Mass. App. at 24-25. By contrast, the statute at issue here – Mass. Gen. Laws ch. 271, § 49(c) - expressly limits standing to "the person to whom the loan was made." The court in *LBM* should have noted the differences between the two statutory texts and concluded that the *LBM* plaintiff, unlike the *Kirk* plaintiff, lacked standing. Its failure to do so constitutes an error that this Court should not follow or reinforce.

### C.   Landay's No-Waiver Argument Is Based On A Reversed Ruling.

Bizarrely, Landay cites to *Hammelburger v. The Foursome Inn Corp.*, 76 A.D.2d 646, 649-50 (N.Y. App. Div. 1980) for the proposition that a criminal usury claim cannot be waived, even though that portion of the opinion was reversed by New York's highest court. *See Hammelburger*, 54 N.Y.2d 580, 592 (1981) (stating, "we reject the Appellate Division's basic premise and hold that ... a valid estoppel certificate executed by a mortgagor and relied upon in good faith by the assignee of the mortgage will preclude the assertion of usury, whether civil or criminal, as a complete defense.").[7] What makes Landay's reliance on *Hammelburger* particularly odd is that he notes in his brief that the Appellate Division's opinion was "modified." Pl.'s Mem. at 5. Apparently, Landay did not appreciate the fact that the high court's "modification" effectively eviscerated his argument.

---

[7]   Whereas the Appellate Division had based its ruling on the idea that criminal usury statutes, as opposed to civil usury protections, are designed to protect society as a whole and no single person can waive a societal protection, *see* 76 A.D. at 649-50, the Court of Appeals explained that even where one victim waives a criminal usury claim, society is still protected by the prospect that the government retains the right to prosecute the alleged offender. *See* 54 N.Y.2d at 591.

Since the controlling *Hammelburger* opinion actually stands for the principle that there are some circumstances where a debtor can be estopped from asserting a defense of criminal usury against a particular creditor, a principle that has subsequently been affirmed, *see, e.g.*, *Seidel v. 18 East 17th Street Owners, Inc.*, 586 N.Y.2d 240, 243-44 (1992), Landay's entire argument on waiver crumbles like a house of cards. The *Hammelburger* opinion is consistent with all of the cases cited in GMAC CF's brief for the proposition that usury claims can be waived.[8] Since Landay waived his right to assert claims against GMAC CF in both the Factoring Agreement and the Guaranty, and usury claims may be waived, he cannot now bring a claim against GMAC CF under the Massachusetts usury statute.[9]

### D. Landay's Interpretation Of The Usury Statute Is Fundamentally Flawed.

Landay does not dispute any of the factual statements contained in Paragraphs 84 through 87 of GMAC CF's Statement of Undisputed Material Facts (Docket No. 54). *See* Pl.'s pp. at 5 (skipping from Paragraph 79 until Paragraph 88). Thus, for purposes of this motion, Landay has admitted that while his proffered expert, Keith D. Lowey, opined that GMAC CF charged the Borrowers a total of $411,480.80 in "interest and expenses" between October 22, 2001 through January 31, 2003, the actual interest during that time period totaled only $144,922.08. *See* Statement of Undisputed Material Facts ¶¶ 84-85; Local R. 56.1 (uncontroverted factual representations will be deemed admitted).[10] Landay also has admitted that Lowey's calculation of $107,775.20 in "usury interest damages" erroneously includes a $56,908.22 payment on a letter of credit, *see* Pl.'s Opp. at 5 (not disputing Paragraph 87), as well as at least $71,204.47 in

---

[8]   Landay's attempt to distinguish between contractual waivers and other forms of usury waivers, *see* Pl.'s Mem. at 6, is nonsensical. If a victim of criminal usury can waive the right to assert such a claim against the lender, the mode of waiver employed is immaterial.

[9]   For reasons stated below, Landay's reliance on United Bk. of Africa, P.L.C., New York Branch v. Odimayo, No. 93 Civ. 3998, 1994 WL 185826 (S.D.N.Y. May 10, 1994), is misplaced.

[10]   For reasons stated elsewhere (Docket Nos. 60-61), Lowey should be precluded from testifying at all.

legal fees that GMAC CF incurred in connection with collecting the Borrowers' debt. *Id.* (not disputing that portion of Paragraph 88).[11] Therefore, even if Landay can show that (a) the Massachusetts usury statute governs his usury claim, (b) he has standing to invoke it, and (c) he has not waived it, his ability to prevail on Count II hinges on whether those collection-related legal fees meet the definition of "interest or expenses" under Mass. Gen. Laws ch. 271, § 49(a). They do not.

> The statute defines "interest or expenses" as:
>
> interest, brokerage, recording fees, commissions, services, extension of loan, forbearance to enforce payment, and all other sums charged against or paid or to be paid by borrower for making or securing directly or indirectly the loan, and shall include all such sums when paid by or on behalf of or charged against the borrower for or on account of making or securing the loan, directly or indirectly, to or by any person, other than the lender, if such payment or charge was known to the lender at the time of making the loan, or might have been ascertained by reasonable inquiry.

Mass. Gen. Laws ch. 271, § 49(a) (second sentence). Landay contends that the *mens rea* clause – "if such payment or charge was known to the lender at the time of making the loan, or might have been ascertained by reasonable inquiry" – applies only to the language immediately preceding it, which addresses payments made to third parties. *See* Pl.'s Mem. at 7-8. Thus, he concludes, it does not matter whether the legal fees that GMAC CF ultimately assessed against the Borrowers were known to GMAC CF at the time of the loan or might have been ascertained by reasonable inquiry. *See id.*

Landay's theory, however, is contradicted by one of the key cases cited in his brief. *See Comstock v. Steinbergh*, No. 20042093J, 2004 WL 3120554, *4 (Mass. Super. Dec. 16, 2004) (stating that "[p]ayments that are not known to the lender or ascertainable by reasonable inquiry at the time of making the loan are excluded from the operation of the usury statute."). In

---

[11] Landay's only dispute with Paragraph 88 is based on Lowey's Supplemental Report, which this Court excluded in an electronic order dated December 13, 2005.

BOS_516227_1.DOC/MDUBNOFF

analyzing the statute, the Court in *Comstock* did not distinguish between payments made to third parties and payments made directly to the lender. *See id.* To the contrary, it held that a provision in a promissory note that required the borrower, upon the sale of the condominium that had been purchased with the loan secured by the note, to share proceeds from the sale *with the lender* was "without the scope of G.L. c. 271, §49," because the market conditions at the time of the sale had not been foreseeable. *Id.* (emphasis added). If Landay's interpretation of the statute were correct, *Comstock* would have been decided differently.

Indeed, Landay's contention that there is no *mens rea* element in the Massachusetts usury statute raises broader concerns, since it is, after all, a criminal statute. In *Staples v. United States*, 511 U.S. 600, 605-07 (1994), the Supreme Court reiterated the traditional common law rule requiring *mens rea* in criminal statutes, except for limited circumstances where the legislature has clearly intended to impose strict liability, such as with statutes regulating potentially harmful or injurious items like hazardous waste. Nothing suggests that the Massachusetts legislature intended to impose strict liability for violations of Mass. Gen. Laws ch. 271, § 49, or that the statute seeks to regulate a "dangerous device." Thus, the common law rule imposing a *mens rea* element should apply.

Moreover, Landay's parsing of the *mens rea* clause highlights another weakness in his claim. If he believes that the legal fees in this case are not "such sums when paid by or on behalf of or charged against the borrower for or on account of making or securing the loan, directly or indirectly, to or by any person, other than the lender," he is left to argue that legal fees fall within the narrow clause, "all other sums charged against or paid or to be paid by the borrower *for making or securing directly or indirectly the loan*." Mass. Gen. Laws ch. 271, § 49(a)(emphasis

added).[12] However, none of the legal fees that GMAC CF incurred in connection with collecting the Borrowers' post-default debt were related to the making or securing of the loan. To the contrary, these fees were all incurred after the loan already had been made and secured. Thus, they cannot fall under Landay's apparent definition of "interest or expenses."

Finally, to the extent that any ambiguity exists in the statute, GMAC CF is entitled to the benefit of the doubt under the "rule of lenity." *See Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393, 409 (2003) (reiterating that when there are two rational readings of a criminal statute, one harsher than the other, courts should choose the harsher one only when the legislature has spoken in clear and definite language). *See also United States Lanier*, 520 U.S. 259, 265 (1997) (stating that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."); *United States v. Meade,* 175 F.3d 215, 222 (1st Cir. 1999) ("[c]riminal statutes are unconstitutionally vague if they do not adequately specify the conduct that they prohibit or the class or persons to whom they apply."). For all of these reasons, GMAC CF is entitled to summary judgment on the Count II.

### E.   It Is Unreasonable As A Matter Of Law For Landay To Have Relied On Representations That Contradicted Agreements He Signed In Any Capacity.

Nowhere in his memorandum opposing summary judgment does Landay even address *McMartin v. Westlake*, 36 Mass. App. Ct. 221 (1994), the primary case relied upon by GMAC CF in support of its argument in favor of summary judgment on Landay's misrepresentation claim (Count I). *Compare* Defs.' Mem. Supp. Summ. J. (Docket No. 53) at 15-16 *with* Pl.'s Mem. at 9-14. For that matter, Landay also declines to address the other cases cited by GMAC CF, such as *Turner v. Johnson & Johnson*, 809 F. 2d 90, 96 (1st Cir. 1996), *Greenery Rehabilitation Group, Inc. v. Antaramian*, 36 Mass. App. Ct. 73 (1994), and *Kuwaiti Danish*

---

[12]   Clearly, collection-related attorneys' fees are not payments for interest, brokerage, recording fees, commissions, services, extension of loan, or forbearance to enforce payment.

*Computer Co. v. Digital Equipment Corp.*, 438 Mass. 459, 468 (2003). *See generally* Pl.'s Mem. at 9-14. Each of these cases supports GMAC CF's argument that it would have been unreasonable, as a matter of law, for Landay to have relied on any oral representations inconsistent with the terms of the Factoring Agreement, the Guaranty, the Forbearance Agreement and the Ratification of Guaranty.[13]

The fact that Landay signed the Factoring Agreement and Forbearance Agreement in a representative capacity instead of an individual capacity does not alter the analysis. *McMartin* involved three plaintiffs, a corporation and its two owners, and three defendants, a corporation and two of its officers. *See* 36 Mass. at 222-223 (sorting out all of the parties in two consolidated actions). In ruling that the defendants were entitled to judgment as a matter of law on the plaintiffs' fraud claims because the oral representations on which the claims were based were inconsistent with a franchise agreement executed by the two corporations, the Appeals Court made no distinction between the plaintiff corporation that was a party to the agreement and the two individual plaintiffs who had merely signed it. *See generally id.* at 232-233. Similarly, in *Turner*, the First Circuit rejected three individuals' fraud claims that were based on statements inconsistent with provisions in a contract between their company and the defendant. *See* 809 F.2d at 97. All that mattered in those cases was the fact that the plaintiffs were experienced in business and that the contracts were fully negotiated and voluntarily signed by the plaintiffs. *See McMartin*, 36 Mass. App. at 231-32; *Turner*, 809 F.2d at 97. Those same factors are present here, so there is no relevance to Landay's statement that he did not sign the Factoring Agreement in an individual capacity. *See* Pl.'s Mem. at 11.[14]

---

[13]   Those terms are detailed in GMAC CF's principal brief, which GMAC CF incorporates by reference.

[14]   Not surprisingly, Landay has not cited to any cases in support of the notion that it might have been reasonable for him to rely on representations inconsistent with documents he signed in a representative capacity.

Nor is there any merit to Landay's contention that the statements on which Count I is based are outside the scope of the written contracts he executed. The Guaranty expressly provided that it was "unconditional and unlimited and not conditional or contingent upon the pursuant by [GMAC CF] of whatever remedies it may have against [the Borrowers]. . . or the security or liens [GMAC CF] may possess." Appx. Ex. 4 at 1. The Ratification of Guaranty affirmed that provision. Appx. Ex. 11 at 1. Thus, Landay could not reasonably have relied on any oral statements from GMAC CF representatives prior to August 9, 2001, that in the event of a default, it would look to the Borrowers assets before collecting his personal collateral.

Landay's bizarre attempt to separate his Guaranty from his other personal collateral, *see* Pl.'s Mem at 9-10 (suggesting that his "collateral" consisted of his $4.1 million First Standby Letter of Credit, $250,000 Second Standby Letter of Credit and $1 million Cash Collateral), is inconsistent with the text of his Amended Complaint. In both the body of Count I and his prayer for relief on that count, Landay seeks recovery of $8.8 million, a figure that makes sense only if he included his Guaranty in the damage calculation. More importantly, Landay's attempted distinction is irrelevant.

The Factoring Agreement expressly stated that it constituted the parties' "entire understanding and supersede[d] all inconsistent agreements and communications, written or oral, between *your and our officers, employees, agents and other representatives*." Appx. Ex. 3 § 14(g), at p.12 (emphasis added). Thus, it superceded all prior communications allegedly made by Paul Fitzgerald and other GMAC CF representatives to Landay regarding the treatment of his First Standby Letter of Credit.

Similarly, the Forbearance Agreement stated that it was "the entire understanding of the parties with respect to the matters set forth herein and supercedes in their entirety any and all

understandings and agreements, whether written or oral, of the parties with respect to the foregoing." Appx. Ex. 10 § 9(f), at p.6. Landay's suggestion that the "matters set forth herein" and "foregoing" did not include the collection of his personal collateral, the Seasonal Overadvance or the alleged "bridge loan," *see* Pl.'s Mem. at 10-12, is patently false. The Forbearance Agreement explicitly states that the Factoring Agreement, which gave GMAC CF full discretion regarding the Seasonal Overadvance, was "in full force and effect." Appx. Ex. 10 § 2, at p.2.[15] It also makes specific references to the Cash Collateral and the Second Standby Letter of Credit. *Id.* §§ 7(b) and (c), at p.4. Additionally, the Forbearance Agreement stated the precise amount of money that the Borrowers owed to GMAC CF, *id.* § 1 at p.2, and set forth all terms of future payments and reimbursements. *Id.* (Schedule C). This field naturally would have included any "bridge loan" reimbursements, were any warranted or intended.

In sum, Landay has not cited to any law or facts that would make *McMartin* and *Turner* inapplicable to this case. This Court should follow those precedents and enter summary judgment for GMAC CF on Count I.

### F. Landay's Fraud Claim Cannot Be Salvaged By Reliance On *Odimayo*.

Landay raises two arguments in defense of GMAC CF's argument that he has waived whatever fraud claims he might once have been able to assert against GMAC CF. *See* Pl.'s Mem. at 13. First, Landay suggests that the waiver contained in his Ratification of Guaranty applies only to claims he might have asserted in a defensive action: i.e., as a defense or counterclaim. *Id.* Such a waiver, Landay maintains, has no impact in "an independent action" initiated by Landay. *Id.* For support, Landay cites to *United Bk. of Africa, P.L.C., New York Branch v. Odimayo*, No. 93 Civ. 3998, 1994 WL 185826 (S.D.N.Y. May 10, 1994). *Id.*

---

[15]   Since Fitzgerald's alleged misrepresentations in 2001 regarding the Seasonal Overadvance pre-date the Forbearance Agreement, the cases cited in Footnotes 9 and 10 of Landay's brief are off-point.

*Odimayo*, however, is an isolated decision, and its dicta suggesting that a guarantor prohibited from bringing any counterclaims in an action for the guaranty's enforcement is nonetheless permitted to institute a separate suit on the same claims does not appear to have been followed by any subsequent court. This is understandable since under *Odimayo*'s logic, guarantors like Landay would be encouraged to race their creditors to the courthouse door whenever the obligations secured by their guaranties are in default so that they could assert as "claims" what they could not assert as "offsets, defenses or counterclaims." This could lead to contradictory rulings by the same judge: one that the creditor is entitled to recover some award from the guarantor, and one that the guarantor is entitled to recover some money from the creditor. Under such circumstances, the waivers that had been executed by the guarantors would have been rendered meaningless. If Landay's waiver is to have any significance, it must be interpreted in a way that precludes him from asserting claims against GMAC CF that were waived as counterclaims and defenses.

Landay's second defense to GMAC CF's waiver argument is that a waiver cannot apply to fraud claims. *See* Pl.'s Mem. at 13, n.12. For support, he cites to *National Westminster Bank USA v. Ross*, 676 F. Supp. 48 (S.D.N.Y. 1987), and *Barclay's Bank of N.Y., N.A. v. Heady Elec. Co.*, 174 A.D.2d 963 (N.Y. App. Div. 1991), *id.*, but neither of those cases help Landay's cause. In *National Westminster*, the court actually acknowledged that under *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90 (1985), guarantors could waive claims of fraudulent inducement, but distinguished its circumstance from *Plapinger* on the grounds that the fraud alleged in *National Westminster* occurred after the execution of the guarantee containing the waiver. In this case, all of Landay's fraud allegations are based on conduct that occurred prior to the execution of the Ratification of Guaranty, in which he waived his fraud claims. *Barclay's Bank*, meanwhile, is inconsistent with

*Plapinger* and the cases cited by GMAC CF in its principal brief. *See* Docket No. 53 at 17. This Court should follow those cases and hold that Landay's waiver of all of his claims against GMAC CF applies to his fraud claim.

### G. Landay Cannot Save His Junior Creditor Claim Through Inadmissible And Irrelevant Opinions On The Value Of The Borrowers' Intellectual Property.

Although Landay disagrees that GMAC CF is entitled to summary judgment on his claim that GMAC CF violated his rights as a junior creditor of Seneca (Count VI), Landay does not disagree with GMAC CF's description of the elements of this charge. *See* Pl.'s Mem. at 14-17. More specifically, Landay does not dispute GMAC CF's contention that in order to prevail on Count VI, he will have to prove both that GMAC CF conducted a commercially unreasonable sale of Seneca's assets and that a commercially reasonable disposition would have generated sufficient proceeds to satisfy the Borrowers' entire debt to GMAC CF *and* leave a surplus for Landay as a junior creditor. *See generally id.* (never challenging GMAC CF's reliance on *River Valley State Bank v. H.O. Peterson*, 154 Wis. 2d 442, 446-447, 453 N.W. 2d 193 (1990), or *McGowan v. Nebraska State Bank*, 229 Neb. 471, 427 N.W. 2d 772, 775 (1988)).

Where Landay parts company from GMAC CF is on the issue of whether there is sufficient evidence on the record to prove that a commercially reasonable disposition of Seneca's assets would have generated a surplus for Landay. Landay does not contest GMAC CF's claim that the Borrowers' debt exceeded $1 million at all relevant times and that Lowey opined only that a commercially reasonable disposition of the Borrowers' inventory and accounts receivable would have closed that gap by a few hundred thousand dollars. *Compare* Defs.' Mem. at 18-19 *with* Pl.'s Mem. at 14-17. Landay, however, argues that GMAC CF's analysis fails to take into account the value of the Borrowers' intellectual property, which he estimates at $2 million. Pl.'s

Mem. at 16. According to Landay, if one adds that value to Lowey's figures, "it is clear that Landay has suffered substantial damages above the alleged amount of the deficiency." *Id.* at 16.

There are at least four major flaws with Landay's argument. First, Landay's affidavit testimony regarding the value of the Borrowers' intellectual property contradicts his prior interrogatory response and must be stricken on that account. *See* Def.'s Motion to Strike Portions of David Landay's Affidavit and Supporting Memorandum (Docket Nos. 69-70). Without his own opinion on the value of the Borrowers' intellectual property, Landay has absolutely no evidence sufficient to prove the element of damages under Count VI.

Second, Landay is simply wrong about his ability to opine about the value of the intellectual property. It is one thing for the owner of tangible property like a tractor to opine about its value, *see American State Bank of Killdeer v. Hewson*, 411 N.W.2d 57, 64-65 (N.D. 1987), or for the owner of a company with personal knowledge of its operations to opine about potential lost profits, *Securiton Magnalock Corp. v. Schnabolk*, 65 F.3d 256 (2d Cir. 1995), or the company's value. *See Glosband v. Watts Detective Agency*, 21 B.R. 963, 981 (Bankr. D. Mass. 1981). But a business owner's testimony as to value cannot be "speculative and conjectural." *Glosband*, 21 B.R. at 981. In this case, Landay's estimate of the Borrowers' intellectual property is purely speculative and conjectural, as he has demonstrated no personal knowledge of the price that GMAC CF could have obtained for it on the open market in 2001.

Indeed, Landay has not even presented any evidence that GMAC CF was *legally permitted* to try to sell the Borrowers' intellectual property. While GMAC CF had a lien in the Borrowers' intellectual property, there is no evidence anywhere in the record that GMAC CF ever recorded that lien with the United States Patent and Trademark Office. Absent such evidence, Landay cannot prove that title to the Borrowers' intellectual property passed to GMAC

CF. *See* 35 U.S.C. §261 (stating that "an assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark office within three months from its date or prior to the date of such subsequent purchase or mortgage"); *In re Refusal of Assignment Branch to Record Attorney's Lien*, 8 U.S.P.Q.2d 1446 (P.T.O. 1988) (an attorney's retaining lien only affects the right of possession, not the right of ownership, and is thus deemed an insufficient interest in a patent or patent application to warrant recordation). Without the title to the intellectual property, GMAC CF could not sell it to third parties. Landay, meanwhile, could have. Indeed, it is undisputed that GMAC CF invited Landay to sell some of the intellectual property and apply the proceeds to the Borrowers' loan balance, but he declined that opportunity. Under such circumstances, he cannot blame GMAC CF for any failure to generate proceeds from the disposition of the intellectual property.

Finally, there is no evidence in the record that the Borrowers' intellectual property, as it existed on October 22, 2001, has lost its value. Nowhere does Landay (or Lowey) undertake a comparative analysis of the value of each patent and trademark as it existed on that date with its value today. Absent such an evaluation, he cannot support his claim that GMAC CF wasted approximately $2 million of the Borrowers' assets.[16] Accordingly, he cannot prove his damage claim under Count VI.

**H.  Landay's Defense Of His Chapter 93A Claim Is Based On A Misunderstanding Of The Controlling Cases And An Attempt To Resurrect Dismissed Portions Of That Claim.**

Landay raises essentially two arguments as to why GMAC CF is not entitled to summary judgment on his Chapter 93A claim (Count VII), even if it is entitled to summary judgment on

---

[16]  Indeed, Landay's claim that he knows the value of the patents and trademarks in 2001 because of the price he paid for them in 2000, Pl.'s Mem. at 16, is inconsistent with any claim he might make that the value of the intellectual property today is simply by virtue of the passage of time..

Counts I, II and VI. First, Landay contends, to the extent that his Chapter 93A claim is based on the same conduct as his fraud claim, the dismissal of the latter for lack of evidence on reasonable reliance would not affect the former, since reasonable reliance is not an element of Chapter 93A. *See* Pl.'s Mem. at 17-19. Second, Landay states, "apart from the allegations relevant to Counts I, II and VI, there are additional factual allegations of GMAC [CF's] sharp practices and business misconduct which support the viability of the Chapter 93A claim." *Id.* at 19. As examples of these "sharp practices," Landay cites to GMAC CF's refusal to consider a proposal by an outside lender to buy out the loan, and GMAC CF's "refusal to provide Landay an accounting or realistic access to his own business records." *Id.*

A fundamental problem with Landay's second argument is that it relies on allegations that have already been dismissed from his Chapter 93A claim. On May 17, 2005, this Court granted GMAC CF's motion for judgment on the pleadings as to Counts III, IV and V, as well as that portion of Count VII, which was based on those substantive counts. Landay's complaint about GMAC CF's refusal to consider Platinum Credit Corp.'s alleged proposal to buyout *the Borrowers'* loan is nothing but a roundabout way of accusing GMAC CF of violating its implied covenant of good faith and fair dealing *to the Borrowers* under the Forbearance Agreement. That claim (Count V) is no longer in the case. Similarly, Landay's complaints about being denied an accounting and access to his business records is an attack on GMAC CF's conduct of the New York litigation, which this Court eliminated from the case in a December 13 electronic order.[17] Thus, they do not impact GMAC CF's motion for summary judgment.

With regard to Landay's first argument, while it is true that reasonable reliance is not "necessarily" an element of a Chapter 93A claim, *Zayre Corp. v. Computer Sys. Of Am., Inc.*, 24

---

[17] Landay has, after all, been reunited with his business records in this case and has received a full accounting of the Borrowers' indebtedness to GMAC CF from October 22, 2001, through August 17, 2005.

Mass. App. Ct. 559, 570 (1987), it can be when the claim is based on the "same circumstances" as the underlying fraud claim. *See, e.g.*, *McMartin*, 36 Mass. App. at 234 (leaving undisturbed a judicial finding that there was no Chapter 93A violation where there was no common law liability of defendants for deceit). Furthermore, when a party acts completely within its legal rights, its conduct cannot give rise to a Chapter 93A violation. *See Massachusetts Bricklayers & Masons Trust Funds v. North American Specialty Ins. Co.*, 20 F. Supp. 237, 240 (D. Mass. 1998). Here, a New York court has already concluded that GMAC CF acted within its legal rights in enforcing the Guaranty against Landay. Under such circumstances, GMAC CF is entitled to summary judgment on Count VII.

### Conclusion

For all the foregoing reasons, this Court should grant GMAC CF's motion for summary judgment and dismiss the remainder (Counts I, II, VI and VII) of Landay's Complaint.

DATED: December 14, 2005

/s/ John A. Houlihan
/s/ Mark B. Dubnoff
John A. Houlihan (BBO # 542038)
Mark B. Dubnoff (BBO # 637212)
EDWARDS ANGELL PALMER &
DODGE LLP
101 Federal Street
Boston, MA 02110
(617) 439-4444