UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-CV-11955-WGY

| | | |
|---|---|---|
| DAVID L. LANDAY, | ) | |
| | ) | |
| Plaintiff, | ) | **PLAINTIFF DAVID L.** |
| | ) | **LANDAY'S** |
| v. | ) | **MEMORANDUM IN** |
| | ) | **OPPOSITION TO** |
| GMAC COMMERCIAL CREDIT, LLC and | ) | **DEFENDANTS' MOTION IN** |
| GMAC COMMERCIAL FINANCE, LLC, | ) | **LIMINE TO EXCLUDE** |
| | ) | **PLAINTIFF'S PROFFERED** |
| Defendants. | ) | **EXPERT TESTIMONY** |
| | ) | |

Plaintiff David L. Landay ("Landay") submits this memorandum in opposition to

Defendants' motion to prevent his expert, Keith D. Lowey ("Lowey"), from testifying.

Defendants are hereinafter referred to as "GMAC."

## PRELIMINARY STATEMENT

Landay is the guarantor of a loan that GMAC made to Seneca Sports, Inc. and

its subsidiary Brookfield International, Inc. (hereinafter referred to jointly as "Seneca").

Landay is also a secured creditor of Seneca, junior to GMAC. Among Landay's several

claims to be tried by this Court are his claims that (a) GMAC's interest and expenses

charged to the Seneca loan rendered the loan usurious and (b) in liquidating the assets

of Seneca, GMAC committed waste (i.e., that the liquidation was commercially

unreasonable). Landay intends to offer Lowey's expert testimony to aid the Court with

its determination of these issues.

In accordance with the modified scheduling order of this Court, Landay provided

GMAC with a report from Lowey that outlines his expected testimony. Thereafter,

GMAC deposed Lowey; Landay conducted only a limited examination of his own expert witness at the deposition.

On this motion, GMAC seeks to bar Lowey from testifying.  In doing so, it mischaracterizes his Report and ignores much of his deposition testimony.  Additionally, GMAC attacks Lowey's Report as if it were testimony, criticizing it for not providing answers to the kinds of questions that may be appropriate for GMAC to ask on voir dire or on cross-examination but which are not necessary to the Report.  The Report is certainly sufficient to show that Lowey is a qualified expert on the subjects of his expert testimony and that its substantive contents are admissible.  To clarify the record concerning GMAC's misstatements about the Report and Lowey's deposition testimony, Landay is filing herewith an Affidavit from Mr. Lowey in opposition to the instant motion as well as the entire transcript of his deposition.

The Lowey Affidavit also illustrates for the Court the extent of forensic accounting that was required to decifer what interest and expenses had been charged to the Seneca loan.  Contrary to GMAC's contention that Landay's Usury claim depends on a simple mathematical calculation that the Court can perform without an expert (GMAC's Memorandum in Support of Motion in Limine ("GMAC's Memorandum"), p. 9), the GMAC records produced to Landay required considerable research, reconciliation and the skills of a forensic accountant in order to ascertain the nature of the charges made to the Seneca loan.  Helping the Court to understand such records is one of the purposes of expert testimony.

For all the reasons set forth in the Argument below, GMAC's Motion in Limine should be denied.

## ARGUMENT

**I.    Lowey's Proferred Testimony On The Usury Issue Is Admissible.**

GMAC seeks to bar Lowey's testimony concerning Landay's Usury claim on the grounds that (1) Lowey is purporting to render a legal opinion; (2) he is not qualified as a usury expert; and (3) his opinions are not the proper subject of expert testimony.  As will be shown in the two sections below, GMAC is wrong on each of these three points.

A.    Lowey Does Not Purport To Render Any Legal Opinions.

An inspection of Lowey's Expert Witness Report, Exhibit 4[1], pp. 2-3, reveals that, at no time, does Lowey purport to give legal opinions on any subject.  Indeed, as set forth therein, he merely analyzed GMAC's documentation, presented it in chart form, and concluded that "the annualized effective interest rate for the period from October 22, 2001 (the "Takeover Date") to January 31, 2003 [was] 27.10%".  Id., p. 2.  He then proceeded to quantify the overage, i.e., the amount in dollars resulting from the differential between 27.10% and the Massachusetts Usury Rate of 20%.  Id., p. 3.

At his deposition, Lowey acknowledged that he spoke to counsel about the Usury Statute and that counsel gave him "some very broad guidelines" as to how the Usury Statute should be interpreted.  Exhibit 5, pp. 24, 46-47.  These discussions concerned the period of the usury calculation (Id., p. 24) and whether certain items, i.e., attorneys fees, should be included.  Id., pp. 46-47.  However, as noted above, Lowey's Report does not include any legal interpretations; and Landay represents that Lowey will not be asked to interpret Section 49(a) at trial.

What GMAC is challenging in its Memorandum, pp. 6-7, is not Lowey's testimony but Landay's interpretation of the Usury Statute.  This GMAC has already done in its

---

[1] Unless designated otherwise, all exhibits are to the Affidavit of Keith D. Lowey which is filed herewith.

summary judgment papers.  If GMAC's interpretation is correct, Lowey's opinion concerning the Usury issue will be mooted.  However, if Landay's interpretation is correct, there is no basis for excluding Lowey's Usury opinion, which is rendered on the assumption that Landay's counsel knew the law.

In this regard, the case of <u>Talmage v. Harris</u>, 354 F. Supp. 2d 860 (W.D. Wisc. 2005) is instructive.  There, the defendant sought to exclude the damages evidence proffered by an expert witness because of insufficient proof of causation.  In rejecting the argument, the Court noted that the expert did not purport to offer an opinion on causation.  Rather, the expert's opinion was premised on the assumption that the plaintiff would be able to prove causation at trial.  The Court wrote: "Thus, defendants' arguments are not so much an attack on [the expert's] opinion as they are an attack on plaintiff's ability to prove the underlying assumptions on which [the expert's] opinion rests."  <u>Id.</u> at 867.  The same is true here.  There is no reason to exclude Lowey's testimony, which is based on an assumption of what the Usury law provides, unless this Court determines that the assumption is incorrect.  Moreover, Landay believes that his summary judgment papers clearly demonstrate the correctness of the legal assumptions on which Lowey's opinion is based.[2]

---

[2] In a footnote, GMAC snidely suggests that "Hoffman's influence upon Lowey's opinion was so strong that in an earlier draft of his report…Lowey repeatedly used the pronoun 'we' instead of 'I' when attributing his opinions."  GMAC's Memorandum, p. 3, n. 3.  To put it charitably, this is complete and utter nonsense.  At his deposition, Lowey testified that Keith Shelansky of his office worked with him in the preparation of his report, and that two other employees of his firm also played a role.  Exhibit 5, p. 13.  In his Affidavit, Lowey has sworn that he was referring to Shelansky when he used the word "we" in an earlier draft of his Report.  Affidavit of Keith D. Lowey, ¶13.

B.    <u>Lowey Is Qualified To Render The Opinion That GMAC Charged Seneca Interest And Expenses In Excess Of The Massachusetts Usury Rate; Moreover, The Opinion Rendered Is A Proper Subject For Expert Testimony.</u>

Lowey is a Certified Public Accountant in Massachusetts and Rhode Island. Affidavit of Keith D. Lowey, ¶4.  He spent the first four years of his career as a Senior Auditor for Arthur Anderson & Co. <u>Id.</u>, ¶5.  Having honed his skills there, including the ability to analyze documentary evidence to validate information set forth in financial statements, (<u>Id.</u>, ¶6), and after a stint as Controller/Chief Financial Officer of a private company (<u>Id.</u>, ¶5), Lowey formed Verdolino & Lowey, P.C. on January 1, 1991,  and has served as its President since 1995.  <u>Id.</u>  A significant component of his work is forensic accountancy.  <u>Id.</u>, ¶¶5 and 7.  He has qualified and testified as an expert witness on such complex issues as solvency, commingling of funds, and whether a contribution to a company by an owner is debt or equity. <u>Id.</u>, ¶¶3 and 7.  These aspects of Lowey's background and experience demonstrate his qualifications to conduct the analysis of GMAC's business records, the categorization of loan charges, and the calculations which led to his Usury opinion.

Although there are very few reported decisions which address the issue of qualifications of a Usury expert and whether such an opinion as Lowey has rendered is a proper subject for an expert to opine on, the recent case of <u>American Equities Group, Inc. v. Ahava Dairy Products Corp.</u>, No. 01 Civ. 5207, 2004 WL 870260 (S.D.N.Y. April 23, 2004), which was decided in GMAC's preferred jurisdiction, is on all fours with the case at bar on both issues.  The case concerned a factoring agreement and a claim by the borrower that the lender, AEG, had charged what amounted to usurious rates.  The lender in that case proffered as an expert a carbon copy of Lowey, i.e., a senior

manager in the Litigation and Fraud Investigation Department of the accounting firm of

BDO Seidman.  The defendant objected to the expert's testimony on numerous

grounds, including several of those raised by GMAC.  Id. at *11.[3]

The relevant portions of the Court's decision rendering AEG expert Henry's

testimony admissible are as follows:

> Henry testified that she based her opinions on review of legal
> pleadings in this case, the Agreement and Letter Agreement,
> correspondence related to the dealings between AEG and Ahava, the
> Book Account and related reconciliations, various bank statements and
> other documents evidencing transactions between AEG and Ahava.
> Henry also based her opinions on discussions with AEG's present and
> former personnel.  In the context of the instant motions, Henry's opinions
> are based on sufficient facts and data….
>
> Finally, Ahava alleges in a conclusory manner that Henry opines as to the
> meaning of contract terms.  While "testimony encompassing an ultimate
> legal conclusion based upon the facts of the case is not admissible,"
> United States v. Bilzerian, 926 F.2d 1285, 1295 (2d Cir. 1991), Ahava has
> not demonstrated that Henry has given any such opinion.  The thrust of
> the Henry affidavit is that the amounts charged by AEG to Ahava do not
> equal or exceed 50% interest per annum.  Such testimony is within
> Henry's expertise, and is an appropriate subject for expert testimony.  The
> Henry Affidavit is therefore admissible.

Id. at *12 (emphasis added).

In light of the above, the fact that "Lowey is an accountant, not a lender or a

lawyer" (GMAC's Memorandum, p.7), far from disqualifying Lowey, makes him

eminently qualified to do the analysis required to determine whether GMAC charged

Seneca an amount in excess of 20% per annum on its loan.  Thus, Lowey clearly meets

---

[3] "[I]t is based on insufficient facts or data… it is 'based on conversation with others and knowledge
gleaned about the case as opposed to general experience in the particular industry and Henry opines as
to the meaning and application of the contract terms at issue'."

Rule 702's threshold that an expert be "qualified by knowledge, skill, training or education."[4]

Finally, GMAC's contention that Lowey's opinion does not rise to the level of expert testimony is also without merit. As noted above, the American Equities Group, Inc. case is directly on point: "Such testimony is within Henry's expertise, and is an appropriate subject for expert testimony." Id. at *12. Moreover, in light of the demonstrated inaccuracies of GMAC's Client Ledgers, the basic documents used by GMAC to manage the Seneca account and to calculate damages, (Affidavit of Keith D. Lowey, ¶¶8 and 9), Lowey's audit skills are even more necessary in the case at bar than were those of AEG's expert in the American Equities Group, Inc. case.

**II.    Lowey's Opinion Concerning Commercial Reasonableness Is Admissible.**

GMAC attempts to preclude Lowey from testifying about the lack of commercial reasonableness in its liquidation of Seneca's assets on the grounds that (1) his Report does not discuss "process"; (2) he lacks expertise; and (3) his methodology is flawed and unreliable. Not only is GMAC totally wrong, it misrepresents the contents of Lowey's Report to arrive at these erroneous conclusions.

**A.    Lowey's Report Addresses The Issue Of Process In A Substantive And Substantial Manner.**

GMAC completely misrepresents the substance of Lowey's Expert Witness Report in stating that he does not focus on process and that his conclusions as to commercial reasonableness were generated by his finding that a greater recovery

---

[4] Bogosian v. Mercedes-Benz of North America, Inc., 104 F.3d 472 (1st Cir. 1997), on which GMAC relies, is clearly distinguishable for a host of reasons. Principally, while in Bogosian the proffered expert had no design experience and no engineering degree and was to testify on a design defect, Lowey, a CPA, has had education, training and experience in analyzing, categorizing, and classifying financial and other documents, which is the essence of his Usury assignment in this case.

should have been obtained.  In this regard GMAC's statement at page 11 of its Memorandum that Lowey addressed process in only one sentence and that the only support for that one-sentence conclusion is "Lowey's assertion that a greater price should have been obtained" is patently false.  Set forth below are excerpts from Lowey's Expert Witness Report which clearly demonstrate that GMAC's argument is based on a false premise.

As to the intellectual property, Lowey wrote: "[m]y review of the Rijo reports and other related material indicated that neither GMAC nor its agent made more than a minimal effort to obtain value for the intellectual property."  Affidavit of Keith D. Lowey, ¶20 and Exhibit 4, p.5.  Lowey continued as follows:

> In preparing the Liquidation Analyses as of June 30, 2001 and October 5, 2001, Rijo provides for a liquidation that is projected to take 12 and 10 weeks, respectively, and the retention of key employees in accounting, shipping, sales and accounts receivable for a period of 5 to 10 weeks. **This is important to note**.  If the goal of a liquidation is to maximize the overall return, sufficient time needs to be provided to allow the liquidating party the opportunity to administer/liquidate the remaining assets.  In this case, the remaining assets were inventory, accounts receivable, intellectual and personal property.  If sufficient time is not provided, a liquidator may be forced to accept lesser offers than he might otherwise procure if given more time.  Further, from a cost and efficiency perspective, it is generally important to retain those individuals who are most familiar with the important assets that are being liquidated/collected in any given situation.  Those individuals are usually more cost effective than professionals being retained and, as a result of their familiarity and experience with the company and/or particular assets, are in a position to liquidate/collect a particular asset more efficiently and effectively.

> Although the Liquidator intends, as of 10/5/01, to retain certain key employees to assist him with the liquidation over the proposed 10 to 12 week period, and GMAC acknowledges Landay's experience with and knowledge of the intellectual property, as well as his potential motivation in maximizing any recovery under a liquidation scenario, that expertise was not drawn upon.  The Liquidator took control of the business on very short notice – October 22, 2001, the day of the asset seizure.  Based on my review of the periodic update reports prepared by the Liquidator, the

majority of the liquidation was completed by November 16, 2001 – **in just 27 days**.  No one was retained to assist the Liquidator in selling the inventory.  See a further discussion of this point below.  Although the Liquidator did use certain key company personnel, he did so only on a very limited basis: customer service personnel, 22 hours; accounting staff (CFO), 32 hours; computer systems personnel, 12 hours; and shipping/warehouse personnel, 152.75 hours.  No one was retained and little, if any effort, was made to try and recover anything with regard to the intellectual property – despite GMAC's recognition of its value AND its funding of the Seneca purchase of the Brookfield intangibles for $1.6MM thirteen months earlier.  It is worth mentioning that Seneca's portfolio of trademarks, patents and licenses is not even reflected in that $1.6MM figure.  Presumably, the value of the combined intellectual property exceeded $1.6MM.

Exhibit 4, p. 5 (emphasis in original).

GMAC took responsibility for collecting the A/R.  It appears as though it was given supporting documentation for the accounts with outstanding balances but company personnel were not utilized to assist in dealing with the high volume of credits and adjustments that were being sought by many of Seneca's customers.  Customer checks were received via lockbox by GMAC and any discrepancies between company records and payment received were identified.  The determination as to the propriety of any credit taken by a customer was up to Seneca to investigate and follow-up on.  GMAC acted merely as a recipient of payments and record keeper of same.  I have not been able to determine what, if any, collection effort was expended by GMAC.  In the event of a discrepancy between invoice and payment amount, GMAC generated and sent a letter to Seneca giving them 60 days to investigate and resolve the discrepancy.  Initially, these discrepancy letters were sent to the company at its main location in Milford, Massachusetts.  Unfortunately, after 10/22/01, there was no one there to respond to these letters.  Further, eventually these letters ended up being forwarded back to GMAC when the Milford location was vacated in late November and the company's mail forwarded to GMAC.  In effect, GMAC was sending itself the discrepancy letters.  Landay and his Attorney found unopened discrepancy letters in the records that were retrieved from the off-site storage facility during the document production process.  GMAC has represented that it collected approximately $588k from A/R on a balance of $1.3MM as reported by the company.  Due to insufficient information provided by GMAC, I have not been able to verify this figure.

Exhibit 4, p. 6.

Since GMAC's briefing on this issue is based on a demonstrably false premise, the cases which it cites are inapposite and its argument is frivolous and should be rejected.

B.    Lowey's Expertise Renders Him Qualified To Opine On The Commercial Unreasonableness Of GMAC's Liquidation Efforts.

In its Memorandum, GMAC discusses the specific cases that Lowey identified at his deposition as part of his experience in liquidation matters, often on behalf of a bankruptcy trustee. After that interrogation, GMAC's counsel asked Lowey whether he had been personally involved in any other liquidation efforts. Lowey responded as follows:

> Yes. I mean, essentially, in a lot of the – certainly in the bankruptcy form, there's always assets that need to be administered, and typically our relationship is either with the trustee, perhaps the creditors committee, but often most, frequently it's the trustee; and to the extent there are any remaining assets, we are typically a very cost-effective – so we are told – cost effective means to help them liquidate whatever the remaining assets are.

> So to the extent there are – there is inventory or there are receivables, we will participate in the process in some way, shape or form in liquidating the remaining assets.

> Whether it be working with an Ozer, a broker, depending on the nature of the asset, we are typically, you know, very much involved and active in the process of, you know, liquidating the remaining assets.

Exhibit 5, p. 136.

As per Lowey's Affidavit, he has been involved in such liquidations since the mid-1990's. Moreover, in the last four years, Lowey has spent a substantial majority of his "forensic" practice, which is at least 50% of his overall professional practice, "in matters relating to the liquidation of a company or a portion of its assets." Affidavit of Keith D.

Lowey, ¶15.  Landay submits that this background of experience clearly qualified Lowey to render the opinions expressed in his Report.

Significantly, GMAC litigated the issue of Lowey's qualifications to opine on GMAC's commercial unreasonableness in the New York action and lost.  In that action, after affording GMAC's New York attorney a voir dire, the Referee denied GMAC's objection to Lowey's qualifications, and permitted Lowey to testify as an expert on the commercial unreasonableness of GMAC's liquidation efforts.  Affidavit of Keith D. Lowey, ¶2, and Exhibit 1.  Whether or not GMAC is collaterally estopped from challenging Lowey's credentials in this regard, this Court should follow the New York Court and find Lowey qualified.

In GMAC's brief argument that Lowey lacks the specialized knowledge required by Fed. R. Evid. 702 with respect to the liquidation process, it focuses on Lowey's opinion with regard to liquidating inventory and does not address his opinion regarding GMAC's commercial unreasonableness in liquidating Seneca's intellectual property or accounts receivable.  GMAC's decision in this regard was, perhaps, dictated by Lowey's testimony concerning his direct involvement in liquidating both intellectual property and accounts receivable on numerous occasions.  See Exhibit 5, pp. 73-76, 127-128, 131-133, 135 and 136.  In light of this testimony, there can be no doubt that he has expertise concerning liquidation of those kinds of assets.

Landay contends that Lowey was qualified to give an opinion on GMAC's liquidation of Seneca's inventory as well as the other two categories of Seneca's property which GMAC seized (intellectual property and accounts receivable).  In this regard, while much of his experience was in a supervisory capacity, Lowey has had

hands-on experience in liquidating inventory.  For example, with regard to MotherNature.com, Lowey was directly involved with the liquidation of receivables, intellectual property and the remaining inventory.  Affidavit of Keith D. Lowey, Exhibit 4, p. 128.  Be that as it may, with respect to many of the other liquidations on which he was personally involved, Lowey played a supervisory role that included overseeing the liquidation of inventory.  Affidavit of Keith D. Lowey, ¶17.  Such supervisory activities can provide a part of an expert's witness credentials which render him qualified to testify on an issue as to which his hands-on experience is limited.  Compare Diefenbach v. Sheridan Transportation, 229 F.3d 27, 30-31 (1st Cir. 2000) (Sea captain was qualified by his training and experience to give opinion regarding docking and undocking procedures and lifting of heavy lines).

GMAC implies, incorrectly, that Lowey's and his firm's role has been limited to providing accounting services, as opposed to actually conducting liquidations, by referring to one company which Lowey testified about at his deposition.  GMAC's Memorandum, p.13.  This is a patently unfair characterization of his testimony and his experience. See e.g., Exhibit 5, p.136 referred to above.  To allay any possible doubt about the extent of his hands-on and supervisory experience in conducting liquidations for troubled companies, Lowey has now averred as follows with respect to that substantial portion of his practice which involves liquidation work:

> The nature of my liquidation responsibilities varies from case to case.
> When I am retained as a liquidating trustee, assignee or receiver, I am
> primarily responsible for liquidating the remaining assets, whatever they may be (including
> inventory, accounts receivable, intangible assets, leases, claims, etc.).  This
> includes overseeing the work of others or having my employees or myself handle
> all or part of the liquidation.  In other cases, our firm is retained by troubled
> business owners, attorneys and/or Trustees or other interested parties to
> participate in and/or evaluate the liquidation process in some capacity.  On these

assignments, I typically work as part of a team often analyzing and/or playing a monitoring or supervisory role with respect to the company's employees or outside contractors who actually do the liquidation.

Affidavit of Keith D. Lowey, ¶17.

Finally, notwithstanding Lowey's involvement with Nordic Track's liquidation, including working with Ozer[5] and another company on the liquidation, GMAC claims that Lowey lacks experience in selling inventory of a toy or sporting goods wholesaler and that such lack of experience in that industry disqualifies Lowey. Exhibit 5, p. 125. GMAC is wrong on both counts. First, Lowey's Nordic Track liquidation work was experience in the relevant industry. Second, even without that experience, Lowey is qualified. The fact that an otherwise qualified expert has not had experience which virtually duplicates the subject of his opinion does not render him unqualified. See Talmage v. Harris, 354 F. Supp. 2d at 866 ("I am not persuaded by defendants' contention that Bohach must be an 'expert fire loss adjuster' in order to offer an opinion on the reasonableness of United Fire's actions with respect to plaintiff's fire loss"); and Microfinancial, Inc. v. Premier Holidays Int'l, Inc., 385 F.3d 72, 80 (1st Cir. 2004). See, also, Wechsler v. Hunt Health Systems, Ltd., 381 F.Supp.2d 135, 143-144 (S.D.N.Y. 2003) and cases cited. In Wechsler, the defendant health care provider objected to the qualifications of an accountant expert witness to analyze records relating to its accounts receivable because of his lack of experience in reviewing records of companies in that industry. In rejecting that argument, the Court wrote: "Certainly an expert with extensive experience reviewing records of health care providers would qualify to testify in this matter, but Rule 702 does not require such specificity among the backgrounds of

---

[5] Ozer is a well-known liquidator; and, indeed, GMAC utilized Ozer's analysis of the Seneca collateral in as part of its loan write-up. Exhibit 4, Exhibit B, pp. 2-3.

proposed expert witnesses." Id., 381 F.Supp. 2d at 143.  In light of the record evidence

of Lowey's relevant experience in liquidations, he is clearly qualified to opine on all

aspects of GMAC's commercial unreasonableness.

      C.     Lowey 's Methodology Was Reliable.

      In its Memorandum, GMAC mounts a Daubert attack on Lowey's methodology on

the ground that he didn't expound on industry practices or standards for the liquidation

of assets in his Report.  GMAC's Memorandum, pp. 13-15.  None of the cases cited by

GMAC supports the proposition which GMAC advances.  As will be shown below, while

the points GMAC makes at pages 14-15 of its Memorandum may provide grist for the

cross-examination mill, neither singly nor in combination do they demonstrate that

Lowey's methodology was unreliable.

      GMAC's specific reliance on Daubert v. Merrell Dow Pharm., Inc. 43 F.3d 1311

(9th Cir. 1995), which is the landmark Supreme Court case on remand, is misplaced. [6]

Like its more important Supreme Court father, Daubert concerned highly technical

medical causation issues and turned on whether the proferred testimony was "good

science":

> One very significant fact to be considered is whether the experts are
> proposing to testify about matters growing naturally and directly out of
> research they have conducted independent of the litigation, or whether
> they have developed their opinions expressly for purposes of testifying.
> That an expert testifies for money does not necessarily cast doubt on the
> reliability of his testimony, as few experts appear in court merely as an
> eleemosynary gesture.  But in determining whether proposed expert
> testimony amounts to good science, we may not ignore the fact that a

---

[6] SMS Sys. Maintenance Servs. Inc v. Digital Equipment Corp., 188 F.3[rd] 11, 25 (1st Cir. 1999), also
mentioned briefly by GMAC, is inapposite.  The Court excluded the expert's testimony because there was
no data supporting the expert's conclusion. ("Although we find Dr. Bleuel's report deficient on several
levels, it suffices only to discuss the shortcomings of his data collection." Id.)  GMAC has not directed its
assault on Lowey's "data collection," nor can it (Lowey reviewed documents supplied by GMAC).   GMAC
has directed its assault on Lowey's Report for not discussing in detail general accounting and liquidating
practices, a topic not discussed in SMS or any other case cited by GMAC.

scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office.

Id. 43 F.3d at 1317 (emphasis added).  While Lowey's testimony is clearly of a different character than that of the expert in Daubert, Landay submits that it is fully compliant with the Supreme Court decision in Daubert and its progeny.

Lowey's proposed testimony is not "scientific" in the Daubert sense but consists of "specialized knowledge" derived from his considerable experience in forensic accounting and liquidation – experience acquired in Lowey's "lab or field, not the courtroom or the lawyer's office."  Id.  Lowey's specialized knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue" within Rule 702. Lowey's methodology was to review the pertinent documentary evidence, as well as deposition testimony, to consult with Mr. Landay, and to analyze the conduct of GMAC and its inventory liquidator, John Rijo, and determine whether their conduct was commercially reasonable in light of his liquidation experience.[7]   His finding – that GMAC did not act in a commercially reasonable manner – was fully supported by the reasons which he gave in his report.  Exhibit 4, pp. 5-6, quoted in full above.

As the Supreme Court has recognized, and the First Circuit has often reiterated, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596 (1993). See, also, United States v. Diaz, 300 F.3d 66, 77 (1st Cir. 2002); and Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Company, 295 F.3d. 68, 81 (1st Cir. 2002).  While

---

[7] While Lowey did not use phrases like industry standards or practices, he was clearly generalizing from his experience in the "liquidation industry."  For example, he wrote: "[F]rom a cost and efficiency perspective, it is generally important to retain those individuals who are most familiar with the important assets that are being liquidated/collected in any given situation."  Exhibit 4, p. 5.

Landay believes that Lowey's testimony is cogent and far from "shaky", he submits that the various points which GMAC makes – the failure to explain how Lowey's opinions "comport with the standards of the accounting or liquidating professions," the failure to "mention practices for liquidating inventory of companies closing their doors," or the failure to reference "commonly accepted standards for trying to collect accounts receivable", etc. – should be left to GMAC's cross-examination at trial and should not be employed to bar the testimony of a qualified expert witness who has done his job competently and professionally.

In this regard, the weakness of GMAC's position is illustrated by reference to the report of its expert, attached as Exhibit A to this Memorandum. While there is a passing reference to industry standards regarding collection of receivables (Exhibit A, p.13), there are no references to industry standards or practices, the purported omission of which appears to be the crux of GMAC's Daubert attack on Lowey, in the expert's discussion of either liquidation of inventory (Exhibit A, pp. 4-11), or liquidation of intellectual property. Id., pp. 12-13. For example, GMAC complains that "[Lowey] also makes no mention of the methods typically used to sell intellectual property of a dying company or how liquidators typically determine whether or not it is economically efficient to liquidate such assets." GMAC's Memorandum, p.15. A perusal of GMAC's Expert Witness Report, Exhibit A, pp. 12-13, reveals that Mr. Gold and his cohort, Attorney Fox, didn't either. While Landay believes that portions of the Gold/Fox report should be stricken for a number of reasons, and will raise these issues by a pre-trial motion in limine, the failure to refer to the shibboleth of "industry practices" is certainly not one of them.

Respectfully submitted,
DAVID L. LANDAY,
By his attorney,


/s/ Alan R. Hoffman
Alan R. Hoffman, BBO# 236860
LYNCH, BREWER, HOFFMAN & FINK, LLP
101 Federal Street, 22nd Floor
Boston, MA 02110
(617) 951-0800

Dated:   December 27, 2005

232615_1