# EXHIBIT A

**ASSET DISPOSITION ADVISORS, LLC**
CONSULTANTS
**655 THIRD AVENUE**
**NEW YORK, NEW YORK 10017**
(212) 573-9084

FAX (212) 476-4788
Email: assetdisposition@aol.com

October 28, 2005

Edwards & Angell LLP
101 Federal Street
Boston, MA 02110
Attn:   John A. Houlihan, Esq.
        Mark B. Dubnoff, Esq.

    Re:   David L. Landay v. GMAC Commercial Credit LLC, et al.
              Civil Action No. 04-11955-WGY
              <u>United States District Court -- District of Massachusetts</u>

Gentlemen:

    Asset Disposition Advisors, LLC ("ADA") has been retained by Edwards & Angell LLP ("E&A"), in its capacity as counsel to GMAC Commercial Credit LLC ("GMAC"), for the purpose of providing the within expert report, and where requested, expert testimony in connection with that certain action styled *David L. Landay v. GMAC Commercial Credit LLC, et al.* pending in the United States District Court, District of Massachusetts, Civil Action No. 04-11955-WGY.

    Our report is based solely upon information and documents provided by E&A, and upon our interviews of certain individuals where specifically noted herein. We make no representation or warranty as to the accuracy or completeness of the information supplied to us. In preparing this report, we have assumed that all such information is accurate and complete and that there are no undisclosed facts or circumstances bearing on the subject matter hereof. The opinions expressed herein are provided for the stated purpose of providing information and assistance to the parties to whom this report is addressed and are not in any way, implied or express, to be used, circulated, copied, quoted, relied on, or otherwise referred to for any other purpose by any other person without our prior express written authorization.

A.   Expert Qualifications

Asset Disposition Advisors, LLC, formed in 2001, is a nationally recognized and respected strategic consulting firm, providing strategic asset acquisition and disposition advice and guidance to companies in distress, official and unofficial creditors' committees, lenders, asset and enterprise purchasers, and asset disposition specialists. ADA is well known for successfully undertaking and completing difficult and complex strategic asset disposition and acquisition transactions.

ADA's consulting practice is co-headed by Barry Gold, a retailer and management consultant with approximately 40 years of experience encompassing every facet of retail, finance, operations, and asset management. In addition to Mr. Gold, Steven Fox, a Senior Consultant with ADA, is a highly regarded attorney and consultant with approximately 19 years of business restructuring experience. ADA brings a unique approach to its asset disposition and acquisition engagements. By forging business, legal and restructuring expertise under one roof, ADA is able to bring the requisite business and operational expertise to each project.

Current Curriculum Vitae of Messrs. Gold and Fox accompany this report at Attachment 1. A list of representative engagements accompanies this report at Attachment 2.

B.   Information/Documents Reviewed

In preparing this report, we have reviewed those documents listed in Attachment 3. As noted above, we make no representation or warranty as to the accuracy or completeness of the information supplied to us. Moreover, in preparing this report, we have made no attempt to independently verify the accuracy or completeness of the information supplied to us, and instead have assumed that all such information is accurate and complete, and that there are no undisclosed facts or circumstances bearing on the subject matter hereof.

In the course of preparing this report, we have also had the opportunity to interview the following representatives of RAS Management Advisors, Inc. ("RAS"): Richard A. Sebastiao and John Rijo. We have also had the opportunity to interview Joseph Lennon, a Receivables Product Manager of GMAC.

C.   Issue Presented

Pursuant to the terms of that certain Letter Agreement, entered into in October 2001 ("Surrender Agreement"), Seneca Sports, Inc. and Brookfield International, Inc. (collectively, "Seneca") agreed to, *inter alia*, surrender, deliver and grant to GMAC peaceful possession of certain "Collateral" (as such term is defined in the Surrender Agreement). Pursuant to the Surrender Agreement, Seneca further agreed and consented to, among other things, GMAC's possession, sale, transfer or other disposition of the Collateral. GMAC thereafter secured possession of the Collateral, and commenced the process of selling, transferring or otherwise disposing of the Collateral.

The question presented to ADA is whether, given the circumstances present at the time of GMAC's and Seneca's execution and delivery of the Surrender Agreement, GMAC and/or any agent(s) engaged by it (*eg.*, RAS) acted in a commercially reasonable manner in

2

selling, transferring or otherwise disposing of the Collateral. It is important to note that in presenting this report we have not been asked to provide any assessment or opinion as to the value of the subject Collateral or as to the application of the proceeds thereof under the terms of the Surrender Agreement, or any other agreement in effect as between GMAC, Seneca or any other third party. Rather, our report is limited solely to an assessment of the commercial reasonableness of the steps undertaken by GMAC and/or its agent(s) to sell, transfer or otherwise dispose of the Collateral.[1]

D. <u>Summary of Findings and Conclusions</u>

Based upon our review of the documents referenced herein and the personal interviews conducted to date, as well as our general experience in the field of strategic asset disposition matters, it is our opinion that GMAC and its agent(s) acted in a commercially reasonable manner in selling, transferring or otherwise disposing of Seneca's assets, for the reasons described more fully herein below.

E. <u>Factual Background</u>[2]

In or about 2001 Seneca was a distributor and seller of sporting equipment, goods, toys and sports-related products. At all relevant times, the Plaintiff in this action, David L. Landay ("Landay"), was the President, Chief Executive Officer, a director and substantial shareholder of Seneca.

Pursuant to that certain Factoring Agreement dated as of September 19, 2000 ("Factoring Agreement"), GMAC provided certain loans and/or other financial accommodations to Seneca in the amounts and for the purposes set forth in the Factoring Agreement. Under the terms of the Factoring Agreement, Seneca granted GMAC a first priority security interest in and upon all or substantially all of Seneca's assets and interests, including, but not limited to, inventory, fixed assets, personal property, accounts, accounts receivable, general intangibles, and books and records. The loans and/or other financial accommodations provided to Seneca by GMAC under the Factoring Agreement were further guaranteed, in part, by Landay, which limited guaranty was partially collateralized by a combination of cash or cash equivalents, and certain letters of credit.

Subsequent to the parties' execution and delivery of the Factoring Agreement, GMAC declared Seneca in default of its obligations under the Factoring Agreement. On or about August 9, 2001, Seneca and GMAC entered into a certain Forbearance Agreement ("Forbearance Agreement"). Subsequent to the parties' execution and delivery of the Forbearance Agreement, GMAC declared Seneca in default of its obligations under the Forbearance Agreement. As a result of Seneca's default of its obligations under the Forbearance Agreement, GMAC and Seneca entered into the Surrender Agreement, under which Seneca agreed to, *inter alia*, surrender, deliver and grant to GMAC peaceful

---

[1] The approach utilized in this report is different in substantial ways than the one adopted by Keith D. Lowey, Plaintiff's expert, in his expert report.

[2] The following description is based upon our review of the documents supplied to us and the interviews conducted to date. This description is not intended as a legal opinion.

3

possession of the Collateral, and further to, among other things, GMAC's sale, transfer or other disposition of the Collateral.

On or about October 22, 2001 ("Surrender Date"), GMAC (either directly or through its agent, RAS) secured possession of the Collateral, and thereupon commenced the process of selling, transferring or otherwise disposing of the Collateral. Our review of the documents supplied to us revealed that RAS was on-site at Seneca for an extended period prior to the Surrender Date, and as a result had an opportunity to become familiar with the company's operations, key employees, assets, customers, and books and records.

The specific Collateral disposition efforts and activities undertaken by RAS, among others, are described in Section F below.

F.   Collateral Disposition Efforts

In assessing whether GMAC (either directly or through its agent, RAS) acted in a commercially reasonable manner in selling, transferring or otherwise disposing of the Collateral, we reviewed activities relative to the sale, transfer or other disposition of the following asset categories[3]:

    (i)     Inventory;
    (ii)    Fixed assets, including property, plant and equipment;
    (iii)   Intellectual property, including patents, trademarks and licenses;
    (iv)   Accounts receivable;
    (v)    Files and business records; and
    (vi)   Real estate (whether owned or leased).

In the course of performing our evaluations and arriving at the conclusions stated herein, we have reviewed and considered the specific activities undertaken by GMAC and RAS, and further considered our general experience in the field of strategic asset disposition and acquisition transactions. Our conclusions, segregated by relevant asset category, follow below.

    (i)     Inventory Disposition Activities

Based upon our review of the documents referenced herein and the personal interviews conducted to date, it would appear that Seneca's inventory assets on or about the Surrender Date can be segregated into three (3) separate subgroups, as follows: on-hand; third party warehoused; and in-port. Each of these subgroups will be addressed separately below.

---

[3] Although there may have existed other categories of assets at the relevant time, such as proceeds under existing insurance policies (*eg.*, unearned premiums or outstanding claims), litigation claims, prepaid assets and deposits, etc., we have been provided with no information concerning any of these items, and therefore we express no opinion as to them.

4

(a)     <u>Inventory On-Hand (Milford, MA)</u>

According to a certain Inventory Appraisal, dated May 2000 ("OVS Appraisal"), Ozer Valuation Services LLC ("OVS") reported that Seneca had approximately $2.4 million in aggregate cost inventory in or about May 2000.[4] Based upon the information reviewed by ADA, on or about the Surrender Date it would appear that there was only approximately $1.28 million aggregate cost inventory[5], of which only less than an approximately $800,000 was on hand in Seneca's Milford, MA facility. Of the balance (approximately $450,000 in the aggregate, representing approximately 45% of total inventory), approximately $300,000 in aggregate cost inventory was located in a third party warehouse in Toledo, OH, with an additional approximately $150,000 in other third party warehouse facilities.

With regard to the inventory on hand in Seneca's Milford, MA facility, it is our understanding that a substantial portion of that inventory represented (i) dated goods (*ie.*, not current stock), which included a larger than normal component of less than first quality merchandise, and (ii) an incomplete mix (*eg.*, limited size ranges and unit numbers), as management sold the most saleable first quality product in the pre-surrender period in order to generate revenue.[6] In addition, it is our further understanding that a substantial portion (estimated at approximately 74%) of the on-hand inventory was product covered by the Mattel and Disney licenses. This was critical because, as noted below, this inventory could have been rendered valueless in the event either Mattel and/or Disney terminated their respective licenses and thereupon obtained injunctions preventing the further sale of these goods.

Our interviews and document reviews indicate that upon taking control of the inventory, RAS reviewed the universe of outstanding open purchase orders to determine which, if any, of such orders could be completed from existing inventory stocks. Although their review indicated that in fact some of said orders could be completed, some of the affected customers had outstanding receivable balances due Seneca, and RAS was reluctant to ship additional goods to customers under that scenario (and thereby increase the risk that

---

[4] The OVS Appraisal does not segregate existing inventory stocks as to its location (*eg.*, on-hand; third party warehoused; or in-port), and therefore appears to assume that all such inventory is on hand and available for immediate sale. The OVS Appraisal also does not adjust projected recovery values based upon the unavailability of certain categories of goods, such as third party warehoused or in-port, and further does not take into account either (i) the cost of accessing or obtaining possession of any such goods that may be subject to third party liens and/or distraints, (ii) associated timing delays and additional sale costs of freeing such goods from the subject third party liens and/or distraints, or (iii) anticipated declination in overall gross/net recovery values in the event possession of any such goods is unattainable.

[5] A further review of the records supplied revealed that of the approximately $1.28 million aggregate cost inventory, approximately $270,000 of that amount represented packaging materials and components (*ie.*, requiring additional manufacturing to convert into finished products), leaving only approximately $1.0 million aggregate cost value of finished products available for sale in the liquidation.

[6] Although we have not been asked to express an opinion as to the underlying value of the inventory as of the Surrender Date, it is important to note that the OVS Appraisal makes clear that altering the mix of the products on hand at the time of liquidation could significantly, and adversely, affect the value of the remaining product.

5

additional goods would go unpaid for, or credits issued to the wrong merchandise shipments, thus unnecessarily complicating the account receivable reconciliation process to follow). Instead, RAS insisted that any new product shipments to those customers would be on a COD (*ie.*, cash on delivery) or CIA (*ie.*, cash in advance) basis only, so as to reduce the collection risk factors with these customers. In view of the collateral value realization focus of the project, and taking into due consideration the existing account receivable balance collection issues[7], it is our view that requiring COD or CIA basis only cash sales to this component of the customer population appears to be a logical and reasonable approach under the circumstances.[8]

As to the balance of the on-hand inventory, our interviews and document reviews indicate that RAS forwarded comprehensive available inventory summaries to Seneca's existing regular customers and solicited their interest in purchasing additional items, preferably in bulk transactions.[9] Again, RAS specified that all sale transactions would be for cash only, and subject further to COD or CIA terms. It would appear that RAS's solicitation efforts with the existing customer base was of limited success, due primarily to the broken nature of the stock (*ie.*, limited mix), as such customers ordinarily need a far broader and complete balance to meet their retail needs. In addition, it was reasonable to expect, and in fact it was RAS's experience here, that most of the main line retail customers had already committed all, or substantially all, of their open-to-buy (*ie.*, seasonal purchase needs) for the Christmas holiday season by the time the Seneca liquidation process had begun, thus further limiting those customers' appetite for additional, sub-optimal product.

In addition to soliciting the existing customer contacts, RAS attempted to liquidate the on-hand inventory by focusing sales efforts on bulk sales to customers within the wholesale and liquidation communities, as these were sale candidates that RAS perceived, in its experience, were most accustomed to buying broken stock in bulk on an expedited basis, and further were known to accept COD or CIA terms for such purchases. Document reviews indicate that RAS engaged in numerous and regular contacts with the customers solicited, provided additional inventory information, and sought to obtain the maximum value realizable given, among other considerations, the time of year (*ie.*, shortly before the

---

[7] One such example is the Toys R Us ("TRU") account. Our review of the documents supplied suggests that prior to the Surrender Date there was some difficulty in reconciling the TRU account, including, but not limited to, determining the allowable amounts of credits and offsets associated with damaged and defective product (among other things). Additional credit sales would have served to potentially exacerbate the account reconciliation problem.

[8] An additional consideration of note was the suspect financial condition of some of these existing customers. At or about that time, Ames was suffering severe financial difficulties, and shortly thereafter underwent its own complete liquidation in chapter 11. Kmart, also a significant Seneca customer, filed for chapter 11 protection in January 2002. KB Toys, although not a bankruptcy candidate until 2004, suffered its own form of financial difficulties at the time, and underwent a comprehensive financial restructuring in 2002. Likewise, Lash Tamaron was on less than sound financial footing at the end of 2001. As a result, RAS assumed little or no recovery on certain accounts in its October 5, 2001 liquidation analysis, which consideration was prior to application of the types of distress environment adjustments that are typical in these situations (*eg.*, KB Toys – 100% at risk; Ames - $0 recovery; Milton Myer - $0 recovery; Lash Tamaron - $0 recovery).

[9] This sales strategy -- namely, attempting to sell existing stock through existing customer and normal distribution channels -- is consistent with the sale strategy noted in the OVS Appraisal.

6

Christmas holidays), the sub-optimal nature and mix of the inventory, and customers' willingness to purchase. A review of Mr. Rijo's detailed daily summary progress reports indicates that these efforts resulted in a variety of bulk sale transactions.

Among the potential liquidation customers for the on-hand inventory, a review of the documents supplied reveals that RAS solicited offers from both The Ozer Group ("Ozer") and Gordon Brothers Retail Partners ("GBRP"), both well-known national inventory liquidation firms headquartered in Boston, MA. Our review of the documents supplied further revealed that representatives of both Ozer and GBRP visited Seneca's Milford, MA facility to inspect the available inventory. Those same documents reveal that despite numerous attempts to secure an offer from GBRP, those efforts proved unsuccessful as GBRP declined to present an offer for the merchandise. RAS's solicitation efforts ultimately yielded an offer from Ozer; however, the Ozer offer was for only approximately 22.5% of the cost value of the inventory[10], or substantially below the value ascribed to the inventory under the OVS Appraisal, and substantially below the value being realized upon bulk sales to third party wholesale customers.[11] RAS therefore determined to not accept the Ozer offer, and instead pursue alternative bulk sales of the merchandise, as described above. Our interviews also confirmed that when prospects for bulk sales diminished, efforts were undertaken by RAS to solicit and secure offers for smaller lots of inventory.[12]

During our interviews we questioned RAS representatives as to what, if any, consideration was given to utilizing more mass media-type advertising to expand the potential customer population. In response, RAS advised that additional marketing activities were in fact considered but not pursued for two (2) principal reasons: first, in their experience, mass media advertising results in a longer sale timeline, which in turn would result in significantly greater overall liquidation expenses being incurred, including, but not limited to, the base cost of the advertising itself *plus* the associated costs of maintaining the Milford, MA facility for an extended period of time; and second, that there was a significant concern that mass media advertising, as distinguished from discreet private contacts with existing and wholesale/liquidation customers, would prematurely alert affected licensors to the liquidation activities, which in turn would jeopardize the inventory liquidation efforts.

---

[10]    On closer examination, the net realizable value under the Ozer offer was likely less than 20%, after exclusion of the approximately $270,000 in packaging and component parts inventory, as well as any distrained warehouse inventory, that likely was not available for sale (either in whole or in part). This reduced valuation serves to further validate RAS's determination to pursue alternative bulk merchandise sales rather than the Ozer offer.

[11]    As noted at footnote 6 *infra*, the OVS Appraisal expressly noted that an adverse shift in the overall mix of the inventory available for liquidation would have a corresponding significant adverse impact on the realizable liquidation value of the inventory. This was later validated by the substantially lower liquidation offer presented by Ozer. As a result, any effort to tie the value of the inventory at October 21st to the value reflected in OVS Appraisal is misleading and ignores substantial differences in both the composition and levels of the inventory on the Surrender Date, among other things, and therefore renders the OVS Appraisal irrelevant in October 2001.

[12]    In our interviews with RAS representatives, they stated that small lots or individual unit sales were not the initial focus of their sale efforts because they believed those transactions were too time consuming and costly relative to the transaction size. In our experience, the assumptions applied by RAS in this instance were reasonable under the circumstances.

Our review of the documents supplied reveals that this latter concern was both real and justified. Correspondence delivered to Seneca confirmed that Mattel had attempted to terminate the existing licenses for various defaults, including, but not limited to, royalty payment failures. In the event that Mattel was alerted and thereupon adopted an aggressive posture, including the possibility of obtaining an injunction prohibiting the sale of the remaining licensed products, little or no value would have been realized therefor.[13]

During our interviews we also questioned RAS representatives whether consideration was given to conducting retail sales of the available merchandise, either as an alternative to the bulk sales approach described above, or on a parallel basis, as records reviewed revealed that during the pre-Surrender Date period Seneca had made limited retail sales from space located within the Milford, MA facility. RAS again confirmed that this was considered; however, it was concluded that space limitations (the existing retail space was too small to realize any meaningful sales in a reasonable period of time), additional costs (*eg.*, rents for extended occupancy at the Milford facility), and advertising needs to attract retail customers (and the associated licensor risks (described above)), made such a sale strategy prohibitive.[14]

Additional inquiry was made of RAS as to their decision to conduct a 5-week liquidation period, as compared to the liquidation duration assumption contained in their June 30, 2001 liquidation analysis (12 weeks), or as compared to the 6-week period projected under the OVS Appraisal. RAS responded that had the collateral liquidation activities commenced in July 2001, when (i) the inventory volume and mix were significantly better than what existed on October 21st, (ii) customer relationships were significantly better, (iii) the Christmas holidays were not around the corner, and (iv) customers had not already committed the substantial portion of their open-to-buy for the Christmas holiday season, a longer liquidation timeline may have been reasonable. RAS also responded that a shorter liquidation period was appropriate since there was only roughly 50% of the inventory on hand at October 21st as compared to the inventory levels assumed under the OVS Appraisal (approximately $2.4 million at cost). Since the stated assumptions proved not to be true at October 21st, and the inventories suffered significant declination and degradation, a more compressed liquidation period was prudent. We therefore concur with RAS's assessment of the need to move faster, rather than slower under the circumstances.[15]

We believe that RAS's marketing and sales activities were sound and commercially reasonable. Given (i) the substantial expense associated with maintaining possession of the

---

[13] In fact, a review of the Mattel termination notice that was later received in fact made a demand that Seneca immediately discontinue sale of licensed products, thus validating RAS's concern.

[14] In our interviews, RAS also indicated that in its opinion making additional space available to conduct retail sales was not advisable due to concerns surrounding potential liability claims and issues regarding safeguarding of the balance of the inventory.

[15] In fact, RAS suggested in interviews that in the event the inventory was not sold in the timeframe allotted, it was their estimation that GMAC would have to hold the inventory for an additional approximately 6-8 months in order for there to be additional sales opportunities. Given the concerns associated with the license cancellations and the costs associated with maintaining possession of the Milford, MA facility, waiting this additional time was neither prudent nor reasonable.

8

Milford, MA facility, (ii) the sub-optimal composition of the inventory, and (iii) concerns with threatened and potential license terminations, the sale strategies employed by RAS were reasonably calculated to achieve sales of the merchandise for maximum value under the circumstances.

### (b) Third Party Warehouse Inventory

As noted above, it is our understanding that approximately $300,000 in aggregate cost inventory was located in a third party warehouse in Toledo, OH, with an additional approximately $150,000 cost inventory located in other third party warehouse facilities. It would further appear from correspondence reviewed and interviews conducted that on the Surrender Date Seneca owed substantial past due amounts in respect of storage and other related charges to these third party warehouses, as a result of which the affected warehousemen asserted possessory warehouseman liens, and distrained (*ie.*, the affected warehouseman exercised state law lien rights to retain possession of the stored goods pending payment of the outstanding storage charges) the goods in question subject to payment of amounts due and owing said warehousemen.

Our review of the documents supplied reveals that the past due amounts notwithstanding, RAS nevertheless solicited offers for the warehouse inventory using an approach similar to that employed for the on-hand inventory (see discussion above). These efforts resulted in a limited number of bulk purchase offers for the inventory; however, the offers presented were for aggregate dollar amounts that were less than the amounts due the warehouses for storage and other outstanding charges. RAS then undertook an economic assessment of the offers presented, and determined that unless there was positive economic value in the offer for Seneca (or GMAC as its secured lender)(*ie.*, the offer yielded more than would be necessary in dollars to secure the release of the warehoused inventory), there was no economic basis to accept the offer and proceed with the sale transaction.

Rather than abandon the proposed sale transactions entirely, it would appear that RAS initiated negotiations with the affected warehousemen in an effort to arrive at compromised storage charge amounts that would result in net positive dollars to Seneca upon consummation of the sale transactions. As concerns the inventory located in the Toledo, OH warehouse, RAS succeeded in negotiating a compromise with the warehouseman that enabled it to consummate a sale transaction for the entirety of the Toledo inventory on a CIA basis.[16] Our review of the documents supplied reveals that similar efforts were expended

---

[16] It should be noted that RAS decision to entertain COD or CIA sale transactions only was validated by its experience in the Toledo warehouse inventory sale transaction. In that circumstance, RAS had concerns that a buyer would seek post-closing adjustments relating to damaged, defective, or otherwise not first quality product unless the sale was all cash and without recourse. RAS provided the buyer, Leon Korol ("Korol"), with the opportunity to inspect the merchandise pre-closing. Subsequent to the closing and delivery of the merchandise, RAS learned that the customer believed that the level of not first quality product actually received was substantially greater than first assumed. However, since RAS wisely insisted on an all cash transaction with no post-closing adjustments possible, no deduction in the sale value resulted. However, Korol's disappointment with the condition of the inventory led him to refrain from making any additional inventory offers/purchases.

As noted above, the risks associated with customers' demands for post-closing adjustments was a significant consideration by RAS not only in connection with sales of the warehoused goods, but also as

9

with respect to the remaining balance of the warehoused inventory. In certain instances, RAS's efforts resulted in offers that provided for positive economic value for Seneca (or GMAC as its secured lender). In certain other instances, no acceptable offers were received; accordingly, the affected distrained inventory was abandoned in place.

We believe that RAS's marketing and sales activities were sound and commercially reasonable. Given the substantial expense associated with securing possession of the warehoused inventory as a result of the outstanding storage and other charges, it was reasonable to consummate only those transactions that provided for net economic value to Seneca/GMAC. In our experience, the sale strategies employed by RAS were reasonably calculated to achieve sales of the merchandise for maximum net economic value under the circumstances.

(c)   In-Port Inventory

Our review of the documents supplied reveals that on the Surrender Date there was certain inventory located in-port warehouse facilities that were subject to substantial demurrage and other charges. A review of these same documents reveals that RAS was operating under the understanding that the customs and associated liens that attached to the in-port inventory were senior in priority to the liens asserted by GMAC, and therefore the only option available for securing the release of the affected goods was to pay all past due amounts, upon which the goods would be released to Seneca/GMAC.

RAS approached this inventory classification in much the same way it did the third party warehouse inventory. Specifically, the documents reviewed reveal that RAS solicited offers that would yield positive economic value to Seneca/GMAC. However, unlike was the case with portions of the warehouse inventory, RAS was not successful in generating any offers for the in-port inventory that would have yielded positive economic value to Seneca/GMAC. Thus, the determination was made to abandon the in-port inventory.

Prior to the time that the decision to abandon the affected goods was decided upon, Seneca received written notification that the existing surety bonds were being cancelled, and also that U.S. Customs intended to liquidate the inventory in mid-December 2001 to pay the balances due. This had the further affect of limiting the available timeline for fielding offers for the in-port inventory. The sale timeline was further compressed because a substantial portion of the in-port inventory was Mattel licensed product.[17] For the reasons noted above (namely the concerns surrounding the termination of the Mattel license and the inability to

---

related to the sales of goods to existing customers with outstanding accounts receivable balances. We believe that RAS's warehouse merchandise disposition experience (such as with the Korol transaction) likewise validated the soundness of the approach it adopted relative to the sale of goods to existing customers with outstanding accounts receivable balances.

These same concerns over adjustments associated with damaged, defective, or other less than first quality merchandise may likewise have negatively impacted on the ability to maximize recoveries on account collections. See Discussion at Section F(iv) below.

[17]   Documents we reviewed revealed that an estimated 74% of the total inventory (including on-hand, warehoused and in-port) were licensed products.

10

sell the goods post-termination), RAS attached a short sale window to these goods. As a result, the in-port inventory was abandoned.

We believe that RAS's marketing and sales activities were sound and commercially reasonable. The sale strategies employed by RAS were consistent with the strategies employed with regard to the on-hand and warehouse inventory; however, the absence of economically viable offers, coupled with the substantial outstanding demurrage charges and the impending U.S. Customs sale, resulted in limited sale opportunities, thus justifying the abandonment of the in-port inventory.

(ii) <u>Fixed Assets Disposition Activities</u>

Subsequent to the Surrender Date, the records reviewed reveal that RAS prepared a comprehensive inventory of all remaining furniture, fixture and equipment located in the Milford, MA facility, and made such items available for sale to third parties.[18] Toward that end, RAS contacted multiple local fixed asset liquidation firms for the purpose of soliciting offers for Seneca's fixed assets. Of the parties solicited, most declined an invitation to visit Seneca's facility and inspect the assets. In fact, of the two parties that did elect to inspect the assets, each party declined to submit an offer. RAS understood the basis of parties' reluctance to present any offers was grounded in the age of the assets in question, their sub-optimal condition, and the absence of demand in the secondary market for these items. All other sale efforts (other than as concerned a certain fork lift), proved unsuccessful.

During our interviews we questioned RAS representatives whether consideration was given to extending the occupancy period in the Milford, MA facility for an additional period of time in order to extend the fixed asset marketing period. RAS responded that they did in fact give such a scenario consideration; however, they concluded that given (a) the absence of meaningful interest to date and (b) the significant additional expense (including, but not limited to, rent, insurance, utilities, etc.) associated with extending the Milford occupancy period, no meaningful economic benefit would result. As a result, the remaining fixed assets were abandoned in place.[19]

We believe that RAS's marketing and sales activities were sound and commercially reasonable. The fixed asset sale strategies employed by RAS were consistent with the strategies employed in similar such transactions. Given (i) the substantial expense associated with maintaining possession of the Milford, MA facility in order to continue marketing activities, (ii) the sub-optimal composition and age of the fixed assets, and (iii) the absence of any meaningful expression of interest from the third party fixed asset liquidation firms

---

[18] The only known exclusion to this were Seneca's computers, which records reveal were retrieved by a representative of GMAC at the conclusion of the collateral liquidation process. It is ADA's understanding that those computers were retrieved by GMAC for purposes of preserving electronic databases needed to support the accounts receivable reconciliation and collection process. ADA did not review any records that would indicate the ultimate disposition of the subject computers.

[19] The Stehl Letter (defined below) advised Seneca that certain fixed assets were being abandoned in place. To the extent that those assets had any residual value, Seneca's representatives and/or Landay could have marketed those assets for sale. There is no indication in the documents supplied to us that any such efforts were undertaken.

solicited, the sale strategies employed by RAS were reasonably calculated to achieve sales of the merchandise for maximum value under the circumstances.

(iii) <u>Intellectual Property</u>

From the documents that we have had occasion to review, including a summary schedule of the owned patents, trademarks, or copyrights, it is apparent that most of those assets remain viable and have current registrations. As a result, additional time appears to be available to realize value from such assets.[20]

Certain observations can also be made relative to the licenses held by Seneca. During our document reviews and interviews, we were provided with copies of Seneca's licenses with Mattel and Disney. We were also provided a summary schedule of the licenses, which schedule contained a summary of the salient terms of each license. Based upon these reviews, it is our observation that although there are situations where meaningful value can be realized upon transfers and assignments of license rights, we do not believe that efforts to transfer the licenses at issue here would have been likely to achieve meaningful success, if any. More specifically, each of the licenses contained transferability restrictions that would have presented significant hurdles to realizing any value for the licenses. Among other things, each license required the express prior written consent of the licensor to any transfer of the license. In our opinion, given that each of the licenses suffered from material defaults, including, but not limited to, substantial royalty arrearages, obtaining consent from the licensor was not likely.[21]

Even assuming, *arguendo*, the requisite licensor consent could be obtained, each license required that in order to effectuate a transfer the licensee (in this case Seneca) would have been required to pay all outstanding royalty amounts. In this case, it is our understanding that those sums were substantial, and would have either (a) required GMAC to advance additional sums (a seemingly unreasonable expectation under the circumstances) and/or (b) substantially diminished the net realizable value associated with the license(s), thus making any such efforts speculative at best.[22] Lastly, we note that each of the licenses

---

[20] We have also been provided with copies of correspondence between counsel for GMAC and Landay, under which GMAC has offered to assign the intellectual property to Landay under certain stated conditions, following which Landay would be free to market and sell the intellectual property. Notwithstanding Landay's apparent financial interest, we have seen nothing in the records supplied to us to suggest that Landay has taken GMAC up on its offer, which may be an indication that protests and legal posturing aside, the intellectual property may be of dubious value.

[21] Transferability of the licenses was even more remote in that in our experience licensors have a preference to choose their licensees themselves for, among other reasons, it enables them the opportunity to negotiate improved business terms based upon current market conditions.

[22] It is also appropriate to reiterate here RAS's stated concern that any activity that would have served to alert the licensors as to GMAC's collateral liquidation activities ran the risk that those same licensors would have initiated steps to interfere with GMAC's efforts to realize value for the existing inventory stock. Marketing the licenses and/or seeking transfer consents from the licensors would run the risk of awakening a "sleeping giant", and posed significant risk to the success of the inventory liquidation efforts. When balanced against the limited prospect for realizing meaningful value for the licenses (for the reasons discussed above), this risk appears unwarranted.

we reviewed (and as further indicated in the summary schedule included among the documents reviewed by us) had a remaining term of between 12 and 18 months. Additionally, between December 2001 and January 2002, approximately $700,000 in guaranteed minimum royalties were scheduled to come due under the Mattel license alone, amounts that it would appear Seneca was in no position to pay. Given the limited term remaining under each license, the substantial sums required to be paid in respect of guaranteed minimum royalties less than 2 months after the liquidation process concluded, and the extended time it would take (a) to market the licenses, (b) to seek and obtain the requisite consents (assuming funding was available to cure existing royalty defaults) and (c) for a license transferee to develop new products and access the necessary materials and manufacturing facilities to bring products to market, little if any term would remain under the subject licenses making it unreasonable to expect that any meaningful value could be realized therefor.

    (iv)    <u>Accounts Receivable</u>

During the course of our interviews, we had occasion to familiarize ourselves with GMAC's standardized account collection practices under their factoring agreements. Specifically, we were provided with a copy of a certain GMAC Factoring Division Memo: North American Factoring Division Collections Policy, dated September 30, 2002, which outlined GMAC's standardized account collection practices. Although it was made clear in our interviews that the policies expressed in the September 30th memo were not in effect in 2001 during the Seneca liquidation process, the GMAC representatives interviewed confirmed that policies and procedures nearly identical to those described in the September 30th memo were utilized by GMAC in the latter part of 2001.

In that connection, it is our understanding that GMAC utilized an automated standard dunning grid/matrix to monitor account collection activities. In addition, in the event of account disputes (*eg.*, disputes over account balances, credits and offsets, etc.), referral to the client (in this instance, Seneca) for resolution was the norm. In cases where the dispute was either not resolved or in situations where a client was not available (such as in Seneca's case due to liquidation), account reconciliation matters were directed by GMAC portfolio managers.

As concerned Seneca-related collection efforts, our interviews revealed that heightened attention and intensive effort was attached to collection of outstanding accounts. In that connection, it has been represented to us that a practice was established under which GMAC collection teams departed from the then standard dunning grid and communicated with account debtors on a weekly basis, rather than less frequent basis as may have been dictated by the standard dunning grid.

In our view, the account collection procedures employed by GMAC were standard for GMAC (if not more aggressive than normal), as well as standard in the industry. It is our further view that collections of these accounts were further challenged by the fact that many of the company's largest accounts suffered from their own form of financial difficulty at or about the time that the collection activities were being undertaken, thus adversely affecting recovery prospects. *See* Discussion at Footnote 8, *infra*. It has also been our general experience that recovery prospects are similarly challenged by the fact that account debtors'

13

credit and offset demands often significantly increase once they learn that a vendor is in liquidation, as it is the last and final opportunity to realize savings on prior shipments.

(v) <u>Files/Business Records; Employee Retention</u>

Our interviews and document reviews indicate that upon taking control of the Collateral, RAS prepared a comprehensive inventory of all business records and files located in the Milford, MA facility. Our review of the documents supplied to us further reveals that during the liquidation process, RAS representatives assessed the business records and determined which records were essential for retention, and at the conclusion of the asset liquidation efforts on or about November 21, 2001, RAS made arrangements to transfer those records deemed essential to a secure off-site storage facility.

In our experience, the steps implemented by RAS relative to the records retention and storage aspects of the liquidation process were entirely appropriate and customary in similar type liquidation environments. Records deemed essential to the ongoing Collateral value realization efforts were retained and remained accessible for future use should the need have arisen. Additionally, records deemed non-essential to those specific activities were catalogued and made available to Seneca and/or Landay for their use and retention, in their discretion.[23]

We also gave consideration to RAS's decision to utilize various former Seneca employees to perform certain tasks in facilitation of the collateral liquidation activities. In that connection, the records we reviewed reveal that Mr. Rijo secured assistance from a variety of former Seneca employees on an as-needed basis, including the following individuals:

| | |
|---|---|
| James Hart | Warehouse/Inventory Logistics |
| Richard Herman | Information Systems |
| Cynthia Foscarota | Customer Service-A/R Back-up |
| Neal Finkelstein | Finance |

Given RAS's familiarity with the company's operations, key employees, assets, customers, and books and records, RAS properly assessed at the time its need for assistance of key company personnel, by operating function, in order to complete the liquidation tasks at hand. In our experience, RAS's decision to utilize these key employees on a limited basis was consistent with customary practices used in other liquidation cases, and was prudent in facilitation of the liquidation efforts.[24]

---

[23] *See, eg.*, November 21, 2001 letter from Richard Stehl, Esq. to David Madoff, Esq. of Cohn, Kelakos, Khoury, Madoff & Whitesell LLP ("Stehl Letter").

[24] The RAS liquidation analysis as of October 5, 2001 assumed that certain key Seneca employees would be retained to facilitate the liquidation efforts. Although the time devoted by these individuals was less than projected in the referenced liquidation analysis, this would appear to be directly related to the shorter duration of the liquidation phase than was first projected in the liquidation analysis.

14

(vi) <u>Real Estate</u>

As of the date of this report, we have not been provided with any information relative to specific activities undertaken by or on behalf of GMAC from which we can opine as to any Seneca-owned or leased real property interests.[25]

G. <u>Reservation</u>

ADA expressly reserves the right to supplement and/or revise any of the opinions expressed herein to the extent additional information is later supplied to ADA that would make any such supplements and/or revisions appropriate.

H. <u>Compensation</u>

In preparing and presenting this expert report, ADA has incurred professional fees and expenses at its usual and customary hourly rates. As of the date hereof, ADA estimates that its fees and expenses incurred in connection with this report aggregate approximately $36,400. Additional professional fees and expenses may be incurred in connection with the litigation as may be requested from time to time from GMAC counsel. Our compensation is not contingent on the outcome of this litigation.

Respectfully submitted,

ASSET DISPOSITION ADVISORS, LLC

By: _____
Barry Gold

By: _____
Steven E. Fox

---

[25] During our interviews RAS made clear that they were not assigned responsibility for handling disposition of any real property assets.

# ATTACHMENT 1

# Barry Gold

## Curriculum Vitae

**Position:**  Asset Disposition Advisors, LLC, Principal

Barry Gold is a founding principal of Asset Disposition Advisors, LLC ("ADA"). Formed in 2001, ADA is a nationally recognized and respected strategic consulting firm, providing strategic asset acquisition and disposition advice and guidance to companies in distress, official and unofficial creditors' committees, lenders, asset and enterprise purchasers, and asset disposition specialists. ADA is well known for successfully undertaking and completing difficult and complex strategic asset disposition and acquisition transactions.

Mr. Gold has broad experience in growth, turn-around, and asset disposition situations, as well as acquisition and sale of retail and wholesale companies, and is well known and respected in the asset disposition industry for his strong analytical and strategic abilities, and his decisive team-building management style.

**Born:**  Brooklyn, New York, February 21, 1943

**Education:**  Bradley University, B.S. 1964
The Pennsylvania State University, M.B.A 1965

**Professional Experience:**

TSS-Seedman's Inc. (1966-1990)
Vice Chairman/Chief Operating Officer

Fishers Big Wheel, Inc. (1990-1994)
Vice Chairman/Chief Operating Officer

The Flax Art and Design Company (1994-1996)
Chief Financial Officer

L. Luria and Sons, Inc. (1996—1997)
Exec. Vice President, Stores & Operations

JumboSports, Inc. (1998-1999)
Exec. Vice President

Stage Stores, Inc. (2000)
Exec. Vice President, Administration

EBC I, Inc. (July 2001-October 2002)
President/ Chief Executive Officer

EBC I, Inc. (Nov. 2002-Present)
Plan Administrator

Steven E. Fox

### Curriculum Vitae

**Position:** Asset Disposition Advisors, LLC, Senior Consultant
Traub, Bonacquist & Fox LLP, Member

Steven Fox is a Senior Consultant of Asset Disposition Advisors, LLC ("ADA"). Formed in 2001, ADA is a nationally recognized and respected strategic consulting firm, providing strategic asset acquisition and disposition advice and guidance to companies in distress, official and unofficial creditors' committees, lenders, asset and enterprise purchasers, and asset disposition specialists. ADA is well known for successfully undertaking and completing difficult and complex strategic asset disposition and acquisition transactions.

Steven Fox is also a member of Traub, Bonacquist & Fox, LLP, a New York based "boutique" law firm, focusing on insolvency and corporate restructuring, strategic asset acquisitions and dispositions, distressed financings, general business law and commercial litigation. The practice emphasizes as creditor's rights in bankruptcy proceedings, representation of official and unofficial creditors' committees, business counseling, contract negotiations and secured transactions. Mr. Fox has served as lead counsel to official and unofficial creditors' committees; official equity committees; and debtors in complex Chapter 11 cases, and has performed transactional work in dozens of cases with sellers, purchasers, lenders and secured and unsecured creditors of financially troubled companies, non-judicial restructurings and Chapter 11 reorganizations throughout the United States and Canada.

**Born:** Queens, New York, January 19, 1961

**Education:** University of Wisconsin-Madison, B.B.A., 1983
Brooklyn Law School, J.D., 1986

**Professional Affiliations:**
American Bar Association
American Bankruptcy Institute
New York City Bar Association -- Committee on Bankruptcy and Corporate Reorganization
Turnaround Management Association

| | |
|---|---|
| **Professional Admissions:** | New York State Bar, 1987<br>U.S. District Court, Southern District of New York<br>U.S. District Court, Eastern District of New York<br>U.S. Court of Appeals, Second Circuit<br>U.S. District Court, Northern District of Illinois<br>U.S. District Court, Southern District of Ohio<br>U.S. District Court, Southern District of Michigan |
| **Publications:** | Co-Authored with Adam H. Friedman: "Successor Liability In Distressed Asset Sales: Is the Safe Harbor Afforded by§363 (f) Not So Safe Anymore?" Bankruptcy Strategist, Volume XVI, Number 12. |
| **Representative Transactions TB&F):** | Kmart Corporation (Chapter 11, Chicago, IL)<br>FAO Schwarz, Inc. (Chapter 11, Wilmington, DE)<br>Zainy Brainy, Inc. (Chapter 11, Wilmington, DE)<br>KB Toys, Inc. (Chapter 11, Wilmington, DE)<br>Jacobson Stores Inc. (Chapter 11, Detroit, MI)<br>TW, Inc., f/k/a Nobody Beats the Wiz, Inc. (Chapter 11, Wilmington, DE)<br>Hechinger's Investment Company, Inc. (Chapter 11, Wilmington, DE)<br>joan & david (Chapter 11, New York, NY)<br>Weathervane Retail Group (Chapter 11, Worcester, MA)<br>Quality Stores, Inc. (Chapter 11, Grand Rapids, MI)<br>Bonus Stores, Inc. (Chapter 11, Wilmington, DE)<br>Chaffin Acquisition Corp., d/b/a Gibson's Discount Stores (Dodge City, KS)<br>JumboSports, Inc. (Chapter 11, Tampa, FL)<br>Old America Stores, LP (Chapter 11, Wilmington, DE)<br>Party America, Inc. (Chapter 11, Los Angeles, CA)<br>Edison Brothers Stores, Inc. (Chapter 11, Wilmington, DE)<br>Shoe Corporation of America, Inc. (Chapter 11, Columbus, OH)<br>Office Max, Inc. (Cleveland, OH)<br>WSS Media, Inc. (Minneapolis, MN)<br>Wet Seal, Inc. (Los Angeles, CA) |
| **Representative Transactions ADA):** | Rhodes, Inc. (Chapter 11, Atlanta, GA)<br>Breuners Home Furnishings Corp. (Chapter 11, Wilmington, DE)<br>Levitz Home Furnishings, Inc. (Chapter11, New York, NY)<br>The Athlete's Foot Stores, LLC (Chapter11, New York, NY)<br>Kitchen Etc., Inc. (Chapter 11, Wilmington, DE)<br>Music Network, Inc. (Chapter 11, Atlanta, GA) |