UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-CV-11955-WGY

| | |
|---|---|
| DAVID L. LANDAY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **AFFIDAVIT OF** |
| v. ) | **KEITH D. LOWEY** |
| ) | |
| GMAC COMMERCIAL CREDIT, LLC and ) | |
| GMAC COMMERCIAL FINANCE, LLC, ) | |
| ) | |
| Defendants. ) | |

I, Keith D. Lowey hereby depose and say:

1.  In this case, I have previously authored an Expert Witness Report, a Supplement to Expert Report and have been deposed by the Defendants.

2.  On November 4, 2005, I testified in the action brought by GMAC Commercial Credit, LLC ("GMAC") against Mr. Landay in New York and, over GMAC's objection and, after a voir dire, I was qualified as an expert witness on the issue of whether GMAC acted in a commercially reasonable manner with regard to the collateral which it seized from Mr. Landay's company, Seneca Sports, Inc. ("Seneca"). Exhibit 1 is a partial transcript from the New York trial which reflects the above.

3.  Exhibit 2 to this Affidavit is a copy of my curriculum vitae which was also attached to my Expert Witness Report. As noted in Exhibit 2, in addition to the Landay case in New York, I have qualified and testified in state and federal courts in five other matters and have been retained in numerous other matters in need of expert services involving the liquidation and/or reorganization of troubled businesses.

4.  I am a Certified Public Accountant in Massachusetts and Rhode Island.

5.      I started my professional career as a Senior Auditor for Arthur Anderson & Co. from 1983 to 1986.  After a four year period as Controller/Chief Financial Officer of a private company, I formed my own accounting firm and merged with another firm creating Verdolino & Lowey, P.C. as of January 1, 1991.  I have served as President of that firm since 1995 to date.  As will be noted below, Verdolino & Lowey, P.C. specializes in accounting services for troubled businesses – usually in the context of a pending bankruptcy case, or business litigation which typically involves the liquidation of assets and complex forensic analysis.

6.      My audit training at Arthur Anderson, coupled with my 19-plus years working for and with troubled businesses, have provided me with the fundamental skills necessary to perform the forensic accountancy aspect of my work at Verdolino & Lowey.  One of the basic skills which an auditor/forensic accountant must have is to be able to adduce evidence, usually documentary in form, to validate information set forth in a financial statement, re-create financial records or perform such other analysis that may be required in a given situation.  It is only by following a "paper/communications trail" and by applying the appropriate principles of accounting and or business judgment to the documentation that one is able to express an opinion that a financial statement has been fairly presented or opine on a complex business issue.

7.      The work that I typically perform in the "forensic" portion of my work includes dealing with liquidation and wind down issues and complex questions such as solvency, commingling of funds, and whether a contribution to a company made by an owner is debt or equity.

8.  With regard to my work on behalf of Mr. Landay on the usury issue, I reviewed the loan documents, GMAC's Client Ledgers, and back-up documentation I was provided from discovery. I and my staff, principally Keith Shelansky, then classified the charges to the loan and quantified them. In the course of my work, I determined that GMAC's records including its Client ledgers, were inaccurate in some significant respects.

9.  Exhibit 3 consists of GMAC records containing six line items which we determined that GMAC has misclassified. The pages of Exhibit 3 were part of Deposition Exhibit 4 marked at the deposition of Ms. Pappalardo. Bates GLAN #01540 shows that GMAC characterized a line item in the amount of $56,908.22 as an "LC Charge." Our research revealed that this was a payment of an outstanding Letter of Credit in favor of the Disney Company and was not properly classified as a "charge" to the loan. Bates GLAN #01526 showed line items of $7,140.00 and $35,042.00 as advances. Our research revealed that GMAC had misclassified these items since the back-up showed that they were payments to RAS, GMAC's consultant and liquidator. Bates GLAN #01519 showed a line item in the amount of $16,115 as an advance. Our review revealed that this line item was a payment to RAS for consulting and/or for liquidation services. Similarly, Bates GLAN #01522 shows a line item in the amount of $10,763.00 as an advance. Our research revealed that this was also a payment to RAS. Finally, Bates GLAN #01534 shows a line item $1,896.00 as an advance. However, we determined this item to be a miscellaneous charge, not an advance.

10. As may be seen from my Expert Witness Report, Exhibit 4, I rendered no legal opinions. As I testified during the deposition, I consulted with Attorney Hoffman who gave me his interpretation of the usury law.

11. In this regard, I included as "interest and expenses" all charges to Seneca's account made in connection with the loan. I also selected an appropriate period which was consistent with the language of the statute for consideration of the issue which I was to opine on: "1) whether the interest and expenses charged by GMAC on the Factoring Agreement exceeded the 20% ceiling under the Massachusetts usury statute…". Exhibit 4, p. 1. My finding in this regard, Exhibit 4, p. 2 was as follows: "GMAC charged Seneca interest and expenses in excess of 20% (the Commonwealth of Massachusetts usury rate) for the period October 22, 2001 to January 31, 2003."

12. I do not believe that I rendered any legal opinions in my report on the usury issue as GMAC states. I merely made professional judgments as to categorizing charges to the loan and as to an appropriate period for consideration. To the extent that I gave any legal opinions at my deposition, it was only in response to Mr. Houlihan's questions which I was obligated to Answer.

13. Parenthetically, when I used the term "we" in my draft report, I was referring to Keith Shelansky, my associate who was my primary assistant on the Landay matter, not to Mr. Hoffman.

14. As to the issue of commercial unreasonableness – "whether GMAC and/or its agents acted in a commercially reasonable manner to maximize the return on the liquidation of the Seneca collateral securing the Factoring Agreement, specifically the accounts receivable, inventory and intellectual property", Exhibit 4, p. 1 – I believe that

my experience at Verdolino & Lowey has rendered me qualified to express an opinion on that issue.

15. Since 1990, the part of my personal practice which relates to bankruptcy has mushroomed. For a number of years, I estimate that at least 50% of my personal practice has related to accounting matters involving troubled businesses and/or forensic accountancy. In this part of my practice, the substantial majority of my time, over the last four years or so, has been spent on matters relating to the liquidation of a company or a portion of its assets.

16. After interrogating me about the specific cases referenced in my resume, Mr. Houlihan asked me whether I have been personally involved in any other liquidation efforts. I responded as follows:

> Yes. I mean, essentially, in a lot of the – certainly in the bankruptcy form, there's always assets that need to be administered, and typically our relationship is either with the trustee, perhaps the creditors committee, but often most, frequently it's the trustee; and to the extent there are any remaining assets, we are typically a very cost-effective – so we are told – cost-effective means to help them liquidate whatever the remaining assets are.
>
> So to the extent there are – there is inventory or there are receivables, we will participate in the process in some way, shape or form in liquidating the remaining assets.
>
> Whether it be working with an Ozer, a broker, depending on the nature of the asset, we are typically, you know, very much involved and active in the process of, you know, liquidating the remaining assets.

Exhibit 5, p. 136.

17. The nature of my liquidation responsibilities varies from case to case. When I am retained as a liquidating trustee, assignee or receiver, I am primarily responsible for liquidating the remaining assets, whatever they may be

5

(including inventory, accounts receivable, intangible assets, leases, claims, etc.). This includes overseeing the work of others or having my employees or myself handle all or part of the liquidation. In other cases, our firm is retained by troubled business owners, attorneys and/or Trustees or other interested parties to participate in and/or evaluate the liquidation process in some capacity. On these assignments, I typically work as part of a team often analyzing and/or playing a monitoring or supervisory role with respect to the company's employees or outside contractors who actually do the liquidation.

18. In its motion, GMAC states that I ignored the "process" and concluded that GMAC acted in a commercially unreasonable manner because I believed that it should have obtained a greater recovery from the collateral. This statement is simply wrong.

19. At pages 5 and 6 of my Report, I specifically addressed the shortfalls in GMAC's liquidation activities which led to my conclusion that it acted in a commercially unreasonable manner with regard to the intellectual property, the inventory and the accounts receivable.

20. As to the intellectual property, I wrote: "[m]y review of the Rijo reports and other related material indicates that neither GMAC nor its agent made more than a minimal effort to obtain a value for the intellectual property." Exhibit 4, p. 5.

21. I continued:

> In preparing the Liquidation Analyses as of June 30, 2001 and October 5, 2001, Rijo provides for a liquidation that is projected to take 12 and 10 weeks, respectively, and the retention of key employees in accounting, shipping, sales and accounts receivable for a period of 5 to 10 weeks. **This is important to note**. If the goal of a liquidation is to maximize the overall return, sufficient time needs to be provided to allow the liquidating

6

party the opportunity to administer/liquidate the remaining assets. In this case, the remaining assets were inventory, accounts receivable, intellectual and personal property. If sufficient time is not provided, a liquidator may be forced to accept lesser offers than he might otherwise procure if given more time. Further, from a cost and efficiency perspective, it is generally important to retain those individuals who are most familiar with the important assets that are being liquidated/collected in any given situation. Those individuals are usually more cost effective than professionals being retained and, as a result of their familiarity and experience with the company and/or particular assets, are in a position to liquidate/collect a particular asset more efficiently and effectively.

Although the Liquidator intends, as of 10/5/01, to retain certain key employees to assist him with the liquidation over the proposed 10 to 12 week period, and GMAC acknowledges Landay's experience with and knowledge of the intellectual property, as well as his potential motivation in maximizing any recovery under a liquidation scenario, that expertise was not drawn upon. The Liquidator took control of the business on very short notice – October 22, 2001, the day of the asset seizure. Based on my review of the periodic update reports prepared by the Liquidator, the majority of the liquidation was completed by November 16, 2001 – **in just 27 days**. No one was retained to assist the Liquidator in selling the inventory. See a further discussion of this point below. Although the Liquidator did use certain key company personnel, he did so only on a very limited basis: customer service personnel, 22 hours; accounting staff (CFO), 32 hours; computer systems personnel, 12 hours; and shipping/warehouse personnel, 152.75 hours. No one was retained and little, if any effort, was made to try and recover anything with regard to the intellectual property – despite GMAC's recognition of its value AND its funding of the Seneca purchase of the Brookfield intangibles for $1.6MM thirteen months earlier. It is worth mentioning that Seneca's portfolio of trademarks, patents and licenses is not even reflected in that $1.6MM figure. Presumably, the value of the combined intellectual property exceeded $1.6MM.

Exhibit 4, p. 5.

22.   I continued:

GMAC took responsibility for collecting the A/R. It appears as though it was given supporting documentation for the accounts with outstanding balances but company personnel were not utilized to assist in dealing with the high volume of credits and adjustments that were being sought by many of Seneca's customers. Customer checks were received via lockbox by GMAC and any discrepancies between company records and payment received were identified. The determination as to the propriety of

>any credit taken by a customer was up to Seneca to investigate and follow-up on. GMAC acted merely as a recipient of payments and record keeper of same. I have not been able to determine what, if any, collection effort was expended by GMAC. In the event of a discrepancy between invoice and payment amount, GMAC generated and sent a letter to Seneca giving them 60 days to investigate and resolve the discrepancy. Initially, these discrepancy letters were sent to the company at its main location in Milford, Massachusetts. Unfortunately, after 10/22/01, there was no one there to respond to these letters. Further, eventually these letters ended up being forwarded back to GMAC when the Milford location was vacated in late November and the company's mail forwarded to GMAC. In effect, GMAC was sending itself the discrepancy letters. Landay and his Attorney found unopened discrepancy letters in the records that were retrieved from the off-site storage facility during the document production process. GMAC has represented that it collected approximately $588k from A/R on a balance of $1.3MM as reported by the company. Due to insufficient information provided by GMAC, I have not been able to verify this figure.

Exhibit 4, p. 6.

23. In light of the above, GMAC's statement that the only reference to "process" is contained in my conclusion at p. 7-8 of the Report, and, that "the only support for this conclusion is Lowey's assertion that a greater price should have been obtained," GMAC's Memorandum, p. 7, is not factual.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS 23rd DAY OF DECEMBER, 2005.

_____
KEITH D. LOWEY

232603_1

8