# EXHIBIT 5

```
 1                    VOL. I, PAGES 1 - 150
 2
 3              UNITED STATES DISTRICT COURT
 4                DISTRICT OF MASSACHUSETTS
 5            CIVIL ACTION NO. 04-CV-11955-WGY
 6
 7   DAVID L. LANDAY
 8                        Plaintiff
 9   V.
10   GMAC COMMERCIAL CREDIT, LLC and
11   GMAC COMMERCIAL FINANCE, LLC
12                        Defendants
13
14                  - - - - - - - -
15            Deposition of Keith D. Lowey
16             Thursday, October 20, 2005
17                     10:34 a.m.
18              Edwards & Angell, LLP
19                 101 Federal Street
20                Boston, Massachusetts
21                  - - - - - - - -
22         Reporter:  Deborah Roth, RPR/CSR
23
24
```

Keith D. Lowey                                                                              10/20/2005

**Page 2**

1  PRESENT:
2
3  Alan Hoffman, Esq.
4  Lynch Brewer Hoffman & Fink, LLP
5  101 Federal Street
6  Boston, Massachusetts 02110
7  617 951 0800
8  For the Plaintiff
9
10 John Houlihan, Esq.
11 Charles A. Ognibene, Esq.
12 Edwards & Angell, LLP
13 101 Federal Street
14 Boston, Massachusetts 02110
15 617 439 4444
16 For the Defendants

**Page 3**

1  INDEX
2  WITNESS: Keith D. Lowey
3  EXAMINATION   DIRECT   CROSS   REDIRECT   RECROSS
4  By Mr. Houlihan   4              144
5  By Mr. Hoffman              142
6  EXHIBITS                                   PAGE
7  100 GMAC_LANDAY 06715-727            4
8  101 Expert Report of K. Lowey        16
9  102 Schedule prepared by K. Lowey    42
10 103 Massachusetts usury statute      44
11 104 Composite Exhibit of Rijo
12    Reports Relied on by K. Lowey     62
13
14
15 Original exhibits retained by Mr. Houlihan

**Page 4**

1         P-R-O-C-E-E-D-I-N-G-S
2         STIPULATION: It is hereby stipulated
3  and agreed to by the attorneys for the respective
4  parties that all objections, except as to the form
5  of the question, and motions to strike shall be
6  reserved to the time of trial.
7         It is further stipulated that the
8  witness will read and sign the transcript under the
9  pains and penalties of perjury, with notarization
10 being waived.
11        KEITH D. LOWEY,
12        having been satisfactorily identified
13 by the production of his driver's license, and duly
14 sworn by the Notary Public, was examined and
15 testified as follows:
16        EXHIBIT NO. 100 MARKED
17        DIRECT EXAMINATION
18 BY MR. HOULIHAN:
19 Q. Mr. Lowey, would you please state your name
20 for the record.
21 A. Keith D., as in David, Lowey.
22 Q. Mr. Lowey, my name is John Houlihan, and I
23 represent the defendants in the case that brings us
24 here for your deposition, David Landay versus GMAC

**Page 5**

1  Commercial Finance.
2         For ease of communication, if it is all
3  right with you, I am going to refer to both of the
4  defendants jointly as "GMAC." Is that agreeable?
5  A. Yes.
6  Q. In connection with today's deposition, I
7  have a couple of requests. The first request is
8  that under no circumstances do I want you to answer
9  a question that you do not understand. If you do
10 not understand the question, whether I ask it or
11 whether Mr. Hoffman asks it, or in the supremely
12 like unlikely event that Mr. Ognibene asks it, if
13 you do not understand the question, please say so,
14 and whoever asked the questions will rephrase it so
15 that you can understand it. Is that agreeable?
16 A. Yes.
17 Q. Second, to the extent that the question
18 calls for a yes-or-no answer, I would ask that you
19 please answer "yes" or "no," as opposed to "uh-huh"
20 or "unh-unh," or by nodding your head up or down or
21 back and forth. Is that agreeable?
22 A. Yes.
23 Q. And, finally, it is my practice to
24 accommodate requests for a break that the witness

LegaLink Boston
(617) 542-0039

Page 6

1  might make. I would prefer not to break while a
2  question is pending, unless it is necessary to
3  consult with counsel on an issue of privilege. Is
4  that agreeable?
5     A. Yes.
6     Q. Otherwise, if you have to take a break at
7  any point in time for any reason let me know, and I
8  will be happy to accommodate you.
9        MR. HOFFMAN: Excuse me. Are we
10 staying with the customary stipulations, or the
11 same stipulations that we agreed upon yesterday,
12 for the record?
13       MR. HOULIHAN: Sure. This deposition
14 will be taken pursuant to the same set of
15 stipulations that have governed all of the
16 depositions taken in this case to date.
17       MR. HOFFMAN: Thank you.
18    Q. Mr. Lowey, where do you reside?
19    A. Medway, Massachusetts.
20    Q. At what address?
21    A. Five Wildwood Road.
22    Q. Are you engaged in business? How do you
23 make your living?
24    A. I am an employee of Verdolino & Lowey, PC.

Page 7

1     Q. What do you do there?
2     A. I am a CPA and practicing accountant.
3     Q. And do you have an area of specialty with
4  that firm?
5     A. Yes.
6     Q. What's your area of specialty?
7     A. A large part of the practice specializes in
8  bankruptcy litigation support and insolvency-
9  related issues.
10       We also have -- I spend some time in
11 the tax area, general tax compliance, and also in
12 person financial planning, some component of that,
13 advising clients as well.
14    Q. Now, in connection with the services that
15 you perform at Verdolino & Lowey, have you been
16 asked to provide expert testimony in this case?
17    A. Yes.
18    Q. Have you signed an engagement letter to
19 provide expert testimony in this case?
20    A. Yes.
21    Q. With what person or entity did you sign the
22 engagement letter?
23    A. With Mr. Landay, David Landay.
24    Q. So your engagement letter is with

Page 8

1  Mr. Landay as opposed to with Mr. Hoffman's law
2  firm?
3     A. Yes.
4     Q. And when did Mr. Landay engage you to
5  provide expert advice in connection with this
6  lawsuit?
7     A. It was early August.
8        MR. OGNIBENE: '05?
9        THE WITNESS: 2005.
10    (A discussion was held off the record.)
11    Q. Mr. Lowey, did you have any personal
12 involvement in connection with the underlying
13 business transaction that underlies this lawsuit?
14    A. No.
15    Q. Did your firm have any involvement in that
16 transaction?
17    A. No.
18    Q. Have either you or Verdolino & Lowey ever
19 performed any services for Mr. Landay prior to this
20 engagement?
21    A. No.
22    Q. Have either you or Verdolino & Lowey ever
23 performed any services for Seneca?
24    A. No.

Page 9

1     Q. Do you have an understanding who I mean
2  when I refer to "Seneca"?
3     A. Yes.
4     Q. Who do you understand that I mean?
5     A. The corporation that operated out of
6  Milford, Massachusetts.
7     Q. And how about the related entity that we
8  will refer to as Brookfield, do you have an
9  understanding of who that is?
10    A. Yes.
11    Q. And what's your understanding of when I use
12 the phrase "Brookfield," what do you understand I
13 mean?
14    A. That's the entity that Seneca acquired many
15 of its assets for for use of the proceeds.
16    Q. Have you or Verdolino & Lowey performed any
17 services for Brookfield?
18    A. No.
19    Q. Have you ever provided either expert
20 consulting services or expert testimony for any
21 client represented by Mr. Hoffman prior to this
22 engagement?
23    A. Yes.
24    Q. How often have you provided expert

Page 10

1 consulting or expert testimony to clients of
2 Mr. Hoffman?
3    A. I believe it was just one other occasion.
4    Q. And what was the nature of that engagement?
5    A. We did a lost profits analysis and prepared
6 a report.
7    Q. Is that engagement referenced in your CV?
8    A. Yes.
9    Q. What's name of the case?
10   A. CyberStorage.
11   Q. CyberStorage, Inc. V Trimm Technologies,
12 Inc.?
13   A. Yes.
14   Q. Which of those parties did Mr. Hoffman
15 represent?
16   A. CyberStorage.
17   Q. After you were retained by Mr. Landay, what
18 did you do to familiarize yourself with the
19 background in this matter?
20   A. We were provided a copy of the complaint,
21 and I believe the deposition transcript for
22 Mr. Rijo and a former employee of GMAC, whose name
23 I can't recall at the moment.
24   Q. Mr. Fitzgerald?

Page 11

1    A. Yes.
2        MR. HOFFMAN: Fitzpatrick.
3    Q. I have commented before it's inexcusable
4 for someone named "Houlihan" to confuse
5 "Fitzgerald" and "Fitzpatrick," but I do it
6 regularly.
7        Other than those two depositions, have
8 you reviewed any other deposition testimony in
9 connection with your engagement by Mr. Landay?
10   A. I looked at Ms. Pappalardo's deposition
11 transcript and looked through briefly Mr. Landay's
12 transcript from an earlier deposition.
13   Q. In another case?
14   A. In another case.
15   Q. Was Mr. Landay's deposition testimony in
16 his malpractice case, or was it testimony taken in
17 another case involving GMAC?
18   A. I'm not sure which one it was.
19   Q. Now, when you say you looked at
20 Ms. Pappalardo's deposition transcript, did you
21 read it?
22   A. Yes.
23   Q. How many volumes of transcripts, deposition
24 transcript did you read from Ms. Pappalardo?

Page 12

1    A. I believe it occurred over two days.
2    Q. And you read both transcripts?
3    A. Yes.
4    Q. Do you recall whether you read one
5 transcript or more than one transcript of
6 deposition testimony by Mr. Landay?
7    A. I actually just looked at that one briefly.
8 One of my associates read through it. I am not
9 sure exactly what the duration is.
10   Q. Now, so far we have identified Mr. Rijo's
11 deposition testimony, Mr. Fitzpatrick's deposition
12 testimony, Ms. Pappalardo's deposition testimony,
13 both volumes, and a brief review, but not a reading
14 of Mr. Landay's deposition testimony in another
15 matter.
16       Did you review any other deposition
17 testimony in connection with the preparation of
18 your report?
19   A. I don't believe so.
20   Q. Now, at some point in time you did prepare
21 a report in connection with your engagement by
22 Mr. Landay?
23   A. Yes.
24   Q. When did you prepare your first draft of

Page 13

1 that report?
2    A. The actual first draft was done over the
3 weekend prior to it being submitted.
4    Q. And do you recall when the report was
5 submitted?
6    A. The report was submitted on October 10th.
7    Q. Do you know how many draft versions of the
8 report were prepared before you submitted the
9 final?
10   A. I want to say maybe three or four.
11   Q. And do you still have access to those
12 drafts?
13   A. I don't believe we do.
14       Actually, I do.
15   Q. Were those drafts prepared on your firm's
16 word processing system?
17   A. Yes.
18   Q. And who worked with you in the preparation
19 of your report?
20   A. We had Keith Schelansky from my office; my
21 partner did a proof, Craig Jalbert; and I also had
22 Nancy Gregory in our office help pull it together.
23   Q. Anyone else?
24   A. Not in terms of -- from my office?

4 (Pages 10 to 13)

Page 14

1  Q. The question was who worked with you in
2  connection with the preparation of the report.
3     You've identified four individuals from
4  your office?
5  A. Right.
6  Q. Did anyone else assist you in preparing the
7  report?
8  A. We communicated with Attorney Hoffman as
9  well.
10 Q. Other than Mr. Hoffman himself, anyone else
11 at his office?
12 A. No.
13 Q. Did Mr. Landay review a draft of the
14 report?
15 A. Yes.
16 Q. Did you receive any written comments from
17 Mr. Landay?
18 A. No.
19 Q. Did you receive any oral comments from
20 Mr. Landay?
21 A. He made some comments. He did make some
22 comments, yes.
23 Q. Do you recall the substance of those
24 comments?

Page 15

1  A. I don't. I don't remember any of the
2  specifics, no.
3  Q. Do you know, can you tell me whether or not
4  as a result of the comments made by Mr. Landay you
5  modified any portion of your report?
6  A. Substantively, no. I don't believe any of
7  his comments actually had any effect on anything in
8  the report.
9  Q. Did Mr. Hoffman provide you with written
10 comments on the report?
11 A. No.
12 Q. Did Mr. Hoffman provide you with oral
13 commentary on the report; yes or no?
14 A. Yes.
15 Q. Do you recall the substance of any of
16 Mr. Hoffman's oral commentary on the report; yes or
17 no?
18 A. Yes.
19 Q. How many conversations did you have with
20 Mr. Hoffman between the time that you prepared your
21 initial draft and the time that you submitted the
22 final version of your report?
23 A. I believe it was three or four.
24 Q. And those all occurred, I assume, over that

Page 16

1  weekend immediately prior to the submission of your
2  report?
3  A. Actually, they were only on that one day.
4  Q. Yes or no, did any of Mr. Hoffman's
5  comments result in anything other than editorial
6  modifications to the report?
7  A. I can recall one.
8  Q. And on what topic did one of Mr. Hoffman's
9  comments result in something other than an
10 editorial change?
11 A. There was an additional section of the
12 report, what I described as "Other Discussions,"
13 and we eliminated that.
14 Q. Just to make sure I understand your
15 testimony, Mr. Lowey, the only noneditorial change
16 in the report that you made as a result of the
17 comments from Mr. Hoffman resulted in the
18 elimination of a section of the report that had
19 been in prior drafts but is not in the final
20 version of the report?
21 A. That's correct.
22    EXHIBIT NO. 101 MARKED
23 Q. Mr. Lowey, I have handed you a document
24 that has been marked as Exhibit 101. Can you

Page 17

1  please identify that document for me?
2  A. This is a copy of the report that we
3  prepared dated October 10th.
4  Q. And just for the record, the last exhibit,
5  Exhibit H, is not appended, correct?
6  A. Yes.
7  Q. And we have agreed that we are not going to
8  do that for purposes of this deposition?
9  A. That's correct.
10 Q. Mr. Lowey, I would like you to turn to Page
11 2 of the report, the section on usury.
12    Have you ever provided expert
13 consultation with respect to the Massachusetts
14 usury statute before this engagement?
15 A. No.
16 Q. At the time that Mr. Landay retained you,
17 did you understand that you were going to be asked
18 to opine with respect to the Massachusetts usury
19 statute?
20 A. Yes.
21 Q. Do you still have a copy of your engagement
22 letter?
23 A. Yes.
24    MR. HOULIHAN: Alan, I would like to

Page 18

1  see a copy of that letter.
2       MR. HOFFMAN: Do you have an objection
3  to that?
4       THE WITNESS: No.
5       MR. HOFFMAN: I don't have an objection
6  to it.
7    Q. What did you do to prepare yourself to
8  opine with respect to the usury statute?
9    A. I was provided a copy of the Massachusetts
10 law.
11   Q. So you read the statute?
12   A. I read the statue.
13   Q. Other than reading the statute, did you do
14 anything else to prepare to opine with respect to
15 the Massachusetts usury statute?
16   A. No.
17   Q. Have you ever spoken with a gentleman by
18 the name of Neal Finkelstein?
19   A. Yes.
20   Q. When did you speak with Mr. Finkelstein?
21   A. I believe it was last Friday. It was
22 either Thursday or Friday, I can't recall.
23   Q. How did you reach Mr. Finkelstein?
24   A. I had actually had tried to reach him the

Page 19

1  prior Saturday, and I had a cell phone number, and
2  he finally returned my call after that.
3    Q. You had a conversation with Mr. Finkelstein
4  at that time?
5    A. Last Thursday, yes.
6    Q. And how long did that conversation last?
7    A. About five minutes, five to ten minutes.
8    Q. Did anyone else participate in that
9  conversation?
10   A. No.
11   Q. Did that conversation relate to the subject
12 matter of your report?
13   A. Yes.
14   Q. And do you recall anything that
15 Mr. Finkelstein said to you during that
16 conversation?
17   A. Yeah. I spoke to him about two aspects.
18 One was to confirm what I had read in all of the
19 periodic regional reports that were generated, and
20 I believe, provided to GMAC, while they were
21 liquidating the company.
22       I had wanted to find out from him if he
23 had done more than was represented in those memos
24 in terms of participating in the liquidating after

Page 20

1  the business had been taken over, and had also
2  wanted to find out what he knew about the
3  opportunity to access some of the inventory that
4  had been on the -- in containers in the ports, I
5  guess it was California and Worcester.
6    Q. With respect to the first issue, you asked
7  him what he had done, if he had done anything more
8  than was what was represented in Mr. Rijo's
9  deposition to participate in the liquidation of
10 Seneca and Brookfield?
11   A. Yes.
12   Q. And what did he say in response to that
13 inquiry?
14   A. He said he did basically nothing. The only
15 tasks that he was asked to perform were ministerial
16 in nature: identify documents, pull information
17 together from Mr. Rijo.
18   Q. Other than identifying documents and
19 pulling information together from Mr. Rijo, did
20 Mr. Finkelstein identify any other tasks that he
21 performed in connection with the liquidation?
22   A. No.
23   Q. Now, your question, I take it, was focused
24 on the period of time after October 22, 2001?

Page 21

1    A. That's correct.
2    Q. You also indicated that you wanted to find
3  out what Mr. Finkelstein knew about the opportunity
4  to access some of the inventory that was in
5  containers in ports in California and Worcester; is
6  that correct?
7    A. Yes.
8    Q. And what did Mr. Finkelstein say in
9  response to that inquiry?
10   A. He was somewhat vague and said he had only
11 a partial recollection and exposure to that; but as
12 best he could remember, he indicated that the
13 company was able to access specific containers
14 without having to pay for all of the demurrage and
15 other freight charges that were outstanding for the
16 many containers that were in a particular port.
17       However, he indicated that there was a
18 customs broker who they had dealt with and his
19 recollection was that as long as the customs
20 broker's out-of-pocket cost had been paid in full,
21 which represented just a small portion of the total
22 amount of the potential cost in freeing up a
23 container, that they could access a container.
24   Q. When you say "they," who is "they"?

6 (Pages 18 to 21)

Page 22

1  A. The company or someone wanting to free up
2  the inventory on the company's behalf.
3  Q. Did Mr. Finkelstein indicate that Seneca or
4  Brookfield had engaged in that practice at some
5  point prior to October 22?
6  A. Yes.
7  Q. Did you ask Mr. Finkelstein whether he was
8  aware of any effort that was made to access a
9  smaller portion of the inventory in storage after
10 October 22?
11 A. What he told me was that he was not
12 consulted in any way and does not know what efforts
13 Mr. Rijo did. He pretty much worked on his own and
14 didn't involve himself at all.
15 Q. So for as you are aware, Mr. Finkelstein
16 has no knowledge as to whether or not GMAC made any
17 effort to strike a similar sort of resolution to
18 the one that he described?
19 A. That's correct.
20 Q. Because Mr. Finkelstein has no knowledge on
21 that point, I assume you have no knowledge on that
22 point?
23 A. Only what I read in the regional memos.
24 Q. Prior to preparing the portion of your

Page 23

1  report that relates to usury, did you read the
2  factoring agreement between GMAC and Seneca-
3  Brookfield?
4  A. I'm sorry, could you repeat the question.
5  Q. Sure. In connection with preparing the
6  portion of your report that relates to the usury
7  issue, did you read the factoring agreement between
8  GMAC and Seneca-Brookfield?
9  A. I definitely looked at it. I'm not sure I
10 read every page, but I definitely looked at it,
11 yes.
12 Q. How about the forbearance agreement between
13 GMAC and Seneca-Brookfield, did you read that
14 document in connection with the preparation of the
15 usury portion of your report?
16 A. Again, I looked at it. I don't think I
17 read the entire agreement.
18 Q. Do you believe that either of those
19 documents have any bearing on the usury analysis?
20 A. They certainly could. It doesn't affect
21 what I -- the period of time that I utilize in my
22 report, but in general, it could.
23 Q. Did you consult with any attorneys
24 concerning the interpretation of the usury statute?

Page 24

1  A. No.
2  Q. Did I consult with any attorneys concerning
3  any aspect of the usury section of your report?
4  A. I spoke to Mr. Hoffman about it.
5     If I correct my earlier statement, I
6  spoke to Mr. Hoffman, who is an attorney, but he is
7  the only one.
8  Q. Did Mr. Hoffman indicate to you how he
9  believed the usury statute should be interpreted?
10 A. He gave me some very broad guidelines, but
11 specifically, no.
12 Q. Did you take Mr. Hoffman's views concerning
13 the interpretation of the usury statute into
14 consideration in preparing your report?
15 A. Yes.
16 Q. What did Mr. Hoffman tell you concerning
17 the broad guidelines of how the usury statute
18 should be interpreted?
19 A. All Mr. Hoffman really did was clarify what
20 the statute said, which is you can take a look at
21 the usury period -- it's undefined in the statute,
22 and you can look at it from up -- as small a period
23 as a day and a much broader period, which led me to
24 have to give it some extensive thought as to what

Page 25

1  period we would present in the report and what made
2  sense.
3  Q. Can you explain for me, Mr. Lowey, how the
4  usury statute would work when viewed from as small
5  a period of time as one day?
6  A. Well, you would have to figure out what the
7  -- assuming there was a payment made relative to a
8  loan -- you would need to take that disbursement as
9  a percentage of that outstanding balance for that
10 day, and annualize the rate as to what that would
11 be, represented on an annualized basis.
12 Q. When you say "on an annualized basis," what
13 do you mean?
14 A. To calculate what the interest rate would
15 be in terms of over the full course of a year. So
16 as if that same activity would have happened
17 consistently over a 360- or 365-day basis,
18 depending on how the specific calculation is being
19 done.
20 Q. Which would you use, a 360-day basis or a
21 365-day basis?
22 A. Well, in this particular case, the loan
23 agreement calls for interest to be calculated on a
24 365-day basis, so that's what we used.

Page 26

1  Q. So if there is a one-time fee assessed on
2  day one, when you analyze that fee, do you take
3  that fee and divide it by 360?
4  A. No. You take that fee and you divide --
5  you take that fee as a fraction of the total amount
6  outstanding of the obligation on that particular
7  day. You come up with a percentage, and you
8  multiply that by 360.
9       For instance, if that fraction were to
10 equal one percent, you times that one percent times
11 360 and that would equal 360 percent on an
12 annualized basis.
13 Q. Mr. Lowey, I am about to introduce you to
14 remedial math for Houlihan.
15      Let's assume for the sake of discussion
16 that there's an obligation from a lender to a
17 borrower for $1 million, and let's assume that
18 obligation bears interest at 10 percent, and let's
19 assume that the obligation goes into default and
20 there's a one-time default fee charged of $100.
21      Walk through for me how you would
22 calculate the impact that $100 fee would have on
23 day one?
24 A. What you would do is take that hundred and

Page 27

1  you divide it by $1 million and come up with
2  whatever that percentage is.
3       It's a very small percentage, and you
4  would multiply that times 360 to get that over an
5  annualized rate on -- yes, on an annualized rate.
6  Q. Okay. Did you read any case law or
7  commentary on the statute in preparing the usury
8  section of your report?
9  A. No.
10 Q. Now, you prepared an analysis that is
11 attached as Exhibit D, correct?
12 A. Yes. There's multiple exhibits that relate
13 to the usury section.
14 Q. You prepared Exhibit D?
15 A. Yes.
16 Q. Where did you get the data that appears on
17 Exhibit D?
18 A. It was actually a two-step process.
19      Initially what we did is we prepared an
20 overall analysis of all the transactions that
21 occurred on -- for this loan from its inception to
22 the time it was written off by GMAC, and we took
23 that larger analysis and we shrunk it down to deal
24 with the period that the usury section dealt with.

Page 28

1  Q. What documents did you consult to prepare
2  the overall analysis of all the transactions that
3  occurred for this loan from inception to the time
4  that it was written off?
5  A. It was many of the documents that were
6  produced during discovery, which included the daily
7  cash sheets that were generated by GMAC.
8       A lot of the -- Ms. Pappalardo had done
9  some analysis as well that we utilized, and I think
10 that was summarized more on a monthly basis as
11 opposed to on a per-day basis, and essentially any
12 of the other bank records that were provided that
13 would substantiate any change in the loan balance,
14 again, from the inception of the loan to the time
15 it was written off.
16      (A discussion was held off the record.)
17 Q. Mr. Lowey, I am going to hand you a
18 document that has been previously marked in this
19 case as Landay 4. Landay 4 consists of a number of
20 pages.
21      Did you consult the kinds of documents
22 that are attached as Landay 4 in connection with
23 putting together Exhibit D?
24 A. Yes.

Page 29

1  Q. Now, you chose to start your analysis with
2  the date October -- on the date October 22, 2001,
3  correct?
4  A. Yes.
5  Q. And to conclude your analysis as of January
6  1, 2003; is that correct?
7  A. January 31.
8  Q. Excuse me. You're correct.
9       Now, why did you choose the starting
10 date of October 22, '01 and the concluding date of
11 1/31/03?
12 A. Basically, after giving it a lot of
13 thought, that period represents the time in which
14 GMAC had taken control of the company, and at that
15 point the company and Mr. Landay did not have an
16 opportunity to kind of control affairs of the
17 remaining assets of the company, and just that was
18 the period that seemed to make sense and that's
19 what we -- how we calculated it.
20 Q. From the standpoint of the usury statute,
21 what relevance do the facts that you just
22 identified have?
23 A. Well, you can calculate interest over
24 certainly any period of time, and that, to me, just

Keith D. Lowey                                                                                                10/20/2005

Page 30

1  made the most sense for purposes of just making a
2  statement as to what the interest rate was over a
3  period of time, where again the loan had just --
4  there were some substantial payments made, I
5  believe, the week prior to 10/22. There was the
6  letter of credit was hit. There was a million-
7  dollar deposit that was applied to the loan, and I
8  believe another $250,000 stand by letter of credit.
9      However, after that point, not only was
10 the loan paid down substantially and the company
11 taken over by GMAC, but the charges continued at
12 the same old rate, and that to me -- you know, that
13 was the point where we just wanted to identify what
14 the rate was to see if there was any change or what
15 the impact of all those charges being hit on a
16 smaller balance was.
17     Q. Did you do any calculations relating to the
18 portion of your report that addresses usury for a
19 period of time other than October 22, '01 through
20 January 31, '03?
21     A. Yes.
22     Q. And what other time periods did you do
23 calculations for?
24     A. I think we actually looked at it from

Page 31

1  inception to the time that the loan was written
2  off, which I can't recall -- I think it was later
3  in '03. I believe it was either November or
4  December '03, and I think we also looked at it from
5  the date of the forbearance agreement, to that
6  other period of time.
7      Q. So your recollection is that you did three
8  sets of calculations with respect to the usury
9  issue?
10     A. I believe that's right.
11     Q. One set of calculations looked at the
12 period of time from inception through to writeoff,
13 correct?
14     A. That's correct.
15     Q. And one set of calculations looked at the
16 period of time from the forbearance agreement
17 through to writeoff; is that correct?
18     A. That's right.
19     Q. And the last time frame is the one
20 referenced in your report, correct?
21     A. That's correct.
22     Q. Do you recall whether or not the annualized
23 effective interest rate for the period from the
24 inception of the loan through to writeoff as

Page 32

1  calculated by you was greater or lesser than the
2  annualized effective rate referenced in your
3  report?
4      A. It was less.
5      Q. Was it less than 20 percent?
6      A. Yes.
7      Q. When you did the calculation of an
8  annualized effective interest rate for the period
9  from the forbearance agreement through to the
10 writeoff of the loan, was the annualized effective
11 interest rate greater or less than the annualized
12 effective interest rate referenced in your report?
13     A. It was less.
14     Q. Was it less than 20 percent?
15     A. I don't believe it was, but I can't recall.
16 I believe it was greater than 20 percent.
17     Q. Now, a few minutes ago, Mr. Lowey, I asked
18 you why you chose to start -- why you chose to use
19 a starting date of October 22 and a concluding date
20 of January 31, '03, and I would like to break down
21 your answer and look at each part of it.
22     You started by saying that after giving
23 it a lot of thought, that period of time represents
24 the time in which GMAC had taken control of the

Page 33

1  company. Why is that fact relevant to the usury
2  analysis, in your view?
3      A. Well, because at that point, to me, the
4  company lost any opportunity to impact the amount
5  that was outstanding; and to the extent they lost,
6  you know, that opportunity, I thought that was a
7  consideration in defining the period.
8      Q. Why did the fact that GMAC took control of
9  the company mean that the company lost control of
10 or lost the ability to impact the amount
11 outstanding?
12     A. Because as of that point, GMAC essentially
13 liquidated the remaining assets of the company on
14 whatever terms they saw fit, as best I can tell.
15     So they -- in essence, if they could
16 have sold something -- at the end of the day, it
17 was their decision to determine how much would be
18 get credited against the loan based on whatever
19 recovery proceeds they generated in their efforts;
20 and at the same time, they also controlled the
21 opportunity to make charges against the loan for
22 whatever fees they were able to do.
23     So, in essence, they controlled both
24 sides of any deducts from the principal balance, in

9 (Pages 30 to 33)

**Page 34**

1  addition to any charges that could be hit against
2  the loan as well.
3     Q. In connection with your review, did you
4  identify any charges that you felt were not
5  authorized by the operative loan documents?
6     A. I thought some were odd, but I don't know
7  whether they were inappropriate.
8     Q. Did you consider with respect to each
9  individual charge whether or not it was a permitted
10 charge under the operative loan documents?
11    A. No.
12    Q. Other than what you testified to, is there
13 any other reason you chose the period October 22
14 through January 31, 2003?
15    A. The only other consideration was -- and I
16 believe I state it in my report -- for selecting
17 January 31st as opposed to the writeoff date was
18 that that was the last significant transaction that
19 occurred on the loan.
20       There were minor charges for interest,
21 maybe some very minor collections, and I couldn't
22 determine as to why it ultimately was written off
23 in December, but I felt that effectively the loan
24 activity had pretty much ended at that time and

**Page 35**

1  that's why I cut it off there. That was the only
2  other consideration.
3     Q. In connection with the work you do for your
4  accounting firm, have you ever performed services
5  for a public company?
6     A. Yes.
7     Q. In connection with performing services for
8  public companies, have you encountered debt that
9  has been written off the books of the public
10 company?
11    A. Yes.
12    Q. And in your experience, why does a public
13 company write debt off its books?
14    A. Because it was forgiven or written off by
15 the lender.
16    Q. Let's eliminate forgiven. Why else might a
17 company -- strike that.
18       Was the debt in this case forgiven?
19    A. It was written off the books of GMAC. As
20 far as I know, it was not forgiven.
21    Q. You saw no evidence that GMAC forgave the
22 debt in this case?
23    A. That's correct. All I saw was that they
24 wrote it off.

**Page 36**

1     Q. Other than having a situation where debt is
2  forgiven, why else might a company write debt off
3  its books?
4     A. The only other situation that I can think
5  of is if they went through the bankruptcy process,
6  and essentially a plan was approved that allowed
7  for debt to be written off or reduced.
8     Q. What about a situation where a company
9  makes a determination that the debt is
10 uncollectible or unlikely to be collected?
11    A. I was looking at it from the perspective of
12 the borrower, not the lender.
13    Q. Let's look at it from the perspective of
14 the lender. Why might a lender write debt off its
15 book?
16    A. Just as you said, in an instance where they
17 don't believe they are going to collect it.
18    Q. And would you agree with me, Mr. Lowey,
19 that the creditor's internal determination that
20 they are unlikely to collect the debt, for whatever
21 reason, has no bearing on whether -- on the
22 question of whether or not the debt is due and
23 owing?
24    A. That's correct.

**Page 37**

1     Q. And, indeed, from the standpoint of the
2  debtor, it has no bearing on whether or not
3  interest is continuing to accrue or not?
4     A. Yes.
5     Q. Would you agree as between a creditor and
6  debtor, the writing off the debt has no meaning?
7     A. That's correct.
8     Q. Did you consult the deposition testimony of
9  Ms. Pappalardo in connection with preparing the
10 usury section of your report?
11    A. I had read it prior to.
12    Q. Would it be fair to say, Mr. Lowey, that
13 given the way -- under your methodology of applying
14 the usury statute, the longer the period of time
15 that one looks at the lesser the impact of any one-
16 time charge.
17       Do you understand the question?
18    A. Yes, I do.
19       Yes.
20    Q. I take it from your answer, Mr. Lowey, that
21 to the extent that you applied your methodology of
22 analyzing usury issues in this case, to the extent
23 that you used an end date of today, that would, in
24 general, have an impact of lowering the -- and kept

Page 38

1  all other factors the same -- that would have an
2  impact of lowering the annualized effective
3  interest rate?
4     A. Assuming no other transaction happened
5  after that time, yes.
6     Q. And in your report you say that you ignored
7  the period from February 1, '03 through to the
8  writeoff date of November 24, '03.
9        Why did you feel that was appropriate?
10    A. There wasn't any significant activity that
11 had occurred on the loan based on the detailed
12 analysis we did of all of the loan transactions
13 that occurred.
14       So I wasn't sure -- there was no
15 information to provide -- that I became aware of as
16 why to GMAC had written off the loan as of December
17 '03. I believe it was December or late November of
18 '03.
19       I didn't know whether it was arbitrary
20 or what. I was just going to cut it at the last
21 transaction, the month that that occurred.
22    Q. Supposing that I were to ask you to
23 recalculate the annualized effective interest rate
24 using different periods of time, but keeping all

Page 39

1  other factors of your report the same, other than a
2  calculator, what would you need to do that?
3     A. You would need certainly to define the
4  period we wanted to look at, and just a calculator,
5  perhaps a calendar.
6     Q. I would like to turn now to Exhibit D.
7        Where did you find the data to -- that
8  falls under the heading "Cumulative Charges"?
9     A. That is the sum of the column that's
10 identified as "Monthly Charges," which is the third
11 column on the left.
12    Q. And where did you get the data for the
13 monthly charges?
14    A. That came off our analysis, the more
15 detailed analysis that we discussed earlier.
16    Q. Have you provided us with a copy of that
17 detailed analysis? Was that among the materials
18 that you produced?
19    A. No.
20       MR. HOULIHAN: I would like to have a
21 copy of that document.
22       MR. HOFFMAN: I have one here
23 (indicating). You can have it photocopied. Do you
24 want to have that photocopied?

Page 40

1        (A recess was taken from
2        11:35 to 11:39 a.m.)
3     Q. Mr. Lowey, I would like you to turn to
4  Exhibit 4, and to the page that bears the Bates
5  number GLAN 01540.
6        Do you have that page?
7     A. Yes, I do.
8     Q. Do you remember looking at this particular
9  page in preparing your usury analysis?
10    A. I don't.
11    Q. Do you see that under the column it looks
12 like "Debit," there is an entry for $56,908.22?
13    A. Yes.
14    Q. Do you know what that was?
15    A. I believe that was a charge against the
16 loan for either a royalty or commission that was
17 due to Disney against a letter of credit.
18    Q. Is that charge included in your total
19 monthly charges for April 2002?
20    A. I'm not sure. If I could look at the
21 analysis that is getting copied now, I might be
22 able to tell you.
23    Q. Okay. Let's wait until that gets back.
24       One other question. Did you read the

Page 41

1  portion of Ms. Pappalardo's deposition testimony
2  where she discussed that $56,908.22 figure?
3     A. I recall seeing it, yes.
4        MR. HOFFMAN: That reference to that
5  figure, is that January or is it April?
6        MR. HOULIHAN: April.
7        MR. HOFFMAN: Okay. It's hard to read.
8     Q. Mr. Lowey, I am going to read you some
9  testimony from Ms. Pappalardo's deposition for
10 Thursday, August 18, 2005, and I am going to read
11 from Pages 58 and 59, and I am going to start with
12 Line 15 on Page 58.
13       "Question: Next one is LC charge.
14 What is that? Is that a letter of credit
15 charge?
16       "Answer: Letter of credit charge.
17       "Question: Are you familiar with a
18 Disney letter of credit that may have been
19 involved in the account?
20       "Answer: I'm familiar with the letter
21 of credit that was roughly -- excuse me -- that
22 was originally $110,000. I don't know that it
23 was Disney.
24       "Question: So are you familiar with a

11 (Pages 38 to 41)

Page 42

1   $110,000 letter of credit?
2   "Answer: Yes."
3   I am now on Page 59.
4   "Question: What does this particular
5   charge -- does this charge relate to that 110?
6   "Answer: The $56,908.22 was drawn on a
7   portion of that LC. The draw, plus, I think,
8   there were some minimal charges in there.
9   "Question: So that would increase the
10  loan balance, correct?
11  "Answer: Correct."
12  Based on that testimony, what is your
13  understanding of the nature of the $56,908.22
14  charge?
15  A. It was an advance against the loan.
16  Q. In effect, an advance of principal?
17  A. Yes.
18  Q. Additional loan?
19  A. Yes.
20  Q. As an advance of principal, additional
21  loan, is it properly included as interest or other
22  charges under the usury statute?
23  A. It shouldn't be.
24      EXHIBIT NO. 102 MARKED

Page 43

1   Q. Mr. Lowey, I have just handed you a
2   document that we have marked as Exhibit 102.
3       First of all, can you identify that
4   document for me?
5   A. This is a schedule that we prepared that
6   summarizes all of the loan activity from inception
7   to the date of the writeoff.
8   Q. By reference to Exhibit 102, can you tell
9   me whether the charge for the $56,908.22 that we
10  have just identified as an advance of additional
11  principal on the loan is included as a charge in
12  your analysis?
13  A. I believe it is.
14  Q. Can you show me where it appears?
15  A. It appears as though it is included in the
16  number $68,590.19 for the period April 1st, 2002
17  through April 30, 2002.
18  Q. And what page of Exhibit 102 are you
19  referring to?
20  A. Page 22.
21  Q. So the $56,908 appears on that page in the
22  fourth or fifth column opposite the date 4/02/02?
23  A. In the third column, identified as "Monthly
24  Charges."

Page 44

1   Q. Your testimony is that that is an error?
2   A. That's correct.
3       EXHIBIT NO. 103 MARKED
4   Q. Mr. Lowey, do you recognize Exhibit 103?
5   A. I do.
6   Q. What is it?
7   A. It's the usury statute.
8   Q. Can you direct me to that portion of the
9   statute that you considered in determining what to
10  include as interest in your analysis?
11  A. In the first paragraph, it identifies in a
12  sentence that, "For the purposes of this section,
13  the amount to be paid upon any loan for interest or
14  expenses shall include all sums paid or to be paid
15  by or on behalf of the borrower for interest,
16  brokerage, recording fees, commissions, services,"
17  and it continues through the end of that sentence.
18  Q. Okay. That's the sentence that you looked
19  to to determine what constituted interest for the
20  purposes of statute?
21  A. To do our calculation, yes.
22  Q. And I take it that you in your analysis
23  included as interest items other than just
24  interest?

Page 45

1   A. Yes.
2   Q. Other than just interest, what kind of
3   charges did you include?
4   A. We essentially, from the analysis that we
5   prepared, the items that we included was everything
6   other than the items included in the column marked
7   "Advances."
8   Q. So if it wasn't an advance, you treated it
9   as a properly includable charge?
10  A. More specifically, we included the items in
11  the column "Interest," and I'm referring to Exhibit
12  102.
13  Q. Okay.
14  A. The column heading marked "Interest, Bank
15  Charges/LOC Fees, Miscellaneous, Last Journal Entry
16  Fees, Month and Charge on Sales," and I believe
17  that's it.
18  Q. In connection with preparing the usury
19  portion of your analysis -- I apologize if I asked
20  this question before -- did you read any case law?
21  A. No.
22  Q. In connection with preparing your usury
23  analysis, did you review any commentary on the
24  usury statute?

Page 46

1  A. No.
2  Q. Okay. Do you know whether or not the usury
3  statute is a criminal statute?
4  A. All I know is what it says in the statute.
5  It says, "criminal usury." Whether it is criminal
6  or civil, I don't know.
7  Q. Assume for the stake of this question,
8  Mr. Lowey, that the usury statute is a criminal
9  statute.
10        Do you know what significance, if any,
11 that that fact might have in terms of the
12 interpretation and application of the statute?
13 A. No.
14 Q. Do you know whether or not there are any
15 charges for legal fees included among the
16 miscellaneous charges?
17 A. Yes.
18 Q. Are there legal fees included among the
19 miscellaneous charges?
20 A. Yes.
21 Q. Do you have a view as to whether or not it
22 is appropriate to include legal fees as interest
23 within the meaning of the Massachusetts usury
24 statute?

Page 47

1  A. We did consider them as part of our
2  calculation.
3  Q. Why?
4  A. We interpreted the statute -- where it
5  identifies services on behalf of -- to be paid on
6  behalf of the borrower for interest, et cetera.
7        We had also -- I recall having a
8  conversation -- that my initial interpretation --
9  and I did ask Mr. Hoffman for a clarification as to
10 whether or not those were appropriately included,
11 as we had done, and he had indicated yes.
12 Q. So Mr. Hoffman told you that in his view it
13 was appropriate to include attorneys fees?
14 A. Yes.
15 Q. Can you point me to the language that you
16 relied upon in the statute?
17 A. Again, in that same sentence, where it says
18 -- starts, "For the purposes of this section," and
19 then it continues, "All sums paid or to be paid by
20 or on behalf of the borrower for interest,
21 brokerage, recording fees, commissions, services,"
22 and then it continues further in that same
23 sentence, "And all other sums charged against or
24 paid or to be paid by the borrower for making or

Page 48

1  securing directly or indirectly the loan and shall
2  include all such item when paid by or on behalf of
3  or charged against the borrower for or on account
4  of making or securing the loan."
5  Q. Based on the language you just read, do you
6  believe that it would be appropriate to distinguish
7  between legal fees that were incurred in connection
8  with making or securing the loan and legal fees
9  that might be incurred for other purposes in
10 connection with the loan?
11 A. I understand the distinction that you are
12 trying to make, but for purposes our calculation, I
13 don't believe it's relevant.
14 Q. Why is that?
15 A. I think it -- I don't think there's the
16 distinction in here.
17 Q. Why is that?
18 A. Because it says, "The amounts be paid upon
19 any loan for interest or expenses shall include all
20 sums paid or to be paid by or on behalf of the
21 borrower for interest," and it defines all of the
22 items that are included in that sentence, and
23 further ends with, "Shall include all such items
24 when paid by or behalf of the borrower for or on

Page 49

1  account of making or securing the loan directly or
2  indirectly to or by any person other than the
3  lender if such payment or charge was known to
4  lender."
5        So, in terms -- it's a charge in terms
6  of -- that came under the loan. So, therefore, any
7  -- any of the charges that were charged to the
8  borrower in connection with that loan, I believe,
9  falls under the description that's provided for
10 there.
11 Q. I think I understand your testimony,
12 Mr. Lowey. Let me make sure.
13       Are you saying that it is your view
14 that if a charge is paid by the borrower in
15 connection with the loan, it is properly included
16 as interest regardless of whether or not the charge
17 was incurred for making or securing the loan?
18 A. Yes.
19 Q. And your analysis is based upon that
20 interpretation of the statute?
21 A. Yes.
22 Q. And so would you agree if that
23 interpretation of the statute is not correct as a
24 matter of law, that your analysis is likewise of no

### Page 50

1  value in this case?
2      MR. HOFFMAN: Objection to the form.
3  You may answer.
4      A. It would be incorrect.
5      Q. Mr. Lowey, did you include all legal fees
6  in connection -- charged to the borrower in your
7  analysis?
8      A. I believe so, yes. To extent that they
9  were included on the activities that were
10 identified within the loan, yes.
11      (A recess was taken from
12      12:00 to 12:05 p.m.)
13     Q. Mr. Lowey, would you agree that if your
14 interpretation of the statute is not correct as a
15 matter of law, that your usury, the usury portion
16 of your report would therefore be inaccurate?
17     A. I guess it all depends on how incorrect it
18 is. As it is currently stated, yes.
19     Q. I would like you to look at Exhibit 103,
20 please. I would like to focus for a minute on the
21 very last clause of Subpart A, the clause that
22 begins, "If such payment or charge." Do you see
23 that?
24     A. Yes.

### Page 51

1      Q. And it goes on to say, "Was known to the
2  lender at the time of making the loan or might have
3  been ascertained by reasonable inquiry." Do you
4  see that?
5      A. Yes.
6      Q. First of all, do you agree with me that
7  clause applies to everything that precedes in that
8  sentence?
9      A. Yes.
10     Q. How do you interpret that language?
11     A. I guess you have to break it down by
12 segment.
13         So it basically -- "if any of the above
14 described charges were known to the lender at the
15 time of making the loan," I guess at the time of
16 funding --
17     Q. They would be included?
18     A. It would be included, or "might have been
19 ascertained by reasonable inquiry," which meant it
20 could anticipate or that the possibility exists of
21 that charge coming due.
22     Q. What do you think that means?
23     A. My interpretation is that anything that was
24 contemplated as a possibility of being charged

### Page 52

1  against the loan would be included as part of this
2  calculation.
3      Q. In your view, what is it that the lender
4  needs to be able to know or ascertain by reasonable
5  inquiry in order to have it fall under the meaning
6  of the statute?
7      A. I guess my layperson's interpretation of
8  that is that if the lender could anticipate the
9  possibility of that kind of charge being asserted
10 against the borrower.
11     Q. So is it your testimony that if the lender
12 could foresee the possibility of that type of a
13 charge, but not the amount of the charge --
14     A. Yes.
15     Q. -- it would fall within the statute, or
16 not?
17     A. Yes.
18     Q. Yes? I'm sorry?
19     A. Yes, to the type.
20     Q. If a lender knows that it's theoretically
21 possibly that a charge may be imposed on a borrower
22 at some point in the future, but has no way of
23 determining the amount of the charge, you believe
24 it would be appropriate to include that charge in a

### Page 53

1  usury analysis?
2      A. Yes.
3      Q. I would like to direct your attention to
4  the last paragraph of your usury analysis.
5          MR. HOFFMAN: Exhibit 101?
6          MR. HOULIHAN: Correct. Exhibit 101.
7      Q. The last paragraph of section Roman VI. It
8  appears on Page 3.
9          Do I understand the statement you make
10 in that paragraph, correctly, Mr. Lowey? If the
11 charges assessed during the period 10/22/01 through
12 1/31/03 -- strike that.
13         If it turns out that the charges
14 properly assessed is reduced by a number equal to
15 or greater than $107,775.20, keeping all other
16 factors the same in your analysis, am I correct
17 that the usury rate under your analysis would fall
18 below 20 percent?
19     A. Not necessarily.
20     Q. Why not?
21     A. That figure that we refer to in that
22 paragraph?
23     Q. Yes.
24     A. That represents the difference of what was

Keith D. Lowey                                                                10/20/2005

Page 54

1  charged -- the incremental amount of the interest
2  from -- greater than 20 percent.
3       So to the extent we determined the
4  effective interest rate for that period was, I
5  believe it was 27 percent and change, I can't
6  recall, but that number represents the difference
7  between what would have been charged if the rate
8  had been capped at 20 percent versus the amount --
9  the effective amount of the interest that was
10 charged.
11      So to get back -- I will let you ask
12 the question.
13   Q. I think we are saying the same thing,
14 albeit differently.
15      In order to effectively cap the
16 interest rate under your analysis at 20 percent,
17 one would have to reduce the total charges made
18 during the relevant period as defined by you by at
19 least $107,775.20?
20   A. I don't know what the number -- you would
21 need to reduce it from the effective rate that we
22 calculated it to be, to 20 percent, because it
23 depends on when the charge would hit and how much
24 it is.

Page 55

1    Q. I take it, therefore, that you cannot opine
2  today what the -- whether or not the effective --
3  the annualized effective interest rate would be
4  above or below 20 percent under your analysis if
5  the only thing that was changed was a reduction in
6  the charges by $108,000?
7    A. Again, it would depend on when that
8  reduction were to take place within that period of
9  time.
10   Q. Among the charges included in the usury
11 analysis are unused line fees, correct?
12   A. Yes.
13   Q. Why did those fall within the usury
14 statute?
15   A. Because that was essentially another charge
16 or another fee charged by the bank pursuant to the
17 loan.
18   Q. How did you understand the unused line fee
19 to operate?
20   A. I didn't do a thorough analysis of that
21 particular fee, but my understanding is there's a
22 -- there is a charge for the bank providing that
23 facility for that entity; and to the extent that
24 there was a portion that wasn't used, there was a

Page 56

1  fee calculated for that unused piece.
2    Q. How did you arrive at that understanding of
3  unused line fee?
4    A. I have come across the term before in other
5  matters.
6    Q. So, hypothetically, if a debtor has a line
7  of credit for a million dollars and never uses it,
8  and as a result incurs unused line fee charges. On
9  the day on which the total of the unused line fee
10 charges equal 20 percent of the total of -- on an
11 annualized basis, that transaction becomes
12 usurious, in your view?
13   A. Not if it is 20 percent.
14   Q. The minute it exceeds 20.001 percent, it
15 becomes usurious at that time?
16   A. Yes.
17   Q. Even though the borrower never use any
18 funds?
19   A. Yes.
20   Q. I would like now, Mr. Lowey, to direct your
21 attention to Page 3 of your report, to Section 7,
22 "Commercial Reasonableness."
23      There is a reference in the opening
24 sentence to RAS. Who is RAS?

Page 57

1    A. RAS was a company that was retained by GMAC
2  to actually perform the liquidation and take over
3  the location in Milford.
4    Q. Have you ever worked with RAS?
5    A. No.
6    Q. Have you ever offered an opinion in
7  connection with any matter in which RAS has been
8  involved?
9    A. Not that I'm aware of, no.
10   Q. Now, you indicated that the primary
11 documents that you relied upon included the GMAC
12 Commercial Credit new client report, dated July 19,
13 2000, correct?
14   A. Yes.
15   Q. I am showing you a document that was marked
16 as Exhibit 60. Is that the document that you
17 referenced in your report?
18   A. Yes.
19   Q. What is Exhibit 60?
20   A. I believe it's the writeup that was
21 prepared that went to what they call the marketing
22 committee to give its approval as to whether to
23 give the loan.
24   Q. Do you have an understanding of the purpose

15 (Pages 54 to 57)

Keith D. Lowey                                                                                                       10/20/2005

Page 58

1  for which Exhibit 60 was prepared?
2      A. Again, I believe it was used by GMAC to
3  make a determination as to whether to give the loan
4  or not.
5      Q. And what's the basis for that
6  understanding?
7      A. Just the nature of the report and the form
8  that it is in.
9      Q. You also indicated that among other the
10 documents that you relied upon primarily were the
11 reports prepared by John Rijo for the period June
12 30, 2001 to November 26, 2001, correct?
13     A. Yes.
14         (A discussion was held off the record.)
15     Q. Mr. Lowey, I have handed you a package of
16 materials that we will in a few moments mark as an
17 exhibit.
18         Before we do that, I would like you to
19 go through the package and identify any item
20 contained in the package that is not a periodic
21 update report or liquidation analysis prepared by
22 John Rijo as referenced in the opening paragraph of
23 Section 7 of your report.
24     A. I believe the documents in this stack

Page 59

1  (indicating) were not relied on. I don't know that
2  I've seen these.
3      Q. Mr. Lowey, I am going to go through the
4  material that you have just identified as being the
5  Rijo periodic update reports and liquidation
6  analyses that you reference in the opening
7  paragraph, Section 7 of your report, and identify
8  them by Bates range, so that the record is clear as
9  to what the exhibit consists of.
10         The first document bears the Bates
11 number RAS 00090 through RAS 00114, correct?
12     A. Yes.
13     Q. The second document begins with the Bates
14 number RAS 00266 and concludes with the Bates
15 number RAS 00279, correct?
16     A. Yes.
17     Q. And that document is also -- has previously
18 been marked as Landay Exhibit 28.
19         The next document consists of one page
20 bearing the Bates number RAS 00801, correct?
21     A. Yes.
22     Q. The next document bears the Bates numbers
23 GLAN 00090 through 00091, correct?
24     A. Yes.

Page 60

1      Q. The next document begins with the Bates
2  number GLAN 00087 and runs through 00089, correct?
3      A. Yes.
4      Q. The next document begins with the Bates
5  number GLAN 00084 and runs through 00086, correct?
6      A. Yes.
7      Q. The next documents begins with the Bates
8  number RAS 00810 and runs through 00813, correct?
9      A. Yes.
10     Q. The next document begins with the Bates
11 numbers GLAN 00082 and concludes with 00083,
12 correct?
13     A. Yes.
14     Q. The next document begins with the Bates
15 number GLAN 00077 through 78, correct?
16     A. Yes.
17     Q. The next document begins with GLAN 00079
18 and runs through 00081, correct?
19     A. Yes.
20     Q. The next document begins with Bates number
21 RAS 00818 and runs through RAS 00824, correct?
22     A. Yes.
23     Q. The next document begins with the Bates
24 number RAS 00825 and runs through RAS 00831,

Page 61

1  correct?
2      A. Yes.
3      Q. The next document begins with Bates number
4  GLAN 00071 and concludes with GLAN 00073, correct?
5      A. Yes.
6      Q. The next document begins with the Bates
7  number RAS 00835 and concludes with the Bates
8  number RAS 00842, correct?
9      A. Yes.
10     Q. The next document begins with the Bates
11 number RAS 000843 and conclude with the Bates
12 numbers RAS 000848, correct?
13     A. Yes.
14     Q. The next document begins with the Bates
15 number GLAN 00060 and runs through 00062, correct?
16     A. Yes.
17     Q. The next document begins with the Bates
18 number RAS 00852 and concludes with RAS 00858,
19 correct?
20     A. Yes.
21     Q. The next document begins with Bates number
22 GLAN 00052 and concludes with 00055, correct.
23     A. Yes.
24     Q. The next document begins with Bates number

16 (Pages 58 to 61)

Page 62

1  GLAN 00049 and concludes with 00051, correct?
2    A. Yes.
3    Q. The next document begins with Bates number
4  GLAN 00045 and concludes with 00048, correct?
5    A. Yes.
6    Q. The next document begins with Bates number
7  GLAN 00041 and concludes with GLAN 00044, correct?
8    A. Yes.
9    Q. The next document begins with Bates number
10 RAS 00874 and concludes with RAS 00876, correct?
11   A. Yes.
12   Q. And finally, GLAN 00037, and concludes with
13 GLAN 00040, correct?
14   A. Yes.
15       EXHIBIT NO. 104 MARKED
16   Q. Mr. Lowey, I direct your attention to the
17 last sentence of the opening paragraph of your
18 Section 7 of your report.
19       There is a reference there to
20 liquidation analyses that were prepared during a
21 certain time frame. Do you see that?
22   A. Yes.
23   Q. Are those liquidation analyses part of
24 Exhibit 104, or are they something separate?

Page 63

1    A. Part of.
2    Q. Am I correct, then, that Exhibit 60 and
3  Exhibit 104 constitute the -- contain all of the
4  items that are specifically referenced in the
5  opening paragraph of Section 7?
6    A. Those that are specifically identified,
7  yes.
8    Q. So Exhibit 60 and Exhibit 104 are the
9  primary documents upon which you relied for this
10 section of your report?
11   A. Yes.
12   Q. Are there other documents upon which you
13 relied in connection with this section of your
14 report?
15   A. There was other information that was
16 provided to us, whether it was through
17 conversations with Mr. Landay or Mr. Hoffman, and
18 just looking at some of the other material that was
19 provided to us that we have listed on our -- I
20 think list of documents in Exhibit H. We looked at
21 those.
22       Just how much consideration was given,
23 I can't tell you, but we were provided with
24 anything that was listed on that Schedule H, and

Page 64

1  but -- this is -- these are the primary ones that I
2  used. I just want to make it clear that other
3  information was considered.
4       MR. HOFFMAN: Can I see the rejected
5  pile? I believe two of the liquidation reports
6  that he references are still found. So they are
7  not in Exhibit 104. I don't know whether, just to
8  save time, you want to clarify that.
9    Q. Mr. Lowey, why don't we do this. Let's
10 take a minute to review the portion of the package
11 that I handed you earlier that you previously
12 rejected and review it one more time and see if
13 there is anything else in that package, that
14 portion of the package that you believe should go
15 in Exhibit 104.
16   A. It looks like I need -- if I could see one
17 dated October 5th. I think that one is missing
18 from the pile.
19       I believe this is one that belongs in
20 the pile for Exhibit 104 that was initially
21 omitted.
22       MR. HOFFMAN: October 9th appears --
23 October 19th appears to be in there. That was the
24 one that was missing.

Page 65

1    Q. Mr. Lowey, you've also identified the
2  document that begins with Bates number RAS 00234
3  and concludes with the Bates number RAS 00255 as
4  also being among the materials that should be part
5  of Exhibit 104, correct?
6    A. Yes.
7    Q. If I understand your earlier testimony
8  correctly, Mr. Lowey, what you are saying is that
9  you had a general understanding of the background
10 that was provided to you by conversations with
11 Mr. Landay and Mr. Hoffman and the review of
12 deposition testimony that you identify earlier, and
13 that in addition to that general understanding that
14 you got from those sources, you got a
15 particularized understanding of the issues relating
16 to commercial -- the commercial reasonableness of
17 the disposition of the Seneca-Brookfield assets
18 through your review of Exhibits 60 and Exhibits
19 104; is that correct?
20   A. Yes.
21   Q. Did you read Exhibit 60 in its entirety?
22   A. Yes.
23   Q. I noted in your report that you quoted only
24 selected portions of Exhibit 60, and I wonder if

Page 66

1  there was any part of Exhibit 60 that you
2  discounted or felt was not worthy of reliance?
3     A. No.
4     Q. Would you agree with me, Mr. Lowey, that
5  Exhibit 60 indicates that Mr. Landay's willingness
6  to deliver a personal guaranty to GMAC was an
7  important part of the decision to enter into the
8  transaction with Seneca and Brookfield?
9     A. Yes.
10    Q. Now, I would like direct your attention to
11 the second bullet point in Section 7 of your report
12 that begins, "Despite GMAC recognizing." Do you
13 see that?
14    A. Yes.
15    Q. Would you agree, based on the materials
16 that you reviewed, that Seneca had performed poorly
17 with increasing losses over the three years
18 preceding the GMAC loan?
19    A. I think I know I looked at the financial
20 statements for the prior year end, and there was a
21 substantial loss.
22       I don't know that I recall looking at
23 any years prior to that, but there was certainly an
24 accumulated deficit on the books.

Page 67

1     Q. Did you agree that the balance sheet was
2  weak and showed negative retained earnings?
3     A. Yes.
4     Q. And a sizable deficit in working capital?
5     A. Yes.
6     Q. Would you agree that that made the
7  underlying transaction a risky transaction from the
8  standpoint of the lender?
9     A. Yes.
10    Q. Would you agree that in reviewing a loan of
11 this type and determining whether or not to extend
12 credit a lender would treat subordinated debt as
13 the functional equivalent of equity?
14    A. That's the way I would typically see it,
15 yes.
16    Q. Would you agree that if Mr. Landay's
17 subordinated debt in Seneca was viewed as a
18 functional equivalent of equity, the net effect of
19 that would be to yield a balance sheet where Seneca
20 would have a net worth of approximately $1.7
21 million?
22    A. Not -- I don't believe so, with just
23 considering the subordinated debt. no.
24    Q. Did you understand that the subordinated

Page 68

1  debt as of the September 2000 closing between GMAC
2  and Seneca-Brookfield was approximately $3,450,000?
3     A. I don't know that I saw a balance sheet as
4  of that time.
5     Q. And I would like you to turn to Page 4 of
6  your report, please. The bullet point about two-
7  thirds of the way down the page.
8        Is the source of the material in that
9  bullet point Exhibit 60?
10    A. Certainly the bullets below the primary
11 bullet that begins "GMAC" comes from Exhibit 60.
12       Whether or not that opening paragraph,
13 you know, that mentions how much is allocated to
14 the IP. I believe it is, but I can't recall.
15       Yes, it does reference it on Exhibit
16 60.
17    Q. Where on Exhibit 60?
18    A. On the page marked GLAN 00102. The last
19 paragraph.
20    Q. Under the heading "Brookfield Acquisition,"
21 correct?
22    A. Yes.
23    Q. And would you agree with, me as referenced
24 in Exhibit 60, the value of 1.6 -- is that million?

Page 69

1     A. Yes.
2     Q. -- reflects the value that Seneca has
3  placed on certain Brookfield assets for purposes of
4  the acquisition of Brookfield, correct?
5     A. I'm not sure it was Seneca that put the
6  value.
7        We initially got the information by
8  looking at the asset purchase agreement.
9     Q. So it is the value that Seneca and the
10 previous owners of Brookfield had attributed to
11 certain intellectual property owned by Brookfield,
12 correct?
13    A. Yes.
14    Q. Would you agree with me that there is
15 nothing in Exhibit 60 that indicates that GMAC
16 agreed with that valuation?
17    A. It just references that they are being
18 valued at 1.6.
19    Q. So GMAC acknowledged that Seneca and the
20 prior owners of Brookfield had placed that value on
21 the intellectual property?
22    A. Yes.
23    Q. Did you look at any of the other underlying
24 patents?

Page 70

1    A. No.
2    Q. Did you look at any of the underlying
3  licenses?
4    A. No.
5    Q. Did you look at any of the underlying
6  trademark or copyright documents?
7    A. No.
8    Q. And I take it your answer would be the same
9  for both Brookfield's and Seneca's intellectual
10 property?
11   A. Yes.
12   Q. So I take it, then, that you have no
13 knowledge as to whether or not those -- that
14 intellectual property or any part of it was
15 assignable?
16   A. Well, there was discussion in some of the
17 material as to whether or not they could be
18 assigned. I believe relative to the license they
19 needed the licensor's permission in order for them
20 to be assigned.
21       There was an analysis somewhere that I
22 read where -- where they did discuss and analyze
23 each of the -- I believe it was the licenses, and
24 there was discussion as to whether they could or

Page 71

1  could not.
2    Q. Can you identify for me what document or
3  documents you were looking at that contained that
4  analysis?
5    A. I am guessing a little bit, but I believe
6  it -- there was a schedule, maybe in one of the
7  Rijo reports where that was, or there was a table
8  somewhere where it actually summarized the
9  licenses, for sure, and I can't recall.
10       I had one of my staff -- we had
11 identified where all the patents and licenses were
12 listed, and I am not sure ultimately what document
13 those pages came out of, but I do recall seeing
14 that.
15   Q. And did that document that you recall
16 seeing identify whether or not the license was
17 assignable without consent or whether the consent
18 of the assignor was required?
19   A. I believe it did indicate, yes.
20   Q. And do you recall whether or not the
21 licenses, at least some of the licenses required
22 approval of the assignor?
23   A. I believe most of them did, yes.
24   Q. Did you do any investigation to determine

Page 72

1  what portion of the Seneca-Brookfield intellectual
2  property had past-due royalties associated with it?
3    A. There was discussion in the Rijo reports
4  about past-due royalties.
5        What percentage of them had, I don't
6  recall, but I know there were some outstanding
7  royalties.
8    Q. So at least some of the intellectual
9  property had past-due royalties associated with it?
10   A. Yes.
11   Q. Did you do any analysis of the remaining
12 term on each item of the intellectual property?
13   A. I looked at it. I didn't do any analysis,
14 but I did -- in the summary that we had, that I
15 saw, there was terms on it.
16   Q. And you believe this was a summary that was
17 prepared by Mr. Rijo?
18   A. Unfortunately, I can't recall where -- it
19 was a copy of something. It was a page from a
20 larger document, and I just -- I don't recall.
21   Q. Have you ever been involved in a
22 liquidation that involved the transfer of patent
23 rights?
24   A. Yes.

Page 73

1    Q. How many times?
2    A. My best estimate is five to ten, maybe.
3    Q. Have you ever been involved in a
4  liquidation in which -- that involved the transfer
5  of licenses?
6    A. My former employer had very a significant
7  license arrangement, and there was a transfer of
8  that. Essentially the company was liquidated. So
9  in that instance, yes.
10       Other than that -- technically, I am
11 not sure if they were licenses or what type of the
12 intellectual property they were.
13       We have been involved in a number of
14 liquidations of high-tech and biotech companies,
15 and I am not sure exactly the nature of those
16 particular intellectual properties, whether they
17 fall into the category of licenses or patents or so
18 on.
19       You know, I can't give you a definite
20 yes or no on that.
21   Q. Have you ever been involved in a
22 liquidation involving the transfer of trademark
23 rights?
24   A. I believe so, yes.