Unfortunately, it's the same answer. A lot of the companies we are involved in have a large portfolio of intellectual property.

We have been -- not necessarily the person, the direct person selling them. We have been involved in the liquidation of those, participated in that process.

Q. How about copyright materials?
A. Same answer.

(A lunch recess was taken from 1:03 to at the 1:56 p.m.)

AFTERNOON SESSION

BY MR. HOULIHAN

Q. Mr. Lowey, have you or your firm ever been retained to liquidate assets?
A. Yes.
Q. How many times?
A. Directly, I would say ten or so times, where we have been the primarily responsible party, but I would say in the vast majority of the larger Chapter 7 or 11 cases the firm gets involved in, we get involved in the liquidation of the remaining assets. Typically, we are doing work on behalf of the trustee.
Q. I am distinguishing that work from work where you are performing services as a liquidator. You understand that?
A. Yes.
Q. Is it your testimony that you or your firm have been involved in roughly 10 cases where you performed services as a liquidator?
A. Yeah. Ten or so specifically.
Q. Have you personally been involved in 10 cases?

A. Approximately, yes.
Q. In any of those 10 cases, have you had to sell intellectual property?
A. Yes.
Q. Can you identify any of those 10 cases in which you had to sell intellectual property?
A. MotherNature.com.

I would say in the majority of them, there was some form of intellectual property, whether it be a patent, a copyright, a license, a Website, or similar asset.
Q. How did you go about performing those sales?
A. In the case of Mother Nature, we worked with the former CFO and identified companies that were basically -- within the same industry.

Mother Nature did primarily vitamins and healthcare products through the Internet, and there were a couple of companies that were competitors of theirs. So we contacted them, engaged -- to see what kind of interest, and generated a sale through that mechanism.

In some of the other instances, where we were directly involved or had worked with a

trustee of some kind, we often just called Gordon Brothers. They have got a group that does intellectual property sales and does a lot of that work, but it's typically, you know, we don't -- we look to other people for assistance to do that.
Q. Essentially you hire a broker?
A. Somebody who is familiar with that, correct.
Q. I assume a broker charges a commission on those kinds of transfers?
A. Sure.
Q. And would you agree with me that issues such as the assignability of the intellectual property, whether it's a patent or a trademark or a license, the degree of exclusivity that's associated with the intellectual property, the extent to which royalties may be past-due, and the remaining life of the right all affect the valve the intellectual property?
A. Yes.
Q. And I take it for purposes of your report you didn't investigate any of those issues with respect to the Seneca-Brookfield intellectual property?

Page 78

A. We looked at it.

We didn't value those assets. I think we specifically say that -- I say that in the report.

But we were aware of those issues. But to investigate, as I said earlier, some -- there were schedules that identified some of those issues. So I was aware of those.

Q. Thank you. I understand that you were aware of the issues.

You did not conduct sufficient analysis of those issues to form an opinion as to the value of the intellectual property, correct?

A. That's correct.

Q. So you have no opinion as to the value of the intellectual property, correct?

A. Yes.

Q. Have you ever been involved in liquidating assets in a company involved in the sporting goods or toy industries?

A. Sporting goods.

Q. Which company was that?

A. Nordic Track.

Q. Would you agree with me that the sporting goods and toy industries are affected by seasonal variances?

Page 79

A. Yes.

Q. And what is your understanding of how those industries are affected by seasonal variance?

A. A lot of the time they peak around Christmastime or the end of year.

Q. When you say "they peak" --

A. That's where they may have their highest amount of sales concentrated throughout the year.

Q. Do you know from reviewing any of the materials that you reviewed in connection with issuing your report whether or not Seneca and Brookfield sales were affect by seasonal issues?

A. Yes.

Q. How were the Seneca-Brookfield sales affected by seasonal issues?

A. What we were told by Mr. Landay is that things needed to go out by no later than the end of November, otherwise pretty much sales would slow down drastically. They wouldn't go to zero, but they would be drastically less after that point in time.

Q. Would you agree with me that in order to take advantage of the peak holiday sales season, it was important for Seneca-Brookfield to get its product out to its customers by the end of November?

Page 80

A. Yes.

Q. And to the extent that the company retained inventory after the end of November, that inventory would decrease -- would be less valuable after the holiday season than it was before the holiday season?

A. For an immediate period of time, yes, but depending on whether it was stuff that would go out of style, if it was material that wouldn't go out of style, it may not be saleable right away, but there would be some interest after this -- that particular Christmas period and perhaps retain its value to be sold during the next cycle.

Q. Based on your experience in liquidating companies, would you agree with me that there is a category of inventory which essentially becomes valueless because it's been held for so long that it has little or no value?

A. Certainly if it is tied to like an event or a date or something like that, there is certainly a segment of inventory that could be valueless after a point in time.

Page 81

Q. So if you are looking at the inventory of a company and analyzing the extent to which it is saleable, is one of the factors that you have to consider the amount of time that the various items have been in inventory?

A. It would be in consideration, sure.

Q. Would you agree with me, as a general proposition, the longer a particular item is in inventory, the less likely it is to be saleable?

A. In a lot of instances, yes, but not necessarily. It could be just a matter that they were bad purchasers of inventory and overbought.

Q. In connection with your report, did you do any analysis of the kind of specific items that were in the Seneca-Brookfield inventory as of October 22, 2001?

A. No.

Q. And I take it, therefore, that you did not do any analysis of how long any of the various elements of the Seneca-Brookfield inventory had been in inventory as of October 22, 2001?

A. That's correct.

Q. I direct your attention to Page 5 of your report.
Would you agree with me that a liquidation process that commences on or about July 1, 2001, could last 10 to 12 weeks without being affected by seasonality issues?
A. In this particular case?
Q. Yes.
A. Yes.
Q. Likewise, if you were to start the liquidation in mid-September of 2001, one could take 10 to 12 weeks to complete the liquidation process without being unduly affected by seasonality issues.
A. I believe so, yes.
Q. Would you agree with me that if you commence your liquidation on October 22 and take 12 weeks to complete your liquidation, you are likely to be adversely affected by seasonality issues?
A. Could you just repeat the ending part of your question.
Q. Sure. Would you agree with me that in an industry like Seneca-Brookfield's, liquidation commenced on October 22 that takes 12 weeks to

complete will likely be adversely affected by seasonality issues?
A. Probably, yes.
Q. The same question, but instead of 12 weeks, let's assume a 10-week liquidation cycle. Would you still anticipate some adverse impact due to seasonality issues?
A. Probably, yes.
Q. On Page 5 of your report, you make the statement that, "It is generally important to retain those individuals who are most familiar with important assets that are being liquidated/ collected in any given situation."
Would you your view -- I take it that that represents your general view?
A. That's correct.
Q. Would that general view change if an individual was involved in illegal activity?
A. Yes.
Q. And how would it change?
A. I wouldn't rely on, nor would I want to retain them, more than likely.
Q. Do you have an understanding of the phrase "check kiting"?

A. Yes.
Q. Would your general view change with respect to an individual who was involved in -- who had been involved check kiting?
A. Probably, yes.
Q. What's your understanding of the phrase "check kiting"?
A. It's continuing to write checks to cover an overdraft. Moving money from one account to another to have the appearance that there is sufficient money in the account.
Q. In layman's terms, would it be fair to describe it as writing checks for which there are insufficient funds in the account to cover the check?
A. Yes.
Q. Would your general view change with respect to an individual whom you knew to be involved in self-dealing by taking funds out of the company?
A. Sure. Yeah. It would certainly be a factor, absolutely.
I mean, to the extent -- you need to know more, but in general terms, yes.
Q. Would your general views change, while you

didn't know that a particular officer was involved in taking funds out of the company, you had reason to believe that that was the case?
A. Yes.
Q. To the extent that the liquidators in the case of Seneca-Brookfield limited the hours of the employees whose services they called upon, didn't they also affectively limit the costs associated with the liquidation efforts?
A. Yes.
Q. So I assume that you would agree with me that in analyzing whether or not it would be beneficial to employ the services of company employees in a liquidation, one needs to compare the costs that will be incurred in retaining the services of those employees against whatever marginal increase those retained services might yield in terms of additional sales and inventory?
A. Not only that, but also to the extent if they're a cheaper billing rate than I would be, and can you literally take work away from me to make for a better situation, we would also consider that component as well.
Q. Would you turn to Exhibit A.

A. Page 1 of 2?
Q. Turn to Page 2 of 2.
What's the second page of Exhibit A?
A. Basically, it's my calculation to project what I would expect the recovery on the accounts receivable might be.
Q. I see you divided the accounts receivable into four categories; is that correct?
A. Yes.
Q. Receivables that are less than 30 days outstanding; receivables that are between 30 and 60 days outstanding; and receivables that are more than 60 days outstanding; and then what is the "Current" category?
A. That would be anything -- well, it actually would be -- it's zero to 30. So they are inappropriately marked.
It would be zero to 30, 30 to 60 and -- actually, it must go out beyond 90.
I'm not sure. We took the headings off the report, but essentially the "Current" would be -- I'm sure it's within the first 30 days.
Q. Who prepared this Page 2 of Exhibit A?
A. This particular sheet I took from another

summary that we did. So it was a joint effort between myself and one of my staff.
Q. And Exhibit A, Page 2, what value is attributable to accounts receivable that are more than 60 days old?
A. I believe it's the two to the right that are marked presently on the schedule "30 to 60" and "60 plus."
Q. What value is attributable to such accounts?
A. It looks like 15 percent or approximately $195,000.
Q. There is a line item on this chart which is an adjusted account receivable balance?
A. Uh-huh.
Q. What's that line item refer to?
A. That's a net number, by taking the number reflected in the "Total" line above, where it starts a million 306, and it subtracts from that all of the bracketed numbers between that 1306 and 588.
So basically what the "Adjusted AR Balance" represents is the numbers included on the line indicated as "Total," and then subtracted from

that number are the numbers under the heading called "Adjustments," to come to a net number which is described as "Adjusted AR Balance."
Q. Then there is a line that says, "Excess Dilution 5.6 Percent"?
A. Yes.
Q. What's that line?
A. That represents a factor of just general returns that the company has historically allowed customers to take for damaged goods, normal wear and tear in this product-oriented environment.
There is a fairly significant discussion of this in the auditor's report for GMAC when they did a preliminary evaluation of the historical financial situation of Seneca where they discuss what the historical dilution factor had been.
Q. What was that historical dilution factor?
A. I believe it was between this 5.6 and 12 percent.
I think in the most immediate time period prior to his analysis, it had been on the lower side of the range, and prior to that, the company had experienced a higher dilution factor.

Q. You used the low end of the dilution range rather than the high range of the dilution range?
A. That's correct. However, I used the same actual percentage that the auditor in their instance did.
Q. Why is there no dilution factor applied to accounts receivable that are under the 61-plus days column?
A. Because I wrote those off entirely. I didn't want to double count.
Q. Do I read this page correctly to mean that you assumed that the liquidator ought to be able to recover 81,781 dollars and change due from Ames for more than 61 days?
A. No.
Q. Would you explain for me, please, what you assumed happen with respect to the $81,000 figure for Ames that is identified as outstanding under the column "61 Plus Days"?
A. What this calculation contemplates is no collection related to that receivable.
Essentially what you are doing is backing it out of the beginning balance in the "Greater Than 60-Day" column, it starts with

$169,000.
So by taking it off, we are essentially recognizing -- assuming that we are not going to collect anything relating to that.
(A discussion was held off the record.)
Q. Mr. Lowey, would you please turn to Page 6 of your report.
Right about exactly in the middle of the page you make the statement that "Landay and his attorney found unopened discrepancy letters in the records that were retrieved from offsite storage facilities during the document production process." Do you see that?
A. Yes.
Q. Do you know how many such letters Mr. Landay and his attorney found?
A. I want -- I believe it was like somewhere like five to ten.
Q. And do you know the amount, the total amount in all of those letters, of the discrepancy at issue?
A. I don't.
Q. So you don't know the impact one way or the other that resolution of those discrepancies would

have had on account receivable collections?
A. That's correct.
Q. Do you have any reason to question the representation that GMAC collected approximately $588,000 on an account receivable balance of $1,300,000?
A. Actually, we did identify about $135,000 that was included that 588 that represented inventory sales.
Q. But my question was, do you have any reason to doubt the representation that GMAC in fact collected approximately $588,000 from an account receivable balance of $1,300,000?
A. Yes.
Q. What is the basis for questioning that representation?
A. That we know, based on our reconciliation of the loan activity, the category that is being referenced -- that sums to that $588,000 on that schedule, included in those receipts we identified, I believe, three transactions that total $135,000 that were inventory sales receipts as opposed to AR collection receipts.
I don't question that they were

received. I question as to whether or not -- I don't believe they were actually receivable receipts.
Based on the information that we found, it appears as though they were inventory receipts. Therefore reducing that 588 by this 134, 135 thousand dollars, but there are certain -- in addition to that, there are certain daily cash receipts that are also included in that 588 which we don't have information on to know whether or not they are truly AR receipts or other receipts.
There's still incomplete documentation, things we haven't seen.
Q. Could you turn for a minute to Page 8 of your report. Near the very end, you make the statement that "The result of this calculation is a shortfall or damage amount of $360,360," correct?
A. Yes.
Q. Have you taken that figure and broken out what part of it is attributable to accounts receivable and what part of it is attributable to inventory?
A. I can break out what we predict for each component. So I come up with an aggregate.

If you look at Exhibit A, Page 1, we project a liquidation value of $1,203,981, and that's what that is comprised of is what I project as liquidation value for the accounts receivable in the inventory amounts. Accounts receivable being $595,958 and inventory of $608,022.
I compare that to the total recoveries that we can identify that GMAC is represented being the aggregate of their inventory in AR.
We just have never been able to determine of that 843 -- how much was actually inventory and how much was actually receivable-related.
Q. From what source did you get the 843,621 figure?
A. A couple. It comes from two categories of our loan analysis that we have done, and it's also the aggregate of the two numbers that I believe Ms. Pappalardo had disclosed in either her interrogatories or in her deposition of the 255,000 related to inventory and the 588 related to accounts receivable.
Q. So is it your testimony that the figure of $843,621, I believe the term is "foots" to GMAC's

total of accounts receivable and inventory?
A. Yes.
Q. Back to Page 6 of your report.
In the second paragraph, you indicate that you reviewed the analysis prepared by the liquidator. I assume that is RAS?
A. Yes.
Q. And what RAS analysis are you referring to there?
A. I believe there were three that were dated June 30th, October 5th, and October 19th, which are included as part of Exhibits 104.
Q. Could you quickly look at Exhibit 104, take as much time as you would like, and identify the three documents by -- that you referring to here by Bates number, please. Just the starting number is sufficient.
A. Okay. The first document is RAS 00090.
Q. Okay.
A. The second one is RAS 00234.
Q. Okay.
A. And the other one is RAS 00266.
Q. Thank you. You go on to say in the same sentence that you relied on other relevant

information provided to you. What other relevant information are you referring to?
A. Certainly the loan writeoff, which was Exhibit 60, and I think, in general, just in talking to Mr. Landay about his business, and you know, I think we did some -- we took a look at some financial statements and did some rough analysis, but it was just a general accumulation of bits and pieces of information from many different sources, but these were the primary documents that we did rely on.
Q. At the end of that paragraph you make the statement, "It is clear that the failure to retain key employees in the abbreviated time frame in which the liquidation was conducted led to less than optimum results from RAS." Do you see that?
A. Yes.
Q. What's the basis for that statement?
A. It is my belief that -- well, as a result of the inventory being sold through what I would describe as fire sales, bulk sales, and doing -- selling them mostly on terms of either cash in advance or cash on delivery, that had the effect of reducing the recovery amount related to the

inventory, and I think the best people who could have maximized any opportunities that were out there to fill existing orders with existing inventory would have been the people who were doing it on a day-to-day basis and had been living it.
So, in essence, the opportunity, had they retained employees and considered doing things and issuance of credit, not necessarily normal terms, but some credit, they could have maximized the opportunity of selling the inventory at a higher value.
Q. So your analysis would require GMAC to extend additional credit beyond the credit it had already extended as of the date -- as of October 22, 2001?
A. Well, credit to the -- to a customer, not necessarily advancing funds.
Q. Your analysis would require GMAC to incur additional risks beyond those that it was already incurring as October 22, 2001?
A. Credit risk, yes.
Q. And the employees that you are advocating be retained were the same employees, the same workforce that had been in place prior to October

22, 2001?
A. That's correct.
Q. Did you do an analysis of Seneca-Brookfield's sales results for the period between July 1, 2001 and October 22, 2001?
A. No.
Q. Did you do an analysis of Seneca-Brookfield's sales results for any period of time prior to October 22, 2001?
A. The analysis that we relied on, for the most part, is the Ozer appraisal that had been done on the inventory in May of 2000, and we also took a look at, I think, some of the -- the draft financial statements that had been done as of, I believe, the prior year end, which would have been the year ending 12/31/99, I believe. But, no, I don't believe we were ever provided with any financial information after that.
Q. Do you know whether or not the sales performance of the Seneca-Brookfield staff in 2001 represented an improvement over the sales performance of Seneca-Brookfield in the year 2000 or not?
A. I do not.

Q. Do you know whether or not the sales performance of Seneca-Brookfield in the year 2001 was trending up or down?
A. I don't know.
Q. Did you do any analysis to determine whether or not it was possible to fill existing orders out of inventory?
A. We had been provided with a copy of an open order report. I believe it was dated on or about October 22 or 23, 2001, and we were told that there were some specific orders included in that report that could have been filled with existing inventory.
Q. Who told you that?
A. Mr. Landay.
Q. And you relied upon that representation by Mr. Landay?
A. Yes.
Q. Did you do any independent analysis to verify the accuracy of Mr. Landay's representation?
A. There was nothing available for us to do that.
Q. So taking a very simple example, if we assume that as of the 22nd of October, 2001,

Seneca-Brookfield had had outstanding orders for 100 skateboards, 100 in-line skates, and 100 widgets, you did not do any analysis of the actual existing inventory as of October 22, 2001 to see if within the existing inventory there were sufficient widgets to cover the outstanding orders for widgets?
A. On an item-by-item basis, no.
Q. On any basis?
A. We had multiple discussions with Mr. Landay asking specifically in the case of, I believe it was a Toys-R-Us order. I can't remember the other customer. I think there might have been two other customers that we discussed, and he specifically identified or represented that those were in inventory, but I don't believe I did any independent verification, no.
Q. If you look on Page 6, the bullet point at the bottom of the page, there is a reference to a figure of $1,293,000. Do you see that?
A. Yes.
Q. Where did that figure come from?
A. We had an inventory report that totaled to that amount.

Q. I apologize if I asked this before.
Did you do any calculation of the costs that would have been incurred had GMAC retained more of the existing Seneca-Brookfield staff?
A. No independent calculation.
I noticed in one of Mr. Rijo's memos there was calculations in terms of, you know, what the, I believe, weekly cost by individual was.
Q. Did you do any analysis as to the extent to which sales would have had to increase in order to make the retention of staff profitable?
A. It was considered, but no direct calculation, yes.
Q. Again, I want to make sure I understand what your testimony is, Mr. Lowey.
You state on Page 5 of your report that the liquidator's use of Seneca-Brookfield employees amounted to 152.57 manhours; is that correct?
A. That was for the shipping and warehouse individuals.
Q. But only --
A. Yeah, for the individuals related to that effort, yes. Those were figures and description taken from Mr. Rijo's memos, yes.

Q. That figure is not a total?
A. Just for that description. Not total employees. Just for that function.
Q. If I were to add the 22 hours attributable to customer service personnel, the 32 hours attributable to CFO time, the 12 hours attributable to computer systems personnel, and the 152.57 attributable to the shipping and warehouse personnel, would that total equal the sum of all manhours spent by former Seneca-Brookfield employees after October 22, 2001?
A. Yes. As represented by Mr. Rijo, yes.
Q. Mr. Ognibene, who is much better at math than I, assures me that the total is 218.75.
Did you do any analysis to attempt to determine the likely net incremental increase in revenues that one might expect by adding 50 manhours or a hundred manhours to that total?
A. No.
Q. If you did not make such an analysis, Mr. Lowey, how can you be sure, at all, frankly, that adding additional manhours would yield a net benefit to the liquidator?
A. When I say I didn't do any analysis, I

didn't do any formal analysis.

It was certainly considered as part of our overall analysis, in our projection here, but I, for the most part, took the position -- again, these are -- again, the nature of these types of calculations are -- they are predictive in their estimates, and for instance, in the inventory area, the percentage that we ultimately concluded would be a reasonable percentage to use as a recovery was that which was basically represented and calculated in the Ozer appraisal, and the way they arrived at that percentage was they projected an overall recovery of 65 percent gross proceeds -- 65 percent of costs in the course of liquidation.

From that, they deducted approximately $250,000 in liquidation costs which included, I believe, $120,000 fee for themselves to liquidate the inventory, which got them down to 53 percent of inventory costs, and then further what they did is they deducted an additional six percent general reserve for unidentified potential additional costs at that would be incurred in such an effort. So as I went through the exercise.

It's very difficult for me to project

whether we need the salesperson for one week, two weeks, four weeks, because I couldn't determine just how much -- how easy or how long and drawn out the process may have taken, you know, until you are on the ground taking a look at the -- the situation, it's difficult to make that determination.

So what I tried to come down to do, when I did my projections was to use a conservative number that would have considered the additional costs, to do that effort, and come up with a net number, so in my mind, I feel although I didn't -- I didn't quantify what that incremental cost would have been for that individual, it is taken into consideration in the overall percentage that I used.

Q. How do you know that the level at which you have taken those additional costs into consideration is the appropriate level?

A. Well, based on my experience what happens are two things: One is when we are able to identify an individual who we think is a value-added person, and they are worth retaining, clearly you make the determination as to whether or not you

are going to earn at least a dollar more than the cost you are going to incur.

The other consideration is there could be a potential large savings in that if they take an hour of my time away, and they are cheaper, there is a cost savings, and then, you know, what we try to do in every instance is basically say what is the best result in the big picture?

So you don't know -- you know, it's very difficult in this situation, if they would have retained somebody, could it possibly have reduced the amount of time that Mr. Rijo spent? It might have been.

I don't know for sure, but our experience is it does take away from other billable time that a more expensive service provider would charge.

Q. Again, on Page 5 of your report, you make the statement about two-thirds of the way down that "The liquidator took control of the business on very short notice - October 22, 2001, the day of the asset seizure." Do you see that?

A. Yes.

Q. In fact, RAS had been working with

Seneca-Brookfield for some time prior to October 22, 2001, correct?

A. They certainly were involved in the situation well in advance of that date, yes.

Q. They certainly didn't walk in on October 22, 2001 without considerable background and experience and understanding of what was going on with Seneca-Brookfield, correct?

A. I believe that's correct, yes.

Q. Did you read the entire Ozer evaluation and services report?

A. Yes.

Q. Where did you find it?

A. Actually, it was provided to me by Mr. Hoffman earlier this week.

MR. HOFFMAN: If you want, I can tell you what the Bates number is.

(A discussion was held off the record.)

Q. Do you know, are you familiar with Ozer Valuation Services?

A. I am familiar with Ozer in general. I know of their valuation services folks, yes.

Q. Do you know who retained them to perform a valuation in connection with Seneca-Brookfield?

A. I believe in the writeup that GMAC did, which is Exhibit 60, I believe it was done for -- it was done for Wells Fargo, I believe.
Q. Do you know as of what date that appraisal was done?
A. I believe it was May of 2000. Some date in May of 2000.
Q. And do you know whether between May of 2000 and October 2001 Seneca-Brookfield's performance improved, deteriorated or remained static?
A. I don't know.
Q. Would you agree with me that roughly a year and a half passed between the date of the Ozer appraisal and October 22, 2001?
A. Yes.
Q. And would you agree with me that it is important to know how Seneca-Brookfield was performing over that year and a half in order to determine the usefulness of the Ozer appraisal as of October 22, 2001?
A. It would be a consideration. It wouldn't be the most critical thing.
Q. Would you agree with me that to the extent that Seneca-Brookfield's performance had

deteriorated over that year and a half, the conclusions reached in the Ozer appraisal would be less informative?
A. They would be affected, yes.
Q. Assume that over the year and a half between the Ozer appraisal and October 22, 2001, Seneca-Brookfield's performance had deteriorated to a material extent. How would that affect the conclusions reached in the Ozer appraisal?
A. Can you explain to me when you say "sales performance"? Overall performance?
Q. I am talking about overall performance.
A. Sales profitability? I am not sure.
Q. Everything down?
A. From the top down?
Q. Less profitable? Fewer sales?
A. It all depends. If they were less profitable, it would depend on what is creating the problem.
If it is -- if they are holding their margins on the sale of the product, then it may not necessarily impact the Ozer appraisal at all.
If the margins shrunk and that was creating the deterioration, that could affect and

probably would affect the Ozer analysis.
So unfortunately performance, in general, doesn't necessarily impact the Ozer appraisal. You would have to do a further analysis to determine what's creating the problem.
Q. Did you do any such further analysis?
A. No.
Q. On Page 7 of your report, near the bottom of the middle paragraph there is the statement, "It is highly unlikely that any shipments made to an existing customer with an outstanding purchase order -- it is highly likely that any shipments made to an existing customer without an outstanding purchase order would have generated a higher return and perhaps even a profit." Do you see that statement?
A. Yes.
Q. What's the basis for that statement?
A. Well, to the extent there was a purchase order, presumably a customer agrees to buy a particular product at a certain dollar amount.
If that sale was negotiated or the purchase order was submitted to Seneca, not under the guise of a liquidation sale or fire sale, it

would be my expectation that we would be getting a far greater price on the sale of those particular items in that scenario than you would in a liquidation, going-out-of-business sale, fire sale, whatever.
Q. What's the basis for that conclusion? Why do you believe that?
A. Logic, and experience, I guess.
Q. In your experience, once a company goes into liquidation, are outstanding orders filled as per their original terms or renegotiated?
A. I would expect there to be some renegotiation, typically.
Q. I think we've already determined that you did nothing to verify that outstanding orders could have -- could be filled from the existing inventory as of October 22, 2001, correct?
A. Yes.
Q. I want to make sure I am correct on this point as well, Mr. Lowey.
Nothing in your report addresses the fair market value as of October 22, 2001 of any of Seneca-Brookfield's intellectual property?
A. That's correct.

Q. And nothing in your report addresses the fair market value of any of Seneca-Brookfield's intellectual property as of today?

A. That's correct.

(A recess was taken from 3:09 to 3:19 p.m.)

Q. Before we took a break, I asked a couple of questions to confirm that nothing in your report addressed the fair market value of Seneca-Brookfield's intellectual property at various points in time.

Does anything in your report address the liquidation value of the Seneca-Brookfield intellectual property at any point in time?

A. No.

Q. Did you do anything to analyze the cost of moving Seneca-Brookfield inventory from where -- from its storage warehouse to a customer location?

A. No. It was considered, and -- it was considered, and I read that it was prominent throughout the regional memos.

I didn't do any analysis relative to that, but it was considered.

Q. Would you agree that to the extent that the

cost of satisfying any warehouse liens or outstanding storage charges would be more than the value of the inventory in storage that it would not be reasonable to take that inventory out of storage?

A. As long as the sale price didn't make up for the whatever the overage would be.

Q. If one assumes that the value of the inventory is the price that one can obtain for it, if that price is in fact less than it would cost you to get it out of storage, then it makes no sense to take it out of storage, agreed?

A. Correct.

Q. I assume we would also agree that if the cost of getting inventory out of storage and moving it to wherever it needs to be moved to in order to deliver it to a customer exceeds the price that the customer is willing to pay, that that is also a transaction that is not worth pursuing?

A. Correct.

Q. Now, as I read your report, Mr. Lowey, I understand that you believe that RAS should have utilized more of the Seneca-Brookfield staff in terms of manhours than it did.

Is that your --

A. Not necessarily. That's probably a true statement, but it's really what it is you retain them to do.

What Mr. Landay had represented to me and what Mr. Finkelstein had also represented to me was that the existing staff was primarily retained to do administrative stuff, that they didn't participate in the collection of receivables or contacting customers about credits and so forth.

They didn't participate in trying to sell the inventory. You know, that Mr. Rijo did that. It's not only a function of time, but responsibility as well.

Q. Is it your belief that RAS should have utilized more of Mr. Landay's time than it did?

A. I believe so, yes.

Q. Is it your belief that RAS should have utilized more of Mr. Finkelstein's time than it did?

A. That's a hard to answer.

Not necessarily. Only to the extent that they could have brought a benefit in the receivable or inventory area or the intellectual

property area.

Q. Is there any other employee who you're prepared to say should have been utilized to a greater degree than he or she was?

A. I believe there was -- there's somebody on the collection side. It was Bob Hatch or Hutch -- his name is something like that -- who I'm told was the individual who would respond to a lot of the customer requests for credits and so forth.

He apparently -- I'm told that he was the individual who would have received that 60-day letter from GMAC and had would have followed up and dealt with that.

I think -- also, I don't know who the individuals were, but certainly someone in sales who was very familiar with, perhaps, that inventory and those customers -- I don't have a name -- but there was clearly somebody there that was in the sales area, and Mr. Landay himself.

Q. Have you done any analysis that would identify or quantify the incremental benefit that you believe would have been obtained by utilizing the services of Mr. Landay Mr. Finkelstein, Mr. Hutch or the unidentified someone from the

Page 114

sales department?

A. That is contemplated in kind of my conclusions and percentages that I used.

I think that my position was let's come up with what I would believe to be a reasonable recovery in an orderly liquidation, and one of the underlying assumption is that those individuals would have been retained, and that the numbers that I utilized takes into consideration the incremental cost of retaining those people to get that recovery.

Q. Assume for the sake of this question that I'm a sceptic. I want to test the validity of the conclusion that you have just articulated, and that I understand your testimony that it is in there, the cost of having those people provide their services and the incremental benefit that they will provide is in there. I understand that.

But I want to say how do I test that the particular incremental benefit that Mr. Landay is going to add is reasonable? And what I think I hear you saying is it's not -- you have not done anything to identify the particular incremental benefit that would be added by any one particular

Page 115

employee; is that correct?

A. I viewed it in the aggregate, not individually by employee, and the other thing, if I may, I'm not sure there would have been a cost associated with Mr. Landay. He may have been willing -- if I had a personal guaranty, I would have considered to do it for nothing. I don't know whether he would have or not.

Q. As I understand your testimony, what you are saying is I have estimated the recovery that I, Mr. Lowey, would expect to see on these assets assuming an orderly liquidation; and that built into an orderly liquidation, as you define it, is the notion that existing staff will continue to be utilized. But you haven't done any particular analysis of additional recoveries that might have been obtained had RAS used Mr. Finkelstein or Mr. Landay or any other identifiable person?

A. I don't think the incremental cost would have been significant.

I didn't do any specific analysis, but my opinion is I don't believe it would have been significant, because I also think there would have been, perhaps, a reduction in fee or time spent by

Page 116

RAS.

But the other thing to consider is in our experience a lot of these employees -- a lot of time the liquidations happen suddenly, and they are unemployed, and they are happy to work on an hourly basis, from time to time, to come in.

Initially, there's a fair amount of effort to do the initial onslaught, to collect receivable or sell inventory, sell intellectual property, but once that first effort is done, to kind of continue with it, it's an hour here and an hour there.

Again, they are looking for their next opportunity. So they are typically willing to do it, not at an overall burdensome rate.

Q. In addition to the claim that RAS did not properly utilize the existing Seneca-Brookfield staff, you also indicated in your report that RAS did not take enough time to do the liquidation; is that correct?

A. Yes.

Q. Given the approaching holiday season, what is it that you think RAS should have done differently from a temporal standpoint?

Page 117

A. Well, I think it probably could have been drawn out a little extra time.

They were bumping against what I consider to be a legitimate time frame to work with, and the couple of thoughts I had were if they would have gone in -- I think they could have extended it a couple of weeks, because I think effectively they were done with the inventory, you know, in mid-November. So I think they could have pushed it out a little bit.

But also, and I don't have any information, but I wonder whether or not had GMAC pulled the trigger earlier -- I don't know that that was an opportunity for them -- you know, they could have effectively bought some additional time.

But even beyond just time, it's approach. and if you go in thinking I've only got two weeks, and if you're marching orders -- I don't know that they were or weren't -- we are not going to issue credit. You know, they did what they should have done.

You know, I don't know whose decision it was to go in. and basically I'm assuming it was GMAC, who set the parameters on which the sales

Page 118

could be done; i.e., cash in advance or cash on delivery, and not extend credit, and that would impact time frame and approach, or even how you approach a potential customer.

If you are approaching them, saying: You got this order. We would like to fill it. You know, they may come back and want to renegotiate as opposed to -- and will offer you some credit terms. As opposed to: We see you want this stuff. You are going to pay in advance, and you've got to get it out of here.

It's a different approach and different expectations by both parties in terms of what the recovery is going to be.

Q. Do you have an opinion as to whether or not it is commercially unreasonable for a lender to refuse to extend credit to buyers in a liquidation scenario?

A. Not in general, no.

Q. So at least in some instances, it may be commercially reasonable for a lender to decline to extend credit to buyers in a liquidation?

A. Sure.

Q. Do you have an opinion as to -- this is a

Page 119

yes-or-no question -- do you have an opinion as to whether or not it was commercially reasonable in this context to not to extend credit to buyers?

A. I can't answer that as a yes or no.

Q. Is your opinion reflected in your report?

A. Yes.

Q. Where?

A. Not specifically related to issuing credit.

My opinion is that the defendant was commercially unreasonable, as it relates to that particular item.

I don't say that specifically in the report.

Q. So whatever opinion you have concerning the issue of the whether or not to extend credit to buyers, whatever that opinion is, it's not in your report?

A. That's correct.

Q. Do you have an opinion as to whether or not in the context of the liquidation of Seneca-Brookfield insistence on terms of cash in advance or cash on delivery was commercially reasonable? Again, that's a yes-or-no question. I am finding out whether you have an opinion.

Page 120

A. I can't answer that as a yes or no.

Q. You don't know whether you have an opinion?

A. I have an opinion. I do have an opinion.

Q. Is that opinion reflected in your report?

A. No.

Q. Other than the alleged failure to properly utilize the Seneca-Brookfield staff and the alleged failure to allow sufficient time for the completion of an orderly liquidation, is there any other process shortcoming that you reference in your report?

A. No.

Q. In those instances, where you or your firm have provided liquidation services, have you signed engagement letters with your clients?

A. Yes.

Q. And either those engagement letters or in some other writing with your client, do you customarily provide a range of expected results?

A. No.

Q. Do you have tell your clients in an orderly liquidation of this company we can expect to recover between X and Y?

A. Not typically, no.

Page 121

Q. In your experience, is there a margin of reasonableness with respect to recovery in liquidation scenarios?

A. Not as a general rule, because a lot of it depends on the type of asset that you are liquidating, and what the market is for that particular asset, and it's very difficult to predict.

Q. Let me tell you what I am trying to get at. I understand that the particular recovery in any given instance is something you can't generalize about because it will vary from entity to entity that is being liquidated and time of year and type of products being liquidated, et cetera. I understand that.

What I'm getting at is this: Pick an instance. We are going to liquidate XYZ Corporation, and I go to your firm and I say, "Mr. Lowey, I would like you to liquidate XYZ Corporation. What do you think I might realize from that liquidation?"

You'll take a look at it, and you will analyze it, and you'll give a range of estimates, and then I go to Mr. Hoffman, and I say,

Page 122

"Mr. Hoffman, I would like you to liquidate and give me a range of what you think."

He goes through a similar analysis, and I go to Mr. Ognibene, and he's a real tough guy, and I say, "Give me an estimate," and he comes up with something a little on the aggressive side, and different from your estimate and Mr. Hoffman's estimate.

Is there a range of reasonableness in which you say the performance on this particular liquidation is going to fall, somewhere within that range, as long as it falls within that range, it's falling within the range of reasonableness?

A. I would say depending on the asset, I take 10 percent give or take.

Q. With tremendous reluctance, I want to go back to the issue of usury. I want to go back to the issue of usury. I want to give you a hypothetical and see what you think of this one.

I want you to assume that a lender extends a line of credit to a borrower of $1 million, and I want you to assume that the terms of the line of credit indicate that to the extent that the borrower goes one quarter without ever

Page 123

using the line of credit, that there be a fee imposed of $20, and I want you to assume that at the end of the first quarter, the borrower hasn't used the letter of credit at all, and the lender on day one of Quarter 2 imposes a $20 fee.

In your view, is the lender in violation of the Massachusetts usury statute on day one of Quarter 2?

A. I believe, technically, yes.

Q. And can you walk through for me the calculation that would lead you to that conclusion?

A. There is no number there, because there is nothing outstanding.

I mean, it's -- it has to be clearly greater than 20 percent.

I'm not a math major. I don't know what you call that.

Q. So essentially the calculation that you would be making is you would have 20 over zero?

A. Right.

Q. Would you agree with me, Mr. Lowey, that the only difference between the hypothetical that I just gave you and the use of the unused line fees as part of your usury calculation is the fact that

Page 124

in the case of Seneca-Brookfield Seneca-Brookfield used portions of the available credit from time to time?

A. Yes.

Q. I would like you to turn, hopefully briefly, to Exhibit G of your report. It's your CV.

A. Okay.

Q. In the portion of your description of your professional experience where you discussed the instances in which you have been employed to provide liquidation services, there's the first reference is to Nordic Track?

A. Right.

Q. Nordic Track is the company that makes the aerobic ski machines?

A. Amongst other type of exercise machines.

Q. Other than exercise machines, what other products did Nordic Track make?

A. At the retail level, they did get into clothing and accessories, exercise accessories.

Q. And by whom were you retained in connection with the liquidation?

A. We were retained by the company, to work

Page 125

along with Ozer who was working there as well.

Q. And would did the liquidation?

A. Ozer, and we worked along with them.

Q. And what services specifically were you asked to provide?

A. We did the accounting on the stuff that they had liquidated.

We provided an accounting services, and then there was remaining stuff that we worked along with them on and an outfit called Closter up in Minnesota who had essentially worked with us as a broker to liquidate the remaining equipment and factory stuff.

Q. How long did that process take, start to finish?

A. They filed bankruptcy in November, and I believe they were done, I want to say we were done in January or February. So approximately two to three months, I think.

Q. What is the nature of the products that Learning Smith --

A. That was the retail store. Toys and whatever else they sell.

Q. Who retained you in connection with the

Page 126

Learning Smith liquidation?
A. We did that -- I believe we were working with the -- it was either the company or the bankruptcy trustee. I can't recall.
Q. In the context of a bankruptcy action?
A. Yes.
Q. And specifically what services did you provide in connection with Learning Smith?
A. We had -- I think we were involved with just general -- helping them make a decision in terms of how to liquidate and evaluating alternatives that were before them.
Q. Did they in fact liquidated?
A. Yes.
Q. And did they hire a different firm to actually come in and conduct the liquidation?
A. I can't recall.
Q. They did not use your firm for that --
A. I specifically -- I was involved a little from an administrative standpoint, but I didn't get down -- I wasn't working on the case.
Q. That was handled by other professionals at Verdolino & Lowey?
A. Yes.

Page 127

Q. How about Toy Smart, did you personally work on Toy Smart?
A. Administratively not on the ground.
Q. What was the nature of inventory that was liquidated in Toy Smart?
A. It was primarily toys. They were a toy e-retailer, if you will.
Q. What was the nature of the services that Verdolino & Lowey performed in connection with the Toy Smart liquidation?
A. Primarily, I think we had worked with them in -- on the collection of AR.
Q. Did you personally provide liquidation services in connection with the Buck a Book liquidation?
A. No.
Q. Did you personally provide liquidation services in connection with the MotherNature.com liquidation?
A. Yes.
Q. What is the nature of the MotherNature.com products?
A. They were -- it was healthcare products, vitamins, books and related healthcare stuff.

Page 128

Q. Specifically what was Verdolino & Lowey retained to do in connection with the MotherNature.com liquidation?
A. We were retained after the company had voted to liquidate, dissolve and liquidate by the board.
They were a publicly traded company, and they had started to sell off a good part of their inventory. I would say it was probably about a month before we were retained.
Once they brought us in, because at that point they didn't want to retain -- they wanted to bring somebody else in to take over the remaining assets that were there.
So it was collection and receivables, sale of some intellectual property and the remaining inventory that was there.
Q. You were retained in that instance or Verdolino & Lowey was retained in that instance by the board of MotherNature.com?
A. By the company, yes. I think it was the officers.
Q. Were you personally involved in the Ground Round liquidation?

Page 129

A. No.
Q. Were you personally involved in the Newport Creamery liquidation?
A. Yes.
Q. Who retained Verdolino & Lowey in the Newport Creamery liquidation?
A. The bankruptcy trustee.
Q. And what was the nature of the services that you were asked to provide in connection with the Newport Creamery liquidation?
A. Essentially that was a going-concern.
When the trustee was appointed, it was a 34-store operation, and we were asked to help them evaluate whether or not it made sense to keep the stores open or to close up and liquidate the remaining assets.
Over, I believe it was a -- we actually got employed 9/11/01, on the magical day, and by mid-October we had helped cut the numbers of stores from 34 to 12 and were able to sell the existing 12 stores as going-concerns and sell off the remaining assets in those other locations.
Q. How long did that process take, start to finish?

A. I think the sale closed to sell the majority -- in late December.
Q. Who was the trustee in that matter?
A. Andy Richardson. He is in Rhode Island at Boyajian Harrington & Richardson.
Q. Were you personally involved in the Act liquidation?
A. No.
Q. Were you personally involved in the Digital Broadband liquidation?
A. No.
Q. Were you personally involved in the Olympus Healthcare Services liquidation?
A. No.
I guess what I want to clarify is that I didn't work the case on a day-to-day basis. We are a two-person firm, that although I am not primarily partner responsible, there are only two of us, and I'm generally involved on some level.
When I say "no," it's not that I am totally absent from the case, I am just not the primary partner on the case.
Q. Were you person -- were the primary partner on the ServiceSense liquidation?

A. No.
Q. Were you the primary partner on the Molten Metals Technology liquidation?
A. No.
Q. Were you the primary partner on the Send.Com liquidation?
A. Yes.
Q. What was the nature of the assets liquidated in Send.com liquidation?
A. It was receivables, pretty much.
Q. Who retained Verdolino & Lowey in the Send.com liquidation?
A. The company did.
Q. And specifically what was Verdolino & Lowey retained to do?
A. Essentially to liquidate the remaining assets which were accounts receivable and personal property.
Q. What was the nature of the personal property?
A. Computer equipment, office equipment.
Q. I take it there was no inventory involved in that liquidation?
A. That's correct.

Q. Were you the primary partner in involved in the Anton Noll liquidation?
A. That was kind of a joint effort.
Q. What was the nature of the assets being liquidated in Anton Noll liquidation?
A. Primarily receivables.
Q. And who retained Verdolino & Lowey in the Anton Noll liquidation?
A. The bankruptcy trustee.
Q. Who was the bankruptcy trustee in that case?
A. Andy Richardson.
Q. Was that also a Rhode Island matter?
A. Yes.
Q. How long did that liquidation take start to finish?
A. That was long, because there was a fairly complex fraud that went on throughout the company.
We had to go and essentially recreate a lot of records to determine what the receivables even were, and I can't remember the duration, but it was pretty long.
Q. Was there any inventory involved in that liquidation?

A. No. It was a metals distributor; and by the time I believe they filed bankruptcy, I think all of the inventory had been pretty well sold.
Q. Were you the primary partner in charge of the Iron Bridge liquidation?
A. No.
Q. Were you the primary partner in charge of the Adero liquidation?
A. Yes.
Q. And what was the nature of the assets involved in Adero liquidation?
A. It was accounts receivable and intellectual property.
Q. Who retained Verdolino & Lowey in the Adero liquidation?
A. The company did.
Q. Did that liquidation involve the liquidation of any inventory?
A. No.
Q. What was the nature of the intellectual property involved?
A. I believe it was -- I am not sure there was ever any sale of it, but they had some patents and -- actually, there was -- they had actually by the

time we came for the intellectual property had a deal to sell their technology.

They were a high-tech software switching company. So it was -- it was software-related.

Q. Start to finish, how long did that liquidation take?

A. That liquidation technically took three years, because in order to dissolve in Delaware, once you file your articles of dissolution, but I think practically speaking it probably took two months.

Q. Were you the primary partner in charge of the Best Eaton liquidation?

A. No.

Q. Were you the primary partner working on the D.D. Barkin liquidation?

A. Yes.

Q. What was the nature of the assets being liquidated in D.D. Barkin?

A. Essentially the operations of six Dunkin' Donuts locations. It's franchise rights to the going-concern business.

Q. No inventory in that case?

A. Just doughnuts.

Q. How long did that liquidation take, start to finish?

A. That is still going on. That sale, we were retained in, I believe it was either late March or early April of this year. The sale is -- will close know mid-November.

Q. Were you the principal partner on the Holland Mark liquidation?

A. Yes.

Q. What was the nature of the assets being liquidated in Holland Mark liquidation?

A. Receivables and personal property.

Q. No inventory?

A. No.

Q. Who retained you in the Holland Mark liquidation?

A. That was actually assignments for the benefit of creditors. We were ultimately retained by the trust, but essentially it was the company.

Q. I don't recollect if I asked that question with D.D. Barkin. Who retained you --

A. Actually Andy Richardson.

Q. The bankruptcy trustee.

A. Yes.

Q. Other than the liquidations referenced here, have you been personally involved in any other liquidation efforts?

A. Yes. I mean, essentially, in a lot of the -- certainly in the bankruptcy form, there's always assets that need to be administered, and typically our relationship is either with the trustee, perhaps the creditors committee, but often most, frequently it's the trustee; and to the extent there are any remaining assets, we are typically a very cost-effective -- so we are told -- cost-effective means to help them liquidate whatever the remaining assets are.

So to the extent there are -- there is inventory or there are receivables, we will participate in the process in some way, shape or form in liquidating the remaining assets.

Whether it be working with an Ozer, a broker, depending on the nature of the asset, we are typically, you know, very much involved and active in the process of, you know, liquidating the remaining assets.

Q. Other than Nordic Track, Learning Smith and

Toy Smart, have you been involved in the liquidation of any companies engaged in the wholesale or retail sale of toys or sporting goods?

A. No.

Q. Have you or Verdolino & Lowey ever been retained by GMAC or any affiliate of GMAC?

A. We recently were contacted to be retained by GMAC, yes, in a limited role, and -- to help them in a particular matter.

Q. Which matter was that?

A. It was a matter -- I got the initial contact, and then I my partner went to the meeting.

So it was kind of a co-partner situation, but it was a matter that involved -- it was a mortgage holder, and I can't recall whether it was a Chapter 13 debtor, but there was a dispute between GMAC and this particular mortgage holder or mortgagee, and the dispute was as to what was the outstanding balance, and we were approached by an attorney here in town who was representing GMAC to see if we could quantify what we thought the balance of that mortgage was.

Q. When did that approach occur?

A. That was in May or June of this year.

Q. Did you accept that engagement in May or June of this year?

A. We encouraged them to settle, and we never heard back from them.

The effort that would -- we would have to undertake in order to give them the number would have been more expensive than their just settling.

Q. Did you actually speak with anyone from GMAC?

A. My partner did. I did not.

Q. Did the initial contact come from GMAC or a local attorney representing GMAC?

A. A local attorney.

Q. Do you know the name of the GMAC person that your partner spoke with?

A. No. I don't off the top of my head, no.

Q. Have you ever been retained to provide any kind of services by Edwards and Angell?

A. Not that I'm aware of.

I know we have run into the firm in bankruptcy cases, where they might be representing other parties, but I don't think we have ever been retained directly by them.

Q. Have you ever been retained by Palmer &

Dodge?

A. Yes.

Q. Are you currently working on any matters for Palmer & Dodge?

A. I'm not. I can't speak for the firm.

Q. Have you personally been the responsible partner on matters where you were retained by Palmer & Dodge?

A. Not for a long time.

Q. Do you recall who at Palmer & Dodge you worked with?

A. When John Aquino was there -- and this was quite a number of years ago -- I think I was involved in a couple of bankruptcy cases where he was the trustee. It's at least three, four, five years.

Q. Prior to today, have you ever been deposed by an attorney from either Edwards & Angell or Palmer & Dodge?

A. No.

Q. In any other matter, have you ever given testimony where an attorney from Edwards & Angell cross-examined you?

A. Not that I'm aware of, no.

Q. Have you ever given testimony in a matter where an attorney from Palmer & Dodge cross-examined you?

A. Not that I'm aware of.

Q. I would like you to turn to Page 2 of 4. "Previous expert testimony." Do you see that?

A. Yes.

Q. Environmental Compliance Corporation, Inc. By whom were you retained in that case?

A. The trustee. The bankruptcy trustee.

Q. Who was the bankruptcy trustee?

A. Stephen Gray.

Q. And in what court, in what bankruptcy court was that matter?

A. The Western District.

Q. In connection with the bankruptcy of Edward S. Stimpson, III, whom did you represent in that matter?

A. The debtor, Ed Stimpson.

Q. He is the person who retained you?

A. Yes.

Q. In the matter of Yary versus Zwick, who retained you?

A. The company.

Q. And can you explain for me how Hyphen, Inc. was involved in Yary versus Zwick?

A. I can't recall. It's been a while, and I remember asking the same question when we were retained. I just can't remember.

Q. In connection the matter CyberStorage, Inc. versus Trimm Technologies, Inc., who retained you as an expert to calculate lost profits?

A. I believe it was Mr. Hoffman.

Q. And which company did Mr. Hoffman represent?

A. CyberStorage Systems.

Q. In the matter of KMS Companies, Inc. V Arthur Ivey, which party did you represent?

A. Arthur Ivey.

Q. In the matter of Edward Stanger versus George Davis, which party retained you as an expert?

A. Ed Stanger.

Q. In the matter of Atlantic Rancher, Inc., which party retained you?

A. The trustee.

Q. Who was the trustee in that matter?

A. John Aquino.

Q. He is the gentleman that you identified as being -- as being a partner at Palmer & Dodge?
A. Yes.
Q. I believe you previously testified that in the Newport Creamery matter you were retained by the trustee?
A. Yes.
Q. In the matter of Timothy P. King versus John F. Conant, who retained you as an expert?
A. The attorneys for Timothy P. King.
Q. Is that matter still pending?
A. It just -- the trial just wrapped up about a week or week and a half ago.
Q. Did you testify?
A. A large component of the case settled the Sunday night before the trial started Monday.
The trial went on for another component, and they stipulated to the facts that we were to testify to. So I did not testify.
(A recess was taken from 4:12 to 4:19 p.m.)

CROSS-EXAMINATION

BY MR. HOFFMAN:
Q. Do you have a copy, Mr. Lowey, of Exhibit

101?
A. Yes.
Q. Can you open it to Page 7.
At Page 7 of Exhibit 101, which is your report, do you reference the fact that GMAC or its agent did not ship, make any shipments to existing customers with outstanding purchase orders, and also the fact that all sales were to be cash in advance or on a COD basis?
Do you make reference to that?
A. Yes.
Q. That's in the large paragraph that starts with the words, "According to."
A. Yes.
Q. Did those facts form any part of the basis of your opinion that GMAC or its agents did not act in a commercially reasonable manner in liquidating the inventory?
MR. HOULIHAN: Objection.
Q. You may answer.
A. It was a consideration.
Q. Okay. And do you reference it as a consideration in this report?
A. Yes.

Q. And can you read the sentence or phrase where you reference the facts that we have just added as a consideration in reaching your opinion.
A. I guess it's referenced somewhat in two places. One is in that first complete paragraph, beginning with, "According," where we say, "The liquidator only accepted offers on cash in advance or COD basis. No credit was extended. These payment terms effectively limited participation of larger customers who do not do business on a cash basis."
Then further in the next paragraph I say, on the fourth line that begins, "I believe that the company could have realized a higher percentage on the inventory liquidation than what Rijo projected if more time had been taken, people with more familiarity with the inventory had been retained and sales to customers with open orders were pursued."
MR. HOFFMAN: I have no further questions.

REDIRECT EXAMINATION

BY MR. HOULIHAN:
Q. Mr. Lowey, what is the basis for the

statement in your report that, "These payments terms effectively limited participation of larger customers who do not do business on a cash basis"?
A. I believe -- well, in the Rijo memos he had indicated at that, I believe it was JC Penny, would not do, I believe, COD.
Also, I believe I asked Mr. Landay what his experience was with large companies, and a lot of their sales had historically been to, I believe, five major customers, and whether or not they would typically participate in a COD or cash-in-advance situation, and he had basically represented no.
Q. Of course this wasn't a typical situation, was it? The liquidation --
A. No. It's not your everyday -- that's correct.
Q. So the fact that a particular customer does not typically engage in cash or cash in advance or COD transactions doesn't mean that in a particular instance at the right price they might not reconsider their typical business practice. Would you agree with that?
A. Yes.
Q. Do you know, yes or no, whether or not Rijo

Page 146

or RAS made any effort to determine whether or not existing customers would be willing to enter into transactions on a COD/cash-in-advance basis?

A. I don't know that they did or they didn't.

Q. Therefore, assuming for the sake of this question that it was commercially reasonable to impose the requirement of cash in advance or COD, you're not in a position to say whether or not RAS's efforts in connection with existing customers was or was not commercially reasonable?

MR. HOFFMAN: Objection.

A. It's a difficult question to answer. I can't answer yes or no.

Q. In response to Mr. Hoffman's questions you pointed to the language near the bottom of Page 7, to extent that you believe that a higher percentage of the inventory might have been liquidated if RAS had pursued sales to customers with open orders, correct?

A. Yes.

Q. You're not changing your testimony, are you, that you made no effort to determine whether or not the existing inventory was available to make such sales?

Page 147

A. I am not changing my testimony.

Q. You simply relied on Mr. Landay's statement that he thought that there were -- that some of the existing inventory could have been used to satisfy open orders to existing customers?

A. Yes.

Q. And you personally did not verify that fact?

A. Correct.

Q. And do you have any basis for offering an opinion as to how much of the available inventory could have been sold on open orders?

A. No.

Q. I take it that you cannot offer an opinion as to the extent to which GMAC would have realized a higher percentage on the inventory liquidation if the sales to customers had been filled out of existing inventory?

A. Not specifically. It's kind of incorporated in my overall estimates.

MR. HOULIHAN: I would like to request copies of the drafts of Mr. Lowey's report.

MR. HOFFMAN: I will ask him to send them to me. I think we already agreed to give you

Page 148

those.

I have to check how we answered your interrogatories. If we have it, no problem, I will give it to you.

MR. HOULIHAN: The second request, I am not quite sure to whom I'm directing this, but I would request that Mr. Lowey check with his partner and verify whether or not there's any open -- confirm whether or not there's any open engagement involving Palmer & Dodge, since, to the extent that it is going to be an issue, the sooner it's addressed, the better.

MR. HOFFMAN: Okay. Keith, you let me know.

THE WITNESS: Okay.

(The deposition was adjourned at 4:30 p.m.)

Page 149

ERRATA SHEET

I, Keith D. Lowey, do hereby certify that I have read the foregoing transcript of my testimony, and further certify that it is a true and accurate record of my testimony (with the exception of the corrections listed below):

| Page | Line | Correction |
|---|---|---|
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |

Signed under the pains and penalties of perjury this ____ day of ____________________, 2005.

______________________________

Keith D. Lowey

COMMONWEALTH OF MASSACHUSETTS )
SUFFOLK, SS )

I, Deborah L. Roth, and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on October 20, 2005, the person hereinbefore named, who was by me duly sworn to the truth concerning any knowledge in this cause; that that person was thereupon examined under oath, and the examination reduced to typewriting; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to nor employed by any attorney or counsel employed by the parties hereto or financially interested in the action.

In witness whereof, I have hereunto set my hand this 22th day of October 2005.

DEBORAH ROTH, Notary Public
My commission expires: 2/7/08