UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-CV-11955-WGY

| | |
|---|---|
| DAVID L. LANDAY, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>GMAC COMMERCIAL CREDIT, LLC and )<br>GMAC COMMERCIAL FINANCE, LLC, )<br>)<br>Defendants. )<br>_____) | AFFIDAVIT OF<br>DAVID L. LANDAY IN<br>OPPOSITION TO<br>DEFENDANTS' MOTION TO<br>STRIKE PORTIONS OF<br>LANDAY'S 12/13/05<br>AFFIDAVIT |

I, David L. Landay, being duly sworn, depose and say as follows:

1.  I am the plaintiff in this action. I am also the defendant in an action brought by defendants (hereinafter "GMAC") in New York for collection on a guaranty that I signed on behalf of corporate borrowers, specifically, Seneca Sports, Inc and its subsidiary Brookfield International, Inc. (together "Seneca"). I make this affidavit in opposition to GMAC's motion to strike portions of my December 13, 2005 affidavit in opposition to GMAC's Motion for Summary Judgment.

2.  The portions of my December 13 affidavit that GMAC attacks are in two categories: (a) GMAC seeks to strike all references to the value of the intellectual property that it seized from Seneca and failed to liquidate and (b) GMAC seeks to strike all references that I make to the fact that GMAC deprived me of information by (i) seizing all Seneca's books and records on October 22, 2001, (ii) refusing me access to those records until late August 2005 and (iii) refusing to provide me with any information relevant to an accounting concerning its liquidation of Seneca although it

has consistently admitted that I am entitled to such an accounting. See GMAC's Answer in this action, paragraph 54.

3. GMAC claims that paragraphs 16, 18, 40-43 and 45 of my affidavit clearly contradict my answer to GMAC's Interrogatory 11 in which I was asked "State the value <u>that you believe</u> GMAC <u>should have been able to obtain</u> for the 'assets of Seneca and Brookfield' and state the basis for your belief." (emphasis added). After answering as to accounts receivable and inventory, I stated the following as to intellectual property:

> The intellectual property has value that Landay cannot estimate. <u>However, he believes that there may be a reasonable basis for estimating such value based on either or both of Seneca's financial records, not in his possession at this time, or the Brookfield acquisition papers</u>. He believes that certain licenses could have been sold or assigned and he knows that certain patents and trademarks could have been sold....Additional documents which support this allegation are contained among the Borrowers documents not currently in Landay's possession.... <u>Landay reserves his right to put a dollar figure on the intellectual property after he obtains further discovery from GMAC.</u>" (emphasis added).

4. The bulk of the statements in my December 13 affidavit attacked by GMAC as being inconsistent with the foregoing answer are paragraphs in which I recite historical facts, not my belief concerning the amount GMAC should have realized. The statements at issue are as follows: (a) paragraph 16 in which I state that Seneca bought Hutch-Forster trademarks for $250,000 in or around 2000; (b) paragraph 18 in which I state that Seneca paid approximately $5 million for Brookfield in September 2000 and that, of that cost, the Brookfield intellectual property accounted for $1.6 million as reflected in the purchase contract; (c) paragraph 40 in which I state how many trademarks and patents Seneca owned in October 2001 and repeat the cost of the Hutch-Forster marks; (d) paragraph 41 in which I repeat the September 19, 2000 cost of the Brookfield intellectual property and calculate that the patent and trademarks

2

accounted for about $1.3 million of the $1.6 million purchase price; (e) paragraph 42 in which I state that Seneca owned numerous other trademarks and patents worth at least as much as those acquired in the Brookfield transaction; (f) paragraph 43 in which I state that on October 22, 2001 Seneca owned patents and trademarks it owned on September 19, 2000, and I state the amount that GMAC should have received in liquidation; (g) paragraph 45 in which I state that patents and trademarks loose their value over time if not used.

5.      Except for my opinion expressed in a portion of paragraph 43 as to what I believe GMAC should have received for the intellectual property in liquidation and, perhaps, my statement in a portion of paragraph 42 that Seneca's patents and trademarks were worth at least as much as Brookfield's, none of the foregoing could even remotely contradict any answer to a question asking what I "believe" GMAC "should have realized" for the intellectual property.  They are simply historical facts, and the interrogatory did not ask me about them. I did not understand this interrogatory to ask me to identify trademarks and patents, to state how much they had cost or to ask me whether they lose value over time if inactive.

6.      As to my opinions expressed in portions of paragraphs 42 and 43, I strongly disagree with GMAC that they contradict my Interrogatory answer.  I will show below that this is not the case.  Moreover, to the extent my interrogatory answer may have been inartful or appear somewhat contradictory, the surrounding circumstances discussed below explain and excuse this.

7.      Indeed, the surrounding circumstances involve GMAC's refusal to provide me with Seneca's records and accounting information over the past four years and

show why the second prong of GMAC's motion should not be granted (i.e., references to information deprivation by GMAC should not be stricken). While this Court has ruled that I may not introduce evidence of New York discovery disputes, as shown below, GMAC took Seneca's records and deprived me of information long before any litigation in New York. My claim concerning this deprivation is independent of the discovery skirmishes and remains a part of my claim here.

8. Moreover, while this Court's ruling prohibits me from introducing evidence of New York discovery disputes at trial, the New York action (including these disputes) are part of the surrounding circumstances that explain my answer to the interrogatory in question. The key to understanding my answer and the reservation of rights therein is the fact that GMAC expelled me from Seneca's premises and seized all Seneca's assets and books and records on October 22, 2001 – including all documents relating to patents and trademarks - and did not give me access to those documents until late August 2005, only days before my answers to interrogatories were due, and then only in the offices of GMAC's Boston attorneys.

9. I finalized and signed my answers to GMAC's First Set of Interrogatories on September 6, 2005, the day they were due. As of that moment, I knew that GMAC had approximately one million pages of Seneca documents in its possession to which I had finally gained access on or about August 23, 2005 and surveyed. Since Interrogatory 11 asked me for my "belief" as to the value GMAC should have received for the intellectual property 4 years earlier, I wanted to do a detailed review of the documents that I had not seen in 4 years. Therefore, I reserved my right to answer the interrogatory until after obtaining full discovery from GMAC.

4

10. As I was finalizing my answers on September 6, GMAC delivered to my attorney copies of the 5,000 some-odd Seneca documents that I had tagged in my initial inspection of the confiscated documents; it was impossible for me to consult them. Nor had I the opportunity to go through all the approximately one million pages that GMAC had tendered. Moreover, I had an expert who had not yet been provided with full information from GMAC on any topic that he was preparing; I expected that, by the time his report came due, in addition to making a usury analysis and an analysis of GMAC's liquidation of Seneca's accounts receivable and inventory, he could put an accurate liquidation figure on the intellectual property as well. Accordingly, I stated that I was not prepared to place a dollar figure on the intellectual property, and I reserved my rights to do so after obtaining full disclosure from GMAC. Nevertheless, in my interrogatory answer I outlined for GMAC how I would arrive at such a figure, and that is exactly the method employed in my December 13 affidavit.

11. My December 13 affidavit does not contradict my answer to Interrogatory 11. GMAC ignores my reservation of rights in the interrogatory answer and the status of discovery at the time and, instead, focuses on one sentence in isolation to the exclusion of the remainder of my answer, in particular the highlighted portions set forth in paragraph 3 above. Although stating that "[t]he intellectual property has value that Landay cannot estimate," the entire answer makes it clear that I meant that I could not give an estimate <u>at that moment in time.</u> As noted above, I believed that I needed more information before I could place a liquidation value on the intellectual property; I stated how I would go about an evaluation; and I reserved my right to do so after obtaining full disclosure from GMAC, including of the Seneca records it continues to hold.

12. At the time of my September 6 answer, I expected to find among the confiscated/produced Seneca documents lists of intellectual property in addition to the lists provided to GMAC at the September 19, 2000 closing and documents concerning the Hutch-Forster purchase. I intended to provide my expert with all this information and expected that he would include in his report his estimate of the liquidation value of the intellectual property. While I believed that my memory is accurate as far as it goes, I also believed that there was more intellectual property than I recall; moreover, I would have preferred to have found some additional supporting documentation to show my expert and the Court.

13. As shown below in more detail, because information trickled in slowly from GMAC, my expert was not able to fully evaluate the liquidation value of the intellectual property by the date that his report was due. Ultimately, that task fell to me. Although I did make another inspection of the Seneca documents after September 6, I did not come across the documentation that I was seeking and, consequently, I could only value the trademarks and patents discussed in my December 13, 2005 affidavit. This probably results in a lower value, but it is still significant. See paragraphs 27 to 29 below.

14. The hectic pace and tremendous expense of two GMAC litigations running simultaneously in two jurisdictions forced me to focus on whatever task was next on the calendar. Although I did not formally supplement my interrogatory answers before GMAC filed its motion for Summary Judgment in this case, I provided GMAC with all the information it seeks to strike from my December 13 affidavit. GMAC obtained this information from the report of my expert, Keith Lowey and from my testimony in the

6

New York action on November 1 and November 4, 2005. See paragraphs 27 to 29 below.

15. A brief chronology of the events preceding and following my answer to Interrogatory 11 is instructive. Moreover, it shows that my answer to Interrogatory 11 does not contradict my affidavit but rather, the affidavit is the culmination of development of a thought process that was revealed to GMAC almost every step of the way.

16. Almost from the moment that GMAC seized Seneca's assets, books and records in October 2001, I sought information from GMAC that would be relevant to (a) my liability, if any, as a guarantor and (b) my ability to collect anything from Seneca as a secured creditor, junior only to GMAC. Although I received a letter from GMAC in 2001 assuring me that I would receive an accounting, I have not received one to this very day; this is part of my complaint in this action.

17. My attempts to get information from GMAC and to gain access to Seneca's documents occurred long before the discovery process in the New York case. Indeed, these attempts occurred before the litigation in New York was commenced. The very day I was expelled from Seneca (October 22, 2001) I asked Mr. Rijo, GMAC's liquidator for Seneca documents and, as early as October 25, 2001, my Massachusetts attorney asked GMAC's attorney to give me access to all books and records of Seneca, and he continued to make such requests. See Exhibit 1.

18. Even my New York attorney's attempt to avoid litigation by entering into settlement negotiations, which prompted the August 6, 2002 letter from GMAC's Lorraine Fields denying access to information (Exhibit 11 to my December 13 affidavit),

7

occurred before GMAC filed its October 25, 2002 New York complaint; it certainly occurred long before discovery was undertaken and any discovery disputes arose. I am informed and believe that the first discovery request made in the New York action was my First Request for Production of Documents served on or about April 30, 2003 – a year-and-one-half following GMAC seizure of Seneca and an equal period of time since I began asking GMAC for access to information and records.

19. Once discovery commenced in New York, disputes did arise. However, the first disputed discovery motion was not filed until October 2003, although I did make several subsequent motions. Suffice it to say here that I never received information for an accounting and I never got access to Seneca's books and records through New York discovery.

20. Meanwhile, the instant action was proceeding. Although I served a document request and interrogatories on GMAC in June 2005, due to a temporary stay of discovery, I did not receive responses to interrogatories in this case until August 10 and document production until late August. GMAC's August responses were lacking and my attorney had to negotiate with GMAC to obtain more documents over the next two-three months and he obtained an order of this Court for more complete answers to interrogatories by October 21, 2005.

21. In its August 10, 2005 Answers to Interrogatories, GMAC revealed that Seneca's books and records were still in its possession and that they were in a warehouse in Milford, Massachusetts. These documents were not tendered to me for examination until August 23, 2005.

22.     Because my expert's report in this case was due on September 15, 2005 (this date was later extended by stipulation and order), Mr. Lowey had to begin his analysis without full discovery from GMAC. He began in or about early August by looking at documents GMAC had produced in the New York action. The GMAC documents were not self-explanatory and it was only after taking depositions of GMAC personnel, that we could analyze them properly.

23.     A deposition of GMAC's Kathleen Pappalardo in both the Massachusetts case and the New York case was scheduled for August 18 and 19 to take place in New York. I traveled to Boston from my home in Florida on August 15 to work with Attorney Hoffman and Mr. Lowey preparing for the deposition of Ms. Pappalardo. On August 18 and 19, I attended her deposition in New York. At that deposition, Ms. Pappalardo produced documents that had never been produced before by GMAC, and GMAC's New York attorney revealed that he had Seneca computer tapes in his possession that he had never produced. Unfortunately, also at that deposition, Barry Okun, my New York attorney, received terrible news about his wife's health, and he was forced to leave without participating in the deposition. Fortunately, the deposition provided us with information that helped us to understand GMAC's records so that Mr. Lowey could proceed with an analysis.

24.     On or about August 23, 2005, GMAC tendered for examination the Seneca records that it had held since October 2001. I was in Boston for a different purpose when the records were tendered, and I was able to spend some time reviewing them in the offices of GMAC's Boston attorneys under the watchful eye of a paralegal from that office. There were about a million pages of documents. I reviewed as many

9

as I could over a period of several days and tagged about 5000 documents for copying. GMAC did not provide those copies to my attorney until September 6, 2005, the day I executed my answers to GMAC's First Set of Interrogatories.

25.     The wife of my New York attorney died on August 29, 2005.  The New York case was scheduled to be tried before a referee on September 20, 2005. Because of the recently discovered evidence (August 10 Answers to Interrogatories in the Massachusetts case; revelations at the August 19-20 Pappalardo deposition) and the incapacity of Mr. Okun, I sought a delay of the New York trial.  Joseph Einstein, an attorney totally new to my case, took over for Mr. Okun.  Although Mr. Einstein made an emergency motion in the New York action on August 31, it was not heard until September 16, a matter of days before the scheduled trial. Until a delay was granted, we had to prepare for a September 20 trial.  It was not until after the September 16 hearing that we knew the referee trial was continued over to October 27, 2005.

26.     Since GMAC was a participant in the New York action, it knew of the pressures on me there.  It also knew that my expert had a report due in the instant action that depended upon a review of GMAC information, not all of which had been provided by GMAC and/or analyzed by my expert.  Nevertheless, on September 8, GMAC sent a letter purporting to impose a deadline on me to finish my review of the Seneca documents and to supplement my September 6 answers to GMAC's First Set of Interrogatories.  I did do an additional review of the Seneca documents in the office of GMAC's Boston counsel in the week of September 12, but it was impossible to make the full review and analysis as demanded by GMAC under all the circumstances (especially since GMAC had not yet made full production of GMAC documents nor fully

10

answered interrogatories) and, on September 14, 2005, my attorney wrote back rejecting the artificial deadline. Exhibit 2 hereto. On September 22, even though it still owed me information that could affect my analysis, GMAC persisted in pressing me to supplement my answers; my attorney disagreed. Exhibit 3 and Exhibit 4 hereto. .

27. My expert presented his report on schedule on October 10, 2005, even though information had trickled in late from GMAC and/or had not been provided at all. In Mr. Lowey's October 10 report, he stated that "I was not able to assign a value to the intellectual property at this time" Exhibit 5, p. 8, (emphasis added). However, he also stated that the $1.6 million dollars that Seneca had paid for the Brookfield intellectual property is an indication of the value of that property (Id., p. 4) and that, presumably, the value of all the intellectual property exceeded $1.6million (Id., p. 5). This information is totally consistent with my December 13 affidavit and with my answer to Interrogatory 11.

28. I was deposed by GMAC in the instant action on October 18, 2005. Mr. Lowey was deposed in the instant action on October 20, 2005. The referee trial in the New York action commenced on October 27 and GMAC's New York counsel used the October 18 and 20 depositions in cross-examining Mr. Lowey and me on November 1 and 4, 2005 in New York. Accordingly, GMAC cannot pretend that information gathered in one forum is not known to GMAC it in the other forum. On November 1 and 4, 2005, having given further thought to the valuation question, I testified about the value of the intellectual property and, thus, GMAC was provided with sworn information that corresponds with my December 13 affidavit long before GMAC filed its motion for Summary Judgment in the instant action.

29. During my testimony in the New York action on November 1 and November 4, 2005, I offered the following concerning the intellectual property. I testified that the Brookfield intellectual property had been acquired by Seneca for $1.6 million in September 2000 and that GMAC knew the details of this purchase. Exhibit 6 (Nov. 1 testimony, pp.6-7). I testified that Seneca had acquired the Hutch- Forster trademarks for $250,000. Exhibit 7 (Nov. 1 testimony, p. 107). I identified the list of Seneca patents and trademarks that Attorney Timothy French supplied for the 2000 closing with GMAC. Exhibit 8 (Nov. 4 testimony, pp. 104-106). I testified that there were additional patents not on Mr. French's list – such as slumber bags – that Seneca owned. Exhibit 9 (Nov. 4 testimony, p. 116). I testified that, with some exceptions, all of the intellectual property that was viable in 2000 was viable on October 22, 2001. Exhibit 10 (Nov 4 testimony, pp. 102-103; 128-30; 137-138). I stated that in my opinion the intellectual property was worth over $2 million in October 2001. Exhibit 7. The foregoing is totally consistent with my December 13 affidavit. Indeed, it is also consistent with my interrogatory answer and Mr. Lowey's report.

30. My answer to Interrogatory 11 was provided at a stage in this case where we were still gathering and analyzing information. Information came to us too late from GMAC for my expert to make his report any more extensive than he did (assigning a value to the intellectual property of at least the $1.6 million cost of the Brookfield intellectual property). However, Mr. Lowey has pointed out that my knowledge of the intellectual property at issue, (including its cost to Seneca), and my experience with intellectual property in general put me in a unique position to value the intellectual property myself. See, e.g., Exhibit 11 (Lowey N.Y. Testimony, Nov.4, pp. 32-33).

31. My November testimony in New York provided GMAC with my estimation of the minimal value of the intellectual property and the building blocks that went into my conclusion. It put meat on the bones of my answer to Interrogatory 11. My December 13 affidavit explains in more detail how I arrived at my conclusion. Essentially, it pulls together in one place all the information that was already known to GMAC concerning 2000 costs and values and shows how I calculated the minimum value for the intellectual property as of October 2001. There are no contradictions but, rather, amplifications.

32. The fact that I did not have the opportunity to supplement my answer to Interrogatory 11 before filing my affidavit does not make my interrogatory answer contradict my December 13 affidavit. Under the time constraints of the schedules in the two cases, I believed that GMAC was sufficiently informed by Mr. Lowey's report and my New York testimony so that I could concentrate on defending against the battery of motions GMAC filed in November/December and leave to the earliest opportunity thereafter my formal supplementation of my answers to GMAC's First Set of Interrogatories. In this regard, it is important to note that I am an individual with limited resources who is litigating against a large corporation in two jurisdictions far from my current home in Florida. It has been up to me to provide all discovery responses and factual input to my attorneys; unlike a corporate party, there is no one to whom I can delegate the job. I have traveled to Boston and New York numerous times this past year to keep up with these litigations, including dodging Hurricane Wilma which hit my Florida home as I was driving to New York for the referee trial. In the meantime, at the age of 66, I am also attempting to earn a living as a real estate salesperson in Florida.

33. While I do not expect sympathy, this is not an instance where form should be elevated over substance. The fact is that, I provided a supplement to Interrogatory 11 by way of my expert's report and the New York testimony before GMAC filed its Motion for Summary Judgment. GMAC had all the information reflected in my December 13 affidavit beforehand. Moreover, there is simply no conflict between the statements in my affidavit and my answer to Interrogatory 11.

34. As to GMAC's request that my references to its confiscation of Seneca documents and its refusal to provide me with information be stricken on the grounds that these are New York "discovery disputes" precluded by the Court's prior order, I respectfully submit that the foregoing shows the contrary. This is an important part of my Chapter 93A claim against GMAC; it is part of the unscrupulous behavior that permeated our relationship and it precedes commencement of the New York action. The fact is that GMAC deprived me of my company records and of any meaningful, relevant information from October 22, 2001 (the day I was expelled from Seneca) forward. That I cannot discuss New York discovery disputes that commenced approximately two years later does not negate - nor prohibit me from stating - the fact that GMAC deprived me of the records and information in October 2001 and, to some extent, continues to do so until this day. (GMAC still has not provided an accounting and, although it finally granted me access in late August 2005 due to discovery in the instant action, it still retains custody of Seneca's documents.) Independent of any discovery requests, GMAC could have – and should have – returned or provided ready access to Seneca's records and provided me with the accounting it promised in 2001.

SIGNED UNDER THE PAINS AND PENALITIES OF PERJURY ON THIS 5th DAY OF JANUARY, 2006.

                                                                          _____
                                                                          DAVID L. LANDAY

233114_1

15