# EXHIBIT 5

United States District Court
District of Massachusetts
Civil Action No. 04-11955WGY
David L. Landay v. GMAC Commercial Credit LLC et al.
**Expert Witness Report of Keith D. Lowey, CPA**
October 10, 2005

### I.	Background

The Plaintiff in this litigation matter, David L. Landay ("Landay"), was the CEO, president, director and major shareholder of Seneca Sports, Inc. ("Seneca"), a distributor of adult and children's sporting good products and Brookfield International, Inc. ("Brookfield"), a purveyor of juvenile sports equipment and sports toys. In the summer of 2000, Landay, on Seneca's behalf, sought financing from GMAC Commercial Credit LLC ("GMAC") to purchase Brookfield. On or about September 19, 2000, Seneca and GMAC entered into a commercial factoring agreement with a line of credit up to $10,000,000 (the "Factoring Agreement") that was secured by Seneca's and Brookfield's accounts receivable, inventory and other assets, and by a personal guaranty and standby letter of credit from Landay. GMAC contends that Seneca and Brookfield defaulted on the covenants of the Factoring Agreement. On or about August 9, 2001, Seneca and Brookfield executed a Forbearance Agreement ("Forbearance Agreement") with GMAC that modified the Factoring Agreement and required Landay to and put up an additional $1,000,000 in cash collateral. The Forbearance Agreement included a financial plan that provided a schedule for loan draws, loan payments and established a formula for eligible accounts receivable. On or about October 15, 2001, GMAC collected Landay's $1,000,000 in cash collateral and collected on his standby letters of credit totaling $4.35MM. On or about October 22, 2001, GMAC seized Seneca's and Brookfield's assets and proceeded to liquidate them.

### II.	The Issues

In my capacity as expert for the plaintiff, I have been asked to assess: 1) whether the interest and expenses charged by GMAC on the Factoring Agreement exceeded the 20% ceiling under the Massachusetts usury statute as articulated in M.G.L. 271, Section 49 and 2) whether GMAC and/or its agents acted in a commercially reasonable manner to maximize the return on the liquidation of the Seneca collateral securing the Factoring Agreement, specifically the accounts receivable, inventory and intellectual property.

### III.	Qualification as Expert

I am President of Verdolino & Lowey, P.C. ("V&L"), a diverse accounting firm offering forensic accounting, business liquidation services, litigation support, business advisory, management consulting and tax planning and compliance services. I have 22 years of accounting experience: three at one of the former international Big Eight

accounting firms, four at a well-known privately-held company in the capacity as CFO and Controller and the remaining 15 at my present practice. I am a Certified Public Accountant, licensed to practice in Massachusetts and Rhode Island. Over the past 19 years, the largesse of my practice has focused on complex business issues and analysis and business litigation in connection with bankrupt, insolvent or otherwise under-performing enterprises. A copy of my current Curriculum Vitae is attached as Exhibit G.

My firm has incurred total fees of $21,561.00 through September 30, 2005 in connection with this litigation. Additional fees and expenses may be billed between now and the time of trial if additional work is requested by counsel for Landay. My compensation is not contingent on the outcome of this litigation.

### IV. Documentation Reviewed

In connection with the work performed in this engagement, numerous documents and records were reviewed; including but not limited to: complaints, responses to interrogatories, deposition transcripts and related exhibits and various company records. For a complete list of documents reviewed see Exhibit H.

### V. Findings

In my expert opinion: (1) GMAC charged Seneca interest and expenses in excess of 20% (the Commonwealth of Massachusetts usury rate) for the period October 22, 2001 to January 31, 2003 and (2) GMAC, on its own or through its Liquidating Agent, RAS ("Liquidating Agent" or "RAS"), did not act in a commercially reasonable manner in liquidating the assets of Seneca.

### VI. Usury

In order to calculate the overall interest rate charged on the GMAC loan, a schedule was prepared that re-created the loan activity for the history of the loan. This recreation effort was performed as a result of GMAC not being able to provide the plaintiff with a similar schedule. GMAC provided the plaintiff with a summarized schedule (by month) of the loan activity, monthly client statements and some daily cash records. In order to validate the activity, and prepare an accurate calculation of the periodic interest being charged on the loan, this comprehensive schedule was prepared. The analysis ultimately afforded me the opportunity to review the loan activity by transaction (i.e., individual charges to the loan, individual payments / receipts posted to the loan, draws against the loan, adjustments to the loan balance, etc.) for propriety. As of the writing of this report, there are still numerous transactions for which GMAC has provided no support.

I calculated the annualized effective interest rate for the period from October 22, 2001 (the "Takeover Date") to January 31, 2003 as being 27.10%. The rationale for specifically identifying this period was that it begins with the date that GMAC took

2

control of the Seneca business and concludes at the end of the month that includes the last significant transaction that was posted to the loan balance, i.e. on 1/9/03 GMAC posted a collection of $103,341.50 against the outstanding loan balance. GMAC wrote the balance of the loan off on 11/24/03. During the period from 2/1/03 to 11/24/03, only monthly interest and over-advance fees were charged to the loan along with two *de minimus* receipts totaling less than $300. Since I could not determine the reason that GMAC waited until November 2003 to write off the loan, I ignored the period from 2/1/03 to 11/24/03 in preparing the usury calculation.

The effect of interest being charged at a rate in excess of 20% (the "Usury Interest Damages") for the period 10/22/01 to 1/31/03 amounts to $107,775.20, as evidenced by the calculation in Exhibit D. Additionally, see Exhibit E for the calculation of the interest rate being charged on the loan and Exhibit F for the loan transaction activity for this period.

## VII.  Commercial Reasonableness

In assessing whether or not GMAC or RAS acted in a commercially reasonable manner, I considered all of the documents made available for review. See Exhibit H for a complete listing of these documents. The primary documents relied upon include: the GMAC Commercial Credit Corp. New Client Report dated July 19, 2000 (see Exhibit B for excerpts from this report) and the periodic update reports, including various liquidation analyses, prepared by John Rijo ("Rijo" or the "Liquidating Agent") of RAS for the period June 30, 2001 to November 26, 2001. The liquidation analyses that were reviewed and included as part of the reports prepared for those dates, were prepared as of June 30, 2001, October 5, 2001 and October 19, 2001, respectively.

My observations on this area of inquiry are as follows:

- The loan was considered by GMAC to be primarily a collateral-based loan, 56% of the original loan advance of which was secured by the assets of Landay. GMAC's loan write-up indicated that it was a "strong collateral loan with over 50% of the initial funding supported by a Standby LC, A/R to be factored with retailers we know well, and a (*sic*) **advance rate against inventory supported by a liquidation value appraisal.**" (emphasis added).

- Despite GMAC recognizing that Seneca "performed poorly with increasing losses over the past three years" and that its "balance sheet is weak with a negative retained earnings and a sizeable deficit in working capital", it still approved the loan.

- In its loan write-up, GMAC acknowledged the importance of Landay's industry experience, including his knowledge of the licenses, trademarks and patents (collectively "the intellectual property") and his personal

3

resources. See Exhibit C for a complete listing of Seneca's and Brookfield's intellectual property. Examples of the weight GMAC assigned to his personal resources and industry knowledge include the following excerpts from the loan write-up:

- "... a $3.5MM personal guaranty of the President and majority owner, David Landay, secured by a $4MM Letter of Credit issued by Fleet Bank **tying him very closely to our loan**" (emphasis added).

- "Seneca primarily through David Landay, has a long established credibility in the industry within which he has more than thirty years experience ... with Landay's personal exposure in this loan it would appear **he would have incentive to liquidate for the highest possible return. Additionally he would have the opportunity to sell the licenses to another distributor/manufacturer that is in the industry to further enhance any recovery**" (emphasis added).

- "David Landay is absorbing a large portion of the risk with his $4.0MM letter of credit and $2.9MM of subordinated debt, with GMAC being in a strong position of control, utilizing our factoring product and in possession of his Letter of Credit."

• GMAC acknowledged the value of Seneca's and Brookfield's intellectual property. It funds the purchase of the Brookfield intellectual property for $1.6MM with its loan to Seneca. Further recognition of the value of that intellectual property is evidenced within the loan write-up by the following excerpts:

- "Seneca's distinction is its long time participation in this industry, and subsequent relationships it has developed, and its **strong licensed brand recognition in the market place.**" (emphasis added).

- "Competition in toys is keen, however start-ups in this category are rare due to the need to garner licensed brands. Seneca/Brookfield have long-term license agreements with the premier brands which management knows intimately."

- In making its recommendation for the loan, the report writer sites "a good strategic acquisition in Brookfield International, and a good list of license agreements which are key to their marketing efforts."

4

Notwithstanding any of the above, my review of the Rijo reports and other related material indicates that neither GMAC nor its agent made more than a minimal effort to obtain a value for the intellectual property. Further, there has been no evidence that any funds were realized from the sale of those assets.

- In preparing the Liquidation Analyses as of June 30, 2001 and October 5, 2001, Rijo provides for a liquidation that is projected to take 12 and 10 weeks, respectively, and the retention of key employees in accounting, shipping, sales and accounts receivable for a period of 5 to 10 weeks. **This is important to note.** If the goal of a liquidation is to maximize the overall return, sufficient time needs to be provided to allow the liquidating party the opportunity to administer/liquidate the remaining assets. In this case, the remaining assets were inventory, accounts receivable, intellectual and personal property. If sufficient time is not provided, a liquidator may be forced to accept lesser offers than he might otherwise procure if given more time. Further, from a cost and efficiency perspective, it is generally important to retain those individuals who are most familiar with the important assets that are being liquidated/collected in any given situation. Those individuals are usually more cost effective than professionals being retained and, as a result of their familiarity and experience with the company and/or particular assets, are in a position to liquidate/collect a particular asset more efficiently and effectively.

Although the Liquidator intends, as of 10/5/01, to retain certain key employees to assist him with the liquidation over the proposed 10 to 12 week period, and GMAC acknowledges Landay's experience with and knowledge of the intellectual property, as well as his potential motivation in maximizing any recovery under a liquidation scenario, that expertise was not drawn upon. The Liquidator took control of the business on very short notice - October 22, 2001, the day of the asset seizure. Based on my review of the periodic update reports prepared by the Liquidator, the majority of the liquidation was completed by November 16, 2001 – **in just 27 days.** No one was retained to assist the Liquidator in selling the inventory. See a further discussion of this point below. Although the Liquidator did use certain key company personnel, he did so only on a very limited basis: customer service personnel, 22 hours; accounting staff (CFO), 32 hours; computer systems personnel, 12 hours; and shipping/warehouse personnel, 152.75 hours. No one was retained and little, if any effort, was made to try and recover anything with regard to the intellectual property - despite GMAC's recognition of its value AND its funding of the Seneca purchase of the Brookfield intangibles for $1.6MM thirteen months earlier. It is worth mentioning that Seneca's portfolio of trademarks, patents and licenses is not even reflected in that $1.6MM figure. Presumably, the value of the combined intellectual property exceeded $1.6MM.

- GMAC took responsibility for collecting the A/R. It appears as though it was given supporting documentation for the accounts with outstanding balances but company personnel were not utilized to assist in dealing with the high volume of credits and adjustments that were being sought by many of Seneca's customers. Customer checks were received via lockbox by GMAC and any discrepancies between company records and payment received were identified. The determination as to the propriety of any credit taken by a customer was up to Seneca to investigate and follow-up on. GMAC acted merely as a recipient of payments and record keeper of same. I have not been able to determine what, if any, collection effort was expended by GMAC. In the event of a discrepancy between invoice and payment amount, GMAC generated and sent a letter to Seneca giving them 60 days to investigate and resolve the discrepancy. Initially, these discrepancy letters were sent to the company at its main location in Milford, Massachusetts. Unfortunately, after 10/22/01, there was no one there to respond to these letters. Further, eventually these letters ended up being forwarded back to GMAC when the Milford location was vacated in late November and the company's mail forwarded to GMAC. In effect, GMAC was sending itself the discrepancy letters. Landay and his Attorney found unopened discrepancy letters in the records that were retrieved from the off-site storage facility during the document production process. GMAC has represented that it collected approximately $588k from A/R on a balance of $1.3MM as reported by the company. Due to insufficient information provided by GMAC, I have not been able to verify this figure.

  In order to project a liquidation value of the company's A/R as of 10/22/01, I reviewed the analyses prepared by the Liquidator and other relevant information provided to me. As a result of this analysis, I have utilized an overall 46% expected recovery rate. See Exhibit A for this calculation. In Rijo's analyses as of 6/30/00 and 10/5/00, respectively, he used an overall 53% and 55% recovery rate. Notwithstanding, his 10/19/01 liquidation analysis projected only a 41% recovery rate. The company historically had a 90% to 94% collection rate – but these recovery rates do not take into consideration certain credits and allowances that were made available to various large customers. Thus, I would characterize the overall collection rate of 46% that I used for projection purposes as being conservative. It is clear that the failure to retain key employees and the abbreviated timeframe within which the liquidation was conducted led to less than optimal results from RAS.

- The company's inventory was sold primarily via bulk sales by Rijo. As of the Takeover Date, the Liquidator focused on selling the remaining inventory of $1,293M as quickly as he could. Although Rijo's Liquidation Analyses as of 6/30/01, 10/5/01 and 10/19/01, respectively,

6

consistently provided for inventory to be liquidated at 42% of cost, it appears as though the actual recovery on the inventory was approximately 20% of cost. GMAC claims that it has received approximately $255k from the sale of inventory, $281k less than Rijo's projected recovery of $536k. To date, I have not been able to verify the actual amount collected from the sale of inventory due to incomplete records being turned over by GMAC. It is clear that the reduced timeframe and lack of retention of a key employee in this area impacted the overall inventory recovery.

According to an inventory liquidation value appraisal prepared by Ozer Valuation Services ("Ozer"), on which GMAC relied (see Exhibit B) in making its loan decision, as of May 2000, Seneca's inventory could have been liquidated at 65 % of cost **utilizing a 42 day going out of business sale** (emphasis added). Ozer calculated the net recovery after all related expenses at 53% and then further reserved an additional 6% to cover unexpected costs. This brought the appraised liquidation value to a net of 47% of cost. This value exceeds the 42% liquidation value BEFORE ANY EXPENSES that Rijo applied. The shorter time period utilized by the Liquidator promoted a "fire" sale perspective with little or no recognition given to open orders on the books as of the Takeover Date. The Liquidator only accepted offers on a cash in advance or COD basis; no credit was extended. These payments terms effectively limited participation of larger customers who do not do business on a cash basis. The Open Order Report dated 10/22/01 had open orders totaling in excess of $1.5MM. To date, I have not been able to verify which of these orders could have been filled with the remaining inventory. However, I want to point out that it is highly likely that any shipments made to an existing customer with an outstanding purchase order would have generated a higher return – and perhaps even a profit. Again, given the fact that no key employees were retained that were familiar with Seneca's customer base, GMAC put itself in a position whereby it was highly unlikely that it could maximize inventory recovery.

In order to project a recovery on the remaining inventory, I utilized a 47% of cost recovery rate - the NET recovery rate determined by Ozer. Given the wide disparity between the Ozer appraisal of 65% of cost and the 42% employed by Rijo, I believe that the company could have realized a higher percentage on the inventory liquidation than what Rijo projected if more time had been taken, people with more familiarity with the inventory had been retained and sales to customers with open orders were pursued.

- As indicated above, it is my opinion that given the fact that GMAC: (1) made little or no effort to liquidate Seneca's intellectual property; (2) did not conduct an "orderly liquidation" of Seneca's inventory since it failed to take at least six weeks to conduct the liquidation in favor of a "fire sale" time line; (3) did not retain key employees to maximize the recovery

related to the intellectual property, A/R and inventory, it was not commercially reasonable in its liquidation of the Seneca assets that remained as of 10/22/01. In order to calculate a damage amount (See Exhibit A), I applied a recovery rate to the actual A/R and inventory balances as of 10/22/01 to arrive at a projected total liquidation recovery amount. This amount was compared to the total amount recovered by GMAC for A/R and inventory. The result of this calculation is a shortfall, or damage amount, of $360,360. **This calculation does not take into consideration any value for the intellectual property.** I was not able to assign a value to the intellectual property at this time.

## VIII. Additional Information

I reserve the right to supplement my conclusion and analysis included herein should additional information become available.

Respectfully submitted,

*[signature]*

Keith D. Lowey
October 10, 2005

8