**EXHIBIT 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-CV-11955-WGY

DAVID L. LANDAY, )
)
      Plaintiff, )
)
v. )
)
GMAC COMMERCIAL CREDIT, LLC and )
GMAC COMMERCIAL FINANCE, LLC, )
)
      Defendants. )
_____ )

RECEIVED JAN 0 9 2006 EDWARDS ANGELL PALMER & DODGE LLP

## PLAINTIFF DAVID L. LANDAY'S SUPPLEMENTAL ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 and 26(e)(2) of the Federal Rules of Civil Procedure, Plaintiff David L. Landay ("Landay" or "Plaintiff") hereby Supplements his Answers to Interrogatory Nos. 4 and 11 to Defendants' First Set of Interrogatories as follows:

### GENERAL OBJECTIONS

The following objections are asserted in response to each and every interrogatory propounded by Defendants (hereinafter "GMAC" or "Defendants"). Each objection will not be restated in each response, but instead will be incorporated by reference. A response does not constitute a waiver of any objection asserted.

1. Plaintiff objects to Defendants' interrogatories insofar as they seek information which is beyond the scope of discovery permitted by Rule 26 of the Federal Rules of Civil Procedure or by any other discovery law or rules.

2. Plaintiff objects to Defendants' interrogatories on the grounds of the attorney-client privilege and the attorney-work product privilege. Plaintiff will not provide

a response to any interrogatory to the extent it seeks information subject to the attorney-client privilege, the attorney work-product privilege or other applicable privilege or protection.

3. Plaintiff objects to these interrogatories to the extent that they purport to impose obligations upon Plaintiff beyond those required by the Federal Rules of Civil Procedure.

4. Plaintiff objects to these interrogatories to the extent that they call for Plaintiff to describe documents or information in the possession, custody or control of Defendants. It is impossible for Plaintiff to provide complete answers without obtaining from Defendants documents and information that Plaintiff has requested. Plaintiff reserves his right to supplement his answers to these interrogatories with material obtained from Defendants.

## INTERROGATORIES

### INTERROGATORY NO. 4

State the basis for the allegation in Paragraph 15 of the Complaint that Landay was "a secured creditor" of Seneca as of September 19, 2000.

### ANSWER NO. 4

As of September 19, 2000, Landay had loaned Seneca a total of $3,450,000. Seneca executed notes evidencing this debt and provided Landay with a security interest in all its assets to secure such debt. These loans and their related security interest predated GMAC's loan to Seneca/Brookfield. All of the notes and security documents should be among the Seneca/Brookfield documents confiscated by GMAC and in its possession, custody and control. Landay would have to have ready access to those documents to describe the notes and security documents with greater specificity. Although he understands that some documents were delivered to counsel on Tuesday morning September 6, 2005, there has been insufficient time to review them before answering. The various notes were consolidated into a note dated 9/19/00 of which GMAC has a copy and which is referred to in paragraph 1 of the Subordination Agreement.

2

## SUPPLEMENTAL ANSWER NO. 4

As of September 19, 2000, Landay had loaned Seneca a total of $3,450,000. Seneca executed notes evidencing this debt and provided Landay with a security interest in all its assets to secure such debt. These loans and their related security interest predated GMAC's loan to Seneca/Brookfield. All of the notes and security documents should be among the Seneca/Brookfield documents confiscated by GMAC and in its possession, custody and control. The various notes were consolidated into a note dated 9/19/00 of which GMAC has a copy and which is referred to in paragraph 1 of the Subordination Agreement.

Neither Landay nor Seneca's former comptroller Neal Finkelstein have been able to locate in the Seneca file cabinets confiscated by GMAC the notes that were consolidated into the $3,450,000 note that was issued to Landay by Seneca on or about September 19, 2000, and which is referred to in paragraph 1 of the Subordination Agreement. Nor, except for one security agreement, were Landay or Finkelstein able to locate the security documents that Seneca issued to secure each of the underlying notes. Landay believes these documents were in the cabinets when he departed Seneca on October 22, 2001 and Finkelstein's deposition testimony indicates that Finkelstein believed such documents should have been in the cabinets following his departure from Seneca. These documents may have been lost or destroyed by GMAC in whose possession or control they have been since October 22, 2001, and it appears from the deposition of Mr. Rijo that two GMAC employees visited Seneca prior to the time that Rijo left the premises for good. In any event, Landay remembers clearly and has no doubts that he loaned Seneca a total of $3,450,000 in the time period preceding September 19, 2000, and that each time he loaned Seneca money, Seneca issued to him additional security interests in all its property so that all amounts loaned by Landay were secured. The total amount of these secured loans was $3,450,000 as of September 20, 2000. Seneca has not paid Landay any portion of the $3,450,000 to date nor any interest thereon.

## INTERROGATORY NO. 11

State the value that you believe GMAC should have been able to obtain for "the assets of Seneca and Brookfield" and state the basis for your belief.

## ANSWER NO. 11

Landay's belief is as follows: The cost value of the inventory seized by GMAC was approximately $1,800,000. (See LAN 0167) A proper liquidation should have resulted in about 40% of this value. The accounts receivable were approximately $1,306,000 (RAS 01565). Historically, Seneca's dilution did not exceed 5% of the total balance; Borrowers typically were able to collect 95% of the receivables. Allowing for a liquidation situation, GMAC should have collected at least three quarters of the $1,306,000 owed, especially where, as here, (a) GMAC had approved the accounts as credit worthy and collectable and (b) Jane Frangos had told Landay on October 15,

3

2001 in front of Robert Schwartz, Richard Lamontagne, David Madoff, Esq., and GMAC lawyers that GMAC is relentless with accounts receivable and can collect 100% of all moneys due. The intellectual property had value that Landay cannot estimate. However, he believes that there may be a reasonable basis for estimating such value based on either or both of Seneca's financial records, not in his possession at this time, or the Brookfield acquisition papers. He believes that certain licenses could have been sold or assigned and he knows that certain patents and trademarks could have been sold. In addition to purchase inquires that Landay's attorney forwarded to GMAC to no avail (see Answer to Interrogatory 9), according to documents produced by GMAC, Rand inquired into one patent that it wanted to buy along with inventory. (GLAN 00085) but RAS mistakenly decided that the patent was expired. Additional documents which support this allegation are contained among the Borrowers documents not currently in Landay's possession. See Answer to Interrogatory No. 4. Landay reserves his right to put a dollar figure on the intellectual property after he obtains further discovery from GMAC.

## SUPPLEMENTAL ANSWER NO. 11

Landay's belief is as follows: The cost value of the inventory seized by GMAC was approximately $1,800,000. (See LAN 0167) A proper liquidation should have resulted in about 40% of this value. The accounts receivable were approximately $1,306,000 (RAS 01565). Historically, Seneca's dilution did not exceed 5% of the total balance; Borrowers typically were able to collect 95% of the receivables. Allowing for a liquidation situation, GMAC should have collected at least three quarters of the $1,306,000 owed, especially where, as here, (a) GMAC had approved the accounts as credit worthy and collectable and (b) Jane Frangos had told Landay on October 15, 2001 in front of Robert Schwartz, Richard Lamontagne, David Madoff, Esq., and GMAC lawyers that GMAC is relentless with accounts receivable and can collect 100% of all moneys due.

As to the intellectual property, Landay believes that GMAC should have been able to obtain at least $2 million if it had proceeded with a prompt, commercially reasonable liquidation. The basis for Landay's belief is a follows:

Landay is knowledgeable concerning intellectual property. He has been intimately involved with patents, trademarks and licenses on behalf of the various companies of which he has been an executive and/or shareholder: Brookfield Athletic Shoe Company, Inc. of East Brookfield MA, Hyde Athletic Industries, Seneca Sports, Inc. and its subsidiary Brookfield International (of Milford, MA).

When Landay was president and CEO of Brookfield Athletic Shoe Company in East Brookfield, MA, in the period 1967-March 1985, Brookfield successfully registered numerous trademarks and patents that it had developed. In the 1970s Landay was instrumental in negotiating a license with Bobby Orr to put his name on product, including hockey sticks and skates. Thereafter, Brookfield developed and registered many patents and trademarks for Bobby Orr products. In addition to Bobby Orr

products, Brookfield's product development/design department created numerous other patents and trademarks that were used on Brookfield products. These products included all manner of footwear-related goods such as shoes, athletic shoes, roller skates and skateboards. Landay personally assumed responsibility for dealing with the patents and trademarks.

Landay oversaw transmission of necessary paperwork to Brookfield trademark and patent attorneys, Fish and Richardson; and it was Landay who dealt with such attorneys concerning the issuance of patents and trademarks and the maintenance thereof.

In the late 1970's-early 1980's, Brookfield purchased all the patents and trademarks of PF Flyers out of receivership. Landay negotiated that purchase. After acquiring PF Flyers, Landay caused Brookfield to develop a juvenile line of PF Flyers shoes and sneakers and to develop additional patents and trademarks related to PF Flyers. In addition to the Bobby Orr merchandise and the PF Flyers merchandise, Brookfield developed many other lines of adult and juvenile goods (e.g., athletic shoes, sneakers, roller skates, skate boards, scooters) and trademarks for which it obtained patents and trademark registrations. Landay negotiated license agreements with various companies so that recognizable names and images could be placed on juvenile products. Brookfield was the first company in the country to produce juvenile roller skates bearing licensed characters. Through Landay's efforts and negotiations Brookfield had licenses for, among others, Star Wars, Coca Cola, Garfield, Strawberry Shortcake, My Little Pony and almost every other license offered by American Greetings and Hasbro Toy.

In March 1985, Landay sold Brookfield to Hyde Athletic Industries ("Hyde"). Brookfield became a subsidiary of Hyde, and Landay was engaged for five and one-half years to run it for Hyde. Essentially, Landay had the same responsibilities for Brookfield that he had had before the sale. In addition, as an Executive Vice President of Hyde, Landay had the added responsibilities of being in charge of all product development and manufacturing (domestic and foreign) for the corporate parent. Specifically, Landay was in charge of product development and manufacturing of Hyde's Saucony and Spot-Bilt footwear. Although Hyde had a sales department (including a Brookfield sales manager) Landay was also made responsible for sales to Big Five Sports, a large retail customer of Hyde and Brookfield.

In the five and one-half years that Landay was with Hyde, numerous patents and trademarks were developed, applied for and issued. Landay also continually explored licenses on behalf of Hyde and Brookfield. Among other licenses, Landay acquired the Mattel "Barbie" license for Brookfield.

Landay formed Seneca in 1990. His role at Seneca was similar to his role at Brookfield; all departments reported to him. Landay negotiated all licenses that Seneca obtained. Conversely, Landay negotiated and entered into license agreements with a UK company allowing it to use many of Seneca's registered patents and trademarks in

the UK. Landay was responsible for dealing with Seneca's several licensing, patent and trademark attorneys (domestic and foreign) and any issues with respect to licenses, patents, and trademarks.

Over the course of its life, Seneca's product development/design department created numerous products that were patented and trademarks that were registered – in the United States and in other countries.

In addition to patents and trademarks that Seneca developed itself, Seneca owned Hutch and Forster and related trademarks that Landay purchased from a Bankruptcy liquidator on behalf of Seneca for approximately $250,000 in or around 2000. Seneca used the Hutch and Forster trademarks on balls and baseball gloves that it developed especially for use with those names.

In 2000 Seneca acquired assets of Brookfield from Craft House, the company to which Hyde had sold Brookfield. Brookfield owned patents, trademarks and licenses that Seneca desired. Landay negotiated this purchase in which Seneca bought from Craft House the Brookfield name together with patents, trademarks and licenses owned by Brookfield and all Brookfield inventory and accounts receivable for approximately $ 5 million.

As of the date of closing (September 19, 2000), the Brookfield intellectual property (patents, trademarks and licenses) had a negotiated value of $1.6 million. The patents and trademarks are listed in a schedule to the purchase agreement with which GMAC has been provided. As of September 19, 2000, the Brookfield trademarks and patents accounted for approximately $1.3 million of the $1.6 million negotiated purchase price for the intellectual property. The licenses accounted for the remaining $300,000.

At the time of the September 19, 2000 closing, the numerous other valid trademarks and patents Seneca had developed and owned (including the Hutch-Forster trademarks for which Seneca had paid $250,000) were worth at least as much as the Brookfield trademarks and patents acquired in the purchase from Craft House. Seneca and Brookfield were competitors of like size and nature. Seneca had more trademarks and patents than did Brookfield, but Brookfield had some superior patents. The bulk of Seneca's patent and trademarks (including the Hutch-Forster) is shown in a letter and schedule from Timothy French, Seneca's patent and trademark attorney, that was provided to GMAC at the September 19, 2000 closing. In addition to the patents and trademarks shown in the French schedule, Seneca owned slumber-bag patents and additional trademarks that were serviced by law firms other than of Mr. French.

On October 22, 2001, Seneca owned hundreds of viable trademarks and patents. This includes the patents and trademarks it had acquired in the Brookfield purchase 13 months earlier ($1.3 million) and the Hutch-Forster trademarks it had purchased for $250,000 in or around 2000. With few exceptions, Seneca had maintained the patents and trademarks by paying all necessary fees. As of October 22,

2001, the package of viable trademarks and patents owned by Seneca was worth $2.6 million and, allowing for a 20% discount, should have commanded a purchase price of $2 million dollars in a liquidation scenario. See p. 107 from transcript of Landay's November 1, 2005 testimony in the New York action brought by GMAC against Landay.

Through discovery Landay has learned that GMAC has made no sales of Seneca's trademarks and patents. Indeed, over the past four years it has undertaken no efforts to sell this intellectual property. Although GMAC has recently renewed its UCC filing on those assets, essentially it abandoned these assets in 2001.

Patents and trademarks lose their value over time when they are not in use on products in the market place. This is especially true of trademarks. GMAC should have offered the Seneca-owned trademarks and patents immediately after seizing all the assets and putting Seneca out of business. Any sales it is able to make now and in the future will realize far less than could have been realized from sales in late 2001-early 2002.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS 6 DAY OF JANUARY, 2006.

_____
DAVID L. LANDAY

As to Objections:


_____
Alan R. Hoffman, BBO# 236860
Lynch, Brewer, Hoffman & Fink, LLP
101 Federal Street, 22nd Floor
Boston, MA 02110
(617) 951-0800

233236_1

7