UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-CV-11955-WGY

| | |
|---|---|
| DAVID L. LANDAY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| GMAC COMMERCIAL CREDIT, LLC and | ) |
| GMAC COMMERCIAL FINANCE, LLC, | ) |
| | ) |
| Defendants. | ) |
| ——————————————————————— | ) |

## JOINT PRE-TRIAL MEMORANDUM

**I.**     **Summary Of Evidence**

     A.     Plaintiff's Summary Of Evidence

     1.     Liability

Plaintiff David L. Landay ("Landay") will offer evidence of a pattern of conduct by Defendants ("GMAC") consisting of sharp business practices prohibited by Chapter 93A (Count VII). The evidence offered in support of Landay's Chapter 93A claim will include evidence concerning GMAC's fraudulent misrepresentations that it would make an uncollateralized $500,000 seasonal overadvance if Landay provided a $250,000 Letter of Credit (Count I). Similarly, the pattern of conduct that will be offered to prove Landay's Chapter 93A claim will also include evidence that proves that GMAC violated Landay's rights as a junior creditor and as a guarantor by its commercially unreasonable liquidation (including waste) of assets which it seized from Landay's companies. (Count VI).

The evidence will show that Landay's relationship with GMAC began in Boston in 2000 when Landay sought financing on behalf of his Milford, Massachusetts-based company, Seneca Sports, Inc. ("Seneca") for funds to acquire the assets of Brookfield International, Inc. (together "Seneca" or "Borrowers") and to run the business of the combined companies at the Milford, Massachusetts location. Landay, a resident of Massachusetts at all relevant times, negotiated the financing with GMAC's Boston office, most particularly with Paul Fitzgerald. For the duration of the loan and through, including and beyond GMAC's foreclosure on the loan, Landay continued to deal with GMAC's Boston office and its Massachusetts-based employees and/or agents (such as RAS Associates).

Borrowers and GMAC entered into a Factoring Agreement on September 19, 2000 for which Landay provided to GMAC (a) personal collateral in the form of a $4,100,000 standby letter of credit drawn on his Boston bank, (b) a guaranty in the additional amount of $3,500,000 and (c) a subordination of his outstanding $3,450,000 secured loan to Seneca. In 2001, Landay was induced by GMAC to provide an additional $250,000 standby letter of credit and a $1,000,000 cash deposit and to increase his guaranty to $4,500,000. In addition to the security provided by Landay, GMAC's loan was secured by all of the Borrowers' assets, including accounts receivable, inventory, and patents and trademarks.

Landay will offer testimony and documents showing that, from the beginning of his relationship with GMAC, GMAC engaged in sharp practices, including many fraud-like practices in addition to the conduct that supports Landay's fraud claim concerning the $250,000 standby letter of credit. Landay will show that he was induced to make

available to GMAC $5,350,000 of his personal assets by various promises made or implied by GMAC which GMAC had no intention of keeping. While each of these promises may not amount to fraud, they do amount to a pattern of sharp business practices. Included are promises that GMAC would look first to the assets of the Borrowers should there be a default; promises that GMAC would fund in May 2001 the uncollateralized $500,000 Seasonal Overadvance described in the Factoring Agreement if Landay would provide in February an additional $250,000 standby letter of credit until the Overadvance was funded; a promise that Landay would be repaid for money he was told to "bridge" to Borrowers pending finalization of a Forbearance Agreement; and promises that, if Landay provided a $1,000,000 cash deposit and increased his guaranty by $1,000,000, GMAC would make money available to Borrowers to allow an orderly liquidation in accordance with a schedule attached to the Forbearance Agreement.

In addition to promises that directly induced Landay to part with his money, Landay will offer evidence concerning other false representations and/or sharp practices condemned by Chapter 93A that destroyed the business of Borrowers and damaged Landay. These include: GMAC's arbitrary refusal to accommodate the business needs of Borrowers, including preventing Borrowers from making purchases and sales that could not in any way affect GMAC's position as the lender; GMAC's failure to execute the Forbearance Agreement in time for the agreed funding schedule, Schedule C of the Forbearance Agreement, to be performed according to its terms, but refusal to change the dates in Schedule C, thereby placing Borrowers in a default position almost immediately; GMAC's refusal to finance in accordance with Schedule C because

Borrowers had been placed off-schedule by GMAC's own actions and inaction; GMAC's refusal to provide the amount of money indicated in Schedule C and, instead, limiting itself to $1,000,000, the amount Landay had deposited in GMAC's favor, thereby making Landay the real lender while GMAC charged interest and other fees related to the "loan" to Borrowers; GMAC's representations that it would look favorably on the Borrowers if they accepted the help of RAS Associates (John Rijo) without GMAC revealing that it had engaged RAS to perform a liquidation analysis and that Rijo was actually on the premises to help GMAC position itself to foreclose; GMAC's promise to consider a take-out by Platinum Funding Corp., while having no intention of doing so, but instead lulling Landay into a false sense of security while preparing to foreclose; GMAC's arbitrary refusal to consider the Platinum Funding Corp. take-out, instead using it as a pretext to obtain additional information useful to its foreclosure on Borrowers' assets; GMAC's use of its superior position to try to force Borrowers and Landay to waive all legal rights in connection with granting it peaceful possession of Borrowers' premises; GMAC's expulsion of Landay from the premises and its denial of access to the books and records of his companies; and GMAC's failure to provide Landay an accounting, despite its written promise to do so.

The evidence will show that GMAC's bad faith conduct and sharp practices continued beyond its October 22, 2001 seizure of Borrowers' assets. Rather than making a good faith, commercially reasonable liquidation, GMAC rushed through the process presuming that it would, instead, get its money from Landay on his guaranty. GMAC ignored Landay's many requests for access to the books and records of Borrowers and it continued to deny him access until August 2005. GMAC ignored

Landay's suggestions concerning the liquidation and collection of Borrowers' assets, and, instead, put the sale of inventory in the hands of the inexperienced John Rijo and the collection of accounts receivable in charge of its own employees who were not familiar with the accounts or the circumstances.  GMAC totally ignored the patents and trademarks it had seized from Borrowers and allowed many to expire by failing to pay maintenance fees.  All Seneca's files concerning such intellectual property had been left in the hands of GMAC when Landay and other Seneca personnel were expelled from the premises.

After GMAC collected and applied Landay's $5,350,000 to Borrowers' debt, according to its records it was owed a balance of approximately $1,400,000.    At the time GMAC seized Borrowers' assets, Borrowers' business records showed gross accounts receivable in the approximate amount of  $1,300,000 and inventory worth $1,377,000 (at cost).  In addition, Borrowers owned valuable patents and trademarks, only a portion of which had recently been purchased for approximately $1,300,000.  Mr. Landay will testify that the total portfolio was worth more than $2,000,000.  In total, GMAC possessed approximately $4,700,000 in assets.  However, when GMAC finished its liquidation activities, it claimed Borrowers still owed it approximately $1,200,000 (on an initial balance of $1,400,000) and it sued Landay on his guaranty.  GMAC had wasted the assets it seized from Borrowers by failing to collect accounts receivable, by failing to fill orders, by abandoning merchandise and by failing to sell the patents and trademarks in a timely fashion and by failing to pay maintenance fees on certain patents and trademarks causing cancellation thereof.  GMAC's commercially unreasonable practices during the liquidation included sending letters to Seneca's seized premises or

to itself which demanded that Borrowers take action in aid of collection or GMAC would debit the account. The Borrowers or Landay could not possibly have taken the action requested since, as should have been obvious to GMAC, the mailings were not designed to reach them.

Following cessation of its liquidation activities, GMAC refused to provide an accounting (which has not been provided to this day), despite promising such an accounting to both Borrowers and Landay. GMAC proceeded to sue Landay in New York on his guaranty. Landay attempted to avoid the litigation and all its related costs; he asked GMAC to provide him with an accounting so that he could understand what was allegedly due. GMAC's bad faith response was to tell Landay that if he wanted an accounting before he agreed to pay, he should litigate. During the course of that litigation and well into this litigation, Landay was denied access to Borrowers' books and records which GMAC had placed and maintained in a Massachusetts warehouse from late 2001 until August 2005.

2.    Damages

Landay will demonstrate that he is entitled to damages on several different theories both under Chapter 93A and on each of his common law counts.

Under Chapter 93A, this Court may unravel the transactions and place Landay in the position he would have been found in on September 18, 2000. This would mean restoring to Landay $5,350,000 of his collateral which GMAC liquidated and compensating him for his counsel and expert witness fees expended in the New York action, approximately $450,000, and any amount awarded against him in that forum. Additional items of damages are the loss of his investment in Seneca ($750,000), the

6

amount of the secured loan which he made to Seneca ($3,450,000), and the $52,000 bridge loan which he made to Seneca. This recovery would be based, inter alia, on GMAC's unfair and deceptive act or practices, including its refusal to allow the Platinum Funding Corp. transaction to proceed which would have paid GMAC in full, while allowing Seneca to survive.

On the Commercial Unreasonableness Count (Count VI), the elements of damages are the difference between the amount which GMAC was owed on October 22, 2001, if any, and the sum of (1) what a reasonable liquidation of Borrowers' assets would have generated and (2) legal fees incurred in New York ($450,000). The evidence will show that a reasonable liquidation would have realized a minimum of $1,400,000 in inventory and accounts receivable plus $2,000,000 for Seneca's intellectual property. Assuming arguendo that GMAC was owed approximately $1,400,000 on October 22, 2001 as it claims, the total minimum damages realizable on Count VI is therefore approximately $2,450,000. This damage is also recoverable under Chapter 93A.

To the extent that there is a finding that Chapter 93A was violated by GMAC's sharp practices with regards to the failure to make a $500,000 Seasonal Overadvance and failure to adjust the schedule attached to the Forbearance Agreement to account for its own dilatoriness, a different theory of damages is available. Under this theory, an orderly liquidation would have paid off GMAC in toto and left $1,200,000 for Landay as per Exhibit C to the Forbearance Agreement. Additionally, Landay would have had the portfolio of intellectual property ($2,000,000) and would not have incurred legal fees in the New York action in the amount of $450,000. These damages of $3,650,000 are

also available on Count I, the Fraud Count, relating to the failure to make the promised Seasonal Overadvance.

Landay will establish that GMAC's violations of Chapter 93A were willful and knowing. Therefore, he will ask the Court for double or triple damages. Finally, should he prevail on the Chapter 93A claim, Landay's counsel will submit an affidavit and other materials documenting the legal fees incurred in prosecuting this action.

B.    Defendants' Summary Of Evidence

Defendant GMAC Commercial Finance LLC ("GMAC CF") entered into a commercial factoring agreement (the "Factoring Agreement") with Seneca Sports, Inc. ("Seneca") and Brookfield International, Inc. ("Brookfield") (collectively, the "Borrowers") effective as of September 19, 2000. In connection with that transaction, David Landay ("Landay") – who was and remains the President and CEO of both companies, as well as the majority stockholder in Seneca – executed a Limited Guaranty. Pursuant to the terms of the Factoring Agreement, GMAC CF extended in excess of $10 million in credit to the Borrowers. The Borrowers defaulted on the Factoring Agreement. They acknowledged those defaults in a Forbearance Agreement, dated August 9, 2001 (the "Forbearance Agreement"), and quickly proceeded to default on the Forbearance Agreement. GMAC CF foreclosed, seized and liquidated some of its collateral and sought to recover a deficiency of more than $1 million by suing Landay in New York state court (the "New York Action") on his Guaranty. Landay denied GMAC CF's allegations and asserted nine affirmative defenses and seven counterclaims, including fraud, failure to dispose of the Borrowers' assets in a commercially reasonable manner,

breach of a "fiduciary duty to Landay as a junior creditor of Seneca under the Subordination Agreement," and violation of Mass. Gen. Laws ch. 93A ("Chapter 93A").

After some initial discovery, GMAC CF moved for summary judgment. The New York Court granted the bulk of GMAC CF's motion, determining that GMAC CF was entitled to summary judgment on all issues relating to liability, including Landay's assertions that GMAC CF had committed fraud, had breached its duty to Landay as a junior creditor of Seneca, and had violated Chapter 93A. The New York Court referred the few remaining questions to a Special Referee, including the issues of "whether or not the collateral was disposed of in a commercially reasonable manner, and the net amount, if any, due to [GMAC CF] from [Landay]," as well as "the reasonable amount of collection expenses and attorneys' fees incurred by [GMAC CF]." Hearings before the Special Referee began on October 27, 2005, and concluded on November 4, 2005. The parties submitted post-hearing briefs in early February 2006.

Landay responded to the New York Court's summary judgment ruling by filing this duplicative lawsuit in an attempt to obtain some settlement leverage. GMAC CF moved for judgement on the pleadings, and this Court dismissed Counts III, IV and V of Landay's Complaint as well as Count VII except to the extent that it was grounded on Counts I, II or VI. After the close of discovery, GMAC CF moved for summary judgment on the remaining counts, and this Court granted that motion in part, dismissing Count II and the bulk of Count I. Thus, all that remains in this case are Landay's: (1) Count I claim that in early 2001, GMAC CF fraudulently misrepresented that it would exercise its discretion under the Factoring Agreement to provide the Borrowers with a Seasonal Overadvance in or about May 2001; (2) Count VI claim that GMAC CF violated

Landay's rights as a junior creditor of Seneca; and (3) Count VII claim that the conduct alleged in the first two claims constituted a violation of Chapter 93A.[1]  The evidence will show that each of these claims lacks merit.

### The Seasonal Overadvance Claim

The last remnant of Landay's fraud claim (Count I) is grounded on the alleged oral representation of a dead man.  Landay claims that Paul Fitzgerald[2] "reiterated" in early 2001 that GMAC CF would provide the Borrowers with a Seasonal Overadvance in May 2001, which, according to Landay, "amounted to a promise that GMAC would exercise its discretion to make the Seasonal Overadvance in May of 2001."  *See* Pl.'s Mem. Opp. Defs.' Mot. Summ. J. at 11-12 (emphasis in original).  Landay does not claim that anyone else at GMAC CF made similar representations, and in fact admitted that when Fitzgerald's supervisor, Jane Frangos, became involved, she repeatedly told him that GMAC CF would not provide the Seasonal Overadvance, under the circumstances that existed during the second quarter of 2001.

Significantly, all of the alleged representations were oral.  Landay will not produce a single document in which Fitzgerald committed GMAC CF to provide the Overadvance at issue.  Thus, Landay's claim depends exclusively on his account of conversations he supposedly had with Fitzgerald in early 2001.

As will be set forth more fully in a motion *in limine*, Landay's testimony about these alleged conversations is inadmissible because, among other reasons, any removal of GMAC CF's discretion with regard to the Seasonal Overadvance would have

---

[1] Landay will argue that portions of his Chapter 93A claim are not based on his surviving substantive claims, but in doing so, he ignores this Court's earlier rulings.

[2] Paul Fitzgerald passed away on September 16, 2003.

constituted a very significant modification of the Factoring Agreement, and the Factoring

Agreement expressly required that all such modifications be in writing.  Moreover, even

if Landay's testimony about the alleged oral communications is admissible, it should be

given no weight in light of the self-serving nature of the testimony and the fact that

Fitzgerald is unable to dispute Landay's account of their conversations.  *See White v.*

*Hunnewell, Inc.*, 141 F.3d 1270, 1277 (8th Cir. 1998) (although statements of a dead

agent of a party opponent are admissible under Fed. R. Evid. 801, "the fact of the

declarant's death impacts on the weight of the evidence").  *See also United States v.*

*Ferber*, 966 F. Supp. 90, 97 n. 7 (D. Mass. 1997) (recognizing that the rationale for

allowing admissions of a party opponent is the ability of the party against whom an

admission is offered to explain the proffered statement).

Irrespective of the admissibility of Landay's testimony concerning Fitzgerald's

oral representations, substantial circumstantial evidence suggests that Fitzgerald never

told Landay that GMAC CF would waive its discretion under the Factoring Agreement

and commit to providing the Seasonal Overadvance.  Indeed, such a representation

would not have made sense, given the high risk associated with this particular credit

facility and the fact that GMAC CF would not be getting any benefit from the Borrowers

in return for giving up its discretion.  At most, Fitzgerald might have expressed a

subjective expectation, based on early 2001 results, that if things went well, the

Seasonal Overadvance probably would be forthcoming.  But there is a big difference

between expressing optimism and committing GMAC CF to providing the Seasonal

Overadvance even if the Borrowers stopped meeting their obligations under the

Factoring Agreement.  The former is logical behavior.  The latter defies common sense.

Indeed, Landay's own behavior undercuts his argument.  Neither Landay nor his attorneys ever raised the issue of any alleged commitment to provide the Seasonal Overadvance in connection with the negotiation of the Forbearance Agreement.  Both common experience and common sense suggest that if Landay, as President and CEO of Seneca and Brookfield and the principal stockholder of Seneca, really believed that GMAC CF had failed to honor a promise to provide critical Overadvance financing, he would have forcefully raised the issue during the negotiation of the Forbearance Agreement.  Certainly a seasoned businessman, represented by counsel with years of experience in commercial transactions, would raise any issue – such as the failure to provide promised financing – that might provide negotiating leverage in a difficult workout scenario of the kind that confronted the Borrowers during the summer of 2001. Indeed, it would have been a violation of the fiduciary duty of utmost good faith and loyalty that Landay owed to his fellow stockholders to remain silent about such a claim. Yet silent he remained.  Landay never raised the alleged Fitzgerald misrepresentations until after GMAC CF filed its collection action against him.  In short, despite all of the incentives to raise the alleged misrepresentation during the negotiation of the Forbearance Agreement, neither Landay nor his attorneys ever did so.  The most probable explanation of this omission is also the simplest.  They never raised the issue of the alleged Fitzgerald's representations because the representations were never made.  GMAC CF believes – and it will ask this Court to conclude – that the circumstantial evidence against the alleged misrepresentations outweighs Landay's self-serving and uncorroborated testimony.

The evidence will also show that even if Fitzgerald promised Landay that GMAC CF would exercise its discretion under the Factoring Agreement to provide Overadvance financing in or about May 2001, there would have been nothing deceptive about such comments. To the contrary, Fitzgerald's internal correspondence at GMAC CF demonstrates that he subjectively expected that the Overadvance would be forthcoming. At the same time, there is no evidence that anybody else at GMAC CF had made a decision prior to May 2001 not to provide the Seasonal Overadvance. Thus, there was no fraud.

Moreover, even if GMAC CF had intended to use Fitzgerald to deceive Landay, the language of the Factoring Agreement makes it impossible for Landay to have reasonably relied on such misrepresentations. Given the tenuous nature of Seneca's financial position and the risky nature of the Brookfield acquisition, it was especially critical for GMAC CF to retain the discretionary right not to advance further credit or to do so only under very specific circumstances. Therefore, the Factoring Agreement expressly provided that GMAC CF had discretion not to provide the Seasonal Overadvance and that any modifications to the contract had to be in writing. Over the course of the first seven months of 2001, Landay had ample opportunity to seek a specific written promise to provide the Overadvance financing that he claims Fitzgerald promised. He failed to do so. Not only did he fail to do so, but he also executed a Forbearance Agreement that specifically supercedes all prior "understandings and agreements, whether written or oral" with respect to the subject matter of the Forbearance Agreement, *i.e.*, the Factoring Agreement and the financing provided pursuant to the Factoring Agreement. In short, assuming for the sake of argument that

Fitzgerald made the representation attributed to him, Landay effectively waived or repudiated that so-called promise when he executed the Forbearance Agreement on behalf of the Borrowers because under such circumstances no businessman with Landay's training and experience could reasonably believe that the alleged oral promise to provide the Overadvance financing had any ongoing vitality after the execution of the Forbearance Agreement, at which time Landay had suffered no loss or harm as a result of the alleged representations.

In sum, the evidence will show that there is no merit to Landay's fraud claim.

### Claims Related to Landay's Rights as a Junior Creditor

In Count VI, Landay claims that GMAC CF breached the duty it owed to him as a subordinated lender to Seneca by failing to use the ordinary care of a prudent creditor seeking to maximize the value of its security. However, Landay will not be able to prove that he actually loaned $3.45 million to Seneca prior to September 19, 2000. Furthermore, even if Landay did actually loan the amounts referenced in the security agreement he executed both individually and as an officer of Seneca, GMAC CF breached no duty to him. By October 22, 2001, the Borrowers were on a downward spiral toward financial oblivion. They owed hundreds of thousands of dollars to various creditors, including suppliers, warehousemen and licensors who owned the trademarks on some of their most valuable inventory. Not surprisingly, given the circumstances, several suppliers began to take advantage of the Borrowers' precarious financial condition by demanding aggressive rebates, chargebacks, and other discounts. Through August and September 2001, the borrowers fell further and further behind their own workout projections. Finally, on September 24, 2001 GMAC CF declared a default and began to take steps to liquidate various pieces of its collateral. On October 22,

2001 GMAC CF took control of the bulk of the Borrowers' assets and asked RAS
Management Advisors, Inc. ("RAS") to liquidate the Borrowers' inventory.

Facing the Holiday Season crunch, RAS employee John Rijo worked diligently
and efficiently to generate as much revenue as was possible from the sale of the
Borrowers' inventory.  For example, knowing that the Borrowers were tens of thousands
of dollars in arrears on their licensing agreement with Mattel, Inc., Rijo managed to sell
much of the Borrowers' Mattel products before Mattel forbade additional sales.  Rijo
also worked wonders in finding a buyer for the Borrowers' Toledo inventory, some of
which was defective; and wisely insisted that all future purchases be made on a COA or
COD basis.  In short, as GMAC CF's experts will confirm, GMAC CF's liquidation of the
Borrowers' inventory was more than just commercially reasonable; it was quite
impressive under the circumstances.

Similarly, the evidence will also show that GMAC CF's efforts to collect the
Borrowers' outstanding accounts receivable were conducted in a commercially
reasonable manner.  Given the environment in which GMAC CF found itself – where the
Borrowers' customers knew that they could exert substantial leverage against the
Borrowers to obtain discounts – it is a wonder that GMAC CF was able to recover as
much money as it did.  Landay will present no competent evidence to the contrary.

Moreover, even if Landay could present evidence to challenge some aspects of
the sale of the Borrowers' inventory or the collection of the accounts receivable, such
evidence would not be sufficient to sustain his Count VI claim.  In order to prevail on
that claim, Landay must show that a commercially reasonable liquidation would have
generated sufficient proceeds to pay GMAC CF's debt in full and leave funds available

to pay other creditors including, but not limited to, Landay. However, Landay's own expert has opined that at most, a commercially reasonable sale would have generated $360,360, an amount that is not even close to covering the Borrowers' debt to GMAC CF, which never dropped below $1 million. Thus, even if somehow deficient – and they were not – GMAC CF's efforts to liquidate the Borrowers' inventory and collect their receivable did not harm Landay.

GMAC CF expects that Landay will attempt to argue that it acted in a commercially unreasonable manner with regard to the Borrowers' intellectual property. However, that argument will be based on inadmissible and irrelevant testimony as well as a fundamental misinterpretation of the relevant portions of the Commercial Code. Apparently unable to find any expert qualified and willing to opine as to the value of the Borrowers' intellectual property, Landay avoided summary judgment on Count VI by submitting a thirteenth-hour affidavit supposedly based on his own personal "experience." In his affidavit Landay purported to value the Borrowers' intellectual property at approximately $2 million as of October 22, 2001.[3] Even Landay, however, declined to offer an opinion as to the value of the Borrowers' intellectual property today. This means that there is not a shred of evidence to support the assertion that the value of the Borrowers' intellectual property has diminished by any specific amount as a result

---

[3] In his original answers to Interrogatory No. 11 in GMAC CF's First Set of Interrogatories, Landay stated that he could not value the Borrowers' intellectual property at that time because he had only recently gained access to certain documents that had been stored at Seneca and Brookfield's old offices. Thereafter, Landay repeatedly accepted GMAC CF's offers for further inspections of the documents. Nevertheless he did not supplement his interrogatory responses prior to the close of discovery and even denied having any obligation to do so. Furthermore, at Landay's deposition, GMAC CF asked him to review his interrogatory responses. After he did so, GMAC CF asked whether he saw anything that he wanted to correct or supplement. While Landay stated that he might want to change his answers to Interrogatory No. 14, which asked about his usury allegation (Count II), and Interrogatory No. 17, which concerned his Chapter 93A claim (Count VII), and that he might amend his response to Interrogatory No. 16 to decrease his damage claim under Count VI, he never mentioned any need to correct or supplement his Original Answer to Interrogatory No. 11. He changed his original testimony only after GMAC CF submitted its motion for summary judgment based on the absence of any evidence of Count VI damages.

of GMAC CF's decision not to liquidate the Borrowers' intellectual property. Since Landay cannot present any admissible evidence as to the present value of the Borrowers' intellectual property, he cannot show that he was damaged by any alleged failure by GMAC CF to dispose of the Borrowers' assets in a commercially reasonable manner.

Moreover, Landay's opinion about the value of the Borrowers' intellectual property as of October 22, 2001 is not even admissible. Under Fed. R. Evid. 701, lay opinion testimony must be based upon the rational perceptions of the declarant, and Landay's opinion about the value of the intellectual property in October 2001 constitutes nothing more than raw speculation. It is also an opinion he formed solely for the purpose of this and the New York litigation. In September and early October 2001, Landay was desperately pleading with GMAC CF not to foreclose on the loan, so he and other agents of the Borrowers kept trying to demonstrate that the company had enough assets to satisfy the debt if there was an orderly liquidation. Not once during these negotiations did Landay or any of the Borrowers' other representatives ever point to the Borrowers' trademarks and patents as assets that would have any value to potential third parties. Landay only began to claim that the intellectual property was valuable in 2003, after GMAC CF had moved for summary judgment in the New York action, presumably in order to create the appearance of a material factual dispute.

Even now, however, Landay cannot show that GMAC CF had any obligation to sell or try to sell the Borrowers' intellectual property. Landay cannot point to any contractual obligation to liquidate its security interest in the Borrowers' intellectual property. Moreover, the evidence will show that GMAC CF never acquired title to the

intellectual property. Therefore, Landay as an officer of Seneca remained free to liquidate the intellectual property on his own. Indeed, GMAC CF repeatedly suggested that Landay sell the intellectual property and apply the proceeds to the Borrowers' outstanding loan balance, but he failed to take advantage of that invitation.

Finally, the evidence will show that Landay did not even have a perfected security interest in Seneca's assets. According to the public records maintained by the Secretary of State's offices in Massachusetts and Delaware, Landay does not have any current U.C.C. financing statement naming Seneca or Brookfield as debtors and Landay as the secured party on file in either state. Indeed, there is no evidence anywhere in the record that Landay made any U.C.C. filings regarding such an alleged security interest in Massachusetts after March 21, 1996, or in Delaware at any time. Under the applicable law, therefore, Landay did not have a perfected security interest in Seneca's assets as of October 22, 2001, the date when GMAC CF seized Seneca's assets. In the bankruptcy scenario that would necessarily have followed any sale of assets that generated proceeds in excess of GMAC CF's secured claim, Landay – because of his failure to perfect his security interest – would have been treated as general unsecured creditor not as a secured creditor.

For all these reasons, GMAC CF will prevail on Count VI.

### The Chapter 93A Claim

To the extent that Landay's Chapter 93A is derivative of his other claims[4], his Count VII claim must fail for the same reasons that the remainder of his Count I fraud

---

[4] Landay's counsel has indicated that he will argue that part of the Chapter 93A claim is not based on the conduct described in Counts I and VI. As will be made clear in a forthcoming motion *in limine*, Landay is mistaken. This Court's earlier decisions, granting in part GMAC CF's motion for judgment on the

claim and his Count VI claim fail.  Additionally, in order for his Chapter 93A claim to succeed, Landay must prove that GMAC CF's alleged misconduct occurred substantially and primarily in Massachusetts.  Landay cannot meet this burden.

Admittedly whatever representations Fitzgerald made to Landay occurred in Massachusetts.  However, the decision not to provide the Borrowers with the full extent of the Overadvance was made in Michigan[5] based in part on input from GMAC CF employees in New York.  Thus, in order to establish the critical element of fraudulent intent, Landay will need to show that when Fitzgerald made the alleged representations at issue, GMAC CF employees in Michigan and New York had already formed an intent not to provide the Overadvance financing.  By definition, therefore, the critical element in Landay's fraud claim must have occurred outside the Commonwealth of Massachusetts.

Similarly, with regard to the claims that GMAC CF acted unreasonably in its disposition of the Borrowers' assets, the evidence will show that the overwhelming majority of GMAC CF's collection efforts with regard to the accounts receivable took place from their New York offices.  Additionally, all communications that Landay had with GMAC CF regarding his intellectual property were through their respective New York counsel.

In short, Landay cannot establish that the predicate acts of his non-existent ch. 93A claim occurred primarily or substantially in the Commonwealth of Massachusetts.

---

pleadings and motion for summary judgment, eliminated the portions of Landay's Chapter 93A claim that are not based on Counts I and VI.

[5] GMAC CF's headquarters are located in Michigan.

## II.    Statement Of Stipulated Facts

A.    The Parties

1.    David L. Landay ("Landay") currently resides in the State of Florida at 26510 Rookery Lake Drive, Bonita Springs, Florida.

2.    For a period of time which includes, but is not limited to, execution of the operative documents in this case, dated September 19, 2000 and August 9, 2001, Landay was a resident of Massachusetts.

3.    Landay is the President and CEO of Seneca Sports, Inc. ("Seneca"), a Delaware corporation engaged in the distribution and sale of adult and childrens sporting goods products.  It held patents, trademarks and/or licenses in connection with its products.  Seneca had its principal place of business at 75 Fortune Boulevard, Milford, Massachusetts.

4.    Landay owns a majority of the stock of Seneca.

5.    Landay is the President and CEO of Brookfield International, Inc. ("Brookfield"), a Massachusetts corporation that sold juvenile sports equipment and sports toys.  Brookfield had its principal place of business at 75 Fortune Boulevard, Milford, Massachusetts.

6.    Seneca owns 100% of the stock of Brookfield.

7.    Landay founded Seneca with others and started working at Seneca as President and CEO in about 1990.

8.    Prior to working at Seneca, Landay was employed as the executive vice president of Hyde Athletic Industries.

20