9.      From about 1967 until about 1985, Landay was an owner of Brookfield Athletic Shoe and was employed as its president.

10.      From 1963 until 1967, Landay performed various management level jobs for Green Shoe Manufacturing.

11.      Landay obtained a BA degree in economics from Brandeis University in 1960.

12.      Landay obtained an MBA degree from Boston University in 1963.

13.      GMAC Commercial Finance LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Southfield, Michigan, and an office in New York, New York.

14.      GMAC CF is the successor by merger of GMAC Commercial Credit LLC and GMAC Business Credit LLC and is responsible for all liabilities incurred by GMAC Commercial Credit LLC.

15.      GMAC Commercial Credit LLC was formerly a New York limited liability company with its principal place of business at 1290 Avenue of the Americas, New York, New York.  As of the execution of the operative documents in this case, September 19, 2000 and August 9, 2001, it had an office in Boston, Massachusetts. (Both GMAC Commercial Finance LLC and GMAC Commercial Credit LLC and referred to as "GMAC CF").

B.      The 2000 Loan Transaction

16.      In 2000, Landay, on behalf of Seneca, sought financing from GMAC CF to assist Seneca to acquire Brookfield.

17.    In this regard, Landay dealt with Paul Fitzgerald ("Fitzgerald") of GMAC CF's Boston office, located at 151 Merrimac Street, Boston, Massachusetts, among others.

18.    Seneca and Brookfield (collectively, the "Borrowers") entered into a commercial factoring agreement with GMAC CF, effective September 19, 2000 (the "Factoring Agreement") with.

19.    Landay signed the Factoring Agreement on behalf of Seneca and Brookfield as their President.

20.    The document marked as Joint Exhibit 2 is a true and accurate copy of a Factoring Agreement.

21.    In conjunction with the Factoring Agreement Landay executed a personal guaranty of the Borrowers' obligations to GMAC CF, up to a maximum indebtedness of $3,500,000 (the "Guaranty") on September 19, 2000.

22.    The document marked as Joint Exhibit 3 is a true and accurate copy of the Guaranty.

23.    On September 19, 2000, Landay provided GMAC CF with a Standby Letter of Credit (the "First Standby Letter of Credit") in the amount of $4,100,000.

24.    The document marked as Joint Exhibit 6 is a true and accurate copy of the First Standby Letter of Credit.

25.    On September 19, 2000, Landay, individually and on behalf of Seneca, executed a contract to subordinate to GMAC CF certain indebtedness of Seneca to Landay (the "Subordination Agreement").

26.    The document marked as Joint Exhibit 4 is a true and accurate copy of the Subordination Agreement.

C.    The Second Standby Letter of Credit

27.    On February 27, 2001, Landay provided GMAC CF with a $250,000 Standby Letter of Credit (the "Second Standby Letter of Credit"), which had an expiration date of May 1, 2001.

28.    On or about April 24, 2001, Landay extended the expiration date of the Second Standby Letter of Credit to May 25, 2001.

29.    On or about May 18, 2001, Landay extended the expiration date of the Second Standby Letter of Credit to October 30, 2001.

30.    On or about August 14, 2001, Landay extended the expiration date of the Second Standby Letter of Credit to March 29, 2002.   This extension was in conjunction with the execution of the Forbearance Agreement, referenced below.

31.    The documents marked as Joint Exhibit 10 are true and accurate copies of the Second Standby Letter of Credit and all extensions thereto.

D.    The Forbearance Agreement

32.    As of August 9, 2001, the Borrowers were in default of certain provisions of the 2000 Loan Agreements.

33.    The Borrowers entered into a Forbearance Agreement with GMAC CF (the "Forbearance Agreement") "as of August 9, 2001."

34.    Landay signed the Forbearance Agreement as president of both Seneca and Brookfield.

23

35. The document marked as Joint Exhibit 16 is a true and accurate copy of the Forbearance Agreement, including Exhibits A, B and C.

36. In conjunction with the Forbearance Agreement, Landay signed a Ratification and Amendment of Guaranty on August 9, 2001.

37. By this document, the Guaranty was amended from a maximum of $3,500,000 to a maximum of $4,500,000.

38. The document marked as Joint Exhibit 17 is a true and accurate copy of the Ratification and Amendment of Guaranty.

39. In addition to providing GMAC CF with the Ratification and Amendment of Guaranty, Landay provided GMAC CF with an additional $1,000,000.00 in cash collateral (the "Cash Collateral").

40. The delivery of the Cash Collateral was an express condition of the Forbearance Agreement.

41. The document marked as Joint Exhibit 18 is a true and accurate copy of a Cash Deposit Letter Agreement, which concerned the Cash Collateral.

42. Landay's extension of the Second Standby Letter of Credit until March 31, 2002, was also an express condition of the Forbearance Agreement.

E.    Declaration of Defaults

43. On or about September 25, 2001, GMAC CF sent separate letters to Landay and to the Borrowers declaring that the Borrowers were in default of the Forbearance Agreement.

44. The document marked as Joint Exhibit 20 is a true and accurate copy of a Notice of Default Letter that GMAC CF sent to the Borrowers on or about September

25, 2001.

45.    The document marked as Joint Exhibit 19 is a true and accurate copy of a Notice of Default Letter that GMAC CF sent to Landay on or about September 25, 2001.

F.    GMAC CF's Collection Efforts

46.    On or about October 15, 2001, GMAC CF collected the $4,100,000 from Landay's First Standby Letter of Credit.

47.    Within the next couple of days, GMAC CF collected the $1,000,000 Cash Collateral and the $250,000 from Landay's Second Standby Letter of Credit.

48.    On or about October 22, 2001, GMAC CF took possession of the Borrowers' premises in Milford, Massachusetts.

49.    GMAC CF hired RAS Management Advisors, Inc. ("RAS") to liquidate the Borrowers' inventory and fixed assets.

50.    John Rijo ("Rijo") oversaw the liquidation of the Borrowers' inventory and fixed assets for RAS.

51.    The schedule attached to this Pretrial Memorandum as Schedule A constitutes a list of all Intellectual Property owned by the Borrowers as of October 22, 2001. [6]

52.    At all times relevant to this action either Seneca or Brookfield was the title owner and/or assignee of the items of Intellectual Property identified on Schedule A.

---

[6] The list was prepared by Keith Lowey, whom Landay has proffered as an expert witness in this case. For present purposes, GMAC CF will accept its accuracy, although it reserves the right to argue that the Schedule is inaccurate, based on records obtained from the United States Patent and Trademark Office or other sources.

53.    At all times relevant to this action GMAC CF held a perfected priority security interest in the items of Intellectual Property identified on Schedule A.

G.    Client Account Statements

54.    From the inception of the loan on September 19, 2000, GMAC CF generated monthly summaries of activity on the Borrowers' account, dated as of the last day of each month, some of which were labeled "Client Ledger Account" (the "Client Statements").

55.    The documents marked as Defendants' Exhibit GD are true and accurate copies of the Client Statements for the period of September 2000 through September 2001.

56.    The documents marked as Joint Exhibit 22 are true and accurate copies of the Client Statements that GMAC CF generated for the Borrowers' account between October 2001 through September 2002.

57.    According to the October 31, 2001 Client Statement, the Borrowers' outstanding loan balance as of October 1, 2001, was $7,376,884.31.

58.    According to the October 31, 2001 Client Statement, on October 22, 2001, the balance stood at $1,427,511.19.

59.    According to the Client Statements, at no time after January 1, 2002, did the Borrowers' loan balance fall below $1,000,000.

H.    Miscellaneous

60.    Paul Fitzgerald died on September 16, 2003.

III.    **Contested Issues Of Fact**

A.    Plaintiff's Statement of Contested Issues of Fact

FRAUD

1.    Whether GMAC's representative, Paul Fitzgerald, made misrepresentations of material fact by stating to Landay that if he provided, and then renewed, an additional $250,000 letter of credit, GMAC would provide the Seasonal Overadvance contemplated by the Forbearance Agreement by May 1, 2001?

2.    Whether Landay relied on this representation to his detriment?

3.    Whether such reliance was reasonable?

4.    Whether Landay was damaged by GMAC's conduct in this regard?

5.    What is the amount of his damages?

COMMERCIAL UNREASONABLENESS

6.    Whether Landay was a secured creditor of the Borrowers?

7.    Whether GMAC acted in a commercially unreasonable manner, in disposing of the Borrowers' collateral?

8.    Whether Landay, qua secured creditor or guarantor, was damaged by GMAC's conduct in this regard?

9.    What is the amount of his damages?

CHAPTER 93A

10.    Whether GMAC's actions, singly or in combination, constituted unfair and/or deceptive acts or practices violative of Chapter 93A including but not limited to: the actionable conduct includes GMAC's initial false representations that it would look first to the assets of Borrowers should there be a default, and that it would make a

27

seasonal overadvance; GMAC's fraudulent representations in 2001 that it would fund the May 2001 uncollateralized seasonal overadvance if Landay would provide an additional letter of credit; GMAC's arbitrary refusal to accommodate the business needs of the Borrowers; GMAC's false promises to Landay that induced him to provide a "bridge loan" to Seneca; GMAC's false promises of funding for Seneca and an orderly liquidation that induced Landay to increase his guaranty by $1 million and to provide an additional $1 million in collateral; GMAC's false representations that induced Landay to give John Rijo free access to Seneca; GMAC's failure to disclose Rijo's true purposes for being at Seneca; GMAC's refusal to adjust Schedule C of the Forbearance Agreement to reflect its delay in signing and funding that agreement while holding Borrowers to that schedule; GMAC's refusal to finance in accordance with Schedule C because Borrowers had been placed off-schedule by GMAC; GMAC's refusal to provide the amount of money indicated on Schedule C and, instead limiting itself to the amount Landay had deposited in its favor; GMAC's refusal to consider the Platinum Funding take-out while using it as a pretext to gain additional information to use on a foreclosure; GMAC's attempts to have Landay and Borrowers waive all rights; GMAC's expulsion of Landay from the premises; GMAC's commercially unreasonable liquidation of Borrowers' assets, including waste thereof; GMAC's practice of sending letters to itself requesting Borrowers to take certain action in default of which GMAC would debit the loan during the collection of accounts receivable; GMAC's commercially unreasonable treatment of Borrowers' patent and trademarks, which it has recently claimed it has no right to sell and, if that is the case, should not have been seized and kept by GMAC; GMAC's refusal to give Landay access to the books and records of Borrowers which it

claimed it could not locate but had placed and maintained in a Massachusetts warehouse from late 2001 until August 2005; and GMAC's refusal to provide an accounting, even when an accounting was requested to avoid litigation of GMAC's claim that the liquidation has resulted in a shortfall that Landay had to pay.

11.    Whether Landay was damaged by GMAC's conduct in this regard?

12.    What is the amount of the damages?

B.    Defendant's Statement of Contested Issues of Fact

1.    Fitzgerald did not tell Landay that GMAC CF was committed to exercising its discretion to make a seasonal overadvance to Seneca or Brookfield in or about May 2001.

2.    At the time that Fitzgerald spoke to Landay concerning overadvance funding he expected that GMAC CF would provide such funding.

3.    At the time that Fitzgerald allegedly made the representation to Landay concerning overadvance funding, GMAC CF had not determined to deny the overadvance funding.

4.    Neither Landay nor his attorneys ever raised the issue of the alleged Fitzgerald representations during the course of the negotiations concerning the Forbearance Agreement.

5.    Landay could not have reasonably relied on any representations made by Fitzgerald with regard to the seasonal over-advance if in fact such representations were made.

6.    Landay sustained no damages as a result of GMAC CF's decision not to make the seasonal Overadvance funding at issue.

7.      Landay is not a junior secured creditor of Seneca.

8.      Seneca was not indebted to Landay for the sum of $3,450,000.

9.      GMAC CF disposed of the Borrowers' inventory in a commercially reasonable manner.

10.     GMAC CF's efforts to collect the Borrowers' receivables were commercially reasonable.

11.     No competent evidence exists to establish the value of the Borrowers' intellectual property as of October 22, 2001.

12.     No competent evidence exists to establish the value of the Borrowers' intellectual property today.

13.     No competent evidence exists to support the proposition that the value of the Borrowers' intellectual property (or any of its constituent parts) has materially diminished in value since October 22, 2001.

14.     Landay's so-called valuation of the Borrowers' intellectual property was done solely for the purposes of this and the related New York litigation.

15.     Landay never evaluated the value of the constituent elements of the Borrowers' intellectual property.

16.     Landay's opinion as to the value of the Borrowers' intellectual property is not grounded in any scientific or recognized commercial methodology.

17.     No objective or verifiable evidence supports Landay's opinion as to the value of the Borrowers' intellectual property.

18.     GMAC CF did not breach any duty to Landay in connection with its disposition of the Borrowers' assets.

30

19.    Landay suffered no damages as a result of the manner in which GMAC CF disposed of the Borrowers' assets.

20.    Landay suffered no damages as a result of GMAC CF's decision not to dispose of or liquidate the Borrowers' intellectual property.

21.    The Borrowers failed to mitigate any damages that they sustained as a result of GMAC CF's decision not to dispose of or liquidate the Borrowers' intellectual property.

22.    Landay failed to mitigate any damages that he sustained as a result of GMAC CF's decision not to dispose of or liquidate the Borrowers' intellectual property.

23.    The conduct giving rise to Landay's Chapter 93A claim did not occur primarily and substantially in Massachusetts.

## IV.    Jurisdictional Questions

None.

## V.    Questions Raised By Pending Motions

### A.    Plaintiff

The only pending motion, Defendants' Motion in Limine to Exclude Plaintiff's Proffered Expert Testimony, raises the issue of Keith Lowey's qualifications and suitability to give expert testimony on commercial unreasonableness.  (The Court has indicated that this motion would be addressed during trial).

### B.    Defendant

1.    Currently pending is Defendants' motion to exclude testimony of Plaintiff's Expert Keith Lowey.

2.    Defendants plan to file a motion *in limine* to preclude Plaintiff from introducing Landay's lay opinion testimony regarding the value of the Borrowers' intellectual property.

3.    Defendants plan to file a motion *in limine* to preclude Plaintiff from introducing any evidence regarding oral representations by Paul Fitzgerald that if made would have effectively modified the terms of the Factoring Agreement.

4.    Defendants plan to file a motion *in limine* to preclude Plaintiff from introducing any evidence or argument relating to his Chapter 93A claim that is not based on what remains of his Count I and Count VI.

## VI.    Issues of Law

A.    Plaintiff's Issues Of Law

Set forth below are Plaintiff's positions on issues of law raised in this action, principally in the summary judgment proceedings.  Most, if not all of these issues, may have been determined by this Court in Plaintiff's favor by its ruling denying in part GMAC's Motion for Summary Judgment.  Thus, it is Plaintiff's position that the legal issues remaining in this case are simple and consist of whether or not GMAC's conduct violated Chapter 93A (Count VII), whether or not it included false representations upon which Plaintiff reasonably relied to his detriment (Count I) and whether or not GMAC acted in a commercially unreasonable manner in violation of Plaintiff's rights as a junior creditor and/or a guarantor (Count VI).

1.    Whether GMAC was prohibited from selling the Seneca patents by federal law and, if so, is this an additional violation of Chapter 93A?

It its Reply on its Motion for Summary Judgment, GMAC raised for the first time a claim that it could not be held responsible for its virtual abandonment and waste of

Seneca's patents and trademarks because it had not recorded with the United States Patent and Trademark Office and did not have the right to sell this intellectual property. First, if that is the case, this is one more reason to find that GMAC violated Chapter 93A, since it confiscated and held itself out has having the right to sell these patent and trademarks to the exclusion of Plaintiff and Seneca.  Second, even had GMAC not recorded with the United States Patent and Trademark Office, its contention that it did not have the right to sell Seneca's intellectual property because of that purported omission is frivolous.  The statute on which GMAC relies, 35 U.S.C. § 261, provides, in pertinent part, as follows: "An assignment, grant or conveyance shall be void against any subsequent purchase or mortgage for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase or mortgage" (emphasis added).

First, this statute does not even purport to prohibit a sale if there is no recordation, but merely protects a holder in due course.  In this regard, the statute provides that, unless there is a recording, a bona fide purchaser or mortgagor for value without notice takes free and clear of the unrecorded "assignment, grant or conveyance." See, e.g., In re Cybernetic Servs., Inc., 252 F.3d 1039, 1053 (9th Cir. 2001).  In Cybernetic Services, the Trustee in Bankruptcy argued that the holder of a security interest in a patent must record that interest in order to have a right in the collateral superior to a subsequent lien creditor. In rejecting that argument, the Court wrote: "Congress intended for parties to record their ownership interests in a patent so as to provide constructive notice only to subsequent holders of an ownership interest."

Id., at 1053. (emphasis added).   To argue that this statute prohibits a sale absent a recording is simply disingenuous.

Second, the plain meaning of this statute, which appears to relate only to patents and not to trademarks, is that as long as recordation occurs prior to a subsequent sale, a previous sale is not void.  Therefore, unless GMAC proves that Landay or Seneca has sold Seneca's intellectual property, its own alleged failure to record would be totally irrelevant in any event.

Finally, and most importantly, the Ninth Circuit has held that "a security interest in a patent that does not involve a transfer of the rights of ownership is a 'mere license' and is not an 'assignment, grant or conveyance' within the meaning of 35 U.S.C. § 261." In re Cybernetic Servs., Inc., 252 F.3d at 1052.  The Court continued: "And because § 261 provides that only an 'assignment, grant or conveyance shall be void' as against subsequent purchasers and mortgagees, only transfers of ownership interests need to be recorded with the PTO."  Id. (emphasis added).  Thus, since there was no requirement for GMAC to record its security interest, ipso facto its purported failure to do so would not disentitle it from selling Seneca's intellectual property after the October 22, 2001 takeover, even under GMAC's misconstruction of the remainder of the quoted portion of Section 261.

2.    Whether Landay's failure to renew his Uniform Commercial Code filing as to his security interest in Seneca's assets affects his Commercial Unreasonableness Claim against GMAC?

Landay has standing to recover against GMAC for its commercially unreasonable disposition of Seneca's assets both as a junior creditor and as a guarantor.

With regard to his position as junior creditor, Landay has standing to recover damages from GMAC's noncompliance with Article 9 since he is "a person that, at the time of the failure, was a debtor, was an obligor, or held a security interest in…the collateral." M.G.L. c. 106, § 9-625(c)(1). The evidence will show that Landay held a security interest in the collateral which GMAC seized on October 22, 2001. The fact that Landay did not continue to perfect his security interest with subsequent Uniform Commercial Code filings after 1996 is totally irrelevant to this case since (a) it did not deprive him of a security interest in Seneca's assets and (b) the security interest remains viable via a`vis GMAC. In this regard, M.G.L. c. 106, § 9-201(a) states that "[e]xcept as otherwise provided in this chapter, a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors." Massachusetts law applies to Landay's security interest. M.G.L. c. 106, § 9-301(a), ("Except as otherwise provided in this section, while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral"). Under Massachusetts law, GMAC's knowledge of Landay's secured position – i.e., via the Subordination Agreement – would make his security interest effective vis a`vis GMAC. See, e.g., In re Babcock Box Co., 200 F. Supp. 80, 81-82 (D. Mass. 1961). See also, (old) M.G.L. c. 106, § 9-301(c) and (d) which focus on the knowledge vel non of the transferee or buyer as a determinant of whether an "unperfected" security interest is subordinated to their rights. Since Landay has sufficient interest qua junior creditor to assert a claim against GMAC under the Uniform Commercial Code, Massachusetts law affords him standing to assert his Commercial Unreasonableness claim.

35

A similar line of reasoning supports Landay's standing <u>qua</u> guarantor.  Under the Code, a guarantor is an "obligor" under M.G.L. c. 106, § 9-102(59)[7], and thus Landay had the right to sue GMAC in that capacity under M.G.L. c. 106, § 9-625(c)(1).

3.    <u>Whether proof of damages caused by a secured creditor's commercially unreasonable disposition of the borrower's assets requires expert opinion evidence?</u>

In its Summary Judgment Motion, GMAC contended that expert testimony is necessary.  Although Plaintiff intends to offer expert testimony to aid the Court, he disagrees that it is required.  The three cases cited by GMAC at p. 18 of its Memorandum in Support of its Motion for Summary Judgment are slim reeds, indeed, on which to rest its argument that expert testimony is a requirement on the issues of commercial unreasonableness and damages.  <u>Mayfair Mills, Inc. v. Spartanburg County (In re Mayfair Mills, Inc.)</u>, 295 B.R. 827, 838 (Bankr. D.S.C. 2002) is a tax valuation case between a debtor and a taxing authority in which the Court stated, at the page cited by GMAC, "in this instance, this Court believes it <u>may be necessary</u> to present expert testimony regarding such factors as…the commercial reasonableness of the sale…" (emphasis added).  In <u>Sunjet, Inc. v. Ford Motor Credit Co.</u>, 703 S.W.2d 285 (Tex. Ct. App. 1986), a Uniform Commercial Code case involving a Learjet aircraft, the Court wrote: "In sales of collateral of this nature, the testimony of an expert <u>may be necessary</u> to establish that procedures used complied with practices normally followed in the industry, or that the sale was otherwise commercially reasonable."  <u>Id.</u> at 289 (emphasis

---

[7] "'Obligor' means a person that, with respect to an obligation secured by a security interest in or an agricultural lien on the collateral, (i) owes payment or other performance of the obligation, (ii) has provided property other than the collateral to secure payment or other performance of the obligation, or (iii) is otherwise accountable in whole or in part for payment or other performance of the obligation.  The term does not include issuers or nominated persons under a letter of credit."

added).  Finally, the only case cited by GMAC which refers to valuation, <u>Wilmington</u>

<u>Trust Co. v. Ruggerio</u>, No. 95-28,1978 WL 139209, at *1 (Del. Com. Pl. 1978), is a one-

page decision, which cites no authorities and contains no description of the underlying

facts.  In denying a motion for a new trial, the Common Pleas Judge wrote:

> Moreover, plaintiff fully anticipated the need to litigate the commercial
> reasonableness of the sale and should have been prepared with expert
> testimony on the market value of the collateral in connection with the
> commercial reasonableness issue, since, had the Court held the sale to
> have been commercially unreasonable, such expert testimony would have
> been necessary.

Clearly, this case cannot possibly support the proposition that expert testimony is

<u>always</u> necessary to prove damages in an unreasonable liquidation case.

The case of <u>American State Bank of Killdeer v. Hewson</u>, 411 N.W.2d 57, 64-65

(N.D. 1987) refutes GMAC's extreme and unsupportable position.  In <u>Hewson</u>, the trial

court had granted summary judgment for the bank against the debtor on a deficiency

notwithstanding the debtor's challenge to the commercial reasonableness of the sale of

the collateral, a "tractor with dozer", for $8,700.  Hewson had offered no expert

testimony but only his affidavit setting forth the circumstances of the sale and his

opinion that the fair market value of the collateral was $20,000.  The Court reversed,

holding that the owner of property was fully competent to testify to its value and that the

evidence of disparity between Hewson's opinion and the sales price, taken in

conjunction with the other statements in his affidavit, raised a genuine issue of fact as to

commercial unreasonableness.

Therefore, Landay submits that GMAC has not demonstrated a special rule

governing Uniform Commercial Code cases which renders expert testimony on liability

or damages a <u>sine qua non</u> of recovery.  To the contrary, ordinary principles of civil

jurisprudence which permit non-expert testimony should obtain.  In this regard, Fed. R. Evid. 701 authorizes the admission of a non-expert opinion of damages by a witness with Landay's credentials.

      4.     <u>Whether Landay's opinion of the value of Seneca's intellectual property is admissible?</u>

Landay will prove that he has had substantial experience with the very intellectual property at issue in this case, the trademarks and patents which GMAC seized on October 22, 2001, but did nothing to market or sell.  In Landay's opinion, this bundle of assets had a liquidation value of $2,000,000 as of that time.  This value is supported by the fact that Seneca acquired just a part of those trademarks and patents for $1,300,000 thirteen months previously, i.e., on September 19, 2000.

The admission of Landay's opinion evidence is supported by a line of cases allowing a corporate officer to testify as a non-expert, under Fed. R. Evid. 701, on the issue of his Company's damages or the value of property owned by his company.  <u>See Securitron Magnalock Corp. v. Schnabolk</u>, 65 F.3d 256, 265 (2d Cir. 1995) (Rule 701 permits a president of a company to testify to as to lost profits).  <u>See also</u>, <u>Glosband v. Watts Detective Agency</u>, 21 B.R. 963, 981 (D. Mass. 1981) (president of a company could give an opinion of its value under Rule 701 as a non-expert or under Rule 702).[8] Indeed, in the instant case, where liquidation occurred shortly after Seneca had paid $1,300,000 for the Brookfield patents and trademarks, opinion testimony is unnecessary to establish that the intellectual property had a value of at least $1,300,000.  <u>Schonfeld</u>

---

[8] Although not listed in the history of <u>Glosband</u>, the case of <u>Robinson v. Watts Detective Agency, Inc.</u>, 685 F.2d 729, 738-739 (1st Cir. 1982) addresses Judge Nelson's decision and affirms the admissibility of the company president's opinion.

v. Hilliard, 218 F.3d 164, 178 (2d Cir. 2000) ("a recent sale price for the subject asset,

negotiated by parties at arm's length, is the 'best evidence' of its market value").

 5. <u>Whether the dismissal of the Fraud Count with regard to several of the fraud allegations precludes Landay from offering the underlying facts in proof of his Chapter 93A claim?</u>

 GMAC's legal theorem – dismissal of a common law or statutory claim <u>requires</u>

dismissal of a Chapter 93A claim based on the conduct underlying such claim – has

been rejected by both the Appeals Court and the Supreme Judicial Court.  In this

regard, the Court in <u>Grand Pacific Finance Corp. v. Brauer</u>, 57 Mass. App. Ct. 407, 420

n. 9 (App. Ct. 2003), wrote as follows:

> The dismissal of the common-law claims of fraud as to all defendants and the common-law conversion claim as to Decnos is not inconsistent with the imposition of liability under G.L. c. 93A.  Rather, the differences in result are attributable to different elements of proof and to the more expansive reach of G.L. c. 93A.  This act, which sounds in terms of fraudulent and deceptive trade practice, is a 'statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights.  The relief available under c. 93A is sui generis.  It is neither wholly tortious nor wholly contractual in nature, and is not subject to the traditional limitations of preexisting causes of action.  It mak[es] conduct unlawful which was not unlawful under the common law or any prior statute.  Thus, a cause of action under c. 93A is not dependent on traditional tort or contract law concepts for its definition. [A]nalogies between common law claims for breach of contract, fraud, or deceit and claims under c. 93A are inappropriate because c. 93A dispenses with the need to prove many of the essential elements of those common law claims.' (citations and internal quotations omitted).

<u>See</u>, <u>also</u>, <u>Kattar v. Demoulas</u>, 433 Mass. 1, 12 (2000) (The Chapter 93A claim is not

merely the sum of the other claims in the complaint; it has a separate existence and

"dispenses with the need to prove many of the essential elements of those common law

claims") (internal citation omitted).

In light of the <u>Grand Pacific Finance Corporation</u> and <u>Kattar</u> cases, Landay submits that the Chapter 93A claim is viable with respect to the fraud allegations which this Court has dismissed because the very element that GMAC has attacked, reasonable reliance, is not an element of a Chapter 93A claim based on a misrepresentation.  The cases in support of this proposition are legion.  <u>See</u> <u>Aspinall v. Philip Morris Companies, Inc.</u>, 442 Mass. 381, 394 (2004) ("A successful G.L. c. 93A action based on deceptive acts or practices does not require proof that a plaintiff relied on the representation,…, or that the defendant intended to deceive the plaintiff,…, or even knowledge on the part of the defendant that the representation was false") (internal citations omitted).  <u>See also</u>, <u>Fraser Engineering Company, Inc. v. Desmond</u>, 26 Mass. App. Ct. 99, 104 (App. Ct. 1988); <u>Zayre Corp. v. Computer Systems of Am., Inc.</u>, 24 Mass. App. Ct. 559, 570 (App. Ct. 1987) ("Reasonable reliance, however, is not necessarily a prerequisite of recovery under G.L. c. 93A, §11"); <u>Sebago, Inc. v. Beazer East, Inc.</u>, 18 F. Supp. 2d 70, 103-104 (D. Mass. 1998); and <u>Phalon v. Varrasso (In re Varrasso)</u>, 194 B.R. 537, 540 (Bankr. D. Mass. 1996).

   6.   <u>Whether GMAC's conduct concerning the Platinum Credit Corp. buy-out proposal will support a finding that Chapter 93A was violated?</u>

With regard to GMAC's deceptive behavior and refusal to consider the Platinum Credit Corp. buy-out of its loan, there is case support for the proposition that such conduct on GMAC's part constitutes a violation of, or part of a pattern of conduct violative of Chapter 93A.  <u>See</u> <u>Snowden v. Chase Manhattan Mortgage Corp.</u>, No. 03-0001B, 2003 WL 22519518, at *3 (Chapter 93A is violated where mortgagee refused to consider a buyer willing to pay an amount which would have resulted in full recovery of the amount due the mortgagee).