7. <u>Whether Landay's allegations regarding GMAC's failure to account and its failure to provide him with access to Seneca's business records support a Chapter 93A violation?</u>

There is also case support for the proposition that GMAC's failure to account and to provide access to Seneca's business records constitutes a violation of, or part of a pattern of conduct violative of Chapter 93A.

<u>See</u> <u>United States v. United States Trust Co.</u>, 660 F. Supp. 1085, 1090 (D. Mass. 1986), where the Court imposed triple damages under Chapter 93A based, in part, on defendant's failure to answer communications and failure to give an accounting to the plaintiff.

> I conclude also that the conduct of US Trust was knowingly and willfully unfair. Its adamant behaviour in failing to answer communications of the plaintiff with respect to the funds, its refusal to recognize the import of its own action in making no interest charge upon receipt of the check and the copy of the Form 1034, its refusal to give an accounting of the money which had been disbursed to someone, merit judgment in the form of treble damages.

B. <u>Defendants' Issues Of Law</u>

1. **This Court should decline to admit any evidence that if admitted and credited would effect an oral modification of the terms of the Forbearance Agreement:** As of August 9, 2001, the Borrowers were in default of numerous provisions of the Factoring Agreement. In order to induce GMAC CF not to immediately exercise its rights as a secured creditor, Landay, in his capacity as president of Seneca and Brookfield, executed the Forbearance Agreement. In the Forbearance Agreement, the parties agreed, among other things, that except to the extent that the Forbearance Agreement expressly modified it, the Factoring Agreement remained in full force and effect. Importantly, the parties also agreed that the

Forbearance Agreement constituted "...the entire understanding of the parties with respect to the matters set forth herein and supersedes in their entirety any and all understandings and agreements, whether written or oral, of the parties with respect to the foregoing." Landay contends that GMAC CF used Fitzgerald to deceive him into believing that GMAC CF would provide the Overadvance funding that Landay wanted. However, the language of the Factoring Agreement makes it impossible for Landay to have reasonably relied on any such representations even if they were made. Given the tenuous nature of Seneca's financial position and the risky nature of the Brookfield acquisition, it was especially critical for GMAC CF to retain the discretionary right not to advance further credit or to do so only under very specific circumstances. Therefore, the Factoring Agreement expressly provided that GMAC CF had the discretion not to fund advances. Under the terms of both the Factoring Agreement and the Forbearance Agreement, any modifications to the parties' contractual obligations had to be in writing. Over the course of the first seven months of 2001, Landay had ample opportunity to seek a specific written promise to provide the Overadvance financing that he claims Fitzgerald promised. He failed to do so. Not only did he fail to do so, but he also executed a Forbearance Agreement that specifically supercedes all prior "understandings and agreements, whether written or oral" with respect to the subject matter of the Forbearance Agreement, *i.e.*, the Factoring Agreement and the financing provided pursuant to the Factoring Agreement. Under such circumstances no businessman with Landay's training and experience could reasonably believe that the alleged oral promise to provide the Overadvance financing had any ongoing vitality as of the execution of the Forbearance Agreement. *See, e.g., Augat, Inc. v. Collier*, 1996

WL 110076, *9 (D. Mass. Feb. 8, 1996) (where a written contract contains terms that contradict prior oral assurances or representations, the written terms will prevail over the oral assurances and representations); *Turner v. Johnson & Johnson*, 809 F. 2d 90, 96 (1st Cir. 1996) and *Greenery Rehabilitation Group, Inc. v. Antaramian*, 628 N.E. 2d 1291, 1293 (Mass. App. Ct.); *Kuwaiti Danish Computer Co. v. Digital Equipment Corp.*, 438 Mass. 459, 468 (2003) (businessman's reliance on other party's oral statements or conduct was unreasonable as a matter of law where it conflicted with documents); *McCartin v. Westlake*, 36 Mass. App. 221, 233 (1994) (ruling that defendants were entitled to directed verdict on plaintiffs' fraud claim that was based upon oral representation inconsistent with a subsequently executed written agreement).

2.  **This Court should not credit Landay's testimony concerning statements allegedly made by Paul Fitzgerald because he is deceased and therefore GMAC cannot offer direct testimony to the effect that the alleged representations were not made:** Landay claims that Paul Fitzgerald "reiterated" in early 2001 that GMAC CF would provide the Borrowers with a Seasonal Overadvance in May 2001. All of Fitzgerald alleged representations were oral, and Landay does not claim that anyone else at GMAC CF made similar representations. Paul Fitzgerald died on September 16, 2003. Thus, Landay's claim depends exclusively on his account of conversations with a dead man. Obviously, as a result of Fitzgerald's death, GMAC CF will be unable to introduce direct testimony to contradict Landay's version of his conversations with Fitzgerald. At a minimum the death of a declarant decreases the weight that a Court gives to testimony concerning alleged statements of the deceased. *White v. Honeywell, Inc.*, 141 F.3d 1270, 1277 (8th Cir. 1998) ("the fact that declarant's

death impacts on the weight of the evidence rather than its admissibility"); *Savarese v. Agriss,* 883 F.2d 1994, 1201 (3d. Cir. 1989). As this Court recognized in *United States v. Ferber,* 966 F.Supp. 90, 97 n.7 (D.Mass. 1997) (Young, D.J.), the rationale for allowing admissions of a party opponent is the ability of a party against whom an admission is offered to explain the proffered statement. It follows that when a party does not have the ability to explain a previous admission due to the death of the declarant, the proffered admission loses credibility.

3. **Landay had a duty to mitigate any damages that he claims to have sustained as a result of GMAC CF's actions, including, but not limited to, its decision not to dispose of or liquidate the Borrowers' intellectual property.** It is "… the universally accepted rule that a harmed plaintiff must take reasonable steps to minimize losses or mitigate damages." *In re Emergency Beacon Corp.*, 48 B.R. 341, 349 (S.D.N.Y. 1985); *see also*, *Air el Chaleur, S.A. v. Janeway,* 757 F.2d 489, 494 (2d Cir.1985); *Wilmot v. State,* 32 N.Y.2d 164, 168-69, 297 N.E.2d 90, 92, 344 N.Y.S.2d 350, 352-53 (1973) ("The duty to mitigate extends not only to actions which should have been taken before the injury, but also to actions taken post-injury"); *Mississippi Chemical Corporation v. Dresser-Rand Company*, 287 F.3d 359, 372 (5th Cir. 2002) (In contract action governed by U.C.C. Article 2, plaintiff "cannot recover for losses he reasonably could have prevented."); *K&D Distributors, LTD v. Aston Group (Michigan), Inc.*, 354 F.Supp.2d 761, 768 (N.D. Ohio 2005) (stating that the injured party has the duty to mitigate damages in breach of contract cases subject to the UCC); *Aircraft Guaranty Corporation v. Strato-Lift, Inc*, 991 F. Supp. 735, (E.D. Pa. 1998) (rejecting plaintiff's argument that mitigation of damages does not apply under the UCC and

44

stating that the UCC does not completely obviate the general duty to mitigate damages) citing 13 Pa. C.S.A.§ 1103 (Pennsylvania statue stating that common law supplements UCC where not specifically displaced); *see also, Carpel v. Saget Studios, Inc.*, 326 F. Supp. 1331, 1333 (E.D. Pa. 1971) (discussing retention of common law in contracts where not directly superceded by the UCC). As the President and CEO of Seneca and Brookfield – the entities that owned the patents and trademarks at issue – and in his own right as a junior creditor of Seneca, Landay possessed the right to liquidate the Intellectual Property, subject to the senior lien of GMAC CF. His decision not to do so constituted a breach of his duty to mitigate whatever damages he claims to have sustained.

4.  **Expert testimony is absolutely required to establish the value of the patents and trademarks at issue in this case:** Courts have long held that in patent validity and infringement suits where the issues are not simple and obvious to the untrained eye, expert testimony can be most helpful. *Sunbeam Corporation v. S.W. Farber, Inc.*, 243 F. Supp. 75, 86 (S.D.N.Y. 1965); see also 60 Am. Jur. 2d. Patents §909. *Markman v. Westview Instruments*, 52 F.3d. 967, 980 (3rd Cir. 1995), aff'd 517 U.S. 370 (1996), reaffirmed the importance of courts using "extrinsic evidence [including expert testimony] in order to aid the court in coming to a correct conclusion as to the true meaning of the language employed in the patent." Today, virtually every issue in patent and trademark litigation is decided with the help of expert testimony. See *Expert Testimony*, 60 Am. Jur. 2d. Patents §909; *Expert Testimony*, 26 Fed. Proc., L. Ed § 60:1103; *Copyrights, Patents and Trademarks*, 32 C.J.S. Evidence § 627 (2005).

Parties involved in patent and trademark litigation do not even contest the principle that expert testimony is necessary to determine patent and trademark valuation,

> Rule 702 of the Federal Rules of Evidence states that if scientific, technical, or other specialized knowledge will assist the trier of fact then a witness qualified by knowledge, skill, experience, training or education may testify thereto. **This rule is phrased broadly and it extends to all specialized knowledge including the specialized knowledge of evaluating the value of trademarks.** [Plaintiff] does not dispute nor argue that the valuation of trademarks is not a specialize[d] field of knowledge.

*Platinum Technology, Inc. v. Federal Insurance Company*, 2001 WL 109814 at *9 (N.D. Ill, Feb. 2, 2001) (emphasis added). If expert testimony is required in order to determine the meaning and scope of a patent or trademark, it necessarily follows that expert testimony must be required to determine the value of a patent or trademark. Not surprisingly, therefore, Courts around the country rely on expert testimony in valuing patents, trademarks, licenses, and copyrights because these are areas of specialized knowledge. *Cascade Designs, Inc. v. Commissioner of Internal Revenue*, 2000 WL 204380 (U.S. Tax Ct., Feb. 23, 2000) (Allowing expert witness testimony under Fed. R. Evid. 702 because valuation of patents is an area of specialized training, knowledge, or judgment); see also *Shane v. Shane*, 891 F. 2d. 976, 984 (1st Cir. 1989) (Allowing expert testimony on trademark valuation); *Ventura v. Titan Sports, Inc.*, 65 F.3d 725, 734 (8th Cir. 1995) (Allowing expert testimony on license and license royalty valuation); *Liesure Time Ent. v. Cal Vista*, 35 Fed. Appx. 565, 566 (9th Cir. 2002) (Allowing expert testimony on copyright valuation). Landay's failure to submit Fed. R. Evid. 702 expert testimony with respect to the value of the Borrowers' intellectual property constitutes a fatal flaw in his Count VI claim.

5.  **The value of the Borrowers' intellectual property is not relevant to the claims remaining in this action:** At oral argument on summary judgment, Landay acknowledged that Count VI of his Complaint (Violation of Landay's Rights as Junior Creditor), is grounded on U.C.C. Article 9 which states, in relevant part, "…a secured party **may** sell, lease, license, or otherwise dispose of the collateral…" [emphasis added]. M.G.L. Ch.106 §9-610(a) (formerly §9-504). Here, GMAC CF chose not to liquidate the Borrowers' intellectual property because it believed that the cost associated with liquidating that property might well exceed the proceeds of any such sale. No provision of the Factoring Agreement, Landay's Guaranty or the Forbearance Agreement required GMAC CF to liquidate any particular part of its collateral. Likewise, "[t]here is no mandate under U.C.C. §9-504 [now §9-610] that a secured creditor conduct a sale of collateral following a default; all that is required is a reasonable disposition of the collateral." *Emergency Beacon*, 48 B.R. 341, 348. In short, as a matter of law, GMAC CF's business decision not to liquidate the Borrowers' intellectual property cannot constitute a commercially unreasonable disposition of collateral under the U.C.C. for the simple reason that no disposition of the collateral occurred. The intellectual property remains (and always has been) available to its title owners – Seneca and Brookfield – for disposition in whatever manner they deem advisable, subject to GMAC CF's priority lien.

6.  **Landay may not offer lay opinion testimony within the meaning of Fed. R. Evid. 701 as to the value of the Borrowers' Intellectual Property because Landay's testimony is not based on personal knowledge from his own experiences with intellectual property:** While Fed. R. Evid 701 permits business

47

owners to opine on the value of their business and profits, any such testimony must be grounded in the witness's own experiences and observations. *United States v. Colon Osorio*, 360 F.3d 48, 52-53 (1st Cir. 2004) (lay opinion testimony is permitted when it is "based on information gleaned from [witness's] personal experience . . . and was arrived at 'from a process of reasoning familiar in everyday life.'"); *Freedom Wireless Inc. v. Boston Communication Group, Inc.*, 369 F.Supp.2d 155, 157 (D.Mass. 2005) (Rule 701 opinions must be based on actual experiences and not conjecture).  In his December 13, 2005 affidavit, Landay stated that Seneca paid $1.6 million for a portion of the Borrowers' intellectual property.  In doing so, Landay merely demonstrated that he is capable of reading a number off of a spreadsheet prepared by an unknown third-party who was almost certainly not an expert in IP valuation.  In any event Landay did not use personal knowledge or experience, much less apply any "factors" or analysis in reaching his opinion.  Indeed, Landay was unable to evaluate the value of the IP when specifically asked to do so in his answers to interrogatories and again at his deposition.  Furthermore, recent opinions construing lay opinion from business owners make it clear that merely being a business owner is not enough to lay the foundation for lay opinion testimony.  The witness's personal knowledge and experience must extend to the factors used to opine on value or profits. *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 929-30 (10th Cir. 2004); *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) (J. Easterbrook) (while Rule 701 permits a manager to provide opinion testimony on the facts underlying a damage estimate, the manager cannot draw inferences from these facts under Rule 701 just because he is the manager.  "Reliable inferences depend on more than say-so, whether the person

doing the saying is a corporate manager or a putative expert."); See also *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1176 (3d Cir. 1993) (At a minimum, an owner will need to provide some valid assumptions beyond being the owner to provide testimony helpful to the fact finder.). To the extent that Landay argues that he employed some analytical method based on reliable factors, those factors still must be based on valid assumptions. Landay's limited experience in buying and selling companies that happen to own intellectual property simply does not give him the ability to form valid assumptions upon which to apply an analysis of the value of the Borrowers' intellectual property.

**7. This Court should decline to accept Landay's testimony concerning the value of the Borrowers' intellectual property because Landay improperly manipulated the discovery process in an effort to ambush GMAC CF at trial:** As the advisory committee notes make plain, Fed. R. Evid 701 was amended in 2000 to prevent exactly the kind of surprise expert testimony that Landay will attempt to introduce in this case. In his original answers to GMAC CF's Interrogatory No. 11, Landay stated that he could not value the Borrowers' intellectual property at that time because he had only recently gained access to certain documents that had been stored at Seneca and Brookfield's old offices. Thereafter, Landay repeatedly accepted GMAC CF's offers for further inspections of the documents. Nevertheless he did not supplement his interrogatory responses prior to the close of discovery and even denied having any obligation to do so. Furthermore, at Landay's deposition, GMAC CF asked him to review his interrogatory responses. After he did so, GMAC CF asked whether he saw anything that he wanted to correct or supplement. While Landay stated that he

49

might want to change his answers to Interrogatory No. 14, which asked about his usury allegation (Count II), and Interrogatory No. 17, which concerned his Chapter 93A claim (Count VII), and that he might amend his response to Interrogatory No. 16 to decrease his damage claim under Count VI, he never mentioned any need to correct or supplement his original Answer to Interrogatory No. 11. As a result of Landay's original answer to Interrogatory No. 11, his failure to timely amend or supplement that answer and his deposition testimony, GMAC CF reasonably concluded that Landay did not intend to introduce opinion testimony concerning the value of the Borrowers' intellectual property. Accordingly, GMAC CF did not retain an expert to testify concerning the value of the intellectual property. Thus, if this Court permits Landay to testify concerning the value of the Borrowers' intellectual property, Landay's discovery ploy will succeed in precluding GMAC CF from presenting effective counter testimony. Such testimony would be both unfairly prejudicial in violation of Fed. R. Evid. 403 and also improper surprise expert testimony prohibited by Fed. R. Evid. 701. "[T]he Court should be vigilant to preclude manipulative conduct designed to thwart the expert disclosure and discovery process." See Fed. R. Evid. 701 (advisory committee notes to 2000 amendments). This Court should not reward Landay's lack of candor in the discovery process by permitting him to introduce surprise testimony concerning the value of the Borrowers' intellectual property, a topic that involves specialized knowledge and requires expert testimony under Fed. R. Evid. 702.

8. **As the record title owners of the intellectual property at issue, Seneca and Brookfield always possessed the ability to transfer good title to their intellectual property, subject to the priority lien of GMAC CF:** A security interest in

50

intellectual property -- like the security interest that GMAC CF held in the Borrowers' intellectual property -- is a "mere license," not an assignment of title. *Waterman v. Mackenzie*, 138 U.S. 252, 255 (1891). "[T]he grant of a security interest is not a conveyance of a present ownership right in the patent and, like the creation of some other lesser rights in a patent (such as licenses) is not required to be recorded with the Patent Office. *In re Transporation Design and Technology, Inc.*, 48 B.R. 635, 639 (Bnkr. S.D. Cal. 1985); *Sanofi, S.A. v. Med-Tech Veterinarian Prods., Inc.*, 565 F. Supp. 931, 939 (D. N.J. 1983) ("there is no obligation to record a license"). *City Bank and Trust Co. v. Otto Fabric, Inc.*, 83 B.R. 780, 783 (D. Kan. 1988). A lien holder is simply a licensee, and a licensee "has no property interest in the monopoly of the patent. . . . Practice of the invention by others may indeed cause [the licensee] pecuniary loss, but it does him no legal injury." *Ortho Pharm. Corp. v. Genetics Inst.*, 52 F.3d 1026, 1031 (Fed. Cir. 1995) (quoting *Western Elec. Co. v. Pacent Reproducer Corp.*, 42 F.2d 116, 118 (2d Cir. 1930)). It necessarily follows that a secured party cannot transfer good title to a patent, copy write or trademark without first obtaining title to such intellectual property, and obtaining good title to intellectual property requires more than simply taking possession of various pieces of paper that describe the intellectual property rights at issue. Mere possession of a written description or certified copy of the patent is insufficient to enable one to gain ownership of the patent because "a security interest in general intangibles may not be perfected by possession." *In re Roy A. Dart Insurance Agency, Inc.*, 5 B.R. 207, 215 (Bnkr. D. Mass. 1980). For example, in order to gain ownership of a patent, one must record an assignment of title with the Assignment Division of the United States Patent and Trademark Office (USPTO) as

51

required under the Patent Act. An "assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark Office." 35 U.S.C. § 261. In this case, it is undisputed that GMAC CF never acquired title to the Borrowers' intellectual property. To the contrary, at all relevant times, Seneca and Brookfield held title ownership in their intellectual property and they continue to do so.

### VII. Requested Amendments To Pleadings

None.

### VIII. Additional Matters

Landay will ask the Court to take judicial notice of certain records of the United States Patent and Trademark Office relating to the status of the Borrower's intellectual property from October 22, 2001 to date and to refer to certain federal statutes including but not limited to 35 U.S.C. §§ 154, 173, and 15 U.S.C. § 1058.

Landay will move to preclude GMAC's expert from testifying or, in the alternative, preclude him from testifying with regard to certain parts of his proposed testimony.

### IX. Length of Trial; Jury or Non-Jury Trial

7 trial days; non-jury.

### X. Witnesses

    A.    Plaintiff's Factual Witnesses

    1.    David L. Landay[*]
           26510 Rookery Lake Drive
           Bonita Springs, FL

---

[*] Landay will also opine as a lay witness on various matters relating to value.

2. Neal Finkelstein
   (Seneca's CFO)
   33 Sweeney Avenue
   Revere, MA

3. Barry Hutch
   (Seneca/Brookfield Accounts Receivable Manager)
   68 Hudson Street
   Marlborough, MA

4. Robert Schwartz
   Schwartz Heslin Group
   8 Airport Park Blvd.
   Latham, N.Y.

5. Doug Rainville
   The Rainville Group
   45 Grant Street
   Needham, MA

6. Stephen Rosenberg, Esq.
   Todtman, Nachamie, Spizz & Johns
   435 Park Avenue
   New York, N.Y. 10022

7. Joseph H. Einstein, Esq.
   Labaton Sucharow & Rudoff, LLP
   100 Park Ave., New York, NY

8. Timothy A. French, Esq.
   Fish & Richardson, P.C.
   225 Franklin Street
   Boston, MA 02110

9. Kathleen Pappalardo
   25091 Arden Park
   Farmington Hills, Michigan (By deposition)

10. Joseph Lennon
    591 Buchanan Boulevard
    Red Bank, New Jersey (By deposition)

11. John Rijo
    18 Kittridge Street
    Walpole, MA (By deposition or live)

12. Richard Lamontaine
    c/o Plymouth Plantations
    Plymouth, MA

13. Jeannette Berube
    c/o Edwards Angell Palmer & Dodge, LLP
    111 Huntington Avenue
    Boston, MA

    Plaintiff's Expert Witnesses

1.  Keith D. Lowey
    Verdolino & Lowey, P.C.
    124 Washington Street
    Foxboro, MA 02035

B.  Defendants' Factual Witnesses

1.  John Rijo
    18 Kittredge Street
    Walpole, Massachusetts

2.  Richard Sebastio
    RAS Management Advisors, Inc.
    599 Ocean Avenue
    Newport, RI

3.  Jane Frangos
    281 Fairbanks Avenue
    Staten Island, NY

4.  Neil Finklestein
    33 Sweeney Avenue
    Revere, Massachusetts

5.  Jeff Dowd
    GMAC Commercial Finance
    3000 Town Center, Suite 280
    Southfield, MI

6.  Kathleen Pappalardo
    25091 Arden Park
    Farmington Hills, MI (live or by deposition)

7. Richard L. Stehl
   Otterbourg, Steindler, Houston & Rosen, P.C.
   230 Park Avenue, 29 Floor
   New York, NY

8. Louis G. Marcus
   Avenue of the Americas, 7th Floor
   New York, NY

9. Gary L. Hoff
   Casner & Edwards, LLP
   303 Congress St.
   Boston, MA

10. David B. Madoff
    Madoff & Khoury LLP
    124 Washington
    Foxboro, MA

11. Joseph Lennon
    GMAC CF
    1290 Avenue of the Americas
    New York, NY (live or by deposition)

12. Margarita Rodriguez
    GMAC CF
    1290 Avenue of the Americas, 3rd Floor
    New York, NY

13. Douglas Rainville
    45 Grant Street
    Needham MA

<u>Defendants' Expert Witnesses</u>

1. Barry Gold
   2485 Matterhorn Drive
   Wexford, Pennsylvania

2. Steven Fox
   39 Admiral Worden's Lane
   Briarcliff Manor, New York

55

## XI.     Proposed Exhibits

### Agreed Exhibits

| Exhibit No. | Bates No. | Description | Deposition Ex. No. |
|---|---|---|---|
| 1. | LAN 0263 - LAN 0272 | 7/31/00 Approval letter to Landay from GMAC with attached Term Sheet | 59 |
| 2. | GLAN 00603 - GLAN 00616 | Factoring Agreement (9/19/00) | 63 |
| 3. | GLAN 00647 - GLAN 00648 | Guaranty (9/19/00) | 64 |
| 4. | GLAN 00641 - GLAN 00642 | Subordination Agreement (9/19/00) | 65 |
| 5. | LAN 0409 - LAN 0410 | Promissory Note (9/19/00) | 66 |
| 6. | GLAN 00663 – GLAN 0665 | Standby Letter of Credit (9/19/00) | |
| 7. | GLAN 00630 - GLAN 00633 | Letter of Credit Financing Supplement (9/19/00) | 67 |
| 8. | | Uniform Commercial Code Financing Statement – Seneca Sports (9/26/00) | |
| 9. | | Uniform Commercial Code Financing Statement – Brookfield International, Inc. (9/26/00) | M (NY case) |
| 10. | GLAN 00656 – GLAN 0661 | Standby Letter of Credit for (various dates) $250,000 | |
| 11. | L00949 | E-mail from Paul Fitzgerald to David Landay regarding memo he sent to Jane Frangos (5/29/01) | |
| 12. | LAN0065 – LAN0067 | Landay's Chronology (6/17/01) | |
| 13. | GLAN 00342 - GLAN 00348 | Memo from Fitzgerald to Loan Committee attaching meeting minutes (6/27/01) | 18 |
| 14. | LAN 0148 - LAN 0153 | Email from Neal Finklestein to Jane Frangos regarding collateral reconciliation and inventory listings (Undated) | 92 |
| 15. | RAS 00445 - RAS 00446 | 5/9/01 Memo from Paul Fitzgerald to Loan Committee regarding Seneca Sports | 20 |
| 16. | LAN 0031 - LAN 0042 | Forbearance Agreement (8/9/01) | 71 |
| 17. | LAN 0027 – LAN 0028 | Ratification and Amendment of Guaranty (8/9/01) | 74 |
| 18. | LAN 0029 – LAN 0030 | Cash Deposit (8/9/01) | 75 |
| 19. | LAN 0162 – LAN 0163 | Letter from GMAC Commercial Credit LLC to David Landay regarding notification of defaults (9/24/01) | 89 |
| 20. | L 02588 | Letter from GMAC Commercial Credit LLC to the Borrowers regarding outstanding obligations (9/25/01) | 90 |
| 21. | RAS 01507 – RAS 01565 | Seneca Sports Accounts Receivable Aging Report, run date Oct. 23, 2001. | 53 |

56

| Exhibit No. | Bates No. | Description | Deposition Ex. No. |
|---|---|---|---|
| 22. | GLAN 01516 - GLAN 01556 | Seneca Sports Client Statements 10/31/01 – 9/30/02 | 4 |
| 23. | LAN 0167 - LAN 0168 | Seneca's Export Status report for 10/22/01 (dated 10/22/01) | 6 |
| 24. | LAN 0172 - LAN 0173 | Seneca's Export Status report for 10/22/01 (dated 10/29/01) | 7 |
| 25. | LAN 0169 - LAN 0171 | GMAC memo to David Landay attaching Factor Status report for 12/13/01 | 8 |
| 26. | GLAN 02156 - GLAN 02165 GLAN 02170 - GLAN 02173 | GMAC – Seneca Sports – schedule of client charges and charge backs – various run dates | 51 |
| 27. | GLAN 01963 - GLAN 01964 GLAN 01986 - GLAN 01992 | Notices of Miscellaneous Credit or Debit Advice for various dates | 51 |
| 28. | GLAN 02427 - GLAN 02454 | 10/31/02 - 12/31/03 Monthly client reports for Seneca Sports GMAC – Reconciliation of Sales Current VS A/R Sales Summary | 58 |
| 29. | NONE | Spreadsheet - Landay's Lending Activity with GMAC through 12/03 (Combined Activity) | 102 |
| 30. | NONE | GMAC Notice of Customer Deductions dated 10/17/01 - 10/18/01; GMAC Notice of Miscellaneous Debit or Credit dated 10/18/01 | 109 |
| 31. | NONE | Seneca Sports, Inc.'s Pro Forma Balance Sheets | 110 |
| 32. | LAN 0290 - LAN 0297 | 10/5/01 letter from Platinum Funding Corp. to David Landay regarding import funding and accounts receivable factoring services | 93 |
| 33. | GLAN 00184 - GLAN 00195 | Seneca Sports, Inc. inventory appraisal report dated May 2000 | 117 |
| 34. | GMAC_LANDAY 05121 - GMAC_LANDAY 05223 | GMAC Client Procedural Manual | 120 |
| 35. | GLAN 01987 - GLAN 01992 | Notices of Customer Deductions dated 6/25/02 regarding Toys R Us | 121 |
| 36. | RAS 00090 - RAS 00114 | 6/30/01 Liquidation Analysis | 121, 26 |
| 37. | RAS 00115 - RAS 00128 | 7/20/01 Rijo Report | 122, 27 |
| 38. | RAS 00129 - RAS 00130 | 8/17/01 Rijo Report | 123 |
| 39. | RAS 00131 - RAS 00143 | 8/27/01 Rijo Report for week ending 8/17/01 | 124, 81 |
| 40. | RAS 00144 - RAS 00155 | 8/27/01 Rijo Report for week ending 8/24/01 | 125, 82 |
| 41. | RAS 00156 - RAS 00169 | 8/27/01 Rijo Report for week ending 8/31/01 | 126, 83 |
| 42. | RAS 00170 - RAS 00183 | 9/14/01 Rijo Report for week ending | 127, 84 |

| **Exhibit No.** | **Bates No.** | **Description** | **Deposition Ex. No.** |
|---|---|---|---|
| | | 9/7/01 | |
| 43. | RAS 00184 - RAS 00201 | 9/21/01 Rijo Report for week ending 9/14/01 | 128, 85 |
| 44. | RAS 00202 - RAS 00219 | 9/28/01 Rijo Report for week ending 9/21/01 | 129 |
| 45. | RAS 00220 - RAS 00233 | 10/5/01 Rijo Report for week ending 9/28/01 | 130 |
| 46. | RAS 00234 - RAS 00255 | 10/5/01 Liquidation Analysis | 131 |
| 47. | RAS 00256 - RAS 00265 | 10/12/01 Rijo Report for week ending 10/5/01 | 132 |
| 48. | RAS 00266 - RAS 00279 | 10/19/01 Rijo Report | 133, 28 |
| 49. | RAS 00801 | 10/22/01 Rijo Report | 134, 29 |
| 50. | GLAN 00090 - GLAN 00091 | 10/23/01 Rijo Report (Seneca Update) | 135, 30 |
| 51. | GLAN 00087 - GLAN 00089 | 10/24/01 Rijo Report (Seneca Update) | 136, 31 |
| 52. | GLAN 00810 - GLAN 00813 | 10/25/01 Rijo Report (Seneca Update) | 138 |
| 53. | GLAN 00084 - GLAN 00086 | 10/25/01 Rijo Report (Seneca Update) | 137, 32 |
| 54. | GLAN 00082 - GLAN 00083 | 10/29/01 Rijo Report (Seneca Update) | 139, 33 |
| 55. | GLAN 00079 - GLAN 00081 | 10/30/01 Rijo Report (Seneca Update) | 140, 35 |
| 56. | GLAN 00077 - GLAN 00078 | 10/30/01 Rijo Report (Seneca Update) | 141, 34 |
| 57. | RAS 00818 - RAS 00824 | 10/31/01 Rijo Report (Seneca Update) | 142 |
| 58. | RAS 00825 - RAS 00831 | 11/1/01 Rijo Report (Seneca Update) | 143 |
| 59. | GLAN 00071 - GLAN 00073 | 11/2/01 Rijo Report (Seneca Update) | 144, 37 |
| 60. | RAS 00835 - RAS 00842 | 11/4/01 Rijo Report (Seneca Update) | 145 |
| 61. | RAS 00843 - RAS 00848 | 11/6/01 Rijo Report (Seneca Update) | 146 |
| 62. | GLAN 00060 - GLAN 00062 | 11/7/01 Rijo Report (Seneca Update) | 147, 40 |
| 63. | RAS 00852 - RAS 00858 | 11/8/01 Rijo Report (Seneca Update) | 148 |
| 64. | GLAN 00052 - GLAN 00055 | 11/9/01 Rijo Report (Seneca Update) | 149, 42 |
| 65. | GLAN 00049 - GLAN 00051 | 11/15/01 Rijo Report (Seneca Update) | 150, 43 |
| 66. | GLAN 00045 - GLAN 00048 | 11/19/01 Rijo Report (Seneca Update) | 151, 44 |
| 67. | GLAN 00041 - GLAN 00044 | 11/20/01 Rijo Report (Seneca Update) | 152, 45 |
| 68. | RAS 00874 - RAS 00876 | 11/21/01 Rijo Report (Seneca Update) | 153 |
| 69. | GLAN 00037 - GLAN 00040 | 11/26/01 Rijo Report (Seneca Update) | 154, 48 |
| 70. | | Liquidation Summary for Seneca Sports, Deals by Location | 162 |
| 71. | GLAN01708 – GLAN01709 GLAN01790 GLAN01793 GLAN01811 GLAN01846 GLAN01865 GLAN01873 GLAN01915 – GLAN01916 GLAN01926 – GLAN01927 GLAN01965 GLAN01978 | Documents Reflecting Overadvance Charges and Commission Charges After 10/22/01 | |

| **Exhibit No.** | **Bates No.** | **Description** | **Deposition Ex. No.** |
|---|---|---|---|
| | GLAN02001 | | |
| 72. | GLAN01704 – GLAN01707<br>GLAN01775 – GLAN01778<br>GLAN01786 – GLAN01789<br>GLAN01794 – GLAN01795<br>GLAN01797 – GLAN01810<br>GLAN01812 – GLAN01830<br>GLAN01844 – GLAN01845<br>GLAN01859 – GLAN01861<br>GLAN01874 – GLAN01881<br>GLAN01891 – GLAN01911<br>GLAN01928 – GLAN01940<br>GLAN01942 – GLAN01948<br>GLAN01950 – GLAN01958<br>GLAN01960 – GLAN01961<br>GLAN01963 – GLAN01964<br>GLAN01966 – GLAN01971<br>GLAN01979 – GLAN01984 | GMAC Notice of Miscellaneous Deductions | |
| 73. | GLAN02213 – GLAN02230<br>GLAN02237 – GLAN02239<br>GLAN02251 – GLAN02257<br>GLAN02273 – GLAN02274<br>GLAN02277 – GLAN02281 | GMAC Notices Relating to Unidentified Cash | |
| 74. | GLAN02166 – GLAN02169<br>GLAN02231 – GLAN02232<br>GLAN02234 – GLAN02236<br>GLAN02240 – GLAN02250<br>GLAN02261 – GLAN02272<br>GLAN02275 – GLAN02276<br>GLAN02282 – GLAN02295 | GMAC Chargeback Notices | |
| 75. | GLAN01687 – GLAN01703<br>GLAN01710 – GLAN01774<br>GLAN01779 – GLAN01785<br>GLAN01882 – GLAN01889<br>GLAN01917 – GLAN01924<br>GLAN01972 – GLAN01977<br>GLAN01987 – GLAN02000<br>GMAC_Landay01210-<br>GMAC_Landay01213<br>GMAC_Landay01236-<br>GMAC_Landay01248<br>GMAC_Landay01255-<br>GMAC_Landay01256<br>GMAC_Landay01387<br>GMAC_Landay01389<br>GMAC_Landay01393<br>GMAC_Landay01396<br>GMAC_Landay01673 | GMAC Notices of Customer Deductions | |

| Exhibit No. | Bates No. | Description | Deposition Ex. No. |
|---|---|---|---|
| 76. | GLAN02078 – GLAN02138<br>GLAN02249 – GLAN02250<br>GMAC_Landay00419 – GMAC_Landay00420<br>GMAC_Landay00422<br>GMAC_Landay00424 – GMAC_Landay00427<br>GMAC_Landay00860<br>GMAC_Landay01196<br>GMAC_Landay01198<br>GMAC_Landay06025 – GMAC_Landay06028 | Daily Cash Journals | |