# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-CV-11955-WGY

DAVID L. LANDAY, )
)
      Plaintiff, )
)
v. )
)
GMAC COMMERCIAL CREDIT, LLC and )
GMAC COMMERCIAL FINANCE, LLC, )
)
      Defendants. )
)

## JOINT PRE-TRIAL MEMORANDUM

**I.**   **Summary Of Evidence**

    A.   Plaintiff's Summary Of Evidence

    1.   Liability

Plaintiff David L. Landay ("Landay") will offer evidence of a pattern of conduct by Defendants ("GMAC") consisting of sharp business practices prohibited by Chapter 93A (Count VII). The evidence offered in support of Landay's Chapter 93A claim will include evidence concerning GMAC's fraudulent misrepresentations that it would make an uncollateralized $500,000 seasonal overadvance if Landay provided a $250,000 Letter of Credit (Count I). Similarly, the pattern of conduct that will be offered to prove Landay's Chapter 93A claim will also include evidence that proves that GMAC violated Landay's rights as a junior creditor and as a guarantor by its commercially unreasonable liquidation (including waste) of assets which it seized from Landay's companies. (Count VI).

The evidence will show that Landay's relationship with GMAC began in Boston in 2000 when Landay sought financing on behalf of his Milford, Massachusetts-based company, Seneca Sports, Inc. ("Seneca") for funds to acquire the assets of Brookfield International, Inc. (together "Seneca" or "Borrowers") and to run the business of the combined companies at the Milford, Massachusetts location. Landay, a resident of Massachusetts at all relevant times, negotiated the financing with GMAC's Boston office, most particularly with Paul Fitzgerald. For the duration of the loan and through, including and beyond GMAC's foreclosure on the loan, Landay continued to deal with GMAC's Boston office and its Massachusetts-based employees and/or agents (such as RAS Associates).

Borrowers and GMAC entered into a Factoring Agreement on September 19, 2000 for which Landay provided to GMAC (a) personal collateral in the form of a $4,100,000 standby letter of credit drawn on his Boston bank, (b) a guaranty in the additional amount of $3,500,000 and (c) a subordination of his outstanding $3,450,000 secured loan to Seneca. In 2001, Landay was induced by GMAC to provide an additional $250,000 standby letter of credit and a $1,000,000 cash deposit and to increase his guaranty to $4,500,000. In addition to the security provided by Landay, GMAC's loan was secured by all of the Borrowers' assets, including accounts receivable, inventory, and patents and trademarks.

Landay will offer testimony and documents showing that, from the beginning of his relationship with GMAC, GMAC engaged in sharp practices, including many fraud-like practices in addition to the conduct that supports Landay's fraud claim concerning the $250,000 standby letter of credit. Landay will show that he was induced to make

available to GMAC $5,350,000 of his personal assets by various promises made or implied by GMAC which GMAC had no intention of keeping. While each of these promises may not amount to fraud, they do amount to a pattern of sharp business practices. Included are promises that GMAC would look first to the assets of the Borrowers should there be a default; promises that GMAC would fund in May 2001 the uncollateralized $500,000 Seasonal Overadvance described in the Factoring Agreement if Landay would provide in February an additional $250,000 standby letter of credit until the Overadvance was funded; a promise that Landay would be repaid for money he was told to "bridge" to Borrowers pending finalization of a Forbearance Agreement; and promises that, if Landay provided a $1,000,000 cash deposit and increased his guaranty by $1,000,000, GMAC would make money available to Borrowers to allow an orderly liquidation in accordance with a schedule attached to the Forbearance Agreement.

In addition to promises that directly induced Landay to part with his money, Landay will offer evidence concerning other false representations and/or sharp practices condemned by Chapter 93A that destroyed the business of Borrowers and damaged Landay. These include: GMAC's arbitrary refusal to accommodate the business needs of Borrowers, including preventing Borrowers from making purchases and sales that could not in any way affect GMAC's position as the lender; GMAC's failure to execute the Forbearance Agreement in time for the agreed funding schedule, Schedule C of the Forbearance Agreement, to be performed according to its terms, but refusal to change the dates in Schedule C, thereby placing Borrowers in a default position almost immediately; GMAC's refusal to finance in accordance with Schedule C because

Borrowers had been placed off-schedule by GMAC's own actions and inaction; GMAC's refusal to provide the amount of money indicated in Schedule C and, instead, limiting itself to $1,000,000, the amount Landay had deposited in GMAC's favor, thereby making Landay the real lender while GMAC charged interest and other fees related to the "loan" to Borrowers; GMAC's representations that it would look favorably on the Borrowers if they accepted the help of RAS Associates (John Rijo) without GMAC revealing that it had engaged RAS to perform a liquidation analysis and that Rijo was actually on the premises to help GMAC position itself to foreclose; GMAC's promise to consider a take-out by Platinum Funding Corp., while having no intention of doing so, but instead lulling Landay into a false sense of security while preparing to foreclose; GMAC's arbitrary refusal to consider the Platinum Funding Corp. take-out, instead using it as a pretext to obtain additional information useful to its foreclosure on Borrowers' assets; GMAC's use of its superior position to try to force Borrowers and Landay to waive all legal rights in connection with granting it peaceful possession of Borrowers' premises; GMAC's expulsion of Landay from the premises and its denial of access to the books and records of his companies; and GMAC's failure to provide Landay an accounting, despite its written promise to do so.

The evidence will show that GMAC's bad faith conduct and sharp practices continued beyond its October 22, 2001 seizure of Borrowers' assets. Rather than making a good faith, commercially reasonable liquidation, GMAC rushed through the process presuming that it would, instead, get its money from Landay on his guaranty. GMAC ignored Landay's many requests for access to the books and records of Borrowers and it continued to deny him access until August 2005. GMAC ignored

4

Landay's suggestions concerning the liquidation and collection of Borrowers' assets, and, instead, put the sale of inventory in the hands of the inexperienced John Rijo and the collection of accounts receivable in charge of its own employees who were not familiar with the accounts or the circumstances. GMAC totally ignored the patents and trademarks it had seized from Borrowers and allowed many to expire by failing to pay maintenance fees. All Seneca's files concerning such intellectual property had been left in the hands of GMAC when Landay and other Seneca personnel were expelled from the premises.

After GMAC collected and applied Landay's $5,350,000 to Borrowers' debt, according to its records it was owed a balance of approximately $1,400,000. At the time GMAC seized Borrowers' assets, Borrowers' business records showed gross accounts receivable in the approximate amount of $1,300,000 and inventory worth $1,377,000 (at cost). In addition, Borrowers owned valuable patents and trademarks, only a portion of which had recently been purchased for approximately $1,300,000. Mr. Landay will testify that the total portfolio was worth more than $2,000,000. In total, GMAC possessed approximately $4,700,000 in assets. However, when GMAC finished its liquidation activities, it claimed Borrowers still owed it approximately $1,200,000 (on an initial balance of $1,400,000) and it sued Landay on his guaranty. GMAC had wasted the assets it seized from Borrowers by failing to collect accounts receivable, by failing to fill orders, by abandoning merchandise and by failing to sell the patents and trademarks in a timely fashion and by failing to pay maintenance fees on certain patents and trademarks causing cancellation thereof. GMAC's commercially unreasonable practices during the liquidation included sending letters to Seneca's seized premises or

to itself which demanded that Borrowers take action in aid of collection or GMAC would debit the account. The Borrowers or Landay could not possibly have taken the action requested since, as should have been obvious to GMAC, the mailings were not designed to reach them.

Following cessation of its liquidation activities, GMAC refused to provide an accounting (which has not been provided to this day), despite promising such an accounting to both Borrowers and Landay. GMAC proceeded to sue Landay in New York on his guaranty. Landay attempted to avoid the litigation and all its related costs; he asked GMAC to provide him with an accounting so that he could understand what was allegedly due. GMAC's bad faith response was to tell Landay that if he wanted an accounting before he agreed to pay, he should litigate. During the course of that litigation and well into this litigation, Landay was denied access to Borrowers' books and records which GMAC had placed and maintained in a Massachusetts warehouse from late 2001 until August 2005.

2.  Damages

Landay will demonstrate that he is entitled to damages on several different theories both under Chapter 93A and on each of his common law counts.

Under Chapter 93A, this Court may unravel the transactions and place Landay in the position he would have been found in on September 18, 2000. This would mean restoring to Landay $5,350,000 of his collateral which GMAC liquidated and compensating him for his counsel and expert witness fees expended in the New York action, approximately $450,000, and any amount awarded against him in that forum. Additional items of damages are the loss of his investment in Seneca ($750,000), the

amount of the secured loan which he made to Seneca ($3,450,000), and the $52,000 bridge loan which he made to Seneca. This recovery would be based, inter alia, on GMAC's unfair and deceptive act or practices, including its refusal to allow the Platinum Funding Corp. transaction to proceed which would have paid GMAC in full, while allowing Seneca to survive.

On the Commercial Unreasonableness Count (Count VI), the elements of damages are the difference between the amount which GMAC was owed on October 22, 2001, if any, and the sum of (1) what a reasonable liquidation of Borrowers' assets would have generated and (2) legal fees incurred in New York ($450,000). The evidence will show that a reasonable liquidation would have realized a minimum of $1,400,000 in inventory and accounts receivable plus $2,000,000 for Seneca's intellectual property. Assuming arguendo that GMAC was owed approximately $1,400,000 on October 22, 2001 as it claims, the total minimum damages realizable on Count VI is therefore approximately $2,450,000. This damage is also recoverable under Chapter 93A.

To the extent that there is a finding that Chapter 93A was violated by GMAC's sharp practices with regards to the failure to make a $500,000 Seasonal Overadvance and failure to adjust the schedule attached to the Forbearance Agreement to account for its own dilatoriness, a different theory of damages is available. Under this theory, an orderly liquidation would have paid off GMAC in toto and left $1,200,000 for Landay as per Exhibit C to the Forbearance Agreement. Additionally, Landay would have had the portfolio of intellectual property ($2,000,000) and would not have incurred legal fees in the New York action in the amount of $450,000. These damages of $3,650,000 are

also available on Count I, the Fraud Count, relating to the failure to make the promised Seasonal Overadvance.

Landay will establish that GMAC's violations of Chapter 93A were willful and knowing. Therefore, he will ask the Court for double or triple damages. Finally, should he prevail on the Chapter 93A claim, Landay's counsel will submit an affidavit and other materials documenting the legal fees incurred in prosecuting this action.

B.   Defendants' Summary Of Evidence

Defendant GMAC Commercial Finance LLC ("GMAC CF") entered into a commercial factoring agreement (the "Factoring Agreement") with Seneca Sports, Inc. ("Seneca") and Brookfield International, Inc. ("Brookfield") (collectively, the "Borrowers") effective as of September 19, 2000. In connection with that transaction, David Landay ("Landay") – who was and remains the President and CEO of both companies, as well as the majority stockholder in Seneca – executed a Limited Guaranty. Pursuant to the terms of the Factoring Agreement, GMAC CF extended in excess of $10 million in credit to the Borrowers. The Borrowers defaulted on the Factoring Agreement. They acknowledged those defaults in a Forbearance Agreement, dated August 9, 2001 (the "Forbearance Agreement"), and quickly proceeded to default on the Forbearance Agreement. GMAC CF foreclosed, seized and liquidated some of its collateral and sought to recover a deficiency of more than $1 million by suing Landay in New York state court (the "New York Action") on his Guaranty. Landay denied GMAC CF's allegations and asserted nine affirmative defenses and seven counterclaims, including fraud, failure to dispose of the Borrowers' assets in a commercially reasonable manner,

### III. Contested Issues Of Fact

   A.   Plaintiff's Statement of Contested Issues of Fact

FRAUD

1. Whether GMAC's representative, Paul Fitzgerald, made misrepresentations of material fact by stating to Landay that if he provided, and then renewed, an additional $250,000 letter of credit, GMAC would provide the Seasonal Overadvance contemplated by the Forbearance Agreement by May 1, 2001?

2. Whether Landay relied on this representation to his detriment?

3. Whether such reliance was reasonable?

4. Whether Landay was damaged by GMAC's conduct in this regard?

5. What is the amount of his damages?

COMMERCIAL UNREASONABLENESS

6. Whether Landay was a secured creditor of the Borrowers?

7. Whether GMAC acted in a commercially unreasonable manner, in disposing of the Borrowers' collateral?

8. Whether Landay, qua secured creditor or guarantor, was damaged by GMAC's conduct in this regard?

9. What is the amount of his damages?

CHAPTER 93A

10. Whether GMAC's actions, singly or in combination, constituted unfair and/or deceptive acts or practices violative of Chapter 93A including but not limited to: the actionable conduct includes GMAC's initial false representations that it would look first to the assets of Borrowers should there be a default, and that it would make a

27

seasonal overadvance; GMAC's fraudulent representations in 2001 that it would fund the May 2001 uncollateralized seasonal overadvance if Landay would provide an additional letter of credit; GMAC's arbitrary refusal to accommodate the business needs of the Borrowers; GMAC's false promises to Landay that induced him to provide a "bridge loan" to Seneca; GMAC's false promises of funding for Seneca and an orderly liquidation that induced Landay to increase his guaranty by $1 million and to provide an additional $1 million in collateral; GMAC's false representations that induced Landay to give John Rijo free access to Seneca; GMAC's failure to disclose Rijo's true purposes for being at Seneca; GMAC's refusal to adjust Schedule C of the Forbearance Agreement to reflect its delay in signing and funding that agreement while holding Borrowers to that schedule; GMAC's refusal to finance in accordance with Schedule C because Borrowers had been placed off-schedule by GMAC; GMAC's refusal to provide the amount of money indicated on Schedule C and, instead limiting itself to the amount Landay had deposited in its favor; GMAC's refusal to consider the Platinum Funding take-out while using it as a pretext to gain additional information to use on a foreclosure; GMAC's attempts to have Landay and Borrowers waive all rights; GMAC's expulsion of Landay from the premises; GMAC's commercially unreasonable liquidation of Borrowers' assets, including waste thereof; GMAC's practice of sending letters to itself requesting <u>Borrowers</u> to take certain action in default of which GMAC would debit the loan during the collection of accounts receivable; GMAC's commercially unreasonable treatment of Borrowers' patent and trademarks, which it has recently claimed it has no right to sell and, if that is the case, should not have been seized and kept by GMAC; GMAC's refusal to give Landay access to the books and records of Borrowers which it

claimed it could not locate but had placed and maintained in a Massachusetts warehouse from late 2001 until August 2005; and GMAC's refusal to provide an accounting, even when an accounting was requested to avoid litigation of GMAC's claim that the liquidation has resulted in a shortfall that Landay had to pay.

    11.    Whether Landay was damaged by GMAC's conduct in this regard?

    12.    What is the amount of the damages?

    B.    <u>Defendant's Statement of Contested Issues of Fact</u>

    1.    Fitzgerald did not tell Landay that GMAC CF was committed to exercising its discretion to make a seasonal overadvance to Seneca or Brookfield in or about May 2001.

    2.    At the time that Fitzgerald spoke to Landay concerning overadvance funding he expected that GMAC CF would provide such funding.

    3.    At the time that Fitzgerald allegedly made the representation to Landay concerning overadvance funding, GMAC CF had not determined to deny the overadvance funding.

    4.    Neither Landay nor his attorneys ever raised the issue of the alleged Fitzgerald representations during the course of the negotiations concerning the Forbearance Agreement.

    5.    Landay could not have reasonably relied on any representations made by Fitzgerald with regard to the seasonal over-advance if in fact such representations were made.

    6.    Landay sustained no damages as a result of GMAC CF's decision not to make the seasonal Overadvance funding at issue.

2.  Defendants plan to file a motion *in limine* to preclude Plaintiff from introducing Landay's lay opinion testimony regarding the value of the Borrowers' intellectual property.

3.  Defendants plan to file a motion *in limine* to preclude Plaintiff from introducing any evidence regarding oral representations by Paul Fitzgerald that if made would have effectively modified the terms of the Factoring Agreement.

4.  Defendants plan to file a motion *in limine* to preclude Plaintiff from introducing any evidence or argument relating to his Chapter 93A claim that is not based on what remains of his Count I and Count VI.

## VI.  Issues of Law

### A.  Plaintiff's Issues Of Law

Set forth below are Plaintiff's positions on issues of law raised in this action, principally in the summary judgment proceedings. Most, if not all of these issues, may have been determined by this Court in Plaintiff's favor by its ruling denying in part GMAC's Motion for Summary Judgment. Thus, it is Plaintiff's position that the legal issues remaining in this case are simple and consist of whether or not GMAC's conduct violated Chapter 93A (Count VII), whether or not it included false representations upon which Plaintiff reasonably relied to his detriment (Count I) and whether or not GMAC acted in a commercially unreasonable manner in violation of Plaintiff's rights as a junior creditor and/or a guarantor (Count VI).

1.  **Whether GMAC was prohibited from selling the Seneca patents by federal law and, if so, is this an additional violation of Chapter 93A?**

It its Reply on its Motion for Summary Judgment, GMAC raised for the first time a claim that it could not be held responsible for its virtual abandonment and waste of

32

v. Hilliard, 218 F.3d 164, 178 (2d Cir. 2000) ("a recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value").

    5.    <u>Whether the dismissal of the Fraud Count with regard to several of the fraud allegations precludes Landay from offering the underlying facts in proof of his Chapter 93A claim?</u>

GMAC's legal theorem – dismissal of a common law or statutory claim <u>requires</u> dismissal of a Chapter 93A claim based on the conduct underlying such claim – has been rejected by both the Appeals Court and the Supreme Judicial Court. In this regard, the Court in <u>Grand Pacific Finance Corp. v. Brauer</u>, 57 Mass. App. Ct. 407, 420 n. 9 (App. Ct. 2003), wrote as follows:

> The dismissal of the common-law claims of fraud as to all defendants and the common-law conversion claim as to Decnos is not inconsistent with the imposition of liability under G.L. c. 93A. Rather, the differences in result are attributable to different elements of proof and to the more expansive reach of G.L. c. 93A. This act, which sounds in terms of fraudulent and deceptive trade practice, is a 'statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights. The relief available under c. 93A is sui generis. It is neither wholly tortious nor wholly contractual in nature, and is not subject to the traditional limitations of preexisting causes of action. It mak[es] conduct unlawful which was not unlawful under the common law or any prior statute. Thus, a cause of action under c. 93A is not dependent on traditional tort or contract law concepts for its definition. [A]nalogies between common law claims for breach of contract, fraud, or deceit and claims under c. 93A are inappropriate because c. 93A dispenses with the need to prove many of the essential elements of those common law claims.' (citations and internal quotations omitted).

<u>See, also, Kattar v. Demoulas</u>, 433 Mass. 1, 12 (2000) (The Chapter 93A claim is not merely the sum of the other claims in the complaint; it has a separate existence and "dispenses with the need to prove many of the essential elements of those common law claims") (internal citation omitted).

39

In light of the Grand Pacific Finance Corporation and Kattar cases, Landay submits that the Chapter 93A claim is viable with respect to the fraud allegations which this Court has dismissed because the very element that GMAC has attacked, reasonable reliance, is not an element of a Chapter 93A claim based on a misrepresentation. The cases in support of this proposition are legion. See Aspinall v. Philip Morris Companies, Inc., 442 Mass. 381, 394 (2004) ("A successful G.L. c. 93A action based on deceptive acts or practices does not require proof that a plaintiff relied on the representation,..., or that the defendant intended to deceive the plaintiff,..., or even knowledge on the part of the defendant that the representation was false") (internal citations omitted). See also, Fraser Engineering Company, Inc. v. Desmond, 26 Mass. App. Ct. 99, 104 (App. Ct. 1988); Zayre Corp. v. Computer Systems of Am., Inc., 24 Mass. App. Ct. 559, 570 (App. Ct. 1987) ("Reasonable reliance, however, is not necessarily a prerequisite of recovery under G.L. c. 93A, §11"); Sebago, Inc. v. Beazer East, Inc., 18 F. Supp. 2d 70, 103-104 (D. Mass. 1998); and Phalon v. Varrasso (In re Varrasso), 194 B.R. 537, 540 (Bankr. D. Mass. 1996).

6. **Whether GMAC's conduct concerning the Platinum Credit Corp. buy-out proposal will support a finding that Chapter 93A was violated?**

With regard to GMAC's deceptive behavior and refusal to consider the Platinum Credit Corp. buy-out of its loan, there is case support for the proposition that such conduct on GMAC's part constitutes a violation of, or part of a pattern of conduct violative of Chapter 93A. See Snowden v. Chase Manhattan Mortgage Corp., No. 03-0001B, 2003 WL 22519518, at *3 (Chapter 93A is violated where mortgagee refused to consider a buyer willing to pay an amount which would have resulted in full recovery of the amount due the mortgagee).

7. <u>Whether Landay's allegations regarding GMAC's failure to account and its failure to provide him with access to Seneca's business records support a Chapter 93A violation?</u>

There is also case support for the proposition that GMAC's failure to account and to provide access to Seneca's business records constitutes a violation of, or part of a pattern of conduct violative of Chapter 93A.

See <u>United States v. United States Trust Co.</u>, 660 F. Supp. 1085, 1090 (D. Mass. 1986), where the Court imposed triple damages under Chapter 93A based, in part, on defendant's failure to answer communications and failure to give an accounting to the plaintiff.

> I conclude also that the conduct of US Trust was knowingly and willfully unfair. Its adamant behaviour in failing to answer communications of the plaintiff with respect to the funds, its refusal to recognize the import of its own action in making no interest charge upon receipt of the check and the copy of the Form 1034, its refusal to give an accounting of the money which had been disbursed to someone, merit judgment in the form of treble damages.

B. <u>Defendants' Issues Of Law</u>

1. **This Court should decline to admit any evidence that if admitted and credited would effect an oral modification of the terms of the Forbearance Agreement:** As of August 9, 2001, the Borrowers were in default of numerous provisions of the Factoring Agreement. In order to induce GMAC CF not to immediately exercise its rights as a secured creditor, Landay, in his capacity as president of Seneca and Brookfield, executed the Forbearance Agreement. In the Forbearance Agreement, the parties agreed, among other things, that except to the extent that the Forbearance Agreement expressly modified it, the Factoring Agreement remained in full force and effect. Importantly, the parties also agreed that the

41