UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-CV-11955-WGY

| | |
|---|---|
| DAVID L. LANDAY, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>GMAC COMMERCIAL CREDIT, LLC and )<br>GMAC COMMERCIAL FINANCE, LLC, )<br>)<br>Defendants. )<br>_____ ) | **LANDAY'S TRIAL MEMORANDUM OF LAW IN RESPONSE TO GMAC'S CONTENTIONS CONTAINED IN JOINT PRE-TRIAL MEMORANDUM** |

Plaintiff David L. Landay ("Landay") respectfully submits this memorandum concerning issues of law relating to the trial of his claims. Specifically, this memorandum addresses and refutes arguments made by defendants ("GMAC") in the section entitled "Defendants' Issues of Law" in the parties' Joint Pre-Trial Memorandum (pages 41-52). Landay's position on other issues of law relevant to the instant action are addressed on pages 32-41 of the Joint Pre-Trial Memorandum in the section entitled "Plaintiff's Issues of Law."

1.  **The Oral Modification Argument Is Inapplicable To The Facts Of This Case.**

GMAC's argument on pages 41 to 43 of the Joint Pre-Trial Memorandum is a recast of an argument that GMAC lost on its Motion for Summary Judgment. On that motion GMAC argued that Landay's fraud claims could not be sustained because he could not reasonably rely on representations that appeared to conflict with language in the September 19, 2000 Factoring Agreement. This Court has found that, despite the discretionary language concerning a Seasonal Overadvance in the 2000 Factoring

Agreement, if Landay provided a $250,000 letter of credit in early 2001 in reliance upon a false promise that that discretion would be exercised in Borrowers' favor in May 2001, a fraud claim could be sustained. Unhappy with that result, GMAC now argues that the August 2001 Forbearance Agreement – <u>entered long after Landay provided the $250,000 letter of credit and long after GMAC's promise to fund in May proved false and caused colossal damage to Borrowers' business</u> – somehow eliminates the fraud that GMAC committed in the several months preceding the Forbearance Agreement and renders Landay's reliance unreasonable. GMAC's argument simply makes no sense.

The time for the Seasonal Overadvance had already come and gone by the time the Forbearance Agreement was entered. Landay had relied on and had performed in accordance with the false promise, the season for the "Seasonal Overadvance" had passed without that overadvance issuing and the damage had been done. There was no reason for the Forbearance Agreement to refer to it; the Forbearance Agreement was looking forward, not backward, and the fact that it is silent on the <u>past Seasonal Overadvance</u> that had not been made as scheduled and as promised is meaningless. GMAC's statement that Landay could not "reasonably believe that the alleged oral promise…had any ongoing vitality as of the execution of the Forbearance Agreement" mischaracterizes the situation. The promise had already been violated and the damage suffered by the time the Forbearance Agreement was signed.

GMAC's argument that the promise to Landay had to be in writing is equally unavailing. First, Fitzgerald's promise that discretion would be exercised in favor of the Borrowers if Landay posted another $250,000 letter of credit was <u>not</u> a modification of the contract with the Borrowers. This was a separate promise made to Landay that in

2

no way changed the terms of the GMAC-Borrowers' contract.  Indeed, in ruling in Landay's favor on GMAC's Summary Judgment motion, this Court has already decided this issue in Landay's favor.  Moreover, writings evidencing Fitzgerald's promises will be offered in evidence.

    **2.**    **Fitzgerald's Statements**

GMAC claims that the Court should not credit Landay's testimony concerning statements which Paul Fitzgerald, GMAC's now-deceased senior Vice President and loan officer, made to Landay (Joint Pre-Trial Memorandum pages 43-44).   There is no support for this argument.

    A.    The Fitzgerald Statements Are Admissible As Non-Hearsay Verbal Acts And As Admissions Of GMAC.

The challenged statements are not hearsay, but "verbal acts".  They are part of the res gestae of the tort of misrepresentation, and are not offered for their truth.  Therefore, they are not "hearsay: as defined by Fed. R. Evid. 801(c).  United States v. Southard, 700 F.2d 1,13 (1st Cir. 1983).  As the drafters of the Rules wrote, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."  Rule 801(c), Notes of Advisory Committee on Proposal Rules.  See, also, United States v. Hicks, 848 F.2d 1, 3 (1st Cir. 1988); and Bolen v. Paragon Plastics, Inc., 754 F. Supp. 221 (D. Mass. 1990).

In addition, Fitzgerald's statements are admissible as admissions of a party pursuant to Fed. R. Evid. 801(d)(2)(D) which provides that:

> A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by the party's agent or servant concerning a matter

3

> within the scope of the agency or employment, made during the existence of the relationship ....

According to Judge Weinstein,

> To qualify as nonhearsay under Rule 801(d)(2)(D), a statement must concern "a matter within the scope" of the declarant's agency or employment. The statement itself is not required to be "within the scope of the declarant's agency. Rather, it need only be shown that the statement be related to a matter within the scope of the agency." Thus, the statement need only be related to the declarant's duties.

5 Jack B. Weinstein and Margaret A. Berger, Weinstein's Federal Evidence (2nd ed. Sec. 801.33[2][c], Joseph M. McLaughlin, ed. 2d ed. 2001) (citations omitted).

The case of Pino v. Protection Maritime Ins. Co., 599 F.2d 10 (1st Cir. 1979), is controlling. In Pino, the plaintiffs were a group of seamen who alleged that the defendant insurance company had "blacklisted" them by demanding higher insurance premiums from the owners of vessels on which they worked. Id. at 11. At trial, the Judge admitted certain statements made by Marshall, an insurance broker who had worked for the defendant but was deceased at the time of trial. Id. at 13. Specifically, the Court admitted statements by Marshall that he could not pay the plaintiff's medical bills and that the plaintiff had been discharged as skipper of a vessel because he was on the "boat 'blacklist'". Id. The First Circuit upheld the admissibility of the former statement under Fed. R. Evid. 801(d)(2)(D) and the latter under 804(b)(3) (statements against interest). Id.

Because Fitzgerald's statements, were made "concerning a matter within the scope" of his position as Vice President and Loan Officer responsible for the Seneca account", they are admissible as admissions of GMAC under Fed. R. Evid. 801(d)(2)(D).

> B. <u>There Is No Principle Of General Applicability Which Should Lead This Court To Discredit Landay's Testimony About Fitzgerald's Statements On Account Of The Latter's Death.</u>

The three cases cited by GMAC do not support the relief requested. In <u>White v. Honeywell, Inc.</u>, 141 F.3d 1270, 1277 (8th Cir. 1998), the Court reversed the trial court's exclusion of the dead man's racially charged epithets under Fed. R. Evid. 403 in a discrimination case. In the course of its decision, it wrote: "Mcgarry's death and the inability to cross-examine him….go to its weight, not to its admissibility." <u>Id.</u> The Court in <u>Savarese v. Agriss</u>, 883 F.2d 1194, 1201 (3d Cir. 1989) affirmed the trial court's ruling allowing the statements in question into evidence while also commenting that "the fact of the declarant's death impacts on the weight of the evidence rather than its admissibility." <u>Id</u>. Finally, this Court's footnote in <u>United States v. Ferber</u>, 966 F. Supp. 90, 97 n.7 (D. Mass. 1997) does not advance the ball in the direction which GMAC wants to push it. In a footnote, this Court wrote:

> In the interests of precision, it should be noted that the Federal Rules treat admissions by party-opponents as non-hearsay under Fed. R. Evid. 801(d)(2) rather than as admissible hearsay. Because they are not hearsay, admissions by a party-opponent need not even possess circumstantial guarantees of trustworthiness normally required of admitted hearsay. <u>McCormick on Evidence</u> § 254, at 141 (John W. Strong ed., 4th ed. 1992). This makes practical sense because a party against whom his own statements are offered can hardly complain of the lack of opportunity to cross-examine himself. <u>See</u> <u>id.</u> at 140; Michael H. Graham, <u>Handbook of Federal Evidence</u> § 801.15, at 294 (4th ed. 1996).
>
> Nevertheless, an admission by a party-opponent is still generally considered an exception to the prohibition against the use of hearsay evidence. For this reason, an analysis consistent with Fed. R. Evid. 805 was prudent.

Indeed, the implication of this Court's statement that "admissions by a party-opponent need not even possess the circumstantial guarantees of trustworthiness normally

5

required of hearsay testimony" is diametrically opposed to GMAC's erroneous line of reasoning.

Therefore, this Court should treat the testimony which Landay will proffer, which indeed is supported by documentary evidence, as any admission of a party regardless of the unavailability of the declarant at trial.

### 3.    Duty To Mitigate

GMAC asserts for the first time in the Joint Pre-Trial Memorandum (pp. 44-45), that Landay failed to mitigate his damages. Since GMAC did not plead this affirmative defense, it may not raise it at trial. Moreover, GMAC is simply wrong on the facts.

A.    <u>GMAC Has Waived A Defense Based On The Purported Duty To Mitigate</u>.

GMAC did not plead mitigation of damages as an affirmative defense. Therefore, the defense has been waived. <u>Conjugal P'ship Comprised By Joseph Jones & Verneta G. Jones v. Conjugal P'ship Comprised of Arthur Pineda & Toni Pineda</u>, 22 F.3d 391, 400 (1st Cir. 1994); <u>Federal Deposit Ins. Corp. v. Niblo</u>, 821 F. Supp. 441, 453 (N.D. Tex. 1993); and <u>Consolidated Mortgage & Fin. Corp. v. Landrieu</u>, 493 F. Supp. 1284, 1293 (D.D.C. 1980).

In the <u>Conjugal Partnership</u> case, the First Circuit did not decide whether the waiver issue was a matter of procedure controlled by Fed. R. Civ. P. 8(c) or state law. Instead, it held that under either Fed. R. Civ. P. Rule 8(c) or the law of Puerto Rico, which applied in that diversity case, failure to plead mitigation constituted a waiver. <u>Conjugal Partnership</u>, 22 F.3d at 400.

New York law, which GMAC has consistently invoked, provides that mitigation is an affirmative defense which is waived if not pleaded.  See CPLR § 3018(b) [1]; Loomis v. City of Binghamton, 43 A.D. 2d 764, 765, 350 N.Y.S.2d 213, 215 (App. Div. 3rd Dep't 1973) and Lipshie v. Lazarus, 235 N.Y.S.2d 764, 769 (Sup. Ct. 1962).  While Plaintiff has not found a Massachusetts case directly on point, Mass. R. Civ. P. 8(c) is based on the Federal Rule and there is no reason to believe that a different result would obtain.

Unlike the case at bar, the plaintiff in The Conjugal Partnership case had permitted the issue of mitigation to be litigated in two trials before objecting that it had not been pleaded as a defense.  Therefore, although finding that both the Federal Rules and Puerto Rico law deemed the defense waived if not pleaded, the Circuit Court found the objection untimely and upheld the District Court's decision admitting mitigation evidence and allowing the issue to be tried at the second trial.  The case at bar is clearly distinguishable since the first reference to the mitigation defense was in the February 24, 2006 Pre-Trial Memorandum and Plaintiff is moving in limine to preclude the proffered evidence and to prevent the defense from being litigated.

    B.    <u>GMAC's Mitigation Defense Must Fail On The Merits Since Neither The Borrowers Nor Landay Had The Right To Sell The Intellectual Property</u>.

As part of the loan transaction which included the execution of the Factoring Agreement, Landay as junior creditor contracted with GMAC as follows: "with respect to assets of the Company, including, but not limited to the Receivables and the Collateral,

---

[1] CPLR § 3018 (b) Affirmative defenses.  A party shall plead all matters which if not pleaded would be likely to take the adverse party by surprise or would raise issues of fact not appearing on the face of a prior pleading such as arbitration and award, collateral estoppel, <u>culpable conduct claimed in diminution of damages as set forth in article fourteen-A</u>, discharge in bankruptcy, facts showing illegality either by statute or common law, fraud, infancy or other disability of the party defending, payment, release, res judicata, statute of frauds, or statute of limitation.  The application of this subdivision shall not be confined to the instances enumerated (emphasis added).

7

you [Landay] shall not take steps to enforce your security interest therein, as long as any of the Obligations remain outstanding." Plaintiff's Exhibit D. <u>See</u> Factoring Agreement, Exhibit 2, Section 12 for broad definition of "collateral". As to the Borrowers, a similar negative covenant appears in Section 9 (xviii) and 9(i) of the Factoring Agreement. Therefore, neither Landay nor the Borrowers had the right to sell Seneca's intellectual property and could not, therefore, mitigate.

In addition, the seizure of the Borrowers' principal place of business and the detention of all the Borrowers' records relating to the intellectual property in a storage facility should preclude any possible finding of failure to mitigate in any event.

### 4. **There Is No Rule Requiring Expert Testimony On The Value Of Intellectual Property As GMAC Posits.**

See #6, <u>infra</u>.

### 5. **The Value Of The Borrowers' Intellectual Property Is Relevant Because GMAC, Having Seized The Borrowers Intellectual Property, Was Required To Either Sell The Property, In A Commercially Reasonable Manner, Or Accept It In Full Satisfaction Of The Deficiency.**

GMAC contends that the value of the intellectual property is not relevant because it was not required to liquidate all the collateral. (Joint Pre-trial Memorandum, p. 47). This contention as to lack of relevance is based on the false premise that it could seize the Borrowers' intellectual property and make virtually no effort to sell said property and <u>not</u> run afoul of the requirement that it act in a commercially reasonable manner.[2] Respectfully, the law is to the contrary.

---

[2] GMAC has also stated that it "chose not to liquidate the Borrowers' intellectual property because it believed that the cost associated with liquidating that property might well exceed the proceeds of any sale." First, discovery in this case, including a Rule 30(b)(6) deposition, has not produced any evidence that GMAC made any such thought-out decision. If GMAC seeks to introduce such evidence now, Landay will object. Second, the only way such a decision could have been reached would be by

8

A creditor that simply holds collateral has not acted in a commercially reasonable manner. The creditor must take affirmative steps to liquidate what it holds in a commercially reasonable manner. Indeed, the creditor may not delay in doing so. There are a plethora of authorities, including two decided under Massachusetts law, which have interpreted the predecessor of M.G.L. c. 106 § 9-610 (M.G.L. c. 106 § 9-504) to this effect.

Thus, as the Court noted in <u>Henderson Few & Co. v. Rollins Communications, Inc.</u>, 148 Ga. App. 139, 141-142, 250 S.E.2d 830, 832 (1978):

> Although the UCC has no requirement that a secured party sell the collateral after repossession, see Code Ann. s. 109A-9 504(1), the secured party who does not elect to retain the collateral in satisfaction of the indebtedness as provided in Code Ann. s. 109A-9 505, must act in a commercially reasonable manner in disposing of the collateral and the disposition must be made in a commercially reasonable time. Code Ann. s. 109A-9 504(3). The commercial reasonableness of the time of the sale must, of course, be judged from the time of repossession rather than the time the creditor finally chooses to dispose of the goods or the debtor will be injured. (See also Code Ann. s. 109A-1 203 which imposes an obligation of good faith in the performance or enforcement of every contract or duty within the scope of the UCC).
>
> In the present case, Rollins did not act in a commercially reasonable manner when it repossessed the collateral more than one year after suit was filed, <u>never disposed of it or returned it to the creditor</u>, and apparently did not intend to apply the value of the asset toward liquidation of the alleged debt although a creditor can only recover the amount of the debt. (emphasis added).

<u>Accord</u>, <u>Borden v. Pope Jeep-Eagle, Inc.</u>, 200 Ga. App. 176, 407 S.E.2d 128 (1991); <u>Solfanelli v. Corestates Bank, N.A.</u>, 203 F.3d 197 (3d Cir. 2000) (a debtor is not obligated to demand sale of the collateral, and a creditor who "sat" on the collateral cannot be said to have acted reasonably).

---

comparing (a) the cost of offering the property for sale and (b) the value of the property in the market place. This very analysis makes Landay's evaluation relevant.

9

Two authorities decided under Massachusetts law are directly on point. In Deephouse Equipment Co., Inc. v. Knapp, 38 B.R. 400, 405 (Bankr. D. Conn. 1984), the Court held that "[a] commercially unreasonable nondisposition of collateral by the secured party has the same effect on the noncomplying creditor's right to recover on its debt as a disposition which does not satisfy Part 5 of Art. 9, UCC § 9-501 et seq." It continued:

> I find that Deephouse did not act in a commercially reasonable way in the length and manner of its retention of the collateral. Deephouse had held the backhoe for over three years at the time of trial. During those three years, Deephouse made no serious efforts to dispose of the backhoe as it stood (with its engine removed) because Deephouse believed the backhoe would not sell in that condition. At some point during that period, Deephouse should have realized that its hopes of repairing the backhoe were unrealistic and made some disposition of the backhoe. This is not to say a secured creditor must rush to sell collateral and is precluded from making feasible repairs which would enhance the net value of the collateral, the Code itself allows for "commercially reasonable preparation," Mass.Ann.Laws ch. 106 § 9-504(1) (Law.Co-op 1983 Supp.), before sale. However, under these circumstances, Deephouse's retention of the backhoe past the time when it should have realized presale preparation was not feasible was commercially unreasonable.

Moreover, in In re Nardone, 70 B.R. 1010, 1017 (Bankr. D. Mass. 1987), the Court held that a secured creditor which retained possession of collateral for two years without making any effort to sell or otherwise dispose of it (and which allowed collateral to be used by a corporation controlled by creditor's principal stockholder) was in default of its obligation under 106 § 9-504 to dispose of collateral in a commercially reasonable manner.

In light of the fact that GMAC did virtually nothing to liquidate the Borrowers' intellectual property, its commercially unreasonable behavior will be established at trial.

### 6. Landay May Offer Lay Opinion Testimony Pursuant To Fed. R. Evid. 701.

GMAC argues that Landay may not offer lay opinion testimony as to the value of the Borrowers' Intellectual property because his testimony is not based on personal knowledge from his own experiences (Joint Pre-Trial Memorandum pp. 47- 49).  GMAC is quite wrong.  Not only is lay opinion testimony of an owner or officer of a business admissible in these circumstances, but Landay has the personal knowledge and experience to support his testimony.

Landay's testimony regarding the value of the trademarks and patents that GMAC seized on October 22, 2001 is admissible under Federal Rule of Evidence 701 as lay opinion testimony.  Courts have long permitted owners to testify regarding the value of their property.  32 C.J.S. Evidence § 661 ("generally held that an owner is qualified by the fact of ownership to testify to the value of his property").  See also 22 Am. Jur. 2d Damages § 755 ("Ownership of property is generally considered sufficient to render admissible the owner's opinion as to its value . . ."); International Rental & Leasing Corp. v. McClean, 303 F. Supp. 2d 573, 578 n.7 (D.V.I. 2004) ("An owner of a business is competent to give his opinion as to the value of his property.  Whether or not the opinion is accurate goes to the weight of the testimony, not its admissibility.").  The First Circuit has held owners competent to testify about the value of their property.  Glosband v. Watts Detective Agency, 21 B.R. 963, 981 (D. Mass. 1981) (permitting company owner to testify to its value as non-expert), aff'd sub nom. Robinson v. Watts Detective Agency, 685 F.2d 729, 738-39 (1st Cir. 1982).

The general rule continues to apply even after the recent amendment to Rule 701.[3] Indeed, the Advisory Committee Notes for the 2000 amendment specifically address this issue:

> [M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser or similar expert. See, e.g., Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. The amendment does not purport to change this analysis.

Fed. R. Evid. 701 Advisory Committee's Note (emphasis added).

As contemplated by the Advisory Committee, numerous courts have permitted business owners and officers to testify about the value of their business or expected profits after the amendment to Rule 701. See, e.g., Allied Systems, Ltd. v. Teamsters Auto. Transport Chauffeurs, Demonstrators and Helpers, Local 604, 304 F.3d 785, 792 (8th Cir. 2002) (affirming admission under Rule 701 of officer's testimony regarding profits lost during work stoppage); Wilson Oil Co. v. Crown Central Petroleum Co., No. Civ. A. 02 F 358 F, 2005 WL 3307158, *2 (M.D. Ala. Dec. 6, 2005) (accepting under Rule 701 affidavit from vice president estimating profits that plaintiff company would lose if defendant's alleged anti-competitive activities not enjoined); In re: Deep River Warehouse, No. 04-52749, 2005 WL 1287987, *10 n.7 (Bankr. M.D.N.C. March 14, 2005) (permitting sole shareholder of debtor to testify under Rule 701 as to value of real

---

[3] Rule 701 traditionally permitted non-expert opinion testimony that was "rationally based on the perception of the witness" and was "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." United States v. Ayala-Pizarro, 407 F.3d 25, 28 (1st Cir. 2005). Rule 701 was amended in December 2000 to add the requirement that the testimony not be based on "scientific, technical or other specialized knowledge within the scope of Rule 702." Id.

estate and warehouse owned by debtor); Diesel Mach., Inc. v. B.R. Lee Indus., 328 F. Supp. 1029, 1039 (D. S.D.) (admitting under Rule 701 president's testimony regarding company's lost profits).

As the Advisory Committee observes, the general rule is based upon a presumption that a property owner is familiar with the property and its value.  Here, the presumption is well founded.  Landay is the principal officer and owner of Seneca.  A substantial portion of the trademarks and patents were bought by Seneca, in arm's length transactions that Landay negotiated shortly before the GMAC seizure.  Landay – on behalf of Seneca and other companies with which he was associated in the past – also bought and sold other property similar to the intellectual property at issue.  See United States v. 60.14 Acres of Land, 362 F.2d 660, 665 (3d Cir. 1966) (evidence of comparable sales admissible as substantive evidence and to support witness's opinion).

Further, the purpose of the amendment is to eliminate the risk that parties will circumvent the reliability requirements of Rule 702 by proffering an expert in lay witness clothing.  See Ayala-Pizarro, 407 F.3d at 28.  That is not the case here.  Landay's testimony is not based on any specialized training, but on personal knowledge obtained by him as the hands-on owner and chief operating officer of businesses involved with intellectual property.  In particular, he is intimately familiar with the amounts that Seneca paid for certain of the patents and trademarks at issue.  See id. at 29 (permitting police officer to testify about characteristics of drug distribution points based on observations made during prior drug arrests).

Finally, even if Landay's opinion, per se, were not admissible, his testimony regarding the amounts that Seneca paid for property at issue would be admissible.  The

best evidence of value is a recent arm's length sale.  Schonfeld v. Hilliard, 218 F.3d 164, 178 (2d Cir. 2000).  Such testimony is "not opinion testimony at all, but a simple recitation of an observed phenomenon:  the price paid for the [property]."  United States v. Kayne, 90 F.3d 7, 12 (1996) (permitting witnesses who purchased rare coins based on defendant's misrepresentations to testify about price they obtained for coins on resale).  See also 60.14 Acres of Land, 362 F.2d at 665 (evidence of comparable sales admissible as substantive evidence).

Notwithstanding the above case-support for the admissibility of Landay's opinion testimony under Rule 701, GMAC attempts to exclude it by arguing that Landay lacks the personal knowledge or experience to offer his opinion of the value of the property.  This argument is clearly without merit as a reading of Landay's December 13 affidavit shows.  Indeed, to make its argument GMAC has misstated Landay's December 13 affidavit and has mischaracterized it as merely demonstrating that Landay can read $1.6 million off a spreadsheet prepared by someone else (Joint Pre-Trial Memorandum, p.48).  On the contrary, Landay's December 13 affidavit shows – as will the evidence at trial – that Landay negotiated the Seneca purchase of the Brookfield assets, including the $1.6 million purchase price for the intellectual property.  Landay's personal knowledge and experience with the intellectual property gives him the ability to value it.

The three cases relied on by GMAC (Joint Pre-Trial Memorandum, pp. 48-49) reflect its mischaracterization of Landay's testimony.  In LifeWise Master Funding v. Telebank, 374 F.3d 917, 929 (10th Cir. 2004), the business owner's testimony was excluded because it was based not on his personal experience with the business, but on a methodology that involved statistical concepts such as "moving averages",

14

"compounded growth rates" and "S-curves."  Similarly, in Zenith Electronics Corp. v. WH-TV Broadcasting Corp., 395 F.3d 416 (7th Cir. 2005), the Court affirmed the exclusion of a company's internal sales projections where there was no evidence that the projections were based on an analysis of the company's actual experience, rather than its mere "hopes."  Finally, in Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993), the Court affirmed the admission of a business owner's estimate of lost profits, even though it relied on projected franchise sales and anticipated profit margins, because it was based on the owner's experience with his business and the industry.

These cases confirm, as Landay contends, that where a proper foundation is laid, business owners may offer lay opinion testimony about the value of their business.  Indeed, the LifeWise court expressly recognized that had the company president testified as "a businessperson based on his personal knowledge and his experience as president of the company," he would have been permitted under Rule 701 to give "a straightforward opinion as to lost profits using conventional methods based on LifeWise's actual operating history."  374 F.3d at 930.  Here, in contrast to LifeWise's president, Landay is prepared to testify based on his personal experience as Seneca's CEO with acquiring and developing the intellectual property at issue.

GMAC's contention that expert testimony is "absolutely required" to establish the value of Seneca's intellectual property (Joint Pre-Trial Memorandum, page 24) is equally unfounded.  GMAC leaps to this conclusion based only on case law holding that expert testimony is required to establish the "meaning or scope" of a patent or trademark and cases in which courts have allowed expert testimony on the value of intellectual property.  (Id., page 25).  Nothing in either line of cases establishes that

Landay is required to offer expert testimony to establish the value of the intellectual property at issue.  To the contrary, the Advisory Committee Notes to Rule 701 make clear that Landay also may offer his own lay opinion, based on his knowledge of and participation in Seneca's business, and particularly its intellectual property portfolio.  Landay is giving "a straightforward opinion . . . using conventional methods" (primarily the price paid for the intellectual property in arm's length transactions).  LifeWise, 374 F.3d at 930.  In these circumstances, expert testimony is not required.

      **7.**      **Landay's Testimony Should Be Admitted Since He Did Not "Ambush" GMAC With His Opinion Of Value.**

Reiterating all the arguments it previously made (and which were rejected by this Court), GMAC continues to argue that Landay should not permitted to testify concerning the value of the intellectual property.  (Joint Pre-Trial memorandum, pp. 49-50).  Attached to this Memorandum AS Exhibit 1 is a chronology relevant to GMAC's argument that Landay's valuation of the Intellectual Property "ambushed" it.  In response Landay makes the following points:

      (a).      The Court has already ruled on this issue in Landay's favor.  Its denial of GMAC's Motion to Strike Portions of the Landay's 12/13/05 Affidavit and its denial of GMAC's Motion to Strike the Supplemental Answers to Interrogatories constitute rulings in Landay's favor on this issue.

      (b).      As this Court implicitly found, contrary to GMAC's accusations, Landay did not utilize a discovery "ploy" to sandbag GMAC.  The tight schedules in New York and Boston – and GMAC's past failures to provide Landay with discovery of his own documents until late August 2005 – put Landay under severe time constraints to accomplish all that had to be accomplished.  He had no time to engage in the type of

16

clever manipulative conduct of which he is being accused.  He provided GMAC with as much information as he had as soon as he obtained and digested it.  In some cases the information came to GMAC by way of the New York action, but it came to GMAC within the discovery deadlines.

      (c).    As argued in opposition to GMAC's motions attacking the 12/13/05 Landay Affidavit and the 1/6/06 Supplemental Answers, Landay provided GMAC with notice during the discovery period of the valuations about which he intends to testify.

      1.    On Nov. 1, within 2 weeks of his October 18 deposition, Landay testified in the New York action about the value of the IP.  This Court's ruling on the Motion to Strike suggests that this Court deemed the New York testimony to amount to a supplementation of Landay's Boston deposition testimony and the Boston interrogatory answers.  Landay was cross-examined at the New York hearing by GMAC which used Landay's October 18 Boston deposition.  As Landay noted in opposition to the Motion to Strike, GMAC cannot claim its Boston and N.Y. counsel were not sharing information and Landay had every reason to believe that what he said in New York was absorbed by GMAC for use in both actions.

      2.    The purchase price of the Brookfield IP ($1,600,000) is information that has been known to GMAC since September 2000.  It is contained in the closing documents of the transaction for which GMAC provided the funding.  Drafts of this agreement and exhibits were found in GMAC's files.  Moreover, in this action, Landay produced those documents to GMAC.  This is not information with which GMAC is being "ambushed" by any stretch of the imagination.

3.   In case GMAC "forgot" about the value of the Brookfield IP, Keith Lowey called attention to it in his October 10, 2005 expert report. Although he did not evaluate all the IP owned by Seneca, he stated that the recent purchase of the Brookfield IP for $1.6 million indicated that the 2001 value of the totality of the Seneca/Brookfield IP exceeded $1,600,000.

For these reasons, GMAC's "ambush" argument should be rejected.

**8.   The Borrowers Could Not Sell The Intellectual Property Because They Had Agreed With GMAC Not To Sell It, GMAC Had Filed Its UCC Security Agreement, GMAC Had Made Filings At The Patent Office With Respect To Its Lien, And Had Seized All Of The Borrowers' Records.**

GMAC argues that it should not be held liable for its waste of the intellectual property because Seneca and Brookfield could have sold it. (Joint Pre-Trial Memorandum, pp. 50-52). This argument totally ignores the facts.

According to the "Negative Covenants" in the Factoring Agreement, Exhibit 2, Section 9(xviii) and 9(ii), Seneca and Brookfield could not sell or encumber any of their properties or assets without having obtained GMAC's written consent. Moreover, the evidence will show that GMAC not only had perfected UCC filings with regard to the Security Agreements covering the Borrowers' Assets, including intangibles, Exhibits 8 and 9, but that it had also recorded its interest in several key patents and numerous trademarks at the U.S. Patent and Trademark Office. Finally, the evidence will show that GMAC seized all the patent and trademark files belonging to the Borrowers and locked them in a warehouse from November 2001 to August 2005. In light of the above, while it can be said that the Borrowers had record title to the intellectual property, their ability to sell their Intellectual Property was completely eviscerated.

On the other hand, GMAC had possession of all the documents relating to the patents and trademarks and had the ability to sell them. See Plaintiff's discussion of the relevant law at pp. 32-34 of the Joint Pre-Trial Statement. Indeed, as of May 2001, GMAC had obtained a "Special Power of Attorney", Plaintiff's Exhibit DP which is attached hereto as Exhibit 2 and by which Seneca specifically gave it the power to assign its trademarks.

        Respectfully submitted,
        DAVID L. LANDAY,
        By his attorney,


        /s/ Alan R. Hoffman
        Alan R. Hoffman, BBO# 236860
        Lynch, Brewer, Hoffman & Fink, LLP
        101 Federal Street, 22nd Floor
        Boston, MA 02110
        (617) 951-0800
        arhoffman@lynchbrewer.com

Dated: March 7, 2006


236212_1